

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

| | | |
|---|---|---|
| JOSHUA DAVID SAPPI BIERING, | § | |
| Petitioner, *Pro Se*, | § | Case No. **4-26CV-381-0** |
| v. | § | |
| J.P. MORGAN SECURITIES, LLC, | § | |
| JPMORGAN CHASE & CO., and | § | FINRA Case No.: 24-01208 |
| JPMORGAN CHASE BANK, N.A., | § | EEOC Charge No.450-2024-04743 |
| Respondents. | § | AAA Case No. 01-26-0000-7215 |
| | § | |

## VERIFIED PETITION TO CONFIRM, MODIFY, AND VACATE IN PART A FINRA ARBITRATION AWARD, AND TO RETAIN JURISDICTION

Petitioner Joshua David Sappi Biering ("Petitioner"), proceeding *pro se*, respectfully submits this Verified Petition pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9–11, seeking discrete, severable relief from the arbitration award issued on December 29, 2025 (the "Award"), in Financial Industry Regulatory Authority ("FINRA") Case No. 24-01208, *Joshua David Sappi Biering v. J.P. Morgan Securities LLC* ("JPMS"), *JPMorgan Chase & Co.* ("JPMC" or "JPMorgan"), and *JPMorgan Chase Bank, N.A.* ("JPM Bank").

The Petition does not reargue the merits. It asks the Court to confirm and give effect to the severable portions the Panel actually decided, to vacate the non-final portions under 9 U.S.C. § 10(a)(4), and to retain jurisdiction to resolve matters the fragmented arbitral forum could not finally and completely resolve. A verified and complete copy of the Award is attached hereto as Exhibit A.

Consistent with the FAA's narrow and severable review framework, Petitioner respectfully requests that the Court:

(i)    **CONFIRM IN PART** pursuant to 9 U.S.C. § 9, the Award's severable findings of

1

historical fact and regulatory misconduct, which were actually litigated and reflected in the Panel's explained decision, its U5 correction directives, and FINRA forum fees previously assessed against Respondent, JPMS;

(ii) **MODIFY IN PART** pursuant to 9 U.S.C. §§ 11(b)–(c), to direct the removal or expungement of archived Form U4 disclosures that misreported Petitioner's student-loan disability discharges as bankruptcies and compromises with creditors from FINRA's Central Registration Depository ("CRD")[1], which Respondent admitted were filed in error and which remain accessible absent judicial intervention;[2]

(iii) **VACATE IN PART** pursuant to 9 U.S.C. § 10(a)(4), the Award's dispositive conclusions regarding damages and defamation liability, which were so imperfectly executed as a structural consequence of the forum's jurisdictional limitations, such that the Panel failed to render a mutual, final, and definite disposition of the issues submitted;

(iv) **AWARD ANCILLARY EQUITABLE RELIEF**, under the Court's inherent authority (*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)), the documented fees and costs totaling *$825,407.26* across four categories detailed in Ex. S, together with all taxable costs and pre- and post- judgement interest as permitted by law;

(v) **RETAIN JURISDICTION TO DETERMINE OPERATIVE EFFECT AND RESOLVE** without remand, the claims and remedies an arbitral forum could not render a final and complete decision upon, including:

    (a) adjudicated, yet unresolved claims against JPMC and JPM Bank (collectively, the "Non-Signatories") arising from the conduct reflected in the Panel's confirmed findings;

    (b) determination of the operative legal effect of the Panel's express findings

---

[1] The Central Registration Depository is FINRA's registration and licensing database for broker-dealer firms and their associated persons, maintained pursuant to 15 U.S.C. § 78o-3(i).

[2] These Form U4 disclosures are distinct from the customer complaint expungement attorney fees claim addressed—and denied for lack of written agreement—in the Award (FINRA No. 24-01208, Award at 5). The bankruptcies/compromises filed in error were presented before the Panel, yet the Award was silent.

in relation to its dispositive conclusions;

    (c)    adjudicate statutory employment discrimination claims against all three named Respondents that were procedurally excluded from the FINRA forum under FINRA Rule 13201(a); and

    (d)    ensure consistent application of the Award's confirmed findings across all Respondents properly before this Court; and

  (vi)  **GRANT** such other and further relief as the Court deems just and proper.

**EXPRESSION OF NON-CONCESSION AND ISSUE PRECLUSION**. Petitioner seeks partial confirmation solely to give preclusive effect to the Panel's explicit factual findings, including findings of bad-faith and retaliatory conduct, and to enforce relief the Panel expressly ordered. Confirmation of severable, definite portions does not constitute admission of any alleged policy violation, nor does it concede that the Award's remaining dispositive conclusions satisfy 9 U.S.C. § 10(a)(4). *Sarofim v. Trust Co. of the W.*, 440 F.3d 213, 218–19 (5th Cir. 2006).

**RESERVATION OF NON-ARBITRABLE CLAIMS.** The Award did not finally resolve all claims or parties. Statutory employment discrimination claims were excluded, JPMC and JPM Bank were not adjudicated on the merits, and the Panel did not fully dispose of all requested relief. Petitioner reserves all claims not finally adjudicated, including statutory employment discrimination claims and all rights under the EFAA, 9 U.S.C. §§ 401–403. Nothing herein constitutes consent to arbitral finality beyond the limited issue-preclusive effect sought, or consent to remand to FINRA, the American Arbitration Association ("AAA"), or review by the Securities and Exchange Commission ("SEC") review.[3]

---

[3]    *See* 15 U.S.C. § 78s(b)–(e) (authorizing SEC review of specified FINRA regulatory actions, including rule changes and certain disciplinary and membership determinations).

## PRELIMINARY STATEMENT

\*\*\*

*The doctrine of judicial estoppel is designed to prevent parties from playing fast and loose with the courts to suit the exigencies of self-interest.*

– *Hall v. GE Plastic Pac., PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)


*Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.*

– *Hellenic Inv. Fund v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006)


\*\*\*

On one side of this Petition is a private employment contract binding a consolidated enterprise to a single, comprehensive arbitration of all Covered Claims among all Covered Parties. On the other is a FINRA proceeding in which key parties and entire categories of claims were excluded—not by the Panel, but by jurisdictional positions taken by Respondents and enforced through FINRA's administrative process.

Between them stands FINRA. It is not merely a private forum, but a self-regulatory organization exercising delegated authority under federal law. *Alpine Sec. Corp. v. FINRA*, 86 F.4th 406, 410–13 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2707 (2024); *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024). The IRS has likewise recognized FINRA as a federal instrumentality. IRS Memorandum No. 201623006. The respondent whose termination decision, investigation, and regulatory filing are at issue is simultaneously among FINRA's largest member firms.

The respondent whose termination decision, investigation, and regulatory filing are at issue is simultaneously among FINRA's largest member firms—with governance participation that shapes the very rules FINRA applied to administer, and then constrain, this very proceeding.

The result is an Award that contains serious factual findings, yet cannot give those findings

4

legal or operative effect. Publicly framed against a generic "Respondent," it attributes intentional conduct, competitive hindrance, and regulatory inaccuracy while the entities that employed Petitioner, conducted the investigation, and directed the enterprise's response were excluded from the proceeding entirely.

That undifferentiated use of "Respondent" is not stylistic. It prevents the Court from determining which entity exercised employment authority, which entity made the U5 filing, which claims were actually resolved, and which rights and obligations were finally determined.

Petitioner acknowledges that judicial review under the FAA is exceedingly narrow and highly deferential. *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008); *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009).

Petitioner does not dispute that standard. **He invokes it.**

This Petition does not challenge the Panel's factual findings, nor does it seek review of the merits. It identifies a structural defect: the failure of the arbitral proceeding to produce a complete and enforceable adjudication of the dispute the parties agreed to arbitrate.

The Binding Arbitration Agreement ("BAA") defines "JPMorgan Chase" and "the Firm" to include JPMorgan Chase & Co. and all direct and indirect subsidiaries as "Covered Parties," and requires that all "Covered Claims" between Petitioner and JPMorgan Chase be resolved in a single, final, and binding arbitration. Ex. B ¶¶ 1, 3. The BAA designates the AAA as the default forum—unless the Parties agree upon another mutually acceptable arbitrator." *Id.* ¶ 6. Because Petitioner was a registered representative of JPMS, a FINRA member firm, FINRA Rule 13200(a) required this intra-industry dispute to proceed in FINRA. That mandatory regime, not paragraph 6's default AAA clause, brought this dispute to FINRA and required FINRA to carry out the BAA's promise of a single, comprehensive arbitration.

Arbitration is "a creature of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). By binding all Covered Parties—JPMS, JPMC, and JPM Bank—as a single defined "Firm" to a single arbitration, the BAA constituted the enterprise's agreement to whatever forum federal law required. " Additionally, [A]rbitration is a matter of consent," *Stolt-*

*Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010), and the consent that matters here is the consent the Firm gave when it executed the BAA. The enterprise cannot be one unified "Firm" for purposes of the contract and three separately consenting entities for purposes of the forum.

**Petitioner upheld his end of the bargain.** Petitioner asserted all Covered Claims against all three Covered Parties in a single FINRA proceeding. JPMorgan did not. JPMC and JPM Bank refused to participate, asserting those entities were outside FINRA's jurisdiction:

> *JPMorgan Chase Bank, N.A., and JPMorgan Chase & Co. . . . are not FINRA member firms, are not subject to FINRA's jurisdiction and do not agree to arbitrate claims against them in FINRA arbitration.*
>
> — Respondents' Statement of Answer to Petitioner's Second Amended Statement of Claim, n.1 (Oct. 31, 2024)

Having fragmented the parties, Respondents then fragmented the claims. One day after arbitrator selection, they invoked FINRA Rule 13201(a), and FINRA (not the Panel) required Petitioner to delete all statutory employment discrimination claims or face dismissal. Ex. C. The Panel was thus structurally prevented from adjudicating the full dispute the BAA required to be resolved.

Within those constraints, the Panel made the following express findings:

(1) *[W]hen Respondent learned that Claimant was contemplating resigning....to work for a competitor of Respondent, Respondent began investigating reasons to terminate Claimant so as to make it more difficult for Claimant to go work with a competitor of Respondent.* Award at 4.

(2) *[R]espondent has been found to have done this in the past. Id.*

(3) *[T]he Panel is concerned that this may be a pattern of [mis]conduct. Id.*

(4) *[O]ne of the primary reasons...was to hinder Claimant's ability to transfer his book of business to a competitor of Respondent. Id.*

6

(5)     *[B]ased on the facts in this case, the Form U-5 [is] inaccurate. Id.*

(6)     *[A]bsence of a clean U-5 makes it very difficult to move to a Tier one competitor of Respondent. Id.*

The Panel ordered U5 correction and assessed all forum fees against Respondent. It nevertheless denied defamation liability and awarded zero damages. Award at 4–5, 7.

Because the proceeding excluded contractually bound entities and entire categories of claims, the Award does not allocate responsibility across the enterprise, identify which claims were finally adjudicated, or translate its own findings into a determinate legal result. The excluded parties would not change the facts the Panel found. They would determine who those facts bind and what relief those facts support.

Under *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004), the relevant question is whether a reviewing court can determine "the scope and operative effect of what the panel actually decided." This Court cannot do so here. The Award finds intentional competitive hindrance and regulatory inaccuracy, yet leaves unresolved which entity acted, which claims were decided, and what rights and obligations were finally determined. *Brown v. Witco Corp.*, 340 F.3d 209, 215–16 (5th Cir. 2003), confirms that an award so uncertain in scope or application is not final and definite.

The Award fails this test.

That indeterminacy is not academic. The U5 remains active through CRD and FINRA's BrokerCheck[4] while the Award does not supply a definitive adjudication of who acted or what legal consequences follow.

Respondents cannot salvage finality by isolating each procedural step. They invoked the BAA when it compelled arbitration, rejected the BAA's unified definition of the "Firm" when affiliated participation became necessary, and now invoke the resulting truncated Award as though it resolved the full dispute. They cannot convert fragmentation of their

---

4     FINRA's BrokerCheck is the public-facing extract of the Central Registration Depository (CRD), providing summary information on the registration history, qualifications, and disciplinary records of registered brokers, firms, and certain investment adviser representatives, accessible at brokercheck.finra.org (last accessed March 29, 2026).

own making into proof of finality. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418–19 (2022); *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Hellenic Inv. Fund v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006).

This Petition does not ask whether the Panel reached the correct result on the record it heard. It asks whether a forum structurally incapable of hearing the full dispute could produce a complete award. It could not. Because the proceeding excluded parties and claims the contract required to be resolved together, the Award cannot be confirmed as mutual, final, and definite.

This Petition does not ask whether the Panel reached the correct result on the record it heard. It asks whether a forum structurally incapable of adjudicating the full dispute could produce a complete award. It could not. Because the proceeding excluded parties and claims the contract required to be resolved together, the Award cannot be confirmed as mutual, final, and definite.

Remand to FINRA would reproduce the same defect. The problem was not a remediable omission by the Panel, but FINRA's inability, absent consent, to compel the participation of all necessary parties and claims. The Court must therefore determine the Award's operative effect and retain jurisdiction over what the arbitral forum could not finally resolve.

**The question presented is narrow.**

Whether an arbitration award that makes express findings of intentional competitive hindrance and regulatory inaccuracy—yet denies liability and damages while excluding contractually defined parties and claims from the proceeding—constitutes a "mutual, final, and definite" award within the meaning of 9 U.S.C. § 10(a)(4). *Brabham*, 376 F.3d at 380; *Brown*, 340 F.3d at 215–16.

**It does not.**

## I.  PARTIES

### A.  Petitioner

1.  **Petitioner Joshua David Sappi Biering** is a natural person, a citizen of the United States and Brazil, and a resident of Fort Worth, Tarrant County, Texas. Petitioner is an honorably discharged former U.S. Army Captain, Bronze Star Medal recipient, and service-connected disabled veteran recognized by the United States Department of Veterans Affairs. Petitioner is a protected veteran within the meaning of 38 U.S.C. § 4212 and is entitled to the protections under the American with Disabilities Act ("ADA"), 42 U.S.C. §§12111–12117, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code ch. 21.

2.  At all relevant times, Petitioner was employed by JPM Bank as an Executive Director, assigned to the J.P. Morgan Private Bank ("JPM PB") Fort Worth office.[5] Ex. H ¶ 2); Award at 4. Petitioner was a dual-registered Associated Person (CRD No. 6883842) within the meaning of FINRA Rule 13100(r), holding Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law), and Series 65 (Uniform Investment Adviser Law) qualifications.[6] Ex. M.

3.  Petitioner executed the Binding Arbitration Agreement ("BAA"), *see supra* Preliminary Statement, and is a "Covered Party" as defined therein. Ex. B ¶ 1.

4.  Petitioner is currently employed by Raymond James & Associates, Inc. ("RJA") (CRD No. 705), a FINRA member firm, where he serves as Senior Vice President, Wealth Management. *See* Ex. M. RJA maintains Petitioner's securities licenses and

---

[5]  JPMorgan's corporate titles in ascending order are Analyst, Associate, Vice President, Executive Director, Managing Director.

  J.P. Morgan Private Bank operates within the firm's Asset & Wealth Management segment, providing bespoke services to high-net-worth and ultra-high-net-worth clients. By contrast, Chase Private Client operates within the Consumer & Community Banking segment as a retail offering for mass-affluent branch customers. *See* JPMC SEC Form 10-K.

[6]  BrokerCheck lists Petitioner's Series 7, Series 63, and Series 65 examinations, current registration with nine self-regulatory organizations, licensure through his employer in 53 U.S. states and territories, and Texas approval as an Investment Adviser Representative. FINRA BrokerCheck Report, Joshua D. Biering, CRD No. 6883842, at 2–6.

registrations, and his CRD record, maintained through RJA, includes the Form U5 disclosures and Form U4 archives at issue.

## B.    Respondents

5.    **Respondent JPMorgan Chase & Co. ("JPMC")** is a Delaware corporation with its principal place of business in New York, New York, and is the ultimate parent of JPMS and JPM Bank. JPMC reported total assets of $4.418 trillion, total net revenue of $182.447 billion, and net income of $57.048 billion for fiscal year 2025, and employed 318,512 persons globally as of December 31, 2025. JPMorgan Chase & Co., Annual Report (Form 10-K) at 39 (filed Feb. 13, 2026). JPMC is not itself a FINRA member firm, did not sign the FINRA Submission Agreement, and did not agree to arbitrate claims against it in FINRA arbitration. Award at 1–3.

6.    **Respondent J.P. Morgan Securities LLC ("JPMS")** is a Delaware limited liability registered as a broker-dealer with the SEC pursuant to Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b), and as an investment adviser under Section 203 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3.[7] JPMS is a FINRA member firm (CRD No. 79). JPMS is a FINRA member firm (CRD No. 79). Ex. M.

7.    JPMS maintained Petitioner's securities registrations and filed the Form U4 and Form U5 disclosures at issue. Ex. M. JPMS signed the FINRA Submission Agreement on September 10, 2024. Award at 1–2.

8.    Registered broker-dealers are required to disclose on Form Uniform Application for Broker-Dealer Registration ("Form BD") each name under which they conduct business and the identity of all indirect owners. 17 C.F.R. § 249.501, Items 1.B, 10. JPMS's Form BD (CRD No. 79) lists 16 "Other Business Names," including JPMC, JPM Bank, JPM PB, "J.P. Morgan Wealth Management," and Chase Private Client ("CPC")—none of which is a separately registered broker-dealer. *See* Ex. M (FINRA

---

[7]    Dual registration reflects the distinct regulatory regimes governing securities activity: the Exchange Act governs broker-dealer transactions, while the Advisers Act governs ongoing compensated investment advice, each imposing different obligations. JPMS's status as a FINRA member broker-dealer—rather than its advisory registration—subjects it and its associated persons to FINRA arbitration and review under the FAA. *See* FINRA Rules 13200–13206; 9 U.S.C. § 10

BrokerCheck Firm Report, CRD No. 79). Form BD also discloses, under Item 10, that JPMC is JPMS's ultimate indirect owner, holding 75% or more control through a chain of affiliated holding entities. *Id.*; *see also* Award at 1–2.

9. **Respondent JPMorgan Chase Bank, N.A. ("JPM Bank")** is a national banking association chartered under the National Bank Act, 12 U.S.C. § 21 *et seq.*, with its main office in Columbus, Ohio. JPM Bank was Petitioner's employer. JPM Bank is not a FINRA member firm, did not submit to FINRA arbitration, and did not agree to arbitrate claims against it in FINRA arbitration. Award at 1–3.

10. JPMC is a control person within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). As JPM Bank's registered bank holding company, JPMC is required to serve as a source of financial strength for its insured depository institution subsidiaries. 12 U.S.C. § 1831o-1; 12 C.F.R. § 225.4(a). *See* Ex. M (Form BD, Item 10).

11. The BAA defines JPMS, JPMC, and JPM Bank as a single "Firm" and identifies each as a "Covered Party" subject to its terms. Ex. B ¶ 1. *See* ¶ 8, *supra*. JPMC and JPM Bank (hereinafter "Non-Signatories," *see* ¶¶ 5, 9, *supra*) were named as respondents, but the Panel made no determination as to claims against either. Award at 1–3.

## II.    JURISDICTION, VENUE, AND TIMELINESS

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332. For diversity purposes, Petitioner is a citizen of Texas. Each Respondent is a citizen of either Delaware, New York, or Ohio. Complete diversity exists because national banks are citizens of the state where their main office is located, aligning with traditional diversity requirements. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). The amount in controversy exceeds $75,000. This action also arises under the FAA, 9 U.S.C. §§ 9–11.

13. Federal courts have exercised jurisdiction over materially identical U5 claims involving JPMS and the same lead counsel. *See J.P. Morgan Sec. LLC v. Luckett*, No. 3:22-cv-137-RGJ, 2023 WL 6050230 (W.D. Ky. Sept. 15, 2023).

14. Venue is proper under 9 U.S.C. § 9 and 28 U.S.C. § 1391(b)(2). The arbitration hearing was held in Dallas, Texas, and substantial events giving rise to the Award—including Petitioner's employment, investigation, termination, and the challenged CRD and U5 consequences—were centered in Fort Worth, Texas.

