# UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| | § | |
| | § | |
| Petitioner, *Pro Se,* | § | |
| v. | § | Case No. 4:26cv-381-O |
| | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No.: 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No.450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| | § | |
| Respondents. | § | |

## AMENDED VERIFIED PETITION TO CONFIRM, MODIFY, AND VACATE IN PART A FINRA ARBITRATION AWARD, AND TO RETAIN JURISDICTION

Petitioner Joshua David Sappi Biering ("Petitioner"), proceeding *pro se*, respectfully submits this Amended Verified Petition, which supersedes the original Verified Petition filed on March 30, 2026 (Dkt. 1), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9–11, seeking discrete, severable relief from the arbitration award issued on December 29, 2025 (the "Award"), in Financial Industry Regulatory Authority ("FINRA") Case No. 24-01208, *Joshua David Sappi Biering v. J.P. Morgan Securities LLC* ("JPMS"), *JPMorgan Chase & Co.* ("JPMC" or "JPMorgan"), *and JPMorgan Chase Bank, N.A.* ("JPM Bank").

This Amended Petition is filed as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(A) because no responsive pleading or Rule 12 motion has been served. It respectfully asks the Court to confirm and give effect to the severable portions of the Award that finally resolved the matters submitted to the Panel, vacatur under 9 U.S.C. § 10(a)(4) of those portions that do not yield a mutual, final, and definite disposition, and retention of jurisdiction to determine the operative effect of the confirmed and vacated portions. A verified

1

and complete copy of the Award is attached hereto as Ex. A.1.

Consistent with the FAA's narrow and severable review framework, Petitioner respectfully requests that the Court:

(i) **CONFIRM IN PART** pursuant to 9 U.S.C. § 9, the Award's severable findings of historical fact and regulatory inaccuracy, which were actually litigated and reflected in the Panel's express findings, its Form U5[1] correction directives, and FINRA forum fees assessed against JPMS;

(ii) **MODIFY IN PART** pursuant to 9 U.S.C. §§ 11(b)–(c), to direct the removal or expungement of archived Form U4[2] disclosures that misreported Petitioner's student-loan disability discharges as bankruptcies and compromises with creditors from FINRA's Central Registration Depository ("CRD")[3], which JPMS admits were filed in error and which remain accessible to market participants absent judicial intervention;

(iii) **VACATE IN PART** pursuant to 9 U.S.C. § 10(a)(4), and alternatively under 9 U.S.C. § 10(c) to the extent the Court concludes that provision may be considered here, the Award's dispositive conclusions regarding damages and defamation liability because, as rendered, those portions do not yield a mutual, final, and definite disposition of the issues submitted;

(iv) **RETAIN JURISDICTION** without remand, to determine the operative effect of the confirmed, modified, and vacated portions of the Award and, if warranted, award ancillary compensatory relief under the Court's inherent authority, including the documented but-for fees and costs identified in Ex. R.1, together with taxable costs and pre- and post-judgment interest as permitted by law;

(v) **GRANT** such other and further relief as the Court deems just and proper.

**LIMITED PRECLUSIVE EFFECT AND NON-CONCESSION.** Petitioner seeks partial confirmation only as to the Award's definite operative directives and the severable relief the Panel expressly ordered. Any later preclusive effect of underlying findings, if any, is governed by ordinary law. This Petition does not concede the correctness or finality of the Award's

---

[1]     FINRA Form U5, Uniform Termination Notice for Securities Industry Registration.

[2]     FINRA Form U4, Uniform Application for Securities Industry Registration or Transfer.

[3]     The Central Registration Depository is FINRA's registration and licensing database for broker-dealer firms and their associated persons, maintained pursuant to 15 U.S.C. § 78o-3(i).

remaining dispositive conclusions under 9 U.S.C. § 10(a)(4), nor does it constitute an admission of any alleged policy violation. *See Sarofim v. Trust Co. of the W.*, 440 F.3d 213, 218–19 (5th Cir. 2006).

**RESERVATION OF UNADJUDICATED CLAIMS AND PARTIES.** Petitioner reserves all claims, parties, and remedies not finally adjudicated in the FINRA proceeding, including claims against JPMC and JPM Bank not adjudicated on the merits, statutory employment discrimination claims excluded from the FINRA forum under FINRA Rule 13201(a), and all rights preserved by the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, 9 U.S.C. §§ 401–403. Nothing herein constitutes consent to remand or to arbitral finality beyond the limited effect sought in this Petition.

## PRELIMINARY STATEMENT

*The purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" and to prevent parties from "playing fast and loose with the courts."*
– *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996))

*We frown upon attempts "to switch judicial horses in midstream" due to "poor judgment . . . or poor foresight."*
– *Garcia v. Fuentes*, 141 F.4th 671, 683 (5th Cir. 2025) (quoting *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991))

Judicial review under the FAA is exceedingly narrow and highly deferential. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008); *Citigroup Glob. Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009).

Petitioner does not dispute that standard. **He invokes it.**

This Petition does not challenge the Panel's factual findings or seek review of the merits. It identifies a structural defect. The Award fails to render a "mutual, final, and definite award." 9 U.S.C. § 10(a)(4).

On one side of this dispute is a private employment agreement requiring a consolidated enterprise to arbitrate all Covered Claims among all Covered Parties in a single proceeding. On the other is a FINRA arbitration that excluded central parties and claims—not by decision of the Panel—but through Respondents' shifting jurisdictional positions as enforced by FINRA's administrative process.

Arbitration is a creature of contract and a matter of consent. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). Here, the Binding Arbitration Agreement ("BAA") defines "JPMorgan Chase" and "the Firm" to include JPMC and all direct and indirect subsidiaries as "Covered Parties" and mandates a single, final, and binding arbitration of all "Covered Claims." Ex. B.1 ¶¶ 1, 3.

Petitioner upheld his end of the bargain by asserting all Covered Claims against all Covered Parties in the required FINRA forum. *See* FINRA Rule 13200(a), (b); 15 U.S.C. § 78o-3.

**Respondents did not.**

Petitioner filed an Equal Employment Opportunity Commission ("EEOC") charge against JPMS asserting statutory employment discrimination claims arising from the same termination and Form U5 at issue here. Ex. N.1. JPMS responded that the filing was "erroneous" because disputes concerning Form U5 reporting "must be adjudicated in FINRA arbitration." JPMS EEOC Position Statement at 9 (May 24, 2024) (Ex. D.3).

Once in FINRA, Respondents took a "clearly inconsistent" position. *Hall*, 327 F.3d at 396. They disavowed the corporate unity on which the BAA's arbitration obligation rests, asserting that "JPMorgan Chase Bank, N.A., and JPMorgan Chase & Co. . . . are not FINRA member firms, are not subject to FINRA's jurisdiction and do not agree to arbitrate claims against them in FINRA arbitration." Ex. D.2 at 1 n.1 (Oct. 31, 2024). That position is irreconcilable with both their EEOC submission and the contractual framework of the BAA. See *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 466, 473–74 (2020) (recognizing that arbitration agreements may bind non-signatory corporate affiliates under traditional principles of agency, alter ego, and estoppel, thereby preventing strategic fragmentation of contracts).

Having fragmented the parties, Respondents then fragmented the claims by way of FINRA as an administrative shield. Although the BAA supplied the consent required by FINRA Rule 13200(b) to arbitrate statutory employment discrimination claims, JPMS invoked Rule 13201(a) and unilaterally instructed FINRA that it "does not agree to arbitrate Claimant's statutory employment discrimination claims in this forum." Ex. F.2 (Aug. 13, 2024). FINRA accordingly directed Petitioner to "delete all causes of action or requests for relief based on statutory employment discrimination, sexual assault, or sexual harassment . . . or this case

will be closed without prejudice." Ex. F.1 (Sept. 6, 2024).

That directive crossed from administration into adjudication. FINRA staff are not arbitral tribunals vested with authority to resolve threshold questions of arbitrability or contract interpretation. Those gateway issues remain for Article III courts. FINRA's directive—effectively adopting JPMS's unilateral position—therefore carries no dispositive force and cannot displace the Court's obligation to determine whether the parties agreed to arbitrate these claims. See *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

The result was structural prejudice. FINRA required Petitioner to abandon claims challenging the adequacy of JPMS's investigation yet allowed JPMS to rely on that same investigation at the hearing to justify termination. Ex. G.7 at 7; *see* ¶¶ 88–92, *infra*.

Within those constraints, the Panel made express findings:

> *(1)   [W]hen Respondent learned that Claimant was contemplating resigning….to work for a competitor of Respondent, Respondent began investigating reasons to terminate Claimant so as to make it more difficult for Claimant to go work with a competitor of Respondent. Award at 4.*
>
> *(2)   [R]espondent has been found to have done this in the past. Id.*
>
> *(3)   [T]he Panel is concerned that this may be a pattern of [mis]conduct. Id.*
>
> *(4)   [O]ne of the primary reasons…was to hinder Claimant's ability to transfer his book of business to a competitor of Respondent. Id.*
>
> *(5)   [B]ased on the facts in this case, the Form U-5 [is] inaccurate. Id.*
>
> *(6)   [A]bsence of a clean U-5 makes it very difficult to move to a Tier one competitor of Respondent. Id.*

The Panel ordered correction of the Form U5 and assessed all forum fees against JPMS. It also stated why it denied defamation and damages: the Panel did not find the Form U5 reason "defamatory," and it noted that Claimant secured lucrative employment with a highly respected national brokerage firm less than two months after termination. Award at 4–5, 7. This Petition does not ask the Court to reweigh that stated merits rationale. The narrower problem is that the same Award also found intentional competitive hindrance, possible

pattern conduct, and Form U5 inaccuracy, yet still left unresolved what its dispositive denials mean as among the separately named entities after the Panel made no determination as to JPMC and JPM Bank. Award at 3–5.

Even while declining to consider claims against JPMC and JPM Bank, the Award attributes operative conduct, motive, competitive interference, and regulatory consequences to an undifferentiated "Respondent." The problem is not that the Panel was required to explain every step of its reasoning. It is that the Award, as written, does not reveal which entity those findings bind or how the dispositive rulings run as among the separately named entities.

During discovery, JPMS insisted on strict corporate separateness to block production, asserting that "Claimant may not like it but JPMorgan, JPMC and JPMS are distinct entities." Ex. G.4 at 6 (JPMS's Resp. in Opp'n to Claimant's Mot. to Compel, Apr. 14, 2025). It further represented that records concerning JPMorgan employees were not within its "possession, custody, or control." *Id.* at 18.

Given the separate roles reflected in the record, the Award does not identify which entity committed the conduct found, which entity is bound by the corrective relief ordered, or whether the entity with authority to implement that relief was actually adjudicated. The defect, therefore, is not disagreement with the Panel's merits determinations, but inability to determine the Award's scope and operative effect with the definiteness required by 9 U.S.C. § 10(a)(4).

**The question presented is narrow.**

Whether an arbitration award that makes express findings of intentional competitive hindrance and regulatory inaccuracy, yet denies defamation and damages and expressly makes no determination as to two named respondents, satisfies the FAA's requirement of a "mutual, final, and definite award upon the subject matter submitted," 9 U.S.C. § 10(a)(4), or alternatively withstands vacatur under § 10(c).

7

**It does not.**

## I.    PARTIES

### A.    Petitioner

1.    **Petitioner Joshua David Sappi Biering** is a natural person, a citizen of the United States and Brazil, and a resident of Fort Worth, Tarrant County, Texas. Petitioner is an honorably discharged former U.S. Army Captain, Bronze Star Medal recipient, and service-connected disabled veteran recognized by the United States Department of Veterans Affairs. Petitioner is a protected veteran within the meaning of 38 U.S.C. § 4212 and is entitled to protection under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12117, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code ch. 21.

2.    At all relevant times, Petitioner was employed by JPMorgan Chase Bank, N.A. ("JPM Bank") as an Executive Director, assigned to the J.P. Morgan Private Bank ("JPM PB") Fort Worth office. Ex. D.2 ¶ 2; Award at 4. Petitioner was a dual-registered Associated Person (CRD No. 6883842) within the meaning of FINRA Rule 13100(u), holding Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent State Law), and Series 65 (Uniform Investment Adviser Law) qualifications. *See* Ex. E.4b.

3.    Petitioner executed the Binding Arbitration Agreement ("BAA") and is a "Covered Party" as defined therein. Ex. B.1 ¶ 1.

4.    Petitioner is currently employed by Raymond James & Associates, Inc. ("RJA"), a FINRA member firm (CRD No. 705), where he serves as Senior Vice President, Wealth Management. *See* Ex. E.4b. RJA maintains Petitioner's securities licenses and registrations, and his CRD record, maintained through RJA, includes the Form U5 disclosures and Form U4 archives at issue.

### B.    Respondents

5.    Respondent JPMorgan Chase & Co. ("JPMC") is a Delaware corporation with its principal place of business in New York, New York, and is the ultimate parent of JPMS and JPM Bank. JPMC is not itself a FINRA member firm, did not sign the FINRA Submission

9

Agreement, and did not agree to arbitrate claims against it in FINRA arbitration. Award at 1–3.

6.   **Respondent J.P. Morgan Securities LLC ("JPMS")** is a Delaware limited liability company registered as a broker-dealer with the SEC pursuant to Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b), and as an investment adviser under Section 203 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3. JPMS is a FINRA member firm (CRD No. 79). Ex. E.4b.

7.   JPMS maintained Petitioner's securities registrations and filed the Form U4 and Form U5 disclosures at issue. Ex. E.4b. JPMS signed the FINRA Submission Agreement on September 10, 2024. Award at 1–2.

8.   Registered broker-dealers are required to disclose on Form Uniform Application for Broker-Dealer Registration ("Form BD") each name under which they conduct business and the identity of all indirect owners. 17 C.F.R. § 249.501, Items 1.B, 10. JPMS's Form BD lists sixteen "Other Business Names," including JPMC, JPM Bank, JPM PB, "J.P. Morgan Wealth Management," and Chase Private Client—none of which is a separately registered broker-dealer. *See* Ex. E.4b (FINRA BrokerCheck Firm Report, CRD No. 79). Form BD also discloses, under Item 10, that JPMC is JPMS's ultimate indirect owner, holding 75% or more control through a chain of affiliated holding entities. *Id.*; *see* also Award at 1–2.

9.   **Respondent JPMorgan Chase Bank, N.A. ("JPM Bank")** is a national banking association chartered under the National Bank Act, 12 U.S.C. § 21 *et seq.*, with its main office in Columbus, Ohio. JPM Bank was Petitioner's employer. JPM Bank is not a FINRA member firm, did not submit to FINRA arbitration, and did not agree to arbitrate claims against it in FINRA arbitration. Award at 1–3.

10.   That parent-subsidiary structure matters here because employment authority, investigative personnel, and regulatory-filing authority were distributed across affiliated

entities even though the Award later referred to a singular "Respondent." See Award at 1–5; Ex. E.4b.

## II.    JURISDICTION, VENUE, AND TIMELINESS

11.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332. For diversity purposes, Petitioner is a citizen of Texas. Each Respondent is a citizen of either Delaware, New York, or Ohio. Complete diversity exists because national banks are citizens of the state where their main office is located, aligning with traditional diversity requirements. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). The amount in controversy exceeds $75,000. This action also arises under the FAA, 9 U.S.C. §§ 9–11.

12.    This Petition seeks ordinary FAA relief from an award issued in a securities-employment dispute centered in this District and carrying continuing regulatory consequences here. No unusual jurisdictional extension is required.

13.    Venue is proper under 9 U.S.C. § 9 and 28 U.S.C. § 1391(b)(2). The arbitration hearing was held in Dallas, Texas, and substantial events giving rise to the Award—including Petitioner's employment, investigation, termination, and the challenged CRD and Form U5 consequences—were centered in Fort Worth, Texas.

14.    Personal jurisdiction exists because Respondents purposefully conducted and directed substantial forum-related conduct in Texas arising from the employment relationship, the challenged regulatory filings, and the FINRA arbitration seated in this District.

