**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT C.1r

## Original Statement of Claim (Redacted)
## C.1r-001 – 037

**Description:** Claimant's original Statement of Claim filed with FINRA Dispute Resolution. Public version; appendices removed because they were incorporated unchanged into the First Amended SOC (C.2r) and Second Amended SOC (C.3r).

**Relevance:** Establishes the initial claims presented to the Panel and the starting pleading lineage. The C.1r → C.2r → C.3r progression documents how Respondents (JPMS, JPMorgan Chase Bank N.A., and JPMorgan Chase & Co.) were brought into the proceeding and how the FINRA Director's letter narrowed claim scope.

**Source:** FINRA Arbitration Filing, Statement of Claim; submitted December 5, 2023

**Petition Cite:** App. A p. 51 ("Original Statement of Claim (June 3, 2024)")

**Disclosures:** Redactions: As produced from FINRA filing (party-redacted).

**Filing Status:** Public — not sealed



C.1r-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## FINRA DISPUTE RESOLUTION

| | |
|---|---|
| In the Matter of<br>Arbitration between    §<br>§<br>§<br>**JOSHUA DAVID SAPPI BIERING,**    §<br>§<br>**Claimant,**    §<br>§<br>- and -    §    **FINRA No. _____**<br>§<br>**J.P. MORGAN SECURITIES, LLC,**    §<br>§<br>**Respondent.**    § | |

## STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following Statement of Claim ("SOC" or this "Pleading") seeking more than $10 million against J.P. Morgan Securities LLC ("J.P. Morgan" or "JPM") and, in support thereof, respectfully states as follows:

### EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1.    Biering is a well-respected registered representative and financial advisor (hereinafter, "FA") with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for J.P. Morgan for 8 years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

2.    Biering ***resigned*** from J.P. Morgan on October 28, 2023. Following his resignation, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Biering honored the Garden Leave.[1] However, on December 1, 2023, J.P. Morgan informed Biering that

---

[1]    Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

C.1r-001

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



he was "terminated" for violating JPM's "anti-harassment policy." This purported term only made zero sense—as Biering was on a Garden Leave that was triggered by his *voluntary* resignation—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate resignation, with the goal of smearing Biering with other firms/clients.

3.      Moreover, after learning that Biering planned to leave J.P. Morgan, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, *after* Biering already resigned, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a ███████. Refusing to provide any further details so that Biering could rebut any baseless accusations against him, JPM questioned Biering regarding the nature of the relationship. Given the seriousness of JPM's ultimate investigative "findings," JPM's secrecy was entirely improper. Had JPM conducted its "investigation" in good faith and treated Biering the same as his ████████, JPM could not have reasonably concluded that Biering violated an "anti-harassment policy" or, as JPM falsely disclosed to the public, engaged in "inappropriate behavior." JPM's wording was intentionally incendiary.

4.      Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even *fired*?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs *falsely* informed Biering's clients that he had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

C.1r-002

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



5.      JPM's defamation of Biering did not stop there. On December 22, 2 after JPM's attempted improper "termination" of Biering, and after <u>repeated</u> demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure was "Voluntary." Even worse, JPM gave the following explanation in support:

> **Termination Explanation:**
>
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

6.      JPM's clear and intentional weaponization of Biering's U5 was beyond egregious. JPM used Biering actually honoring (unlike many FAs) his Garden Leave against him so that JPM could tarnish his name and ensure that it would keep his clients. Indeed, JPM was well aware that Biering's pipeline of business opportunities indicated more than $300 million in anticipated AUM for 2024.

7.      J.P. Morgan's defamation, including its weaponization of Biering's U5, has caused catastrophic damage to Biering's career. As a direct result of JPM's false disclosures on Biering's U5 and tortious interference with Biering's business, Biering's job offers from two firms were rescinded, and multiple other firms stopped considering him. Likewise, Biering has lost prominent clients that do not want to associate with someone who was purportedly "terminated for inappropriate behavior."

8.      As a result of J.P. Morgan's intentional and wrongful conduct, Biering had no choice but to file this Arbitration[2] and seek to hold J.P. Morgan accountable.

---

[2]      This "Arbitration" or "Action" refers to the present arbitration that Biering is instituting against J.P. Morgan.

C.1r-003

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## FACTS

9.      Biering is a proud Brazilian American, a veteran, and an accomplished FA.

10.     After graduating from the prestigious United States Military Academy at West Point, Biering served honorably in the United States Army for five years. As part of his service to our country, Biering completed a tour to Afghanistan in support of Operating Enduring Freedom, after which he was humbly awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Biering consistently received exemplary evaluations throughout his military career (as outlined in his annual Officer Evaluation Reports). Biering was honorably discharged, and the Department of Veteran Affairs has deemed Biering to be a 100% service-connected, disabled Veteran.

### Biering Joins and Excels at J.P. Morgan

11.     Biering joined J.P. Morgan through its military hiring initiatives in May 2016. Throughout Biering's eight-year tenure with the Firm, JPM recognized Biering as a top performer and quickly promoted him from Associate to Vice President and, most recently, Executive Director. Biering's strong performance at JPM was consistently outlined in his annual year-end performance reviews and further supported through formal and documented peer review feedback.

12.     For the last 8 years, Biering worked at JPM's Fort Worth Private Bank office.[3] Biering managed a sizeable book of business that generated $5.4 million in annual revenue, and Biering oversaw $975 million of assets and credit positions.

---

[3]      J.P. Morgan Chase consists of two separate wealth management arms—J.P. Morgan Advisors, which utilizes a traditional wire house and commission-based FA model, and the J.P. Morgan Private Bank, which utilizes a base salary and annual bonus model. Biering worked in the J.P. Morgan Private Bank arm. However, J.P. Morgan Securities LLC held Biering's licenses and mismarked his U5 at the direction of the J.P. Morgan Private Bank.

C.1r-004

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.1r-005
4:26-cv-00381-O
*Biering v. JPMS, et al.*



14.     Biering's investment in the careers of his ██████ ███████s at JPM extended beyond the Fort Worth Private Bank office. Specifically, after J.P. Morgan implemented a program with offshore partners in India to support Analysts, the Fort Worth office received negative feedback for underutilizing their offshore partners (who both were women). Not until Biering assumed the role of Analyst Manager did the Fort Worth office utilization metrics and offshore partnership feedback drastically improve. The offshore analyst program leadership praised Biering for his efforts.[5]

**JPM Assigns ███████████████ to Support Biering**

15.     In or around February 2023, JPM assigned █████████████ ("██████") to support Biering. As he had done in the past with his female (and male) colleagues, Biering took strides to mentor ██████, and the two worked with each other closely. Together, they managed a sizeable book of business relative to their peers and often required (and requested) additional

---

[4]     J.P. Morgan's corporate titles, in ascending order, are: Analyst, Associate, Vice President, Executive Director, and Managing Director.

[5]     Biering invested in the careers of his male colleagues as well. For example, after being mentored by Biering, Biering's male Analyst secured a role with the prestigious "23 Wall" team in JPM's New York office.

C.1r-005

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

**C.1r-006**
4:26-cv-00381-O
*Biering v. JPMS, et al.*

support from management. In fact, Biering repeatedly expressed concerns to h

regarding his and ███████'s increased workload and lack of coverage.



### Despite His Success, Biering Could Not Ignore JPM's Toxic Work Environment

18.    As set forth above, Biering managed a large book of business, and he was further responsible for bringing in substantial new accounts. In fact, toward the end of his time at J.P. Morgan, Biering forecasted that several new business opportunities were expected to close in 2024 (*i.e.*, "hot" pipeline entries). Most notably, the onboarding of a $3.5 billion ███████ rollup (hereinafter, "XYZ ███████")[6] was expected to bring in more than $300 million in assets under management. In Q3 of 2023 (*i.e.*, shortly before Biering's resignation from JPM), Biering had already begun onboarding XYZ ███████'s top shareholders.

19.    Biering's success at J.P. Morgan was not due to the Firm's resources or support. Instead, Biering grew increasingly frustrated with JPM's recently appointed leadership at the Fort Worth office, including the promotions of Kyle Hitchcock ("Hitchcock") to Head of Investments and Advice and John Aughinbaugh ("Aughinbaugh") to Market Manager. Specifically, among

---

[6]    To preserve client confidentiality, "XYZ ███████" serves as a pseudonym for the client at issue.

C.1r-006
03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



numerous other things, Hitchcock openly reprimanded Biering in front of fello

Aughinbaugh repeatedly criticized Biering's business development efforts (and baselessly disagreed with Biering's management of client relationships). Likewise, Biering's frustrations with Ben Stewart, Jr. ("Stewart") also grew. In his capacity as Single Coverage Team Lead for the Fort Worth office, Stewart served as Biering's immediate manager, and he routinely ignored Biering's requests for support due to Biering's excessive workload.

20.     More specifically, with respect to Hitchcock, Biering was chastised in front of his colleagues and faced baseless accusations of overworking ███████. In truth, Hitchcock was well aware of ███████'s *and Biering's* repeated requests for support from management due to their excessive workloads. In addition, Hitchcock (along with Aughinbaugh) spearheaded the plot to discriminate against Biering and try to fabricate reasons to purportedly terminate him.

21.     With respect to Aughinbaugh, when Biering pursued XYZ Dental (via both its CEO and President) as a large prospective client, Biering requested Aughinbaugh's support and asked for a brief internal meeting to discuss. Aughinbaugh first accused Biering of wasting his time but then later scolded Biering when Aughinbaugh felt that he was unprepared for a meeting with XYZ ██████ (*i.e.*, the meeting for which Biering *tried* to prepare Aughinbaugh before being accused of wasting Aughinbaugh's time). Aughinbaugh further denied Biering's request for sponsorship support for a charity event, despite that Aughinbaugh knew that this very event previously resulted in new business from ███████[7] XYZ ██████ was not the only prospective client about which Biering and Aughinbaugh had disagreements. In approximately August 2023, Aughinbaugh refused to let Biering present a prospective client (*i.e.*, a $100 million endowment opportunity for

---

[7]     Ironically, after Biering resigned from J.P. Morgan, Fort Worth office leadership—including Aughinbaugh—agreed to sponsor the event.

