## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT C.03r

## Second Amended Statement of Claim (Redacted) – Operative Pleading C.03r-001 – 096

**Description:** Second Amended Statement of Claim – the operative pleading before the Panel. Per the FINRA Director's letter (see F.1), statutory discrimination claims and the negligent-investigation claim were removed from the FINRA forum and preserved for court (see Dkt. 11 statutory-claims discussion).

**Relevance:** Operative statement of claim; defines the factual record and remaining claims actually decided in the Panel Award. Reflects the FINRA Director's exclusion of statutory-employment claims (F.1) and the corresponding preservation for Article III court adjudication.

**Source:** FINRA Case No. 24-01208 – Second Amended SOC (redacted variant)

**Petition Ref:** App. A p. 51 ("Second Amended SOC – REDACTED version")

**Disclosures:** Redactions: As produced from FINRA filing (party-redacted).

**Filing Status:** Public - not sealed



## FINRA DISPUTE RESOLUTION

| | |
|---|---|
| In the Matter of Arbitration between<br><br>**JOSHUA DAVID SAPPI BIERING,**<br><br>Claimant,<br><br>- and -<br><br>**J.P. MORGAN SECURITIES, LLC, JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A.,**<br><br>Respondents. | § § § § § § § § § § § § § § § § § § §  **FINRA No. 24-01208** |

## SECOND AMENDED STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following Second Amended Statement of Claim ("SOC" or this "Pleading") seeking no less than $10 million[1] against J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMorgan Chase"), JPMorgan Chase Bank, N.A. ("Chase Bank") (collectively, "J.P. Morgan, "JPM," or Respondents") and, in support thereof, respectfully states as follows:

## EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1.      Biering is a proud Brazilian American, honorably discharged U.S. Army Captain, West Point graduate, Bronze Star Medal recipient, and most recently, an accomplished financial advisor (hereinafter, "FA"). Biering has consistently received stellar marks and distinguished recognition throughout his 15-year professional career.

---

[1]      The exact amount Claimant seeks is to be determined through evidence and discovery presented during Arbitration.

C.3r-001

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

2.      Biering is also a well-respected registered representative and financial a

a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for JPM for eight years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

3.      This abrupt and dramatic deterioration in Biering's treatment can be traced to two primary causes:

- **A toxic work environment created by new leadership**, led by John Aughinbaugh ("Aughinbaugh") and Kyle Hitchcock ("Hitchcock"), who consistently ignored Biering's request for support.

- **Biering's well-known dissatisfaction and his repeated pleas for support**, which were ignored by management, ultimately leading to his resignation.

4.      JPM's actions reflect a clear pattern of wrongful treatment and deliberate misconduct. From fostering a toxic work environment, retaliating against Biering's resignation, and fabricating claims of misconduct, to continuing a campaign of defamation, JPM's objective was to retain Biering's business while damaging his professional reputation. Despite Biering's years of exemplary service, JPM sought to remove him from the firm in a manner that would discredit him and protect JPM's interests. This Arbitration[2] seeks to hold JPM accountable for its actions and the harm caused to Biering's career and reputation. This, in fact, is what this Arbitration is all about.

5.      Biering **resigned** from J.P. Morgan on October 28, 2023. Following his **resignation**, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Garden Leave is just that – Biering no longer had any job duties, no longer had access to

---

[2]      This "Arbitration" or "Action" refers to FINRA No. 24-01208.

C.3r-002

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

JPM's systems, and could no longer perform any job functions – he was to sit at home. Garden Leave, Biering certainly could not execute any trades or professional services for clients, which is the very purpose of his FINRA license, and for JPM holding his license. Biering honored the Garden Leave.[3] However, on December 1, 2023, or nearly five weeks after Biering already resigned from JPM and could no longer perform any duties (including as a registered advisor) for JPM, JPM informed Biering that he was "*terminated*" for violating JPM's "*anti-harassment policy*." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his **voluntary resignation**—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate **resignation**, with the goal of smearing Biering with other firms and clients.

6.    Moreover, after learning that Biering planned to leave JPM, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, ***after Biering already resigned***, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a ████████ and into his submitted, yet approved weeks prior, expense reports.

7.    Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even fired?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs falsely informed Biering's clients that he

---

[3]    Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

C.3r-003

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



had been fired. It is without question that JPM hoped that its FAs' defamatory statement would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

8.      JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after repeated demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged, (*i.e.*, fired), rather than the truth that Biering's departure was "Voluntary" (*i.e.*, resigned). Even worse, JPM gave the following explanation in support:

**Reason for Termination:** Discharged

**Termination Explanation:**
If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

9.      Had JPM correctly marked Biering's U5 as "Voluntary," there would have been no "*Termination Explanation*" or any other "explanation" regarding his departure, as there were no regulatory or compliance issues in question. JPM knew this.  Instead, JPM distorted Biering's clear resignation and his decision to honor Garden Leave into a "Discharge," knowing this would trigger the U5 rules, requiring JPM to provide a "Termination Explanation," which JPM weaponized to defame Biering.

10.      JPM's deliberate and malicious weaponization of Biering's U5 was beyond egregious. By honoring his Garden Leave (unlike many FAs), Biering became vulnerable to JPM's tactics to tarnish his reputation and retain his clients. Indeed, JPM knew that Biering's pipeline of business opportunities indicated more than $600 million in anticipated AUM for 2024. The false U5 disclosure was a strategic move to prevent Biering from transitioning clients and furthering his career elsewhere.

C.3r-004

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

11.     JPM's defamatory actions, particularly the weaponization of Biering inflicted catastrophic damage on Biering's career. As a direct consequence of these false disclosures and tortious interference with his business, Biering lost job offers from two major firms, and several other firms stopped considering him for employment. Additionally, prominent clients and prospective clients distanced themselves from Biering, unwilling to associate with someone purportedly "terminated for inappropriate behavior," further compounding the financial and reputational damage caused by JPM's deceitful actions.

12.     As a result of JPM's intentional and wrongful conduct, Biering had no choice but to file this Arbitration and seek to hold JPM accountable.

## FACTS

### A.     Biering's Career Before, During, and After West Point

13.     Biering's long-established professional career—spanning over 15 years—consisted of exemplary performance and unblemished evaluations. A sudden shift in his character and behavior simply does not add up. How does such a drastic change occur? For someone who earned a 4.0 GPA in high school, achieved the rank of Eagle Scout, was accepted into the prestigious United States Military Academy at West Point (where only the top candidates are admitted), and served as a decorated officer during five years in the U.S. Army, including active combat, such a shift seems highly improbable.

14.     After graduating from West Point, Biering served honorably in the United States Army, completing a tour in Afghanistan in support of Operation Enduring Freedom. He was awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Throughout his military career, Biering consistently received exemplary marks in his annual Officer Evaluation

C.3r-005

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



Reports. Upon his honorable discharge, Biering had achieved the rank of Captain and

deemed a 100% service-connected, disabled Veteran by the Department of Veterans Affairs.

### B.   Biering's Professional Success at JPM

15.    Biering joined JPM in May 2016 through its prestigious Military Officer Executive

Development Program. Throughout his eight-year tenure, he quickly distinguished himself as a

top performer. Biering's consistent, high-level contributions earned him rapid promotions,

advancing from Associate to Vice President, and ultimately to Executive Director.[4] Biering's year-

end performance reviews and documented peer feedback consistently highlighted his leadership,

work ethic, and ability to drive results across the firm.

16.    By August 2023, Biering was managing a substantial book of business that

generated $5.4 million in annual revenue, representing a 14% year-over-year growth, significantly

outpacing the Fort Worth market's growth of 8% and the broader U.S. Private Bank's 6% growth.

Biering's performance was continually highlighted in the firm's internal weekly finance reports

circulated widely along with his Banker Scorecard, published monthly. In fact, Biering was

recognized as a "gold" producer on the national U.S. Private Bank Town Hall on **October 23,**

**2024**. A brief snapshot of Biering's scorecard and respective metrics are as follows:



| | A | Risk Adj. Rev 33% | B | Flows 33% | C | Total Pts 33% | | Overall |
|---|---|---|---|---|---|---|---|---|
| Metric Results | 455 | 14.4% | | 65.05 | | 31 | | |
| Tier | | Gold | | Silver | | Silver | | Gold |
| Gold Breakpoint | | 8.5% | | 72.1 | | 38 | | |

18.    As an Executive Director Biering managed nearly $1 billion in total client asset and

credit positions across 51 key relationships. He played a critical role in driving revenue growth for

the broader Fort Worth office, personally contributing to 21.34% of the overall revenue generated

---

[4]    JPM's corporate titles, in ascending order, are Analyst, Associate, Vice President, Executive
Director, and Managing Director.

C.3r-006

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-007
4:26-cv-00381-O
*Biering v. JPMS, et al.*

by his peers, emphasizing the imbalance of support resources. This further underscor

to the firm and his ability to deliver results, making Biering a vital contributor to JPM's overall

success in Fort Worth and the Central Region.

19.    In addition to his client-focused work, Biering played a pivotal role as a leader and mentor within JPM. He took an active role in mentoring junior colleagues, including analysts and associates, providing guidance on how to approach and manage relationships with high-net-worth clients, such as public company executives. For instance, Biering led efforts to train and mentor newly hired FAs, equipping them with tailored prospecting strategies to successfully engage larger prospects. His leadership extended beyond his immediate team, as he worked across JPM's global teams to facilitate cross-functional partnerships. Notably, Biering led the integration of an offshore partner, which significantly improved the offshore resource utilization metrics for the Fort Worth office, further demonstrating his leadership capabilities.

20.    JPM required FAs to maintain a "pipeline" of anticipated new business opportunities, which was reviewed monthly by management. Biering excelled in this area, consistently building a strong pipeline of prospective deals. In mid to late 2024, he had several "hot" opportunities expected to close, including two major transactions. One involved a $3.5 billion dental rollup (hereinafter, "XYZ ███████")[5] and the other an estimated $1.5 billion Fort Worth-based oil and gas exploration company (hereinafter, "XYZ Energy Partners").[6]

21.    Biering successfully negotiated a $10 million private stock secured line of credit for XYZ ██████ CEO, despite internal resistance and political hurdles. Biering's ability to push

---

[5]    To preserve confidentiality, "XYZ ██████" serves as a pseudonym for the client at issue. "Dr. XYZ, XYZ President, XYZ Dr., serve as pseudonyms for key stakeholders, clients, and prospects.

[6]    To preserve confidentiality, "XYZ Energy Partners" serves as a pseudonym for the clients at issue. "Smith" serves as an alias to preserve confidentiality, in addition to "XYZ Energy CEO" for the second co-founder.

C.3r-007

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



C.3r-008
4:26-cv-00381-O
*Biering v. JPMS, et al.*

through these obstacles and deliver for his clients demonstrated his dedication to th

XYZ Dental's President text to Biering is definitive proof of these accolades:

> 1/13/2024 10:08:53 AM
>
> As I've told every person including JPM people. Josh is the only financial person I've ever felt actually goes to bat for his clients.

22.     As a result, Biering not only secured the loyalty of top executives at XYZ Dental but also received high-value referrals from their leadership team.

23.     In addition to XYZ Dental, Biering had also secured a significant opportunity with XYZ Energy Partners, a Fort Worth-based oil and gas company. This "hot" pipeline entry was closely reviewed by JPMorgan's management and involved over $400 million in new AUM from XYZ's two co-founders. Biering was instrumental in positioning XYZ Energy Partners for its eventual sale, introducing a $150 million lending deal to his investment bank colleagues and successfully securing the business of both co-founders. The sale of XYZ Energy Partners to a pair of public companies closed on September 20, 2024, following a public announcement on July 29, 2024.

24.     On the very morning that Biering informed JPM of his intention to resign, the CEO of XYZ Energy emailed Biering onboarding information to open personal Private Bank accounts. Suspiciously, a Senior Managing Director, whom Biering had introduced to the relationship in a supporting role as an investment specialist, intercepted the email, even though it was directly addressed to Biering. This unusual intervention strongly suggests that JPM was already plotting to terminate Biering, with the intent to retain control over his clients, despite Biering not having officially resigned at this point. The timing and nature of this intervention indicate that JPM was working to secure the client relationship before Biering could transition it elsewhere.