15. Personal jurisdiction exists because Respondents purposefully conducted and directed substantial forum-related conduct in Texas arising from the employment relationship, the challenged regulatory filings, and the FINRA arbitration seated in this District.

16. The Award was issued December 29, 2025, and this Petition is timely under 9 U.S.C. § 12 because it is filed within three months of the Award; the three-month deadline falls on Sunday, March 29, 2026, and, because the last day falls on a weekend, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday, i.e., Monday, March 30, 2026. *See* Fed. R. Civ. P. 6(a)(1)(C).

## III.   FINRA'S MANDATORY FORUM COULD NOT YIELD A MUTUAL, FINAL, AND DEFINITE AWARD

### A.   The Proceeding Was Mandatory Under FINRA Rules

17. This arbitration proceeded within FINRA's SEC-approved regulatory framework rather than by ad hoc private submission. 15 U.S.C. § 78s(b). FINRA's 2024 Form 990 describes it as a Delaware § 501(c)(6) nonprofit organization, overseen by the SEC, that writes rules, examines for and enforces compliance with federal securities laws and FINRA rules, registers broker-dealer personnel, and administers a dispute-resolution forum for investors, brokerage firms, and their registered employees. FINRA, Inc., Return of Organization Exempt From Income Tax (Form 990) at 1–2 (tax year 2024).

18. FINRA's public filings reflect the scale of that regulatory system. Its 2024 Form 990 reported 4,703 employees and $2.607 billion in total revenue, and its 2024 Annual Financial Report reported approximately 3,200 member firms and more than 630,000 registered representatives under FINRA oversight. *Id.* at 1, 6, 9; FINRA, 2024 Annual Financial Report 5, 7 (pub. June 27, 2025). By comparison, the SEC's FY 2026 Congressional Budget Justification, reporting FY 2024 actuals, listed 4,920 full-time

equivalents and $2.193 billion in total obligations. SEC, FY 2026 Congressional Budget Justification 5–7 (2025). Petitioner was a registered representative of a FINRA member firm, so FINRA Rule 13200(a) required the FINRA-arbitrable portion of this dispute to proceed there. Absent consent from all relevant entities, that structure did not provide a forum in which all claims arising from the same employment and CRD/U5 dispute could be heard together.

19. JPMS was the FINRA member through which Petitioner held his registrations and through which the challenged Form U5 was filed. *See* ¶¶ 6–8, *supra*. The underlying events, however, were alleged to involve conduct and decision-making across the broader JPMC enterprise. *See* ¶ 5, *supra*. That distinction bears on whether the arbitration could resolve the entire dispute in a single proceeding.

## B.   CRD Disclosures Carry Regulatory and Legal Consequences Beyond Private Arbitration

20. The records at issue were CRD filings governed by SEC-approved rules. Form U4 creates and maintains the associated person's CRD registration record, and Form U5 is the mandatory termination filing that follows the end of association with the member firm. 15 U.S.C. § 78o(b); FINRA By-Laws, Art. V, §§ 2–3. FINRA operates CRD and BrokerCheck under that regulatory framework, and BrokerCheck publicly disseminates specified information drawn from those filings. 15 U.S.C. § 78o-3(i); FINRA Rule 8312.

21. FINRA's rules impose duties of accuracy and completeness. Rule 1122 makes it a violation to file information with FINRA that is incomplete or inaccurate so as to be misleading. Regulatory Notice 10-39 further requires firms to provide enough detail for a reasonable reader to understand the circumstances behind the disclosure and states that a generic reference to a code-of-conduct or policy violation is insufficient unless the policy is identified. FINRA Regulatory Notice 10-39, at 2–3 (Sept. 2010).

22. The Notice also requires the firm to state the facts necessary to explain the conduct involved, determine whether other disclosure questions require affirmative answers, and provide complete and accurate Form U5 information in a timely manner. Id. at 3–4.

13

23. Those duties sit within a broader regulatory framework. FINRA's 2024 Annual Financial Report describes its mission in terms of investor protection and market integrity, and the SEC's FY 2026 Congressional Budget Justification describes the SEC's mission as protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation. FINRA, 2024 Annual Financial Report 3 (pub. June 27, 2025); SEC, FY 2026 Congressional Budget Justification 1 (2025). The Exchange Act requires FINRA rules to promote just and equitable principles of trade, protect investors and the public interest, and avoid unnecessary burdens on competition. 15 U.S.C. § 78o-3(b)(6), (9). FINRA Rule 2010 separately requires members to observe high standards of commercial honor and just and equitable principles of trade. Those standards are enforceable within FINRA's disciplinary framework. FINRA Rule 8310 authorizes censure, fine, suspension, or bar for rule violations, and the Exchange Act independently requires FINRA to impose appropriate disciplinary sanctions. 15 U.S.C. § 78o-3(b)(7), (g)(3).

24. Petitioner could not correct the record unilaterally. Unless corrected or expunged, the disclosure remains in CRD and BrokerCheck and may affect licensing, hiring, and public-facing reputation. FINRA Rules 2080, 13805. Here, within days of Petitioner's registration with his new employer, securities regulators in Missouri, Hawaii, Colorado, and Massachusetts issued letters of inquiry based on the U5 disclosures. Ex. K (CX086–089). The dispute therefore involved an active regulatory record with ongoing legal and commercial consequences. For purposes of finality, the Award needed to resolve the operative status and effect of that record

## C. FINRA's Jurisdictional Limits Restricted Resolution of the Full Enterprise Dispute

25. The parties' agreement treated JPMS, JPMC, and JPM Bank as a single "Firm" and directed Covered Claims to one final and binding arbitration. Ex. B ¶¶ 1–3, 6. FINRA's compulsory jurisdiction did not align with that structure. JPMS was the only FINRA member respondent. JPMC and JPM Bank were not FINRA members, did not sign the FINRA Submission Agreement, and did not appear before the Panel. Award at 1–3. FINRA's Code permits joinder of non-member entities only with consent. FINRA Rule

13100(r); FINRA Regulatory Notice 09-74, at 2 (Dec. 18, 2009). Respondents did not provide that consent.

26. That limitation follows from FINRA's governing framework. The Exchange Act and FINRA membership rules use control-based definitions broad enough to reach affiliated entities. 15 U.S.C. § 78c(a)(9), (18); FINRA Rule 1011(b)(3). FINRA's arbitration code uses a narrower definition of "associated person" that excludes corporate affiliates. FINRA Rule 13100(u); FINRA Regulatory Notice 09-74, at 2. As a result, an enterprise treated as integrated for contractual or regulatory purposes may be segmented in FINRA arbitration.

27. The record reflects that JPM Bank employed Petitioner, JPMC's Human Resources, Employee Relations, and Global Security functions participated in the investigation and separation process, and JPMS maintained the registrations and filed the CRD disclosures. Ex. H ¶ 2; Award at 1–3. The events at issue thus involved multiple affiliated entities, while only JPMS was before the Panel.

28. The panel-selection history shows the same limitation with respect to claims. FINRA Rule 13802 requires statutory employment-discrimination claims to be heard by an all-public-arbitrator panel with employment-law qualifications. FINRA Rule 13802(c)(2)–(3). After Respondents objected on the final day of the rank-and-strike deadline, FINRA withdrew the Rule 13802 panel list, directed Petitioner to remove the statutory employment-discrimination claims, and reissued the selection under Rule 13402(b), which provides a panel of one non-public arbitrator and two public arbitrators. *See* Ex. C; Award at 7. Under Rule 13201(a), those statutory claims could proceed in FINRA only with mutual consent, which Respondents did not provide.

29. The resulting Award resolved only the matters that remained within FINRA's compulsory reach. Where the parties' agreement defined a single dispute, but the forum could compel only one affiliated entity and could not include certain claims without consent, the Award did not resolve the full controversy identified by the agreement. That conclusion follows from the structure of the proceeding and from the continuing regulatory consequences of the challenged CRD/U5 disclosure. *See* FINRA Regulatory Notice 10-39; FINRA Rule 1122. Under these circumstances, the Award was not mutual,

final, and definite as to the integrated subject matter within the meaning of 9 U.S.C. § 10(a)(4).

## IV.   PETITIONER EXHAUSTED AVAILABLE AVENUES AND PRESERVES REMAINING CLAIMS

30. **Petitioner Honored the Contractual Bargain.** Petitioner submitted all Covered Claims to a single FINRA arbitration as the BAA required. Respondents fragmented that proceeding by excluding two of the three Covered Parties and stripping the statutory claims. The arbitral process is now exhausted. The Award was issued December 29, 2025. Ex. A; Award at 7. *See* ¶ 16, *supra* (timeliness). Petitioner does not consent to re-arbitrate the excluded claims or to submit to a second fragmented forum. This Petition is the statutory mechanism for judicial review under 9 U.S.C. §§ 9–11.

31. **EEOC & TWC Administrative Filings.** On February 25, 2024, Petitioner filed a verified Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 450-2024-04743, simultaneously dual-filed with the Texas Workforce Commission ("TWC") Civil Rights Division. CX-AAA-0038. The EEOC issued a Dismissal and Notice of Rights on March 19, 2025. CX-AAA-0042. Administrative prerequisites for Petitioner's TCHRA, Title VII, and ADA claims are complete. *See* Ex. V (Petitioner's EEOC Reply).

32. **AAA Protective Filing.** Petitioner filed a protective arbitration demand with the AAA, Case No. 01-26-0000-7215, on February 11, 2026, asserting TCHRA claims (Tex. Lab. Code §§ 21.001 *et seq.*) to preserve the two-year limitations period of § 21.256 pending this Court's forum determination. AAA acknowledged receipt of that demand by written notice. As of the date of this Petition, Respondents have not answered that demand, and a stay of the AAA proceeding has been requested pending the Court's forum determination. This protective filing does not concede that AAA or any forum other than this Court may resolve the FAA finality defect presented here.

33. **FINRA Administrative Request.** Petitioner submitted written demands on March 13 and March 21, 2026 to the Executive Vice President and Director of FINRA Dispute Resolution Services, requesting reimbursement of $32,657.50 in professional fees

incurred as a result of FINRA's July 24, 2024 dissemination of a rank-and-strike packet later acknowledged to have been "sent in error." Ex. L. Petitioner separately notified the FINRA Office of the Ombuds. On March 26, 2026, Senior Director Katherine M. Bayer issued a written denial of the reimbursement request on behalf of FINRA Dispute Resolution Services. Petitioner replied in writing to Mr. Berry on March 26, 2026, renewing the reimbursement request, seeking executive review, and requesting independent review through the FINRA Office of the Ombuds or the Board of Governors. Ex. L.

34. **Congressional and Regulatory Outreach**. Before seeking judicial relief, Petitioner pursued assistance through Congresswoman Kay Granger, Senator Ted Cruz, Representative Al Green, the SEC, and FINRA. Ex. N; Ex. O. Each channel confirmed it lacked authority or jurisdiction to intervene: congressional offices could not interfere with legal proceedings; the SEC directed Petitioner to FINRA's Investor Complaint Center; Representative Green did not respond. Those responses document exhaustion and confirm that no corrective path exists outside the courts.

35. **Code of Conduct Hotline.** On December 7, 2023, Petitioner submitted a formal retaliation complaint through JPMorgan's Code of Conduct Hotline. The same HR/ER group the Panel found possessed a "pattern of conduct" intercepted the complaint. Fifteen days later, JPMS filed the Form U5. Ex. X (JPMS_00025619).

36. **Internal Remedies and Firm's Open Communication Policy**. Before pursuing FINRA arbitration, Petitioner exhausted available internal remedies through JPMorgan's *me@jpmc* portal, submitting HR service tickets seeking guidance, personnel records, and correction. Ex. Y. JPMorgan denied the formal request for his personnel file. Ex. W. No corrective process, neutral review, or substantive resolution was offered.

37. **National Labor Resource Board ("NLRB")**. During Petitioner's notice period, the NLRB General Counsel issued Memorandum GC 23-08 (May 30, 2023), and the FTC proposed its Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Jan. 19, 2023), both addressing non-compete and garden-leave restrictions. Having received no substantive response to his written request for the Notice Period terms, Petitioner contacted the

NLRB to determine whether those authorities applied to his restrictions. No further administrative action followed.

38. **Reservation of Claims and Non-Consent to Further Arbitration.** Petitioner honored his contractual obligation to arbitrate Covered Claims in a single proceeding. Respondents' jurisdictional objections prevented that proceeding from reaching a complete disposition. Having fulfilled that obligation, Petitioner respectfully submits that remand to any arbitration forum is not appropriate: the structural limitations that produced the defect.

39. FINRA's inability to compel non-member respondents without consent, and the consent-dependent nature of statutory employment-discrimination jurisdiction under Rule 13201(a)—are features of each forum's architecture, not correctable panel errors, and would reproduce the same deficiency on remand. Although FINRA's Code permits non-member entities to be joined and statutory claims to proceed, both require Respondents' consent, which Respondents have withheld.

40. Petitioner does not consent to re-arbitrate the excluded claims or to submit to a second fragmented forum. As an additional basis for retaining jurisdiction, Petitioner reserves all rights under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–03 ("EFAA"), which vests in the claimant the right to void a pre-dispute arbitration agreement as to any claim that "relates to" a sexual harassment dispute and provides that the applicability of the EFAA "shall be determined by a court of law" and not by an arbitrator, 9 U.S.C. § 402(a)–(b).

41. By filing this Petition, Petitioner expressly reserves:
    (i)   all non-arbitrable and non-submitted statutory claims, including rights under the EFAA, 9 U.S.C. §§ 401–403;

    (ii)  all claims against JPMC and JPM Bank as Non-Signatories;

    (iii) all statutory employment-discrimination claims under TCHRA, Title VII, and the ADA, excluded from FINRA under Rule 13201(a);

    (iv)  the right to assert that Respondents are estopped from invoking arbitral finality

as to claims and parties they themselves excluded;

(v)  the position that the AAA filing is purely protective and does not concede that any forum other than this Court may resolve the FAA finality defect; and

(vi)  the right to challenge the Panel's "no defamation" and "lucrative employment" findings in any subsequent proceeding.

## V.  STANDARD OF REVIEW

42.  Judicial review of an arbitration award under the FAA is extraordinarily narrow. *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004). The Court does not reweigh evidence, reassess credibility, or correct ordinary legal or factual error. The question is whether the challenged portion of the award is confirmable, modifiable, or vacatable under 9 U.S.C. §§ 9–11.

43.  That narrow scope does not eliminate the FAA's threshold requirement that an award be mutual, final, and definite. The Act separately authorizes confirmation of definite portions, modification or correction of discrete defects, and vacatur where arbitrators "so imperfectly executed" their powers that "a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. §§ 9–11, 10(a)(4). The reviewing court must be able to determine the award's scope and operative legal effect. *Brabham*, 376 F.3d at 380; *Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003); *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996–98 (5th Cir. 1995).

44.  The FAA's statutory grounds for vacatur are exclusive. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–88 (2008); *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009). Petitioner proceeds solely under 9 U.S.C. § 10(a)(4).

45.  The Fifth Circuit does not recognize "manifest disregard of the law" as an independent ground for vacatur. *Bacon*, 562 F.3d at 355–58; *Trinity Energy Servs., L.L.C. v. Southeast Directional Drilling, L.L.C.*, 135 F.4th 300, 307–08 (5th Cir. 2025). Petitioner therefore proceeds under § 10(a)(4), but preserves the alternative position that, to the extent manifest-disregard reasoning survives as a gloss on that statute or is later revived, the same facial incoherence identified here would satisfy it.

Arbitrators exceed their powers when they dispense "their own brand of industrial justice" rather than render an award a court can enforce under the parties' agreement and governing law. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

46. Section 10(a)(4) is violated where an award is internally inconsistent, indeterminate in scope, or incapable of yielding a determinate legal result. The Fifth Circuit frames the inquiry functionally: whether the Court can determine "the scope and operative effect of what the panel actually decided." *Brabham*, 376 F.3d at 380. An award that leaves the Court to speculate as to its meaning, or that cannot be reduced to judgment with a coherent legal effect, is not "final and definite." *Brown v. Witco Corp.*, 340 F.3d 209, 215–16 (5th Cir. 2003).

47. This inquiry is structural, not substantive. It concerns the existence of an enforceable adjudication, not the correctness of a factual finding or legal conclusion. The interpretation of the parties' contractual rights and the operative legal effect of an arbitration award remain judicial functions. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). That point matters especially where punitive damages remain in issue, because punitive monetary relief is legal in nature: it turns on punishment and deterrence, not merely restoration of the status quo. *SEC v. Jarkesy*, 603 U.S. 109, 123–25 (2024).

48. FINRA operates under delegated Exchange Act authority, subject to SEC oversight. 15 U.S.C. §§ 78o-3, 78s; *Alpine Sec. Corp. v. FINRA*, 86 F.4th 406, 410–13 (D.C. Cir. 2023). That regulatory setting does not create a new ground for vacatur or authorize merits review. It confirms only that this Court, not the arbitral forum, must determine whether the Award yields an enforceable legal result under § 10(a)(4). *Parrott v. Int'l Bancshares Corp.*, No. 25-50367, 2026 WL 364324 (5th Cir. Feb. 10, 2026).

49. Where an award is severable, the Court may confirm the definite portions while vacating or modifying the indeterminate remainder. *Prestige Ford*, 324 F.3d at 395; *Gateway Techs.*, 64 F.3d at 996–98; *Sarofim v. Trust Co. of the West*, 440 F.3d 213, 218–19 (5th Cir. 2006). Modification under 9 U.S.C. § 11(b)–© is appropriate

where an issue was squarely submitted, the underlying error was conceded or necessarily resolved, and the award failed to dispose of it. *See* ¶¶ 83–85, *infra*.

50. Following partial vacatur, the Court may award fees and costs causally linked to bad-faith conduct under a but-for causation standard. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). Equitable doctrines, including judicial estoppel, equitable estoppel, and waiver by inconsistent conduct, may also bear on the remedy available after vacatur. *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517 (5th Cir. 2006); *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418–19 (2022); *Garcia v. Fuentes*, 141 F.4th 671, 675 (5th Cir. 2025). *See* ¶¶ 108–114, *infra*.

51. Remand is not appropriate where the defect is structural and the same jurisdictional constraints would recreate it. *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1134 (5th Cir. 1991). *See* ¶¶ 110–114, *infra*.

52. Petitioner reserves all rights under the EFAA, 9 U.S.C. §§ 401–403, as to the sexual-harassment claims FINRA required him to delete. *See* ¶ 38, *supra*; ¶ 114, *infra*.

## VI. The Record Fully Establishes the Underlying Facts, Investigation, and Participants, but Yields an Incomplete Disposition and Practical Effect

### A. The Panel Was Presented with Quantifiable Performance Records

53. Petitioner is a graduate of the United States Military Academy at West Point, holds an MBA from Southern Methodist University's Cox School of Business, entered JPMorgan through its Military Officer Executive Development Program, and served as an honorably discharged U.S. Army Captain and awarded the Bronze Star for his service in support of Operation Enduring Freedom.

54. The performance record was similarly straightforward. Petitioner advanced from Associate to Vice President to Executive Director, effective February 1, 2023. BIERING0000926. At separation, he managed approximately $1 billion in client assets, generated $5.8 million in annualized revenue, achieved 14% year-over-year revenue

21

growth against a 6% bank average, and was recognized as a "Gold Producer" on October 23, 2023. Ex. G (CX-109; CX-9). His September 27, 2023 self-assessment reported that he contributed 21.34% of team revenue growth, while contemporaneous scorecards and Insight360 feedback reflected year-over-year strong reviews, mentorship, and new-business production. Ex. G (CX-225; CX004–CX010; CX-228). Petitioner further testified that the produced October 2023 scorecard omitted the section reflecting new-client acquisition and the related growth percentage. CX-AAA-0031 at 3 n.3; *see also* ¶ 67, *infra_*.