15.    The Award was issued December 29, 2025, and this Petition is timely under 9 U.S.C. § 12 because it is filed within three months of the Award; the three-month deadline falls on Sunday, March 29, 2026, and, because the last day falls on a weekend, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday, i.e., Monday, March 30, 2026. *See* Fed. R. Civ. P. 6(a)(1)(C); Ex. A.2.

### III. FINRA'S MANDATORY FORUM COULD NOT YIELD A MUTUAL, FINAL, AND DEFINITE AWARD

#### A. FINRA's Statutory Role, Scale, and Governance

16. FINRA is a not-for-profit self-regulatory organization ("SRO") and the sole registered national securities association under the Securities Exchange Act of 1934. 15 U.S.C. § 78o-3. FINRA writes rules, examines broker-dealers for compliance, registers industry personnel, and administers the largest securities dispute-resolution forum in the United States. 15 U.S.C. § 78o-3(b)(6)–(7); *see* also 15 U.S.C. § 78w(a). The Supreme Court has described the securities industry FINRA regulates as one that "touches nearly every American." *SEC v. Jarkesy*, 603 U.S. 109, 123 (2024).

17. The D.C. Circuit has described FINRA as exercising "executive-like enforcement power." *Alpine Sec. Corp. v. FINRA*, 86 F.4th 406, 410 (D.C. Cir. 2023). The Internal Revenue Service has further recognized FINRA as "a corporation serving as an agency or instrumentality of the government of the United States." IRS CCA No. 201623006 (June 3, 2016).

18. The Investment Advisers Act of 1940 establishes a separate federal regime governing those who provide investment advice for compensation, distinct from the broker-dealer framework under the Exchange Act. 15 U.S.C. § 80b-1 *et seq*. Investment advisers are fiduciaries regulated directly by the SEC, not by any SRO. 15 U.S.C. §§ 80b-3, 80b-3(f), 80b-4, 80b-9. Accordingly, advisory activity falls outside FINRA's compulsory arbitration jurisdiction.

#### B. FINRA Arbitration, Dual Registration, and Jurisdictional Limits

19. FINRA Rule 13200(a) requires arbitration of disputes between or among members and associated persons that arise out of the business activities of a member or an associated person. Petitioner held his broker-dealer registrations through JPMS, a FINRA

12

member. On that basis, the FINRA-arbitrable portion of this dispute had to proceed in FINRA's forum.

20.   But FINRA's compulsory forum does not encompass the entire enterprise merely because a dispute involves a dually registered relationship. FINRA's arbitral jurisdiction is based on member status, associated-person status, and consent, not on the practical reality that a bank, holding company, broker-dealer, and advisory platform may operate as one enterprise. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943-45 (1995).

21.   That divide appears in the governing definitions. Outside the arbitration code, the Exchange Act and FINRA membership provisions can reach control affiliates more broadly. 15 U.S.C. § 78c(a)(9), (18); FINRA Rule 1011(b)(3); FINRA By-Laws art. I(rr)(3). Under those broader control-based definitions, JPMC and JPM Bank fall within the same regulated enterprise as JPMS.

22.   FINRA's arbitration code, however, is narrower. Regulatory Notice 09-74 explained that the prior arbitration-code definition of 'associated person' could be read to include corporate entities, so FINRA amended the rule to clarify that nonmember corporate entities are excluded from the compulsory forum unless they separately consent. FINRA Regulatory Notice 09-74, at 2; FINRA Rules 13100(b), 13100(u). The forum therefore could not compel the full enterprise or adjudicate the entire integrated dispute the BAA required to be resolved in one proceeding.

**C.   CRD Disclosures Carry Public Regulatory and Legal Consequences Beyond Private Arbitration**

23.   The CRD is the centralized registration and licensing system jointly maintained by FINRA, the SEC, other SROs, and state regulators. 15 U.S.C. § 78o-3(i); FINRA By-Laws art. V, §§ 2-3. Member firms—not associated persons—create, amend, and terminate CRD records through Forms U4 and U5. An associated person cannot unilaterally alter a CRD or

BrokerCheck record; absent a firm-filed amendment or ordered relief, the disclosure remains available for review by regulators, firms, market participants, and the investing public.

24.    FINRA rules imposed overlapping duties on JPMS to ensure the accuracy and specificity of its regulatory reporting. Article V, Section 3 of the FINRA By-Laws requires notice of termination, and FINRA Rule 1122 bars the filing of registration information that is incomplete or inaccurate so as to be misleading.

25.    That duty of accuracy is reinforced by FINRA Rule 2010, which requires member firms to observe high standards of commercial honor and just and equitable principles of trade, and by FINRA Rule 3110(e), which requires a hiring firm to investigate an applicant's good character, business reputation, qualifications, and experience, including review of the most recent Form U5.

26.    Regulatory Notice 10-39 rejects vague termination summaries. FINRA explained that complete and accurate Forms U5 are used by FINRA, the SEC, state regulators, member firms, and investors, and that it is not enough to report only that a person violated 'firm policy' without identifying the specific conduct. FINRA Regulatory Notice 10-39, at 2–3 (Sept. 2010).

27.    Because Form U5 disclosures remain available through CRD and BrokerCheck, they carry immediate and ongoing consequences for licensing, hiring, and reputational standing. Those consequences do not disappear simply because an arbitration hearing has ended.

28.    The disclosure ecosystem does not stop at the broker-dealer side. For dually registered individuals, the same separation event can also affect adviser-facing records maintained through the Investment Adviser Registration Depository ("IARD"), an adviser-registration system operated by FINRA under SEC authority. Because Petitioner held both broker-dealer and adviser-side qualifications, the challenged separation event had consequences beyond the narrow four corners of FINRA's arbitral forum.

29. Those downstream effects are not abstract. Hiring firms must review the most recent Form U5 under Rule 3110(e), state regulators use CRD information in licensing and supervision decisions, and Petitioner received regulator inquiries after the challenged filing. Ex. E.5; FINRA Regulatory Notice 10-39, at 2.

30. FINRA Rules 12904(h) and 13904(h) provide that "[a]ll awards shall be made publicly available." FINRA accordingly publishes final awards in its Arbitration Awards Online database. FINRA, Arbitration Awards Online.

31. FINRA's Dispute Resolution Services statistics confirm that intra-industry disputes are a substantial part of the forum rather than an edge category. FINRA separately tracks wrongful termination, Form U5 libel or slander, general defamation, and discrimination or harassment as recurring intra-industry controversy types. FINRA, Dispute Resolution Services Statistics.

32. A structural gap in SEC oversight compounds the forum's limitations. Under Sections 19(d) and 19(e) of the Exchange Act, 15 U.S.C. § 78s(d)-(e), the SEC may review SRO disciplinary actions against members and associated persons. Those provisions do not create SEC review of a private FINRA arbitration award. The Court therefore does not intrude on an SEC merits function by applying the FAA's ordinary finality requirement here. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392-93 (2024).

## IV. PETITIONER EXHAUSTED AVAILABLE AVENUES AND PRESERVES REMAINING CLAIMS

33. Petitioner submitted the dispute to FINRA as required by the BAA, thereby exhausting the arbitral process. The Award was issued on December 29, 2025. Ex. A.1; Award at 7; *see* ¶ 42, *supra*. Petitioner does not consent to remand to a second arbitral forum. This Petition invokes 9 U.S.C. §§ 9–11.

34. **EEOC/TWC and AAA Protective Filing**. On February 25, 2024, Petitioner filed a verified Charge of Discrimination with the EEOC (Charge No. 450-2024-04743), dual-

filed with the Texas Workforce Commission ("TWC") Civil Rights Division. Ex. N.1. The EEOC issued a Dismissal and Notice of Rights on March 19, 2025. Exs. N.2–N.3. Petitioner then filed a protective AAA demand on February 11, 2026, to toll TCHRA limitations while preserving this Court's role in resolving the FAA finality question. The AAA accepted the filing, the full BAA was submitted on March 11, 2026, no deficiency has been identified, and Respondents still had not answered on the merits at the time of this filing. The AAA demand is protective only and does not concede that any forum other than this Court should decide the FAA finality question.

35. **FINRA Administrative Request.** On March 13 and March 21, 2026, Petitioner sought from Richard Berry, Executive Vice President and Director of FINRA DRS, reimbursement of $32,657.50 in legal and professional fees caused by FINRA's July 24, 2024, rank-and-strike error. Ex. F.3. Senior Director Katherine M. Bayer denied the request on March 26, 2026. Petitioner promptly sought reconsideration and further review. *Id.*

36. **Congressional and Regulatory Outreach.** Before seeking judicial relief, Petitioner pursued the available administrative and oversight channels. Congresswoman Kay Granger's office initially advised that Members of Congress can place inquiries only with federal agencies and are prohibited from interfering with legal issues. Counsel then clarified that the request concerned FINRA, a self-regulatory organization overseen by the SEC. Granger's office thereafter submitted an inquiry to FINRA seeking an update on Petitioner's ongoing arbitration. Ex. I.5. Senator Ted Cruz's office separately engaged on the same subject. See Exs. I.1–I.4.

37. **Code of Conduct Hotline.** Petitioner submitted a retaliation complaint through JPMorgan's Conduct Hotline, which the Code describes as operated by an 'independent third-party service.' JPMC Code of Conduct (2023 ed.). The record does not show that the complaint remained with an external channel. Instead, the hotline materials and hearing record show the matter was forwarded into the same internal Human Resources

("HR") and Employee Relations ("ER") chain, including Jena Cohen and Julie Sanchez. Hr'g Tr. 19238:2-5. No independent determination is reflected in the record before the Form U5 filing.

38. **Internal Remedies and Firm's Open Communication Policy.** Before pursuing FINRA arbitration, Petitioner used JPM's *me@jpmc* HR portal to request guidance, personnel records, correction, and the operative notice-period terms. Exs. T.1, T.3–T.4. On December 22, 2023—the same day JPMS filed Form U5—JPM Bank's Employee Records Department denied the personnel-file request and directed Petitioner to subpoena records from separate entities. Exs. T.5–T.6. The requested registration and compliance materials were not produced until formal discovery on March 10, 2025, more than fifteen months later. Ex. G.2. No corrective process or neutral review was provided.

39. **National Labor Relations Board ("NLRB").** During Petitioner's notice period, the NLRB General Counsel issued *Memorandum GC 23-08* (May 30, 2023), and the FTC proposed its Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Jan. 19, 2023), both addressing non-compete and garden-leave restrictions. Having received no substantive response regarding the actual notice-period terms, Petitioner asked the NLRB to determine whether those authorities applied to the restraint JPMorgan was imposing. No further administrative action followed. Ex. T.2.

40. **Reservation of Claims and Non-Consent to Further Arbitration.** Having fulfilled any contractual obligation to arbitrate, Petitioner does not consent to remand to FINRA, the AAA, or any second fragmented arbitral forum.

41. By filing this Petition, Petitioner expressly reserves:

    (a) all non-arbitrable and non-submitted statutory claims, including rights under the EFAA, 9 U.S.C. §§ 401–403;

    (b) all claims against JPMC and JPM Bank as Non-Signatories;

    (c) all statutory employment-discrimination claims under TCHRA, Title VII,

17

and the ADA, excluded from FINRA under Rule 13201(a);

(d) the right to assert that Respondents are estopped from invoking arbitral finality as to claims and parties they themselves excluded;

(e) the position that the AAA filing is purely protective and does not concede that any forum other than this Court may resolve the FAA finality defect; and

(f) the right to challenge the Panel's "no defamation" and "lucrative employment" findings in any subsequent proceeding.

## V.   STANDARD OF REVIEW

42.   Judicial review of an arbitration award under the Federal Arbitration Act ("FAA") is exceedingly narrow. Courts do not reweigh evidence, reassess credibility, or correct ordinary legal or factual errors. Review is limited to determining whether the award may be confirmed, modified, or vacated under 9 U.S.C. §§ 9–11. *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004).

43.   The FAA's statutory grounds are exclusive, but that exclusivity does not displace the Act's separate requirement that an award be mutual, final, and definite. 9 U.S.C. § 10(a)(4); *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–88 (2008); *Citigroup Glob. Mkts., Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009). The Court must be able to determine what was decided and the legal effect of the award. *Brabham*, 376 F.3d at 380; *Brown v. Witco Corp.*, 340 F.3d 209, 215–16 (5th Cir. 2003). Petitioner does not contend that arbitrators were required to issue a reasoned award or to reach any particular legal result on the merits.

44.   Manifest disregard of the law is not an independent ground for vacatur. If it survives at all, it survives only as a narrow gloss on § 10(a)(4) where the arbitrators knew the governing rule and refused to apply it. *Citigroup Glob. Mkts., Inc. v. Bacon*, 562 F.3d 349, 355-58 (5th Cir. 2009); *Trinity Energy Servs., L.L.C. v. Se. Directional Drilling, L.L.C.*, 135 F.4th 303, 307-08 (5th Cir. 2025). Petitioner invokes that principle only in the limited sense that the Court may not supply a missing attribution or rule-to-result bridge the Award itself

18

never states. Arbitrators may not dispense their own brand of industrial justice. *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

45.    Questions concerning the existence and scope of an arbitration agreement, arbitral authority, and the legal operative effect of an award are for the Court. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995). *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 392-93 (2024) confirms that courts resolve such legal questions independently.

46.    That allocation matters here because federal law effectively requires most firms and individuals that trade securities to join FINRA as a condition of engaging in that business, while simultaneously subjecting FINRA to SEC oversight. *Alpine Sec. Corp. v. FINRA*, 86 F.4th 406, 408-10 (D.C. Cir. 2023), cert. denied, 144 S. Ct. 2707 (2024). FINRA administered the forum, but arbitral scope, party status, and operative legal effect remain questions for the Court.

47.    State contract law governs who is bound by the arbitration agreement, including recognized non-signatory doctrines such as equitable estoppel where claims are intimately founded in and intertwined with the agreement. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009); *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000). Courts then determine what preclusive or binding effect, if any, follows from the issues actually litigated and necessarily decided. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148-49, 154 (2015); *Taylor v. Sturgell*, 553 U.S. 880, 892-95 (2008).

48.    Here, the Award contains express findings that JPMS investigated Petitioner's termination to hinder his competitive transition, that the Form U5 was inaccurate, that similar conduct had occurred previously, and that the absence of a clean U5 impeded movement to a Tier One firm. Award at 4–5. The Court does not ask whether those findings should have yielded a different merits result. It asks whether the Award identifies the parties bound, the claims actually disposed of, and the legal operative effect of its dispositive rulings with the definiteness required by 9 U.S.C. § 10(a)(4). *Brown,* 340 F.3d at 215–16.

49. The Court further determines whether the award is mutual as to all parties bound by the agreement. The Panel made no determination as to claims against two of three named respondents. Award at 3. The BAA defines the Firm to include affiliates and subsidiaries as Covered Parties. Ex. B.1 ¶ 1. Whether the resulting award satisfies § 10(a)(4)'s mutuality requirement is a question of law.

50. Federal judicial-estoppel principles likewise apply to inconsistent positions regarding forum and arbitrability. *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001). The record reflects that JPMS directed Petitioner into FINRA on the ground that Form U5 disputes belonged there, then relied on FINRA's narrower arbitral definitions to exclude entities and claims once the case was in that forum. Exs. D.3, F.2.

51. Texas law supplies the substantive rules for the defamation issue presented to the Panel. The Court does not decide which Texas theory should have prevailed. It asks only whether the Award identifies the publication or publications addressed, the parties bound, and the operative disposition with sufficient definiteness to satisfy 9 U.S.C. § 10(a)(4). *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114-15 (Tex. 2000); *Hancock v. Variyam*, 400 S.W.3d 59, 63-64 (Tex. 2013).

52. The Court retains inherent authority to award compensatory fees and costs for bad-faith, vexatious, wanton, or oppressive conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). Any such award must remain compensatory and limited to but-for loss. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107–08 (2017). The discovery record described below bears on that question.