C.1r-007

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.1r-008

4:26-cv-00381-O

*Biering v. JPMS, et al.*

a quasi-government entity) to JPM's Client Review Forum for onboarding approval the standard onboarding operating procedure.[8]

22.    With respect to Stewart—with whom Biering repeatedly conveyed his dissatisfaction with JPM's toxic work environment—Biering received zero support when he reached out for assistance with his massive workload. Even worse, after learning that Biering intended to join a competitor, Stewart turned his back on Biering, joined JPM's witch hunt to fabricate reasons to support an alleged termination of Biering and jumped on the bandwagon to frame Biering. In addition, for months leading up to Biering's resignation, Stewart shared personal items about Biering, which Biering told Stewart *in confidence*, with Hitchcock and Aughinbaugh.

23.    Stewart, Hitchcock, and Aughinbaugh all used their knowledge of Biering's personal issues to discriminate against Biering and treat him differently from his colleagues. For example, when Biering requested reasonable accommodations and FMLA leave due to his personal struggles, Human Resources and leadership told Biering that if he chose to take FMLA leave, he would be prohibited from contacting clients. Oddly enough, Aughinbaugh told Biering that he did not think FMLA leave was the "right move" for Biering weeks later. Upon information and belief, many non-disabled, female employees were permitted to contact clients at their discretion while they were on leave. Biering, however, was not offered the same accommodation or opportunity. Given that there were upcoming liquidity events and substantial new business, Biering knew that he could not take FMLA leave under these circumstances.

24.    The aforementioned examples are merely a glimpse into the long list of consistent scrutiny and harassment Biering faced from his leadership.

---

[8]    Notably, this denial occurred swiftly after Aughinbaugh spoke with one of Biering's colleagues—

C.1r-008

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



25.    Put simply, this new leadership created a hostile, toxic work envir culture that became unsustainable for Biering. As a result, Biering considered resigning *numerous* times from January 2023 through October 2023 (*i.e.*, when he ultimately did resign). Indeed, in the months preceding his resignation, Biering *repeatedly* told Stewart and several other J.P. Morgan colleagues that he was unhappy and discouraged with his work environment and that he was considering resigning.

## Biering Explores Other Opportunities

26.    In the months preceding his resignation, Biering actively explored opportunities with multiple firms. Specifically, Biering interviewed with and received offers from Merrill Lynch and Texas Capital. Upon information and belief, Stewart had actual knowledge that Biering was communicating with Merrill Lynch regarding potential employment.[9]

## Biering Resigns from J.P. Morgan

27.    On October 24, 2023, Biering informed Stewart and Aughinbaugh that he planned to resign from JPM. Biering further expressed that he felt he nonetheless deserved incentive compensation due to his strong 2023 performance.[10] In response, Aughinbaugh and Stewart unfairly accused Biering of acting in a way that did not align with "team culture" (which was ironic, given Aughinbaugh's and Stewart's recent actions that violate their own "How We Do Business Principles").

28.    On October 25, 2023, Biering informed Stewart that he intended to take paid time off from October 25 through October 27, 2023.

---

[9]    In fact, Stewart called Biering during what Stewart *knew* was an interview and meeting with Merrill Lynch on October 27, 2023. Biering also submitted PTO requests to Stewart and reported his time off.

[10]    Incentive compensation paid in January 2024 is awarded for performance from the Q3 2022 to Q3 2023—the period during which Biering exuded stellar performance recognized by executive leadership.

C.1r-009

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_I



29.     On October 27, 2023 (*i.e.*, the day before Biering's resignation from JF informed Merrill Lynch that he accepted its generous terms, subject to Merrill Lynch's review of JPM's marking of Biering's U5.

30.     That *same day*, Stewart called Biering and informed him that he was being placed on an "involuntary administrative leave." When Biering asked Stewart for additional information regarding the purpose of the administrative leave, Stewart refused to provide it. Further, when Biering tried to contact JPM's Human Resources department, he received no response. Given that Stewart called Biering late on a Friday afternoon and no one would respond to him, Biering could only speculate as to the reason he was placed on leave. In Biering's view, the only possible reason was because JPM knew that Biering was planning to leave to join a competitor, and JPM wanted to retain his significant book of business.

31.     This unexpected administrative leave—on which Biering was placed with zero context, despite his requests for same—was the final straw. It was clear to Biering that management was retaliating against him for informing them that he planned to resign. Biering therefore had no choice but to do what was in his and his clients' best interests and finally resign.

32.     On October 28, 2023, Biering voluntarily **resigned** from J.P. Morgan. Specifically, Biering submitted a written resignation via e-mail and JPM's HR system (*i.e.*, "me@JPMC").

33.     Biering's resignation could not have been clearer. Indeed, he stated: "I am writing to inform you of my formal resignation." J.P. Morgan recognized that Biering resigned by stating: "Your resignation was processed." In addition, upon information and belief, JPM's internal reporting system reflects that Biering's "Last Day Worked" was October 26, 2023. As such, there

C.1r-010

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



can be no question that—at the very latest—Biering resigned from J.P. Morgan on 2023.[11]

## Biering's Garden Leave

34.    Following his resignation, Biering was required to honor a 60-day notice period (*i.e.*, the Garden Leave), during which Biering was not allowed to solicit clients.

35.    Despite the fact that it was incredibly broad and that most FAs do not honor this "sit out" period, Biering honored the Garden Leave to ensure an amicable departure and smooth transition for his clients.

## JPM's Investigation (*i.e.*, Witch Hunt) of Biering

36.    On or about November 1, 2023, Biering learned—via his counsel—that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy, and (2) an alleged violation of JPM's expense report policy."[12] This was the first time that Biering learned he was being investigated for anything. Thus, at the time that Biering resigned from JPM, Biering clearly was not under investigation.[13] Instead, Biering learned, after he resigned, JPM tried to find anything that would "stick" to end Biering's career in wealth management.

---

[11]    It is Biering's position that, at a minimum, JPM—via Aughinbaugh and Stewart—had actual knowledge of Biering's intended resignation on October 24, 2023. Stewart was aware of Biering's intended resignation for months.

[12]    Specifically, as part of its witch hunt, JPM investigated certain expense reports that Biering submitted (which JPM had already approved). Biering answered all JPM's questions truthfully, and he further offered examples of systemic abuse of expense policies by leadership throughout the Private Bank. Unsurprisingly, JPM concluded that Biering did not violate JPM's expense report policy and dropped the issue altogether.

[13]    To the extent JPM claims that Biering was already under investigation when he resigned, he was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave).

C.1r-011

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



37.    On November 2, 2023, Biering received an initial e-mail from Jona ("Jacobs"), an investigator with JPM Employee Relations.

38.    On November 7, 2023, Jacobs interviewed Biering. Specifically, Jacobs asked Biering various questions regarding his relationship with ████. However, Jacobs did not provide any details regarding the purpose of the investigation or why he was asking about the relationship between Biering and ████.



40.    In addition, it is clear that JPM did not conduct *any* investigation into ████'s actions or place her on administrative leave. To the extent JPM suggests that any of its policies required disclosure of Biering's and ████'s relationship with each other, then ████ should have faced the same investigation that Biering had to endure. Likewise, ████ should have been placed on an involuntary administrative leave and denied access to clients and JPM systems just like Biering. But neither of these things occurred. Instead, JPM apparently accepted all of ████'s statements as true and refused to share any information with Biering so that he could dispute any baseless accusations against him. Biering offered exculpatory text messages with ████ and insisted that JPM consider these messages as evidence, but JPM emphatically refused.

41.    Despite that he was without crucial details regarding JPM's purported investigation, Biering informed Merrill Lynch of the situation. Though Biering had already signed employment

C.1r-012

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_...



onboarding documents, Merrill Lynch told Biering that it would need to see how Biering's U5 before finalizing Biering's offer and employment agreement.

42.     Throughout November 2023, Merrill Lynch asked Biering several times if JPM provided any updates regarding JPM's plan to mark Biering's U5. Biering and Merrill Lynch had nearly finalized Biering's deal structure, and they were anxious to complete the hiring process.

43.     On November 13, 28, and 29, 2023, Biering asked Jacobs for an update on the investigation. Jacobs refused to provide one.

44.     On November 29, 2023, JPM denied Biering's requests for copies of his personnel records and a copy of the Garden Leave policy.

**J.P. Morgan Attempts to Baselessly "Terminate" Biering**

45.     On December 1, 2023—*i.e.*, 33 days into Biering's Garden Leave, which directly followed his voluntary <u>resignation</u>—Aughinbaugh and Stewart called Biering and purported to "terminate" him. Specifically, Aughinbaugh and Stewart told Biering that, following the investigation performed by JPM's Employee Relations department, Biering was being terminated for violating the Firm's Code of Conduct and "anti-harassment policy."

46.     As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already*** <u>***resigned***</u>.

47.     Even if Biering could have been terminated (he could not), the reasons for Biering's purported termination were unquestionably fabricated and discriminatory.

C.1r-013

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



48.    First, given the facts and nature of Biering's and ████'s rela[...] evidenced by the numerous text messages they exchanged), Biering could not have violated JPM's "anti-harassment" policy. Upon information and belief, violations of JPM's "anti-harassment" policy include, for example:

- Engaging in conduct that creates "a hostile or offensive environment, or can reasonably be expected to cause an individual to feel uncomfortable, intimidated, humiliated, or distressed"; and/or

- Engaging in "unwelcome sexual advances, requests for sexual favors and other verbal or nonverbal behavior or physical contact of a sexual nature."