C.3r-008

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



25.    Biering's relationship with XYZ Energy Partners' co-founder, "Sm before Biering's time at JPM, as both Biering and Smith were West Point graduates from the same tight-knit community. Their shared background, combined with the professional successes Biering delivered for Smith at JPM, led Smith to fully intend to follow Biering to Merrill Lynch. In fact, Smith even attended a veteran charity gala in November 2022 as Biering's guest, along with Biering's soon-to-be Merrill Lynch partner. Leading up to XYZ Energy Partners' liquidity event, Biering sent investment proposals to Smith, reinforcing their strong professional relationship. However, on September 24, 2024, Smith called to inform Biering that he had chosen Goldman Sachs instead. Smith hinted that uncertainty surrounding Biering's sudden departure, questions about his stability, and concerns about Raymond James'[7] ability to handle complex clients— compared to firms like Merrill Lynch or Goldman Sachs—were key factors in his decision. This highlights the significant disruption caused by JPM's actions on Biering's long-standing professional relationships and trajectory.

### C.    JPM Scrambles to Retain Biering's Business

26.    JPM's actions were driven by a calculated motive to retain the business that Biering had developed while simultaneously attempting to tarnish his professional reputation to ease the transition.

27.    JPM's sudden change n treatment toward Biering coincided with Biering's increasingly vocal dissatisfaction with management and his plans to resign. This pretextual motive became apparent as JPM scrambled to retain the high-value AUM Biering was cultivating. JPM's actions—ranging from a sudden investigation into fabricated misconduct to defamation via false

---

[7]    Raymond James is Biering's new firm, which he joined after two other offers were pulled as a direct result of JPM's defamatory statements on Biering's U5.

C.3r-009

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



U5 disclosures—reveal a coordinated effort to block Biering from taking clients with JPM could retain control over Biering's business for its own benefit.

### D.    The Shift? A Toxic Work Environment and Unaddressed Pleas for Help

28.    As leadership changed in the Fort Worth office, the work environment became increasingly toxic, driven by the indifference and hostile management of newly appointed leaders, Aughinbaugh and Hitchcock. Despite multiple requests from Biering for support, these pleas went unaddressed. The work environment deteriorated to the point where it became intolerable for many employees. The alarming turnover of key personnel following Biering's departure—combined with the toxic culture perpetuated by new leadership—further reflects the dysfunction JPM allowed to take over the office.

29.    After Biering's resignation, a drove of FAs left the Fort Worth office, further highlighting the severity of the toxic work environment. Despite being fully aware of these ongoing issues, JPM failed to take meaningful action and instead retaliated against those, like Biering, who voiced legitimate concerns. Upon information and belief, the Fort Worth office ranked dead last in the 2022 U.S. JPM Private Bank Employee Opinion Results Survey.

### E.    Biering's Internal Turmoil: To Stay or Resign? . . . RESIGN

30.    The escalating dysfunction within the Fort Worth office, combined with the increasingly toxic work environment, put Biering in a precarious position. On the one hand, his success as a FA and his long-standing relationships with high-net-worth clients made it difficult to leave a firm where he had built a reputation as a top performer. On the other hand, the unbearable work conditions under the leadership of Aughinbaugh and Hitchcock, along with the lack of support from management, pushed him toward resignation.

C.3r-010

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



31.     In the months leading up to his **resignation**, Biering made several address the hostile work environment and sought support from both his immediate managers, Stewart, and Aughinbaugh. Despite his proactive efforts to mitigate the issues, including flagging critical concerns regarding the growing toxicity, no action was taken by management despite conversations and text messages between Biering and Stewart. Instead, Biering was met with indifference and, at times, outright reprimand for "failing to align" with the new leadership's vision for the office.

32.     Biering's internal conflict reached a tipping point in October 2023. On October 19, 2023, after months of frustration and feeling trapped in an increasingly hostile environment, Biering decided to depart JPM. Despite his high hopes for a future with JPM, he had reached a breaking point. It was clear that the firm he had once been proud to work for was no longer a place where he could thrive.

33.     On October 24, 2023, during a meeting with Aughinbaugh and Stewart, Biering inquired about his **resignation** options, expressing his dilemma of feeling trapped between staying and enduring the toxic work environment or leaving, despite having earned incentive compensation due in January 2024.[8] During this conversation, Aughinbaugh reprimanded Biering, accusing him of insubordination and "*failing to align with the Fort Worth office's cultures and values.*" It became evident that management was not interested in addressing the root causes of Biering's dissatisfaction but was instead focused on undermining him.

34.     In the following days, Biering submitted his plans for time away in JPM's HR system (hereinafter, me@JPMC) and also emailed Stewart, marking his intent to take paid time

---

[8]     Biering provided a draft of his 2023 Performance Review Self-Assessment to not forfeit his earned compensation. Biering's request for incentive compensation was also later denied by JPMorgan's Head of Human Resources.

C.3r-011

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



off on October 26 and 27, 2023. During this period, Biering met with Merrill Lynch manager (C. Miller) and the Merrill Lynch FAs Biering planned to join (also former JPM Fort Worth colleagues) to discuss Biering's next steps now that Biering signed onboarding documents. Biering finalized his plans to join Merrill Lynch on October 27, 2023.

35.      Ultimately, on October 28, 2023, after careful consideration, Biering submitted his resignation to formalize his discussion with Aughinbaugh and Stewart. Despite his efforts to make things work and his long-standing commitment to the firm, it was no longer feasible for him to stay. The work environment had become untenable, and management's refusal to provide the support he needed left him with no choice but to leave. Biering's resignation triggered the commencement of the 60-day Garden Leave period, during which time his access to the firm's systems and clients was revoked.

36.      Throughout this period, it became increasingly evident that JPM's leadership viewed Biering's potential departure as a significant threat to the firm's profitability. This perception fueled their pretextual actions in the following months, including the fabricated misconduct investigation and the ultimate defamatory actions surrounding his U5 marking, aimed at discrediting him and impeding his ability to transition his business to a new firm.

**F.    JPM's "Investigations" (*i.e.*, Witch Hunt) of Biering**

37.      On or about November 1, 2023, Biering learned that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy",[9] and (2) an alleged violation of JPM's "expense report policy." This was the first time that Biering learned he was being investigated for anything. Thus, at the time that

---

[9]      At JPMS's urging FINRA has not allowed Biering to assert his statutory employment discrimination claims, which allege disparate treatment for the same behavior. Given JPM's refusal to agree to have Biering's claims on these issues heard before this Panel, JPM should be disallowed from attempting to smear Biering on these same issues.

C.3r-012

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴄ



Biering resigned from JPM, Biering clearly was not under investigation.[10] Instead, Bier

***after he resigned***, that JPM tried to find anything that would "stick" to end Biering's career in wealth management.

(1)    Fabricated Investigation of Biering Expense Report(s)

38.    On October 20, 2023, Biering's manager, Stewart, allegedly "*noticed suspicious expenses*" incurred by Biering. This investigation was entirely fabricated after the fact.[11] Indeed, Biering's expenses were submitted and immediately approved on October 2, 2023, in the same manner he had followed for the previous seven years and in line with the Fort Worth's standard operating procedures regarding expense reports. This demonstrates a clear attempt by JPM to retroactively manufacture a ***pretext for termination***, especially after Biering had raised concerns regarding lack of support, a toxic work environment, and his internal turmoil of staying versus resigning.

(2)    Alleged Violation of "Anti-Harassment Policy"

39.    While now irrelevant to the claims in this Arbitration, as demanded by JPM and as a result of JPM's refusal to allow Biering to arbitrate his allegations of disparate treatment in the FINRA forum, suffice it to say, Biering denies any "inappropriate behavior" in connection with

---

[10]    To the extent JPM claims that Biering was already under investigation (and especially for any specific reason) when he resigned, Biering was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave), and it did not relate to any customer or regulatory issues.

[11]    Despite the fabricated expense policy investigation (aka witch hunt), Biering answered the JPMorgan Investigator, Nadia Muraira ("Muraira"), fully and truthfully. In fact, after Mr. Biering emailed Muraira examples of systemic expense policy violations and abuse from broader leadership, Muraira's phone number was *mysteriously* disconnected, and she was no longer reachable. JPM claims they did not pursue the investigation further due to client considerations, but the ***truth***, shows JPM got caught red handed with ***pretextual motives***.

C.3r-013

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



his consensual and reciprocated involvement with a ▮▮▮▮▮▮. In any event, JPM

of "Discharged" on Biering's U5 is knowingly false and defamatory.

### G.    JPM Attempts to Baselessly "Terminate" Biering

40.    On December 1, 2023, Aughinbaugh and Stewart informed Biering that he had been "*terminated*" for violating *JPMorgan's Code of Conduct*. These allegations came as a complete shock to Biering, as he had never been subject to any disciplinary action during his nearly eight years with the firm or even in his *entire professional career*. Moreover, the allegations were entirely unfounded, as there was no evidence to support the claims of misconduct.

41.    As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, *JPM could not have terminated Biering because Biering already __resigned__*.

42.    Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

### H.    JPM's Campaign of Defamation and Weaponization of Biering's U5

(1)    Immediate Verbal Defamation: The Rumor Mill Begins

43.    Upon Biering's resignation from JPM, JPMorgan's internal communications quickly spread false rumors that Biering had been fired. These rumors rapidly damaged Biering's reputation, with both colleagues and clients adopting the false narrative. On November 2, 2023—

---

C.3r-014

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th



only four days after Biering voluntarily resigned—Biering's former executive assistant stating, "Why in the hell were you even fired???" This confusion was a direct result of internal messaging by JPM management, deliberately framing Biering's departure as a termination rather than a resignation.

44.     The speed at which false rumors spread—well before any purported investigation concluded—contradicts JPM's claims of a fair and impartial process. Every indicator, from the internal communications to the final U5 marking, points to the fact that the "investigation" was nothing more than a formality to justify a premeditated decision: to remove Biering from the firm and end Biering's career in wealth management[12] – while smearing his reputation in the process

(2)    Client Reactions to Defamatory Messaging

45.     Biering and XYZ Dental's President are close friends. Text messages exchanged between Biering and XYZ ███████ President establish that XYZ ███████ President fully intended to follow Biering to his new firm. However, this changed after JPM's campaign of defamation reached the shores of XYZ ██████ headquarters. In various subsequent conversations between Biering and XYZ ██████ President, it became evident that JPM had been actively defaming Biering to prevent his clients from following him to his new firm. These calculated actions were designed to damage Biering's professional relationships, thereby harming his business and reputation while protecting JPM's financial interests.

46.     JPM cannot seriously dispute that it was not the cause of XYZ ██████ decision not to follow Biering to his new firm. After only eight months into the 2023 fiscal year, Biering onboarded $40 million of Dr. XYZ's business with a clear path to at least $250 million by 2024

---

[12]     Indeed, U5 defamation is a common tactic in the industry, used to hinder FA transitions and retain their production f/b/o the firm's profits and bottom line.

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᏟ



year-end.[13] As evident by the multitude of texts from XYZ ███ Dr. XYZ appreciate "hustle" and, as a result, Biering thought Dr. XYZ would be one of the first to join Biering at his new firm. This was not the case. Dr. XYZ, along with other top shareholders Biering had already made clients at JPM, expressed concerns regarding the defamatory statements they heard from JPM and, as a result, declined to join Biering at his new firm.

### (3)   JPM's FAs' Defamation

47.     During the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was <u>false</u>. Clearly, given that Biering was on Garden Leave—which was *solely* triggered because Biering *resigned*—Biering was not and could not have been fired.