55. The record identified several participants in the separation process across the enterprise, including Ben Stewart (direct supervisor), J.T. Aughinbaugh (market manager), Stephanie Stainback, Beth Wilson, and Jenna Cohen (Global Head of the JPMorgan Private Bank Human Resources), and Jonathan Jacobs (JPMC Global Security and Investigator). Ex. T-1A [Tr. Excerpts]; Ex. E (JPMS*00026881;* *JPMS*00021517; JPMS_00027085; CX-188). The record reflects participation by local management, human resources, investigative personnel, and JPMS registration functions in the events leading to the Form U5 wording.

56. The record also included Stewart's Managing Director promotion criteria, Cohen's inquiry about "keeping Josh Biering" and retaining his allocation in the incentive pool, communications between Stewart and Wang regarding the "opportunity to send a lot back to PC," and Wang's "Biering Book Analysis" spreadsheet quantifying the revenue benefits and drags of redistributing Petitioner's book. Ex. Q (CX-209; CX-144; CX-145); *see also* ¶ 65, *infra.* That context made Panelist Rister's questioning of Aughinbaugh relevant not merely as tone, but as to motive and benefit: whether management had contemporaneous business reasons to welcome Petitioner's departure because single-coverage relationships, client-retention risk, and internal credit allocation could improve once his book was reassigned. Hearing Tr. (ZOOM0025).

## B.   The Record Included the Separation Chronology

57. Following a leadership transition in the Fort Worth office in January 2023, the office received the lowest Employee Opinion Survey results nationally. By September, Petitioner was telling Stewart he did not know whether the office was "the right place"

for him, had contacted JPMorgan's Employee Assistance Program, and was exploring FMLA leave. Ex. T-1A [Tr. Excerpts]; Ex. Z.

58. The record included three overlapping tracks after management learned Petitioner might leave: (1) a Global Security expense inquiry, (2) a documented performance fallback inside of Human and Employee Relation, and (3) a rapid response workplace-conduct investigation. Award at 4.

> **October 2–3, 2023.** Petitioner submitted the later-challenged expense reports through the ordinary process, and Stewart approved them. Muraira later closed the matter as "Disposition Allegations NOT supported," with Global Security finding "similar patterns of expense activity" among Petitioner's peers, including Stewart, and expenses "fairly consistent for at least 12 months." Ex. F (CX-031; JPMS_00028911).

> **October 17, 2023.** Stewart escalated Petitioner's expenses to Global Security, providing what Muraira later described as a "vague weekly expense report." Ex. F (CX-184).

> **October 23, 2023.** Petitioner was recognized as a "Gold Producer," and the same day Global Security formally opened expense investigation Case No. ECNA1020239740. Ex. G (CX-109); Ex. F (JPMS_00028911).

> **October 24, 2023.**

> > **2:59 PM CST,** Stewart reported that Petitioner had approached him about resigning and sought guidance on compensation for the completed metric year. Ex. E (CX-214).

> > **3:54 PM CST,** Stainback forwarded the expense matter to Beth Wilson writing, "FYI if you can do anything to help move this forward it would be appreciated." JPMS00026881.

> > Wilson replied that she was "actually quite surprised this case has received this much attention already much faster than I ever expected" and that she would ensure the "performance case" was well documented so that, if there were a plausible reason for the expenses, they could "fall back on performance." *Id.*; Ex. AB.

**October 26, 2023.**

**1:05 PM CST** Petitioner emailed that he would use paid time off the following day, Friday, October 27. Petitioner had a prescheduled meeting at the Merrill Lynch offices to sign onboarding documents.

**1:34 PM CST**, *Twenty-nine minutes later,* Stephanie Stainback opened a rapid-response case alleging potential inappropriate behavior toward the employee raising complaint ("ERC"). Ex. F (CX-020); Ex. E (CX-122).

**October 27–28, 2023.** On October 27, while Petitioner was on approved leave and at Merrill Lynch, internal HR/ER escalated the matter to a "very serious allegation of sexual assault" and recommended placing him on paid administrative leave "today if possible." Ex. E (CX-123; CX-224).

By 5:30 PM CST, Cohen wrote: "FYI hoping to wrap early next week with a term." Ex. E (JPMS00021517).

The next day Petitioner submitted formal resignation at 9:45 AM, Cohen wrote that Petitioner was likely headed to "MS or ML" and they should amend the U4 "ASAP" because he had "likely just cleared their background," and Stainback directed Registration not to file the U5 until wording could be "finalize[d]." Ex. E (CX-021; JPMS00027085).

**November 8–29, 2023.** The "inappropriate behavior" investigation was substantively complete but Employee Relations held formal closure so it could be "disposition[ed] simultaneously" with the still-pending expense track. Claimant's Prehearing Brief; Ex. F (JPMS*00028911*).

On November 29, Jacobs circulated the draft RFT at 1:38 PM CST, Muraira closed the expense inquiry at 2:42 PM CST as "NOT supported," and Stewart approved the request for termination ("RFT") at 2:44 PM CST. Ex. F (CX-031; JPMS00001424; JPMS_00028911). The two-minute sequence mattered because it showed the termination recommendation was not contingent on any adverse expense finding.

**December 7 and 22, 2023.** Petitioner lodged a retaliation complaint through the Code of Conduct Hotline on December 7.

24

**December 22, 2023.** Fifteen days later, JPMS filed Form U5, using "Discharged" and "inappropriate behavior." JPMS_00025619; Ex. X; Award at 3–4.

## C.  The Shifting Rationale: Inflated as a Weapon, Deflated to Avoid Review

59.  Internal personnel used materially different descriptions at different stages: a potential inappropriate-behavior matter on October 26, a "very serious allegation of sexual assault" on October 27, an anti-harassment-policy issue in the ER track, "inappropriate behavior" on the Form U5, and later a "lapse of judgment" in the Award. Ex. E (CX-122; JPMS00023374); Award at 3–4; Ex. T-1A [Tr. Excerpts]. The record thus allowed the Panel to see that sexual-assault language was used to accelerate Rapid Response and administrative-leave action while Petitioner was already away from the office and at Merrill Lynch, followed the next day by the instruction to move on the U4 "ASAP" because he had "likely just cleared their background." Ex. E (CX-123; JPMS00027085).

60.  The two principal investigation tracks also had different start and completion dates. The ER/Rapid Response investigation began on October 26 and was substantively complete by approximately November 8, yet ER held formal closure so it could be "disposition[ed] simultaneously" with the expense track. Ex. F (JPMS00028911). The expense investigation began on October 17/23 and closed on November 29 with Muraira's notation "Disposition Allegations NOT supported," after Global Security found "similar patterns of expense activity" among peers and expenses "fairly consistent for at least 12 months." Ex. F (CX-031; JPMS00028911). Stewart's approval two minutes later mattered because it showed the termination recommendation was not contingent on any adverse expense finding. The phrase "inappropriate behavior" later appeared on the Form U5. Award at 3–4.

61.  On December 1, 2023, JPMS notified Petitioner that his employment was terminated for "violation of Respondent's code of conduct" and stated that it was "not related to the sale of securities or any customer complaints." Award at 4. On December 22, 2023, JPMS filed the Form U5 using "Discharged" and "inappropriate behavior." Award at 3–4; Ex. X; JPMS_00025619.

**D.   The Record Included Separate Form U4 Disclosure Errors**

62.   From 2018 through 2023, JPMS entered five disclosures on Petitioner's Form U4 (Question 14K, DRP) mischaracterizing federally authorized student-loan disability discharges as "bankruptcy/SIPC/compromise with creditors." On the hearing record, JPMS acknowledged those entries were "filed in error," and related correspondence referenced removing the disclosures and filing them "in error" after the underlying student-loan balances were forgiven. Ex. K; CX-026. Archived entries remain visible through CRD background review.

63.   During the evidentiary hearing, the Panel Chair stated, "this makes no sense to me. I don't care that they're archived," and added, "We should be able to get them expunged in the CRD." Ex. K. The hearing record included the requested U4 relief. The Award did not include a disposition of that request.

**E.   Institutional Discovery Conduct and Evidentiary Withholding**

64.   The discovery record reflected multiple rounds of document production, motions to compel, and related Panel orders.

65.   Discovery in the FINRA arbitration opened on December 6, 2024. FINRA Rule 13507 required responses within 60 days, by February 4, 2025.

66.   On February 5, 2025—61 days after discovery opened—Respondents served objections but no documents. CX-AAA-0025; CX-AAA-0026. The record then reflected three motions to compel, two Panel orders, and nine production rounds over 351 days. On May 8, 2025, the Panel ordered production by July 7, 2025. CX-AAA-0030. July 7 and September 8 were each described as "final," but additional rounds continued through November 22, 2025, one day before closing arguments. A second Panel order on August 28, 2025, directed production of opening and closing memoranda. CX-AAA-0034. Respondents attributed delay to a third-party vendor outage. CX-AAA-0028.

67.   The third motion to compel, filed November 12, 2025, identified still-missing Skype communications and 2021–2023 Insight360 peer-feedback data, including October 2023 feedback from the ERC describing Petitioner as an "excellent mentor" and stating it was

a "privilege" to work with him. CX-AAA-0035; Ex. G (CX-228). JPMS attributed the omission to the Oracle HCM transition and produced the missing feedback only after spoliation concerns were raised and near the second trial setting. CX-AAA-0035 ¶¶ 14–17; CX-AAA-0037 at 5–6.

68. On control, Respondents first stated that certain affiliate documents were not within JPMS's possession, custody, or control. JPMS's Resp. in Opp'n to Mot. to Compel at 15–18 (Apr. 14, 2025). Later rounds nonetheless produced internal Chase HR and JPMorgan documents on JPMS Bates numbers. CX-AAA-0031 at fns.18–20.

69. On damages, JPMS stated that Petitioner could "extrapolate any alleged lost compensation," while also stating that it did not possess the revenue and relationship data tied to the products and accounts he serviced. CX-AAA-0026 (Req. 70, 75, 76). Later rounds then produced the "Biering Book Analysis" (Ex. Q (JPMS_00028664)), which directly addressed redistribution of that very book.

70. Later rounds produced documents central to timing, wording, redistribution, and credibility themes that had not been produced when first due: Ex. E (JPMS*00021517* (*"hoping to wrap . . . with a term"*); JPMS00027085 (hold the U5 and "finalize wording")); Ex. Q (JPMS*00027073* (*"amend the U4 ASAP"*); JPMS00028663–28664 (redistribution email and book analysis)); Ex. F (JPMS*00028911* (*expense allegations "NOT supported"*)); and Ex. G (CX-228 / JPMS00029376 (Insight360 feedback)).

71. Petitioner testified that JPMorgan removed from the produced October 2023 Scorecard a section documenting new-client acquisition and the associated growth percentage. CX-AAA-0031 at 3 n.3.

72. Ex. S itemizes $137,345.00 in discovery-related costs associated with repeated motions to compel, review and reconstruction of productions, forensic work on altered or damaged business records, and follow-up concerning document control and completeness. Ex. S; *see* ¶¶ 61–67, *supra*. The record, taken as a whole, reflected not an isolated late document but a pattern of delay, control shifting, altered or degraded business records, and production only after motion practice. The Panel did not impose an adverse inference or broader discovery sanction. FINRA Rule 13511(a).

**F.    Expert Evidence on Industry Harm and Damages**

73. The following discussion does not ask the Court to reassess damages on the merits; it establishes the evidentiary record necessary for the Court to determine whether the Award's zero-damages disposition can be reconciled with the Panel's own findings under § 10(a)(4).

74. Uncontroverted Damages Expert. Petitioner's forensic accounting expert, recently experienced with high-profile damages cases (matching paradigms such as Depp v. Heard, Case No. CL-2019-2911), presented damages analysis (CX-030) quantifying net career loss. The Expert is a CPA, a Certified Fraud Examiner, and holds the CFF, ABV, and CAMS designations. He testified that he has appeared approximately 150 times in trials, arbitrations, and depositions. Hearing Tr. 45799, 45844 (ZOOM0021) (Expert Testimony). Respondents offered no rebuttal expert, and the Award does not explain how it treated the expert's net-loss analysis:

| Damages Measure | Calculated Amount |
|---|---|
| Gross Lost Earnings (Conservative) | $22,719,882 |
| Gross Lost Earnings (with investor transitions) | $29,993,659 |
| Less Mitigation Credit (RJA) | ($12,035,470) |
| **Net Damages (Conservative)** | **$10,684,413** |
| **Net Damages (with investor transitions)** | **$17,958,189** |

75. The CX-030 analysis included a $12,035,470 mitigation credit for Petitioner's employment at Raymond James. Ex. D (CX-030). The resulting net figures were $10,684,413 on the conservative model and $17,958,189 on the model with investor transitions. *Id.* Raymond James was not a party to the arbitration. The Award later referred to Petitioner's employment at Raymond James in denying damages. Award at 4–5.

76. The damages presentation also addressed client-book transfer rates. Ex. D (CX-030); Ex. T-1A [Tr. Excerpts]. The analysis used a 35% actual transfer rate and an 80%–90% Tier One benchmark. *Id.*

**G.    Form U5 Filing: Violation of FINRA Regulatory Notice 10-39**

77.    The record included FINRA Regulatory Notice 10-39, discussed above at ¶¶ 21–22, and hearing colloquy in which the Panel Chair expressly acknowledged its operative requirement, stating that "it is not sufficient for a firm to report only that a person's registration was terminated because that person violated firm policy"; instead, "[t]he firm must identify the policy." Ex. T-1A [Tr. Excerpts].

78.    JPMS's Form U5 stated "Discharged" with a Termination Explanation referencing "inappropriate behavior." The explanation did not identify a specific policy and did not describe the conduct in further detail. The record included testimony that prospective employers could not determine from the filing what conduct was at issue. The record also reflected that affiliated HR and legal personnel instructed Registration not to file the U5 until wording could be "finalize[d]." Ex. E (JPMS_00027085).

79.    The record also reflected three phases in how Petitioner explained the separation to prospective employers, occurring against a backdrop of the five archived Form U4 entries described in ¶¶ 59–60, *supra*.

> **Phase 1 (October 27–December 1, 2023).** From the date of administrative leave through the formal termination notification, Petitioner could offer prospective employers only limited details: he had been placed on leave and had not been told the nature of the claim against him. Award at 4. During this same period, JPMS personnel were already telling employees internally that Petitioner had been terminated. Ex. E (CX-126; CX-127; JPMS_00021517 ("hoping to wrap early next week with a term")). Petitioner was interviewing at competitor firms while the five archived U4 entries remained visible on BrokerCheck.

> **Phase 2 (December 1–December 22, 2023).** On December 1, JPMS notified Petitioner that his employment was terminated for "violation of Respondent's code of conduct" and stated it was "not related to the sale of securities or any customer complaints." Award at 4. From that date until the Form U5 filing, Petitioner disclosed that description to prospective employers without a filed U5 that identified a policy or factual basis.

**Phase 3 (December 22, 2023–present).** JPMS filed the Form U5 on December 22, fifteen days after Petitioner submitted a retaliation complaint through the Code of Conduct Hotline. Ex. X; JPMS_00025619. From that date, CRD and BrokerCheck displayed "Discharged" with "inappropriate behavior" as the Termination Explanation. Award at 4. The record also included letters of inquiry from regulators in Missouri, Hawaii, Colorado, and Massachusetts. Ex. K (CX086–089).

## VII.  PROCEDURAL HISTORY

80. The chronology of FINRA Case No. 24-01208, detailed in Appendix A, shows that the fragmentation was structural, not incidental. Five features of the procedural record confirm this:

81. **Excluded entities.** JPMC and JPM Bank were named in the Second Amended SOC but did not consent to FINRA jurisdiction, did not sign Submission Agreements, and were not adjudicated on the merits. Award at 1–3.

82. **Excluded statutory claims.** Respondents objected on the final day of rank-and-strike, FINRA withdrew the Rule 13802 all-public panel, directed deletion of all statutory employment-discrimination claims, and reissued the panel selection under standard Rule 13402(b). Ex. C; Ex. I.

83. **Changed panel architecture.** Petitioner ranked Tanner Craig Forman No. 1 in the rank-and-strike process. Ex. J. Forman's FINRA arbitrator disclosure identified him as an attorney at Jim S. Adler & Associates—a claimant-side litigation firm that represents individuals against corporations. *Id.* On September 11, 2025, FINRA issued a Hearing Location Letter confirming hearing dates beginning September 23 and addressed to Forman as a sitting panelist. Ex. J. Seven days later, on September 18, Forman withdrew—five days before the hearing was set to begin. FINRA provided no explanation for the withdrawal. *Id.* The hearing dates were vacated and reset to December 2025; Forman's replacement, Alison Battiste Clement—a non-public arbitrator with a defense-firm and broker-dealer background—was not appointed until October 17 and had approximately six weeks to review the 27,957-document record. The

30

panel that heard the case was composed under a different rule for a narrower set of claims. Ex. J.

84. **Incomplete discovery control narrative.** Nine production rounds over 351 days, three motions to compel, two Panel orders, selective corporate-separateness objections followed by affiliate-document production on JPMS Bates numbers. *See* ¶¶ 61–67, *supra.*

85. **Resulting inability to render enterprise-wide final relief.** The Award found pretext, pattern, and inaccuracy, ordered U5 corrections, and assessed all forum fees against JPMS—yet denied defamation and awarded $0 damages without identifying which entity acted, which theory applied, or what legal consequence the findings carried. Award at 3–5.

86. A detailed, source-verified chronology organizing these events by phase is attached as Appendix A.

## VIII. THE AWARD'S EXPRESS FINDINGS DO NOT YIELD A DETERMINATE LEGAL RESULT

87. The Award ordered JPMS to correct Petitioner's Form U5 by: (a) changing the Reason for Termination to "Voluntary"; (b) deleting the Termination Explanation in its entirety; and (c) correcting the Date Terminated to October 28, 2023. Award at 3–4. The Panel assessed all FINRA forum fees against Respondent JPMS. Award at 5–6.

88. The Award denies defamation liability and simultaneously awards zero compensatory damages, zero punitive damages, and zero attorneys' fees, yet provides no discernible legal basis tying those outcomes to the Panel's express findings or reconciling those findings with the zero-damages result.

89. The Award's principal defect is that it uses the singular and undifferentiated "Respondent" for conduct the record distributes across separate entities. Award at 4–5.

90. The employer-side actor with authority to terminate was JPM Bank. JPMS filed the U5. JPMC personnel participated in Human Resources, Employee Relations, and

Global Security decision making. If the Award's singular references mean JPMS, they attribute employment authority to the wrong entity. If they mean JPM Bank or JPMC, the Award made findings about entities it simultaneously said it was not deciding. Either way, the Court cannot determine the Award's operative effect.

91. The Award states that the Panel made "no determination as to claims" against JPMC and JPM Bank. Award at 3. It is also silent as to Petitioner's requested relief on the admitted U4 errors. Ex. K; *see* ¶¶ 83–85, *infra*. The Award therefore speaks definitively when describing wrongdoing, but not when identifying who was actually bound or what relief was finally decided.

92. Respondents took inconsistent positions about forum scope at each stage. Before the EEOC, counsel directed U5 disputes to FINRA. Ex. U. Within FINRA, the same side excluded affiliated entities and statutory claims. Ex. I. In discovery, JPMS denied control over affiliate records, then produced them following multiple motions to compel. *See* ¶¶ 64, *supra*.

## IX. THE FAA REQUIRES PARTIAL CONFIRMATION, VACATUR, AND FURTHER PROCEEDINGS TO RENDER A MUTUAL, FINAL, AND DEFINITE AWARD

93. This Award contains both enforceable and indeterminate components. The Form U5 correction directives and forum-fee assessment are definite and capable of confirmation. The damages and defamation dispositions, however, do not yield a determinate legal result when read in light of the Award's own findings and the limited scope of the arbitral forum.

94. The Federal Arbitration Act permits courts to treat severable portions of an award differently. Accordingly, Petitioner seeks discrete relief across five grounds: (1) confirmation of the definite portions under § 9; (2) modification to address an omitted disposition under § 11; (3) compensatory fee-shifting limited to but-for costs; (4) partial vacatur of the indeterminate portions under § 10(a)(4); and (5) retention of jurisdiction to effectuate a final resolution.