53. The primary vacatur ground remains § 10(a)(4). This Petition does not ask the Court to revisit the Panel's factfinding or substitute a different merits judgment. It asks the Court to determine finality, party reach, and legal effect after taking the Award as written.

54. That inquiry takes on heightened significance because FINRA is not an ordinary private arbitral forum. It administers a compulsory proceeding under delegated Exchange

20

Act authority, publishes awards, and leaves public regulatory consequences in place through CRD, BrokerCheck, and adviser-facing systems. *Alpine* recognizes that FINRA exercises "executive-like" enforcement power under SEC supervision. 86 F.4th at 410–13. *Loper Bright* confirms that legal questions arising in delegated-authority frameworks remain for the courts to resolve independently. 603 U.S. at 392–93. *Jarkesy* likewise underscores that adjudicatory machinery exercising delegated executive power and producing public consequences is not treated as an ordinary private contract mechanism. 603 U.S. at 123–31.

55.  Congress separately identified settings in which arbitration is a poor fit where an authoritative resolution is required, significant policy questions or consistent treatment matter, nonparties are materially affected, a full public record is important, or continuing supervisory jurisdiction is needed. 5 U.S.C. § 572(b).

56.  Petitioner also preserves § 10(c) in the alternative, to the extent the Court concludes that provision may be considered in this compulsory delegated-authority setting. Petitioner recognizes the text of § 10(c) and does not invoke it as a merits end-run around § 10(a)(4).

57.  Under 9 U.S.C. § 9, the Court must confirm an award unless vacated, modified, or corrected. Severable portions may be confirmed while defective portions are addressed. *Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003); *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996–98 (5th Cir. 1995); *Sarofim v. Tr. Co. of the W.*, 440 F.3d 213, 218–19 (5th Cir. 2006). Modification remains available for discrete defects. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994); *Janvey v. Alguire*, 647 F.3d 585, 595–97 (5th Cir. 2011).

58.  Remand is inappropriate where defects are structural and jurisdictional constraints persist. *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1134 (5th Cir. 1991).

59.     Rights under the EFAA remain preserved as to claims not adjudicated on the merits. The Act defines a sexual harassment dispute as a dispute relating to conduct alleged to constitute sexual harassment and provides that applicability is determined by a court. 9 U.S.C. §§ 401(4), 402(a)–(b). Congress enacted the EFAA in 2022 because it found that pre-dispute arbitration agreements "routinely" forced sexual harassment and sexual assault claims into forums that offered "no meaningful transparency or accountability." Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, § 2, 136 Stat. 26 (2022). The statutory findings recognized that arbitration of such claims could "shield combative behavior from public accountability." Id. § 2(2).

60.     The Court need not resolve the merits of each underlying claim. Its task is to determine whether the award yields a determinate and enforceable resolution of the submitted claims and parties, and, if not, what relief is available under §§ 10(a)(4) and 11 and the Court's inherent authority.

## VI.   AN OVERWHELMING FACTUAL RECORD THAT DEMANDS A MUTUAL, FINAL, AND DEFINITE RESOLUTION

61.     Appendix A contains the full chronology. This section isolates the facts material to finality: the resignation sequence, the workplace-conduct and expense investigations, the managed U5 wording process, the altered performance records, and the resulting regulatory record.

### A.   The Separation Sequence Preceded and Shaped the Investigations

62.     Before any workplace-conduct complaint reached HR, the relevant actors were already identifiable across the enterprise: Ben Stewart, Petitioner's direct manager in the Fort Worth Private Bank office; J.T. Aughinbaugh, the Fort Worth market manager; Kyle Hitchcock, Head of Investments and Advice; Jena Cohen, JPMC's Global Head of Human Resources ("HR"); Stephanie Stainback, the HR partner who opened the rapid-response track; Jonathan Jacobs, Vice President, Employee Relations; Greg Thompson, the

registration/U5-compliance employee; and Rachel Tidwell-Neal, JPMorgan's Assistant General Counsel. See Ex. S.2; Exs. K.4–K.7; Ex. E.1b.

63. On October 24, 2023, Petitioner verbally tendered resignation subject to guidance regarding notice-period terms, compensation, and transition treatment. Management did not treat that communication as tentative. That same day, Stewart reported internally that Petitioner had raised resignation, Stainback responded that "anything to help move this forward" would be appreciated, and Cohen wrote she was "hoping to wrap . . . with a term." Exs. K.4–K.5, K.1.

64. The business-side participants were not neutral observers. Stewart relayed the resignation internally; Aughinbaugh sat in the same Fort Worth management chain; Hitchcock initiated the October 27 reporting chain. Ex. S.2; Exs. K.4-K.7; Exs. L.3-L.4. Their involvement matters because the process later presented as an HR/ER response began with interested managers controlling the office transition and the client book.

65. On October 26, 2023, Petitioner sent a routine PTO email to his manager, Stewart, while on standby awaiting the guidance response he had requested on October 24. Twenty-nine minutes later, ER opened a Rapid Response entry. Ex. W.1; Ex. U.6. The firm's later investigation materials labeled the matter a "sexual assault" allegation to trigger the Rapid Response protocol—a characterization never conveyed to Petitioner in those terms and used only to accelerate the internal process.

66. On October 27, while Petitioner was at Merrill Lynch pre-onboarding meetings, JPMS accessed his calendar, escalated to HR, and placed him on administrative leave. Ex. W.3. But the administrative machinery had already started: ER had opened the Rapid Response case the prior afternoon, twenty-nine minutes after Petitioner's PTO email. Ex. U.6. The next morning, after Petitioner submitted his written resignation, Cohen wrote: "Turns out that his resignation is likely to go work for Michael Parrelly at MS or ML so we should make sure we amend the u4 asap as he likely just cleared their background." Ex. K.9.

23

67.    On October 28, Petitioner submitted written resignation through JPMorgan's me@jpmc HR portal at 9:45 a.m. CDT. Ex. W.2. The firm's own HR system recorded the separation as a voluntary termination and reflected a last-worked date of October 28. Id. Later that day, at 5:37 p.m. CDT, Stainback instructed Registration not to file the U5 "until further notice so we can finalize wording." Ex. E.1b. The later recharacterization of the separation thus involved HR, registration, and legal functions across the enterprise, not a single ministerial filing act.

### B.    The Investigation Was Substantially Completed but Formally Held Open

68.    By November 8, 2023—thirteen days after the Rapid Response entry—the workplace-conduct investigation was substantively complete. Jacobs later admitted that he had represented on November 8 that the matter was "concluded," meaning it was complete that day or earlier. Ex. S.2 at 256; Ex. U.10. A "performance" basis for separation, explored early in the investigation, was silently dropped from the final analysis.

69.    Employee Relations Investigator Jacobs was instructed to hold the workplace-conduct investigation open for "simultaneous disposition" with the separate expense investigation, which concluded on November 29, 2023, with a Global Security finding that "Allegations NOT Supported." Ex. L.1 (Global Security Summary). The investigation was held open not to complete its work but to time its closure with a predetermined separation outcome.

70.    Formal closure nevertheless was withheld. Jacobs testified that he was told not to finalize the workplace-conduct matter until the separate expense investigation also concluded so the matters could be dispositioned at the same time. Ex. S.2 at 251–52. That instruction extended the workplace-conduct track roughly twenty-one days beyond substantive completion.

71.    The hold-open mattered. It preserved a second, independently stigmatizing basis for separation until November 29, 2023, even though the expense investigation also closed as

"not supported." Exs. L.1–L.2. The parallel tracks let JPMS preserve leverage over both the termination narrative and the regulatory wording process.

72.    On December 1, 2023, Petitioner was terminated during his notice period.

73.    Following termination, counsel for Petitioner objected to any discharge-marked Form U5 and requested a voluntary designation.

74.    Following termination, Petitioner's counsel sent five written demands to JPMS over a period of months, each citing the governing standard for accurate Form U5 reporting. Ex. X.3; see Ex. F.15. Each demand requested correction of the discharge designation and deletion of the termination explanation. JPMS did not respond to the demands and did not amend the Form U5 until ordered to do so by the Panel.

## C.    The Form U5 Filing Was Directed and Timed

75.    JPMS nevertheless filed a Form U5 on December 22, 2023, marking the separation Discharged and stating:

> *After RR submitted resignation but before expiration of Notice Period RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.*

76.    That filing came fifty-five days after resignation, twenty-one days after termination, and only after the internal direction to finalize wording. At hearing, testimony described the immediate effect of a discharge-marked U5 on Petitioner's pending Merrill Lynch transition.

77.    The Panel later found the Form U5 inaccurate and ordered correction.

78.    At hearing, JPMS compliance officer Greg Thompson confirmed that the five Form U4 financial disclosure entries were "filed in error." Hr'g Tr. (ZOOM0005, lines 877–884). Thompson further testified regarding the U5 that JPMS "could have included the language but chose not to." Id. This admission came from the compliance officer responsible

for JPMS's regulatory filings—not from counsel or a general officer—underscoring that the filing decisions were made at the operational level with knowledge of their inaccuracy.

### D. The Asserted Basis for Termination Narrowed Over Time

79. At the time of separation, Petitioner managed approximately $1 billion in client assets under management, generated $5.8 million in annualized revenue, achieved 14% year-over-year growth against a 6% firm average, and delivered 233% new-client growth attainment. Ex. V.1. Petitioner had been recognized as a Gold Producer on October 23, 2023— one day before the separation sequence began. Ex. V.3.

80. The record reflects a progression in how the asserted basis for termination was described:

81. The description narrowed over time in a way that matters both factually and regulatorily. Internally, the matter was escalated on October 27 as a serious assault allegation, which triggered Rapid Response and administrative leave. By December 1, the termination call used anti-harassment and code-of-conduct language. By December 22, the filed Form U5 used the materially narrower phrase 'inappropriate behavior' and added that the conduct was 'Not related to the sale of securities or any customer complaints.' Ex. E.1; Exs. L.1–L.2; Ex. S.2 at 251–56.

82. JPMorgan's own characterizations of the same underlying conduct shifted at each stage — not because the facts changed, but because the firm's strategic objectives did. On October 27, 2023, JPMS characterized the matter as a "serious assault allegation," submitted a Rapid Response, and placed Petitioner on administrative leave "prior to clearing background." By December 1, 2023, the characterization had become a termination for "Violating the Firm's Code of Conduct and Anti-Harassment policy" — executed during Petitioner's notice period, ensuring prospective employers would see "anti-harassment" as the reason for termination alongside existing U4 bankruptcy disclosures. Three weeks later, on December 22, 2023, JPMS filed the Form U5 describing the separation as a discharge for

"inappropriate behavior" — a CRD disclosure that effectively precluded new broker-dealer sponsorship. By the time of the hearing in 2025, JPMS's own witnesses had retreated to calling the identical conduct a mere "lapse of judgment" — but by then, JPMorgan had retained Petitioner's book of business, Petitioner had not been placed at Merrill Lynch or any direct competitor, and the reputational damage was already irreversible.

83.    The significance is twofold. The narrative grew softer, but the regulatory checkbox did not: JPMS still marked the separation Discharged, the designation that hiring firms, regulators, and compliance personnel must treat seriously under the U5 regime. The Panel found the filed explanation inaccurate, yet the Award did not say what description it treated as operative, how the Discharged designation fit with the resignation chronology, or how those distinctions bore on the denial of defamation and damages.

## VII.  PROCEDURAL HISTORY

84.    The following procedural history demonstrates how the case was directed into a forum capable of issuing limited regulatory corrections but not a complete disposition of all parties and claims. A detailed, source-verified chronology appears in Appendix A and is incorporated by reference.

85.    In February 2016, Petitioner joined JPMorgan, obtained Series 7, 63, and 65 qualifications, and became a dual-registered Associated Person (CRD No. 6883842) employed by JPM Bank and registered through JPMS. Petitioner filed his Statement of Claim with FINRA on June 3, 2024, asserting statutory employment-discrimination claims, negligent investigation, and related causes of action arising from his termination and the December 22, 2023 Form U5 filing.

86.    Respondents' jurisdictional posture then shifted. On August 13, 2024—on the eve of arbitrator selection—JPMS informed FINRA it would not arbitrate the statutory employment-discrimination claims and maintained that JPMC and JPM Bank were outside FINRA jurisdiction. Ex. F.2; Ex. D.2 at 1 n.1. FINRA adopted that position administratively,

withdrew the Rule 13802 employment panel, and redirected the case to the Rule 13402(b) intra-industry path. Ex. F.1. The case remained a three-arbitrator matter, but the shift from an all-public employment panel to a mixed public/non-public industry panel changed time and cost, not the underlying structural problem: the forum still excluded parties and claims.

87.    The tribunal was then reconstituted. FINRA initially issued ranking forms in July 2024 and later, shortly before the September 2025 hearing settings, withdrew Tanner Craig Forman as the selected non-public arbitrator, requiring cancellation of those settings. FINRA thereafter appointed Alison Battiste Clement as replacement non-public arbitrator in October 2025, and the hearing was reset. Exs. H.1–H.5. That reconstitution extended the proceeding but did not alter the jurisdictional limits described above.

88.    The selection process was itself irregular. FINRA provided a panel selection packet that included a front cover, abbreviated panelist biographies, and prior award summaries. Alison Battiste Clement was designated as the non-public arbitrator, yet during the hearing, she asked foundational questions about Form U4 terminology and regulatory filing obligations that suggested unfamiliarity with the securities-industry registration framework central to the dispute. The lack of subject-matter expertise on a non-public panelist seat that was reconstituted after the original selection was withdrawn compounds the structural concerns described in Section III.

89.    The final Panel—Eric Ross Cromartie (Chair), Christine Rister, and Alison Battiste Clement—conducted six evidentiary hearing days between December 3 and December 15, 2025. Award at 5–6. On December 29, 2025, the Panel issued its Award.

90.    Discovery stretched across nine production rounds over 351 days and required three motions to compel. The Panel twice ordered production of affiliate-held or affiliate-generated materials, reflecting its view that the record could not be limited to JPMS-only custody when the underlying conduct was enterprise-wide. The production history included an altered October scorecard, late-produced 2023 peer-feedback and employee-opinion

material, repeated representations that production was complete, and disclosure of central emails and investigative materials only after motion practice and shortly before hearing. Appendix A, Phase 6; Exs. G.6–G.10.

91. Following the Award, Petitioner took steps to preserve review and any unadjudicated claims. On February 11, 2026, he filed a protective arbitration demand with the AAA to toll limitations under the TCHRA and requested a stay. He also sought reimbursement from FINRA DRS for expenses caused by the acknowledged rank-and-strike error; that request was denied on March 26, 2026. Petitioner then timely filed this action within the period prescribed by 9 U.S.C. § 12, as extended by Federal Rule of Civil Procedure 6(a)(1)(C).

92. The AAA filing underscores the structural limitations of the FINRA forum. Unlike FINRA's three-arbitrator panel, the AAA commercial rules provide for a single arbitrator unless the parties agree otherwise. JPMS objected to Petitioner's proposed hearing dates, causing scheduling delays at every stage. The original FINRA panelist was withdrawn at the last minute with no explanation beyond FINRA's standard non-disclosure protocol. From the filing of the Statement of Claim through the Award, the proceeding took the better part of two years—a period during which the challenged CRD disclosures continued to propagate regulatory consequences.

93. This procedural history reveals the central defect. The arbitration proceeded in a forum that excluded contractually required parties and claims, was shaped by Respondents' inconsistent jurisdictional positions, and produced an Award that is definite as to limited regulatory corrections but incomplete as to liability, damages, and party-wide effect. The result is not a mutual, final, and definite resolution of the controversy submitted.

## VIII. The Award Is Not Confirmable as Written Because It Is Internally Indeterminate and Partially Non-Adjudicative

94.    The court does not revisit the merits of the Panel's conclusions. Nor does Petitioner challenge the Panel's authority to weigh evidence or reach its ultimate outcomes. The issue presented is narrower: whether the Award, on its face, is sufficiently definite and complete to permit confirmation under the FAA.