████'s relationship was entirely consensual. Indeed, had JPM reviewed any of the numerous text messages that ████ and Biering exchanged, JPM would have learned that ████ was ████████████████████ ████ was incredibly comfortable around Biering, and that ████ welcomed and enjoyed any personal attention she received from Biering. To the extent that JPM concluded otherwise, then ████ had to have fabricated allegations against Biering (in a likely attempt to save her marriage and after being coerced by JPM leadership), which JPM simply took at face value without even attempting to hear and consider Biering's side of the story.

50.    Likewise, to the extent that J.P. Morgan claims that, in light of his relationship with ████, Biering violated a policy regarding required disclosure of personal relationships with other employees, that too would be suspect. Upon information and belief, ████ was not

C.1r-014

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[...]



investigated for having a "personal relationship" with a fellow employee, and she c[...]

not placed on administrative leave, disciplined, or terminated for her failure to disclose same. In

fact, it appears that ▮▮▮▮ was permitted to work remotely during JPM's entire sham

investigation. JPM cannot claim—in good faith—that Biering, but not ▮▮▮▮, violated a policy

that makes no distinction between employees (*i.e.*, via gender or corporate job title) when it comes

to disclosing personal relationships.[14]

51.     Clearly, JPM's purported "termination" of Biering and the fabricated reasons in

support of same were engineered once JPM learned that Biering was resigning. It is without

question that JPM used Biering's mandatory Garden Leave against him to conduct a sham

investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5

in an effort to retain Biering's business.

**JPM's Campaign of Defamation and Weaponization of Biering's U5**

52.     To that end, as if JPM's witch hunt and bogus, one-sided investigation into Biering's

relationship with ▮▮▮▮, as well as JPM's illegitimate attempted termination of Biering, were

not enough, JPM instituted a campaign of defamation against Biering during the Garden Leave.

And JPM has not stopped.

53.     First, during the Garden Leave, J.P. Morgan directed other FAs to call on Biering's

clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by

stating that Biering had been *fired*. This statement was <u>false</u>. Clearly, given that Biering was on

------

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

)F CLAIM                                                                                    PAGE 15

C.1r-015

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[...]



Garden Leave—which was *solely* triggered because Biering resigned—Biering was n[ot] not have been fired.

54.    JPM, however, would not stop there. In an effort to ensure that it could retain Biering's clients and irreparably harm his business, JPM further intentionally and maliciously mismarked and weaponized Biering's U5.

55.    Shortly after JPM's illegitimate, purported termination of Biering, Biering caught wind that JPM planned to mismark Biering's U5 to indicate that he was discharged, rather than that he resigned voluntarily.

56.    On December 6, 2023, Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was *voluntary*. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

57.    On December 12, 2023, Biering's counsel *again* demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

58.    On December 13, 2023, JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

> "During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

59.    Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he *already resigned*. Biering's counsel further put

C.1r-016

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[…]



JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering wo

significant damages, for which JPM would be responsible.  JPM proceeded anyway with the false

and defamatory U5 marking.

60.    On December 19, 2023, Ms. Tidwell-Neal provided a short response to Biering's

counsel's letters. Specifically, she indicated that JPM maintains its position that it terminated

Biering *"immediately"* following the results of an investigation and, as such, was not required to

mark Biering's U5 as a "voluntary" termination. Even worse, she incorrectly stated that Biering

knew he was under investigation the day before he resigned and that his resignation was not

"effective" until after the Garden Leave period. Notably, however, JPM did not provide any legal

authority supporting its positions.

61.    On December 20, 2023, Biering's counsel outlined and disputed the clearly

erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, during Stewart's

call to Biering late on a Friday afternoon—when Stewart *knew* Biering was taking paid time off

and interviewing with a competitor—Stewart refused to explain why Biering was being placed on

administrative leave. Biering was <u>*not*</u> told that he was under investigation. Instead, Biering

believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's

calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative

leave, with *zero* context or ability to reach out to HR before the weekend, Biering knew that he

had no choice but to immediately resign.

62.    Also on December 20, 2023, and only after JPM refused to make the correct U5

marking of "voluntary," to attempt to limit the damage of JPM's false and defamatory "discharged"

marking Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with

changes that, at a *minimum*, should be made:

C.1r-017

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



"After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Ga Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

63.     Biering's counsel then implored JPM to follow FINRA guidance and the uncontroverted case law presented in Biering's demand letters.

64.     On December 22, 2023, JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all of the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary").

65.     First, J.P. Morgan marked that Biering was "Discharged":

**Reason for Termination:** Discharged

66.     JPM then provided the following explanation for Biering's purported "Discharge."

**Termination Explanation:**

After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

67.     To date, J.P. Morgan has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed their tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering).

**Prospective Employers Rescind Their Offers and Interest in Biering**

68.     After J.P. Morgan—via Aughinbaugh and Stewart—purported to terminate Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Immediately, Merrill Lynch stopped the onboarding process and rescinded Biering's offer, stating that it could not hire Biering with "Discharged" on his U5 as the reason for his termination. Unfortunately, the deal

C.1r-018

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_…



structure Merrill Lynch had offered Biering (which he then lost due to JPM's wrong

was incredibly favorable. The structure not only gave credit to Biering for new AUM but also

counted loan positions, whether mortgages or outstanding lines of credit balances, towards the

"asset hurdles" baked into the offer. Furthermore, a significant portion of Biering's business

required banking and complex lending solutions only provided by larger banks, such as Merrill

Lynch.

69.     Likewise, before JPM finalized the language it marked on Biering's U5, Texas

Capital pulled its interest in hiring Biering. Specifically, Texas Capital cited concerns with the

uncertainty surrounding JPM's imminent disclosures on Biering's U5.[15] Texas Capital viewed

Biering as high-risk and rescinded its offer to hire Biering.

70.     Biering also interviewed with Morgan Stanley, UBS, and RBC. When they learned

about JPM's disclosures on Biering's U5, Morgan Stanley referred to Biering as a "walking

AdvisorHub news article waiting to happen," and UBS did not even follow up with Biering. While

Biering was able to have several interviews with RBC, ultimately RBC became suspicious that

Biering did not have more detail regarding the alleged "inappropriate behavior" referenced on his

U5. However, Biering could not provide same because *J.P. Morgan* refused to give Biering any

information that he requested. Under the circumstances, RBC concluded that hiring Biering was

too risky.

**Raymond James Takes a Chance on Biering**

71.     Ultimately, Raymond James agreed to take a chance on Biering and hire him.

However, Biering's interview process was significantly more intensive than the standard process.

---

[15]     Texas Capital also expressed concern regarding various disclosures on Biering's U4. Specifically, J.P. Morgan filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged.

C.1r-019

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



72.     Further, Biering's employment offer was much less favorable than that other FAs and what he was originally offered at Merrill Lynch. Specifically, while most FAs' asset bonuses are paid on the front end prior to a candidates onboarding, Biering is only being paid a salary for two years (which is more than 2x less than his JPM salary) and will only receive asset bonuses following the transition of client assets. In addition, unlike Merrill Lynch's offer, Raymond James did not give credit to Biering for loan positions or compensate Biering for unvested deferred compensation.

**Ongoing Detriment to Biering's Business**

73.     Initially, several of Biering's prominent clients intended to transfer their business to Biering at his new firm. Biering relied on the transfer of these clients to achieve asset goals at Raymond James to even come close to the financial upside offered by Merrill Lynch. However, once the clients learned that Biering was purportedly "Discharged" due to engaging in "inappropriate behavior," the clients chose not to join Biering.

74.     For various clients that agreed to take a risk and join Biering at Raymond James, JPM has still found a way to interfere. Specifically, JPM has rejected lines of credit payoff letters and ACAT forms without legitimate reason. In so doing, JPM has not only frustrated Biering's clients but further caused some clients to pay higher interest on lines of credit, which has made them question Biering's competency and firm's capabilities. Further, upon information and belief, JPM has instructed its derivatives team to delay their responses to Biering regarding upcoming transactions in order to buy time for the incumbent JPM FA to "save the relationship." These actions are wholly improper and are designed to further interfere with Biering's business.

C.1r-020

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## LEGAL CLAIMS/CAUSES OF ACTION

75.     Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor:

### COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

76.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

77.     During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired. [16]

78.     Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

79.     All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's

---

[16]     Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

C.1r-021

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



mandate against "overly broad or misleading narratives" but intentionally was left va[ ] reasonable readers to assume nefarious behavior.[17]

80.     Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10.  By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

81.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

82.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

### COUNT 2: BUSINESS DISPARAGEMENT

83.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

84.     J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and

---

[17]     To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory).

C.1r-022

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[

C.1r-023
4:26-cv-00381-O
*Biering v. JPMS, et al.*


directed at Biering are false. Such publications are without justification, excuse, or pr

they are intended to interfere with the economic interests of Biering.

85.     JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

86.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

87.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## <u>COUNT 3:</u> TORTIOUS INTERFERENCE

88.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

89.     Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

90.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

C.1r-023

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

C.1r-024

4:26-cv-00381-O
*Biering v. JPMS, et al.*

91.    Moreover, JPM committed such wrongful acts with malice, willful reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

92.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

93.    JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

94.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

95.    Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

96.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

97.    Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

98.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

C.1r-024

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## COUNT 6: WEAPONIZATION OF U5

99.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

100.    FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

101.    J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just one month ago, a FINRA Panel found[18] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[19]

102.    Further, just a few weeks ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[20] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the

---

[18]     *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

[19]     Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[20]     *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

C.1r-025

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defa

FA by mismarking the U5.[21]

103.    In 2022, another FINRA Panel again found[22] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts.  Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[23] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[24]

> [R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

---

[21]    *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, ___ N.Y.S.3d ___, 2024 WL 2061527, at *1 (N.Y. App. Div. May 9, 2023).