### (4)   U5 Mismarking and Written Defamation

48.     JPM formalized its campaign of defamation in writing by deliberately mismarking Biering's U5. Despite his voluntary resignation, JPM falsely marked him as "discharged" for "inappropriate behavior," a categorization that has caused significant harm to Biering's professional standing. The marking was not only inaccurate but also maliciously timed to coincide with Biering's departure, creating long-lasting reputational damage within the financial industry. A brief timeline of JPM's written campaign of defamation is as follows:

- **December 6, 2023**: Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was voluntary. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

---

[13] Upon completion of discovery, the Dr. XYZ investment proposal along with Biering's pipeline entries support the vast business tied to the XYZ ███ relationship.

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



C.3r-017
4:26-cv-00381-O
*Biering v. JPMS, et al.*

- **December 12, 2023** - Biering's counsel *again* demanded that JPM indicate ( U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

- **December 13, 2023** - JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

  > *"During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."*

  Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he already *resigned*. Biering's counsel further put JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

- **December 19, 2023** – Ms. Tidwell-Neal provided a brief response to Biering's counsel (which, notably, failed to cite any legal authority supporting JPM's positions). She asserted that JPMorgan maintained its stance that Biering was "immediately" terminated following the conclusion of JPM's investigation, justifying its refusal to mark Biering's U5 as a "voluntary" termination. However, her response raised several glaring inconsistencies.

  First, she incorrectly claimed that Biering was aware of the investigation the day before his resignation, when in reality Biering had been contemplating resignation for several months. Additionally, she asserted that Biering was terminated "*immediately*" after the investigation concluded. This contention from JPM is false and misleading, as it ignores the actual timeline of events. On November 28, 2023, JPM *conveniently* sent a "JPM bus" of FA replacements to XYZ ██████s headquarters to inform Dr. XYZ that they "appreciated his business" and, as such, decided to increase a private stock secured line of credit exclusively for Dr. XYZ. Then, on December 1, 2023, *only three days later*, JPM purportedly "terminated" Biering (after he had already **resigned**). By delaying making the

C.3r-017

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



phone call to purportedly "terminate" Biering, JPM strategically waited to en necessary client outreach was completed, positioning itself as the "white knight" riding in to double Dr. XYZ's private stock line from $10 million to $20 million – a loan that Biering had fought tooth and nail to secure, expending all his political capital and working relentlessly, with limited leadership support. This maneuver was a blatant attempt by JPM to seize control of the situation, saving face while masking its true intentions to retain the business Biering had cultivated.

- **December 20, 2023** – Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, Biering *resigned* from JPM on October 28, 2023. A few short days prior, on October 24, Biering met with Aughinbaugh and Stewart to discuss his resignation options. Then, on October 26 and October 27, Biering took PTO. Despite that Stewart knew that Biering was taking PTO and meeting with a competitor, Stewart called Biering late on a Friday afternoon and informed Biering that he was being placed on administrative leave. However, when pressed, Stewart refused to explain why Biering was being placed on administrative leave, and Biering was *not* told that he was under "investigation." Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with zero context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

- **December 20, 2023** – On the same day, and only after JPM refused to make the correct marking of "voluntary" on Biering's U5, to attempt to limit the damage of JPM's false and defamatory "discharged" marking, Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

Biering's counsel then implored JPM to follow FINRA's guidance and the uncontroverted case law presented in Biering's demand letters.

C.3r-018

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



- **December 22, 2023** – JPM proceeded to not only intentionally mismark Bieri further did not implement all the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary"). First, JPM marked that Biering was "Discharged":

> **Reason for Termination:** Discharged

JPM then provided the following explanation for Biering's purported "Discharge":

> **Reason for Termination:** Discharged
>
> **Termination Explanation:**
> If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

49.     To date, JPM has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed its tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering). This discrepancy between JPMorgan's actions and their stated justification underscores that the investigation was used as a cover for a termination that was predetermined, long after critical client transitions were completed.

## I.     JPM's Loose Interpretation of Disclosure Reporting

50.     Further exacerbating the situation, JPM *loosely* interpreted disclosure requirements on Biering's Form U4, marking it with multiple bankruptcies/compromises related to student loan discharges.[14] This loose interpretation of regulatory requirements further demonstrates JPM's

---

[14]     JPM filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged. JPMorgan, more than one year later, has since admitted these disclosures were erroneous. FINRA does not have a process in place to remove or expunge the bankruptcy or compromises disclosures. At the behest of Claimant's Counsel, FINRA consolidated the five disclosures into a single disclosure as "archived" on Biering's Form U4 (which still unfortunately appears and is accessible by prospective employers).

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



consistent pattern of harming Biering's professional record through misrepresentation. disclosures, combined with the defamatory U5 marking, paint a clear picture of JPM's malicious intent to sabotage Biering's career.

51.    The underlying motive behind Biering's termination was not about upholding ethical standards, but about retaining business and revenue tied to his portfolio. The fabricated investigation and pretextual termination were clear attempts to prevent the transition of clients and protect JPM's bottom line, exposing the company's selective enforcement of policies when it serves *JPM's* financial interests.[15]

### J.    Biering's Job Search and Raymond James' Confidence in Biering

#### (1)    Rescinded Job Offers

52.    After JPM, through Aughinbaugh and Stewart, purportedly terminated Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Merrill Lynch immediately halted the onboarding process and rescinded Biering's offer, citing that they could not hire him with "Discharged" listed on his U5 as the reason for termination, despite that they considered him to be a "first round draft pick." This was a significant loss, as the deal Merrill Lynch offered Biering was highly favorable. For example, Merrill Lynch offered credit for new AUM and loan positions, such as mortgages and outstanding lines of credit, towards the asset hurdles in Biering's compensation structure. In addition, many of Biering's clients required complex banking and lending solutions that only larger institutions like Merrill Lynch could offer. Since joining Raymond James in January 2024, Biering can trace over $500,000 in lost production

---

[15]    Just one recent example (amongst a sea of many) is as follows: a JPM Fort Worth FINRA licensed investment professional was terminated on July 22, 2024, after admitting to forging a client's initials on private equity subscription documents. This is a clear and severe violation of FINRA regulations. Despite the gravity of this offense, Aughinbaugh, a key figure in Biering's termination, fought to retain this individual, even escalating her case to the CEO of JPM's Private Bank, Dave Frame, in an attempt to avoid her termination.

C.3r-020

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



in just six months, primarily due to the limited banking and lending options available James (which are otherwise available at Merrill Lynch).

53.     Similarly, before JPM finalized the language on Biering's U5, Texas Capital also withdrew its interest in hiring him. The uncertainty surrounding JPM's imminent U5 disclosures along with the five separate "bankruptcies and discharges" on Biering's U4 made Texas Capital view Biering as a high-risk candidate, leading Texas Capital to rescind its offer.

54.     Biering also interviewed with Morgan Stanley, UBS, and RBC, but their reactions were similar once they learned of JPM's false U5 disclosures. Morgan Stanley referred to Biering as a "walking Advisor Hub news article waiting to happen," and UBS did not even follow up with him. RBC, despite multiple interviews, became suspicious when Biering was unable to provide more details regarding the "inappropriate behavior" referenced on his U5. Since JPM refused to provide Biering with information regarding the allegations, RBC ultimately deemed the risk of hiring Biering too high.

(2)    Raymond James Takes a Chance on Biering

55.     Ultimately, Raymond James agreed to hire Biering, though his interview process was much more intensive than the standard process for most FAs. This heightened scrutiny stemmed from JPM's defamatory markings on Biering's U5, which cast significant doubt on Biering's professional standing and made potential employers wary.

56.     In addition to the increased scrutiny, Biering's employment offer from Raymond James was considerably less favorable than those offered to other FAs or his initial offer from Merrill Lynch. Whereas most FAs receive asset bonuses upfront before onboarding, Biering was only offered a salary for two years—less than half of what he earned at JPMorgan. His asset bonuses would only be paid once client assets transitioned and, unlike Merrill Lynch, Raymond

C.3r-021

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



James did not provide credit for loan positions or compensate him for unvest compensation.

57.     Despite Raymond James' willingness to take a chance on Biering, JPM's false and defamatory U5 markings have made his transition to Raymond James more difficult. After joining Raymond James, Biering received several email inquiries from state regulators questioning the bankruptcy and compromise disclosures on his U4, as well as JPM's "Discharged" U5 marking and termination explanation. These false and suspicious markings, including the reference to "inappropriate behavior," painted Biering in a false light both within his new firm and in the eyes of his new management.

### K.    Ongoing Detriment to Biering

58.     Initially, several of Biering's prominent clients intended to transfer their business to him at Raymond James. Biering relied on these client transitions to achieve the asset goals necessary to even approach the financial upside that had been offered by Merrill Lynch. However, once these clients became aware that Biering had been purportedly "Discharged" for "inappropriate behavior," many decided not to follow him, significantly impacting his ability to grow his business at Raymond James.

59.     For the clients who have decided to join Biering at Raymond James, JPM continued to interfere. Specifically, JPM rejected line of credit payoff letters and ACAT transfer forms without legitimate cause, frustrating both Biering and his clients. These delays caused some clients to incur higher interest costs on their lines of credit, further eroding trust in Biering's competency and Raymond James' capabilities. Furthermore, upon information and belief, JPM instructed its derivatives team to delay responses to Biering's inquiries regarding upcoming transactions,

---

C.3r-022

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



allowing the incumbent JPMorgan FA time to "save the relationship." These actions a

and clearly designed to sabotage Biering's business.

60.     In response to these ongoing obstacles, JP Morgan Private Bank's Head of HR, Jena Cohen, instructed Biering to communicate directly with Aughinbaugh regarding any client transition issues. As a result, on August 16, 2024, Biering sent a letter to Aughinbaugh documenting JPMorgan's continued attempts to interfere with and discredit his business efforts. This letter has not stopped JPM's interference.

### LEGAL CLAIMS/CAUSES OF ACTION

61.     Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor.

### COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

62.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

63.     During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired.[16]

64.     Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's

---

[16]     Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

C.3r-023

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



departure from JPM was "Voluntary." J.P. Morgan further published a narrative that i

whole public that Biering was "terminated for inappropriate behavior."

65.    All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's mandate against "overly broad or misleading narratives" but intentionally was left vague to cause reasonable readers to assume nefarious behavior.[17]

66.    Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10. By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

67.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

---

[17]    To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 115 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory). Indeed, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*

C.3r-024

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



68.    Moreover, JPM committed such wrongful acts with malice, willful reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

## COUNT 2: BUSINESS DISPARAGEMENT

69.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

70.    J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

71.    JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

72.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

73.    Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 3: TORTIOUS INTERFERENCE

74.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

NDED STATEMENT OF CLAIM                                                              PAGE 25

C.3r-025

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



75.    Upon Biering's departure from J.P. Morgan, JPM started a campaign of and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

76.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

77.    Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

78.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

79.    JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

80.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

81.    Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

82.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

C.3r-026

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

83.    Biering was employed by J.P. Morgan. Biering hoped to retire and end J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

84.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

<u>COUNT 6</u>: **WEAPONIZATION OF U5**

85.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

86.    FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

87.    J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just months ago, a FINRA Panel found[18] that JPM defamed an ex-FA by mismarking the

---

[18]    *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

C.3r-027

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM defamatory U5 marking to "voluntary."[19]

88.    Further, just a few months ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[20] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defamed the ex-FA by mismarking the U5.[21]

89.    In 2022, another FINRA Panel again found[22] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts.  Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[23] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude

---

[19]    Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[20]    *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

[21]    *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, 227 A.D.3d 469, 470 (N.Y. App. Div. 2024).

[22]    *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[23]    *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

C.3r-028

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



that JPMS knew of the prospective employers and the effect which the Form would have on Luckett's hiring prospects. . . ."[24]

[R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

90.     In 2018, another FINRA Panel granted expungement (and an award of $28,867 in attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[25]

91.     It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business. JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing. FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5. Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[26] UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the

---

[24]     *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

[25]     *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC,* Case No. 18-01879 (May 10, 2019).

[26]     *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.,* Case No. 18-02179 (December 11, 2019).

C.3r-029

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



defamation and punitive damages.[27] The ex-FA lamented that UBS's defamatory U "unemployable."