**GROUND ONE: CONFIRM THE DEFINITE PORTIONS UNDER 9 U.S.C. § 9**

95. Under 9 U.S.C. § 9, the Court "must grant" an order confirming an award unless it is vacated, modified, or corrected under §§ 10 or 11. The Form U5 correction directives and the forum-fee assessment are severable and enforceable portions of the Award.

96. Confirmation of severable portions does not waive Petitioner's right to seek vacatur or modification of other severable portions. *Sarofim*, 440 F.3d at 218--19.

## GROUND TWO: MODIFICATION AND CORRECTION OF ADMITTED FORM U4 ERRORS (9 U.S.C. § 11)

97. On the hearing record, Respondent admitted it filed five Form U4 disclosures mischaracterizing federally authorized student-loan disability discharges as bankruptcies and compromises with creditors in error. Ex. K. The archived disclosures continue to cause present professional harm. The dispute is not factual. It concerns the omitted remedy.

98. The Panel Chair stated, "this makes no sense to me. I don't care that they're archived," and then, "We should be able to get them expunged in the CRD." Ex. T-1A [Tr. Excerpts]. That colloquy confirms the issue was squarely submitted and its practical consequence understood.

99. Because the factual error was admitted and the requested regulatory correction was presented, the Award's silence left a submitted issue unresolved. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994). Petitioner therefore seeks correction under 9 U.S.C. § 11(b)--(c) and, if necessary, ancillary equitable relief to make the Award effectual. *Janvey*, 647 F.3d at 595--97. Fees associated with contesting these admitted errors are addressed under Ground Three, *infra*.

## GROUND THREE: SHIFT THE BUT-FOR COSTS OF THE INCOMPLETE PROCEEDING

*Applicable Causal and Contractual Standards*

100. Petitioner seeks compensatory reimbursement only for documented fees and expenses he would not have incurred but for Respondents' bad-faith conduct. The Court possesses inherent authority to sanction conduct that abuses the judicial process through fee-

shifting. *Chambers*, 501 U.S. at 44--46, 51. But *Goodyear* limits any such award to the fees the innocent party incurred solely because of the misconduct. 581 U.S. at 107. The misconduct at issue occurred in the FINRA arbitration. Petitioner therefore does not ask this Court to police ordinary arbitral discovery disputes as such. He asks the Court to reimburse the specific expenses that Respondents' bad-faith conduct caused, that the Panel did not fully remedy, and that had to be carried into this FAA proceeding through an incomplete record and additional reconstruction work.

101. The discovery record described in ¶¶ 61--68, *supra*, shows precisely that sort of but-for expense. Respondents served objections without production, labeled deficient productions "final," relied on unsupported outage explanations, shifted from non-possession to overproduction narratives, invoked corporate separateness and privilege selectively, withheld the Biering Book Analysis and related financial data, and produced damaged or altered business records requiring forensic reconstruction. Each withholding phase generated motion practice, review burden, or reconstruction work that would not have been necessary absent the misconduct. That is the sort of "delay, oppression, harassment and massive expense" *Chambers* addresses, but *Goodyear* requires the Court to award only the documented portion causally linked to the misconduct. The pattern is also consistent with discovery disputes publicly litigated against the same JPMorgan enterprise in the Epstein matters before Judge Rakoff: the public record there reflected complaints of strategic late productions, custodial-file dumps after key depositions, and production of a central timeline only after its practical use had been materially blunted, followed by court-ordered supplemental relief tied to post-deadline production. The point is not to imply a spoliation ruling in those cases; it is the more limited observation that rolling, strategically timed production and shifting control narratives have surfaced before.

*Documented Fee Categories*

102. Exhibit S organizes the fee-and-cost request into four documented but-for categories. The principal total reflected in the schedule is $825,407.26, itemized as follows:

| Category | Description | Documented Amount |
| --- | --- | --- |
| A | Pre-Arbitration Form U4 Filing Errors | $41,517.40 |

| | | |
|---|---|---|
| B | Procedural Rule 13201(a) / Rank-and-Strike Costs | $36,060.75 |
| C | Discovery Obstruction Costs | $137,345.00 |
| D | Direct Prosecution / Proceeding Costs | $610,484.11 |
| | | **$825,407.26** |

**Categories A and B** reflect costs the Panel left unremedied. The BAA contemplated relief equivalent to what would have been available in court on a covered claim, Ex. B ¶ 7(h); those unaddressed expenses therefore carry forward.

**Category A**: U4 Errors ($41,517.40). Legal and consulting costs incurred to address JPMS's unprovoked Form U4 errors. Ex. S.

**Category B:** Procedural Costs ($36,060.75). Procedural arbitration costs required to attain standing for the Form U5 clearing process, distinct from the merits of the defamation claims. Ex. S.

**Category C:** Discovery Obstruction ($137,345.00). This category covers the eDiscovery, forensic reconstruction, and motion practice expenses incurred solely because JPMS withheld evidence in violation of FINRA rules. Ex. S. *See* ¶¶ 61--68, *supra.*

**Category D:** This category covers the direct prosecution costs that would not have been incurred but for Respondents' inaccurate and pretextual Form U5 filing and the bad-faith discovery conduct documented in ¶¶ 61--68, *supra,* up to and including this FAA proceeding. Ex. S.

103. Petitioner seeks only the documented amounts reflected in Ex. S and the supporting invoices, subject to the but-for causation principles described in *Goodyear*. The request is therefore limited to the contemporaneous schedule rather than to any broader estimate. Category C is independently warranted because it directly tracks the discovery motion practice, reconstruction work, and review burden that Respondents' bad-faith conduct made necessary. To the extent the Court finds other Ex. S categories likewise caused by bad-faith conduct left uncured by the Panel, it may award those documented amounts as well. The requested sanction is compensatory, not punitive.

35

**GROUND FOUR: VACATE THE NON-FINAL PORTIONS UNDER 9 U.S.C. § 10(a)(4)**

104. The Award fails § 10(a)(4)'s finality requirement because it does not resolve the submitted claims into a determinate legal outcome. Instead, it combines (i) entity findings that do not identify the actor legally responsible for the conduct and (ii) findings of inaccuracy, intentional hindrance, recurrence, and professional harm that are assigned no operative legal consequence. The resulting disposition is not readily reducible to an enforceable judgment.

**Finality Defect No. 1: Undifferentiated Entity Attribution**

105. The Award's entity findings are jurisdictionally incoherent. The Award simultaneously attributes conduct to a singular undifferentiated "Respondent," disclaims any determination as to JPMC and JPM Bank, and describes conduct the record distributes across those separate entities. Award at 3--5; *see* ¶¶ 76--79, *supra*. The Court therefore cannot determine who, if anyone, was found responsible for the conduct the Award itself describes. *Brabham*, 376 F.3d at 380.

106. The Award supplies no coherent path from findings to disposition. An arbitration award must be sufficiently definite to permit the Court to determine the basis and effect of the disposition. Here, the Award contains no stated rule---whether no injury, no causation, full mitigation, privilege, or some other damages limitation---that connects its findings to its outcome.

107. A panel may award zero damages where it finds no injury or no causation. But where the panel makes express findings of intentional hindrance, regulatory inaccuracy, recurrence, and foreseeable professional harm, a zero-dollar disposition in that context does not reveal the basis on which the Panel resolved the claim. That is not a wrong damages calculation. It is an incomplete adjudication. *Enterprise Wheel*, 363 U.S. at 597. Because the Award does not specify the legal basis for denying relief despite its findings, the Court cannot enter judgment on it without supplying reasoning the Panel itself did not provide. *Brabham*, 376 F.3d at 380; *Brown*, 340 F.3d at 215--16.

108. The defect is statutory and facial. Petitioner does not invoke *Jarkesy* as an independent ground of vacatur. At most, *Jarkesy* underscores the narrower point that findings sounding in culpability, harm, recurrence, and deterrence still require a determinate disposition. 603 U.S. 109 (2024). The defect here remains statutory and facial: the Award identifies no rule connecting its findings to zero damages and no defamation.

**Finality Defect No. 2: No Findings-to-Disposition Path**

109. The Award does not disclose the theory on which it denied relief. It does not state whether it relied on at-will status, on U5 accuracy, or on some other rationale altogether. Petitioner submitted a formal resignation before any purported discharge designation. Ex. E (CX-021; JPMS_00027085). Natsource recognizes that where resignation precedes termination, the resignation is the operative event. 151 F. Supp. 2d at 469. Yet the Award does not indicate whether that principle was applied, rejected, or deemed irrelevant. That silence confirms that the Award's operative legal basis cannot be determined. The Award does not reveal whether it relied on at-will status, U5 accuracy, or some other theory. Petitioner submitted a formal resignation before any purported discharge designation. Ex. E (CX-021; JPMS_00027085). Natsource recognizes that when resignation precedes termination, the resignation is the operative event. 151 F. Supp. 2d at 469. More important here, the Award does not indicate whether it relied on at-will status, on a view that the U5 was nonactionable despite being inaccurate, or on some other theory altogether. That silence reinforces that its operative legal basis cannot be determined.

110. The investigation record was before the Panel---including the 29-minute escalation from PTO email to rapid-response file opening, Cohen's "hoping to wrap . . . with a term" email, the "amend the U4 ASAP" and "finalize wording" instructions, and the two-minute gap between expense exoneration and RFT approval, see ¶¶ 55--57, supra---yet the Award does not identify whether those facts were credited, rejected, or deemed immaterial.

111. Mitigation does not explain the zero-dollar disposition. Mitigation can reduce damages to zero only if it fully offsets proven harm. The Award does not state that conclusion or identify any calculation supporting it. Its sole stated rationale---that Petitioner found

"lucrative employment" within two months, Award at 5---restates the variable the expert already credited through a $12,035,470 RJA mitigation offset, leaving net damages of $10,684,413 to $17,958,189. See ¶¶ 69--72, supra; Ex. D (CX-030). The Award does not say it found no residual injury, no causation, or full offset.

112. The Award found recurrence and foreseeable harm but did not explain the consequences. The Panel found that Respondent had "done this in the past," was concerned the conduct "may be a pattern," and acknowledged that the absence of a clean U5 makes it very difficult to move to a Tier one competitor. Award at 4--5. Those findings bear directly on foreseeability and reprehensibility and align with the obvious industry consequence that an adverse U5 will be reviewed by prospective employers. See J.P. Morgan Sec. LLC v. Luckett, No. 3:22-cv-137-RGJ, 2023 WL 6050230, at *5--6 (W.D. Ky. Sept. 15, 2023) ("JPMS was likely to know of this practice as a member of the same industry and would have expected [the claimant's] potential employers to conduct this kind of review"; confirming $1.4 million FINRA award against JPMS; denying vacatur). Those are liability-level findings. The Award does not explain what legal consequence, if any, they carried.

113. Comparable FINRA proceedings confirm that a zero-dollar disposition in the face of such findings is an outlier. Petitioner cites these proceedings not to argue the Panel was required to reach the same result, but to show that the Award's outcome—against its own liability-level findings—cannot be reconciled with directly comparable authority:

(i) **Luckett v. J.P. Morgan Securities LLC**, FINRA No. 19-03075 (Award, Feb. 4, 2022), *confirmed, J.P. Morgan Sec. LLC v. Luckett*, No. 3:22-cv-137-RGJ, 2023 WL 6050230 (W.D. Ky. Sept. 15, 2023): $1.4 million compensatory; U5 expungement ordered based on the "defamatory nature" of the U5 information. The federal court denied JPMS's vacatur attempt, holding that JPMS, "as a member of the same industry," was "likely to know" that prospective employers would review the U5 and that the filing would harm the claimant's hiring prospects. *Id.* at 5--6. Same lead defense counsel. Same U5 fact pattern.

(ii) **Becht v. J.P. Morgan Securities LLC**, FINRA No. 23-03185 (Award, Apr. 8, 2025): $363,200 compensatory; $50,000 punitive; U5 expungement. The sole arbitrator found the same Global Security investigation methodology "woefully

inadequate" and "rubber stamp[ed]," found retaliation based on the claimant's job search, and found the U5 language caused "irreparable harm." Becht Award at 4–5. Same institutional respondent. Same investigation channels.

(iii) **Han v. J.P. Morgan Securities LLC**, FINRA No. 18-02978 (Award, Jul. 7, 2023), aff'd, 227 A.D.3d 469 (N.Y. App. Div. 2024): $2.5 million; U5 expungement. Han managed approximately $250 million AUM at separation; a comparable per-AUM multiple implies a $10–12.5 million range for Petitioner's $1 billion book. The Appellate Division affirmed.

(iv) **Munizzi v. UBS Financial Services, Inc.**, FINRA No. 18-02179 (Award, Dec. 11, 2019), confirmed, *Munizzi v. UBS Fin. Servs. Inc.*, 2021 IL App (1st) 201237: $3,149,656 compensatory; $7.5 million punitive; total judgment $11,170,790.86; U5 changed to neutral language. The Illinois Appellate Court affirmed, holding there is "no public policy favoring false or defamatory disclosures by employers." 2021 IL App (1st) 201237, ¶ 37.

114. The Panel Chair's own prior explained decision applied a different framework to a parallel U5 case. In *Bhatti v. Wells Fargo Clearing Services, LLC*, FINRA No. 22-01852 (Award, Sept. 4, 2024), Panel Chair Cromartie presided over a U5 defamation claim involving the same affiliate-employer/broker-dealer structure, wrote an explained decision, and awarded $40,000 in compensatory damages plus partial expungement. The *Bhatti* decision found termination "may have been pretextual" given "the harshness of termination and the fact that ample alternatives, such as warnings or reprimands, were available." Bhatti Award at 3.

115. It imputed the bank employer's knowledge to the broker-dealer U5 filer, holding: "Although Wells Fargo and Respondent may be separate entities, we find that all of Wells Fargo's knowledge should be imputed to Respondent." *Id.* And it found the false U5 entry "defamatory" and that it "substantially impaired Claimant's ability to secure employment in his desired career." *Id.* In this case, the same Chair made stronger predicate findings---intentional hindrance, pattern conduct, regulatory inaccuracy, foreseeable career harm---yet the Award assigned no operative consequence to any of them. That inconsistency is not a basis for vacatur in itself, but it reinforces that the

disposition cannot be understood as a reasoned application of any stated legal framework.

116. The defamation denial is equally indefinite. The Award found the U5 "inaccurate" yet denied defamation liability without identifying which element failed. Award at 4. Without identifying whether the denial rested on falsity, implication, privilege, publication, fault, damages, or some phase-specific limitation, the Court cannot determine what was actually decided. Each possibility carries different consequences for judgment and preclusion. *See Turner*, 38 S.W.3d at 114--15; *Tatum*, 554 S.W.3d at 624--25; *Hancock*, 400 S.W.3d at 65--66.

117. The record placed distinct publication phases before the Panel, each imposing a different informational burden and carrying different defamation elements. *See* ¶ 74, *supra* (Phase 1: leave without notification; Phase 2: code-of-conduct termination without U5; Phase 3: "Discharged" / "inappropriate behavior" on CRD); Ex. P (Rule 202 Petition); Ex. P-1 through P-4 (Rule 202 Citations). The Award does not identify which phase or phases it meant to reject, whether some phases were not reached, or why. Giving the Panel the benefit of the doubt, that silence is more naturally read as an unresolved findings-to-disposition gap than as ignorance of the governing law. But if the Panel meant silently to reject all phases on the merits, the Court would still be left to supply a theory the Award never states. Either way, the Court cannot tell what publication conduct, if any, was adjudicated to finality.

118. This is a finality defect, not a merits appeal. Petitioner does not ask the Court to choose a damages figure or reweigh competing inferences. He asks only that the Court recognize the narrower defect on the face of the Award: it describes intentional and harmful conduct, yet does not disclose why that conduct produced zero damages and no defamation liability. If the Panel lacked jurisdiction or declined to reach some phases, the Award is incomplete. If it reached them and rejected them, the Award does not disclose the governing theory.

119. The Court cannot determine the operative basis for judgment from the Award as written. Because the Award does not identify the liable actor, the controlling theory, or the basis for denying relief, the Court cannot enter judgment on the damages and

defamation portions without supplying reasoning the Panel itself did not provide. *Brabham*, 376 F.3d at 380; *Brown*, 340 F.3d at 215--16.

**Finality Defect No. 3: Unresolved Records and Submitted Issues**

120. The same problem appears in the Award's other silences. The omission of any disposition on the admitted U4 errors, together with the exclusion of JPMC, JPM Bank, and deleted statutory claims from final adjudication, reinforces that the Award did not resolve the submitted dispute into a determinate legal result. *See* ¶¶ 78--80, 83--85, *supra*.

121. The record reflects shifting positions regarding forum scope and control over relevant materials, confirming that remand would reproduce the same indeterminacy. *See* ¶¶ 47, 79, *supra*; ¶¶ 110--114, *infra*.

122. *Alpine* confirms that FINRA acts under delegated Exchange Act authority, and *Loper Bright* confirms that courts decide questions of legal effect. Those authorities do not expand FAA review. They underscore why the finality question presented here belongs to this Court rather than to a remand into the same constrained forum. Taken together, these defects leave the Court unable to determine who is liable, for what conduct, under what legal theory, or why no relief was awarded despite findings of harm. That is not a deferential-review problem. It is the absence of a mutual, final, and definite award under § 10(a)(4).

## GROUND FIVE: RETAIN JURISDICTION BECAUSE REMAND WOULD REPRODUCE THE DEFECT

123. Following partial vacatur, this Court should retain jurisdiction to give operative effect to the confirmed and corrected portions of the Award and to adjudicate the claims the arbitral forum could not reach. Remand to any alternative forum would perpetuate, not cure, the structural defect. Universal Am. Barge Corp. v. J-Chem, Inc., 946 F.2d 1131, 1134 (5th Cir. 1991). Retained jurisdiction is not an invitation to conduct a trial de novo on matters the Panel decided. It is the necessary consequence of partial vacatur where no alternative forum possesses the jurisdiction to supply the missing disposition.

124. Remand to FINRA. FINRA already heard this dispute through a full evidentiary record. A remand would recreate the same fragmented posture: JPMS before the panel, JPMC and JPM Bank outside it, the statutory claims elsewhere, and the U4 issue unresolved. The defect is structural, not a clerical omission.

125. Remand to AAA. AAA remains a protective filing to preserve limitations. Respondents directed U5 issues into FINRA; they cannot now use AAA to further fragment the same dispute. New Hampshire, 532 U.S. at 749--51.

126. SEC Review. SEC review cannot supply the relief requested. The issue here is the operative effect of a specific FINRA award under the FAA. That is a judicial function.

127. Reserved Statutory Arguments Do Not Cure the Finality Defect. Petitioner preserves any EFAA or other statutory arguments concerning the claims FINRA required him to delete. He does not invoke the EFAA as an independent ground for vacatur here. The narrower point is that a second arbitration would not cure the finality defect created by the first forum's jurisdictional limits.

### X.    PRAYER FOR RELIEF

128. WHEREFORE, Petitioner requests that the Court:
   (i)    **CONFIRM IN PART** pursuant to 9 U.S.C. § 9, the Award's severable findings of historical fact and regulatory misconduct, which were actually litigated and reflected in the Panel's explained decision, its U5 correction directives, and FINRA forum fees previously assessed against Respondent, JPMS;

   (ii)   **MODIFY IN PART** under 9 U.S.C. § 11(b)–© and ancillary equitable authority: direct removal, nullification, or full expungement from CRD (including archived entries) of the five erroneous Form U4 financial disclosures Respondent admits were filed in error, and implement the Award to give effect to the Panel's confirmed findings;

   (iii)  **VACATE IN PART** under 9 U.S.C. § 10(a)(4) the Award's dispositive conclusions regarding damages and defamation liability which were so

42

imperfectly executed that the Panel failed to render a mutual, final, and definite disposition of the issues submitted;

(iv) **AWARD ANCILLARY EQUITABLE RELIEF**, under the Court's inherent authority (*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)), the documented fees and costs totaling *$825,407.26* across four categories detailed in Ex. S, together with all taxable costs and pre- and post- judgement interest as permitted by law;

(v) **RETAIN JURISDICTION TO DETERMINE OPERATIVE EFFECT AND RESOLVE** without remand, the claims and remedies an arbitral forum could not render a final and complete decision upon, including:

  (a) adjudicated, yet unresolved claims against JPMC and JPM Bank (collectively, the "Non-Signatories") arising from the conduct reflected in the Panel's confirmed findings;

  (b) determination of the operative legal effect of the Panel's express findings in relation to its dispositive conclusions;

  (c) adjudicate statutory employment discrimination claims against all three named Respondents that were procedurally excluded from the FINRA forum under FINRA Rule 13201(a); and

  (d) ensure consistent application of the Award's confirmed findings across all Respondents properly before this Court; and

(vi) **GRANT** such other and further relief as the Court deems just and proper.