95.    The Award contains two clear directives: it orders amendment of Petitioner's Form U5 and assesses forum fees against JPMS. The Award also states why it denied defamation and damages: the Panel did not find the Form U5 reason defamatory, and it noted that Claimant secured lucrative employment with a highly respected national brokerage firm less than two months after termination. Award at 4–5, 7. Petitioner does not ask the Court to reweigh that stated merits rationale. The narrower problem is that the same Award also found intentional competitive hindrance, possible pattern conduct, and Form U5 inaccuracy, yet still left unresolved what its dispositive denials mean as among the separately named entities after the Panel made no determination as to JPMC and JPM Bank. Award at 3–5.

96.    The defect is not the existence of those outcomes. The defect is that, from the face of the Award, the Court can only infer who prevailed on those denials, what conduct those denials actually encompass, and whether the Panel stayed within the entity limits it announced. Without choosing among competing inferences, the Court cannot determine what, precisely, it is being asked to confirm.

### A.    Attribution: The Court Can Only Infer Which Entity Is Bound

97.    The Award repeatedly refers to "Respondent" in the singular while describing conduct that, on its face, involves multiple legally distinct entities. Award at 4–5.

98.    The record reflects that different entities performed different functions: one controlled employment status and termination, another filed regulatory forms, and others participated in internal decision-making. The singular term "Respondent" does not resolve

whether the dispositive denials run only to JPMS or instead depend on conduct by JPMC and JPM Bank that the Panel elsewhere said it was not adjudicating.

99.    This is not a merits issue. It is an enforceability issue. The Court cannot confirm an award without being able to determine which party or parties are bound by the findings it contains. The Award, as written, does not permit that determination.

**B.    Indeterminacy: Either Available Inference Produces a Structural Defect**

100.   The Award includes factual observations and conclusions, including statements regarding at-will employment, timing of resignation, re-employment, and denial of defamation. Award at 4–5.

101.   The Award references Petitioner's at-will employment status. But Petitioner had already tendered a verbal resignation on October 24, 2023, seven days before the formal written resignation on October 28 and thirty-eight days before the December 1 termination. Under Texas law, a verbal resignation communicated to management and acknowledged by the employer's conduct constitutes an effective separation. The firm's own HR system initially recorded the separation as voluntary. Ex. W.2 (CX-131; JPMS_21375). The point for present purposes is not that the Panel had to discuss that sequence. It is that any dispositive reliance on an at-will-employment premise necessarily reaches employment conduct allocated in the record to JPM Bank and enterprise HR, not merely JPMS's U5-filing role.

102.   Petitioner likewise does not contend that the Panel was required to explain itself. The defect is narrower and structural. If the denial is read as running only to JPMS, then the Award leaves unresolved the core investigative, employment, and managerial conduct the record allocates to JPMC and JPM Bank.

103.   If the denial instead depends on that broader enterprise conduct, then the Award necessarily reaches beyond the only respondent unquestionably before the Panel and beyond the matters the Panel said it was deciding. Either inference alters party binding, preclusion, and the judgment this Court could enter.

104.  The Court need not choose between those competing inferences, and under the FAA it may not. Its task is only to decide whether the Award is definite enough to confirm as written. A denial that can be sustained only by selecting between a JPMS-only underreach and a broader-entity overreach is not definite as to operative effect.

## C.    Scope: The Award Partly Withholds Adjudication Yet Purports to End the Case

105.  The Award expressly states that the Panel made "no determination as to claims" against certain named entities. Award at 3.

106.  It is also silent as to the scope and continuing effect of the regulatory record that accompanied the disposition. *See* ¶¶ 52–57, *supra*.

107.  Again, Petitioner does not ask the Court to decide those issues. The problem is that the Award closes the case without allowing the Court to tell whether those matters were omitted from the denial, subsumed within it, or left for some other forum.

108.  An arbitration award need not address every argument raised. But it must be sufficiently definite to permit a court to determine what was actually decided. Where an award expressly declines to decide certain claims yet enters dispositive denials using collective terms and enterprise-level facts, the Court cannot determine the extent of its binding or preclusive effect.

109.  The same structural uncertainty appears where the Award references relevant context, such as the absence of a governing contract or asserted authority during garden leave. Those facts matter only if the Panel reached enterprise conduct beyond a JPMS-only disposition; if it did not, then a material part of the controversy was never finally resolved.

## D.    Result: Confirmation Would Require the Court To Choose an Inference the Award Never Fixes

110.  These issues do not invite the Court to revisit the Panel's reasoning or reweigh the evidence. They present a threshold problem: the Award does not yield a sufficiently

definite statement of (i) who won the dispositive denials, (ii) what conduct those denials encompass, and (iii) whether the Panel acted within the party and claim boundaries it announced.

111.  Confirmation under FAA section 9 would therefore require the Court either to treat a JPMS-only denial as if it resolved broader enterprise conduct, or to treat an enterprise-level denial as if the Panel had authority to enter it. The FAA does not permit the Court to make that choice for the Award.

112.  Accordingly, Petitioner does not seek wholesale vacatur of the Award. Rather, as set forth in Section IX, Petitioner seeks limited, severable relief directed only to those portions of the Award that are sufficiently definite to be confirmed, while declining confirmation of those portions that are not.

## IX.    THE FAA REQUIRES PARTIAL CONFIRMATION, VACATUR, AND FURTHER PROCEEDINGS TO RENDER A MUTUAL, FINAL, AND DEFINITE AWARD

113.  This Petition presents one structural defect through multiple statutory vehicles under the FAA: as written, the Award does not permit the Court to determine, across all submitted matters and respondents, the "scope and operative effect" of what the Panel actually decided. See *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380-81 (5th Cir. 2004); *Brown v. Witco Corp.*, 340 F.3d 209, 215-16 (5th Cir. 2003).

114.  That defect manifests in three forms. Some portions of the Award are definite and confirmable under 9 U.S.C. § 9. Some submitted matters were acknowledged but left without operative relief and are modifiable under 9 U.S.C. § 11. The damages and defamation dispositions are indeterminate and require partial vacatur under 9 U.S.C. § 10(a)(4). Each Ground below addresses one facet of the same finality defect.

33

**GROUND ONE: THE COURT MUST CONFIRM THE AWARD'S SEVERABLE, DEFINITE JPMS-DIRECTED COMPONENT UNDER 9 U.S.C. § 9**

115. The FAA supplies a statutory and exclusive remedial framework. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–88 (2008). Within that framework, 9 U.S.C. § 9 directs that the Court "must grant" an order confirming an award unless it is vacated, modified, or corrected under §§ 10 or 11. The Fifth Circuit applies this scheme severably: when an award contains definite, judicially enforceable components alongside defective or indeterminate ones, the Court may confirm the former while vacating or modifying the latter. *Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003); *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996–98 (5th Cir. 1995); *Sarofim v. Tr. Co. of the W.*, 440 F.3d 213, 218–19 (5th Cir. 2006). The Court's role is to determine the operative legal effect of what the Panel actually decided, not to defer to the Panel's own characterization of that effect. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995).

116. The Award's JPMS-directed component satisfies that standard. The Panel ordered JPMS to change the Form U5 Reason for Termination to "Voluntary," delete the Termination Explanation in its entirety, correct the Date Terminated to October 28, 2023, and pay the assessed FINRA forum fees. Award at 3–6. Those directives are complete, party-specific, and reducible to judgment without inference. As to that relief, the Court can determine exactly what the Panel decided and exactly what judgment would enforce it. *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004); *Brown v. Witco Corp.*, 340 F.3d 209, 215–16 (5th Cir. 2003).

117. This JPMS-specific component is also the only part of the Award that is fully mutual, final, and definite on its face. JPMS was the undisputed FINRA member firm, the respondent through which Petitioner held his registrations, the entity that filed the challenged Form U5, and the only respondent that signed the FINRA Submission Agreement and stood unquestionably within FINRA's jurisdiction. The Panel expressly stated that JPMC and JPM Bank did not voluntarily submit to arbitration and that it made no

determination as to claims against them. Award at 1–3. The Award's JPMS-directed correction and fee provisions therefore stand on a footing the remainder of the Award does not: they bind the only respondent indisputably before the Panel and require performance only by that respondent.

118. FINRA's own rules underscore why those directives are definite and enforceable. Article V, Section 3 of the FINRA By-Laws, as summarized in FINRA Regulatory Notice 10-39, required JPMS to file Form U5 within 30 days of termination and to file an amended Form U5 when it learned facts or circumstances making a previously filed Form U5 inaccurate or incomplete. FINRA Rule 1122 prohibits a member from filing information with FINRA that is incomplete or inaccurate so as to be misleading, or from failing to correct such a filing after notice thereof. Regulatory Notice 10-39 further requires firms to file "complete and accurate Forms U5 in a timely manner," to provide enough detail such that "a reasonable person may understand the circumstances that triggered the affirmative response," and not merely to recite a generic policy violation. Once the Panel found the filed Form U5 "inaccurate" and ordered JPMS to change the Reason for Termination to "Voluntary," delete the Termination Explanation, and correct the Date Terminated, the Award necessarily established that the original filing failed FINRA's own accuracy standards and required amendment.

119. Confirmation of these definite portions does not ask the Court to endorse the Award's separate denial of defamation liability, its zero-damages disposition, or any unresolved allocation of responsibility among JPMS, JPMC, and JPM Bank. It gives effect only to what the Panel actually and definitively ordered as to the only respondent unquestionably before it. That is not merits reweighing. It is the severable application of the FAA's own remedial scheme. If the Court concludes, as the Award's text confirms, that these JPMS-directed provisions are definite, severable, and unaffected by any § 10 or § 11 defect specific to them, then § 9's command applies and the Court must confirm that component

while addressing the indeterminate remainder separately under §§ 10 and 11. *Sarofim*, 440 F.3d at 218–19; *Prestige Ford*, 324 F.3d at 395.

120. To the extent any factual determinations necessarily embodied in the confirmed JPMS-directed component later bear on other proceedings, any preclusive effect follows, if at all, under ordinary preclusion principles. It is not the basis for confirmation here. Ground One seeks confirmation because the Award contains a severable, definite, judicially enforceable JPMS-directed component, and only on that basis.

## GROUND TWO: THE COURT MUST MODIFY THE AWARD UNDER 9 U.S.C. §§ 11(b)–(c) TO DIRECT REMOVAL OF ARCHIVED FORM U4 DISCLOSURES

121. Section 11 of the FAA authorizes the Court to modify or correct an award where it is "imperfect in matter of form not affecting the merits." 9 U.S.C. § 11(c). It also permits modification where "the award is upon a matter not submitted" to the arbitrators, so long as the modification does not affect the merits of the decision upon the matters submitted. 9 U.S.C. § 11(b).

122. The Award orders correction of Petitioner's Form U5. Award at 3–5. It does not address the archived Form U4 disclosures that misreported Petitioner's student-loan disability discharges as bankruptcies—disclosures JPMS itself acknowledged were erroneous. Those disclosures persist in the CRD and are visible to regulators, hiring firms, and the public through BrokerCheck. They were presented before the Panel as a contested claim, JPMS conceded the error, the Panel agreed they should be removed, yet the Award is silent since FINRA lacks a mechanism to remove them absent a judicial order.

123. Modification under § 11(b) is appropriate because the U4 inaccuracy is a "matter not submitted" that the Panel did not decide on the merits, and its correction does not disturb any contested finding. Modification under § 11(c) is likewise appropriate because the Award's omission of any U4 directive is an imperfection in form: the Award corrects one regulatory

filing (the U5) while leaving an acknowledged error in a related filing (the U4) uncorrected, producing an incomplete and inconsistent regulatory record.

124.  The Court should therefore modify the Award to direct JPMS to remove, nullify, or seek expungement of the archived Form U4 disclosures that misreported Petitioner's student-loan disability discharges as bankruptcies, and to enter any ancillary orders needed to make that correction effective in the CRD and IARD systems.

## GROUND THREE: PARTIAL VACATUR OF THE DAMAGES AND DEFAMATION DISPOSITIONS (9 U.S.C. § 10(a)(4))

125.  Section 10(a)(4) authorizes vacatur where arbitrators so imperfectly executed their powers that "a mutual, final, and definite award upon the subject matter submitted was not made." The reviewing court must be able to determine "the scope and operative effect of what the panel actually decided." *Brabham*, 376 F.3d at 380.

126.  Petitioner does not seek to disturb the Award's Form U5 corrections, forum-fee assessment, or express factual findings. He challenges only the damages and defamation dispositions because, as written, those portions do not yield an enforceable legal result. This is a finality objection, not a merits appeal.

127.  Three independent defects prevent those dispositive portions from satisfying § 10(a)(4).

### A.  The Award's Use of "Respondent" Forces Competing Inferences About Operative Effect

128.  The record did not present a unitary actor. It allocated the challenged conduct across separate legal entities with distinct roles: JPMS as broker-dealer and FINRA-registered firm; JPMC as the parent holding company that promulgated firm-wide policies; and JPM Bank as the banking affiliate whose employees conducted the investigation and employment-side steps at issue. The Panel disclaimed jurisdiction over the two non-FINRA-member entities, yet its operative findings still speak in collective terms about investigation,

37

termination, and competitive hindrance. The Court is left to infer whether those findings were being used only against JPMS or were carrying non-JPMS conduct into the dispositive denials.

129.  That uncertainty is not semantic. It is a threshold finality defect. A reviewing court must be able to determine who is bound by an award's operative directives before it can confirm or enforce them. When three separately named respondents appear, and the arbitrators expressly disclaim jurisdiction over two, a denial running only to "Respondent" leaves the Court unable to ascertain the Award's operative effect. *Sarofim*, 440 F.3d at 218-19; *Prestige Ford*, 324 F.3d at 395.

130.  If "Respondent" means only JPMS, then the Panel stayed within the Submission Agreement only by leaving unresolved the principal conduct the record allocates to JPM Bank and JPMC, including the investigation and business-side approval chain the Award itself describes. If "Respondent" instead captures that broader enterprise conduct, then the denial necessarily speaks to entities and issues as to which the Panel expressly made no determination. Either reading reveals a structural defect: under one inference the Award under-adjudicates the controversy; under the other it reaches beyond the parties or issues submitted.

131.  The Court is not being asked to choose the better attribution theory. It is being asked not to invent one. *Brabham* and *Brown* require the Court to identify the scope and operative effect of what the Panel actually decided. If the broader-enterprise inference is required to sustain the denials, then the Award rests on a theory the Panel never stated.

132.  The record confirms that attribution was not a stray issue. During panel colloquy on the Form U5 issue, the Chair stated that he ordinarily "lump[s] the banks together with their securities arm" before identifying the tension created here by Petitioner's registration through JPMS and employment through JPM Bank. Hr'g Tr. (ZOOM0025).

133. The same point appears in a recent explained award chaired by the same presiding arbitrator: "Although Wells Fargo and Respondent may be separate entities, we find that all of Wells Fargo's knowledge should be imputed to Respondent." *Bhatti v. Wells Fargo Clearing Servs., LLC*, FINRA Arb. No. 22-01852, Award at 3 (Sept. 4, 2024).

134. The point is not that this Panel had to reach the same merits result as *Bhatti* or award damages simply because another panel did. It is narrower and more deferential: even where a panel states some merits rationale, the Award still must disclose how its operative denials run when party attribution matters.

135. The Panel's stated reasons for denying defamation and damages do not cure the problem. The Panel reiterated its non-defamation finding and noted Petitioner's lucrative employment within two months. Award at 5. Those points may bear on merits, but they do not resolve the threshold question whether the zero-damages and defamation denials ran only for JPMS or instead depended on conduct and knowledge attributed from entities not before the Panel. Under Texas law, false statements injuring a person in his profession may be defamatory per se. *Hancock*, 400 S.W.3d at 63–64.

136. The Court need not decide which merits inference would have been correct. Nor may it repair the Award by choosing between a narrow reading that leaves core conduct unresolved and a broad reading that reaches beyond submitted entities. As to the damages and defamation denials, the Award is not sufficiently definite to confirm as written.