[22]    *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[23]    *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

[24]    *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

C.1r-026

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

104.    In 2018, another FINRA Panel granted expungement (and an award o[f] attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[25]

105.    It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business.  JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing.  FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5.  Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[26]  UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the defamation and punitive damages.[27]  The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

106.    JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

107.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

---

[25]    *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[26]    *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

[27]    *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

C.1r-027

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.1r-028
4:26-cv-00381-O
*Biering v. JPMS, et al.*

108.    Moreover, JPM committed such wrongful acts with malice, willful reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 7: NEGLIGENT INVESTIGATION

109.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

110.    At all times relevant to this Action, J.P. Morgan owed a duty to Biering to exercise reasonably prudent and ordinary care in the investigation of Biering's and ███████'s relationship (and ███████'s allegations which, presumably, resulted in such investigation). JPM violated this duty by negligently investigating the nature of Biering's and ███████'s relationship and by failing to act as a reasonably prudent person under the same or similar circumstances, including, but not limited to:

(a)    Negligently investigating Biering's and ███████'s relationship;

(b)    Failing to conduct a proper and thorough investigation of such relationship; and

(c)    Terminating Biering on the basis of an inadequate investigation.

111.    Had JPM performed proper investigation of Biering's and ███████'s relationship, JPM would have clearly seen that the relationship was entirely consensual. Further, JPM could not have reasonably concluded that Biering violated JPM's "anti-harassment" policy.

112.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 8: BREACH OF CONTRACT

113.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

C.1r-028
03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.1r-029
4:26-cv-00381-O
*Biering v. JPMS, et al.*

114. When Biering was still working at J.P. Morgan, a customer filed complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

115. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

116. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

117. As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 9: SEX DISCRIMINATION
### (Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act)

118. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

119. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA").

120. Biering is a member of a protected class under Title VII and TCHRA because of his sex.

121. By virtue of the conduct alleged herein, Respondent discriminated against Biering based on Biering's sex, in violation of Title VII and TCHRA. Specifically, JPM discriminated against Biering because of his sex in connection with the terms, conditions, and privileges of

C.1r-029
03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.1r-030
4:26-cv-00381-O
*Biering v. JPMS, et al.*

employment and limited Biering in a manner that deprived him or tended to dep

employment opportunities and adversely affected his status as an employee.

122.    First, J.P. Morgan conducted a one-sided, sham investigation into the relationship between Biering and ▮▮▮. In so doing, JPM failed to investigate in good faith and give Biering an opportunity to share his side of the story. Had JPM acted in a fair and non-discriminatory manner, it would have treated ▮▮▮ the same as it treated Biering. Specifically, JPM would have investigated ▮▮▮, placed ▮▮▮ on administrative leave, and applied the same policies to ▮▮▮ that it applied to Biering. But JPM wholly failed to do so. It is therefore without question that Biering was treated less favorably than similarly situated female employees.

123.    As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

124.    Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

125.    Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[28]



---

[28]    With respect to this claim, a Right to Sue letter from the Texas Workforce Commission ("TWC") is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

C.1r-030

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

C.1r-031

4:26-cv-00381-O

*Biering v. JPMS, et al.*



130.    As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

131.    Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

132.    Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[29]

---

[29]    With respect to this claim, a Right to Sue letter from the TWC is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

C.1r-031

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_...



## COUNT 11: QUANTUM MERUIT AND UNJUST ENRICHMENT

133.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

134.    Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ ████ business to JPM. Yet, Biering received zero compensation for his successful efforts.

135.    By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

136.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 12: ILLEGAL FORFEITURE OF EARNED COMPENSATION

137.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

138.    JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

139.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 13: FORFEITURE OF DEFERRED COMPENSATION
### (VIOLATION OF ERISA)

140.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

141.    J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

C.1r-032

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



142.    As a direct and proximate result of JPM's wrongful conduct descr

Biering has suffered damages. Biering seeks such damages from JPM.

### COUNT 14: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS

143.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

144.    Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

145.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

### ATTORNEYS' FEES

146.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

147.    JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

### PUNITIVE DAMAGES

148.    Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

149.    As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

150.    J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM

C.1r-033

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



has not learned. Instead, it remains JPM's business practice to smear departing FAs

can unfairly compete for business.

151.    Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead *knowingly* and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

152.    Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

(1)    In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2)    In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

153.    The defamatory statements at issue were published in Biering's CRD.

154.    Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

155.    Claimant requests damages against Respondent to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

(a)    Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

C.1r-034

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_|

**C.1r-035**
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(b)   Expungement as set forth herein;

(c)   Lost or forfeited deferred compensation;

(d)   Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(e)   Statutory penalties and damages;

(f)   Liquidated damages;

(g)   Punitive damages;

(h)   Damages to Claimant's reputation;

(i)   Past lost earnings;

(j)   Future lost earnings;

(k)   Consequential damages;

(l)   Mental anguish and emotional distress damages;

(m)   Future lost earning capacity;

(n)   The highest pre- and post-judgment interest permitted by law on all damages;

(o)   FINRA forum and other fees; and

(p)   Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

<u>**REPRESENTATION BY COUNSEL**</u>
<u>**AND REPRESENTATIVE'S CURRENT ADDRESS**</u>

156.   Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

C.1r-035

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## VENUE

157.    Claimant worked for Respondent in Texas and was working in Fort Worth, Texas when all or part of Respondent's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

## AMOUNT IN DISPUTE AND AMOUNT
## REQUESTED FOR DAMAGES, AWARD, AND RELIEF

158.    Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

159.    The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

C.1r-036
03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_|



Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By:   */s/ Joshua J. Iacuone*
Joshua J. Iacuone
Texas State Bar No. 24036818
Anna Olin Richardson
Texas State Bar No. 24102947
4925 Greenville Ave., Ste. 700
Dallas, Texas 75206
Telephone: (214) 960-2832
Email:   josh@imcplaw.com
anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

C.1r-037
03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT C.02r
## First Amended Statement of Claim (Redacted)
## C.02r-001 – 043

**Description:** First Amended Statement of Claim. Adds JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co. as named Respondents (in addition to JPMS); maintains statutory discrimination claims and the negligent-investigation claim. Public version; appendices removed because they were incorporated unchanged into C.3r.

**Relevance:** Documents the jurisdictional expansion to the JPMorgan parent entities and confirms the statutory-claims posture before the FINRA Director's letter required removal. Supports the respondent-identity arguments and the FAA § 10 partiality analysis.

**Source:** FINRA Arbitration Filing, First Amended Statement of Claim; submitted August 12, 2024

**Petition Ref:** App. A p. 51 ("First Amended Statement of Claim (Aug. 12, 2024)")

**Disclosures:** Redactions: As produced from FINRA filing (party-redacted).

**Filing Status:** Public - not sealed



C.2r-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

# Submitted Documents by Party

*Subject Posted on 08/12/2024*

Party Case Submission Form for Tracking Number DR0662560.pdf( 8/12/2024 3:23:40 PM)

2024-08-12 - First Amended Statement of Claim.pdf( 8/12/2024 3:23:48 PM)

C.2r-001



## Party Case Submission Form for Tracking Number
### DR0662560.pdf( 8/12/2024 3:23:40 PM)

C.2r-002



**FINRA Dispute Resolution Party Case Submission**

Your form was submitted to FINRA successfully.  Please print this page if you wish t
records.

**Tracking Number:** DR0662560
**Case ID:** 24-01208
**Case Name:** Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC
**Submitted By:** Joshua Iacuone
**Submitted Date:** 08/12/2024 03:20:02 PM
**Payment Method:** This filing does not require any (additional) fees to be paid.

**Attachments**

| Attachment Type | File Name | Description |
|---|---|---|
| Amended Claim | 2024-08-12 - First Amended Statement of Claim.pdf | First Amended Statement of Claim |

I affirm that I have complied with FINRA rules relating to protecting personal confidential information in
documents filed with FINRA.

**Document Service**

Serve Attachments on ALL Parties in this Case

I affirm that I am serving a copy of these documents on all other parties to this case, either through the DR
Portal by using the "Serve Attachments" option on this form or by other means for parties not required to
use the DR Portal. For parties I am serving by other means, I am providing proof of service. (Exception: You
are not required to serve a copy of your arbitrator or mediator ranking sheet or fee waiver request to the
opposing parties.)

C.2r-003



**2024-08-12 - First Amended Statement of Claim.pdf( 8/12 3:23:48 PM)**

C.2r-004



## FINRA DISPUTE RESOLUTION

| | |
|---|---|
| In the Matter of<br>Arbitration between<br><br>**JOSHUA DAVID SAPPI BIERING,**<br><br>Claimant,<br><br>- and -<br><br>**J.P. MORGAN SECURITIES, LLC,<br>JPMORGAN CHASE & CO., and<br>JPMORGAN CHASE BANK, N.A.,**<br><br>Respondents. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§        **FINRA No. 24-0108**<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

### FIRST AMENDED STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following First Amended Statement of Claim ("SOC" or this "Pleading") seeking more than $10 million against J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMorgan Chase"), JPMorgan Chase Bank, N.A. ("Chase Bank") (collectively, "J.P. Morgan, "JPM," or "Respondents") and, in support thereof, respectfully states as follows:

### EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1.      Biering is a well-respected registered representative and financial advisor (hereinafter, "FA") with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for J.P. Morgan for 8 years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

2.      Biering *resigned* from J.P. Morgan on October 28, 2023. Following his resignation, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Garden Leave is just that – Biering no longer had any job duties, no longer had access to JPM's systems,

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



and could no longer perform any job functions – he was to sit at home.  During Ga

Biering certainly could not execute any trades or professional services for clients, which is the *very purpose of his FINRA license*, and for JPM holding his license. Biering honored the Garden Leave.[1] However, on December 1, 2023, J.P. Morgan informed Biering that he was "terminated" for violating JPM's "anti-harassment policy." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his *voluntary* resignation—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate resignation, with the goal of smearing Biering with other firms/clients.