92.    JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

93.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

94.    Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 7: BREACH OF CONTRACT

95.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

96.    When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

97.    In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

98.    Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

---

[27]    *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

C.3r-030

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-031
4:26-cv-00381-O
*Biering v. JPMS, et al.*

99.    As a direct and proximate result of JPM's breach of contract, Biering damages. Biering seeks such damages from JPM.

## COUNT 8: PROMISSORY ESTOPPEL

100.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein. In the alternative to his breach of contract claim (*i.e.*, Count 7 herein), Biering asserts this promissory estoppel claim.

101.    When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

102.    In connection with same, J.P. Morgan promised that it would pay Biering's attorney's fees incurred in obtaining an expungement of the customer complaint at issue.

103.    J.P. Morgan knew, or should have known, that Biering would rely on J.P. Morgan's promise to pay Biering's attorney's fees.

104.    Biering instituted a separate arbitration to expunge the customer complaint at issue and incurred attorney's fees as a result of (at least in part) and in reliance on JPM's promise to pay such attorney's fees.

105.    As a direct and proximate result of this reliance, Biering has been injured by JPM's conduct. Injustice can be avoided only by enforcement of the promise made by JPM to pay Biering's attorney's fees incurred in obtaining the requested expungement of the customer complaint at issue. Biering seeks enforcement of such promise made by JPM by an order requiring payment of such attorney's fees.

C.3r-031

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



## COUNT 9: QUANTUM MERUIT AND UNJUST ENRICHMENT

106.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

107.    Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ ████ s business to JPM. Yet, Biering received zero compensation for his successful efforts.

108.    By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

109.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 10: ILLEGAL FORFEITURE OF EARNED COMPENSATION

110.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

111.    JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

112.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 11: FORFEITURE OF DEFERRED COMPENSATION
### (VIOLATION OF ERISA)

113.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

114.    J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

C.3r-032

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴑ



C.3r-033
4:26-cv-00381-O
*Biering v. JPMS, et al.*

115.    As a direct and proximate result of JPM's wrongful conduct descr[...] Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 12: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS

116.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

117.    Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

118.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## ALTER EGO AND/OR PIERCING THE CORPORATE VEIL

119.    JPMorgan Chase and Chase Bank are jointly and severally liable for all wrongful conduct alleged herein that is or could be attributed to JPMS.

120.    JPMS and Chase Bank are both subsidiaries of JPMorgan. In fact, JPMS and Chase Bank are subject to JPMorgan's Code of Conduct, which JPM claims Biering purportedly violated:

> The Code of Conduct ("Code") sets forth the expectation that employees conduct themselves with integrity, at all times. It provides employees with the principles to help govern their conduct with clients, customers, suppliers, vendors, shareholders, fellow employees, regulators, markets, and the communities in which we operate. The Code applies to the employees and directors of JPMorgan Chase & Co. ("firm" or "JPMorganChase") and its direct and indirect subsidiaries.

121.    Upon information and belief, in mismarking Biering's U5, JPMS relied upon information and evidence purportedly obtained during an investigation performed by and/or at the direction of JPMorgan Chase and/or Chase Bank. As such, JPMS will undoubtedly rely upon such

C.3r-033

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-034
4:26-cv-00381-O
*Biering v. JPMS, et al.*

evidence and/or present testimony from representatives or employees of JPMorgan C

Chase Bank to defend against Biering's claims in this Arbitration.

122.    To prevent the use of corporate fiction as an unfair device to inflict injustice upon Biering and to achieve equity, the separate corporate identities of JPMS, JPMorgan Chase, and Chase Bank must be disregarded, and Respondents should be treated as one and the same with respect to Biering's claims in this Arbitration.

## ATTORNEYS' FEES

123.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

124.    JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

125.    Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

126.    As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

127.    J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

128.    Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM

C.3r-034

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thᴼ



ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

129.    Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

(1)   In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2)   In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

130.    The defamatory statements at issue were published in Biering's CRD.

131.    Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

132.    Claimant requests damages against JPM to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

(a)    Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

(b)    Expungement as set forth herein;

(c)    Specific performance of JPM's promise to pay Claimant's attorney's fees in connection with expungement of the customer complaint referenced herein (or, alternatively, damages due to JPM's failure to perform such promise);



C.3r-036
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(d)    Lost or forfeited deferred compensation;

(e)    Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(f)    Statutory penalties and damages;

(g)    Liquidated damages;

(h)    Punitive damages;

(i)    Damages to Claimant's reputation;

(j)    Past lost earnings;

(k)    Future lost earnings;

(l)    Consequential damages;

(m)    Mental anguish and emotional distress damages;

(n)    Future lost earning capacity;

(o)    The highest pre- and post-judgment interest permitted by law on all damages;

(p)    FINRA forum and other fees; and

(q)    Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

## REPRESENTATION BY COUNSEL
## AND REPRESENTATIVE'S CURRENT ADDRESS

133.    Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

## VENUE

134.    Claimant worked for JPM in Texas and was working in Fort Worth, Texas when all or part of JPM's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

C.3r-036

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



## AMOUNT IN DISPUTE AND AMOUNT REQUESTED FOR DAMAGES, AWARD, AND RELIEF

135.    Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

136.    The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

C.3r-037

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By:    /s/ Joshua J. Iacuone
        Joshua J. Iacuone
        Texas State Bar No. 24036818
        Anna Olin Richardson
        Texas State Bar No. 24102947
        4925 Greenville Ave., Ste. 700
        Dallas, Texas 75206
        Telephone: (214) 960-2832
        Email:   josh@imcplaw.com
                 anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

**CERTIFICATE OF SERVICE**

This pleading is being served upon all counsel of record in the DR Portal on the date recorded therein, and all other interested persons as set-forth herein.

/s/ Joshua J. Iacuone
Joshua J. Iacuone

C.3r-038

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(




C.3r-039
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant                                       Case Number: 23-00446
Michael C. Nolan

    vs.

Respondent                                     Hearing Site: Philadelphia, Pennsylvania
J.P. Morgan Securities, LLC

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

The evidentiary hearing was conducted partially by videoconference.

### REPRESENTATION OF PARTIES

For Claimant Michael C. Nolan ("Claimant"): Todd Gutfleisch, Esq., Harris St. Laurent & Wechsler LLP, New York, New York.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Kevin B. Leblang, Esq., and Amelia B. Munger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York.

### CASE INFORMATION

Statement of Claim filed on or about: February 21, 2023.
Amended Statement of Claim filed on or about: March 22, 2023.
Claimant signed the Submission Agreement: February 19, 2023.

Statement of Answer filed by Respondent on or about: May 19, 2023.
Respondent signed the Submission Agreement: May 19, 2023.

### CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: defamation; tortious interference with prospective contractual relations; violation of FINRA Rule 1122; advancement/indemnification; and injunctive relief.

... ally admitted in the Statement of Answer, Respondent denied the allegations made
  Statement of Claim and asserted various affirmative defenses.

C.3r-039



C.3r-040
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the defamatory language on Claimant's Form U5 and the filing of a substitute Form U5 stating that his employment termination was "voluntary"; and: (1) in box 7F "no" answers to all questions, and (2) in the box 7B DRP, question 5B ("How was the internal review concluded") that there was "no violation of internal policies"; compensatory and punitive damages in the amount of $10,000,000.00; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

In the Statement of Answer, Respondent requested that the Amended Statement of Claim be dismissed in its entirety; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

At the hearing, Claimant requested: $5,174,324.00 in compensatory damages; $1,000,000.00 in additional damages for emotional distress; $555,000.00 in legal fees, including fees/costs incurred during Respondent's internal investigation, through the end of this hearing; and up to 10 times the amount of compensatory damages in punitive damages.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On January 3, 2024, Claimant filed a Motion for Sanctions ("Motion"). On January 10, 2024, Respondent filed a response opposing Claimant's Motion. On January 12, 2024, Claimant filed a reply in further support of the Motion. On January 16, 2024, the Chairperson heard oral arguments on the Motion, as well as a previously filed Claimant's Motion to Compel. By Order dated January 16, 2024, the Chairperson, on behalf of the panel, denied Claimant's Motion for Sanctions in its entirety.

The evidentiary hearings were conducted in-person on February 26-29, 2024, and by videoconference on April 2-3, 2024.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  Respondent is liable for and shall pay to Claimant the sum of $250,000.00 in compensatory damages, which includes the claim for advancement/indemnification.

2.  The Panel recommends the expungement of all references to Occurrence Numbers 2244047 and 2244048 from the registration records maintained by the Central Registration Depository ("CRD") for Michael C. Nolan (CRD Number 1082281). Any "Yes" answers should be changed to "No," as applicable.

C.3r-040

Case 4:26-cv-00381-O-BP   Document 20-4   Filed 04/29/26   Page 42 of 97   PageID 413



C.3r-041
4:26-cv-00381-O
*Biering v. JPMS, et al.*

The Panel recommends expungement based on the defamatory nature of the
The above recommendations are made with the understanding that the registrat
are not automatically amended. Michael C. Nolan must forward a copy of this Award to
FINRA's Credentialing, Registration, Education and Disclosure Department for review.

3. Any and all claims for relief not specifically addressed herein, including any requests for
punitive damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,300.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm that employed the associated person at the time of the events giving rise to the
dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,850.00 |
| Member Process Fee | =$ 7,050.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| March 1 and 4, 2024, postponement requested by Respondent | =$ 1,575.00 |
| Total Postponement Fees | =$ 1,575.00 |

The Panel has assessed the total postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any
meeting between the parties and the Arbitrators, including a pre-hearing conference with the
Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Four (4) pre-hearing sessions with a single Arbitrator @ $450.00/session | | | =$ 1,800.00 |
| Pre-Hearing Conferences: | August 30, 2023 | 1 session | |
| | November 29, 2023 | 1 session | |
| | January 16, 2024 | 1 session | |
| | February 8, 2024 | 1 session | |
| One (1) pre-hearing session with the Panel @ $1,575.00/session | | | =$ 1,575.00 |

C.3r-041

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC


C.3r-042
4:26-cv-00381-O
*Biering v. JPMS, et al.*

FINRA Dispute Resolution Services
Arbitration No.  23-00446
<u>Award Page 4 of 5</u>

Pre-Hearing Conference:    June 27, 2023              1 session

Twelve (12) hearing sessions @ $1,575.00/session                              =$ 18,900.00
Hearings:                   February 26, 2024          2 sessions
                            February 27, 2024          2 sessions
                            February 28, 2024          2 sessions
                            February 29, 2024          2 sessions
                            April 2, 2024              2 sessions
                            April 3, 2024              2 sessions

Total Hearing Session Fees                                                      =$ 22,275.00

The Panel has assessed $11,137.50 of the hearing session fees to Claimant.

The Panel has assessed $11,137.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

C.3r-042

Case 4:26-cv-00381-O-BP    Document 20-4    Filed 04/29/26    Page 44 of 97    PageID 415



C.3r-043
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## ARBITRATION PANEL

| | | |
|---|---|---|
| Peter George Erdely | - | Public Arbitrator, Presiding Chairperson |
| Paul J. Leis | - | Public Arbitrator |
| Edward Turner Borer | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

**Peter George Erdely**
Peter George Erdely
Public Arbitrator, Presiding Chairperson

**04/08/2024**
Signature Date

**Paul J. Leis**
Paul J. Leis
Public Arbitrator

**04/09/2024**
Signature Date

**Edward Turner Borer**
Edward Turner Borer
Non-Public Arbitrator

**04/08/2024**
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 10, 2024
Date of Service (For FINRA Dispute Resolution Services use only)

C.3r-043

C.3r-044
4:26-cv-00381-O
*Biering v. JPMS, et al.*



**AH**

S&P 500 Earnings (https://www.advisorhub.com/wall-street-is-sending-a-bullish-signal-for-sp-500-earnings/)

(https://www.advisorhub.com)
**NEWS**

(https://www.advisorhub.com)

- News ⌄

# Ex-J.P. Morgan Broker Clears Record of 'Defamatory' Allegations, Wins $250K in Damages

- Deals & Comp(/deals-and-comps/)

by Karmen Alexander (https://www.advisorhub.com/team/karmen-alexander/)   April 11, 2024

- Breakaway Center(/breakaway-center/)

(/#linkedin)    (/#x)    (/#facebook)    (/#email)

- Asset Management(https://www.advisorhub.com/asset-manager/)

- Events(https://www.advisorhub.events/)

- Rankings ⌄

- More



04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-045
4:26-cv-00381-O
*Biering v. JPMS, et al.*

*Michael Nolan, who can now clear his record of defamatory allegations written on his U5 form by J.P. Morgan.*

J.P. Morgan Securities was ordered to pay $250,000 in damages to a New York City broker over claims that th in a regulatory filing when he left the firm in 2022, according to a Financial Industry Regulatory Authority arb finalized on Wednesday.