## XI.   VERIFICATION

129. I, Joshua David Sappi Biering, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Petition and that the factual allegations stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on 3/30 (March 30) 2026, in Fort Worth, Texas.

43

Respectfully submitted,

JOSHUA DAVID SAPPI BIERING

4635 Washburn Ave

Fort Worth, TX 76107

(682)-218-6738

jdsb@bierfam.com

*Pro Se*

44

## XII.   CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1, the undersigned certifies that on March 23, 2026, he conferred with Jeffrey S. Dunlap of UB Greensfelder LLP, counsel for Respondents, regarding the relief requested in the foregoing Verified Petition. Counsel stated that the petition is opposed.

## XIII. CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, a true and correct copy of the foregoing Verified Petition to Confirm in Part, Vacate in Part, and Modify in Part a FINRA Arbitration Award, together with all exhibits, was served on all counsel of record for Respondents in a manner authorized by Federal Rule of Civil Procedure 5(b)(2) via certified mail, return receipt requested, and by email to counsel for Respondents.

JOSHUA DAVID SAPPI BIERING

Case No. _____

## XIV. INDEX OF EXHIBITS

**Exhibit A**  *Arbitration Award*

**Exhibit B**  *Award Service Letter*

**Exhibit C**  *Binding Arbitration Agreement*


*[Attach exhibits after this page, each starting on a new page with an exhibit cover sheet]*

*Notice Regarding Exhibits: Included here are Exhibit A (FINRA Arbitration Award), Exhibit B (Award Service Letter), and Exhibit C (Binding Arbitration Agreement).*

46

Case No. _____

## APPENDIX A — SOURCE VERIFIED CHRONOLOGY OF THE FINALITY DEFECT

This appendix provides a source-verified, phase-organized chronology of events supporting the claims in the foregoing Petition. Entries map to a specific jurisdictional, procedural, or award-defect argument. This chronology does not challenge the Panel's merits findings.

**Phase 1 — The Employment Relationship and Regulatory Record Created the Entity-Mismatch Problem (2016–Sept. 2023)**

| Date | Event | Source | Significance |
|---|---|---|---|
| Apr. 25, 2016 | Employment begins with JPMorgan Chase Bank, N.A. | CX011; Ex. H ¶ 2 | Petitioner enters JPMorgan through Military Officer Executive Development Program. Employing entity is JPM Bank, not JPMS—sets up entity-identification defect. |
| Dec. 15, 2017 | Petitioner becomes licensed: Series 7, Series 63, Series 65 | CX011; Ex. H ¶ 2; Ex. M | Petitioner is now a dual-registered Associated Person (CRD No. 6883842): broker-dealer representative (Series 7), state securities agent (Series 63), and investment adviser representative (Series 65). Broker-dealer registrations run through JPMS. |
| March 2018 | JPMS files first of five Form U4 disclosures mischaracterizing student-loan disability discharges as bankruptcies/compromises with creditors | Ex. K; CX-026; Petition ¶ 61 | Five U4 errors—eventually admitted as "filed in error"—were **publicly visible on BrokerCheck** for years, carrying severe professional stigma: prospective employers, clients, and regulators could see what appeared to be five separate bankruptcy or creditor-compromise events. Archived entries remain visible through CRD background review. Panel Chair at |

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | | | hearing: "this makes no sense to me. I don't care that they're archived." Supports U4 relief left undecided.[8] |
| Apr. 13, 2022 | Customer complaint filed (Occurrence No. 2204024; $109,697.16) | Ex. M; Petition ¶ 85 | A separate Form U4 disclosure—distinct from the student-loan entries. The Award addressed this complaint and found that while there "may have been some discussions" about JPMS paying attorney's fees for expungement, "no such agreement was ever reduced to writing." Award at 4–5. The complaint was expunged via FINRA Arb. No. 23-03445 (Oct. 25, 2024) and confirmed by this Court, No. 4:24-cv-01099-O (N.D. Tex. Jan. 7, 2025).[9] |
| Oct. 23, 2023 | Gold Producer recognition + Global Security Case No. ECNA1020239740 opened **same day** | CX-109; Petition ¶ 55 | Simultaneity of peak recognition and investigation opening—Panel relied on this as pretext evidence (Award at 4). |

**Phase 2 — Three Overlapping Investigations, the Separation Sequence, and Managed U5 Wording (Oct.–Dec. 2023)**

---

[8] The student-loan U4 errors are distinct from the customer complaint discussed in the next entry. Each of the five student-loan disclosures appeared as a separate entry on BrokerCheck, publicly mischaracterizing federally authorized disability discharges. JPMS acknowledged the entries were erroneous, yet the Award contains no disposition on the U4 correction relief Petitioner requested. *See* Petition ¶¶ 61–62; 9 U.S.C. § 11(b)–(c).

[9] The customer complaint and the student-loan U4 entries involve different regulatory records and different legal theories. The Panel's finding that JPMS's promise to pay expungement attorney's fees was unenforceable for lack of a written agreement (Award at 4–5) disposed of the contract claim for fees, but did not address the student-loan U4 corrections, which rest on JPMS's own admission of error and the Panel Chair's own hearing statement.

Case No. _____

The record reflects three overlapping internal tracks that converged after management learned Petitioner might leave: (1) a Global Security expense inquiry, (2) a documented performance fallback inside HR/ER, and (3) a Rapid Response workplace-conduct investigation. Award at 4; Petition ¶ 56. The two operative tracks had **inverted timelines**: the ER/Rapid Response track (Track 3) started later (Oct. 26) and concluded first (~Nov. 8), producing the "inappropriate behavior" label placed on the U5; the expense track (Track 1) started earlier (Oct. 17/23) and ran longest (through Nov. 29), concluding "not supported." ER was instructed to hold formal closure until the expense investigation closed, so both could be "dispositioned simultaneously." Meanwhile, JPMorgan used the garden-leave period to secure Petitioner's largest client relationship and hot pipeline opportunity that ultimately closed in September 2024.

| Date | Event | Source | Significance |
|---|---|---|---|
| Oct. 2–3, 2023 | Petitioner submits expense reports through JPMorgan's standard expense system; expenses reviewed and approved through normal supervisory process | Ex. AA | The very expenses Stewart later flagged as "concerning" had already been approved by him. GS later found Petitioner's expenses "fairly consistent for at least 12 months" and "similar patterns of expense activity" to peers including Stewart himself. JPMS_00028911. |
| Oct. 17, 2023 | Stewart opens HR service case regarding Petitioner's expenses— 15 days after approving them | CX-184; JPMS_00 024952 | **Track 1 (Expense):** Stewart provided only a "vague weekly expense report" to GS, escalating to claims of "$8,000 in personal charges." Investigation ultimately found allegations "not supported." |
| Oct. 23, 2023 | **(Same day):** Gold Producer recognition at national town hall + Global Security formally opens expense | CX-109; JPMS_00 028911; Petition ¶ 55 | Simultaneity of peak recognition and investigation opening—Panel relied on this as pretext evidence (Award at 4). |

49

Case No. _____

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
| | investigation Case No. ECNA1020239740 | | |
| Oct. 24, 2023 | Petitioner communicates resignation intent to Stewart, Aughinbaugh, and Hitchcock. Stainback escalates expense matter to Beth Wilson (ER). Wilson replies: "I will ensure the performance case is well documented so that if there is a plausible reason for Joshua's expenses and we have to **fall back on performance** . . ." (references performance case HRC0098308). A second HR participant responds: "I'll be sure it's well documented." | JPMS_00 026881; Ex. AB; Petition ¶ 55 | **Track 2 (Performance fallback):** Pre-scripted backup narrative created before any investigation concludes— Panel found JPMS "began investigating reasons to terminate" (Award at 4). Three tracks now open simultaneously. |
| Oct. 25, 2023 | Stewart sends follow-up email with more detailed expense allegations | CX-187 | Attempt to substantiate Oct. 17 claims after the fact. GS ultimately dismissed these allegations. |
| Oct. 26, 2023 | PTO email (1:05 PM CST) → ER rapid-response case opened (1:34 PM CST) | CX-122; CX-020; Petition ¶ 55 | **Track 3 (Rapid Response/ER):** 29-minute escalation from personal-day email to formal rapid-response investigation. Three investigation tracks now running concurrently. |

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| Oct. 27, 2023 | **Petitioner was already on his own approved leave from JPMS and was not at work.** He was at the Merrill Lynch office signing onboarding documents for a competitive transfer. The day unfolded as follows: (a) 8:11 AM: Stewart emails supportive message concealing investigations; (b) 10:30 AM: Jacobs & McGee interview Kimball; Stainback escalates to "Rapid Response"; (c) 2:35 PM: Stewart texts Petitioner "call me at the office as soon as possible" (knowing from calendar access that Petitioner is at Merrill); (d) 3:34 PM: Velasquez reclassifies allegation to **"sexual assault"**— recommends "placing subject on paid admin leave **today if** | CX-224; JPMS_00 029339; JPMS_00 023374; JPMS_00 021517; CX-126; CX-127; CX-188; BIERIN G_931 | Petitioner was not at work, was on his own approved leave, and was already transitioning to a competitor when JPMS escalated the Kimball allegations to "sexual assault" to invoke Rapid Response protocols and place him on administrative leave the same day. Cohen's predetermination email came only **5.5 hours** after the investigation formally opened. The Award confirmed: "Claimant was placed on administrative leave on October 27, 2023, without being informed of the claim being asserted against him." Award at 4. |

51

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | possible"; (e) 4:36 PM: Petitioner returns Stewart's call → **placed on involuntary paid administrative leave** without being informed of the claim against him; (f) 5:05 PM: Jacobs sends Rapid Response Opening Memo to Legal and HR; (g) 6:43 PM: JPMS IT accesses Petitioner's calendar (CX-224), confirming awareness of the Merrill meeting—destroying Stewart's later claim to Sanchez that he "was not aware" (CX-188); (h) 10:30 PM: Cohen emails: "FYI **hoping to wrap early next week with a term.**" | | |
| Oct. 28, 2023 | **Formal written resignation submitted** (9:45 AM via email + me@jpmc HR system). Resignation triggered a **60-day Notice Period ("garden leave")** under Respondent's policies, | CX-021; JPMS_00 027085; Award at 4 | The Panel corrected the U5 termination date to **October 28, 2023**—the date of voluntary resignation. Award at 3–4. The Award specifically found: "At no time following October 27, 2023, was Claimant permitted to engage in any conduct with Respondent for which |

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | during which Petitioner remained a nominal employee but was barred from engaging in any registered activity. Garden leave was set to expire approximately **December 27, 2023.**[10] | | registration would be required." Award at 4. The corrected date therefore marks the end of all broker-dealer activity, not just the employment relationship. |
| Oct. 28, 2023 | Cohen emails (12:30 PM): Petitioner is "likely to go work for Michael Parrelly at MS or ML so we should make sure we **amend the U4 ASAP** as he likely just cleared their background." Stainback instructs Registration (5:37 PM): **"not file the U5 until further notice** so we can **finalize wording."** | JPMS_00 027085 | Same-day sequence: resignation (9:45 AM) → competitive-motive email (12:30 PM) → U5-hold instruction (5:37 PM). Documents institutional coordination of the regulatory filing to hinder competitive transfer. |
| Nov. 2, 2023 | Jacobs (ER, Jersey City) sends formal investigation notification to Petitioner—**five days** | JPMS_00 021645 | First written notice to Petitioner that an investigation existed. He had been placed on leave Oct. 27 without being told the nature of the complaint. |

---

[10] The Award states: "Respondent's policies required Claimant to remain an employee on a 'Notice Period' or 'garden leave' for 60 days after resignation, unless earlier terminated by Respondent." Award at 4. The 60-day garden leave from October 28 resignation would have expired approximately December 27, 2023. JPMS terminated Petitioner on December 1—Day 34 of 60—converting the voluntary resignation into a "Discharged" U5 before the garden leave had run its course. The significance for the finality defect is that the Award corrected the termination date to October 28, implicitly treating the garden-leave termination as improper, yet awarded $0 damages for the resulting 2+ years of inaccurate U5 harm.

53

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
| | after being placed on administrative leave and five days after resignation | | |
| Nov. 7, 2023 | Jacobs and Magee interview Petitioner by phone regarding the Kimball allegations | Respondent's Prehearing Brief | Petitioner's version recorded. This is the only interview of Petitioner during the ER track. |
| ~Nov. 8, 2023 | **Track 3 (ER/Kimball) substantively concluded.** ER determined it had enough to support a termination recommendation. However, ER was instructed to **hold formal closure** to "disposition simultaneously" with the still-pending expense investigation. | Claimant's Prehearing Brief; JPMS_00028911 | The ER track—the "inappropriate behavior" / anti-harassment track that actually generated the U5 rationale— was **substantively complete by approximately November 8**, roughly **12 days** after it opened. It was the **faster** investigation. Yet the formal closure was deliberately delayed to synchronize with the expense investigation, which would not close for another three weeks. This coordination disproves any claim that the two tracks were independent. |
| Nov. 15, 2023 | **(Same day)**: (a) GS interviews Petitioner as part of expense investigation—the only interview of Petitioner during the expense track; (b) **JPM advisors visit the headquarters of Petitioner's** | JPMS_00028911; Colby Decl. ¶ 9 | JPMorgan visited Petitioner's largest client relationship the same day it interviewed him about expenses. Petitioner could not contact his own clients during garden leave, but JPMorgan could—and did. |

54

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | **premier prospect**—his largest pipeline relationship (~$600 million)—while Petitioner is on garden leave and prohibited from client contact. | | |
| Nov. 16, 2023 | GS communicates with Stainback regarding comparable expense data. Stainback states "she believed HR **had enough reason to term Josh**"—despite no formal findings from either investigation. | JPMS_00 028911 | Stainback's statement confirms the termination decision preceded any investigation conclusion. The expense investigation had not yet interviewed the subject (that happened just the day before); the ER track's formal closure was being held. |
| Nov. 28, 2023 | **"JPM bus"** visits the same premier prospect again. JPM advisors inform the principal they "appreciated his business" and discuss increasing his credit line. | SOC ¶ 56; Colby Decl. ¶ 9 | Second client visit in two weeks. JPMorgan was actively securing the business Petitioner had built—his largest pipeline relationship—while he sat on involuntary garden leave unable to communicate with his own clients. |
| Nov. 29, 2023 | **The critical day.** Three events converged: **(a) 11:29 AM(?)/1:38 PM CST:** Jacobs circulates Draft RFT ("Recommendation for Termination") to | CX-031; Ex. F (JPMS_2 5338); JPMS_00 028911; JPMS_00 | The sequence tells the full story: (1) The RFT was circulated **before** the expense investigation concluded—proving the termination was not contingent on the expense findings. (2) The expense track—the only investigation that produced a |

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | Aughinbaugh and Stewart for approval—**before** the expense investigation closed. **(b) 2:42 PM CST: Track 1 (Expense) closes.** GS expense investigation close-out: "Allegations **not supported**"—"GS was not in receipt of any evidence to substantiate the allegations"; "no evidence to support the allegations of Theft from Firm/Expense Reimbursement"; found Petitioner's expenses "fairly consistent for at least 12 months" and "similar patterns of expense activity" to peers. **(c) 2:44 PM CST:** Stewart replies "I approve"—**two minutes** after the exoneration. **(d) Same day:** JPMorgan **doubled** the prospect's credit line from **\$10 million to \$20 million**—the very loan Petitioner had "fought | 001424; SOC ¶ 56; Colby Decl. ¶ 9 | documented close-out—**cleared Petitioner.** (3) Stewart approved termination two minutes after exoneration, relying instead on the ER track that had been substantively complete since ~Nov. 8 but held open for exactly this moment. (4) The same day, JPMorgan locked down Petitioner's largest client relationship. The expense investigation was never about expenses. It was held open to provide a simultaneous-disposition cover story while the firm secured the business Petitioner had built. |

Case No. _____

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
|  | tooth and nail to secure." |  |  |
| Nov. 30, 2023 | Jacobs sends signed RFT with instructions: "The termination code you should use is **CON for Misconduct**." Includes talking points for the Dec. 1 termination call. Jacobs also circulates the **ER Closing Memo (CX-172)**. | JPMS_00 001424; CX-172 (JPMS_2 9313) | The ER Closing Memo was dated the day after the expense close-out— confirming the formal ER closure was synchronized with the expense track as described. The termination code "CON" (Misconduct) was applied despite the only completed investigation (expense) having cleared Petitioner. |
| Dec. 1, 2023 | **Termination call.** JPMS notifies Petitioner that his employment is terminated for "violation of Respondent's code of conduct." "Not related to the sale of securities or any customer complaints." This was **Day 34** of garden leave (Oct. 28 → Dec. 1). The 60-day Notice Period would not have expired until approximately Dec. 27. | Award at 4 | JPMS terminated Petitioner during the garden-leave Notice Period, converting what the Panel later found was a voluntary resignation into a "Discharged" U5—the basis for the regulatory harm. Both parties concede the violation did not involve regulatory concerns. The Panel corrected the termination to "Voluntary." |
| Dec. 7, 2023 | Petitioner files formal retaliation complaint through JPMorgan Code of Conduct Hotline | JPMS_00 025619; Ex. X | Reported through an ostensibly independent channel. The same HR/ER group the Panel found had a "pattern of conduct" intercepted the |

| Date | Event | Source | Significance |
|---|---|---|---|
| | | | complaint. Sanchez later assigned to investigate retaliation—interviewed Stewart on Jan. 16, 2024, where Stewart falsely stated he "was not aware" of the Merrill Lynch meeting. CX-188. |
| Dec. 22, 2023 | **Form U5 filed.** Reason for Termination: "Discharged." Termination Explanation: "After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints." | Award at 3–4; JPMS_00 027085 | Filed **55 days** after resignation (Oct. 28), **21 days** after termination (Dec. 1), and **exactly 15 days** after the Code of Conduct Hotline retaliation complaint (Dec. 7). The filing was held per the Oct. 28 "finalize wording" instruction—not delayed by processing constraints. FINRA By-Laws, Art. V, § 3 requires filing within 30 days of termination (deadline: Dec. 31, accounting for FINRA office closures Dec. 25 and Jan. 1). The U5 was filed within the regulatory window, but the deliberate hold instruction preceded the termination itself by 34 days.[11] |
| Jan.–Feb. 2024 | Petitioner secures employment with Raymond James & | Ex. M; Ex. K (CX086– | Award at 5: Petitioner "secured lucrative employment with a highly respected national brokerage firm less |

[11] Under FINRA By-Laws, Art. V, § 3, a member firm must file a Form U5 within 30 days of the date of termination. Termination occurred December 1, 2023. Thirty calendar days from December 1 is December 31, 2023. FINRA offices were closed December 25 (Christmas) and January 1 (New Year's Day). The U5 was filed December 22—within the regulatory window. But the filing was delayed not by processing constraints but by the deliberate "finalize wording" hold instruction issued October 28, 2023—**34 days before the termination itself**. The stated rationale for the U5 also kept changing internally: the matter was at various points described as a "serious sexual-misconduct allegation," an "anti-harassment-policy issue," "inappropriate behavior," and a "lapse of judgment." JPMS_00023374; Award at 3–4; Ex. T-1A. That inconsistency matters because FINRA Notice 10-39 requires specificity, not generalized characterizations.