### B. Submitted issues were left without a determinate disposition

137. The Award makes no determination as to claims against JPMC and JPM Bank. Award at 3. It likewise does not state what effect, if any, follows from FINRA's requirement that Petitioner delete statutory employment-discrimination claims from the proceeding. If the Panel truly stayed within those limits, then a material part of the controversy was never finally resolved.

138. If the dispositive denials are instead read to absorb that excluded conduct anyway, then the Award exceeds the lane the Panel described for itself. Either way, the Court cannot determine what part of the dispute was finally resolved, what part was left unresolved, and what part the forum structurally could not reach. That is a defect in finality, not a disagreement with the Panel's merits views.

## C.  This Petition operates within the FAA's deferential framework

139. This Petition does not ask the Court to reweigh evidence or retry liability. It invokes the threshold inquiry Congress assigned to the Court under §§ 9–11. FAA deference remains narrow and real as to the Panel's merits determinations, but it does not require the Court to preserve an administratively convenient yet indeterminate disposition when the Award's finality, party reach, and operative effect are the questions presented.

140. The core defect is the same across entity attribution, rule-to-result, and scope: the Court cannot determine the scope and operative effect of what the Panel actually decided. The damages and defamation dispositions therefore require partial vacatur under § 10(a)(4).

141. Respondents will contend that Petitioner seeks to "have it both ways"— confirming favorable findings while vacating unfavorable outcomes. That objection misapprehends the FAA's framework. Section 9 mandates confirmation of definite portions; Section 10(a)(4) mandates vacatur of indefinite portions. Petitioner asks precisely what the statute contemplates: severable treatment of a partially defective award. *Sarofim*, 440 F.3d at 218–19; *Prestige Ford*, 324 F.3d at 395.

142. The better framing is that Respondents seek to have it both ways: they directed the dispute into a fragmented forum, excluded two of three Covered Parties, stripped statutory claims, withheld documents through nine production rounds, and now invoke the resulting incompleteness as though it were finality. The FAA does not reward that posture.

143. That problem is heightened here because the Award carries permanent public regulatory consequences. FINRA administers the arbitral forum under SEC-delegated

Exchange Act authority. 15 U.S.C. §§ 78o-3, 78s; *Alpine Sec. Corp. v. FINRA*, 86 F.4th 406, 410–13 (D.C. Cir. 2023), cert. denied, 144 S. Ct. 2707 (2024). Post-Loper Bright, the Court still applies the FAA's limited and deferential review, while independently resolving the legal questions of finality, scope, and operative effect that the Award leaves open. *Loper Bright*, 603 U.S. at 392–93. The Panel's findings are published through BrokerCheck, recorded in the Central Registration Depository, distributed to state securities regulators, and considered in future licensing, hiring, and supervisory determinations. An indeterminate private-contract award may be tolerable because the parties can agree on its meaning or move on. An indeterminate award that permanently marks a regulated professional's public record—triggering state regulatory inquiries and foreclosing employment opportunities— imposes ongoing consequences that cannot be unwound. Section 10(a)(4) was designed to prevent precisely that result.

**D.** Comparable Public Awards Underscore the Finality Defect

144. Determinate dispositions on materially comparable U5 records are not uncommon. They are routine enough that public FINRA awards become part of the practical landscape against which firms, counsel, and associated persons assess similar disputes. This underscores the significance of the public nature of the Award.

145. In *Bhatti v. Wells Fargo Clearing Servs., LLC*, FINRA Arb. No. 22-01852 (Award, Sept. 4, 2024), a panel chaired by the same Chair who presided over this arbitration issued an explained award identifying the rule imputing affiliate knowledge to the broker-dealer filer and awarded damages plus partial U5 expungement.

146. In *Han v. J.P. Morgan Sec. LLC*, FINRA Arb. No. 18-02978 (Award, July 7, 2023), a panel awarded approximately $2.5 million in damages and ordered full Form U5 expungement. JPMS twice challenged the award, and those challenges were rejected. *Han v. J.P. Morgan Sec. LLC*, 227 A.D.3d 469 (N.Y. App. Div. 2024). *Han* is relevant here as a public benchmark, not as a formula for relief.

(i)   In *J.P. Morgan Sec. LLC v. Luckett*, No. 3:22-cv-137-RGJ, 2023 WL 6050230 (W.D. Ky. Sept. 15, 2023), a federal court confirmed a $1.4 million FINRA award over JPMS's vacatur motion, identifying a legally intelligible basis for compensatory relief tied to U5 hiring harm.

(ii)  In *Becht v. J.P. Morgan Sec. LLC*, FINRA Arb. No. 23-03185 (Award, Apr. 8, 2025), a sole arbitrator issued an explained award describing JPMS's investigation as 'woefully inadequate' and its methodology as a 'rubber stamp,' then awarded damages and ordered U5 expungement. JPMS later dismissed its federal vacatur action.

(iii) In *Munizzi v. UBS Fin. Servs., Inc.*, FINRA Arb. No. 18-02179 (Award, Dec. 11, 2019), a Rule 13200 mandatory-arbitration panel found UBS's stated reasons for termination to be false and awarded approximately $11.1 million in compensatory and punitive damages and fees, with full U5 expungement. The Illinois Appellate Court affirmed. *Munizzi v. UBS Fin. Servs., Inc.*, 2021 IL App (1st) 201237 (Nov. 19, 2021).

147.  These proceedings are not cited as outcome templates. They are cited because in each, an adjudicator described, in writing or on a confirmed record, how U5-related findings translated into relief or denial. Here, the Panel did state part of its rationale: it found the U5 not defamatory and noted that Claimant obtained lucrative employment within two months. Award at 5. Petitioner does not challenge the Award for saying nothing at all. The narrower point is that, even taking those stated reasons as given, the Award still does not explain how the denials run as among the undefined "Respondent" after the Panel made no determination as to JPMC and JPM Bank, or how those denials coexist with the Award's express findings of intentional competitive hindrance, possible pattern conduct, and U5 inaccuracy. Award at 3–5.

148.  Those comparator awards therefore underscore a narrower point than outcome matching. In this setting, adjudicators ordinarily make clear how U5-related findings translate into a denial or an award, and as to whom.

149.  Here, even accepting the Panel's stated rationale that the U5 was not defamatory and that Claimant obtained lucrative employment within two months, the Award still leaves

unresolved how the denials run after the Panel made no determination as to JPMC and JPM Bank.

150. The delegated-authority and public-record considerations discussed above reinforce why that unresolved effect matters. FINRA publishes the Award, and the resulting consequences continue through CRD, BrokerCheck, and related systems.

151. Petitioner accordingly preserves § 10(c) only as a conditional alternative, to the extent the Court concludes it may be considered here; the live vacatur framework remains § 10(a)(4).

152. The Court is not asked to retry merits. It is asked to determine finality, party reach, and legal effect on the record the Panel actually issued.

153. Those same structural limits explain why remand is inadequate: FINRA's forum cannot compel JPMC or JPM Bank, restore the deleted statutory claims, or decide the Award's binding effect outside the award itself.

## GROUND FOUR: REMAND IS INADEQUATE; THE COURT SHOULD RETAIN JURISDICTION TO DETERMINE OPERATIVE EFFECT

154. Following partial confirmation, modification, and vacatur, the Court should retain jurisdiction to determine the operative effect of the Award and to supervise any ancillary relief that depends on that determination. Remand would not cure the defect because the constraints that produced it were structural, not clerical. *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1134 (5th Cir. 1991).

155. The same FINRA structure that produced the defect would remain on remand. The forum could not compel JPMC or JPM Bank, could not revive the deleted statutory claims, and could not itself determine which parties are bound under the BAA or what legal effect the Award's findings carry outside the Award.

156. Congress's guidance in 5 U.S.C. § 572(b) points the same direction. This dispute requires an authoritative resolution, affects nonparties and regulators through public records, and calls for continuing supervisory jurisdiction that the arbitral forum does not retain after issuance of the Award.

157. Retained jurisdiction therefore does not retry the arbitration. It gives effect to what was definitively decided and resolves what no arbitral panel, operating under the same limits, could finally determine. Respondents directed the dispute into that fragmented forum and may not now invoke the resulting incompleteness as a bar to judicial relief. *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

## GROUND FIVE: THE COURT'S INHERENT EQUITABLE AUTHORITY SUPPORTS DOCUMENTED COMPENSATORY RELIEF

158. Federal courts possess inherent equitable authority to award fees and costs caused by a party's bad-faith litigation conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991). That authority exists independent of any statute or rule and "can make up for the inadequacies—or, as appropriate, complement the operation—of other rules." *Id.* at 46. Under *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107-09 (2017), the Court confirmed that inherent authority extends to all documented fees and costs the innocent party would not have incurred "but for" the sanctionable conduct. Equity also "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).

159. Petitioner seeks only the documented categories set out in Ex. R.1: pre-arbitration U4 errors, rank-and-strike / Rule 13201(a) errors, discovery obstruction costs, and direct prosecution costs. Stewart, Aughinbaugh, and Hitchcock were not neutral bystanders to those costs. Stewart relayed the resignation, Hitchcock initiated the reporting chain, and Aughinbaugh sat in the business-side approval chain while the matter was being managed

44

across HR, ER, registration, and legal functions. Ex. S.2; Exs. K.4-K.7; Exs. L.3-L.4; Ex. U.1. Respondents cannot ask the Court to withhold equitable relief while presenting those actors as if they came to this controversy with clean hands.

160. Those documented categories include:

(i) $36,060.75 for rank-and-strike / Rule 13201(a) errors;

(ii) $176,345.00 for discovery obstruction costs, including the Upwork and related discovery-reconstruction expenses captured in the but-for subset;

(iii) $41,517.40 for pre-arbitration U4 errors; and

(iv) $610,484.11 for direct prosecution costs. Ex. R.1 (Documented Cost Summary).

161. The resulting but-for total is $864,407.26. The request is compensatory, not punitive or duplicative merits relief. The $176,345.00 discovery figure is the narrower but-for subset, including the Upwork and related discovery-reconstruction component, rather than the broader all-in discovery spend reflected in earlier draft materials. The record reflects admitted filing errors, rank-and-strike / Rule 13201(a) errors, discovery obstruction, and direct prosecution costs carried forward into this proceeding. The disparity in resources matters only because it helps explain why a separate pre-hearing federal action to compel a unified arbitration was not a realistic substitute for the relief now available under the FAA and the Court's inherent authority.

**GROUND SIX: PUNITIVE RELIEF ON PRESERVED CLAIMS IS RESERVED TO THE COURT**

162. If the Court, after determining the operative effect of the Award, reaches the question of punitive relief, that determination belongs to the Court, not the arbitral panel. *SEC v. Jarkesy*, 603 U.S. 109, 123–25 (2024). *Jarkesy* held that when a proceeding seeks penalties for conduct analogous to common-law fraud, the Seventh Amendment guarantees adjudication before an Article III court, not an administrative or other non-Article III tribunal. Id. at 128–31. The FINRA arbitration that produced this Award operated under SEC-delegated authority and resolved claims of intentional competitive hindrance,

regulatory manipulation, and pattern misconduct—conduct that sounds in common-law fraud and business tort. The Panel denied punitive damages without analysis: "Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied." Award at 4. Under *Jarkesy*, the Court has independent authority to consider punitive relief on a proper record.

163. The established framework for punitive-relief analysis identifies three guideposts: (1) the degree of reprehensibility of the conduct, including whether the harm was physical or economic, whether the conduct evinced reckless disregard of health or safety, whether the target was financially vulnerable, whether the conduct was repeated or isolated, and whether the harm resulted from intentional malice, trickery, or deceit, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003); (2) the ratio of punitive to compensatory damages, *id.* at 424–25; and (3) the difference between the punitive award and civil or criminal penalties authorized or imposed in comparable cases, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). Each factor is implicated here: the Panel found intentional competitive hindrance, a potential pattern of similar conduct, and ongoing regulatory harm— all involving economic targeting of a financially vulnerable departing employee through deliberate manipulation of regulatory filings.

164. Petitioner does not ask the Court to award punitive damages at this stage. He preserves the right to seek such relief after the Court resolves the finality and operative-effect issues presented in this Petition. The point is structural: the FINRA forum denied punitive relief in a single sentence without analysis, in a proceeding that excluded parties and claims. Under *Jarkesy*, any punitive determination on these facts—involving SEC-regulated conduct, common-law tort analogues, and permanent public consequences—is reserved to the Court.

**GROUND SEVEN: PRESERVATION OF NON-CONCESSION, RESERVED CLAIMS, AND LATER-PHASE RELIEF**

165. Partial confirmation of definite portions does not concede the correctness or finality of the Award's indeterminate portions, waive vacatur, or release claims the Award did not reach. Petitioner preserves all excluded statutory claims under TCHRA, Title VII, and the ADA; all rights under the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, which Congress enacted because forced arbitration had "transferred the rights of workers and consumers to a secretive, closed, and private system designed by corporate interests to evade oversight and accountability," H.R. Rep. No. 117-234, at 4 (2022), and to ensure that no predispute arbitration agreement is valid or enforceable with respect to a sexual harassment or sexual assault dispute at the election of the person alleging such conduct, 9 U.S.C. §§ 401–402; all claims against JPMC and JPM Bank not adjudicated on the merits; and all common-law or business-tort claims arising from conduct or publications outside the Award's final disposition. Respondents may not invoke arbitral finality as to claims and parties they excluded from the forum. *New Hampshire*, 532 U.S. 742, 749–51 (2001); *see* Exs. P.1–P.5 (Texas Rule 202 Verified Petition and Citations).

166. Petitioner preserves the right to seek punitive relief under the framework set forth in Ground Six, *supra*. Under *SEC v. Jarkesy*, 603 U.S. 109, 123–25, 128–31 (2024), any such determination on these facts is reserved to the Court. The Panel's categorical denial of "punitive damages, treble damages, and attorneys' fees" without analysis, Award at 4, does not foreclose the Court's independent authority to consider such relief after resolving the operative-effect questions presented herein.

167. The Award's lack of finality inflicts continuing prejudice. The challenged Form U5 history remains part of Petitioner's CRD and BrokerCheck record, and the Award itself is publicly searchable through FINRA's online awards database. Subsequent employment does not withdraw those public artifacts or undo their use by firms, regulators, and market

participants. The structural harm is therefore ongoing until the Court determines operative effect.

## X.   PRAYER FOR RELIEF

168.   Nothing in this prayer seeks merits reweighing. The requested relief is limited to confirmation of definite portions, modification of discrete filing errors, partial vacatur under 9 U.S.C. § 10(a)(4) of the indefinite portions, and ancillary orders necessary to make those rulings operative.

169.   WHEREFORE, Petitioner requests that the Court:

(i)   **CONFIRM IN PART** pursuant to 9 U.S.C. § 9 the Award's specific U5 correction directives and the FINRA forum fees assessed against JPMS;

(ii)   **MODIFY IN PART** pursuant to 9 U.S.C. § 11(b)-(c), and enter any ancillary orders needed to make that relief effectual, by directing removal, nullification, or full expungement from CRD (including archived entries) of the five erroneous Form U4 financial disclosures JPMS admitted were filed in error;

(iii)   **VACATE IN PART** pursuant to 9 U.S.C. § 10(a)(4), and alternatively under 9 U.S.C. § 10(c) to the extent the Court concludes that provision may be considered here, only those portions of the Award that deny defamation liability and award zero damages, because those portions do not disclose a mutual, final, and definite disposition of the issues submitted, including how the Award's findings regarding intentional competitive hindrance, Form U5 inaccuracy, and transfer-related harm map onto the undefined 'Respondent' after the Panel made no determination as to claims against JPMC and JPM Bank;

(iv)   **RETAIN JURISDICTION**, without remand, to determine the operative effect of the confirmed, modified, and vacated portions of the Award and, if warranted, award ancillary compensatory relief under the Court's inherent authority, including the documented but-for fees and costs reflected in Ex. R.1, together

with all taxable costs and pre- and post-judgment interest as permitted by law;

(v)    **GRANT** such other and further relief as the Court deems just and proper.