3.          Moreover, after learning that Biering planned to leave J.P. Morgan, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, *after* Biering already resigned, JPM informed Biering's counsel that it was conducting an investigation into Biering██████████████

██████ Refusing to provide any further details so that Biering could rebut any baseless accusations against him, JPM questioned Biering regarding the nature of the relationship. Given the seriousness of JPM's ultimate investigative "findings," JPM's secrecy was entirely improper. Had JPM conducted its "investigation" in good faith and treated Biering the same ████████

██████ JPM could not have reasonably concluded that Biering violated an "anti-harassment policy" or, as JPM falsely disclosed to the public, engaged in "inappropriate behavior." JPM's wording was intentionally incendiary.

---

[1]          Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

C.2r-006

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

4.      Biering's demise was planned for months before the suspect i: "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even *fired*?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs *falsely* informed Biering's clients that he had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

5.      JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after repeated demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure was "Voluntary." Even worse, JPM gave the following explanation in support:

> **Termination Explanation:**
>
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

6.      Had JPM correctly marked Biering's U5 as "Voluntary," there would have been no "Termination Explanation" or any other "explanation" as to Biering's departure (as Biering was not under investigation for any regulatory or compliance issues). JPM knew this. JPM perverted Biering's clear resignation – and Biering's decision to honor Garden Leave – into a "Discharge" so JPM would be "required" under U5 rules to smear him with the "Termination Explanation."

7.      JPM's clear and intentional weaponization of Biering's U5 was beyond egregious. JPM used Biering actually honoring (unlike many FAs) his Garden Leave against him so that JPM could tarnish his name and ensure that it would keep his clients. Indeed, JPM was well aware that

ED STATEMENT OF CLAIM                                                                      PAGE

C.2r-007

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-008
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Biering's pipeline of business opportunities indicated more than $600 million in antic[ ]

for 2024.

8.    J.P. Morgan's defamation, including its weaponization of Biering's U5, has caused catastrophic damage to Biering's career. As a direct result of JPM's false disclosures on Biering's U5 and tortious interference with Biering's business, Biering's job offers from two firms were rescinded, and multiple other firms stopped considering him. Likewise, Biering has lost prominent clients that do not want to associate with someone who was purportedly "terminated for inappropriate behavior."

9.    As a result of J.P. Morgan's intentional and wrongful conduct, Biering had no choice but to file this Arbitration[2] and seek to hold J.P. Morgan accountable.

## FACTS

10.    Biering is a proud Brazilian American, a veteran, and an accomplished FA.

11.    After graduating from the prestigious United States Military Academy at West Point, Biering served honorably in the United States Army for five years. As part of his service to our country, Biering completed a tour to Afghanistan in support of Operating Enduring Freedom, after which he was humbly awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Biering consistently received exemplary evaluations throughout his military career (as outlined in his annual Officer Evaluation Reports). Biering was honorably discharged, and the Department of Veteran Affairs has deemed Biering to be a 100% service-connected, disabled Veteran.

## Biering Joins and Excels at J.P. Morgan

12.    Biering joined J.P. Morgan through its military hiring initiatives in May 2016.

---

[2]    This "Arbitration" or "Action" refers to the present arbitration that Biering is instituting against J.P. Morgan.

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29\



Throughout Biering's eight-year tenure with the Firm, JPM recognized ▬▬▬▬ as a to

and quickly promoted him from Associate to Vice President and, most recently, Executive Director.

Biering's strong performance at JPM was consistently outlined in his annual year-end performance

reviews and further supported through formal and documented peer review feedback.

13.     For the last 8 years, Biering worked at JPM's Fort Worth Private Bank office.[3]

Biering managed a sizeable book of business that generated $5.4 million in annual revenue, and

Biering oversaw $975 million of assets and credit positions.

14.     In addition, Biering was promoted on an accelerated basis and served in various

leadership roles, both formally and informally. ██████████████████████████

████████████████████████████████████████

████████████████████████████████ Biering's

former Executive Administrative Assistant was promoted to the role of Onboarding Associate for

the Fort Worth office, and she has since accepted a Senior Client Service Associate role, supporting

Biering at his new Firm.

15.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[3]     J.P. Morgan consists of two separate wealth management arms—J.P. Morgan Advisors, which utilizes a traditional wire house and commission-based FA model, and the J.P. Morgan Private Bank, which utilizes a base salary and annual bonus model. Biering worked in the J.P. Morgan Private Bank arm. However, JPMS held Biering's licenses and mismarked his U5 at the direction of the J.P. Morgan Private Bank, Chase Bank, and/or JPMorgan Chase.

[4]     J.P. Morgan's corporate titles, in ascending order, are: Analyst, Associate, Vice President, Executive Director, and Managing Director.

---

**ED STATEMENT OF CLAIM**                                                        **PAGE**

C.2r-009

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

███████████████████████████████████████████████████
███████████████████████████████████████████████████

**JPM Assigns** ████████████████████████████

16.   ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ managed a

sizeable book of business relative to their peers and often required (and requested) additional

support from management. In fact, Biering repeatedly expressed concerns to his superiors

regarding ████████████ increased workload and lack of coverage.

17.   ████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██   ████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

**Despite His Success, Biering Could Not Ignore JPM's Toxic Work Environment**

19.   As set forth above, Biering managed a large book of business, and he was further

responsible for bringing in substantial new accounts. In fact, toward the end of his time at J.P.

Morgan, Biering forecasted that several new business opportunities were expected to close in 2024

---

█ ████████████████████████████████████████
█████████████████████████████

ᴇᴅ STATEMENT OF CLAIM                                        PAGE

C.2r-010

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



(*i.e.*, "hot" pipeline entries). Most notably, the onboarding of a $3.5 billion (hereinafter, "XYZ ▮▮▮▮")[6] was expected to bring in more than $300 million in assets under management. In Q3 of 2023 (*i.e.*, shortly before Biering's resignation from JPM), Biering had already begun onboarding XYZ ▮▮▮▮ top shareholders.

20.    In addition, Biering highlighted a separate hot pipeline entry (which was also visible and closely reviewed by management) for more than $400 million of new AUM from the two co-founders of a Fort Worth-based exploration and production oil and gas company (hereinafter, "XYZ Energy Partners").[7] Biering individually sourced these clients, introduced a $150 million lending deal to his investment bank colleagues, and secured the business of both co-founders.[8]

21.    Biering's success at J.P. Morgan was not due to the Firm's resources or support. Instead, Biering grew increasingly frustrated with JPM's recently appointed leadership at the Fort Worth office, including the promotions of Kyle Hitchcock ("Hitchcock") to Head of Investments and Advice and John Aughinbaugh ("Aughinbaugh") to Market Manager. Specifically, among numerous other things, Hitchcock openly reprimanded Biering in front of fellow FAs and Aughinbaugh repeatedly criticized Biering's business development efforts (and baselessly disagreed with Biering's management of client relationships). Likewise, Biering's frustrations with

---

[6]    To preserve client confidentiality, "XYZ ▮▮▮▮" serves as a pseudonym for the client at issue.

[7]    To preserve client confidentiality, "XYZ Energy Partners" serves as a pseudonym for the client at issue.

[8]    Oddly enough, as Biering's hot pipeline entry indicated to senior leadership, XYZ Energy Partner's $1.1 billion sale to Vital Energy and Northern O & G (both publicly traded companies), was announced on July 29, 2024. In fact, the morning that Biering expressed his plans to leave J.P. Morgan, Biering received the onboarding information from XYZ Energy Partners' CEO to open personal Private Bank accounts with Biering's team. With Biering's absence, a senior Managing Director Investment Specialist Biering introduced to BM intercepted the email to replace Biering.

---

ED STATEMENT OF CLAIM                                                                                          PAGE

C.2r-011

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



Ben Stewart, Jr. ("Stewart") also grew. In his capacity as Single Coverage Team Lead Worth office, Stewart served as Biering's immediate manager, and he routinely ignored Biering's requests for support due to Biering's excessive workload.

22.     More specifically, with respect to Hitchcock, Biering was chastised in front of his colleagues and faced baseless accusations of ███████████. In truth, Hitchcock was well aware of ███████ *Biering's* repeated requests for support from management due to their excessive workloads. In addition, Hitchcock (along with Aughinbaugh) spearheaded the plot to discriminate against Biering and tried to fabricate reasons to purportedly terminate him.

23.     With respect to Aughinbaugh, when Biering pursued XYZ ███ (via both its CEO and President) as a large prospective client, Biering requested Aughinbaugh's support and asked for a brief internal meeting to discuss. Aughinbaugh first accused Biering of wasting his time but then later scolded Biering when Aughinbaugh felt that he was unprepared for a meeting with XYZ ███ (*i.e.*, the meeting for which Biering *tried* to prepare Aughinbaugh before being accused of wasting Aughinbaugh's time). Aughinbaugh further denied Biering's request for sponsorship support for a charity event, despite that Aughinbaugh knew that this very event previously resulted in new business from XYZ ███.[9] XYZ ███ was not the only prospective client about which Biering and Aughinbaugh had disagreements. In approximately August 2023, Aughinbaugh refused to let Biering present a prospective client (*i.e.*, a $100 million endowment opportunity for a quasi-government entity) to JPM's Client Review Forum for onboarding approval, which was the standard onboarding operating procedure.[10]

---

[9]     Ironically, after Biering resigned from J.P. Morgan, Fort Worth office leadership—including Aughinbaugh—agreed to sponsor the event.

[10]     Notably, this denial occurred swiftly after Aughinbaugh spoke with one of Biering's colleagues ███ ████████████████████.