The arbitrators also ruled that Michael C. Nolan, who managed $1 billion in client assets (https://www.advisorhub.com/rbc-nets-billion-dollar-father-son-team-from-j-p-morgan-in-nyc/) when he moved to RBC Wealth Management-U.S., could clear his record of the defamatory allegations.

J.P. Morgan in a U5 filing had accused Nolan of a swath of potential violations, including sharing material nonpublic information with a customer, failing to properly disclose an outside business activity and using an unapproved channel to communicate with clients. The allegations appeared in an "employment separation after allegations" disclosure on his public BrokerCheck report.

Those claims, which Nolan denied, interfered with his ability to prospect customers at RBC and also violated Finra Rule 1122 prohibiting the filing of misleading information, Nolan argued, according to the award. Submit a Tip (/submittip/)

The arbitrators ordered his record be revised to identify his departure as "voluntary" and note there was "no violation of internal policies," according to the settlement. The panel did not provide a reason for their decision as is customary unless both parties request an explained award.

A J.P. Morgan spokesperson declined to comment.

The $250,000 is far less than the total damages that Nolan had sought. He requested more than $6.7 million in compensatory damages and legal fees, including $1 million due to emotional distress, and punitive damages equal to 10 times the compensatory damage claim.

"The fact that there was any form of a monetary award in a claim primarily seeking expungement goes to show that the panel thought there was at least some level of wrongdoing on behalf of the company," said Nolan's lawyer, Todd Gutfleisch of Harris St. Laurent & Wechsler in New York.

Nolan did not respond to a request for comment sent through social media. "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage my reputation," he had written in a comment appended to the BrokerCheck disclosure.

At RBC, Nolan runs an eponymous team with his son, Brian M. Nolan, and two client associates, according to their website. He splits time between New York and Bryn Mawr, Pennsylvania, according to his LinkedIn.

The elder Nolan started his career in 1983 with Goldman Sachs, moved in 1984 to Morgan Stanley and seven years later joined J.P. Morgan's Bear Stearns predecessor, according to his BrokerCheck report.

Nolan is required to have the expungement approved by Finra's Credentialing, Registration, Education and Disclosure Department before it is effective. The panel split the $22,275 in hearing session fees evenly between J.P. Morgan and Nolan.

| | Arbitration | Finra | JP Morgan | RBC |
|---|---|---|---|---|
| **Tags:** | (https://www.advisorhub.com/tag/arbitration/) | (https://www.advisorhub.com/tag/finra/) | (https://www.advisorhub.com/tag/jp-morgan/) | (https://www.advisorhub.com/tag/rbc/) |

## Like this article? Let AdvisorHub come to you! SIGN UP

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-046
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## COMMENTS (5)

on Apr 11 2024, Herb R (https://www.advisorhub.com/author/) says:

For anyone looking to change firms (and for all the right reasons) brace yourself for the potential of this kind of atta[...]
The very individuals who are recruiting in advisors with red carpet treatment, will often seek to crush good advisors who are recruited out.
So much for the Golden Rule...

Reply to Herb R

on Apr 11 2024, Retiring soon (https://www.advisorhub.com/author/) says:

Your point is particularly salient as it relates to advisor moves between UBS and Morgan Stanley. Both firms withdrew from the Broker Protocol agreement and now regularly try to sue each other out of existence for daring to take the other's advisors. The hypocrisy of such actions is glaring but continues unabated. Why anyone would go to either firm knowing it would amount to indentured servitude is beyond the rest of us.

Reply to Retiring soon

on Apr 11 2024, stuart pankin (https://www.advisorhub.com/author/) says:

Because both of those are the highest gross per advisor firms, not chumps looking for a check. Your sister Minnie Mouse was looking for you.

Reply to stuart pankin

on Apr 11 2024, Lou Mannheim (https://www.advisorhub.com/author/) says:

Anyone that moves and takes a check was obviously motivated to move by the amount of the check. The firms all do and offer the same thing. Is it really any different for the client from firm to firm? We can remove "chump" from that last comment and just say everyone is moving for the check. If you were not getting a check, would you move? The grass isn't greener. All of these wire houses are going to change your comp every year and tell you who you can't do business with anymore (account minimums).

Reply to Lou Mannheim

on Apr 12 2024, Advhub (https://www.advisorhub.com/author/) says:

If you, as you say, are the highest gross per advisor. The highest grossing advisor would realizes they are lowest Net advisor.
At this point in their career, they should realize the Firm needs them, more than them needing the Firm.

Reply to Advhub

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name ***

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC[...]

C.3r-047
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**Website**

| Post Comment |
|---|

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

---

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

---

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-048
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

**Creating More Scale and Efficiency in Your Practice**



04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-049
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(https://www.advisorhub.com)

Search AdvisorHub

Topics ⌄

Deals & Comp(/deals-comps/)

Breakaway Center(/breakaway-center/)

AdvisorHub RIA(/resource_type/ria-resource-center/)

More ⌄

About Us(/about-us/)

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL

Careers(/careers/)

Content Use(/conduct us/)

Advertise(/advertise-2nd-level/)

C.3r-050
4:26-cv-00381-O
*Biering v. JPMS, et al.*

C.3r-050

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-051
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
### FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Liet Han | <u>Case Number</u>: 18-02978 |
| vs. | |
| <u>Respondent</u><br>J.P. Morgan Securities, LLC | <u>Hearing Site</u>: New York, New York |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

### REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

### CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

### CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

C.3r-051

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

Case 4:26-cv-00381-O-BP    Document 20-4    Filed 04/29/26    Page 53 of 97    PageID 424



## RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2.  The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

    The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

    The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

C.3r-052

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



3.  Any and all claims for relief not specifically addressed herein, including any re{
    attorneys' fees, are denied.

## Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making.  The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior.  Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false. The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit.  He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit. Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back.  A "pull-back" the undisputed record showed, is a red flag for unlawful structuring.  Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth.  I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which investigation also found that he engaged in unlawful structuring, and he again used the pronoun "we" when trying to explain the circumstances surrounding the
letter he sent to prospective employers.  In addition, the Claimant falsely stated

C.3r-053

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

Case 4:26-cv-00381-O-BP   Document 20-4   Filed 04/29/26   Page 55 of 97   PageID 426



in the Statement of Claim that his prior record was "spotless," while the evidence (
that he previously received a warning and letter of education for other rules violatio
respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was).  I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR.  It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant.  They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact.  They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it.  There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect.  In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so.  All of the steps Respondent took were entirely the result of Claimant and his wife's deliberate and unlawful actions on July 3 and July 5, 2017. Nevertheless. the majority has decided to award an unconscionable $2,500,000 to the Claimant

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(



for "compensation."  One can only look incredulously at this record and ask "comp
Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.


## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:
### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                        =$ 2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*


### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm that employed the associated person at the time of the event giving rise to the
dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the
following:

Member Surcharge                                                          =$ 3,025.00
Member Process Fee                                                      =$ 6,175.00


### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

November 18-22, 2019, postponement requested by the parties           =$ 1,400.00
February 8-14, 2022, postponement requested by the parties                   Waived

Total Postponement Fees                                                  =$ 1,400.00

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.


### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any
meeting between the parties and the Arbitrators, including a pre-hearing conference with the
Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session      =$    450.00
Pre-Hearing Conference:  October 7, 2019               1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session          =$ 5,600.00
Pre-Hearing Conferences: January 23, 2019            1 session
                         May 5, 2020                 1 session
                         March 2, 2021               1 session

CONFIDENTIAL

FINRA Dispute Resolution Services
Arbitration No.  18-02978
<u>Award Page 6 of 7</u>

C.3r-056
4:26-cv-00381-O
*Biering v. JPMS, et al.*

|  | October 27, 2022 | 1 session |  |
|---|---|---|---|

| Four (4) hearing sessions @ $1,400.00/session | | | =$  5,600.00 |
|---|---|---|---|
| Hearings: | June 12, 2023 | 2 sessions | |
| | June 13, 2023 | 1 session | |
| | June 14, 2023 | 1 session | |

| Total Hearing Session Fees | =$ 11,650.00 |
|---|---|

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

C.3r-056

Case 4:26-cv-00381-O-BP   Document 20-4   Filed 04/29/26   Page 58 of 97   PageID 429



## ARBITRATION PANEL

| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

**_Linda J. Baer_**

**06/26/2023**

Linda J. Baer
Public Arbitrator

Signature Date

**_Sean F. Monahan_**

**06/26/2023**

Sean F. Monahan
Non-Public Arbitrator

Signature Date

### Concurring In-Part, Dissenting In-Part Arbitrator's Signature
Arbitrator dissented on the award for compensatory damages

**_Mitchell Regenbogen_**

**07/06/2023**

Mitchell Regenbogen
Public Arbitrator, Presiding Chairperson

Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

July 07, 2023

Date of Service (For FINRA Dispute Resolution Services use only)

C.3r-057

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL

C.3r-058
4:26-cv-00381-O
*Biering v. JPMS, et al.*



**EXHIBIT D**

227 A.D.3d 469
Supreme Court, Appellate Division,
First Department, New York.

In the Matter of Liet HAN,
Petitioner–Respondent,

v.

J.P. MORGAN SECURITIES,
LLC, Respondent–Appellant,

Financial Regulatory
Authority, Inc., Respondent.

2249–, 2250
|
Index No. 653456/23
|
Case Nos. 2023-05480, 2023-06156
|
Entered: May 9, 2024

**Synopsis**
**Background:** Petitioner filed petition against respondent to confirm arbitration award in favor of petition, and respondent filed notice of cross-petition to vacate award. The Supreme Court, New York County, Andrea Masley, J., 2023 WL 6462923, issued initial judgment granting petitioner's petition, denying respondent's notice of cross-petition and motion for stay, and issued subsequent judgment in favor of petitioner and against respondent in the amount of $2,590,550, representing amount arbitrator awarded petitioner plus interest. Respondent appealed both judgments.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] trial court had jurisdiction over petitioner's petition;

[2] respondent was not entitled to stay or adjournment pending availability of arbitration record or to leave to file supplemental memorandum under statute granting parties 90 days to apply to vacate or modify an arbitration award, or under the Federal Arbitration Act (FAA);

[3] trial court did not improvidently exercise its discretion in denying respondent's motion for stay; and

[4] trial court did not err in reject arguments that arbitration panel manifest by apparently applying New Jersey l... defamation claim.

Appeal of initial judgment dismissed, and subsequent judgment affirmed.

West Headnotes (4)

**[1] Alternative Dispute Resolution** Application or petition

Trial court had jurisdiction over petitioner's petition against respondent to confirm an arbitration award in favor of petitioner and against respondent in the amount of $2,500,000, even though respondent's cross-petition to vacate the award was not procedurally proper; after petitioner commenced the proceeding, respondent could oppose the award either by a motion to vacate or modify the award, or by objecting to the award in opposition to an application to confirm the award. N.Y. CPLR §§ 304(a), 7510, 7511.

**[2] Alternative Dispute Resolution** Proceedings

Respondent was not entitled to a stay or adjournment pending availability of the arbitration record or to leave to file a supplemental memorandum under statute granting parties 90 days to make an application to vacate or modify an arbitration award, or under the provision of the Federal Arbitration Act (FAA) providing a three-month window to move to vacate the award, in proceeding on petitioner's timely petition against respondent to confirm the arbitration award in petitioner's favor; statutes merely established limitations periods for motions to vacate or modify arbitration awards. 9 U.S.C.A. § 12; N.Y. CPLR § 7511.