58

| Date | Event | Source | Significance |
|---|---|---|---|
| | Associates, Inc. ("RJA") as Senior Vice President, Wealth Management; registration transferred. Within days of new CRD registration, **state securities regulators in Missouri, Hawaii, Colorado, and Massachusetts** each issue letters of inquiry triggered by the U5 disclosures. | 089); Award at 5 | than two months after his termination." The Panel used RJA employment as its rationale for $0 damages—but the expert's net-loss analysis already credited a $12,035,470 RJA mitigation offset, leaving net damages of $10.7M–$17.9M. Ex. D (CX-030). The state regulatory inquiries confirm the U5's continuing harm. |

**Phase 3 — Retaliation Investigation, Administrative Filings, and JPMS Directed the Dispute into FINRA (Jan.–June 2024)**

| Date | Event | Source | Significance |
|---|---|---|---|
| Jan. 16, 2024 | Sanchez (ER) interviews Stewart as part of retaliation investigation triggered by Petitioner's Dec. 7 Code of Conduct Hotline complaint. Stewart tells Sanchez he "was not aware" that Petitioner was at Merrill Lynch on Oct. 27. | CX-188 | Stewart's denial is contradicted by JPMS IT's own records: at 6:43 PM on Oct. 27, the firm accessed Petitioner's calendar confirming the Merrill meeting (CX-224). The retaliation investigation was handled by the same ER group the Panel found had a "pattern of conduct." |
| Feb. 25, 2024 | EEOC Charge of Discrimination filed | CX-AAA-0038; Ex. | Federal administrative process initiated—statutory claims existed |

| Date | Event | Source | Significance |
|---|---|---|---|
| | (Charge No. 450-2024-04743); dual-filed with TWC | G | before FINRA. |
| May 24, 2024 | JPMS EEOC Position Statement: "disputes over Form U5 reporting must be adjudicated in FINRA arbitration" | Ex. U; CX-AAA-0039 | JPMS affirmatively channels the U5 dispute into the FINRA forum—the same forum from which it later excluded claims. |
| June 3, 2024 | Original Statement of Claim filed with FINRA (Case No. 24-01208) against JPMS; Submission Agreement and BAA attached; 14 causes of action including statutory employment-discrimination claims (Title VII, ADA, TCHRA) | Award at 1 | Arbitral jurisdiction established per JPMS's own EEOC direction. The original SOC named JPMS and asserted both statutory and non-statutory claims in a single forum, as the BAA contemplated. Not served on Respondent or considered by Panel (Award at 3). |
| Mar. 19, 2025 | EEOC issues Dismissal and Notice of Rights (Right to Sue letter) | CX-AAA-0042 | EEOC exhaustion completed. Right to sue within 90 days (deadline: June 17, 2025). The AAA protective filing preserves these claims. Placed here (out of strict date order) to close the EEOC track opened Feb. 25, 2024. |

**Phase 4 — FINRA Excluded Claims, Forced Claim Stripping, and Left Necessary Matters Undecided (July 2024–Oct. 2024)**

Case No. _____

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
| July 24, 2024 | FINRA disseminates arbitrator ranking forms under Rule 13802 (all-public, employment-law-qualified panel)—later acknowledged "sent in error" | Ex. J; Ex. L | FINRA's erroneous rank-and-strike packet triggered $32,657.50 in professional fees for Petitioner to evaluate a panel list that was subsequently voided. |
| Aug. 12, 2024 | First Amended SOC filed: adds JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. as respondents; retains all statutory employment-discrimination claims | Award at 1 | Broadened to correct entities. JPMC and JPM Bank declined to participate, did not file answers or sign Submission Agreements (Award at 1–2). Not served on Respondent or considered by Panel (Award at 3). |
| Aug. 13, 2024 | JPMS writes FINRA: "does not agree to arbitrate Claimant's statutory employment discrimination claims in this forum"; JPMC and JPM Bank "do not agree to arbitrate claims against them in FINRA arbitration"; requests new arbitrator list under Rule 13402(b) | Ex. I; Petition ¶ 87 | Filed on the **final day** of the rank-and-strike deadline. Seventy-one days after JPMS channeled the dispute to FINRA in its EEOC Position Statement, JPMS blocked the same claims there. FINRA withdrew the Rule 13802 all-public panel and reissued under standard Rule 13402(b) (one non-public + two public arbitrators)—stripping the employment-law-qualified panel composition the statutory claims required. |
| Sept. 5, 2024 | JPMS files initial Statement of Answer (to original filing) | Award at 2 | Respondent engaged on the merits while simultaneously objecting to forum scope. |

| Date | Event | Source | Significance |
|---|---|---|---|
| Sept. 6, 2024 | FINRA letter: directs Petitioner to "delet[e] all causes of action or requests for relief based on statutory employment discrimination, sexual assault, or sexual harassment" by September 20, 2024, or "this case will be closed without prejudice" | Ex. C | FINRA imposed an ultimatum: strip your statutory claims or lose the entire case. This was not a jurisdictional determination on the merits—it was an administrative directive that forced Petitioner to choose between (a) abandoning statutory claims or (b) losing the entire arbitration. No court reviewed or approved the claim stripping. The directive created the incompleteness defect by ensuring that material issues—including the very claims JPMS told the EEOC belonged in FINRA—could not be adjudicated in the forum JPMS selected. |
| Oct. 11, 2024 | Second Amended SOC filed "under protest": removes statutory employment-discrimination, sexual assault, and sexual harassment claims per FINRA directive; retains all three respondents (JPMS, JPMC, JPM Bank) | Award at 1, 3 | Deemed "the only Statement of Claim filed in this matter" (Award at 3). Petitioner preserved objection on the record. The 2nd Amended SOC kept all three respondents but was forced to remove the statutory discrimination claims JPMS had told the EEOC belonged in FINRA. |
| Oct. 31, 2024 | JPMS files Statement of Answer to Second Amended SOC; JPMC and JPM Bank decline participation | Ex. H; Award at 1–2 | Related entities escape accountability while claims against them remain unresolved. The Panel "made no determination" as to JPMC or JPM Bank (Award at 3). |

Case No. _____

## Phase 4A — Rank-and-Strike Panel Composition and Reconstitution (July 2024–Oct. 2025)

| Date | Event | Source | Significance |
|---|---|---|---|
| July 24, 2024 | FINRA issues Rule 13802 arbitrator ranking forms (all-public, employment-law-qualified panel) | Ex. J; Ex. L | Statutory employment-discrimination claims required all-public arbitrator panel with demonstrated employment-law qualifications under Rule 13802(c)(2)–(3). |
| Aug. 13, 2024 | JPMS objection triggers withdrawal of Rule 13802 panel; FINRA reissues under standard Rule 13402(b) | Ex. I; Ex. C | Panel composition downgraded from all-public/employment-qualified to standard mixed panel (one non-public + two public arbitrators). The $32,657.50 Petitioner spent evaluating the voided list was wasted. |
| Sept.–Oct. 2025 | Panelist Tanner Craig Forman withdrawn or removed; FINRA offered stipulation or short-list process | Ex. J | Panel reconstituted shortly before hearing dates. |
| Oct. 2025 | Alison Battiste Clement appointed as replacement non-public arbitrator; hearing dates reset | Ex. J | Final Panel: Eric Ross Cromartie (Public, Chair), Christine Rister (Public), Alison Battiste Clement (Non-Public). |

## Phase 5 — Discovery Withholding Necessitated But-For Expenses (Dec. 2024–Nov. 2025)

| Date | Event | Source | Significance |
|---|---|---|---|
| Dec. 6, 2024 | **D + 0:** Discovery requests served on | CX-AAA-0025 | Discovery clock begins. FINRA Rule 13507 sets T+60 response deadline of |

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| | Respondents | | February 4, 2025. |
| Feb. 4, 2025 | **D + 60:** Rule 13507 response deadline | FINRA Rule 13507 | Statutory deadline for Respondents to serve responses and produce documents. |
| Feb. 5, 2025 | **D + 61:** JPMS serves objections; produces **zero documents** | CX-AAA-0025; CX-AAA-0026 | One day late. First of serial obstructions; Panel intervention required. JPMS objected it did not possess documents responsive to requests supporting its own affirmative defenses. |
| Apr. 14, 2025 | JPMS opposes first motion to compel; invokes corporate separateness | JPMS Resp. in Opp'n | Beginning of the explicit entity-control dispute: JPMS argued affiliate documents were outside its possession, custody, or control—yet later produced internal Chase HR and JPMorgan documents on JPMS Bates numbers (JPMS_00027073, JPMS_00028663, JPMS_00027214–27217). |
| May 8, 2025 | **D + 153:** First motion to compel granted; Panel orders production by July 7, 2025 | CX-AAA-0030 | Panel had to order production—including affiliate-held documents used in preparing the Form U5. Discovery was not voluntary. |
| July 7, 2025 | **D + 213:** JPMS production ("final" #1) | CX-AAA-0031 | Prompted second motion to compel describing a "mass dump of logo pages, non-responsive slip sheets, and image attachments." |
| Aug. 4, 2025 | **D + 241:** JPMS opposes second motion to compel; pivots to production-volume narrative | JPMS Resp. in Opp'n to 2d Mot. | After earlier non-possession objections, JPMS argued it had already produced "almost 29,000 pages," shifting the story from non-control to supposed |

64

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
| | | to Compel | overproduction while key affiliate and HR materials remained missing. |
| Aug. 11, 2025 | **D + 248:** Additional production round | Production records | Rolling production continues. |
| Aug. 28, 2025 | **D + 265:** Second motion to compel filed; Panel orders production of opening/closing memos | CX-AAA-0034 | Continued obstruction. "Biering Book Analysis" (JPMS_00028664) still withheld. Privilege claimed over Investigation Opening and Closing Memos with no privilege log. |
| Sept. 8, 2025 | **D + 276:** JPMS production ("final" #2) | Production records | Second use of "final"—prompted additional motions. |
| Sept. 16, 2025 | **D + 284:** Additional production round | Production records | Rolling production continues. |
| Sept. 17, 2025 | **D + 285:** Additional production round | Production records | Rolling production continues. |
| Nov. 12, 2025 | **D + 341:** Third motion to compel filed | CX-AAA-0035 | Identified still-missing Skype communications and 2021–2023 peer-feedback data (including Oct. 2023 Kimball review calling Petitioner "excellent mentor"). JPMS attributed gap to Oracle HCM transition. |
| Nov. 22, 2025 | **D + 351:** Final production round—**one day before closing arguments** | Production records | Last of 9 rounds. 351 days from first request. $408,793.39 in attorney fees and eDiscovery expenses—47.5% of all case fees. Ex. S; Petition ¶¶ 63–75. Systemic obstruction prejudiced Petitioner's ability to prove damages. |

**Phase 6 — The Panel Issued Findings Without a Definite Disposition (Dec. 2025)**

65

Case No. _____

| Date | Event | Source | Significance |
|---|---|---|---|
| Dec. 3–5, 11–12, 15, 2025 | 6 hearing days, 11 sessions | Award at 5–6 | Full evidentiary proceeding—not a default; sufficient record for Panel to make a definite award. |
| Dec. 29, 2025 | Award issued (Cromartie 12/24, Clement 12/26, Rister 12/29) | Award at 1, 7 | **Starts FAA § 12 clock.** |

## Phase 7 — Post-Award Steps Preserved Review and Confirmed Ongoing Fragmentation (Dec. 2025–Present)

| Date | Event | Source | Significance |
|---|---|---|---|
| Feb. 11, 2026 | AAA protective filing (TCHRA statutory claims) | Petition ¶ 32 | Preserves claims stripped from FINRA—confirms forum fragmentation is ongoing. |
| March 13, 2026 | Fee-reimbursement demand ($32,657.50 for erroneous rank-and-strike) | Ex. L | Quantified procedural prejudice from the rank-and-strike error. |
| March 21, 2026 | Follow-up demand to FINRA DRS for written response by March 25, 2026 | Ex. L | Documents administrative record and deadline for FINRA written response. |
| March 26, 2026 | FINRA DRS (K. Bayer) denial of reimbursement request; Petitioner's written reply to R. Berry same day, renewing request and seeking executive and independent review | Ex. L | FINRA DRS administrative channels exhausted; correspondence record complete before filing. |

| Date | Event | Source | Significance |
|------|-------|--------|--------------|
| March 30, 2026 | This Petition filed | — | Within 3 months of Award—9 U.S.C. § 12 satisfied. |

## The Petition Was Timely Under FAA § 12

| Date | Event | Significance |
|------|-------|--------------|
| Dec. 29, 2025 | Award issued | Starts three-month clock under 9 U.S.C. § 12. |
| March 29, 2026 | Three-month deadline falls on Sunday; under Fed. R. Civ. P. 6(a)(1)(C), the period continues to Monday, March 30, 2026. | Last permissible filing date. |
| March 30, 2026 | Petition filed | Timely. |

## The Award's Internal Contradictions Confirm Non-Finality

These contradictions are the core of the § 10(a)(4) argument: an award this internally inconsistent is not "mutual, final, and definite."

| Finding | Award Language | Contradicting Outcome | Source |
|---------|----------------|-----------------------|--------|
| **Pretext** | "Began investigating reasons to terminate" | $0 damages— termination treated as legitimate | Award at 4 vs. 4–5 |
| **Pattern** | "Has been found to have done this in the past"; "may be a pattern of conduct" | No remedial or punitive consequences | Award at 4 |
| **Interference** | "Interfered with Petitioner's ability to compete" | $0 compensatory damages | Award at 4 vs. 3 |
| **U5 Correcti** | Changed to "Voluntary"; explanation deleted; date | No damages for 2+ years of inaccurate U5 or | Award at 3–4 |

Case No. _____

| Finding | Award Language | Contradicting Outcome | Source |
|---|---|---|---|
| **on** | corrected | career harm | |
| **Fee Shift** | All forum fees assessed against JPMS | No recognition of $408K discovery costs or $32K rank-and-strike costs | Award at 5–6; Ex. S; Ex. L |
| **Defamation** | Denied—no articulated theory | "finalize wording" directive + six publication phases documented | Award at 4; JPMS_00027085 |

TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i
TABLE OF AUTHORITIES ................................................................................... iii

          Cases      iii

          Statutes    v

          Rules and Regulations .......................................................................vi

          Other Authorities ............................................................................vii
UNITED STATES DISTRICT COURT ...................................................................1
VERIFIED PETITION TO CONFIRM, MODIFY, AND VACATE IN PART A FINRA
          ARBITRATION AWARD, AND TO RETAIN JURISDICTION ........................1
PRELIMINARY STATEMENT ...............................................................................4
I.         PARTIES ..............................................................................................9
A.        Petitioner .............................................................................................9
B.        Respondents ......................................................................................10
II.        JURISDICTION, VENUE, AND TIMELINESS.....................................11
III.       FINRA'S MANDATORY FORUM COULD NOT YIELD A MUTUAL, FINAL,
          AND DEFINITE AWARD ....................................................................12
A.        The Proceeding Was Mandatory Under FINRA Rules...........................12
B.        CRD Disclosures Carry Regulatory and Legal Consequences Beyond
          Private Arbitration............................................................................13
C.        FINRA's Jurisdictional Limits Restricted Resolution of the Full
          Enterprise Dispute ...........................................................................14
IV.       PETITIONER EXHAUSTED AVAILABLE AVENUES AND PRESERVES
          REMAINING CLAIMS .......................................................................16
V.        STANDARD OF REVIEW.....................................................................19
VI.       The Record Fully Establishes the Underlying Facts, Investigation, and
          Participants, but Yields an Incomplete Disposition and Practical Effect21
A.        The Panel Was Presented with Quantifiable Performance Records ........21
B.        The Record Included the Separation Chronology..................................22
C.        The Shifting Rationale: Inflated as a Weapon, Deflated to Avoid Review25
D.       The Record Included Separate Form U4 Disclosure Errors ......................26
E.       Institutional Discovery Conduct and Evidentiary Withholding ..............26
F.       Expert Evidence on Industry Harm and Damages.................................28
G.      Form U5 Filing: Violation of FINRA Regulatory Notice 10-39....................29
VII.      PROCEDURAL HISTORY ....................................................................30
VIII.    THE AWARD'S EXPRESS FINDINGS DO NOT YIELD A DETERMINATE
          LEGAL RESULT ................................................................................31
IX.       THE FAA REQUIRES PARTIAL CONFIRMATION, VACATUR, AND
          FURTHER PROCEEDINGS TO RENDER A MUTUAL, FINAL, AND
          DEFINITE AWARD ...........................................................................32

          GROUND ONE: CONFIRM THE DEFINITE PORTIONS UNDER 9 U.S.C. §
               9 ...............................................................................................32

          GROUND TWO: MODIFICATION AND CORRECTION OF ADMITTED
               FORM U4 ERRORS (9 U.S.C. § 11) .................................33

          GROUND THREE: SHIFT THE BUT-FOR COSTS OF THE INCOMPLETE
               PROCEEDING ................................................................33
Applicable Causal and Contractual Standards........................................................ 33
Documented Fee Categories ................................................................................. 34

Categories A and B ................................................................35

Category A 35

Category B: ..............................................................................35

Category D: ..............................................................................35

GROUND FOUR: VACATE THE NON-FINAL PORTIONS UNDER 9 U.S.C.
§ 10(a)(4) ...............................................................36

Finality Defect No. 1: Undifferentiated Entity Attribution ................36

Finality Defect No. 2: No Findings-to-Disposition Path .....................37

Finality Defect No. 3: Unresolved Records and Submitted Issues .....41

GROUND FIVE: RETAIN JURISDICTION BECAUSE REMAND WOULD
REPRODUCE THE DEFECT .........................................41

X.       PRAYER FOR RELIEF ...............................................................42
XI.      VERIFICATION .........................................................................43
XII.     CERTIFICATE OF CONFERENCE ...........................................45
XIII.    CERTIFICATE OF SERVICE.....................................................45
XIV.     INDEX OF EXHIBITS.................................................................46
APPENDIX A — SOURCE VERIFIED CHRONOLOGY OF THE FINALITY DEFECT47

Phase 1 — The Employment Relationship and Regulatory Record Created the
Entity-Mismatch Problem (2016–Sept. 2023) ..................47

Phase 2 — Three Overlapping Investigations, the Separation Sequence, and
Managed U5 Wording (Oct.–Dec. 2023)............................48

Phase 3 — Retaliation Investigation, Administrative Filings, and JPMS
Directed the Dispute into FINRA (Jan.–June 2024)........59

Phase 4 — FINRA Excluded Claims, Forced Claim Stripping, and Left
Necessary Matters Undecided (July 2024–Oct. 2024) .....60

Phase 4A — Rank-and-Strike Panel Composition and Reconstitution (July
2024–Oct. 2025).................................................................63

Phase 5 — Discovery Withholding Necessitated But-For Expenses
(Dec. 2024–Nov. 2025)......................................................63

Phase 6 — The Panel Issued Findings Without a Definite Disposition
(Dec. 2025) ........................................................................65

Phase 7 — Post-Award Steps Preserved Review and Confirmed Ongoing
Fragmentation (Dec. 2025–Present) ................................66

The Petition Was Timely Under FAA § 12.........................................67

The Award's Internal Contradictions Confirm Non-Finality..............67

TABLE OF AUTHORITIES

**Cases**

*Alpine Sec. Corp. v. FINRA*, 86 F.4th 406 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2707 (2024)     Prelim. Statement; ¶¶ 45, 109

*Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314 (D.C. Cir. 2024)     Prelim. Statement; ¶ 109

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)     Prelim. Statement

*Badgerow v. Walters*, 596 U.S. 1 (2022)     ¶ 12

*Becht v. J.P. Morgan Securities LLC*, FINRA No. 23-03185 (Award, Apr. 8, 2025)     ¶ 102A

*Bhatti v. Wells Fargo Clearing Servs., LLC*, FINRA No. 22-01852 (Award, Sept. 4, 2024)     ¶¶ 30, 102B

*Biering v. J.P. Morgan Securities LLC*, No. 4:24-cv-01099-O (N.D. Tex. Jan. 7, 2025)     ¶ 13

*Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377 (5th Cir. 2004)     Prelim. Statement; ¶¶ 39–40, 43, 95, 97, 106

*Brown v. Witco Corp.*, 340 F.3d 209 (5th Cir. 2003)     Prelim. Statement; ¶¶ 40, 43, 97, 106

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)     Introduction (e); ¶¶ 47, 86–87, 93

*Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349 (5th Cir. 2009)     Prelim. Statement; ¶¶ 41–42

*Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018)     ¶ 103

*Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314 (5th Cir. 1994)     ¶ 85

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)     ¶ 44

*Garcia v. Fuentes*, 141 F.4th 671 (5th Cir. 2025) — ¶ 47

*Gateway Techs., Inc. v. MCI Telecomm. Corp.*, 64 F.3d 993 (5th Cir. 1995) — ¶¶ 40, 46

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) — Introduction (e); ¶¶ 47, 86–87, 93

*Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) — Prelim. Statement; ¶ 41

*Hall v. GE Plastic Pac., PTE Ltd.*, 327 F.3d 391 (5th Cir. 2003) — Prelim. Statement (epigraph)

*Han v. J.P. Morgan Securities LLC*, FINRA No. 18-02978 (Award, Jul. 7, 2023), *aff'd*, 227 A.D.3d 469 (2024) — ¶ 102A

*Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013) — ¶ 103

*Hellenic Inv. Fund v. Det Norske Veritas*, 464 F.3d 514 (5th Cir. 2006) — Prelim. Statement; ¶ 47

*J.P. Morgan Sec. LLC v. Luckett*, No. 3:22-cv-137-RGJ, 2023 WL 6050230 (W.D. Ky. Sept. 15, 2023) — ¶ 13

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) — ¶ 85

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) — ¶¶ 44, 109

*Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) — Prelim. Statement; ¶¶ 47, 80

*Munizzi v. UBS Fin. Servs. Inc.*, FINRA No. 18-02179 (Award, Dec. 11, 2019), *confirmed*, 2021 IL App (1st) 201237 — ¶ 102A

*Natsource LLC v. Paribello*, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) — ¶ 99

*New Hampshire v. Maine*, 532 U.S. 742 (2001)     Prelim. Statement; ¶¶ 47, 80, 112

*Parrott v. Int'l Bancshares Corp.*, No. 25-50367, 2026 WL 364324 (5th Cir. Feb. 10, 2026)     ¶ 45

*Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 391 (5th Cir. 2003)     ¶¶ 40, 46

*Sarofim v. Trust Co. of the West*, 440 F.3d 213 (5th Cir. 2006)     Introduction; ¶¶ 46, 82

*SEC v. Jarkesy*, 603 U.S. 109, 144 S. Ct. 2117 (2024)     ¶¶ 44, 98

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010)     Prelim. Statement

*Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000)     ¶¶ 74, 103

*Trinity Energy Servs., L.L.C. v. Se. Directional Drilling, L.L.C.*, 135 F.4th 300 (5th Cir. 2025)     ¶ 42

*United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960)     ¶¶ 42, 97

*Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131 (5th Cir. 1991)     ¶¶ 48, 110

*Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006)     ¶ 12

**Statutes**

9 U.S.C. §§ 9–12 (Federal Arbitration Act)     *passim*

9 U.S.C. §§ 401–403 (EFAA)     Introduction; ¶¶ 38, 49, 114

12 U.S.C. § 21 *et seq.* (National Bank Act)     ¶ 9

12 U.S.C. § 1831o-1     ¶ 10

15 U.S.C. § 78c(a)(9), (18)     ¶ 26

15 U.S.C. § 78o (Exchange Act § 15)     ¶¶ 6, 19

15 U.S.C. § 78o-3 (Exchange Act § 15A)     ¶¶ 17, 19, 22, 23, 108

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**JOSHUA DAVID SAPPI BIERING,**
*Petitioner, Pro Se,*

v.

**J.P. MORGAN SECURITIES LLC,
JPMORGAN CHASE & CO., and
JPMORGAN CHASE BANK, N.A.,**
*Respondents.*

Case No.: _____
FINRA Case No. 24-01208

# EXHIBIT A

**FINRA Arbitration Award**

*FINRA Dispute Resolution Services — Arbitration No. 24-01208*

Award dated December 29, 2025
Biering v. J.P. Morgan Securities LLC & JPMorgan Chase & Co.
7 pages

EXHIBIT

**A**

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

<u>Claimant</u>                                                    <u>Case Number</u>: 24-01208
Joshua David Sappi Biering

  vs.

<u>Respondents</u>                                               <u>Hearing Site</u>: Dallas, Texas
J.P. Morgan Securities, LLC
JPMorgan Chase & Co.
JPMorgan Chase Bank, N.A.

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Non-Members

## REPRESENTATION OF PARTIES

For Claimant Joshua David Sappi Biering ("Claimant"): Joshua J. Iacuone, Esq. and Greg McAllister, Esq., Iacuone McAllister Potter PLLC, Dallas, Texas.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Sarah Richardson, Esq., UB Greensfelder LLP, Cleveland, Ohio.

Respondent JPMorgan Chase & Co. did not enter an appearance in this matter.

Respondent JPMorgan Chase Bank, N.A. (collectively, with Respondent and JPMorgan Chase & Co., "Respondents") did not enter an appearance in this matter.

## CASE INFORMATION

Statement of Claim filed on or about: June 3, 2024.
Amended Statement of Claim filed on or about: August 12, 2024.
Second Amended Statement of Claim filed on or about: October 11, 2024.
Claimant signed the Submission Agreement: June 3, 2024.

Statement of Answer filed by Respondent on or about: September 5, 2024.
Statement of Answer to Second Amended Statement of Claim filed by Respondent on or about: October 31, 2024.
Respondent signed the Submission Agreement: September 10, 2024.

JPMorgan Chase & Co. did not file a Statement of Answer or sign the Submission Agreement.

EXHIBIT

A

JPMorgan Chase Bank, N.A. did not file a Statement of Answer or sign the Submission Agreement.

## CASE SUMMARY

In the Second Amended Statement of Claim, Claimant asserted the following causes of action: defamation/defamation per se and violation of FINRA rules; business disparagement; tortious interference; unfair competition; wrongful discharge; weaponization of U5; breach of contract; promissory estoppel; quantum merit and unjust enrichment; illegal forfeiture of earned compensation; forfeiture of deferred compensation (violation of ERISA); and violation of Texas and/or New York labor and wage laws.

Unless specifically admitted in the Statement of Answer to Second Amended Statement of Claim, Respondent denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Second Amended Statement of Claim, Claimant requested damages at least more than $10,000,000.00, including:

a) Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;
b) Expungement and modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD");
c) Specific performance of Respondents' promise to pay Claimant's attorneys' fees in connection with expungement of a customer complaint referenced in the Second Amended Statement of Claim (or, alternatively, damages due to Respondents' failure to perform such promise);
d) Lost or forfeited deferred compensation;
e) Reasonable attorneys' fees incurred in the prosecution of Claimant's claims in this action;
f) Statutory penalties and damages;
g) Liquidated damages;
h) Punitive damages;
i) Damages to Claimant's reputation;
j) Past lost earnings;
k) Future lost earnings;
l) Consequential damages;
m) Mental anguish and emotional distress damages;
n) Future lost earning capacity;
o) The highest pre- and post-judgment interest permitted by law on all damages;
p) FINRA forum and other fees; and
q) Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

In the Statement of Answer to the Second Amended Statement of Claim, Respondent requested that the Panel deny Claimant's claims; assess all costs and forum fees against Claimant; and award any other relief to Respondent that the Panel deems just and proper.

FINRA Dispute Resolution Services
Arbitration No. 24-01208
Award Page 3 of 7

EXHIBIT

**A**

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The original Statement of Claim filed on June 3, 2024, and an Amended Statement of Claim filed on August 12, 2024, were not served on Respondent or considered by the Panel. The Statement of Claim filed on October 11, 2024, is deemed the only Statement of Claim filed in this matter.

JPMorgan Chase & Co. is not a member or associated person of FINRA and did not voluntarily submit to arbitration. Therefore, the Panel made no determination with respect to the claims against JPMorgan Chase & Co.

JPMorgan Chase Bank, N.A. is not a member or associated person of FINRA and did not voluntarily submit to arbitration. Therefore, the Panel made no determination with respect to the claims against JPMorgan Chase Bank, N.A.

The Panel has provided an explanation of the decision in this award. The explanation is for the parties' information only and is not precedential in nature.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims, except for expungement, are denied in their entirety.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Joshua David Biering's (CRD Number 6883842) Form U5 filed by J.P. Morgan Securities, LLC (CRD Number 79) on December 22, 2023 and maintained by the CRD. The Reason for Termination shall be changed to "Voluntary" and the Termination Explanation should be deleted in its entirety and shall appear blank. This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of the Date Terminated field in Section 4 of the Form U5. The entry should be deleted in its entirety and shall be replaced with the following date: "10/28/2023".

   The above recommendations are made with the understanding that the registration records are not automatically amended. Joshua David Sappi Biering must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

EXHIBIT

A

FINRA Dispute Resolution Services
Arbitration No. 24-01208
Award Page 4 of 7

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## ARBITRATORS' EXPLANATION OF DECISION

The Panel believes that when Respondent learned that Claimant was contemplating resigning from Respondent and going to work for a competitor of Respondent, Respondent began investigating reasons to terminate Claimant so as to make it more difficult for Claimant to go to work with a competitor of Respondent. Based on the testimony and the citation to instances in which Respondent has been found to have done this in the past, the Panel is concerned that this may be a pattern of conduct.

Claimant was placed on administrative leave on October 27, 2023, without being informed of the claim being asserted against him. On October 28, 2023, Claimant resigned from Respondent. Respondent's policies required Claimant to remain an employee on a "Notice Period" or "garden leave" for 60 days after resignation, unless earlier terminated by Respondent. At no time following October 27, 2023, was Claimant permitted to engage in any conduct with Respondent for which registration would be required.

On December 1, 2023, Claimant was notified his employment was terminated for violation of Respondent's code of conduct. Both parties concede the violation did not involve regulatory concerns. On December 22, 2023, Respondent filed a Form U-5 annotating that Claimant was "Discharged" with an explanation of "After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

While the Panel believes Respondent was within its rights, based on the continuing employment status of Claimant and the results of its investigation, to terminate Claimant subsequent to his resignation, the Panel believes one of the primary reasons for the timing of the filing of the U-5 was to hinder Claimant's ability to transfer his book of business to a competitor of Respondent. The Panel does not find the reasons for termination given in the Form U-5 to be "defamatory." It does find, however, based on the facts in this case, the Form U-5 to be inaccurate. Accordingly, the Panel orders the Form U-5 to be expunged and amended to reflect that the termination was "Voluntary;" the explanation for termination be omitted, and; the date of termination be amended to October 28, 2023.

As to Claimant's claim that Respondent agreed to pay his attorneys' fees with respect to the expungement of a customer claim from his Form U-4, the Panel finds that while there may have been some discussions in that regard while Claimant was still employed by Respondent no such agreement was ever reduced to writing and any benefit/consideration that Respondent might derive from such an action vanished once Claimant was no longer employed by Respondent. The expungement was commenced after Claimant left Respondent and the correspondence between counsel for Claimant and Respondent shows Respondent did not acknowledge the

EXHIBIT

A

existence of any such agreement. There was, therefore, no detrimental reliance on any such promise by Claimant in proceeding with the expungement.

With respect to damages, although the Panel acknowledges the absence of a clean U-5 makes it very difficult to move to a Tier One competitor of Respondent, the Panel notes Claimant secured lucrative employment with a highly respected national brokerage firm less than two months after his termination from Respondent. The Panel further reiterates its finding that the reason for termination in the Form U-5 submitted by Respondent was not "defamatory." Accordingly, Claimant's claim for damages is denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                                      =$ 2,300.00

*The filing fee is made up of a non-refundable and a refundable portion.*

FINRA Dispute Resolution Services administratively waived Claimant's refundable portion of the filing fee of $ 1,500.00.

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

Member Surcharge                                                                          =$ 4,325.00
Member Process Fee                                                                       =$ 7,300.00

### Discovery-Related Motion Fees
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers                    =$   200.00
with one (1) Arbitrator @ $200.00/decision

Claimant submitted one (1) discovery-related motion

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$   200.00 |

The Panel has assessed the total discovery-related motion fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

FINRA Dispute Resolution Services
Arbitration No. 24-01208
<u>Award Page 6 of 7</u>

EXHIBIT

**A**

Two (2) pre-hearing sessions with a single Arbitrator @ $450.00/session          =$    900.00
Pre-Hearing Conferences: May 8, 2025                    1 session
                         August 27, 2025               1 session

One (1) pre-hearing session with the Panel @ $1,575.00/session          =$  1,575.00
Pre-Hearing Conference:  November 21, 2024      1 session

Eleven (11) hearing sessions @ $1,575.00/session          =$ 17,325.00
Hearings:                December 3, 2025        2 sessions
                         December 4, 2025        2 sessions
                         December 5, 2025        2 sessions
                         December 11, 2025       2 sessions
                         December 12, 2025       2 sessions
                         December 15, 2025       1 session

Total Hearing Session Fees                                            =$ 19,800.00

The Panel has assessed the total hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

EXHIBIT

A

FINRA Dispute Resolution Services
Arbitration No. 24-01208
Award Page 7 of 7

## ARBITRATION PANEL

| Eric Ross Cromartie | - | Public Arbitrator, Presiding Chairperson |
| Christine Rister | - | Public Arbitrator |
| Alison Battiste Clement | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

*Eric Ross Cromartie*                          **12/24/2025**

Eric Ross Cromartie                            Signature Date
Public Arbitrator, Presiding Chairperson


*Christine Rister*                             **12/29/2025**

Christine Rister                               Signature Date
Public Arbitrator


*Alison Battiste Clement*                      **12/26/2025**

Alison Battiste Clement                        Signature Date
Non-Public Arbitrator


Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


December 29, 2025

Date of Service (For FINRA Dispute Resolution Services use only)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

**JOSHUA DAVID SAPPI BIERING,**

*Petitioner, Pro Se,*

v.

**J.P. MORGAN SECURITIES LLC,**
**JPMORGAN CHASE & CO., and**
**JPMORGAN CHASE BANK, N.A.,**

*Respondents.*

**Case No.:** _____

FINRA Case No. 24-01208

# EXHIBIT A-1

**FINRA Award Service Letter**

*Service of Arbitration Award — Case No. 24-01208*

Dated December 29, 2025
FINRA Dispute Resolution Services
Service of Final Award to All Parties

EXHIBIT

**A-1**

# FINC3.®

**TO:**        Jeffrey S. Dunlap, Esq.
            Joshua J. Iacuone, Esq.

**CC:**        Alison Battiste Clement
            Eric Ross Cromartie
            Christine Rister

**From:**      Christal T. Dolly
            Senior Case Administrator

**Subject:**   FINRA Dispute Resolution Services Arbitration Number 24-01208
            Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC,  JPMorgan Chase & Co.,
            and JPMorgan Chase Bank, N.A

**Date:**      December 29, 2025


Awards are rendered by independent arbitrators who are chosen by the parties to issue final,
binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by
the SEC—but has no part in deciding the award. Attached please find the decision reached by the
arbitrator(s) in the above-referenced matter. Accordingly, we have closed this case and removed it
from our arbitration docket

## Responsibility to Pay Monetary Award

FINRA rules provide that all monetary awards shall be paid within 30 days of receipt unless a
motion to vacate has been filed with a court of competent jurisdiction. An award shall bear interest
from the date of the award:

- If not paid within 30 days of receipt;
- If the award is the subject of a motion to vacate which is denied; or
- As specified by the panel in the award.

Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award
was rendered, or at a rate set by the arbitrator(s).

## Expedited Suspension Proceedings for Non-Payment of Awards

Article VI, Section 3 of the FINRA By-Laws and FINRA Rule 9554 permit FINRA to suspend or
cancel the registration of any firm or associated person that fails to comply with a FINRA
arbitration award.

Firms are required to notify FINRA in writing within 30 days of receipt of an award that they or
their associated persons have paid or otherwise complied with the award, or to identify a valid

**Investor protection. Market integrity.**     FINRA Dispute Resolution Services     Brookfield Place     t  212 858 4200
                                            East Region                           200 Liberty Street    www.finra.org
                                                                                  New York, NY 10281

EXHIBIT

**A-1**

basis for non-payment. We also request that prevailing claimants notify us in writing when their awards have not been paid within 30 days of receipt of the award.

Written notification concerning award compliance or lack thereof should be directed to:

Raina Burke, Case Management Analyst
FINRA Dispute Resolution Services
Brookfield Place, 200 Liberty Street, 11ᵗʰ Floor
New York, NY 10281
(213) 830-2282 | Raina.Burke@finra.org

### Notice to FINRA Firms

Please note that FINRA has also emailed a copy of this letter and the attached decision directly to the Executive Representative, Chief Compliance Officer, and Regulatory Inquiries Liaison of the brokerage firm.

### Right to File Motion to Vacate Award

FINRA rules provide that, unless the applicable law directs otherwise, all awards rendered are final and are not subject to review or appeal. Accordingly, FINRA has no authority to vacate this award. Any party wishing to challenge the award must make a motion to vacate the award in a federal or state court of appropriate jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, or applicable state statute. There are limited grounds for vacating an arbitration award, and a party must bring a motion to vacate within the time period specified by the applicable statute. If you are not represented by counsel and wish to challenge the award, we urge you to seek legal advice regarding any rights or remedies available to you.

### Forum Fees

You will receive separately an invoice that reflects the fees assessed and any outstanding balance or refund due. Fees are due and payable to FINRA upon receipt of the invoice and should be sent to the address specified on the invoice. Any applicable refunds will also be sent under separate cover approximately 45 to 60 days after the case closes. All questions regarding payment of fees and refunds should be directed to FINRA Finance at (240) 386-5910.

### Expungement

Brokers who obtain court confirmation of an award recommending expungement must forward a copy of the court order to CRDExpungementRequest@finra.org.

### Party Experience Survey

FINRA encourages parties to complete a Party Experience Survey, which can be submitted through the DR Portal, at the conclusion of every case. We will utilize your comments in our ongoing efforts to evaluate and improve the services our forum provides. In the DR Portal, go to the "Drafts & Submissions" tab for the associated case, select "Party Experience Survey" as the Submission Type, and press the "Start" button to access the form. If you did not use the DR Portal to manage your case, you may send an email with your feedback regarding the case to your assigned Case Administrator.

EXHIBIT

**A-1**

<u>Party Submissions to Arbitrators After a Case Closes</u>

FINRA rules provide that parties may not submit documents to arbitrators in cases that have been closed except under the following limited circumstances: 1) as ordered by a court; 2) at the request of any party within 10 days of service of an award, for typographical or computational errors, or mistakes in the description of any person or property referred to in the award; or 3) if all parties agree and submit documents within 10 days of service of an award. Any documents, if submitted, must be sent through FINRA.

<u>Questions Concerning Award</u>

If you have any questions, please do not hesitate to contact me at 212-858-4344 or by email at Neprocessingcenter@finra.org. Parties should not directly contact arbitrators under any circumstances.

CTD:ctd:LC09A
idr: 08/22/2025

RECIPIENTS:
Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland, OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC

Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700, Dallas, TX 75206
On Behalf Of: Joshua David Biering

CC:
Alison Battiste Clement
Eric Ross Cromartie
Christine Rister

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**JOSHUA DAVID SAPPI BIERING,**
*Petitioner, Pro Se,*

v.

**J.P. MORGAN SECURITIES LLC,**
**JPMORGAN CHASE & CO., and**
**JPMORGAN CHASE BANK, N.A.,**
*Respondents.*

**Case No.:** _____
FINRA Case No. 24-01208

# EXHIBIT B

**Binding Arbitration Agreement**

*JPMorgan Chase & Co. — Employment Offer Letter with BAA*

Executed February 18, 2016 by Joshua Biering
Contains Binding Arbitration Agreement governed by FAA, 9 U.S.C. § 1 et seq.
Originally produced as CX-11 (BIERING_0000454–BIERING_0000464)
CONFIDENTIAL — Produced in FINRA Arbitration No. 24-01208

BIERING_0000454

EXHIBIT

**B**



February 18, 2016


Joshua Biering
1514 Habersham St
Savannah, Georgia 31401

Dear Joshua:

We are very pleased to formally present our employment offer. In this letter we have included the details of your position, your compensation and the terms and conditions of your offer. You will also find information about your next steps. You will join us as a Military Officer Executive Development Program Associate - Dallas, TX at Chase Bank USA, NA, which we'll refer to as "Chase". Your manager will be Jeffrey T Hassman, whom you can reach at 302-282-3989.