## XI.    VERIFICATION

I, Joshua David Sappi Biering, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Amended Verified Petition and that the factual allegations stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on April 13, 2026, in Fort Worth, Texas.

**JOSHUA DAVID SAPPI BIERING**
4635 Washburn Ave
Fort Worth, TX 76107
(682)-218-6738
jdsb@bierfam.com
Petitioner, Pro Se

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2026, the Summons and Amended Verified Petition to Confirm in Part, Vacate in Part, and Modify in Part a FINRA Arbitration Award, together with all exhibits, were served on Respondents by personal delivery to CT Corporation System, Respondents' registered agent for service of process, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201, by a person at least 18 years of age and not a party to this action, pursuant to Federal Rule of Civil Procedure 4(e)(1) and Texas Rule of Civil Procedure 106(a)(1). Proof of service will be filed separately.

**JOSHUA DAVID SAPPI BIERING**
4635 Washburn Ave
Fort Worth, TX 76107
(682)-218-6738
jdsb@bierfam.com
Petitioner, *Pro Se*

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| **A.1** | FINRA Arbitration Award (Case No. 24-01208, Dec. 29, 2025) |
| **A.2** | Award Service Letter (establishes FAA § 12 deadline: Mar. 29, 2026) |
| **B.1** | Binding Arbitration Agreement (executed Feb. 18, 2016) |
| **B.2** | FINRA Submission Agreement — Claimant (Dec. 5, 2023) |
| **B.3** | Submission Agreement — Respondent JPMS (Sept. 10, 2024) |
| **C.1** | Original Statement of Claim (June 3, 2024) |
| **C.2** | First Amended Statement of Claim (Aug. 12, 2024) |
| **C.3** | Second Amended Statement of Claim — U5 Only (Oct. 11, 2024) |
| **C.3r** | Second Amended SOC — REDACTED version |
| **D.1** | JPMS Answer to First Amended SOC |
| **D.2** | JPMS Answer to Second Amended SOC (Oct. 31, 2024) |
| **D.3** | JPMS EEOC Position Statement |
| **E.1** | Form U5 (Dec. 22, 2023 — "Discharged – Inappropriate Behavior") [Arb. Record: CX001 (JPMS 21766)] |
| **E.1b** | Stainback instruction to finalize U5 wording |
| **E.2** | Form U4 with five student-loan DRP entries (later admitted "filed in error") [Arb. Record: CX065 (JPMS 198)] |
| **E.2b** | U4 "Filed in Error" admission |
| **E.3** | Form U4 post-complaint (Dec. 19, 2023) [Arb. Record: CX065 (JPMS 198)] |
| **E.4a** | BrokerCheck Individual (CRD 6883842) |
| **E.4b** | BrokerCheck Firm (JPMS CRD 79) |
| **E.5** | State Securities Regulator Inquiry Letters (MO, HI, CO, MA — Jan. 2024) [Arb. Record: CX086 (RJA 124); CX087 (RJA 122); CX088 (RJA 120); CX089 (RJA 115)] |
| **E.6** | JPM Registration EM — entries "forgiven" (June 16, 2023) [Arb. Record: CX070 (JPMS 295)] |
| **F.1** | FINRA Letter directing deletion of statutory claims (Sept. 6, 2024) |
| **F.2** | JPMS Letter objecting to statutory claims / non-member jurisdiction (Aug. 13, 2024) |
| **F.3** | FINRA Fee-Reimbursement Correspondence (rank-and-strike error) |
| **F.4** | Panel Composition Records composite |
| **F.4a** | Forman Arbitrator Disclosure |
| **F.4b** | FINRA Withdrawal Notice |
| **F.4c** | Claimant Ranking Submission |
| **F.5** | FINRA Letter re Statutory Employment (Sept. 6, 2024) |
| **F.6** | Biering Letter Seeking Reconsideration of Jurisdiction |

| Exhibit | Description |
|---------|-------------|
| **F.7** | Iacuone Response re Panel List (Aug. 13, 2024) |
| **F.8** | JPM Letter re Panel Composition (Aug. 13, 2024) |
| **F.9** | Letter re Statutory Employment Deadline (Sept. 17, 2024) |
| **F.10** | Additional Correspondence Letter (Sept. 20, 2024) |
| **F.11** | Iacuone Response re Dunlap Letter (Sept. 23, 2024) |
| **F.12** | Biering Letter re Panel (Sept. 24, 2024) |
| **F.13** | Respondent's Response to Sept. 25 Letter |
| **F.14** | FINRA Letter Granting Statutory Extension (Sept. 27, 2024) |
| **F.15** | UPS Proof of Delivery — U5-Correction Demand Letters [Arb. Record: CX001 (JPMS 21766)] |
| | |
| **G.1** | Claimant's First RFP and RFI (Dec. 6, 2024) |
| **G.2** | JPM Responses and Objections to Discovery (Feb. 5, 2025) |
| **G.3** | Claimant's First Motion to Compel (Apr. 3, 2025) |
| **G.4** | JPMS Response in Opposition (Apr. 14, 2025) |
| **G.5** | Claimant's Reply ISO MTC (Apr. 21, 2025) |
| **G.6** | Order Granting First MTC (May 8, 2025) |
| **G.7** | Claimant's Second Motion to Compel (July 25, 2025) |
| **G.8** | Order Granting Second MTC (Aug. 28, 2025) |
| **G.9** | Claimant's Third Motion to Compel (Nov. 12, 2025) |
| **G.10** | Claimant's Reply ISO Third MTC (Nov. 26, 2025) |
| | |
| **H.1** | Arbitrator Rank & Strike Packet (Sept. 9, 2024) |
| **H.2** | Extension to Submit Arb Rankings (Sept. 26, 2024) |
| **H.3** | Biering Letter — Extension Request (Oct. 2, 2024) |
| **H.4** | FINRA Motion Denial — Motions for Reconsideration (Oct. 3, 2024) |
| **H.5** | FINRA Director Grants Extension (Oct. 4, 2024) |
| | |
| **I.1** | Senator Cruz Reply — Nov. 7, 2025 (AM) |
| **I.2** | Senator Cruz Reply — Nov. 7, 2025 (Mid-day) |
| **I.3** | Senator Cruz Reply — Nov. 7, 2025 (PM) |
| **I.4** | Senator Cruz Reply — January 2026 |
| **I.5** | Congresswoman Granger Office Inquiry Emails (Oct. 2, 2024) |
| | |
| **J.1** | Initial Prehearing Conference Order (Nov. 21, 2024; Chair Cromartie) |
| **J.2** | Letter re Pre-Hearing Dates — MTC (Apr. 25, 2025) |
| **J.3** | Panel Selected — IPHC and Packet Materials (Oct. 22, 2024) |
| | |
| **K.1** | Cohen "HOPING TO WRAP WITH A TERM" email (Oct. 27, 2023) [Arb. Record: CX130 (JPMS 21517)] |
| **K.2** | Biering Resignation Email (Oct. 28, 2023) [Arb. Record: CX132 (JPMS 21505)] |
| **K.3** | Cohen Retention / Chiu Skype Messages (Oct. 27–Nov. 10, 2023) [Arb. Record: CX209 (JPMS 21519)] |
| **K.4** | Stewart & Stainback Teams Messages — coordination before HR complaint (Oct. 24, 2023) [Arb. Record: CX214 (JPMS 29354)] |

| Exhibit | Description |
|---------|-------------|
| **K.5** | Stainback & Wilson EMs — "anything to help move this forward" (Oct. 24, 2023) |
| | [Arb. Record: CX186 (JPMS 26884)] |
| **K.6** | Stainback EM to Cohen — "as soon as possible" (Oct. 27, 2023) |
| | [Arb. Record: CX126 (JPMS 27061)] |
| **K.7** | Stewart to Jacobs, Stainback & Magee — multi-party coordination (Oct. 27, 2023) |
| | [Arb. Record: CX127 (JPMS 23377)] |
| **K.8** | Stainback EM to Muraira — coordination directive (Oct. 24, 2023) |
| | [Arb. Record: CX185 (JPMS 25205)] |
| **K.9** | Stainback-Cohen termination-day emails — 8-email chain (Oct. 28, 2023) |
| | [Arb. Record: CX134 (JPMS 27072); CX135 (JPMS 27073); CX136 (JPMS 27075); CX137 (JPMS 27076); CX138 (JPMS 27078); CX139 (JPMS 27081); CX140 (JPMS 27083); CX141 (JPMS 27085)] |
| **K.10** | Stewart & Stainback Teams messages — earliest coordination (Oct. 9, 2023) |
| | [Arb. Record: CX215 (JPMS 29350)] |
| | |
| **L.1** | Global Security Summary — "Allegations NOT Supported" (Nov. 29, 2023) |
| **L.2** | Muraira Expense Investigation — Not Supported |
| | [Arb. Record: CX031 (JPMS 25338)] |
| **L.3** | Muraira EM to Huynh — expense investigation opening (Oct. 23, 2023) |
| | [Arb. Record: CX184 (JPMS 24952)] |
| **L.4** | Stewart EM to Muraira directing expense allegations (Oct. 25, 2023) |
| | [Arb. Record: CX020 (JPMS 21217)] |
| **L.5** | HR Talent Management Case Details (Oct. 17, 2023 — 9 days before "formal" opening) |
| | [Arb. Record: CX182 (JPMS 729)] |
| **L.6** | Expense Investigation Details (Oct. 20, 2023 — 6 days before formal case) |
| | [Arb. Record: CX220 (JPMS 29353)] |
| | |
| **M.1** | Spindler Expert Damages Analysis — REDACTED |
| **M.2** | Spindler Curriculum Vitae |
| | [Arb. Record: CX029 (BIERING 5193)] |
| | |
| **N.1** | EEOC Charge of Discrimination and Full Correspondence (No. 450-2024-04743) |
| **N.2** | EEOC Dismissal and Notice of Rights (Mar. 19, 2025) |
| **N.3** | Petitioner's EEOC Reply |
| | |
| **O.1** | SEC Reply (Mar. 25, 2025) |
| **O.2** | FINRA Investigator Emails (Nov. 9, 2025) |
| | |
| **P.1** | Rule 202 Verified Petition |
| **P.2** | Rule 202 Citation — Lindsey |
| **P.3** | Rule 202 Citation — Borer |
| **P.4** | Rule 202 Citation — Reeb |
| **P.5** | Rule 202 Citation — Perry |

| Exhibit | Description |
|---|---|
| **Q.1** | Internal Client-Redistribution Communications |
| **R.1** | Documented Fee and Cost Schedule (Four Categories) |
| **S.1** | Hearing Transcript Excerpts (Unofficial; ~31 hours Zoom recordings) |
| **S.2** | Unofficial Hearing Transcript — Court-Formatted (complete; ~31 hours) |
| **T.1** | HR Service Tickets |
| **T.2** | EAP/FMLA Correspondence — REDACTION REQUIRED |
| **T.3** | JPM Notice Period Policy<br>[Arb. Record: CX016 (JPMS 831)] |
| **T.4** | JPM Notice Period Policy Chart<br>[Arb. Record: CX017 (JPMS 29)] |
| **T.5** | Biering's JPM Personnel File<br>[Arb. Record: CX011 (BIERING 449)] |
| **T.6** | Biering EM requesting personnel file (Nov. 29, 2023)<br>[Arb. Record: CX179 (BIERING 915)] |
| **T.7** | HR Workforce Notes — internal HR characterization (Dec. 1, 2023)<br>[Arb. Record: CX176 (JPMS 787)] |
| **T.8** | HR System Notes (Dec. 3, 2023)<br>[Arb. Record: CX189 (JPMS 792)] |
| **U.1** | Recommendation for Termination (Nov. 29–30, 2023)<br>[Arb. Record: CX163 (JPMS 23586); CX165 (JPMS 23590); CX166 (JPMS 23591)] |
| **U.2** | Jacobs Investigation Summary<br>[Arb. Record: CX120 (JPMS 1276)] |
| **U.2r** | Jacobs Investigation Summary — REDACTED<br>[Arb. Record: CX120 (JPMS 1276)] |
| **U.3** | Jacobs Rapid Response Opening Memo (Oct. 27, 2023)<br>[Arb. Record: CX129 (JPMS 29307)] |
| **U.3r** | Jacobs Opening Memo — REDACTED<br>[Arb. Record: CX129 (JPMS 29307)] |
| **U.4** | Jacobs ER Closing Memo (Nov. 30, 2023)<br>[Arb. Record: CX172 (JPMS 29313)] |
| **U.4r** | Jacobs Closing Memo — REDACTED<br>[Arb. Record: CX172 (JPMS 29313)] |
| **U.5** | Sanchez Interview Pages<br>[Arb. Record: CX188 (JPMS 29151)] |
| **U.5r** | Sanchez Interview Pages — REDACTED<br>[Arb. Record: CX188 (JPMS 29151)] |
| **U.6** | ER Case Opening (Oct. 26, 2023 at 1:34 PM)<br>[Arb. Record: CX122 (JPMS 1303)] |
| **U.6r** | ER Case Opening — REDACTED<br>[Arb. Record: CX122 (JPMS 1303)] |
| **U.7** | Jacobs EM to Biering — investigation questioning (Nov. 2, 2023)<br>[Arb. Record: CX152 (JPMS 23429)] |

54

| Exhibit | Description |
|---|---|
| U.8 | Jacobs & Biering EMs — investigation follow-up (Nov. 6, 2023) [Arb. Record: CX155 (JPMS 23489)] |
| U.9 | Jacobs & Muraira EMs — cross-investigation coordination (Nov. 8, 2023) [Arb. Record: CX156 (JPMS 29150)] |
| U.10 | Biering & Jacobs EMs — investigation "concluded" (Nov. 13, 2023) [Arb. Record: CX157 (JPMS 23511)] |
| U.11 | Jacobs Full Investigation File — complete Kimball record [Arb. Record: CX120 (JPMS 1276)] |
| U.12 | Recommendation for Termination — issued 33 days AFTER separation (Nov. 30, 2023) [Arb. Record: CX172 (JPMS 29313)] |
| U.13 | Sanchez coordinating with complaint subjects (Jan. 25, 2024) [Arb. Record: CX195 (JPMS 26137)] |
| U.14 | Aughinbaugh EM to Magee, Stainback & Sanchez (Jan. 24, 2024) [Arb. Record: CX193 (JPMS 26035); CX194 (JPMS 26121)] |
| | |
| V.1 | Oct. 2023 Gold Producer Scorecard — Formatted (233% attainment) [Arb. Record: CX007 (JPMS 29316)] |
| V.2 | Scorecard — Redacted by JPMS [Arb. Record: CX002 (BIERING 5088); CX003 (BIERING 5088)] |
| V.3 | Gold Producer Recognition (Oct. 23, 2023) [Arb. Record: CX007 (JPMS 29316)] |
| V.4 | Oct. 2023 Scorecard — Native Excel (CX-AAA-0051; 243 CLIENT INFO REDACTIONS APPLIED) [Arb. Record: CX007 (JPMS 29316)] |
| V.4a | Oct. 2023 Scorecard — Formatted Excel [Arb. Record: CX007 (JPMS 29316)] |
| | |
| W.1 | PTO Email (Oct. 26, 2023 at 1:05 PM) [Arb. Record: CX020 (JPMS 21217)] |
| W.2 | JPM System Voluntary-Termination Approval (Oct. 28, 2023) [Arb. Record: CX131 (JPMS 21375)] |
| W.3 | Calendar Access During Merrill Lynch Meeting (Oct. 27, 2023) [Arb. Record: CX224 (JPMS 29339)] |
| W.4 | Peer Review — "Excellent Mentor" [Arb. Record: CX010 (JPMS 29138)] |
| W.5 | Biering text to Hitchcock — resignation raised (Oct. 24, 2023) [Arb. Record: CX019 (BIERING 1749)] |
| W.6 | Biering text to Stewart (Mar. 30, 2023) [Arb. Record: CX021 (BIERING 1778)] |
| W.7 | Biering EM to Stainback & Watson (May 1, 2023) [Arb. Record: CX026 (BIERING 108)] |
| | |
| X.1 | Wilson/Stainback "Well Documented" Performance Fallback Email [Arb. Record: CX134 (JPMS 27072); CX135 (JPMS 27073); CX136 (JPMS 27075); CX137 (JPMS 27076); CX138 (JPMS 27078); CX139 (JPMS 27081); CX140 (JPMS 27083); CX141 (JPMS 27085)] |
| X.2 | Becht v. JPMS Pattern Award — FINRA No. 23-03185 |

| Exhibit | Description |
|---------|-------------|
| **X.3** | Dec. 2023 U5-Correction Demand Letters<br>[Arb. Record: CX001 (JPMS 21766)] |
| **X.4** | Cohen EM Response to U5-Correction Demands — JPM refusal (Dec. 29, 2023)<br>[Arb. Record: CX049 (JPMS 22395)] |
| | |
| **Y.1** | Declaration of MC — sworn third-party declaration (Sept. 5, 2025)<br>[Arb. Record: CX212 (BIERING 5195)] |

**APPENDIX A - CHRONOLOGY OF THE FINALITY DEFECT**

Biering v. J.P. Morgan Securities LLC et al. — FINRA Case No. 24-01208

Source-verified, phase-organized chronology supporting the jurisdictional, procedural, and award-defect arguments in the Petition. Citations reflect the underlying arbitration record and the named petition exhibits. This chronology does not challenge the Panel's merits findings.