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-013
4:26-cv-00381-O
*Biering v. JPMS, et al.*

24. With respect to Stewart—with whom Biering repeatedly co dissatisfaction with JPM's toxic work environment—Biering received zero support when he reached out for assistance with his massive workload. Even worse, after learning that Biering intended to join a competitor, Stewart turned his back on Biering, joined JPM's witch hunt to fabricate reasons to support an alleged termination of Biering and jumped on the bandwagon to frame Biering. In addition, for months leading up to Biering's resignation, Stewart shared personal items about Biering, which Biering told Stewart *in confidence*, with Hitchcock and Aughinbaugh.

25. Stewart, Hitchcock, and Aughinbaugh all used their knowledge of Biering's personal issues to discriminate against Biering and treat him differently from his colleagues. For example, when Biering requested reasonable accommodations and FMLA leave due to his personal struggles, Human Resources and leadership told Biering that if he chose to take FMLA leave, he would be prohibited from contacting clients. Oddly enough, Aughinbaugh told Biering that he did not think FMLA leave was the "right move" for Biering weeks later. Upon information and belief, many ███████████ employees were permitted to contact clients at their discretion while they were on leave. Biering, however, was not offered the same accommodation or opportunity. Given that there were upcoming liquidity events and substantial new business, Biering knew that he could not take FMLA leave under these circumstances.

26. The aforementioned examples are merely a glimpse into the long list of consistent scrutiny and harassment Biering faced from his leadership.

27. Put simply, this new leadership created a hostile, toxic work environment and culture that became unsustainable for Biering. As a result, Biering considered resigning *numerous* times from January 2023 through October 2023 (*i.e.*, when he ultimately did resign). Indeed, in the months preceding his resignation, Biering *repeatedly* told Stewart and several other J.P.

C.2r-013

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



Morgan colleagues that he was unhappy and discouraged with his work environment was considering resigning.

### Biering Explores Other Opportunities

28.      In the months preceding his resignation, Biering actively explored opportunities with multiple firms. Specifically, Biering interviewed with and received offers from Merrill Lynch and Texas Capital. Upon information and belief, Stewart had actual knowledge that Biering was communicating with Merrill Lynch regarding potential employment.[11]

### Biering Resigns from J.P. Morgan

29.      On October 24, 2023, Biering informed Stewart and Aughinbaugh that he planned to resign from JPM. Biering further expressed that he felt he nonetheless deserved incentive compensation due to his strong 2023 performance.[12] In response, Aughinbaugh and Stewart unfairly accused Biering of acting in a way that did not align with "team culture" (which was ironic, given Aughinbaugh's and Stewart's recent actions that violate their own "How We Do Business Principles").

30.      On October 25, 2023, Biering informed Stewart that he intended to take paid time off from October 25 through October 27, 2023.

31.      On October 27, 2023 (*i.e.*, the day before Biering's resignation from JPM), Biering informed Merrill Lynch that he accepted its generous terms, subject to Merrill Lynch's review of JPM's marking of Biering's U5.

---

[11]      In fact, Stewart called Biering during what Stewart *knew* was an interview and meeting with Merrill Lynch on October 27, 2023. Biering also submitted PTO requests to Stewart and reported his time off.

[12]      Incentive compensation paid in January 2024 is awarded for performance from the Q3 2022 to Q3 2023—the period during which Biering exuded stellar performance recognized by executive leadership.

ED STATEMENT OF CLAIM                                                                 PAGE

C.2r-014

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-015
4:26-cv-00381-O
*Biering v. JPMS, et al.*

32.     That *same day*, Stewart called Biering and informed him that he was t̶ on an "involuntary administrative leave." When Biering asked Stewart for additional information regarding the purpose of the administrative leave, Stewart refused to provide it. Further, when Biering tried to contact JPM's Human Resources department, he received no response. Given that Stewart called Biering late on a Friday afternoon and no one would respond to him, Biering could only speculate as to the reason he was placed on leave. In Biering's view, the only possible reason was because JPM knew that Biering was planning to leave to join a competitor, and JPM wanted to retain his significant book of business.

33.     This unexpected administrative leave—on which Biering was placed with zero context, despite his requests for same—was the final straw. It was clear to Biering that management was retaliating against him for informing them that he planned to resign. Biering therefore had no choice but to do what was in his and his clients' best interests and finally resign.

34.     On October 28, 2023, Biering voluntarily **resigned** from J.P. Morgan. Specifically, Biering submitted a written resignation via e-mail and JPM's HR system (*i.e.*, "me@JPMC").

35.     Biering's resignation could not have been clearer. Indeed, he stated: "I am writing to inform you of my formal resignation." J.P. Morgan recognized that Biering resigned by stating: "Your resignation was processed." In addition, upon information and belief, JPM's internal reporting system reflects that Biering's "Last Day Worked" was October 26, 2023. As such, there can be no question that—at the very latest—Biering resigned from J.P. Morgan on October 28, 2023.[13]

---

[13]     It is Biering's position that, at a minimum, JPM—via Aughinbaugh and Stewart—had actual knowledge of Biering's intended resignation on October 24, 2023. Stewart was aware of Biering's intended resignation for months.

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

**Biering's Garden Leave**

36.      Following his resignation, Biering was required to honor a 60-day notice period (*i.e.*, the Garden Leave), during which Biering was not allowed to solicit clients.

37.      Despite the fact that it was incredibly broad and that most FAs do not honor this "sit out" period, Biering honored the Garden Leave to ensure an amicable departure and smooth transition for his clients.

**JPM's Investigation (*i.e.*, Witch Hunt) of Biering**

38.      On or about November 1, 2023, Biering learned—via his counsel—that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy, and (2) an alleged violation of JPM's expense report policy."[14] This was the first time that Biering learned he was being investigated for anything. Thus, at the time that Biering resigned from JPM, Biering clearly was not under investigation.[15] Instead, Biering learned, after he resigned, JPM tried to find anything that would "stick" to end Biering's career in wealth management.

39.      On November 2, 2023, Biering received an initial e-mail from Jonathan Jacobs ("Jacobs"), an investigator with JPM Employee Relations.

40.      On November 7, 2023, Jacobs interviewed Biering. Specifically, Jacobs asked Biering various questions regarding his ███████ ███████ However, Jacobs did not

---

[14]      Specifically, as part of its witch hunt, JPM investigated certain expense reports that Biering submitted (which JPM had already approved). Biering answered all JPM's questions truthfully, and he further offered examples of systemic abuse of expense policies by leadership throughout the Private Bank. Unsurprisingly, JPM concluded that Biering did not violate JPM's expense report policy and dropped the issue altogether.

[15]      To the extent JPM claims that Biering was already under investigation when he resigned, he was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave).

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



provide any details regarding the purpose of the investigation or why he was askir

relationship ████████████████████

41.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

42.    In addition, it is clear that JPM did not conduct *any* investigation into ████████

████████████████████████████. To the extent JPM suggests that any of its policies

required disclosure of Biering ████████████████████████████

███ faced the same investigation that Biering had to endure. Likewise, ████████████████

placed on an involuntary administrative leave and denied access to clients and JPM systems just

like Biering. But neither of these things occurred. Instead, JPM apparently accepted all of

████████ statements as true and refused to share any information with Biering so that he could

dispute any baseless accusations against him. Biering offered exculpatory text messages with

████████ and insisted that JPM consider these messages as evidence, but JPM emphatically refused.

43.    Despite that he was without crucial details regarding JPM's purported investigation,

Biering informed Merrill Lynch of the situation. Though Biering had already signed employment

onboarding documents, Merrill Lynch told Biering that it would need to see how JPM marks

Biering's U5 before finalizing Biering's offer and employment agreement.

44.    Throughout November 2023, Merrill Lynch asked Biering several times if JPM

provided any updates regarding JPM's plan to mark Biering's U5. Biering and Merrill Lynch had

---

ED **STATEMENT OF CLAIM**                                                                                   **PAGE**

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



nearly finalized Biering's deal structure, and they were anxious to complete the hiring

45.    On November 13, 28, and 29, 2023, Biering asked Jacobs for an update on the investigation. Jacobs refused to provide one.

46.    On November 29, 2023, JPM denied Biering's requests for copies of his personnel records and a copy of the Garden Leave policy.

## J.P. Morgan Attempts to Baselessly "Terminate" Biering

47.    On December 1, 2023—*i.e.*, 33 days into Biering's Garden Leave, which directly followed his voluntary <u>resignation</u>—Aughinbaugh and Stewart called Biering and purported to "terminate" him. Specifically, Aughinbaugh and Stewart told Biering that, following the investigation performed by JPM's Employee Relations department, Biering was being terminated for violating the Firm's Code of Conduct and "anti-harassment policy."

48.    As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already <u>resigned</u>***.

49.    Even if Biering could have been terminated (he could not), the reasons for Biering's purported termination were unquestionably fabricated and discriminatory.

50.    First, given the facts and nature of ███████████████████ evidenced by the numerous text messages ████████ Biering could not have violated JPM's "anti-harassment" policy. Upon information and belief, violations of JPM's "anti-harassment" policy include, for example:

ED STATEMENT OF CLAIM                                                                 PAGE

C.2r-018

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



- Engaging in conduct that creates "a hostile or offensive environm⬛ reasonably be expected to cause an individual to feel uncomfortable, intimidated, humiliated, or distressed"; and/or

- Engaging in "unwelcome sexual advances, requests for sexual favors and other verbal or nonverbal behavior or physical contact of a sexual nature."

51.   As set forth above, to the extent ⬛⬛⬛ ⬛⬛⬛ *Biering's* requests for support with their workloads. Further, had JPM investigated in good faith, it would have quickly seen that ⬛⬛⬛ ⬛⬛⬛ Indeed, had JPM reviewed any of the numerous text messages ⬛⬛ Biering exchanged, JPM would have learned ⬛⬛ ⬛⬛⬛ ⬛⬛⬛ To the extent that JPM concluded otherwise, then ⬛ had to have fabricated allegations against Biering (in a likely attempt to ⬛⬛ after being coerced by JPM leadership), which JPM simply took at face value without even attempting to hear and consider Biering's side of the story.