C.3r-058

...euters. No claim to original U.S. Government Works.                    1

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL



C.3r-059
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**[3]    Alternative Dispute Resolution** 🔑 Proceedings

Trial court did not improvidently exercise its discretion in denying respondent's motion for a stay pending availability of the arbitration record, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 arbitration award in petitioner's favor; respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration to its opposition to the petition to confirm, as the arbitration record was received six days before respondent filed its brief in opposition to the petition.

**[4]    Alternative Dispute Resolution** 🔑 Error of judgment or mistake of law

Trial court did not err in rejecting respondent's arguments that the arbitration panel manifestly disregarded the law by apparently applying New Jersey law to petitioner's defamation claim against respondent, as would support vacatur of the arbitration award, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 award in favor of petitioner; while the arbitration agreement contained a choice-of-law provision choosing New York law, the provision did not dictate the substantive defamation law to be applied so unambiguously as to make the apparent application of New Jersey law an egregious impropriety, the panel did not provide an explanation for its award, and petitioner's defamation claim was a justifiable ground for the decision.

**Attorneys and Law Firms**

**\*\*47** Orrick, Herrington & Sutcliffe LLP, New York (Daniel A. Rubens of counsel), for appellant.

Rasco Klock Perez & Nieto, LLC, New York (Blaine Bortnick of counsel), for respondent.

Manzanet–Daniels, J.P., Singh, Kapnick, ( JJ.

**Opinion**

**\*469** Judgment, Supreme Court, New York County (Andrea Masley, J.), entered November 29, 2023, in favor of petitioner and against respondent in the amount of $2,590,550, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered October 2, 2023, which granted petitioner's petition to confirm an arbitration award and denied respondent's notice of cross-petition to vacate the award and motion for a stay and for leave to file a supplemental memorandum, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

**[1]** Regardless of any procedural deficiencies in respondent's cross-petition to vacate the arbitration award (CPLR 402), the court had jurisdiction over the proceeding and could either confirm or vacate the award (*see* CPLR 304[a], 7510, 7511). After petitioner commenced the proceeding, respondent could oppose the award "either by motion ... to vacate or modify the award ... or by objecting to the award in opposition to an application to confirm the award" (*Matter of Pine St. Assoc., L.P. v. Southridge Partners, L.P.,* 107 A.D.3d 95, 100, 965 N.Y.S.2d 15 [1st Dept. 2013]). Although the court found the cross-petition was not procedurally proper, it nonetheless proceeded to review the merits of the petition to confirm the award.

**[2]** Respondent has not shown that the court improvidently exercised its discretion in declining its request for a stay or **\*\*48** adjournment of the proceeding to confirm the arbitration award pending the availability of the arbitration record and denying respondent leave to file a supplemental memorandum (*see Pena–Vazquez v. Beharry,* 82 A.D.3d 649, 649, 919 N.Y.S.2d 336 [1st Dept. 2011]; *see also Matter of Steven B.,* 6 N.Y.3d 888, 889, 817 N.Y.S.2d 599, 850 N.E.2d 646 [2006]; *Marquez v. 171 Tenants Corp.,* 220 A.D.3d 575, 576, 198 N.Y.S.3d 324 [1st Dept. 2023]). Respondent points out that CPLR 7511 grants a party 90 days to make an application to vacate or modify an arbitration award, and the Federal Arbitration Act (FAA) likewise provides a three-month window to move to vacate (9 USC § 12). However, respondent cites no authority for treating these statutory limitations periods as entitling it to a stay of a court's consideration of a timely petition.

**[3]** Respondent also fails to demonstrate that the court improvidently exercised its discretion in denying its request

Case 4:26-cv-00381-O-BP    Document 20-4    Filed 04/29/26    Page 61 of 97    PageID 432



for a stay *470 under these circumstances, when the arbitration record was received six days before it filed its brief in opposition to the petition to confirm. Thus, respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration.

[4] On this record, respondent has not shown that the court erred in confirming the award and rejecting its arguments that the arbitration panel showed a "manifest disregard of the law" (*Matter of Nexia Health Tech., Inc. v. Miratech, Inc.*, 176 A.D.3d 589, 590–591, 110 N.Y.S.3d 420 [1st Dept. 2019]). The New York choice-of-law provision in the parties' arbitration agreement did not dictate the substantive defamation law to be applied so unambiguously as to make the arbitration majority's apparent application of New Jersey law to petitioner's claim an "egregious impropriety on the part

of the arbitrators" (*id.* at 591, 110 N.Y.S.3d did not provide an explanation for its a petitioner's defamation claim was a "justifi___ decision," respondent's manifest-disregard arguments as to petitioner's other claims are unpersuasive (see *Tullett Prebon Fin. Servs. v. BGC Fin., L.P.,* 111 A.D.3d 480, 481–482, 975 N.Y.S.2d 18 [1st Dept. 2013], *lv denied* 22 N.Y.3d 864, 2014 WL 1243636 [2014]).

We have considered respondent's remaining arguments and find them unavailing.

**All Citations**

227 A.D.3d 469, 212 N.Y.S.3d 46, 2024 N.Y. Slip Op. 02594

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

C.3r-060

euters. No claim to original U.S. Government Works.

3

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-061
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
### FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

| | |
|---|---|
| Claimant<br>Dustin B. Luckett | Case Number: 19-03075 |
| vs. | |
| Respondents<br>J.P. Morgan Securities, LLC and<br>Todd G. Fannin | Hearing Site: Louisville, Kentucky |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

### REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

### CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

### CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealing. The causes of action related to events occurring after the conclusion of Claimant's employment with JPMS.

C.3r-061

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL

Case 4:26-cv-00381-O-BP    Document 20-4    Filed 04/29/26    Page 63 of 97    PageID 434



C.3r-062
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Unless specifically admitted in the Statement of Answer, Respondents denied the a made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00. Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction. The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2. JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. The Panel recommends the expungement of the Termination Explanation in Section 3 of e Luckett's (CRD Number 5126374) Form U5 filed by J.P. Morgan Securities

C.3r-062

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

Case 4:26-cv-00381-O-BP    Document 20-4    Filed 04/29/26    Page 64 of 97    PageID 435



C.3r-063
4:26-cv-00381-O
Biering v. JPMS, et al.

LLC on June 29, 2017 and maintained by CRD. The Reason for Termination s
the same and the Termination Explanation shall be replaced with the following la
"Non-investment related. After a dispute about a clerical process, RR became disillusioned
with the company's atmosphere requiring separation of his at-will employment." This
directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number
1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any
"Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information.
The above recommendations are made with the understanding that the registration records
are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to
FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4.  Claimant's claims against Fannin are denied.

5.  Any and all claims for relief not specifically addressed herein, including any requests for
    punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                  =$      2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to
the dispute. Accordingly, as a party, JPMS is assessed the following:

Member Surcharge                                                         =$      3,025.00
Member Process Fee                                                       =$      6,175.00

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any
meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the
Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session    =$        450.00
Pre-Hearing Conference:   July 27, 2021                1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session         =$      5,600.00
                 onferences: February 4, 2020          1 session

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

FINRA Dispute Resolution Services
Arbitration No.  19-03075
Award Page 4 of 5

C.3r-064
4:26-cv-00381-O
*Biering v. JPMS, et al.*

C.3r-064

| | | |
|---|---|---|
| February 2, 2021 | 1 session | |
| February 11, 2021 | 1 session | |
| December 9, 2021 | 1 session | |

Eight (8) hearing sessions @ $1,400.00/session        =$   11,200.00

Hearings:

| | | |
|---|---|---|
| January 25, 2022 | 2 sessions | |
| January 26, 2022 | 2 sessions | |
| January 27, 2022 | 2 sessions | |
| January 28, 2022 | 2 sessions | |

Total Hearing Session Fees                =$   17,250.00

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

C.3r-064



C.3r-065
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## ARBITRATION PANEL

| | | |
|---|---|---|
| David F. Barrett | - | Public Arbitrator, Presiding Chairperson |
| Linda W. Hester | - | Public Arbitrator |
| John R. Michael, II | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

**David F. Barrett**                                    **02/04/2022**

David F. Barrett                                        Signature Date
Public Arbitrator, Presiding Chairperson


**Linda W. Hester**                                     **02/04/2022**

Linda W. Hester                                         Signature Date
Public Arbitrator


**John R. Michael, II**                                 **02/04/2022**

John R. Michael, II                                     Signature Date
Non-Public Arbitrator


Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


February 04, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

C.3r-065

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(

C.3r-066
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**NEWS** Industry News

# J.P. Morgan loses $1.4 million defamation case to adviser



The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022  *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According *to the arbitration award* by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called *a Form U5*, that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's *BrokerCheck profile,* he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: *Judge rips Wells, Finra, in decision over arbitration claim*]



Related Topics: *J.P. Morgan Securities*

Learn more about **reprints and licensing** for this article.



:scribe for original insights, commentary

C.3r-066

1/2

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-067
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Recent Articles by Author



### Merrill data bungle hits Walmart 401(k) plan

'We're hearing more horror stories' about clients becoming targets after a data breach, one attorney says.



### Starwood latest nontraded REIT with concerns

Nontraded REITs are facing hurdles, higher interest rates, headlines about half-empty office buildings, and investors pulling their money from products.



### Miami advisors fight over book of business

'Handshake' deal goes wrong for two south Florida advisors.



### Wisc. broker facing charges over stealing town's money

In twist, the broker has blamed other members of a town board for allegedly allowing the theft.



### Interactive Brokers latest B-D to report data breach

'Sophisticated hackers for last 10 years have constantly improved their ability to breach systems,' compliance consultant says.

C.3r-067

2/2

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

**EXHIBIT G**

**C.3r-068**
4:26-cv-00381-O
*Biering v. JPMS, et al.*

2023 WL 6050230
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

J.P. MORGAN SECURITIES LLC, Plaintiff

v.

Dustin LUCKETT, Defendant

Civil Action No. 3:22-cv-137-RGJ
|
Signed September 14, 2023
|
Filed September 15, 2023

**Attorneys and Law Firms**

Alyson Terrell, Pro Hac Vice, Ulmer & Berne LLP, Columbus, OH, Jeffrey Scott Dunlap, Pro Hac Vice, Ulmer & Berne LLP, Cleveland, OH, Jesse R. Lipcius, Ulmer & Berne LLP, Cincinnati, OH, for Plaintiff.

Hayden A. Holbrook, Michael A. Valenti, Valenti Hanley, PLLC, Louisville, KY, for Defendant.

## MEMORANDUM OPINION & ORDER

Rebecca Grady Jennings, District Judge

*1 Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id.*]. Luckett is a citizen of Kentucky. [*Id.*]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in

the "district court wherein the award was 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

## I. BACKGROUND[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky. [DE 16 at 126]. JPMS and Chase are affiliates. [DE 16 at 126]. JPMS is a member of the Financial Industry Regulatory Authority ("FINRA"). Luckett was employed by Chase, but his securities licenses were held by JPMS. [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].

*2 Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. He also asserted that JPMS breached an implied covenant of good faith and fair dealing by not facilitating his right to rollover funds in his 401(k) account. [*Id.* at 73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")].

C.3r-068

euters. No claim to original U.S. Government Works.                    1

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL



C.3r-069
4:26-cv-00381-O
*Biering v. JPMS, et al.*

The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id.*]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.' " [*Id.*]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id.*]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

## II. ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1. Motion to Vacate Arbitration Award Standard

The Federal Arbitration Act ("FAA") expresses a federal policy in favor of enforcing arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result

or believes the arbitrator made a serious leg[al] ... *United Paperworkers Int'l Union v. Mis[co, Inc.]*, [484 U.S.] 29, 38 (1987). Courts should proceed with [cautio]n when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

*3 The FAA sets out only four situations in which an arbitration award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The Sixth Circuit recognizes an additional ground for vacating an award where the arbitrators "manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2. Manifest Disregard of the Law

[Thomson Re]uters. No claim to original U.S. Government Works.