We're planning to have you start on April 25, 2016. Whenever we mention start date in this letter, we are referring to the date of the first day you actually start working for us. Touch base with your manager before you start to make sure you have everything you need to know for your first day.

**Your pay**
Your annual base salary as of your start date is $100,000.00 (less applicable taxes). While your hours will vary based on business needs, your salary covers all hours you work during any week. You are not eligible for any overtime payments in this position. You will be paid consistent with Chase's payroll practices.


**Special cash award**
You will be paid a one-time sign-on award of $25,000. This award is subject to applicable taxes. We'll make this payment within 30 days after your start date. If your employment with Chase ends for any reason other than job elimination within a year after your start date, you would need to repay this sign-on award. The repayment is due within ten days of our request for repayment. You agree that Chase may withhold all or part of the repayment amount as allowed by law from any remaining salary or other payments owed to you at the time you leave. Chase will also be entitled to any costs and attorneys' fees associated with enforcing your repayment obligations.


**Other benefits**
We offer a comprehensive benefits program to our U.S. benefits-eligible employees, including health care and insurance plans, a cash balance pension plan, a 401(k) plan, and discounted Chase products. In addition, you will be eligible for paid time off, including vacation, based on your role and time working for us.


We provide some of our benefits materials electronically - by e-mail or on the company Intranet, which is accessible from work or from home. When you accept this offer, you agree to receive documents for the JPMorgan Chase Benefits Program electronically. This includes the summary plan descriptions, plan prospectuses and other documents. You may request a paper copy for a benefit plan at any time. The contact information you will need for each benefits plan is available in the Highlights of the JPMorgan Chase U.S. Benefits Program under a section called Benefits at a Glance. After completion of the Onboarding process, we will make this information available to you on our My Welcome site which is covered in more detail in the Next Steps section of this offer letter.

CONFIDENTIAL — Produced in FINRA Arbitration No. 24-01208

CX11-6

BIERING_0000459

| | |
|---|---|
| EXHIBIT | |
| **B** | |

the Binding Arbitration Agreement detailed below. By signing below I acknowledge
have read and understand the Binding Arbitration Agreement, have accepted its ter
that it is a condition of my employment with JPMorgan Chase.

## BINDING ARBITRATION AGREEMENT:

JPMorgan Chase believes that if a dispute related to an employee's or former employee's employment arises, it is in the best interests of both the individual and JPMorgan Chase to resolve the dispute without litigation. Most such disputes are resolved internally through the Firm's Open Communication Policy. When such disputes are not resolved internally, JPMorgan Chase provides for their resolution by binding arbitration as described in this Binding Arbitration Agreement ("Agreement"). "JPMorgan Chase" and the "Firm" as used in this Agreement mean JPMorgan Chase & Co. and all of its direct and indirect subsidiaries.

This Agreement will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. ? 1 et seq.

As a condition of and in consideration of my employment with JPMorgan Chase & Co. or any of its direct or indirect subsidiaries, I agree with JPMorgan Chase as follows:

**1. SCOPE:** Any and all "Covered Claims" (as defined below) between me and JPMorgan Chase (collectively "Covered Parties" or "Parties", individually each a "Covered Party" or "Party") shall be submitted to and resolved by final and binding arbitration in accordance with this Agreement.

**2. COVERED CLAIMS:** "Covered Claims" include all legally protected employment-related claims, excluding those set forth below in Paragraphs 3 and 4 of this Agreement, that I now have or in the future may have against JPMorgan Chase or its officers, directors, shareholders, employees or agents which arise out of or relate to my employment or separation from employment with JPMorgan Chase and all legally protected employment-related claims that JPMorgan Chase has or in the future may have against me, including, but not limited to, claims of employment discrimination or harassment if protected by applicable federal, state or local law, and retaliation for raising discrimination or harassment claims, failure to pay wages, bonuses or other compensation, tortious acts, wrongful, retaliatory and/or constructive discharge, breach of an express or implied contract, promissory estoppel, unjust enrichment, and violations of any other common law, federal, state, or local statute, ordinance, regulation or public policy, including, but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866 and 1991, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act of 1990, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, the Fair Labor Standards Act of 1938, the Equal Pay Act of 1963, Section 1981 of the Civil Rights Act, and the Worker Adjustment and Retraining Notification Act.

**3. EXCLUDED CLAIMS:** This Agreement does not cover, and the following claims are not subject to arbitration under this Agreement: (a) any criminal complaint or proceeding, (b) any claims covered by state unemployment insurance, state or federal disability insurance, and/or state workers' compensation benefit laws, except that claims for retaliation pursuant to these laws shall be subject to arbitration under this Agreement, (c) any claim under the National Labor Relations Act, and (d) claims for benefits under a plan that is governed by Employee Retirement Income Security Act of 1974 ("ERISA").

Further, this Agreement also does not cover any action seeking only declaratory and/or emergency, temporary or preliminary injunctive relief (including a temporary restraining order) in a court of competent jurisdiction in accordance with applicable law, so long as that action is brought on an individual basis and not on a consolidated basis or as part of a collective or class action, and subject to the following:

CX11-11

BJERING_0000460

EXHIBIT

**B**

- In the event such relief is sought by a Covered Party, who is not otherw[ise] arbitration requirements of the Financial Industry Regulatory Authority ("FINR[A"] issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered Claim to arbitration pursuant to this Agreement, and

- In connection with any such action related to post-employment restrictions (e.g., actions to enforce rights to trade secrets, or agreements not to compete or solicit customers or employees) on a Covered Party who is otherwise subject to the arbitration requirements of FINRA (absent this Agreement), in order for the Covered Parties to have available to them the expedited arbitration procedures provided by FINRA, after the court issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered Claim to arbitration before FINRA in accordance with its expedited arbitration procedures under FINRA Rule 13804.

**4. CLASS ACTION/COLLECTIVE ACTION WAIVER:** All Covered Claims under this Agreement must be submitted on an individual basis. No claims may be arbitrated on a class or collective basis unless required by applicable law. Covered Parties expressly waive any right with respect to any Covered Claims to submit, initiate, or participate in a representative capacity or as a plaintiff, claimant or member in a class action, collective action, or other representative or joint action, regardless of whether the action is filed in arbitration or in court. Furthermore, if a court orders that a class, collective, or other representative or joint action should proceed, in no event will such action proceed in the arbitration forum, subject to applicable law. Claims may not be joined or consolidated in arbitration with disputes brought by other individual(s), unless agreed to in writing by all parties or required by applicable law. To the extent there is a question of enforceability of class or collective arbitration, it shall be decided only by a court, not an arbitrator.

The arbitrator's authority to resolve disputes and make awards under this Agreement is limited to disputes between: (i) an individual and JPMorgan Chase; and (ii) the individual and any current or former officers, directors, employees and agents, if such individual is sued for conduct within the scope of their employment. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

I retain the right to challenge the validity of this Agreement upon grounds that may exist at law or equity and will not be subject to any form of retaliation for asserting such rights.

**5. ADMINISTRATIVE AGENCIES:** I understand that this Agreement does not preclude me from filing an administrative claim or charge with the Equal Employment Opportunity Commission ("EEOC") and/or state and local human rights agencies to investigate alleged violations of laws enforced by the EEOC or those agencies. However, I understand that I am not required to initiate an administrative proceeding before pursuing a Covered Claim under this Agreement. In the event I file such an administrative proceeding, I understand that I cannot pursue Covered Claims under this Agreement without first exhausting all required administrative remedies, such as obtaining a right to sue notice from the EEOC in order to arbitrate federal discrimination claims that require such a notice. By responding to administrative agencies, JPMorgan Chase does not waive its right to enforce this Agreement and the arbitrator shall treat a decision of an administrative agency in the same manner as it would be treated by a court of law.

**6. INITIATING ARBITRATION:** Arbitration under this Agreement shall be conducted before a single neutral arbitrator of the American Arbitration Association ("AAA")(unless the Parties agree upon another mutually acceptable arbitrator, in which case the arbitration will be conducted before such mutually acceptable arbitrator) in accordance with and selected pursuant to the rules and procedures of the Employment Arbitration Rules of the AAA ("AAA Rules") to the extent the AAA Rules do not

CX11-12

CONFIDENTIAL — Produced in FINRA Arbitration No. 24-01208

BIERING_0000461

EXHIBIT

B

conflict with the terms of this Agreement or applicable law. The AAA Rules will gove[ ]
explicitly addressed by this Agreement. Where there is a conflict between this Agre[ ]
Rules, this Agreement will govern. Where there is a conflict between applicable law and the AAA rules
and/or this Agreement, the applicable law will govern. I understand that arbitration under this
Agreement will occur in the state where I am currently or was most recently employed by the Firm,
unless otherwise agreed by the Parties. Information about AAA is available from its website
www.adr.org. A Covered Party may contact them directly at 1-800-778-7879. A Covered Party who is
otherwise subject to the arbitration requirements of FINRA who wishes to pursue arbitration of a
Covered Claim, must file such Covered Claim with AAA (or other mutually acceptable arbitrator),
except as otherwise provide in Paragraph 3 of this Agreement.

To initiate arbitration:

- A Covered Party must send a written demand for arbitration to any office of the AAA (or if
  another mutually acceptable arbitrator has been agreed to by the Parties, to the offices of such
  other arbitrator). The Covered Party submitting the demand for arbitration must also
  simultaneously send a copy of the written demand for arbitration to the other Party (if being sent
  to JPMorgan Chase, the copy should be sent to the following address:JPMorgan Chase & Co.
  Legal Department, c/o Legal Papers Served, 4 Chase Metrotech Center, Floor 18, Brooklyn, NY
  11245).
- Both of the following must be included in the demand for arbitration:

(a) A statement of the nature of the dispute, including the alleged act or omission at issue, the names
of the parties involved in the dispute, the amount in controversy, if any, the remedy sought to resolve
the issue (including the dollar amount, if any), the mailing address for future correspondence and the
legal counsel, if any, and

(b) Any required filing fee. If a Covered Claim is filed by me, the filing fee is $100 payable by check,
money order or any other method of payment permitted by the AAA (or another mutually acceptable
arbitrator agreed to by the parties). In the event the filing fee required by the state or federal court in
which the Covered Claim could have been brought is less than $100, JPMorgan Chase agrees to
refund to me the difference between $100 and such state or federal court filing fee within 30 days of
receiving notice of payment. Any demand received by the AAA (or another mutually acceptable
arbitrator agreed to by the Parties) that is not accompanied by the required filing fee will be returned.

Nothing in this Agreement releases a Covered Party from any obligation to comply with timely filing
requirements and statutes of limitations under applicable law, statutes, or regulations. Thus, whether
or not a Covered Party chooses to file with administrative agencies, his/her arbitration must still be
initiated as an arbitration within the applicable administrative, statutory or judicial filing time frame, as
required by law, and the demand for arbitration must be received at the address above within the time
period allowed pursuant to the statute, regulation or other law applicable to the alleged act or omission
giving rise to the dispute.  Nothing in this Agreement is intended or should be construed to shorten or
extend the statute(s) of limitations and/or filing periods that exist under applicable law.

The submission and timing of any response to an arbitration demand shall be in accordance with
AAA's Rules, which currently provides that a response be filed within 15 days after the date of the
letter from the AAA (or other mutually agreed to arbitrator) acknowledging receipt of the demand for
arbitration.

**7.  ARBITRATION PROCEEDINGS:** The arbitrator will conduct the hearing as expeditiously as
possible, while ensuring that all Parties have the opportunity to present evidence and arguments and
ensuring that the Agreement is followed. The arbitrator will set the date, time, and place of the hearing,
and AAA (or other arbitration provider mutually agreed to by the parties) will notify the Parties at least

CX11-13

BIERING_0000462

EXHIBIT

**B**

30 calendar days in advance, unless the Parties otherwise agree. In the event the hearing reasonably be completed in one day, the arbitrator will schedule the hearing to be [continued on a date] or dates that is/are convenient to both Parties. The arbitrator will make every effort to select a reasonably convenient location for the continued arbitration, without incurring additional expense, if possible.

**(a)      Fees:** All ordinary and reasonable administrative expenses of the arbitration, including fees for a single arbitrator, hearing room expenses, travel expenses of the arbitrator, the AAA representatives (if applicable), and any witnesses produced at the arbitrator's specific request and not otherwise called by a party, will be paid completely by JPMorgan Chase. The fees and expenses of any witness, expert, consultant, interpreter and others retained or consulted by a party shall be paid by the party requiring the presence of such persons, subject to applicable law.  JPMorgan Chase will not pay for fees or costs incurred as a result of deliberate and inappropriate delay or absence caused by employees or their counsel, as determined by the arbitrator and permitted by applicable law. Except as otherwise provided by law, all attorney's fees shall be paid by the party that incurs them.  Nothing in this Agreement is intended or should be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

**(b)      Legal Representation and Language Interpreter:** The Parties (if desired) may use the services of legal counsel and/or a language interpreter. The Parties utilizing such services are responsible for making and paying all fee and other arrangements directly with the legal counsel and/or interpreter, subject to applicable law. Nothing in this Agreement is intended or should be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

**(c)      Attendance at and Confidentiality of Arbitration Hearing:** The Covered Party, a JPMorgan Chase corporate representative of its choosing, and the arbitrator must be present at the hearing. In addition, an official recorder and legal counsel (for any party) also may attend the hearing. Further, the Parties may call witnesses to testify at the arbitration. Unless the parties agree otherwise, the arbitrator shall exclude witnesses (other than the represented Parties) from the hearing during the testimony of any other witness. The arbitrator, the Parties and their representatives must maintain the confidentiality of the hearings unless the law provides otherwise.

**(d)      Discovery:** Discovery requests and the provision of discovery must be consistent with this Agreement, general standards of due process, the Rules of AAA and the expedited nature of arbitration. The guidelines below are only guidelines, do not establish a minimum or maximum of discovery, and will be applied subject to these principles. Thus, there may be cases which warrant more or less discovery than that outlined below.

- At least 20 days before the arbitration hearing, the Parties must submit the names and addresses of the witnesses each party intends to produce and any documents each party intends to present.  The Parties may add to such information up to 10 days before the hearing. All such submissions are final after that point absent a finding of good cause by the arbitrator.

- In general, the Parties may take the depositions of all expert witnesses and up to 3 other individuals. Any individual who certifies he/she has no direct knowledge of the facts should not be deposed as a fact witness. At least 10 days' prior notice should be given by the party requesting a deposition and advance efforts should be made to mutually agree on deposition dates, including the time and place for any depositions to be taken. The party requesting the deposition is responsible for all related costs for that deposition. Discovery must be completed at least 20 days before the hearing. The arbitrator may alter the timing and scope of discovery as necessary or upon request of the Parties.

CONFIDENTIAL -- Produced in FINRA Arbitration No. 24-01208

BIERING_0000463

EXHIBIT

B

- The arbitrator will resolve discovery disputes and may expand or of discovery within his or her reasonable discretion, and the rules of AAA cons expedited nature of arbitration.

**(e)    Prehearing Motions**: The arbitrator is authorized to consider and rule on prehearing motions, including discovery motions, motions to dismiss and summary judgment on the claims, provided that the other party has reasonable notice and time to respond to any such prehearing motions. Any dispute which fails to state a claim upon which relief may be granted under applicable law (including, but not limited to claims that are barred by the applicable statute of limitations or mandated timeframe for filing such claim, or that are barred by an enforceable release, or involve a claim against someone who was not associated with the conduct at issue) is subject to dismissal without an evidentiary hearing. Any ruling regarding such motion shall be made consistent with the Form of Decision and Scope of Relief sections in this Agreement.

**(f)    Time of Decision:** The arbitrator will make the decision within 30 days of the close of the hearing or as soon as possible thereafter, unless otherwise agreed to by the Parties or otherwise specified by law.

**(g)    Form of Decision:** The decision will be in writing and signed by the arbitrator. Unless otherwise agreed to by the Parties, the decision will include a summary of claims arbitrated and decided, a reasoned opinion setting forth any findings of fact or conclusions of law, and damages and other relief (if any) granted. All decisions shall be executed in the manner required by law. The decision will be final and binding upon the Parties, and appeal of the decision to a court shall be limited as provided by the FAA.

**(h)    Scope of Relief:** The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, including the award of monetary damages and the imposition of requirements on the Parties (including injunctive relief), as permitted by applicable law. The arbitrator may award only such relief as may be granted for a Covered Claim brought in court on an individual basis under applicable law. The arbitrator may award punitive or exemplary damages or attorneys' fees as provided or limited by applicable law.  Nothing in this Agreement is intended or should be construed to limit the remedies that otherwise would be available to the Parties in a court of law.

**(i)    Enforcement of Arbitration Decision/Judicial Procedure:** The decision of the arbitrator may be enforced under the terms of the FAA to the maximum extent possible. Either party may have an arbitration decision enforced in a court of law in accordance with applicable the FAA. If this occurs, neither the arbitrator nor AAA will be involved in the court proceedings.

If a court determines that the decision is not completely enforceable, it will be enforced and binding on both parties to the maximum extent permitted by law.

**8.   SEVERABILITY:** If any part of this Agreement is held to be void or unenforceable, the remainder of the Agreement will be enforceable and any part may be severed from the remainder as appropriate, to the extent permitted by law. For example, if a court determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its use of arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this Agreement is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class, collective, or representative or joint action waiver provided in Paragraph 4 of this Agreement must be decided by a court with jurisdiction over the Parties, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class, collective, or representative or joint action waiver is found to be unenforceable, the class, collective, or

CONFIDENTIAL — Produced in FINRA Arbitration No. 24-01208

BIERING_0000464

EXHIBIT

**B**

representative or joint action may only be heard in court and may not be arbitrated
Agreement

**9.  AMENDMENT OR TERMINATION OF AGREEMENT:** JPMorgan Chase reserves the right to amend, modify or discontinue this Agreement at any time in its sole discretion to the extent permitted by applicable law. Such amendments may be made by publishing them on the JPMorgan Chase Intranet or by separate notification to me and shall be effective 30 calendar days after such amendments are provided to me and will apply on a going-forward basis only.  Amendment, modification or discontinuation of the Agreement will not affect pending arbitration proceedings. Continuation of my employment after receiving such amendments or modifications will be considered my acceptance of the amended terms.

This Agreement does not alter the voluntary ("at will") nature of my employment relationship with the Firm, nor does it afford any rights or remedies not otherwise available under applicable law. Of course, this Agreement does not require that JPMorgan Chase initiate arbitration before taking corrective action of any kind, including termination of employment.

Signature:  _Joshua Biering_          Date:  __18-Feb-2016__

CX11-16

CONFIDENTIAL — Produced in FINRA Arbitration No. 24-01208

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Joshua David Sappi Biering

**DEFENDANTS**

J.P. Morgan Securities LLC; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.

**(b)** County of Residence of First Listed Plaintiff    Tarrant County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Diversity
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Joshua David Sappi Biering, Pro Se
4635 Washburn Ave, Fort Worth, TX 76107
M (682)-218-6738

Attorneys *(If Known)*    **4-26CV-38 - 0**

Jeffrey S. Dunlap, Esq., UB Greenfelder LLP
1660 West 2nd St, Suite 1100, Cleveland, OH 44113
D (216)-583-7026; M 216-410-2531

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
9 U.S.C. §§ 9-11
Brief description of cause:
Petition to partially confirm, modify, and vacate FINRA Award 24-01208, and retain juris.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE    March 27, 2026

SIGNATURE OF ATTORNEY OF RECORD    *Joshua David Sappi Biering*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.