*All times are Central Daylight Time (CDT, UTC−5) for events through November 4, 2023, and Central Standard Time (CST, UTC−6) on or after November 5, 2023.*

| Date | Event |
|------|-------|
| Phase 1 - Employment Relationship and Regulatory Record (2016-Sept. 2023) | |
| **Apr. 25, 2016** | Petitioner begins employment with **JPMorgan Chase Bank, N.A.** through the Military Officer Executive Development Program. Employing entity is JPM Bank, not JPMS — foundation of the entity-mismatch defect. *(Ex. H ¶ 2; CX-011)* |
| **Dec. 15, 2017** | Petitioner licensed as Series 7, 63, and 65 registrant (CRD No. 6883842); broker-dealer registrations run through JPMS (CRD No. 79). Assigned to JP PB Fort Worth. *(Ex. H ¶ 2; Ex. M; CX-011)* |
| **May 3, 2018** | JPMS enters five Form U4 DRP disclosures mischaracterizing federally authorized student-loan disability discharges as "bankruptcy/SIPC/compromise with creditors." Entries remained publicly visible on BrokerCheck for over five years (May 2018–June 2023). *(CX-065; Ex. K)* |
| **Feb. 2023** | Petitioner promoted to Executive Director. Promotion track: Associate → VP (3 yrs) → ED (3 yrs) — described as "fast track" based on performance. October 2023 peer reviews: "a go-getter and a driver of business results," "a wealth of knowledge," "a trusted member of the client's financial team," "puts the client first." Colleague cited in termination gave favorable feedback that same month. *(ZOOM0023 L613–680; CX-228; CX-AAA-0037 at 6 n.7)* |
| **Apr. 13, 2022** | Customer complaint filed (Occurrence No. 2204024; $109,697.16). Wealth management executive office investigated and denied Petitioner's expungement request. Later expunged: FINRA panel unanimously found complaint "factually impossible, clearly erroneous, and false." Confirmed by court order Jan. 9, 2025 (Cause No. 096-360735-25). Co-advisor Hitchcock retains the |

| Date | Event |
|---|---|
| | same Occ. No. on his U4; he elected not to pursue expungement. *(Ex. M; Award at 4–5; FINRA Rule 1122)* |
| May 2023 | New management structure under Aughinbaugh (Market President) and Hitchcock (Head of Investments & Advice). Fort Worth office recorded lowest Private Bank Employee Opinion Survey results nationally. |
| July–Sept. 2023 | Petitioner documented workplace concerns through repeated texts with Stewart.<br>Sept. 4: "Disappointed [he] can't get this level of support from market." Stewart: "You want a shovel to keep going or you good?"<br>Days later: "Can we please connect tomorrow? I don't like the emotional state that I'm in … I don't know if this is the right place for me." *(Ex. V (Exs. D.1, G.1); ZOOM0016; ZOOM0023)* |
| Sept. 27, 2023 | Petitioner managed **$1 billion AUM**, $5.8M annualized revenue, 14% YoY growth vs. 6% firm average, **233% new-client growth**. 21.34% of 17-advisor Fort Worth Single Coverage Team's overall revenue growth. Circulated draft self-assessment to Stewart documenting ~$600M pipeline transactions and forward revenue. Sanchez investigation notes: Stewart denied receiving it and said the 21.34% metric was "not an accurate statement." *(CX-225; ZOOM0016 39894–39912; CX-188)* |
| Oct. 6, 2023 | Petitioner contacts Stainback (HR) regarding FMLA request. *(Ex. G)* |
| Oct. 17, 2023 | Petitioner meets with Merrill Lynch to discuss a potential new role — same day Stewart opens HR Talent Management case regarding Petitioner's expenses. *(CX-182; JPMS_729)* |
| Oct. 23, 2023 | Petitioner receives **Gold Producer** recognition at national town hall. Same day: Global Security opens expense investigation Case No. ECNA1020239740. *(CX-109; JPMS_00028911; Award at 4)* |
| Phase 2 - Three Overlapping Investigations, Separation Sequence, and Managed U5 Wording (Oct.-Dec. 2023) | |
| After management learned Petitioner intended to leave, three matters moved in rapid sequence: the still-open expense investigation, the same-day performance fallback, and the workplace-conduct inquiry two days later. October 24 is the pivot - it links the resignation discussion, the compensation question for the completed metric year, and immediate internal emails about accelerating the performance file. The workplace-conduct inquiry substantively concluded by ~November 8 but was held open for "simultaneous disposition" with the still-open expense investigation. Award at 4; JPMS_00028911. | |
| Oct. 2–3, 2023 | Petitioner submits expense reports through standard system; approved by Stewart through normal supervisory process — the same expenses Stewart later flagged as "concerning." |

| Date | Event |
|------|-------|
| | GS later found expenses "fairly consistent for at least 12 months" and "similar patterns of expense activity" to peers, including Stewart. *(Ex. AA; JPMS_00028911)* |
| Oct. 17, 2023 | Stewart escalated Petitioner's expenses to Global Security with what Muraira later described as "a vague weekly expense report" — **15 days after approving them**. *(CX-184; JPMS_00024952; Ex. F)* |
| Oct. 24, 2023 | **Resignation pivot.** <br><br> **11:00 AM** — Petitioner requests meeting with Stewart to discuss resignation. Stewart defers until Aughinbaugh can be present. In the interim, Petitioner meets Hitchcock for coffee and states his intention to resign. Hitchcock subsequently met the employee who later raised the complaint ("ERC") but did not learn of—nor was he informed of—any concerns or allegations regarding Petitioner at that time, or at any point until three days later. *(Hearing Tr. [00:07:12–00:07:24]; CX-188)* <br><br> **11:04 AM** — Stewart sent Stainback a Teams message: "…[Petitioner] just approached me around discussing if he should resign." *(Ex. E (CX-214; JPMS_00029354))* <br><br> **2:30 PM** — Petitioner informed Stewart and Aughinbaugh he was resigning and asked about preserving earned incentive compensation. *(Hearing Tr. [00:12:40–00:13:09])* <br><br> **3:54 PM** — Stainback emailed Wilson: "FYI if you can do anything to help move this forward it would be appreciated." *(CX-186 (JPMS_00026884))* <br><br> **4:01 PM** — Wilson replied: "I'm actually quite surprised this case has received this much attention already, much faster than I ever expected. …I will ensure the performance case is well documented so that if there is a need to 'fall back on performance,' one of my colleagues can pick up where we left off." *(CX-186 (JPMS_00026884))* <br><br> **4:21 PM** — Stainback replied: "…Things have escalated this week." *(CX-186 (JPMS_00026884))* <br><br> Stainback later testified that the "escalation" was, at least "potentially," management's learning that Petitioner might resign. *(Hearing Tr. [00:34:22–00:35:25])* |

iii

| Date | Event |
|------|-------|
| | *The entire October 24 sequence preceded the workplace-conduct reporting chain.* |
| Oct. 25, 2023 | Stewart directed additional expense allegations to Muraira. *(CX-187)* |
| Oct. 26, 2023 | **1:05 PM** — Petitioner sent Stewart a routine email advising of pre-scheduled out-of-office plans for the following day. The communication did not reference external meetings or employment plans. *(CX-020)*<br><br>**1:34 PM** — Stainback opened a "rapid response" case in the Employee Relations system, escalating "a concern raised by a manager [Hitchcock] related to potential inappropriate behavior by an executive director." The entry documented an event that had not yet occurred: the firm's investigation report confirms Hitchcock did not meet the employee or notify Stainback of any concern until the following day, October 27. Rapid response routes a matter to the team handling "the most sensitive and time pressing matters." *(CX-122; CX-188; Hearing Tr. (ZOOM0010 at 00:46:03–00:49:26))*<br><br>Chair Cromartie later described the resulting Oct. 26/27 mismatch as "bizarre." *(ZOOM0036 [00:20:05–00:20:07])* |
| Oct. 27, 2023 | Petitioner on approved leave, attending pre-scheduled Merrill Lynch onboarding meeting.<br><br>**8:11 AM** — Stewart replied to out-of-office notice: "Thank you for letting me know [Petitioner]." Separately, Petitioner received automated notification that his work email and calendar had been remotely accessed. Stewart later told ER investigator Sanchez that "Joshua did not request in advance or tell Ben that he was taking personal days on … 10/27" and "Ben was not aware that Joshua had on his work calendar that he was going to meet with Merrill Lynch on 10/27." **Both statements contradicted** by Stewart's own 8:11 AM reply and IT calendar-access records. *(CX-020; CX-188 at JPMS_00029204; CX-224; JPMS_00029339)*<br><br>**9:35 AM** — Stewart texted Petitioner: "Call me at the office as soon as possible." *(CX-126)*<br><br>**10:30 AM** — ER interviews Kimball regarding the allegations. *(CX-188)*<br><br>**10:34 AM** — Velasquez described "a very serious allegation of sexual assault" and recommended administrative leave "today if possible." *(JPMS_00023374)* |

iv

| Date | Event |
|---|---|
| | **12:00 PM** — Petitioner arrived at Merrill Lynch headquarters for pre-onboarding lunch and introductory meetings with wealth management leadership. *(ZOOM0010 at 00:21:27–00:21:34)* <br><br> **1:43 PM** — JPMS IT accessed Petitioner's calendar and confirmed Merrill Lynch meeting — after the escalation was already underway. *(CX-224; JPMS_00029339)* <br><br> **3:30 PM** — Petitioner attended pre-scheduled onboarding meeting with Merrill Lynch Complex Manager to execute his transition. *(ZOOM0010 at 00:22:03–00:22:11)* <br><br> **4:36 PM** — Petitioner returned Stewart's call on speakerphone from the office of his incoming Merrill Lynch partner. The partner's testimony confirmed he was present when Stewart placed Petitioner on involuntary paid administrative leave without context, and corroborated that the transition offered Petitioner a substantial compensation increase. *(ZOOM0010 at 00:58:01–00:58:39; Award at 4; CX-127)* <br><br> **5:30 PM** — Cohen, Global Head of Human Resources, emailed executive leadership: "FYI hoping to wrap early next week with a term." *(JPMS_00021517)* <br><br> ***Closing colloquy:*** JPMS's counsel acknowledged "there's at least some evidence that HR initiated the ticket for inappropriate sexual advances before they ever heard from Mr. Hitchcock." Chair: "Yes." Counsel could not explain the dating problem: "I had not focused on that. I was under the assumption that it was October the 27th." Chair described the mismatch as "bizarre." *(ZOOM0036 [00:20:05–00:21:19], [00:40:13–00:40:49])* |
| **Oct. 28, 2023** | **9:45 AM** — Petitioner submitted written resignation by email and through me@jpmc, beginning the 60-day notice period. *(Ex. E; W.2)* <br><br> **12:30 PM** — Cohen wrote that Petitioner was "likely to go work … at MS [Morgan Stanley] or ML [Merrill Lynch]" and that JPMS "should amend the U4 asap" because he had "likely just cleared [his] background." *(JPMS_00027073)* <br><br> **5:37 PM** — Stainback instructed Registration to **"not file the U5 until further notice so we can finalize wording."** *(JPMS_00027085; Ex. E; CX-021)* |

v

| Date | Event |
|---|---|
|  | Panel later corrected U5 termination date to Oct. 28. *(Award at 3–4)* |
| **Nov. 2, 2023** | Jacobs emailed Petitioner to schedule discussion about a "confidential investigation," giving no details about the subject. *(CX-152; CX-155; Hearing Tr. [00:37:58–00:38:31])* |
| **Nov. 7, 2023** | Jacobs and Global Security investigator Chris McGee interviewed Petitioner regarding the ERC allegations — the **only** ER interview of Petitioner during the workplace-conduct inquiry. *(ZOOM0003 [01:01:12–01:01:34]; CX-156)* |
| **~Nov. 8, 2023** | Workplace-conduct inquiry substantively concludes. Jacobs testified: "I represented on November 8th that it was concluded. So it was that day or before? Correct."<br><br>**Formal closure deliberately withheld.** Jacobs admitted he "did not make that unilateral decision" — someone instructed him to hold his conclusions until the parallel expense investigation also concluded, so both tracks could be "dispositioned at the same time." *(ZOOM0016 [00:29:44–00:31:22]; ZOOM0017 [00:01:27–00:01:43])* |
| **Nov. 13, 2023** | Petitioner emailed Jacobs asking about investigation status. Jacobs told him the investigation "remains open" — **five days after using the word "concluded" internally**. *(CX-157; ZOOM0017 [00:02:37–00:03:14])* |
| **Nov. 15, 2023** | (a) Global Security interviewed Petitioner — **only** interview during expense investigation.<br>(b) Same day: JPM advisors visit Petitioner's largest pipeline client (~$600M) while Petitioner is barred from client contact during garden leave. *(JPMS_00028911)* |
| **Nov. 16, 2023** | Stainback told Global Security she "believed HR had enough reason to term Josh" — **before either investigation formally closed**. *(JPMS_00021645; Ex. F (JPMS_00028911))* |
| **Nov. 21, 2023** | Petitioner cooperated further with investigation. *(CX-159)* |
| **Nov. 24, 2023** | Petitioner raised concerns about the investigation process directly to Jacobs, Muraira, and Tidwell-Neal. *(CX-160)* |
| **Nov. 28, 2023** | JPM advisors make second visit in two weeks to Petitioner's largest pipeline client; discuss increasing credit line.<br>Internal communications described redistribution of Petitioner's book as "an opportunity to send a lot back to PC [Partner Coverage]" with "some great revenue here."<br>Stewart's April 2025 promotion to Managing Director was awarded on |