52.   Likewise, to the extent that J.P. Morgan claims that, ⬛⬛⬛ ⬛ Biering violated a policy regarding required disclosure ⬛⬛⬛ ⬛⬛ , that too would be suspect. Upon information and belief, ⬛⬛ was not investigated for having a "personal relationship" with a fellow employee, and ⬛ certainly was not placed on administrative leave, disciplined, or terminated for her failure to disclose same. In fact, it appears that ⬛⬛ was permitted to work remotely during JPM's entire sham investigation. JPM cannot claim—in good faith—that Biering, ⬛⬛ , violated a policy

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-020
4:26-cv-00381-O
*Biering v. JPMS, et al.*

that makes no distinction between employees (*i.e.*, via gender or corporate job title) wl

to disclosing ███████████

53.    Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

**JPM's Campaign of Defamation and Weaponization of Biering's U5**

54.    To that end, as if JPM's witch hunt and bogus, one-sided investigation into Biering's ███████████████ as well as JPM's illegitimate attempted termination of Biering, were not enough, JPM instituted a campaign of defamation against Biering during the Garden Leave. And JPM has not stopped.

55.    First, during the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was <u>false</u>. Clearly, given that Biering was on Garden Leave—which was *solely* triggered because Biering resigned—Biering was not and could not have been fired.

56.    JPM, however, would not stop there. In an effort to ensure that it could retain Biering's clients and irreparably harm his business, JPM further intentionally and maliciously



ED **STATEMENT OF CLAIM**                                                    **PAGE**

C.2r-020



mismarked and weaponized Biering's U5.

57.     Shortly after JPM's illegitimate, purported termination of Biering, Biering caught wind that JPM planned to mismark Biering's U5 to indicate that he was discharged, rather than that he resigned voluntarily.

58.     On December 6, 2023, Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was _voluntary_. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (_i.e._, a purported termination following a resignation).

59.     On December 12, 2023, Biering's counsel _again_ demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

60.     On December 13, 2023, JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

> "During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

61.     Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he _already resigned_. Biering's counsel further put JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

C.2r-021

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



62.    On December 19, 2023, Ms. Tidwell-Neal provided a short response counsel's letters. Specifically, she indicated that JPM maintains its position that it terminated Biering *"immediately"* following the results of an investigation and, as such, was not required to mark Biering's U5 as a "voluntary" termination. Even worse, she incorrectly stated that Biering knew he was under investigation the day before he resigned and that his resignation was not "effective" until after the Garden Leave period. Notably, however, JPM did not provide any legal authority supporting its positions.

63.    On December 20, 2023, Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, during Stewart's call to Biering late on a Friday afternoon—when Stewart *knew* Biering was taking paid time off and interviewing with a competitor—Stewart refused to explain why Biering was being placed on administrative leave. Biering was <u>not</u> told that he was under investigation. Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with *zero* context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

64.    Also on December 20, 2023, and only after JPM refused to make the correct U5 marking of "voluntary," to attempt to limit the damage of JPM's false and defamatory "discharged" marking Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

ED STATEMENT OF CLAIM                                                                PAGE

C.2r-022

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



65.    Biering's counsel then implored JPM to follow FINRA guidan uncontroverted case law presented in Biering's demand letters.

66.    On December 22, 2023, JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all of the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary").

67.    First, J.P. Morgan marked that Biering was "Discharged":

> **Reason for Termination:** Discharged

68.    JPM then provided the following explanation for Biering's purported "Discharge."

> **Termination Explanation:**
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

69.    To date, J.P. Morgan has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed their tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering).

**Prospective Employers Rescind Their Offers and Interest in Biering**

70.    After J.P. Morgan—via Aughinbaugh and Stewart—purported to terminate Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Immediately, Merrill Lynch stopped the onboarding process and rescinded Biering's offer, stating that it could not hire Biering with "Discharged" on his U5 as the reason for his termination. Unfortunately, the deal structure Merrill Lynch had offered Biering (which he then lost due to JPM's wrongful conduct) was incredibly favorable. The structure not only gave credit to Biering for new AUM but also

---

'ED STATEMENT OF CLAIM                                                                              PAGE

C.2r-023

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



counted loan positions, whether mortgages or outstanding lines of credit balances, "asset hurdles" baked into the offer. Furthermore, a significant portion of Biering's business required banking and complex lending solutions only provided by larger banks, such as Merrill Lynch. Since joining Raymond James in January 2024, Biering can trace more than $500,000 of lost production in six months because Raymond James Bank did not offer similar banking and lending solutions required by Biering's clients (which were otherwise available at Merrill Lynch).

71.     Likewise, before JPM finalized the language it marked on Biering's U5, Texas Capital pulled its interest in hiring Biering. Specifically, Texas Capital cited concerns with the uncertainty surrounding JPM's imminent disclosures on Biering's U5.[17] Texas Capital viewed Biering as high-risk and rescinded its offer to hire Biering.

72.     Biering also interviewed with Morgan Stanley, UBS, and RBC. When they learned about JPM's disclosures on Biering's U5, Morgan Stanley referred to Biering as a "walking AdvisorHub news article waiting to happen," and UBS did not even follow up with Biering. While Biering was able to have several interviews with RBC, ultimately RBC became suspicious that Biering did not have more detail regarding the alleged "inappropriate behavior" referenced on his U5. However, Biering could not provide same because *J.P. Morgan* refused to give Biering any information that he requested. Under the circumstances, RBC concluded that hiring Biering was too risky.

### Raymond James Takes a Chance on Biering

73.     Ultimately, Raymond James agreed to take a chance on Biering and hire him. However, Biering's interview process was significantly more intensive than the standard process.

---

[17]     Texas Capital also expressed concern regarding various disclosures on Biering's U4. Specifically, J.P. Morgan filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged.

---

ED STATEMENT OF CLAIM                                                                          PAGE

C.2r-024

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



74.    Further, Biering's employment offer was much less favorable than the other FAs and what he was originally offered at Merrill Lynch. Specifically, while most FAs' asset bonuses are paid on the front end prior to a candidates onboarding, Biering is only being paid a salary for two years (which is more than 2x less than his JPM salary) and will only receive asset bonuses following the transition of client assets. In addition, unlike Merrill Lynch's offer, Raymond James did not give credit to Biering for loan positions or compensate Biering for unvested deferred compensation.

**Ongoing Detriment to Biering's Business**

75.    Initially, several of Biering's prominent clients intended to transfer their business to Biering at his new firm. Biering relied on the transfer of these clients to achieve asset goals at Raymond James to even come close to the financial upside offered by Merrill Lynch. However, once the clients learned that Biering was purportedly "Discharged" due to engaging in "inappropriate behavior," the clients chose not to join Biering.

76.    For various clients that agreed to take a risk and join Biering at Raymond James, JPM has still found a way to interfere. Specifically, JPM has rejected lines of credit payoff letters and ACAT forms without legitimate reason. In so doing, JPM has not only frustrated Biering's clients but further caused some clients to pay higher interest on lines of credit, which has made them question Biering's competency and firm's capabilities. Further, upon information and belief, JPM has instructed its derivatives team to delay their responses to Biering regarding upcoming transactions in order to buy time for the incumbent JPM FA to "save the relationship." These actions are wholly improper and are designed to further interfere with Biering's business.

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## LEGAL CLAIMS/CAUSES OF ACTION

77.     Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor:

### COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

78.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

79.     During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired. [18]

80.     Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

81.     All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's

---

[18]     Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-027
4:26-cv-00381-O
*Biering v. JPMS, et al.*

mandate against "overly broad or misleading narratives" but intentionally was left va[...] reasonable readers to assume nefarious behavior.[19]

82.     Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10.  By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

83.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

84.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

### COUNT 2: BUSINESS DISPARAGEMENT

85.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

---

[19]     To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 115 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory). Indeed, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[...]



86. J.P Morgan has published disparaging statements concerning, among ( Biering's integrity and/or business practices. The disparaging statements published by JPM and directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

87. JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

88. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

89. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 3: TORTIOUS INTERFERENCE

90. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

91. Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

92. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

---

ED STATEMENT OF CLAIM                                                                 PAGE

C.2r-028

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-029
4:26-cv-00381-O
*Biering v. JPMS, et al.*

93.     Moreover, JPM committed such wrongful acts with malice, willful reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

94.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

95.     JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

96.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

97.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

98.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

99.     Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

100.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

C.2r-029

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## COUNT 6: WEAPONIZATION OF U5

101.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

102.    FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

103.    J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just one month ago, a FINRA Panel found[20] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[21]

104.    Further, just a few weeks ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[22] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the

---

[20]    *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

[21]    Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[22]    *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

---

ED STATEMENT OF CLAIM                                                                    PAGE

C.2r-030

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defa

FA by mismarking the U5.[23]

105.    In 2022, another FINRA Panel again found[24] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts. Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[25] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[26]

> [R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

---

[23]    *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, ___ N.Y.S.3d ___, 2024 WL 2061527, at *1 (N.Y. App. Div. May 9, 2023).