2

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

**\*4** "To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.' " *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros*, 70 F.3d at 421). "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis for their award. Generally, arbitrators are not required to explain their decisions. *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it *must* be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained decision has been described as "all but impossible." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable basis on which the arbitrators could have based their award, the reviewing court should decline vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471,

483–485 (6th Cir. 2006) (declining to va[cate] panel's unexplained decision because plai[ntiff] plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision. Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v. Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties may request an explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

**\*5** The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N. Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed " 'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.' " *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic*

C.3r-070

[Re]uters. No claim to original U.S. Government Works.    3

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(


C.3r-071
4:26-cv-00381-O
*Biering v. JPMS, et al.*

*Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id.* at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision ... [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. The Court notes that this element may be less supported in the record than the others. However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36). There is thus a plausible basis from which the Panel could have found this element satisfied.

**\*6** As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS

acted with either the sole purpose of h means that were dishonest, unfair, or in 150]. This element may be satisfied by ⸏ ⸏ defendant's actions amounted to an independent tort. *See Carvel Corp.*, 818 N.E.2d at 1103. In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts. In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature." [DE 1-2 at 10]. Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient ... Rather, the decision must fly in the face of clearly established legal precedent."). JPMS has failed to establish the Panel's decision necessarily "flies in the face" of New York law if it was based on Luckett's tortious interference claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-072
4:26-cv-00381-O
*Biering v. JPMS, et al.*

one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

## 3. Exceeded Powers

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi,* 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

## 4. Motion to Confirm Arbitration Award Standard

 *7 Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such

an order unless the award is vacated, mod... as prescribed in sections 10 and 11 of thi...

9. The Sixth Circuit has held that "the pl... Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale,* 125 F. App'x at 676. JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

## III. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

3. The Court will enter separate judgment.

**All Citations**

Slip Copy, 2023 WL 6050230

## Footnotes

1  The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination. Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award. Many of the contested characterizations are not relevant given the standard of review for arbitration awards. As a result, the Background includes only those facts agreed upon by the parties.

2  The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan,* 835 F.3d at 600; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 672 n.3 (2010) (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.,* 2023 WL 5002875, at *6 (W.D. Ky. Aug. 4, 2023) ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a 'manifest disregard of the law.' ") (citation omitted).

3  It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If,

C.3r-072

...uters. No claim to original U.S. Government Works.                    5

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th...

CONFIDENTIAL



C.3r-073
4:26-cv-00381-O
*Biering v. JPMS, et al.*

under New York law, the tortious interference claim could plausibly support the Award, then the Co

*Jaros,* 70 F.3d at 421.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

...uters. No claim to original U.S. Government Works.

C.3r-073

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th...



C.3r-074
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Office of Dispute Resolution

In the Matter of the Arbitration Between:

Claimant
Rose Mascarenhas

Case Number: 18-01879

vs.

Respondent
J.P. Morgan Securities, LLC

Hearing Site: Chicago, Illinois

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Rose Mascarenhas ("Claimant"): Marc D. Schifanelli, Esq. and Gordana Schifanelli, Esq., Schifanelli Law, LLP, Annapolis, Maryland.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio and Scott R. Koch, Esq., JPMorgan Chase Bank, NA, Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: May 16, 2018.
Claimant signed the Submission Agreement: May 16, 2018.

Statement of Answer filed on or about: August 6, 2018.
Respondent signed the Submission Agreement: July 30, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following cause of action: defamation. The cause of action relate to Claimant's allegation that the statements made by Respondent in Claimant's Form U4 and U5 caused Claimant to suffer great financial loss and to be unable to find comparable employment in the financial industry.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested $740,000.00 in compensatory and mages, reimbursement of costs and attorneys' fees, and expungement and

C.3r-074



modification of the Form U5 in Claimant's registration records maintained by t
Registration Depository ("CRD").

In the Statement of Answer, Respondent requested that the Panel deny Claimant's claims and request for expungement and damages, assess all costs and forum fees against Claimant, and award any other relief that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Arbitrators have provided an explanation of their decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The Panel recommends expungement of the Termination Explanation in Section 3 of the Form U5 of Rose Mascarenhas (CRD# 5487635) filed by J.P. Morgan Securities, LLC on April 4, 2018, and maintained by the CRD. The Termination Explanation shall be changed to the following: "Terminated by Affiliate Bank – Not securities related. Reg. rep. as an affiliate bank employee opened two checking accounts for a long-time customer who had previously opened over 70 accounts. To accommodate the customer, and consistent with the branch practice prior to the recent arrival of a new manager, Reg. rep. opened the accounts without customer being present for the entire opening process, other than appearing to execute the account documents, which was contrary to policies of the Bank." The Reason for Termination shall remain the same.

   In addition, the Panel recommends the expungement of the "Yes" answer to question 7F(1) of the foregoing Form U5. The "Yes" answer shall be changed to "No" and the accompanying Termination Disclosure Reporting Page shall be deleted in its entirety.

   The above recommendations also apply to all subsequent disclosures concerning this event.

   The Panel recommends expungement based on the defamatory nature of the information. The Form U5 is not automatically amended to include the changes indicated above. Rose Mascarenhas must forward a copy of this
            :o FINRA's Registration and Disclosure Department for review.

C.3r-075

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-076
4:26-cv-00381-O
*Biering v. JPMS, et al.*

2. Respondent is liable for and shall pay to Claimant the sum of $28,867.00 in attorneys' fees pursuant to the parties' submission agreements, in which they agreed to "submit the present matter in controversy, as set forth in the attached statement of claim [and] answer." Claimant requested an award of attorneys' fees in her Statement of Claim. Respondent's submission agreement therefore created a de facto arbitration agreement that included the authority for the arbitrators to award attorneys' fees if Claimant should prevail. The Panel further notes that Respondent did not oppose Claimant's request for attorneys' fees, other than to object to certain time entries, which the Panel has overruled.

3. Respondent is liable for and shall pay to Claimant the sum of $974.72 in costs.

4. Respondent shall reimburse Claimant for the non-refundable portion of Claimant's filing fee in the amount of $425.00.

5. Respondent is liable for and shall pay to Claimant the sum of $1.00 in compensatory damages.

6. Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

## ARBITRATORS' FINDINGS

### Relevant Facts

Claimant was a long-time employee of Respondent and the principal banker for a family business which was a very large and active customer of the bank, having opened over 70 accounts over the years. The policies and procedures of the bank provide a 14-part computer process for opening business accounts, the first step of which is to verify at the beginning of the process that the customer is present in the bank in person. If the "in person" button is not pressed, the account opening process cannot proceed.

It is undisputed that under Claimant's prior bank manager (and perhaps more than one prior bank manager), it was generally allowed that for large, well-known customers such as these, the banker (including Claimant) was allowed to perform most of the process with the customer not present, including pressing the "in person" button. This allowed the account opening procedure, which can take as long as 40 minutes for each account, to be completed without the customer having to be present for the entire process, arriving only to sign the account opening documents. Respondent presented testimony that the branch manager who assumed her responsibilities on January 8, 2018 insisted that the account opening procedure no longer occur without the customer present for the entire process of opening the account.

The customers here contacted Claimant and requested that she prepare two new checking accounts on February 3, 2018 for two separate out-of-state branches of their business, and asked that they be required to appear only for so long as necessary to sign . Claimant agreed to do that, as she had on prior occasions, and prepared the

C.3r-076

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(



C.3r-077
4:26-cv-00381-O
*Biering v. JPMS, et al.*

materials for their signature. It appeared undisputed that prior to the arrival of the customers, she performed each of the electronic tasks called for in the process with respect to the first account she opened that day, including pressing the "submit" button for that account. She then set aside the signature documents that had been created by the computer in the course of that process, and began the account opening process for the second account. It was not clear whether the "submit" button was pressed for the second account prior to the customers' arrival. It was further undisputed that the customers appeared that day, sometime after the "submit" button had been pressed for the first account, and signed the account opening documents for both accounts. There was no allegation that there was anything irregular about any aspect of the accounts or the opening procedure, other than the dispute about whether the customer needed to be present for the entire process.

Respondent terminated Claimant on March 16, 2018 as a consequence of her conduct on February 3. Claimant was a licensed banker, holding Series 6 and 63 licenses. As a consequence, the bank submitted a Form U5, which included an answer to Section 3, regarding "Termination Explanation" which Claimant alleged was false and defamatory.

In addition, Claimant alleged that the answer to question 7F(1) was false and defamatory.

NATURE OF THE CLAIM

Claimant contends that the Termination Explanation and the answer to question 7F(1) in the U5 were false and defamatory in that the first implied that the account was opened without customer approval and the second falsely asserts that Claimant was alleged to have violated an investment-related regulation when the offending conduct involved only opening a checking account. Beyond citing the language itself, Claimant presented documentary evidence from a prospective subsequent employer which showed that those bank officials had read the U5 as reporting that Claimant had been terminated for opening an account without customer authorization.

AWARD

a. Termination Explanation

The Panel finds that the explanation contained in the U5 Form is defamatory in that it incompletely and inaccurately describes the reason for termination.

Respondent argued that that the statement was accurate because Respondent considered the account to be "open" at the moment the "submit" button was pressed and it was pressed for the first account before the customer appeared. That is an unfairly literal reading of that language. It omits facts sufficient to give the reader an understanding of what actually occurred, and how it constituted inappropriate conduct. The statement is therefore incomplete and inaccurate and defamatory in allowing the impression that the account was opened without customer approval.

It is notable in this regard that the representative of the registration department testified that the only information in their possession regarding the basis for the termination was the the HR department that "Rose opened an account for a customer without them

C.3r-077

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

Case 4:26-cv-00381-O-BP   Document 20-4   Filed 04/29/26   Page 79 of 97   PageID 450

C.3r-078
4:26-cv-00381-O
*Biering v. JPMS, et al.*



being present." The representative and her team were therefore unaware of whe customer knew about the account, was there for part of the time or was there for the time. In the context of the long history of the bank with that customer, the description of what occurred was therefore false and defamatory and the individual who prepared and submitted the U5 did so with an incomplete and therefore inaccurate understanding of the basis for the discharge.

(The expungement recommendation is stated above in the Award section.)

b. Answer to Question 7F(1)

The answer to question 7F(1) should be "no" because the opening of a checking account was not "investment-related." Respondent relies upon FINRA Regulatory Notice 10-39 as requiring that any allegation related to the products of a Bank are drawn within the definition of "investment-related" by the third bullet point of the second page of RN 10-39 where it states as follows:

> A firm should err on the side of interpreting the term "investment-related" in an expansive manner in line with the scope of the term when reporting information on Form U5. The scope of the term pertains to securities, commodities, banking, insurance or real estate (including, but not limited to, acting as or being associated with a broker-dealer, issuer, investment company, investment advisor, futures sponsor, bank or saving association." Accordingly, a firm may be required to provide an affirmative answer to a question even if the matter is not securities related.

The panel concludes that this language is intended to convey to the reporting entity that it should not focus on the nature of the institution at which the alleged misconduct occurs, but rather on the nature of the financial event being addressed. It was undisputed here that a checking account is not an investment. Respondent's witness testified that a checking account was not an investment. The fact that it was opened as part of "banking" cannot logically make it "investment-related."

Respondent was also unable to identify any particular statute, regulation, rule or industry standards of conduct that was violated. Respondent's position appeared to be that Claimant's conduct violated its Code of Conduct, which barred employees from falsifying company records which Respondent argued occurred when Claimant pressed the "in person" button when the customer was in fact not present in person. The panel was persuaded that, because the prior branch manager(s) had accommodated this very large and demanding customer to allow them not to be present for the entire account opening, that the customers were present to complete the process and none of the information submitted to create the accounts was inaccurate, there was no falsified record but rather a technical violation that had theretofore been allowed by management. Critically, the internal investigation performed by Respondent determined that there had been no violation of the Code of Conduct precisely because of the context in which the events occurred.