vi

| Date | Event |
|---|---|
| | prior-year retention, growth, and revenue metrics — the measurement year being the first full year after Petitioner's December 2023 separation. The same incentive applied to Aughinbaugh, who claimed credit for Fort Worth office performance that a panelist attributed to retaining Petitioner's business. *(Ex. Q; SOC ¶ 56; Ex. T-1A; ZOOM0025)* |
| Nov. 29, 2023 | **Three events converge:**<br><br>(a) Jacobs circulated Draft Recommendation for Termination to Aughinbaugh/Stewart — **before** the expense investigation closed. *(Ex. AF (JPMS_23591); ZOOM0019B [00:28:27–00:28:35])*<br><br>(b) **2:42 PM** — Global Security closed expense investigation: "Allegations NOT supported" — "no evidence to support the allegations of Theft from Firm / Expense Reimbursement"; expenses "fairly consistent for at least 12 months" with "similar patterns of expense activity" to peers, including Stewart. *(CX-031; Ex. F (JPMS_00028911))*<br><br>(c) **2:44 PM** — Stewart replied: "I approve." Aughinbaugh likewise: "I approve." **Two minutes after exoneration.** *(JPMS_00001424; JPMS_1312; ZOOM0035 [00:23:55–00:24:15])*<br><br>Same day: JPMorgan doubles client prospect's credit line from $10M to $20M. *(Ex. Q)* |
| Nov. 30, 2023 | Jacobs sent signed RFT: "The termination code you should use is CON for Misconduct."<br>Same day: ER Closing Memo (CX-172) circulated — **one day after the expense close-out**, confirming synchronized "simultaneous disposition." The ER investigation had been substantively complete since ~November 8 but was held open for 22 days until this moment. *(Ex. AF (JPMS_23612); ZOOM0035 [00:24:36–00:24:44]; CX-172 (JPMS_29313))* |
| Dec. 1, 2023 | Aughinbaugh and Stewart told Petitioner he was terminated for violating the code of conduct and anti-harassment policies — **Day 34 of 60-day Notice Period**.<br>Panel later corrected U5 termination designation to "Voluntary." *(ZOOM0017 [00:01:50–00:01:59]; Award at 4)* |
| Dec. 6–20, 2023 | Four demand letters from Petitioner's counsel objecting to any discharge-marked U5 and demanding "Voluntary" marking.<br>Dec. 13: Tidwell-Neal confirmed JPMS intended to mark as "Discharged" with explanation: "During Notice Period, RR was |

vii

| Date | Event |
|---|---|
| | terminated for inappropriate behavior." No substantive reply to final demand (Dec. 20). *(CX-038; CX-039; CX-040; CX-042; CX-AAA-0014)* |
| **Dec. 7, 2023** | Petitioner files formal retaliation complaint through JPMorgan Code of Conduct Hotline. The hotline is designated in JPMorgan's Code of Conduct as an "independent third-party" channel; in practice, the complaint was not handled independently (*see* Jan. 8, 2024 *infra*). *(Ex. X; JPMS_00025619)* |
| **Dec. 22, 2023** | Form U5 filed. Reason: "Discharged." Explanation: "During Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints." Question 7F(1) answered "Yes" (under internal review at termination).<br><br>Filed **55 days** after resignation, **21 days** after termination, **15 days** after Code of Conduct complaint.<br>Wording held pending "FINALIZE WORDING" instruction (JPMS_00027085). *(Award at 3–4; Ex. F)* |
| **Jan.–Feb. 2024** | Petitioner transfers CRD registration to Raymond James (SVP, Wealth Management).<br>State regulators in Missouri, Hawaii, Colorado, and Massachusetts issue inquiry letters triggered by U5 disclosures.<br>Merrill Lynch offer rescinded: "When they saw the U-5, the exact day, non-starter." A discharge-marked U5 was a "non-starter"; a voluntary U5 was "clean." Actual client-transfer rate at Raymond James: 35%, not the 80–90% Tier One benchmark. *(Ex. K (CX-086–089); Ex. M; Award at 5; Ex. T-1A; ZOOM0024 53439–53442; ZOOM0030 64692–64725)* |
| Five Successive Characterizations of Alleged Conduct:<br>1. "A very serious allegation of sexual assault" - Velasquez, HR, Oct. 27. (JPMS_00023374)<br>2. "Violation of the code of conduct and the anti-harassment policy" - Dec. 1 termination basis. (ZOOM0006)<br>3. "Inappropriate behavior" - Form U5 filed Dec. 22. (Award at 4)<br>4. "Lapse of judgment" - Respondents' counsel at hearing.<br>5. Becht panel: same investigative process "woefully inadequate," Global Security "cursory at best." (Becht, FINRA No. 23-03185, Award at 4-5) | |
| Phase 3 - Retaliation Investigation, Administrative Filings, and JPMS Directs the Dispute to FINRA (Jan.-June 2024) | |
| **Jan. 8, 2024** | Hotline complaint routed to Jena Cohen in ER — the same person who conducted the investigation the Panel found was used to "terminate Petitioner so as to make it more difficult for him to go work with a competitor." The complaint was not routed to an independent third party. *(Ex. X (JPMS_00025619, -22, -24); Award at 4)* |

| Date | Event |
|---|---|
| **Jan. 16, 2024** | Sanchez (ER) interviews Stewart for retaliation investigation. Stewart stated Petitioner "did not request in advance or tell Ben that he was taking personal days on 10/25, 10/26 or 10/27" and "Ben was not aware that Joshua had on his work calendar that he was going to meet with Merrill Lynch on 10/27" — **both contradicted** by Stewart's own 8:11 AM reply (CX-020) and IT calendar-access records (CX-224). *(CX-188 at JPMS_00029204)* |
| **Feb. 25, 2024** | EEOC Charge of Discrimination filed (No. 450-2024-04743); dual-filed with TWC. *(Ex. G; CX-AAA-0038)* |
| **Mar. 19, 2024** | EEOC issued Dismissal and Notice of Rights. Administrative prerequisites for TCHRA/Title VII/ADA complete. 90-day deadline: June 17, 2025. *(Ex. R; CX-AAA-0042)* |
| **May 24, 2024** | **JPMS EEOC Position Statement**: "Disputes over Form U5 reporting must be adjudicated in FINRA arbitration." JPMS directed Petitioner into and through FINRA as the required forum. *(Ex. U; CX-AAA-0039)* |
| **June 3, 2024** | Statement of Claim filed with FINRA (Case No. 24-01208) against JPMS; Submission Agreement and BAA attached; 14 causes of action including Title VII, ADA, TCHRA. *(Award at 1; Ex. B)* |
| Phase 4 - FINRA Excludes Claims and Forces Claim Stripping (July-Oct. 2024) | |
| **July 24, 2024** | FINRA disseminates **Rule 13802** arbitrator ranking forms (all-public, employment-law-qualified panel) — subsequently acknowledged as "sent in error." Petitioner incurs **$32,657.50** evaluating a panel list that is voided. *(Ex. J; Ex. L)* |
| **Aug. 12, 2024** | First Amended SOC adds JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. as respondents; retains all statutory claims. JPMC and JPM Bank **decline to file answers or sign Submission Agreements**. *(Award at 1–2)* |
| **Aug. 13, 2024** | JPMS notifies FINRA it "does not agree to arbitrate Claimant's statutory employment discrimination claims in this forum"; requests new list under **Rule 13402(b)**. Filed on the rank-and-strike deadline — **71 days** after JPMS directed the same claims to FINRA in its EEOC Position Statement. *(Ex. I; Award at 2)* |
| **Sept. 5, 2024** | JPMS files initial Statement of Answer. *(Award at 2)* |
| **Sept. 6, 2024** | **FINRA letter** directs Petitioner to "delet[e] all causes of action or requests for relief based on statutory employment discrimination, sexual assault, or sexual harassment" by Sept. 20, 2024, or "this case will be closed without prejudice." |

| Date | Event |
|---|---|
| | **Administrative directive — not a court jurisdictional ruling.** *(Ex. C)* |
| **Oct. 11, 2024** | Second Amended SOC filed **"under protest"**: statutory claims removed per FINRA directive; all three respondents retained. Panel deems this "the only Statement of Claim filed in this matter." Objection preserved. *(Award at 1, 3)* |
| **Oct. 25, 2024** | FINRA expungement panel (No. 23-03445) unanimously found April 2022 customer complaint "factually impossible, clearly erroneous, and false." Award expressly noted no agreement existed to cover fees. Confirmed by court order Jan. 9, 2025 (Cause No. 096-360735-25). *(Award at 4–5; Ex. M)* |
| **Oct. 31, 2024** | JPMS files Answer to Second Amended SOC. JPMC and JPM Bank decline participation. Panel "made no determination" as to JPMC or JPM Bank. *(Award at 1–2, 3; Ex. H)* |
| Phase 5 - Panel Composition and Reconstitution (July 2024-Oct. 2025) | |
| **July 24, 2024** | FINRA issues Rule 13802 ranking forms (all-public, employment-qualified panel). *(Ex. J; Ex. L)* |
| **Aug. 13, 2024** | JPMS objection triggers withdrawal of Rule 13802 panel; reissued under Rule 13402(b) (one non-public; two public arbitrators). *(Ex. I)* |
| **Oct. 22, 2024** | Panel appointed under reconstituted Rule 13402(b) rank-and-strike. *(Ex. J.3; CX-AAA-0044)* |
| **Sept.–Oct. 2025** | Panelist Tanner Craig Forman withdrawn five days before first scheduled session (Sept. 23–26 / Oct. 1–3, 2025). Petitioner ranked Forman #1; Respondent refused consent to proceed with two arbitrators. *(Ex. J)* |
| **Oct. 17, 2025** | Alison Battiste Clement appointed as replacement non-public arbitrator; hearing dates reset.<br>**Final panel**: Eric Ross Cromartie (Chair, Public), Christine Rister (Public), Alison Battiste Clement (Non-Public). *(Ex. J)* |
| Phase 6 - Discovery Withholding and But-For Expenses (Dec. 2024-Nov. 2025) | |
| Nine production rounds spanning 351 days. Three motions to compel. Two Panel orders (May 8, Aug. 28). Feb. 5: zero documents → Aug. 4: "almost 29,000 pages." | |
| **Dec. 6, 2024 (D+0)** | Discovery requests served on Respondents. *(CX-AAA-0025)* |
| **Feb. 4, 2025 (D+60)** | **FINRA Rule 13507** response deadline. |

x

| Date | Event |
|---|---|
| **Feb. 5, 2025 (D+61)** | JPMS serves objections; produces **zero documents**. Stated it lacked documents supporting some of its own defenses. *(CX-AAA-0025; CX-AAA-0026)* |
| **Mar. 10, 2025** | First production: "Registration File" and "Compliance-Registration Forum File" — not personnel file. Personnel file denied Dec. 22, 2023. *(CX-AAA-0026; Ex. W)* |
| **Apr. 14, 2025** | JPMS opposes first motion to compel; invokes corporate separateness as to affiliate-held documents. JPMS later produces internal Chase HR records on its own Bates — contradicting the separateness claim. *(JPMS Resp. in Opp'n)* |
| **May 8, 2025 (D+153)** | First motion to compel **granted**; Panel orders production by July 7, 2025. *(CX-AAA-0030)* |
| **July 7, 2025 (D+213)** | JPMS "final" production (Round 1): large mixed production that still obscured key materials. Gold Producer scorecard appeared in flattened form without the new-client section.<br>Respondents blamed "unprecedented outage" — no incident report, vendor correspondence, system-scope description, or restoration proof produced. *(CX-AAA-0031; CX-AAA-0028; Ex. AE)* |
| **Aug. 4, 2025 (D+241)** | JPMS opposes second motion to compel; pivots to volume narrative (~29,000 pages). *(JPMS Resp. in Opp'n to 2d MTC at 5)* |
| **Aug. 28, 2025 (D+265)** | Second motion to compel filed. Panel orders production of Investigation Opening and Closing Memos. "Biering Book Analysis" (JPMS_00028664) still withheld; privilege claimed **with no privilege log**. JPMS invoked privilege while relying on investigation conclusions at hearing. *(CX-AAA-0034; CX-AAA-0031 at 7)* |
| **Sept. 8–17, 2025 (D+276– 285)** | Rounds 3–5 production. *(Production records)* |
| **Nov. 12, 2025 (D+341)** | Third motion to compel filed (spoliation). Identifies still-missing Skype communications and 2021–2023 peer-feedback data. JPMS disclosed for the first time that Insight360 was replaced by Oracle HCM in 2020 and post-transition peer feedback "was not kept beyond active use" — withheld 89 days, disclosed only when a formal motion made further concealment untenable.<br>JPMS then produced missing 2021–2023 peer feedback. Oct. 2023 reviews: "a go-getter," "a wealth of knowledge," "puts the client first." Favorable feedback from colleague cited in termination. *(CX-228; CX-AAA-0035; CX-AAA-0037 at 5–6 & n.7)* |

xi

| Date | Event |
|---|---|
| **Nov. 22, 2025 (D+351)** | **Final production (Round 9)** — nine rounds over 351 days, ending one day before closing arguments.<br>**Attorney fees and eDiscovery expenses: $408,793.39** (47.5% of all case fees). *(Ex. S; CX-AAA-0035)* |
| Key Production Pattern: Five documents produced only after repeated motion practice corroborate Panel's findings at Award 4:<br>· JPMS_00021517 - Cohen's "hoping to wrap early next week with a term" email (Ex. E)<br>· JPMS_00027085 - "FINALIZE WORDING" instruction before U5 filing<br>· JPMS_00027073 - Competitive-motive note: "amend the U4 ASAP"<br>· JPMS_00028663-28664 - Client redistribution email with withheld "Biering Book Analysis"<br>· JPMS_00028911 - Global Security close-out: expense basis "NOT SUPPORTED" (Ex. F) | |
| Phase 7 - Panel Issues Findings Without a Definite Disposition (Dec. 2025) | |
| **Dec. 3–15, 2025** | Six hearing days (Dec. 3, 4, 5, 11, 12, 15); eleven sessions. Full evidentiary proceeding on the merits. *(Award at 5–6)* |
| **Dec. 29, 2025** | **Award issued** (Cromartie: Dec. 24; Clement: Dec. 26; Rister: Dec. 29).<br><br>Express findings: competitive hindrance, pattern concern, U5 inaccuracy. Ordered U5 correction to "Voluntary," deleted explanation, changed termination date to Oct. 28. Assessed all forum fees against JPMS.<br>Denied defamation liability; awarded zero damages across all categories. "No determination" as to JPMC/JPM Bank.<br><br>FAA § 12 three-month filing clock begins. *(Award at 1, 3–7)* |
| **Dec. 30, 2025** | *Financial Advisor* Magazine publishes "Finra Panel Offers Insight Into Alleged JPMorgan U5 Tactics" (Jennifer Lea Reed), reporting Panel's "pattern of conduct" finding and U5 correction order. Public consequences attached immediately while displaced claims remained unresolved. |
| **Jan. 2, 2026** | *Financial Planning* Magazine publishes "Arbitrators blast JPMorgan for 'pattern' of post-resignation firings" (Dan Shaw). |
| Phase 8 - Post-Award Steps, Preserved Review, and Confirmed Ongoing Fragmentation (Dec. 2025-Present) | |
| **Feb. 11, 2026** | **AAA protective filing** (Case No. 01-26-0000-7215) to preserve TCHRA statutory claims under Tex. Lab. Code § 21.256. Confirms forum fragmentation is ongoing. *(Petition ¶ 32)* |
| **Mar. 11, 2026** | Complete Binding Arbitration Agreement submitted to AAA to complete intake. *(Ex. Z.2)* |

| Date | Event |
|------|-------|
| **Mar. 13, 2026** | Fee-reimbursement demand to FINRA DRS ($32,657.50 for erroneous Rule 13802 rank-and-strike). *(Ex. L)* |
| **Mar. 21, 2026** | Follow-up demand to FINRA DRS; written response requested by Mar. 25, 2026. *(Ex. L)* |
| **Mar. 26, 2026** | FINRA DRS (K. Bayer) denies reimbursement request. Petitioner files written reply to R. Berry renewing request and seeking executive and independent review. **Administrative channels exhausted.** *(Ex. L)* |
| **Mar. 30, 2026** | **Petition filed.** FAA § 12 deadline: March 29 (Sunday) → Monday, March 30. Timely under Fed. R. Civ. P. 6(a)(1)(C). |
| **Apr. 1, 2026** | Respondent requested additional time in AAA matter; Petitioner transmitted same-day response requesting stay/abeyance pending federal-court determination. *(Exs. Z.3–Z.4)* |
| **Apr. 7, 2026** | AAA preliminary administrative review: case administered under Employment/Workplace Rules; employee fee received; employer fee outstanding. AAA requested Respondent's position on abeyance by Apr. 9. *(Exs. Z.5–Z.8)* |