[24]    *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[25]    *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

[26]    *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett*, No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

---

ED STATEMENT OF CLAIM                                                                 PAGE

C.2r-031

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



106.    In 2018, another FINRA Panel granted expungement (and an award o attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[27]

107.    It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business.  JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing.  FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5.  Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[28]  UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the defamation and punitive damages.[29]  The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

108.    JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

109.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

---

[27]    *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[28]    *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

[29]    *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



110.    Moreover, JPM committed such wrongful acts with malice, willful, reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

### COUNT 7: NEGLIGENT INVESTIGATION

111.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

112.    At all times relevant to this Action, J.P. Morgan owed a duty to Biering to exercise reasonably prudent and ordinary care in the investigation of ████████████████████ ████████ allegations which, presumably, resulted in such investigation). JPM violated this duty by negligently investigating the nature of ████████████████████ and by failing to act as a reasonably prudent person under the same or similar circumstances, including, but not limited to:

(a)    Negligently investigating Biering's ████████████████;

(b)    Failing to conduct a proper and thorough investigation of such relationship; and

(c)    Terminating Biering on the basis of an inadequate investigation.

113.    Had JPM performed proper investigation of Biering's ████████████████ JPM would have clearly seen that the relationship was entirely consensual. Further, JPM could not have reasonably concluded that Biering violated JPM's "anti-harassment" policy.

114.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

### COUNT 8: BREACH OF CONTRACT

115.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

ED STATEMENT OF CLAIM                                                                                          PAGE

C.2r-033

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-034
4:26-cv-00381-O
*Biering v. JPMS, et al.*

116. When Biering was still working at J.P. Morgan, a customer filed complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

117. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

118. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

119. As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 9: SEX DISCRIMINATION
### (Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act)

120. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

121. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA").

122. Biering is a member of a protected class under Title VII and TCHRA because of his sex.

123. By virtue of the conduct alleged herein, Respondent discriminated against Biering based on Biering's sex, in violation of Title VII and TCHRA. Specifically, JPM discriminated against Biering because of his sex in connection with the terms, conditions, and privileges of

ED STATEMENT OF CLAIM                                                          PAGE

C.2r-034

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-035
4:26-cv-00381-O
*Biering v. JPMS, et al.*

employment and limited Biering in a manner that deprived him or tended to dep

employment opportunities and adversely affected his status as an employee.

124.    First, J.P. Morgan conducted a one-sided, sham investigation into ██████

██████ Biering ██████ In so doing, JPM failed to investigate in good faith and give Biering

an opportunity to share his side of the story. Had JPM acted in a fair and non-discriminatory

manner, it would have treated ██████ he same as it treated Biering. Specifically, JPM would have

investigated ██████ placed ██████ on administrative leave, and applied the same policies to

██████ that it applied to Biering. But JPM wholly failed to do so. It is therefore without question

that Biering was treated less favorably than similarly situated female employees.

125.    As a direct and proximate result of JPM's wrongful conduct and unlawful

discrimination described herein, Biering has suffered damages. Biering seeks such damages from

JPM.

126.    Further, JPM acted with malice and with willful and reckless indifference for

Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated

damages as a result of JPM's unlawful discrimination.

127.    Biering has met all procedural prerequisites for bringing this claim. Biering filed

an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the

EEOC relating to this claim.[30]

### COUNT 10: DISABILITY DISCRIMINATION
**(Americans with Disabilities Act and the Texas Commission on Human Rights Act)**

128.    Claimant realleges and incorporates by reference all of the preceding paragraphs of

this Statement of Claim as if fully alleged herein.

---

[30]    With respect to this claim, a Right to Sue letter from the Texas Workforce Commission ("TWC") is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

ED STATEMENT OF CLAIM                                                                    PAGE

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

129.    Pursuant to Federal and Texas law, Biering pleads a cause of action f

discrimination in violation of the Americans with Disabilities Act ("ADA") and TCHRA.

130.    At all times during his employment, Biering met the ADA's definition of

"disability" and was qualified for the position he had. Though Biering's disability was 100%

service-connected, as a veteran, he is entitled to protections under the ADA even if his disability

was not service-connected. As a veteran, Biering further has the right to reasonable

accommodations in the workplace due to his disability.

131.    J.P. Morgan discriminated against Biering based on his disability and treated

Biering less favorably than similarly situated non-disabled employees. J.P. Morgan further violated

the ADA and TCHRA by failing to grant Biering reasonable accommodations for his disability

even though they would not have caused a significant difficulty or expense on their operations.

132.    As a direct and proximate result of JPM's wrongful conduct and unlawful

discrimination described herein, Biering has suffered damages. Biering seeks such damages from

JPM.

133.    Further, JPM acted with malice and with willful and reckless indifference for

Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated

damages as a result of JPM's unlawful discrimination.

134.    Biering has met all procedural prerequisites for bringing this claim. Biering filed

an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the

EEOC relating to this claim.[31]

---

[31]    With respect to this claim, a Right to Sue letter from the TWC is not required. Biering will submit
the Right to Sue letter from the EEOC via the Portal upon receipt.

ED STATEMENT OF CLAIM                                                                 PAGE

C.2r-036

03_Series_C_Statements_of_Claim.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## COUNT 11: QUANTUM MERUIT AND UNJUST ENRICHMENT

135.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

136.    Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing ███ ███'s business to JPM. Yet, Biering received zero compensation for his successful efforts.

137.    By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

138.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 12: ILLEGAL FORFEITURE OF EARNED COMPENSATION

139.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

140.    JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

141.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 13: FORFEITURE OF DEFERRED COMPENSATION
## (VIOLATION OF ERISA)

142.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

143.    J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

C.2r-037

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_

C.2r-038
4:26-cv-00381-O
*Biering v. JPMS, et al.*



144.    As a direct and proximate result of JPM's wrongful conduct descr[...]

Biering has suffered damages. Biering seeks such damages from JPM.

### COUNT 14: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS

145.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

146.    Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

147.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

### ALTER EGO AND/OR PIERCING THE CORPORATE VEIL

148.    JPMorgan and Chase Bank are jointly and severally liable for all wrongful conduct alleged herein that is or could be attributed to JPMS.

149.    JPMS and Chase Bank are both subsidiaries of JPMorgan. In fact, JPMS and Chase Bank are subject to JPMorgan's Code of Conduct, which JPM claims Biering purportedly violated:

> The Code of Conduct ("Code") sets forth the expectation that employees conduct themselves with integrity, at all times. It provides employees with the principles to help govern their conduct with clients, customers, suppliers, vendors, shareholders, fellow employees, regulators, markets, and the communities in which we operate. The Code applies to the employees and directors of JPMorgan Chase & Co. ("firm" or "JPMorganChase") and its direct and indirect subsidiaries.

150.    Upon information and belief, in mismarking Claimant's U5, JPMS relied upon information and evidence purportedly obtained during an investigation performed by and/or at the direction of JPMorgan and/or Chase Bank. As such, JPMS will undoubtedly rely upon such

ED STATEMENT OF CLAIM                                                                     PAGE

C.2r-038

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_[...]



evidence and/or present testimony from representatives or employees of JPMorgan a Bank to defend against Claimant's claims in this Arbitration.

151.    To prevent the use of corporate fiction as an unfair device to inflict injustice upon Claimant and to achieve equity, the separate corporate identities of JPMS, JPMorgan, and Chase Bank must be disregarded, and Respondents should be treated as one and the same with respect to Claimant's claims in this Arbitration.

## ATTORNEYS' FEES

152.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

153.    JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

154.    Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

155.    As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

156.    J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

157.    Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-040

4:26-cv-00381-O

*Biering v. JPMS, et al.*

ignored all of it. Put simply, JPM had the opportunity to do the right thing but instea

and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of

intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests

an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

158.    Claimant respectfully requests that the Panel enter an order requiring FINRA to

expunge all defamatory statements from Claimant's U5 and the registration records maintained by

the Central Registration Depository ("CRD") for Claimant, including:

(1)    In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2)    In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in

its entirety and instead leave it blank.

159.    The defamatory statements at issue were published in Biering's CRD.

160.    Biering specifically requests that a substitute Form U5 be filed that reflects the

requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

161.    Claimant requests damages against Respondent to compensate for the wrongs,

claims, and causes of action describe herein and Claimant's actual damages, including:

(a)    Damages Claimant suffered from loss of clients, including, without limitation, lost

commissions and profits;

(b)    Expungement as set forth herein;

(c)    Lost or forfeited deferred compensation;

(d)    Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this

Action;

---

**ED STATEMENT OF CLAIM**                                                        **PAGE**

C.2r-040

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-041
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(e)    Statutory penalties and damages;

(f)    Liquidated damages;

(g)    Punitive damages;

(h)    Damages to Claimant's reputation;

(i)    Past lost earnings;

(j)    Future lost earnings;

(k)    Consequential damages;

(l)    Mental anguish and emotional distress damages;

(m)    Future lost earning capacity;

(n)    The highest pre- and post-judgment interest permitted by law on all damages;

(o)    FINRA forum and other fees; and

(p)    Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

## REPRESENTATION BY COUNSEL
## AND REPRESENTATIVE'S CURRENT ADDRESS

162.    Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

## VENUE

163.    Claimant worked for Respondent in Texas and was working in Fort Worth, Texas when all or part of Respondent's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

ED STATEMENT OF CLAIM                                                        PAGE

C.2r-041

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



## AMOUNT IN DISPUTE AND AMOUNT
## REQUESTED FOR DAMAGES, AWARD, AND RELIEF

164.    Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

165.    The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By:    */s/ Joshua J. Iacuone*

Joshua J. Iacuone
Texas State Bar No. 24036818
Anna Olin Richardson
Texas State Bar No. 24102947
4925 Greenville Ave., Ste. 700
Dallas, Texas 75206
Telephone: (214) 960-2832
Email:    josh@imcplaw.com
anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

ED STATEMENT OF CLAIM                                                            PAGE

C.2r-042

03_Series_C_Statements_of_Claim.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thCirc_AAA\00_NDTX\Docket\00_Docketed\2026-04-29_



C.2r-043
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## CERTIFICATE OF SERVICE

This pleading is being served upon all counsel of record in the DR Portal on the date recorded therein, and all other interested persons as set-forth herein.

/s/ *Joshua J. Iacuone*
Joshua J. Iacuone

---

C.2r-043