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC


C.3r-079
4:26-cv-00381-O
Biering v. JPMS, et al.

# FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

## Filing Fees
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,725.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

## Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 2,475.00 |
| Member Process Fee | =$ 5,075.00 |

## Discovery-Related Motion Fee
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$ 200.00 |

Respondent submitted one discovery-related motion.

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees to Respondent.

## Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with the Panel @ $1,300.00/session | | | =$ 1,300.00 |
| Pre-hearing conference: | August 24, 2018 | 1 session | |

| | | | |
|---|---|---|---|
| Four (4) hearing sessions @ $1,300.00/session | | | =$ 5,200.00 |
| Hearing Dates: | April 2, 2019 | 2 sessions | |
| | April 3, 2019 | 2 sessions | |

| | |
|---|---|
| Total Hearing Session Fees | =$ 6,500.00 |

The Panel has assessed $6,500.00 of the hearing session fees to Respondent.

C.3r-079

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

CONFIDENTIAL

FINRA Office of Dispute Resolution
Arbitration No. 18-01879
Award Page 7 of 7



C.3r-080
4:26-cv-00381-O
*Biering v. JPMS, et al.*

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

5-10-19
Signature Date

_____
Victoria Wolf
Public Arbitrator

_____
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

_____
Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

C.3r-080

CONFIDENTIAL



C.3r-081
4:26-cv-00381-O
*Biering v. JPMS, et al.*

FINRA Office of Dispute Resolution
Arbitration No. 18-01879
Award Page 7 of 7

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

_____
Victoria Wolf
Public Arbitrator

5/10/19
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

C.3r-081



FINRA Office of Dispute Resolution
Arbitration No.  18-01879
Award Page 7 of 7

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Victoria Wolf
Public Arbitrator

_____
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

May 10, 2019
_____
Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

C.3r-082

C.3r-083
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Office of Dispute Resolution

In the Matter of the Arbitration Between:

Claimant                                              Case Number: 18-02179
Mark Munizzi

     vs.

Respondent                                           Hearing Site: Chicago, Illinois
UBS Financial Services Inc.

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

### REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch Thompson LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

### CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

### CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, that Respondent's inaccurate Form U5 filing will interfere with Claimant's ability to obtain commensurate future employment.

C.3r-083

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

FINRA Office of Dispute Resolution
Arbitration No. 18-02179
<u>Award Page 2 of 6</u>



C.3r-084
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Unless specifically admitted in the Statement of Answer and Statement of Answ
Amended Statement of Claim, Respondent denied the allegations made in the St
of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the Form U5 filed by Respondent, an award of compensatory damages and punitive damages in an amount to be determined at hearing, and all other appropriate relief. In the Amended Statement of Claim, Claimant requested the same relief as the Statement of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for severance pay; $3,149.00 for interest on the severance pay, with interest accruing at $187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the amount of $23,419.13; punitive damages of ten times the compensatory damages; and that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim ("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-hearing conference on March 13, 2019, in a written order dated March 14, 2019, the Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00 in compensatory damages.

2.  Respondent is liable for and shall pay to Claimant interest on $112,500.00 of the above-stated compensatory damages award, which represents severance the rate of 5% per annum from the date of this Award through and

C.3r-084

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



including the date on which that portion of the compensatory damages awa
is paid in full.

3.  Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4.  Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5.  Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6.  Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7.  The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

    In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

    These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

    In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

    The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

            d all claims for relief not specifically addressed herein are denied.

C.3r-085

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf | C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

FINRA Office of Dispute Resolution
Arbitration No. 18-02179
Award Page 4 of 6



C.3r-086
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$  1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$  1,900.00 |
| Member Process Fee | =$  3,750.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$  1,125.00 |
| Total Postponement Fees | =$  1,125.00 |

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

### Last Minute Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$  1,800.00 |
| Total Last Minute Cancellation Fees | =$  1,800.00 |

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

### Discovery-Related Motion Fee
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$    200.00 |
| One (1) decision on a discovery-related motion on the papers with three (3) arbitrators @ $600.00 /decision | =$    600.00 |

C.3r-086

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



FINRA Office of Dispute Resolution
Arbitration No. 18-02179
<u>Award Page 5 of 6</u>

Claimant submitted (2) two discovery-related motions

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 800.00 |

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

## **Hearing Session Fees and Assessments**

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session     =$ 450.00
Pre-hearing Conference:   March 13, 2019                 1 session

One (1) pre-hearing session with the Panel @ $1,125.00/session     =$ 1,125.00
Pre-hearing Conference:   October 16, 2018                 1 session

Twenty-six (26) hearing sessions @ $1,125.00/session     =$ 29,250.00

| Hearing Dates: | | |
|---|---|---|
| | June 11, 2019 | 2 sessions |
| | June 12, 2019 | 2 sessions |
| | June 13, 2019 | 2 sessions |
| | June 14, 2019 | 2 sessions |
| | June 17, 2019 | 2 sessions |
| | June 18, 2019 | 2 sessions |
| | September 24, 2019 | 2 sessions |
| | September 25, 2019 | 2 sessions |
| | September 26, 2019 | 2 sessions |
| | September 27, 2019 | 2 sessions |
| | November 19, 2019 | 2 sessions |
| | November 20, 2019 | 2 sessions |
| | November 21, 2019 | 2 sessions |

| | |
|---|---|
| Total Hearing Session Fees | =$ 30,825.00 |

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

C.3r-087

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-088
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. Thompson | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

*Lisa M. Krimen*
_____
Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019
_____
Signature Date


*Donald M. Thompson*
_____
Donald M. Thompson
Public Arbitrator

12/11/2019
_____
Signature Date


*Craig D. Cook*
_____
Craig D. Cook
Non-Public Arbitrator

12/11/2019
_____
Signature Date


December 11, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

C.3r-088

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5th(



C.3r-089
4:26-cv-00381-O
*Biering v. JPMS, et al.*



All Quiet on the Stock Market Front
(https://www.advisorhub.com/resources/all-quiet-on-the-stock-market-front/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

**NEWS**

- **News** ⌄

# UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award

Deals & Comp(/deals-and-comp/)

by Miriam Rozen    April 19, 2022

- **Breakaway Center(/breakaway-center/)**

(/#linkedin)        (https://www.advisorhub.com(/asset-
**Asset**        (https://www.facebook.com/#detail
Management    manager/)

- **Events(https://www.advisorhub.events/)**

- **Rankings** ⌄

- **More** ⌄

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-090
4:26-cv-00381-O
*Biering v. JPMS, et al.*



Submit a Tip 💬(/submittip/)

JHVEPhoto - stock.adobe.com

A drawn-out legal dispute that has spanned four years and multiple appeals has concluded with a $14.1 million wire transfer from UBS Wealth Management USA to a former compliance officer in Chicago.

UBS Financial Services paid the total on April 12 to Mark Munizzi, its former regional compliance manager in Chicago, whom it had fired in 2018. Munizzi sued later that year for defamation and won $11.1 million in an arbitration award the following year.

UBS waged lengthy court battles (https://www.advisorhub.com/ubss-appeal-to-vacate-11-mln-finra-award-faces-uphill-battle-lawyers/) that were seen as a message to others who may consider taking on the firm in court, but ultimately failed to vacate the award. On March 31, the Supreme Court of Illinois denied UBS its final appeal without offering an explanation.

Because of the lengthy appeals process, UBS added about $3 million to the amount it ultimately paid Munizzi as interest continued to accrue, as well as attorney fees UBS was required to cover under the terms of the award, according to Munizzi's lawyer Stephen Gomberg of Lynch Thompson in Chicago.

A spokesperson for UBS declined to comment. The firm would have had to petition the U.S. Supreme Court for a hearing to continue with any appeal.

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-091

4:26-cv-00381-O

*Biering v. JPMS, et al.*

In his arbitration complaint filed in June 2018, Munizzi alleged UBS defamed him on his U5 termination filing, which accused him of failing to supervise employees executing uncovered options strategy in accounts and of giving "varied responses" during the firm's review of his activities.

Munizzi, who had been earning roughly $200,000 a year, according to his lawyer, asserted that he was not properly informed by the firm's central supervision office of margin calls against brokers in UBS's Madison, Wisconsin branch. He had been one of several fired in the wake of a junior broker's naked options trades that were said to have cost $3.7 million in losses in employee-related accounts.

In the December 2019 award, which was the largest employee arbitration penalty that year, the Financial Industry Regulatory Authority arbitration panel had ordered UBS Financial Services to pay Munizzi $7.5 million in punitive damages, $3.1 million in compensatory damages for severance and almost $497,000 of attorneys' fees—a total of about $11.1 million.

In January 2020, a court upheld the award and entered a judgment for $12,177,360, which included an additional $908,965 of statutory interest and attorneys' fees and costs of $97,604, Gomberg said. The judge in that case also did not provide a written explanation, although courts are often deferential to arbitrators and have narrow grounds to overturn awards.

Munizzi was "very much relieved" with UBS's final payment and he "has enough money to retire," but he had been through an ordeal, Gomberg said. The U5 mark-up left him unemployable, according to the lawyer.

"He hasn't gotten a job, or even gotten an interview," Gomberg said.

The favorable outcome could embolden others to bring cases, according to Gomberg, who said he has seen signs of an "uptick" in employment disputes between brokerages and brokers relating to terminations as well as complaints filed with defamation claims.

Since the news of Munizzi's initial win before the Finra panel first surfaced, firms have also begun issuing more "carefully worded" U5s to avoid defamation claims, he added.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/) Defamation (https://www.advisorhub.com/tag/defamation/)*

# Like this article? Let AdvisorHub come to you! SIGN UP

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-092
4:26-cv-00381-O
*Biering v. JPMS, et al.*

C.3r-092

## COMMENTS (4)

**on Apr 19 2022, Tired of Large Firm CYA-Hot Potato Game (https://www.advisorhub.com/author/) says:**

I'm very happy to hear the Compliance Officer won this battle. Its terrible how expensive it is in legal costs for the fired employee. I know far too many people who have lost their jobs so that senior executives at large firms could make it look like they took action for the regulators. I'm looking at you JPM.

Reply to Tired of Large Firm CYA-Hot Potato Game

**on Apr 19 2022, So tired of CYA Hot Potato Games! (https://www.advisorhub.com/author/) says:**

you are indeed a kindred spirit!

Reply to So tired of CYA Hot Potato Games!

**on Apr 20 2022, Not a Choosen one (https://www.advisorhub.com/author/) says:**

Happy for this guy. UBS is notorious for trashing employees and mid level mangers while they protect the inner circle choosen few. Sadly for every win like this there are many more who never get their justice due to cost and how like the big bank can fight for...

Reply to Not a Choosen one

**on Apr 20 2022, Arl (https://www.advisorhub.com/author/) says:**

Wow, makes me wonder if I have a case. My former broker dealer made mark on my U5 on my record from email and client said he was wrong and then a very large potential client saw
my U5 before it was removed and didn't hire me and recently had FINRA remove.

Reply to Arl

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-093
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**Name** *

**Email** *

**Website**

Post Comment

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

C.3r-093

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

---

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

## Creating More Scale and Efficiency in Your Practice

r-compliance-officer-capping-off-battle-over-defamation-award/

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC

C.3r-095
4:26-cv-00381-O
Biering v. JPMS, et al.

r-compliance-officer-capping-off-battle-over-defamation-award/

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC



C.3r-096

(https://www.advisorhub.com)

Search AdvisorHub

Topics ∨                                    AdvisorHub RIA(/resource_type/ria-resource-center/)

Deals & Comp(/deals-comps/)               More ∨

Breakaway Center(/breakaway-center/)       About Us(/about-us/)

Careers(/careers/)                         Contact Us(/contact-us/)

Advertise(/advertise-2nd-level/)

04_Exhibit_C.03r_Second_Amended_Statement_of_Claim_Redacted_Operative_Pleading.pdf  |  C:\Users\JDSB\OneDrive - Green Bier Capital\JB Legal - Working Teams - JB v JPMS - Workspace\+00.00 - USDCNT_5thC