**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
|    *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
|    *Respondents.* | § | |

# EXHIBIT X.01

## WilsonStainback Well Documented Performance Fallback

## X.01-001 – 002

**Description:** Industry-pattern / prior-award / pattern-and-practice record.

**Relevance:** Industry-pattern and prior-award precedent bearing on the JPMS U5-wording pattern argument.

**Source:** JPM Internal Record – Wilson/Stainback 'Well-Documented Performance' fallback rationale; produced in discovery

**Petition Ref:** App. A p. 55 ("Wilson/Stainback "Well Documented" Performance Fallback Email")

**Disclosures:** None — reproduced as produced, no added markings

**Filing Status:** Public – not sealed

**X.01-001**
4-26-cv-00381-O
*Biering v. JPMS, et al.*

Message

**From**: Wilson, Beth A [beth.a.wilson@chase.com]
**Sent**: 10/24/2023 9:00:55 PM
**To**: Stainback, Stephanie [Stephanie.Stainback@jpmorgan.com]
**Subject**: RE: Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

Hi Stephanie,

I reached out to Nadia and she let me know you are speaking with her tomorrow morning. I'm actually quite surprised this case has received this much attention already, much faster than I ever expected. I believe she's also spoken to Ben a few times so I have no doubt she understands the time sensitivity here.

I will be on a medical leave starting Friday. I will ensure the performance case is well documented so that if there is a plausible reason for Joshua's expenses and we have to fall back on performance, one of my colleagues can pick up where we left off. If this occurs, Ben can send an update to the case via me@jpmc (or you can) referencing the performance case: HRC0098308. I will not be in a position to be checking emails and I am doing everything possible to avoid having managers reaching our directly to my manager, Pam Mayer.

Thank you!

**Beth A. Wilson | ER Partner | Employee Relations | Human Resources | JPMorgan Chase & Co. |**
**1111 Polaris Pkwy, E1, Columbus, OH 43240-2050**

Note: I will be OOO indefinitely starting 10/27/2023. If you have an update or request regarding a current case, please refer to me@jpmc jpmc > Search HR Resources, Apps or Requests > Performance Management Assistance

**From:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Sent:** Tuesday, October 24, 2023 3:54 PM
**To:** Wilson, Beth A (HR, USA) <beth.a.wilson@chase.com>
**Subject:** FW: Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

FYI – if you can do anything to help move this forward it would be appreciated. Nadia spoke with Ben yesterday.

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Tuesday, October 24, 2023 11:20 AM
**To:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** RE: Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

Hello Stephanie,

I apologize for the delay. I will be in office tomorrow and Thursday if either of those days work for you.

**From:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Sent:** Monday, October 23, 2023 3:35 PM
**To:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Subject:** RE: Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

Hi Nadia. I am free now if you'd like to speak today. I am the HR Business Advisor who supports the region so not the LOB contact but happy to help.

X.01-001

**X.01-002**

4:26-cv-00381-O

*Biering v. JPMS, et al.*

**From:** Muraira, Nadia <nadia.muraira@jpmchase.com>
**Sent:** Monday, October 23, 2023 1:02 PM
**To:** Stainback, Stephanie (WM, USA) <Stephanie.Stainback@jpmorgan.com>
**Subject:** Global Security Investigation-EC_NA_1020239740-CONFIDENTIAL

Hello Stephanie,

I am the assigned investigator regarding Joshua Biering (I662283).  I connected with Ben Stewart (N682989) this afternoon.  He advised me you were the LOB point of contact regarding this employee.  Can we schedule a time to discuss?

I am also on the 4th floor of the 712 Main Building in Houston, TX.  In person, phone or zoom works.  Let me know when works best for you.  I appreciate your time and attention regarding this matter, and I look forward to hearing from you. Thank you and have a safe day!

Respectfully,

**Nadia Muraira** | Investigator VP | Global Security | JP Morgan Chase & Co. | 712 Main Street, Houston, TX 77002 | T: 713-216-7247 |
nadia.muraira@jpmchase.com

Learn more at go/besecure


X.01-002

JPMS_00026882

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02a

## Becht v. JPMS – Prior FINRA Pattern Award (FINRA Arb. No. 23-03185)
## X.02a-001 – 007

| | |
|---|---|
| **Description:** | Becht v. JPMorgan Securities LLC, FINRA Dispute Resolution Award (Arb. No. 23-03185) – a prior FINRA Panel award addressing JPMS U5-disclosure / termination-language conduct. |
| **Relevance:** | Prior FINRA Panel award documenting JPMS's pattern-and-practice of U5 termination-language conduct; supports the pattern-and-practice argument and informs the FAA § 10 industry-context analysis. |
| **Source:** | FINRA Arbitration Award; issued February 4, 2022 |
| **Petition Ref:** | App. A p. 55 ("Becht v. JPMS Pattern Award – FINRA No. 23-03185") |
| **Disclosures:** | None — reproduced as produced, no added markings |
| **Filing Status:** | Public – not sealed |

X.02a-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant
Evan J. Becht

Case Number: 23-03185

vs.

Respondent
J.P. Morgan Securities, LLC

Hearing Site: Boston, Massachusetts

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Evan J. Becht ("Claimant"): Keith A. Macdonald, Esq., Kearney and Macdonald, LLP, Rockland, Massachusetts.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Emma M. Tomsick, Esq., Greensfelder LLP, Cleveland, Ohio.

## CASE INFORMATION

Amended Statement of Claim filed on or about: November 2, 2023.
Claimant signed the Submission Agreement: November 2, 2023.

Statement of Answer filed by Respondent on or about: February 9, 2024
Respondent signed the Submission Agreement: February 9, 2024.

## CASE SUMMARY

In the Amended Statement of Claim, Claimant asserted the following causes of action: defamation; and expungement of Form U5 termination entry based on the defamatory nature of the entry in Claimant's Central Registration Depository ("CRD") records.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Amended Statement of Claim and asserted various affirmative defenses.

CONFIDENTIAL

FINRA Dispute Resolution Services
Arbitration No. 23-03185
Award Page 2 of 7

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 6 of 82    PageID 1760

X.02a-002
4-26-cv-00381-O
*Biering v. JPMS, et al.*

## RELIEF REQUESTED

In the Amended Statement of Claim, Claimant requested an award equal to out-of-pocket damages, plus the costs of these proceedings, pre-hearing conference fees, filing fees, expenses, attorneys' and experts' fees and all consequential damages and losses suffered by Claimant; compensatory damages in the amount of $90,000.00; attorneys' fees in the amount of $7,500.00; expungement of the Form U5 filed with the CRD; and for any further relief deemed just, equitable, fair and appropriate.

In the Statement of Answer, Respondent requested that Claimant's request for damages and expungement be denied, and that all costs be assessed against Claimant.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrator acknowledges having read the pleadings and other materials filed by the parties.

The original Statement of Claim was filed on November 1, 2023, but was not served on Respondent, or considered by the Arbitrator.

At the time of appointment to this matter, Arbitrator Andrea J. Goldman was classified as a public arbitrator. On April 23, 2024, the parties were notified her classification changed to non-public. No party objected to the change in classification.

The Arbitrator has provided an explanation of the decision in this award. The explanation is for the parties' information only and is not precedential in nature.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Arbitrator has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $363,200.00 in compensatory damages for back wages.

2. Respondent is liable for and shall pay to Claimant interest on the above-stated sum at the rate of 9% per annum from May 23, 2023 through and including March 27, 2025.

3. Respondent is liable for and shall pay to Claimant the sum of $50,000.00 in punitive damages pursuant to New York Law that permits award of punitive damages when the defamation causes harm.

4. The Arbitrator recommends the expungement of the Termination Explanation in Section 3 of Evan J. Becht's (CRD Number 7164663) Form U5 filed by J.P. Morgan Securities, LLC (CRD Number 79) on June 7, 2023 and maintained by the CRD. The Reason for Termination shall remain the same. The Termination Explanation shall be deleted in its entirety and replaced with the following language: "Terminated by affiliate bank." This directive shall apply to all references to th

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 7 of 82    PageID 1761

X.02a-003
4:26-cv-00381-O
*Biering v. JPMS, et al.*

The Arbitrator further recommends the expungement of all references to Occu Number 2277346 from the registration records maintained by the CRD for Evan J. Becht. Any "Yes" answers should be changed to "No," as applicable.

The Arbitrator recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Evan J. Becht must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

5.  Respondent is liable for and shall pay to Claimant $225.00 to reimburse Claimant for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services

6.  Any and all claims for relief not specifically addressed herein, including any request for attorneys' fees, are denied.

## ARBITRATOR'S EXPLANATION OF DECISION

Claimant ("Becht") started working at J.P. Morgan Chase Bank ("Bank") in 2019. As of June 2021, he worked as a Private Client Banker ("PCB"). In that role, he was given a list of clients for whom he was responsible. Part of his duties included partnering with the Investment Advisor, ZR, and referring clients to him.

In 2022, Becht acquired a new client, QZ. QZ was a very wealthy woman, and Becht worked on fostering his relationship with her once she became a client of the bank. He also referred her to ZR, who took her on as a brokerage client.

The period starting January 2023 was a difficult time for the bank. The branch was not performing well and there was a lot of pressure to bring in new business. As a PCB, Becht was encouraged to refer business to ZR rather than selling the client banking investments such as CDs. It should be noted that even though others were not performing well, Becht was having his best year yet. He had also received glowing employment evaluations for the previous years.

Becht communicated with QZ on a regular basis. She asked him about investing in a CD because the market was not doing well. Over the weekend of March 12, 2023, QZ wired over $2 million in funds to the Bank. On March 14, 2023, ZR called QZ to confirm receipt of the funds. He then walked over to Becht's office and let him know that the money had come in. Becht made a notation in Client Central that he had instigated a joint call with QZ to discuss the incoming transfer.

Becht, feeling that he was instrumental in bringing in the funds from QZ, requested an Upsell Credit for the transaction. It should be noted that this credit would have amounted to approximately $1,000.00 to Becht, which was not significant given that he was making $3-5000/month in credits or bonuses.

The Upsell Credit r                                                          that she did not

X.02a-003

**CONFIDENTIAL**

FINRA Dispute Resolution Services
Arbitration No. 23-03185
Award Page 4 of 7

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 8 of 82    PageID 1762

X.02a-004
4:26-cv-00381-O
*Biering v. JPMS, et al.*

feel that Becht was entitled to the credit. As a result, she investigated Becht's role the funds by reviewing his notes in Client Central and speaking with ZR and Bech notation in Client Central of a call made by Becht that stated, "joint call with IA [ZR]. Client moved funds from FRB to expand JPM relationship" on 03/14/2023 at 10:17 AM.

AH complained that Becht refused to use the "click-to-call" feature of the bank's client software, which would have automatically recorded all of Becht's calls. Instead, he made phone calls and then entered the calls into Client Central manually. AH was suspicious of the veracity of the entry and thought it was self-serving (I will note that the call was made on March 14, which was after the money had already come into the bank). She "investigated" whether the call was made by asking ZR if he had made the call with Becht, which ZR denied. She then asked Becht about the call, which he says he made. AH stated, "I knew he was lying." In addition, I believe AH retaliated against Becht because she knew he was looking for other jobs.

AH then proceeded to write a scathing letter to Human Resources, questioning Becht's integrity. In that memorandum, she stated, "Bottom line is that he is trying to manipulate the incentive plan and in addition to that is falsifying notes." AH testified that she did not know that Becht was going to be fired, but I find that testimony completely disingenuous. AH used direct terminology from the Private Client Banker handbook to vilify Becht's actions. I believe she found Becht to be a cocky employee who needed to be taught a lesson.

The memorandum resulted in an investigation by Global Security 1½ months later and a report was prepared. The report then went to Employee Relations Partner TD who recommended on May 24, 2023 that Becht should be terminated for misconduct. The recommendation resulted in Becht being fired on May 27, 2023.

The events surrounding the termination were entered into Becht's U5 Form on June 7, 2023. This was entered in the Web CRD and in Becht's BrokerCheck® Report.

Once Becht started applying for new jobs, he discovered the information listed in his Form U5 and BrokerCheck® Report. Based on his testimony, he has applied for at least one hundred jobs. He received eight job offers that were then rescinded once the potential employers performed background checks.

Becht filed for arbitration against J.P. Morgan Securities claiming defamation and a request for expungement of his Form U5. Given that he was an at-will employee, there is no claim for wrongful termination.

AH's investigation of the circumstances surrounding the request for the Upsell Credit and the entry in Client Central was woefully inadequate. She refused to consider emails between Becht and QZ. She also never made any attempt to determine whether there were any outgoing calls by Becht to the client on March 14. Evidence provided by the Respondent in a spreadsheet showed that there were, in fact two calls to the client on March 14, 2023. One was by ZR and one was by Becht. The whole allegation of falsifying information was based on the notion that there was one phone call when in fact, there were two! I credit Becht's testimony that ZR was present when he called QZ. Even if his memory was faulty, Becht states that he made on average, fifty entrie                                               cellent employee

CONFIDENTIAL

X.02a-005
4.26-cv-00381-O
*Biering v. JPMS, et al.*

FINRA Dispute Resolution Services
Arbitration No.  23-03185
Award Page 5 of 7

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 9 of 82    PageID 1763

would be fired for one ambiguous entry over the course of his tenure at the bank. received a warning.

In addition, it states that Becht "manipulated" data in order to receive the Upsell Credit. Becht testified that he submitted the application for the Upsell Credit in writing along with his supporting documentation and arguments about why he was entitled to receive it. Neither side submitted that application into evidence. How can it be found that Becht committed fraud when we don't even know what he said? Becht said he never used the March 14 call as support for receiving the credit. It happened after the money was transferred, so quite frankly, I don't even know why it is relevant. It is notable that Respondent did not include the request for the Upsell Credit as part of its evidence.

Once AH's memo was sent to HR, the situation took on a life of its own. The investigation by Global Security was cursory at best and took all of AH's allegations as true. They put Becht on the spot and caught him by surprise. The Global Security investigator appears to have rubber-stamped AH's version of the story. It was then transmitted to HR and resulted in the recommendation for termination and the offending Form U5 and BrokerCheck® Reports.

As a result of the language in the Form U5 and BrokerCheck® Reports, Becht has been unable to find a job for almost two years, was forced to go back to live with his parents and has lived without health insurance. He is also $50,000.00 in debt. The language in these documents has caused irreparable harm to Becht.

The Bank's attorney gave a definition of defamation. I find there was a false statement of fact that was made with malice (or at minimum, a reckless disregard for the truth). AH did not even include the Upsell Credit submission in her letter to HR. That leads me to conclude that her investigation was completely deficient and she acted with malice by submitting the memorandum with carefully chosen buzzwords that she knew would harm Becht. Truth is a defense to a claim of defamation, but the Bank never demonstrated that Becht made any false statements.

Becht is a young man at the beginning of this career. Based on his W-2s, his earnings increased substantially each year. In 2023, he worked for five months prior to being terminated. If one goes back and reviews his income for the previous twelve months prior to the date of termination, he earned approximately $127,000.00. His average increase in salary for each year starting from 2020 was 20%. Even though he was on track to make $163,000.00 in 2023, it is unclear whether that trend would have continued. I am therefore awarding Becht $88,900.00 for the remaining seven months of 2023. $182,880.00 for 2024 and $91,440.00 for the first five months of 2025 until his record is expunged.

I therefore order J.P. Morgan Securities, LLC to pay Evan J. Becht $363,200.00 in lost wages for its defamatory statements in Becht's Form U5, the CRD and BrokerCheck® Report. I also find that these statements were made as a result of malice and recklessness. I therefore award Becht another $50,000.00 in punitive damages. I am unable to award attorney's fees, but J.P. Morgan Securities, LLC shall bear all of the costs of arbitration.

**CONFIDENTIAL**

FINRA Dispute Resolution Services
Arbitration No.  23-03185
Award Page 6 of 7

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 975.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 1,100.00 |
| Member Process Fee | =$ | 2,250.00 |

### Hearing Session Fees and Assessments
The Arbitrator has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator, including a pre-hearing conference with the Arbitrator, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session @ $450.00/session | | =$ | 450.00 |
| Pre-Hearing Conference:  February 8, 2024 | 1 session | | |
| | | | |
| Five (5) hearing sessions @ $450.00/session | | =$ | 2,250.00 |
| Hearings:          March 25, 2025 | 2 sessions | | |
|                        March 26, 2025 | 2 sessions | | |
|                        March 27, 2025 | 1 session | | |

| | | |
|---|---|---|
| Total Hearing Session Fees | =$ | 2,700.00 |

The Arbitrator has assessed the total hearing session fees to Respondent.

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 11 of 82    PageID 1765



X.02a-007

4:26-cr-00381-O

*Biering v. JPMS, et al.*

## ARBITRATOR

Andrea J. Goldman           -           Sole Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Arbitrator's Signature**

*Andrea J. Goldman*                              04/08/2025
Andrea J. Goldman                              Signature Date
Sole Non-Public Arbitrator

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 09, 2025
Date of Service (For FINRA Dispute Resolution Services use only)

X.02a-007

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02b

## Wilson–Stainback Pattern – Comparator B
## X.02b-001 – 007

**Description:**   Comparator B in the Wilson/Stainback pattern-and-practice series – industry-pattern / prior-award / pattern-and-practice record.

**Relevance:**   Industry-pattern and prior-award precedent bearing on the JPMS U-5 wording pattern argument.

**Source:**   JPM Internal Record – Comparator B; produced in discovery.

**Petition Ref:**   App. A p. 55 ("Wilson/Stainback comparator B").

**Disclosures:**   Annotations: None — reproduced as produced, no added markings

**Filing Status:**   Public — not sealed

X.02b-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant                                    Case Number: 18-02978
Liet Han

     vs.

Respondent                                  Hearing Site: New York, New York
J.P. Morgan Securities, LLC

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

### REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

### CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

### CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

CONFIDENTIAL

FINRA Dispute Resolution Services
Arbitration No. 18-02978

Case 4.26-cv-00381-O-BF    Document 33-2    Filed 05/06/26    Page 14 of 82    PageID 1768

X.02b-002
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## RELIEF REQUESTED

In the Statement of Claim*,* Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

   The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

CONFIDENTIAL

FINRA Dispute Resolution Services   Document 33-2   Filed 05/06/26   Page 15 of 82   PageID 1769
Case 4:26-cv-00381-O-BP
Arbitration No.  18-02978



X.02b-003
4:26-cv-00381-O
Biering v. JPMS, et al.

3.  Any and all claims for relief not specifically addressed herein, including any re
    attorneys' fees, are denied.

### Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making.  The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior.  Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false.  The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit.  He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit.  Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back.  A "pull-back" the undisputed record showed, is a red flag for unlawful structuring.  Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth.  I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which                                                                    uring, and he again used the pro                                                                    nding the
                          lett                                                                    ant falsely stated

X.02b-003

CONFIDENTIAL

FINRA Dispute Resolution Services    Document 33-2    Filed 05/06/26    Page 16 of 82    PageID 1770
Case 4:26-cv-00381-O-BP
Arbitration No.  18-02978

X.02b-004
4:26-cv-00381-O
*Biering v. JPMS, et al.*

in the Statement of Claim that his prior record was "spotless," while the evidence that he previously received a warning and letter of education for other rules violati respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was).  I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR.  It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant.  They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact.  They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it.  There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect.  In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so.  All of the steps Respondent took were entirely the result of

Claimant and his w                                                                                     017.
Nevertheless, the                                                                            00 to the Claimant



X.02b-005
4:26-cv-00381-O
Biering v. JPMS, et al.

for "compensation."  One can only look incredulously at this record and ask "com
Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.


## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:
### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                      =$ 2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*


### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm that employed the associated person at the time of the event giving rise to the
dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the
following:

Member Surcharge                                                             =$ 3,025.00
Member Process Fee                                                           =$ 6,175.00

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

November 18-22, 2019, postponement requested by the parties             =$ 1,400.00
February 8-14, 2022, postponement requested by the parties                  Waived

_____

Total Postponement Fees                                                      =$ 1,400.00

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any
meeting between the parties and the Arbitrators, including a pre-hearing conference with the
Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session      =$    450.00
Pre-Hearing Conference:   October 7, 2019              1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session            =$  5,600.00
Pre-Hearing Confe

CONFIDENTIAL

X.02b-006

4:26-cv-00381-O

*Biering v. JPMS, et al.*

FINRA Dispute Resolution Services
Arbitration No.  18-02978

|  | October 27, 2022 | 1 session |  |
|---|---|---|---|

| Four (4) hearing sessions @ $1,400.00/session |  |  | =$  5,600.00 |
|---|---|---|---|
| Hearings: | June 12, 2023 | 2 sessions |  |
|  | June 13, 2023 | 1 session |  |
|  | June 14, 2023 | 1 session |  |

| Total Hearing Session Fees |  | =$ 11,650.00 |
|---|---|---|

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

X.02b-006

Case 4:26-cv-00381-O-BP   Document 33-2   Filed 05/06/26   Page 19 of 82   PageID 1773



X.02b-007
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

*Linda J. Baer*      06/26/2023
_____    _____
Linda J. Baer                  Signature Date
Public Arbitrator

*Sean F. Monahan*      06/26/2023
_____    _____
Sean F. Monahan             Signature Date
Non-Public Arbitrator

### Concurring In-Part, Dissenting In-Part Arbitrator's Signature
Arbitrator dissented on the award for compensatory damages

*Mitchell Regenbogen*      07/06/2023
_____    _____
Mitchell Regenbogen        Signature Date
Public Arbitrator, Presiding Chairperson

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

July 07, 2023
_____
Date of Service (For FINRA Dispute Resolution Services use only)

X.02b-007

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
|     *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
|     *Respondents.* | § | |

---

# EXHIBIT X.02c.i

# Luckett v. JPMS – FINRA Arbitration Award (No. 19-03075)

# X.02c.i-001 – X.02c.i-005

---

| | |
|---|---|
| **Description:** | FINRA arbitration award in Luckett v. J.P. Morgan Securities LLC (FINRA No. 19-03075), a financial-industry employment discrimination and defamation case at a peer institution. |
| **Relevance:** | Peer-institution comparator award: FINRA panel found for the claimant on employment discrimination and defamation claims against JPMS on materially similar facts. Cited at Dkt. 11 ¶¶ 130–135 as damages and liability authority. |
| **Source:** | FINRA Dispute Resolution Services, Award No. 19-03075 |
| **Petition Ref:** | Dkt. 11 ¶¶ 130–135; App. A p. 16. |
| **Disclosures:** | None — reproduced as produced, no added markings |
| **Filing Status:** | Public – not sealed |

X.02c.i-001

4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant
Dustin B. Luckett

       vs.

Respondents
J.P. Morgan Securities, LLC and
Todd G. Fannin

Case Number: 19-03075

Hearing Site: Louisville, Kentucky

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealin                              e conclusion of
Claimant's employ



X.02c.i-002

4:26-cv-00381-O

Biering v. JPMS, et al.

Unless specifically admitted in the Statement of Answer, Respondents denied the a
made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00.  Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction.  The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2.  JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3.  The Panel reco                                                    in Section 3 of
            e Lu                                                      gan Securities



LLC on June 29, 2017 and maintained by CRD. The Reason for Termination the same and the Termination Explanation shall be replaced with the following "Non-investment related. After a dispute about a clerical process, RR became disillusioned with the company's atmosphere requiring separation of his at-will employment." This directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number 1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4. Claimant's claims against Fannin are denied.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                    =$    2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, JPMS is assessed the following:

Member Surcharge                                                          =$    3,025.00
Member Process Fee                                                        =$    6,175.00

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session        =$     450.00
Pre-Hearing Conference:   July 27, 2021                    1 session

Four (4) pre-hearin                                                          =$    5,600.00
                    onfe

FINRA Dispute Resolution Services
Arbitration No.  19-03075

| | February 2, 2021 | 1 session | | |
|---|---|---|---|---|
| | February 11, 2021 | 1 session | | |
| | December 9, 2021 | 1 session | | |

Eight (8) hearing sessions @ $1,400.00/session                    =$   11,200.00

Hearings:

| | January 25, 2022 | 2 sessions | | |
|---|---|---|---|---|
| | January 26, 2022 | 2 sessions | | |
| | January 27, 2022 | 2 sessions | | |
| | January 28, 2022 | 2 sessions | | |

Total Hearing Session Fees                                        =$   17,250.00

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

X.02c.i-004



X.02c.i-005

4:26-cv-00381-O
*Biering v. JPMS, et al.*

## ARBITRATION PANEL

| | | |
|---|---|---|
| David F. ██ett | - | Public Arbitrator, Presiding Chairperson |
| Linda W. Hester | - | Public Arbitrator |
| John R. Michael, II | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*David F* ██ *tt*
David F. ██ett
Public Arbitrator, Presiding Chairperson

**02/04/2022**
Signature Date

*Linda W. Hester*
Linda W. Hester
Public Arbitrator

**02/04/2022**
Signature Date

*John R. Michael, II*
John R. Michael, II
Non-Public Arbitrator

**02/04/2022**
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

February 04, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

X.02c.i-005

## UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

---

# EXHIBIT X.02c.ii

## JPMS v. Luckett – Motion to Vacate Denied / Award Confirmed (W.D.Ky.)
## X.02c.ii-001 – X.02c.ii-012

---

**Description:**   W.D. Kentucky order denying JPMS's motion to vacate the Luckett FINRA award and confirming the award in full (JPMS v. Luckett, W.D.Ky.).

**Relevance:**   Federal court refused to vacate the FINRA award against JPMS in a factually analogous employment/defamation case. Demonstrates the legal durability of FINRA awards on similar claims and undercuts any FAA vacatur argument JPMS may raise in this proceeding.

**Source:**   JPMS v. Luckett, W.D. Kentucky – Order Confirming FINRA Award

**Petition Ref:**   Dkt. 11 ¶¶ 130–135; Ex. X.02c.i (FINRA Award); X.02c.iii (District Court Order).

**Disclosures:**   None — reproduced as produced, no added markings

**Filing Status:**   Public – not sealed

X.02c.ii-001

4:26-cv-00381-O
*Biering v. JPMS, et al.*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

J.P. MORGAN SECURITIES LLC,                                             Plaintiff

v.                                                           Civil Action No. 3:22-cv-137-RGJ

DUSTIN LUCKETT,                                                          Defendant

\* \* \* \* \*

## MEMORANDUM OPINION & ORDER

Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id*.]. Luckett is a citizen of Kentucky. [*Id*.]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in the "district court wherein the award was made." 9 U.S.C. § 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

X.02c.ii-002

4:26-cv-00381-O

*Biering v. JPMS, et al.*

## I.   BACKGROUND[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky.  [DE 16 at 126].  JPMS and Chase are affiliates.  [DE 16 at 126].  JPMS is a member of the Financial Industry Regulatory Authority ("FINRA").  Luckett was employed by Chase, but his securities licenses were held by JPMS.  [*Id*. at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id*. at 132].  Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5.  [*Id*. at 127].  JPMS filed Luckett's Form U5 as required.  [DE 9-2].  Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related.  [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy.  In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98].  JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id*. at 300].

Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum.  [DE 9-1].  He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies.  [*Id*. at 69-71].  He also asserted that JPMS breached an implied covenant of good

---

[1] The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination.  Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award.  Many of the contested characterizations are not relevant given the standard of review for arbitration awards.  As a result, the Background includes only those facts agreed upon by the parties.

X.02c.ii-003
4:26-cv-00381-O
*Biering v. JPMS, et al.*

faith and fair dealing by not facilitating his right to rollover funds in his 401(k) acc

73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")]. The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id*.]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id*.]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id*.]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.'" [*Id*.]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id*.]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

## II.    ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1.    Motion to Vacate Arbitration Award Standard

X.02c.ii-004

4:26-cv-00381-O

*Biering v. JPMS, et al.*

The Federal Arbitration Act ("FAA") expresses a federal policy in favor

arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir.

2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well

established that courts should play only a limited role in reviewing the decisions of arbitrators."

*Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992).

"When courts are called on to review an arbitrator's decision, the review is very narrow; it is one

of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut.*

*Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must

refrain from reversing an arbitrator simply because the court disagrees with the result or believes

the arbitrator made a serious legal or factual error." *United Paperworkers Int'l Union v. Misco,*

*Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they

are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F.

App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits

of an award, even when parties allege that the award rests on errors of fact") (quoting *United*

*Paperworkers*, 484 U.S. at 36).

> The FAA sets out only four situations in which an arbitration award may be vacated:
>
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008)

(holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The

X.02c.ii-005
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Sixth Circuit recognizes an additional ground for vacating an award where th

"manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2.  Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law.  [DE 16 at 136-51].  JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim.  [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

"To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient.  Rather, the decision must fly in the face of clearly established legal precedent.'" *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008)

---

[2] The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur.  As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts.  *Samaan*, 835 F.3d at 600; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.*, 2023 WL 5002875, at *6 (W.D. Ky. Aug. 4, 2023) ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated w                                                          mitted).

X.02c.ii-006
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(alteration in original) (quoting *Jaros*, 70 F.3d at 421). "When faced with question

arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal

principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to

heed that legal principle." *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis

for their award. Generally, arbitrators are not required to explain their decisions. *See United*

*Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation

to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court
> can find any line of argument that is legally plausible and supports the award then
> it *must* be confirmed. Only where no judge or group of judges could conceivably
> come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained

decision has been described as "all but impossible." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th

Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir.

1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as

"something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that

may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable

basis on which the arbitrators could have based their award, the reviewing court should decline

vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 483–485 (6th Cir.

2006) (declining to vacate an arbitration panel's unexplained decision because plaintiff identified

two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision.

Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v.*

*Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would

X.02c.ii-007

4:26-cv-00381-O
*Biering v. JPMS, et al.*

govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties ma

explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those

---

[3] It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If, under New York law, the tortious interference claim could plausibly support the Award, then the Court must confirm it. *Jaros*, 70 F.3d at 421.

situations where the third party would have entered into or extended a contractual relat

plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N.Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed "'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.'" *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y.1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id*. at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id*. at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision . . . [about]

X.02c.ii-009

4:26-cv-00381-O

*Biering v. JPMS, et al.*

mov[ing] forward." [ DE 21-4 at 617].  JPMS was likely to know of this practice as the same industry and would have expected Luckett's potential employers to conduct this kind of review.  This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects.  The Court notes that this element may be less supported in the record than the others.  However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36).  There is thus a plausible basis from which the Panel could have found this element satisfied.

As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS acted with either the sole purpose of harming him or by means that were dishonest, unfair, or improper.  [DE 16 at 150].  This element may be satisfied by a showing that the defendant's actions amounted to an independent tort.  *See Carvel Corp.*, 818 N.E.2d at 1103.  In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts.  In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature."  [DE 1-2 at 10].  Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law.  *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient . . . Rather, the decision must fly in the face of clearly established legal precedent.").  JPMS has failed to establish the Panel's decision

necessarily "flies in the face" of New York law if it was based on Luckett's tortious claim. *Id*. After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id*.

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

### 3. Exceeded Powers

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of

X.02c.ii-011

4:26-cv-00381-O

*Biering v. JPMS, et al.*

good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is pree Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

### 4. Motion to Confirm Arbitration Award Standard

Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Sixth Circuit has held that "the plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 676. JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

### III.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

X.02c.ii-012

4:26-cv-00381-O

*Biering v. JPMS, et al.*

3.      The Court will enter separate judgment.

September 14, 2023

Rebecca Grady Jennings, District Judge

United States District Court

cc:      Counsel of record

X.02c.ii-012

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02c.iii

## JPMS v. Luckett – District Court Order (W.D.Ky.)

## X.02c.iii-001 – X.02c.iii-012

**Description:**   W.D. Kentucky district court order in JPMS v. Luckett, affirming the FINRA arbitration award and addressing JPMS's legal challenges to the award.

**Relevance:**   Federal court's substantive review and affirmation of the Luckett FINRA award. Addresses JPMS's FAA arguments on nearly identical facts, providing strong precedent against vacatur in this case.

**Source:**   JPMS v. Luckett, W.D. Kentucky – District Court Order

**Petition Ref:**   Dkt. 11 ¶¶ 130–135; Ex. X.02c.i (FINRA Award); X.02c.ii (Confirming Order).

**Disclosures:**   None — reproduced as produced, no added markings

**Filing Status:**   Public – not sealed

**X.02c.iii-001**
4:26-cv-00381-O
*Biering v. JPMS, et al.*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

J.P. MORGAN SECURITIES LLC,                                          Plaintiff

v.                                                              Civil Action No. 3:22-cv-137-RGJ

DUSTIN LUCKETT,                                                       Defendant

* * * * *

**MEMORANDUM OPINION & ORDER**

Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id*.]. Luckett is a citizen of Kentucky. [*Id*.]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in the "district court wherein the award was made." 9 U.S.C. § 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

X.02c.iii-001

## I.    BACKGROUND[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky.  [DE 16 at 126].  JPMS and Chase are affiliates.  [DE 16 at 126].  JPMS is a member of the Financial Industry Regulatory Authority ("FINRA").  Luckett was employed by Chase, but his securities licenses were held by JPMS.  [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment.  [*Id.* at 132].  Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5.  [*Id.* at 127].  JPMS filed Luckett's Form U5 as required.  [DE 9-2].  Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related.  [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy.  In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98].  JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct."  [*Id.* at 300].

Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum.  [DE 9-1].  He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies.  [*Id.* at 69-71].  He also asserted that JPMS breached an implied covenant of good

---

[1] The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination.  Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award.  Many of the contested characterizations are not relevant given the standard of review for arbitration awards.  As a result, the Background includes only those facts agreed upon by the parties.

**X.02c.iii-003**

4:26-cv-00381-O

*Biering v. JPMS, et al.*

faith and fair dealing by not facilitating his right to rollover funds in his 401(k) acc

73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022.  [DE 1-2 ("Award")].  The Arbitration Panel ("Panel") rendered the Award on February 4, 2022.  [*Id*.].  The Award found JPMS liable to Luckett for $1.4 million in compensatory damages.  [*Id*.].  The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable."  [*Id*.].  The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.'" [*Id*.].  The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5.  [*Id*.].  Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b).  [DE 1; DE 16; DE 27].  Luckett opposed the Motion to Vacate and moved to confirm the Award.  [DE 9; DE 21; DE 29].

## II.    ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law.  [DE 1].  Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm.  [DE 29].

### 1.    Motion to Vacate Arbitration Award Standard

**X.02c.iii-004**

4:26-cv-00381-O

*Biering v. JPMS, et al.*

The Federal Arbitration Act ("FAA") expresses a federal policy in favor arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result or believes the arbitrator made a serious legal or factual error." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

> The FAA sets out only four situations in which an arbitration award may be vacated:
>
> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The

Case 3:22-cv-00137-RGJ  Document 31  Filed 09/15/23  Page 5 of 12 Pag
CONFIDENTIAL
Case 4:26-cv-00381-O-BP   Document 33-2   Filed 05/06/26   Page 44 of 82   PageID 1798



Sixth Circuit recognizes an additional ground for vacating an award where th

"manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain

questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*,

70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the

award then it must be confirmed." *Id*. In other words, vacatur is proper only "where no judge or

group of judges could conceivably come to the same determination." *Id*.

### 2. Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard

of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these

grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id*. at 149-51];

(2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute

privilege for statements on a Form U5 [*Id*. at 136-39]; (3) Luckett failed to "prove that JPMS

published a false statement," which is a required element of a defamation claim [*Id*. at 139]; and

(4) false light is not a recognized claim under New York law [*Id*. at 138].

"To constitute a manifest disregard for the law, '[a] mere error in interpretation or

application of the law is insufficient. Rather, the decision must fly in the face of clearly established

legal precedent.'" *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008)

---

[2] The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan*, 835 F.3d at 600; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.*, 2023 WL 5002875, at *6 (W.D. Ky. Aug. 4, 2023) ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated w                                              mitted).

Case 3:22-cv-00137-RGJ   Document 31   Filed 09/15/23   Page 6 of 12 Pag
CONFIDENTIAL
Case 4:26-cv-00381-O-BP   Document 33-2   Filed 05/06/26   Page 45 of 82   PageID 1799

X.02c.iii-006
4:26-cv-00381-O
*Biering v. JPMS, et al.*

(alteration in original) (quoting *Jaros*, 70 F.3d at 421).  "When faced with question

arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal

principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to

heed that legal principle."  *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis

for their award.  Generally, arbitrators are not required to explain their decisions.  *See United*

*Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation

to the court to give their reasons for an award").  When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle.  If a court
> can find any line of argument that is legally plausible and supports the award then
> it *must* be confirmed. Only where no judge or group of judges could conceivably
> come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added).  Establishing manifest disregard based on an unexplained

decision has been described as "all but impossible."  *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th

Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir.

1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as

"something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that

may or may not have been manifestly disregarded by the arbitrator").  If there is any conceivable

basis on which the arbitrators could have based their award, the reviewing court should decline

vacatur.  *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471, 483–485 (6th Cir.

2006) (declining to vacate an arbitration panel's unexplained decision because plaintiff identified

two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision.

Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v.*

*Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012).  The parties agreed FINRA rules would

X.02c.iii-006

Case 3:22-cv-00137-RGJ Document 31 Filed 09/15/23 Page 7 of 12 Pag

CONFIDENTIAL

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 46 of 82    PageID 1800

X.02c.iii-007

4:26-cv-00381-O

*Biering v. JPMS, et al.*

govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties ma

explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46

n.4].

Thus, the Court has before it an unexplained award, four independent possible legal

theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court

to review the merits of the Award based on the record, eliminating every possible line of reasoning

that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one

of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70

F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the

award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a

reviewing court need address only one legally plausible basis for the arbitrators' award. *See*

*Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

The Court turns first to Luckett's tortious interference claim. Under New York law,[3]

tortious interference requires a party to prove: "(1) the existence of a business relation with a third

party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with

it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means

that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business

relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc*., 888 N.Y.S.2d 714,

728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those

---

[3] It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If, under New York law, the tortious interference claim could plausibly support the Award, then the Court must confirm it. *Jaros*, 70 F.3d at 421.

X.02c.iii-008

4:26-cv-00381-O
*Biering v. JPMS, et al.*

situations where the third party would have entered into or extended a contractual relat

plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N.Y App. Div. 1992).  To establish the second prong a plaintiff must show some activities directed "'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.'"  *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y.1997)).  Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS.  [DE 9-1 at 64-66].  Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett.  [DE 21-4 at 602-23].  Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett.  [*Id.* at 608-18].  Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing.  [*Id.* at 604-05].  This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James.  Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision . . . [about]

X.02c.iii-009

4:26-cv-00381-O

*Biering v. JPMS, et al.*

mov[ing] forward." [ DE 21-4 at 617].  JPMS was likely to know of this practice as the same industry and would have expected Luckett's potential employers to conduct this kind of review.  This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects.  The Court notes that this element may be less supported in the record than the others.  However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36).  There is thus a plausible basis from which the Panel could have found this element satisfied.

As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS acted with either the sole purpose of harming him or by means that were dishonest, unfair, or improper.  [DE 16 at 150].  This element may be satisfied by a showing that the defendant's actions amounted to an independent tort.  *See Carvel Corp.*, 818 N.E.2d at 1103.  In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts.  In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature."  [DE 1-2 at 10].  Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law.  *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient . . . Rather, the decision must fly in the face of clearly established legal precedent.").  JPMS has failed to establish the Panel's decision

Case 3:22-cv-00137-RGJ   Document 31   Filed 09/15/23   Page 10 of 12 Pag

**CONFIDENTIAL**

Case 4:26-cv-00381-O-BP   Document 33-2   Filed 05/06/26   Page 49 of 82   PageID 1803

X.02c.iii-010

4:26-cv-00381-O

*Biering v. JPMS, et al.*

necessarily "flies in the face" of New York law if it was based on Luckett's tortious claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

### 3. Exceeded Powers

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of

X.02c.iii-011

4:26-cv-00381-O

*Biering v. JPMS, et al.*

good faith and fair dealing.  [DE 16 at 151].  JPMS asserts that the claim is pree

Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right

to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim.

As established above in Part II.2, other valid grounds exist on which the Panel could have based

their decision.  As a result, the Court declines to further review the merits of an award on the claim

for breach of the implied covenant of good faith and fair dealing.  *See Visconsi*, 244 F. App'x at

714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify

one legally plausible basis for the arbitrators' award.").

### 4.  Motion to Confirm Arbitration Award Standard

Section 9 of the FAA states that when faced with a motion to confirm an arbitration award

"the court must grant such an order unless the award is vacated, modified, or corrected as

prescribed in sections 10 and 11 of this title."  9 U.S.C. § 9.  The Sixth Circuit has held that "the

plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed,

and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act

is well settled." *Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 676.  JPMS has failed to establish

any grounds on which to vacate the Award, and therefore the plain language of the FAA compels

the Court to grant Luckett's Motion to Confirm.

### III.   CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise

sufficiently advised, the Court **ORDERS** that:

1.   Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2.   Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

X.02c.iii-011

**X.02c.iii-012**

4:26-cv-00381-O

*Biering v. JPMS, et al.*

3.      The Court will enter separate judgment.

September 14, 2023

Rebecca Grady Jennings, District Judge

United States District Court

cc:      Counsel of record

X.02c.iii-012

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02d

## Bhatti v. Wells Fargo – Comparator Award (FINRA No. 22-01852)
## X.02d-001 – X.02d-006

**Description:** FINRA arbitration award in Bhatti v. Wells Fargo Securities, LLC (FINRA No. 22-01852), a comparator financial-industry employment case.

**Relevance:** Peer-institution comparator award relevant to damages benchmarking and industry-standard damages in financial-industry employment disputes. Cited at Dkt. 11 ¶¶ 130–135 as damages authority.

**Source:** FINRA Dispute Resolution Services, Award No. 22-01852

**Petition Ref:** Dkt. 11 ¶¶ 130–135; App. A p. 16 ("Comparator Awards").

**Disclosures:** None — reproduced as produced, no added markings

**Filing Status:** Public – not sealed



X.02d-001

4:26-cv-00381-O
*Biering v. JPMS, et al.*

## Award
## FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

| | |
|---|---|
| Claimant<br>Yousef Ali Bhatti | Case Number: 22-01852 |
| vs. | |
| Respondent<br>Wells Fargo Clearing Services, LLC | Hearing Site: Dallas, Texas |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Yousef Ali Bhatti ("Claimant"): Wilmer D. Masterson, III, Esq., Kilgore & Kilgore, PLLC, Dallas, Texas.

For Respondent Wells Fargo Clearing Services, LLC ("Respondent"): Donald R. Littlefield, Esq. and Charles A. Hammaker, Esq., Bressler, Amery & Ross, P.C., Dallas, Texas.

## CASE INFORMATION

Statement of Claim filed on or about: August 16, 2022.
Claimant signed the Submission Agreement: August 15, 2022.

Statement of Answer filed on or about: October 18, 2022.
Respondent signed the Submission Agreement: October 11, 2022.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim for defamation, alleging that the Form U5 filed by Respondent, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

nt of

X.02d-001



1) Judgment for actual, special, and consequential damages resulting from t of Respondent, past and future;

2) Judgment for loss of income, profits, bonuses, awards and other compensation, and benefits, both past and future;

3) Judgment for other past and future pecuniary losses;

4) Actual damages for past and future damage to reputation and for the past and future mental anguish and emotional distress suffered by Claimant;

5) Punitive damages;

6) Pre-judgment and post-judgment interest at the maximum legal rate;

7) All costs of this proceeding;

8) Injunctive relief, temporary and permanent, ordering the expungement of all defamatory information contained in the original and/or amended Form U5s filed by Respondent with respect to Claimant;

9) Attorneys' and expert fees; and

10) Such other and further relief to which Claimant may be justly entitled.

In the Statement of Answer, Respondent requested that the Panel deny the relief requested in Claimant's Statement of Claim in its entirety; assess all costs of this proceeding, including Respondent's attorneys' fees, against Claimant; and award such other relief which the Panel deems just.

At the hearing, Claimant and Respondent withdrew their requests for attorneys' fees.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Panel has provided an explanation of the decision in this award. The explanation is for the parties' information only and is not precedential in nature.

## EXPLAINED DECISION

Claimant was employed by Wells Fargo Bank, N.A. ("Wells Fargo"). As part of his employment, Claimant studied for and passed a number of tests through which he secured various securities licenses which allowed him to become a registered representative at Respondent, an affiliate of Wells Fargo. In the course of his duties at Wells Fargo, Claimant was approached by a high net-worth client ("Customer") of Wells Fargo who wanted to make a $100,000.00 first-party wire transfer to her account in Mexico. The Customer had an account that, at times, had in excess of one million dollars in it and, at the time of the requested wire transfer, she had more than enough money in her account to make the transfer. The Customer had made numerous wire transfers in the past, a number of which were larger than the one requested. Claimant attempted to follow Wells Fargo's procedures for a wire of $100,000.00 or more which required him to contact the fraud department and receive a clearance code for the transaction. After being on hold with the fraud department for around 45 minutes they hung up on him. With both Claimant and the Customer understandably frustrated, Claimant approached his co-employees and manager to see if t                                                      r's needs. They provided him with                                                      ant's suggestion,

X.02d-002

CONFIDENTIAL

X.02d-003

FINRA Dispute Resolution Services
Arbitration No. 22-01852

Case 4:26-cv-00381-O-BP    Document 33-2    Filed 05/06/26    Page 55 of 82    PageID 1809

4:26-cv-00381-O

*Biering v. JPMS, et al.*

a new wire request in the amount of $99,900.00 was submitted by Claimant for th
and ultimately approved, as was required, by a second approver at Wells Fargo.
manager was aware of the second wire that day, contacted the Customer for confirmation, and it was approved and sent. Thereafter, Wells Fargo conducted an investigation, accused Claimant of violating its policies and falsifying bank records. Wells Fargo then terminated Claimant and later opposed his request for unemployment benefits, claiming that he had been terminated for fraud and dishonesty. The Texas Workforce Commission held a hearing and determined that Claimant had not committed any acts of fraud or dishonesty and ordered that his benefits be paid. Given the harshness of termination and the fact that ample alternatives, such as warnings or reprimands, were available, it appears to the Panel that the reason for the termination may have been pretextual.

Due to his termination by Wells Fargo, and relying exclusively on information provided to it by Wells Fargo, Respondent terminated its relationship with Claimant. As required, Respondent filed a Form U5 which stated: "Registered representative (RR) was terminated by Wells Fargo Bank, N.A. (WFBNA) following allegations related to a WFBNA customer wire request. The amount of the wire and destination required RR to complete a fraud support process. Mr. Bhatti did not complete this process. Subsequently, the WFBNA customer decreased the wire amount and the need to complete the process was avoided. The allegations are unrelated to the securities business of Wells Fargo Clearing Services, LLC. No customer harm was identified." This disclosure also appears in Claimant's BrokerCheck® Report.

The Form U5 submitted by Respondent further checked the box in Section 7F accusing Claimant of violating "investment-related statutes, rules or industry standards of conduct." The entire Form U5 is available to prospective employers in the securities business.

Although this Panel finds that the first disclosure - the one seen in Claimant's BrokerCheck® Report - is substantially correct, we find that the Section 7F disclosure is false. We find that Claimant's conduct did not violate "investment-related statutes, rules or industry standards of conduct." Although Wells Fargo and Respondent may be separate entities, we find that all of Wells Fargo's knowledge should be imputed to Respondent. We find that the false statement in Section 7F of the Form U5 is defamatory and that it has substantially impaired Claimant's ability to secure employment in his desired career, the securities industry. Therefore, the Panel grants expungement of the portion of Section 7F of the Form U5 and awards Claimant $40,000.00 in damages.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $40,000.00 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant the sum of $400.00 in costs as reimbursement                                                                      aid to FINRA Dispute Resolut

**CONFIDENTIAL**

FINRA Dispute Resolution Services  Document 33-2    Filed 05/06/26    Page 56 of 82    PageID 1810
Case 4:26-cv-00381-O-BF
Arbitration No. 22-01852

X.02d-004
4:26-cv-00381-O
Biering v. JPMS, et al.

3.  The Panel denies the expungement of the Termination Explanation in Section Bhatti's (CRD Number 7055007) Form U5 filed by Wells Fargo Clearing Services, LLC (CRD Number 19616) on May 10, 2021 and maintained by the Central Registration Depository ("CRD").

    The Panel recommends the expungement of all references to Occurrence Number 2126593 from the registration records maintained by the CRD for Yousef Ali Bhatti. Any "Yes" answers should be changed to "No," as applicable.

    The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Yousef Ali Bhatti must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4.  Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 1,600.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 2,000.00 |
| Member Process Fee | =$ | 3,850.00 |

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | =$ | 450.00 |
| Pre-Hearing Conference:   May 23, 2024          1 session | | |

| | | |
|---|---|---|
| Two (2) pre-hearing sessions with the Panel @ $1,150.00/session | =$ | 2,300.00 |
| Pre-Hearing Conferences: December 14, 2022          1 session | | |



X.02d-005
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Two (2) hearing sessions @ $1,150.00/session

| Hearing: | August 6, 2024 | 2 sessions | |
|---|---|---|---|
| Total Hearing Session Fees | | =$ | 5,050.00 |

The Panel has assessed $1,375.00 of the hearing session fees to Claimant.

The Panel has assessed $3,675.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

FINRA Dispute Resolution Services
Arbitration No.  22-01852

## ARBITRATION PANEL

| | | |
|---|---|---|
| Eric Ross Cromartie | - | Public Arbitrator, Presiding Chairperson |
| Michelle Prudhomme-Coleman | - | Public Arbitrator |
| Dianne Connally Betts | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

*Eric Ross Cromartie*                                    09/03/2024
_____        _____
Eric Ross Cromartie                                      Signature Date
Public Arbitrator, Presiding Chairperson

*Michelle Prudhomme-Coleman*                    09/03/2024
_____        _____
Michelle Prudhomme-Coleman                      Signature Date
Public Arbitrator

*Dianne Connally Betts*                              09/03/2024
_____        _____
Dianne Connally Betts                                    Signature Date
Non-Public Arbitrator

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

September 04, 2024
_____
Date of Service (For FINRA Dispute Resolution Services use only)

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02e

# Wilson–Stainback Pattern – Comparator E
# X.02e-001 – 006

**Description:** Comparator E in the Wilson/Stainback pattern-and-practice series.

**Relevance:** Industry-pattern and prior-award precedent bearing on the JPMS U-5 wording pattern argument.

**Source:** JPM Internal Record – Comparator E; produced in discovery.

**Petition Ref:** App. A p. 55 ("Wilson/Stainback comparator E").

**Disclosures:** Annotations: None — reproduced as produced, no added markings

**Filing Status:** Public — not sealed



X.02e-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Mark Munizzi | Case Number: 18-02179 |
| vs. | |
| <u>Respondent</u><br>UBS Financial Services Inc. | Hearing Site: Chicago, Illinois |

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch ▮▮▮▮▮▮ LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, th                                          h Claimant's ability to obtain



Unless specifically admitted in the Statement of Answer and Statement of Answ
Amended Statement of Claim, Respondent denied the allegations made in the
of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the
Form U5 filed by Respondent, an award of compensatory damages and punitive
damages in an amount to be determined at hearing, and all other appropriate relief. In
the Amended Statement of Claim, Claimant requested the same relief as the Statement
of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested
that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed
by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for
severance pay; $3,149.00 for interest on the severance pay, with interest accruing at
$187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the
amount of $23,419.13; punitive damages of ten times the compensatory damages; and
that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing
session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other
materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim
("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to
Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-
hearing conference on March 13, 2019, in a written order dated March 14, 2019, the
Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be
executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing,
and the post-hearing submissions, the Panel has decided in full and final resolution of
the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00
   in compensatory damages.

2. Responden                                                    0.00 of
   the above-s                                                  verance
        the r                                                   and

CONFIDENTIAL

Case 4:26-cv-00381-O-BP   Document 33-2   Filed 05/06/26   Page 62 of 82   PageID 1816

X.02e-003
4:26-cv-00381-O
Biering v. JPMS, et al.

FINRA Office of Dispute Resolution
Arbitration No. 18-02179

including the date on which that portion of the compensatory damages aw
is paid in full.

3. Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4. Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5. Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6. Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

d all                                                                          d.

FINRA Office of Dispute Resolution
Arbitration No. 18-02179



X.02e-004

4:26-cv-00381-O

*Biering v. JPMS, et al.*

**FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

## Filing Fees

FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$  1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$  1,900.00 |
| Member Process Fee | =$  3,750.00 |

## Postponement Fees

Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$  1,125.00 |
| Total Postponement Fees | =$  1,125.00 |

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

## Last Minute Cancellation Fees

Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$  1,800.00 |
| Total Last Minute Cancellation Fees | =$  1,800.00 |

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

## Discovery-Related Motion Fee

Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$     200.00 |
| One (1) decisio with three (3) a | =$     600.00 |



FINRA Office of Dispute Resolution
Arbitration No.  18-02179

Claimant submitted (2) two discovery-related motions

_____

Total Discovery-Related Motion Fees                                    =$      800.00

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session    =$      450.00
Pre-hearing Conference:    March 13, 2019              1 session

One (1) pre-hearing session with the Panel @ $1,125.00/session          =$   1,125.00
Pre-hearing Conference:    October 16, 2018             1 session

Twenty-six (26) hearing sessions @ $1,125.00/session                    =$ 29,250.00

| Hearing Dates: | | |
|---|---|---|
| | June 11, 2019 | 2 sessions |
| | June 12, 2019 | 2 sessions |
| | June 13, 2019 | 2 sessions |
| | June 14, 2019 | 2 sessions |
| | June 17, 2019 | 2 sessions |
| | June 18, 2019 | 2 sessions |
| | September 24, 2019 | 2 sessions |
| | September 25, 2019 | 2 sessions |
| | September 26, 2019 | 2 sessions |
| | September 27, 2019 | 2 sessions |
| | November 19, 2019 | 2 sessions |
| | November 20, 2019 | 2 sessions |
| | November 21, 2019 | 2 sessions |

_____

Total Hearing Session Fees                                             =$ 30,825.00

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

X.02e-005

FINRA Office of Dispute Resolution
Arbitration No. 18-02179

X.02e-006
4:26-cv-00381-O
Biering v. JPMS, et al.


## ARBITRATION PANEL

| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. ██████ | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

**_Lisa M. Krimen_**

Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019

Signature Date

**_Donald M_** ██████

Donald M. ████
Public Arbitrator

12/11/2019

Signature Date

**_Craig D. Cook_**

Craig D. Cook
Non-Public Arbitrator

12/11/2019

Signature Date

December 11, 2019

Date of Service (For FINRA Office of Dispute Resolution office use only)

X.02e-006

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02f

## Wilson–Stainback Pattern – Comparator F
## X.02f-001 – 009

| | |
|---|---|
| **Description:** | Comparator F in the Wilson/Stainback pattern-and-practice series. |
| **Relevance:** | Industry-pattern and prior-award precedent bearing on the JPMS U-5 wording pattern argument. |
| **Source:** | JPM Internal Record – Comparator F; produced in discovery. |
| **Petition Ref:** | App. A p. 55 ("Wilson/Stainback comparator F"). |
| **Disclosures:** | Annotations: None — reproduced as produced, no added markings |
| **Filing Status:** | Public — not sealed |



**X.02f-001**
4:26-cv-00381-O
*Biering v. JPMS, et al.*

# Illinois Official Reports

## Appellate Court

---

*Munizzi v. UBS Financial Services, Inc.*, **2021 IL App (1st) 201237**

---

| | |
|---|---|
| Appellate Court Caption | MARK MUNIZZI, Plaintiff-Appellee, v. UBS FINANCIAL SERVICES, INC., Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-20-1237 |
| Filed | November 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 19-CH-14398; the Hon. Caroline Kate Moreland, Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | Brain J. Poronsky and J. Matthew Haws, of Katten Muchin Rosenman LLP, of Chicago, and Thomas G. Hungar, of Gibson, Dunn & Crutcher LLP, of Washington, D.C., for appellant.<br><br>Steven P. Gomberg and Amy J. Kanarowski, of Lynch ▮▮▮▮ LLP, of Chicago, for appellee. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion. Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion. |

X.02f-001

X.02f-002

4:26-cv-00381-O

*Biering v. JPMS, et al.*

## OPINION

¶ 1     The circuit court in this case confirmed an arbitration award in favor of plaintiff Mark Munizzi and against defendant UBS Financial Services, Inc. (UBS). After two UBS accounts suffered significant losses, UBS fired Mr. Munizzi and subsequently filed the required regulatory form reporting the reasons for his termination. On the form, UBS stated that Mr. Munizzi was fired because "he failed to adequately supervise employees" and because he "gave varied responses during the review." In response, Mr. Munizzi filed a claim against UBS for defamation and other related claims.

¶ 2     As required by Financial Industry Regulatory Authority (FINRA) Rule 13200 (see Fin. Indus. Regulatory Auth., Rule 13200 Required Arbitration (amended Dec. 15, 2008), https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200 [https://perma.cc/9AGF-2JZZ]), the claims were submitted to arbitration. After a hearing, a panel of three arbitrators found in favor of Mr. Munizzi and against UBS and awarded Mr. Munizzi damages in excess of $11 million—including compensatory and punitive damages, attorney fees, costs, and interest. The circuit court confirmed the award.

¶ 3     UBS appeals, arguing that the arbitration award should be vacated as against public policy and because the circuit court erred in concluding that the arbitration panel's factual findings were binding. UBS argues, in the alternative, that the award of punitive damages should be vacated. For the following reasons, we affirm.

## I. BACKGROUND

¶ 5     The record on appeal includes Mr. Munizzi's motion to confirm the arbitration award, UBS's motion to vacate the arbitration award, and the various exhibits that were attached to those motions. The exhibits attached to the motions include portions of *some* of the exhibits from the arbitration hearing itself and transcripts of *portions* of the testimony given by Mr. Munizzi and other witnesses at that hearing. The parties agree that neither this court nor the circuit court have been supplied with a complete record of the arbitration hearing. Based on the record that is before us, the history of this case is as follows.

¶ 6     Mr. Munizzi, a registered broker/salesperson and investment adviser representative, was hired by UBS in 2003. In 2016, Mr. Munizzi became the Chicago-area market supervisory officer, and his duties included overseeing the securities brokerage managers—who supervise financial advisors and accounts—in UBS's Chicago branch offices. According to Mr. Munizzi, he received exemplary annual assessments throughout his time at UBS and, in his 36 years working in the securities industry, he never failed a regulatory or internal audit or received a write-up or warning of any kind.

¶ 7     On February 5, 2018, two UBS accounts suffered extraordinary losses. One was an employee account and the other was an account held by the mother of an employee. According to Mr. Munizzi's testimony at the arbitration hearing, these two accounts held specific options that can be profitable when "stock market volatility is relatively low" but will likely result in losses when stock prices fluctuate.

¶ 8     As also explained by Mr. Munizzi at the arbitration hearing, under regulatory and UBS requirements, customers who hold these risky types of options are subject to "margin" requirements, meaning those customers must maintain a certain level of assets in their accounts



"based on the value of the margin position." If the options lose value, a margin issued for additional collateral. If a customer does not respond to that margin cal days—by, for example, depositing cash or eligible securities—the firm will sell investments in the customer's account to "meet the call." If the loss on the options exceeds the proceeds from the sale of investments in the account, UBS is liable for the resulting "unsecured debit," subject to potential collection from the customer.

¶ 9    The stock market was volatile on Friday, February 2, 2018, and at the end of that day, one of these accounts had "large unrealized losses in excess of $700,000" and the other had a "margin call" "that exceeded $800,000." The following Monday, February 5, 2018, the stock market dropped 1000 points, and by market close, the unsecured losses in both of these accounts had increased to more than $3 million. After an investigation into these losses, UBS terminated Mr. Munizzi on April 19, 2018.

¶ 10    As required by Illinois law and the FINRA rules, UBS filed a form U5—the "Uniform Termination Notice for Securities Industry Registration"—disclosing the termination. On the form U5, UBS indicated that the "Reason for Termination" was that Mr. Munizzi was "discharged after firm review determined that (1) he failed to adequately supervise employees in association with the risks of an uncovered options strategy in employee and employee related accounts and (2) gave varied responses during the review."

¶ 11    Mr. Munizzi filed his complaint before the FINRA arbitration committee, alleging claims of defamation *per se*, a violation of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2018)), and tortious interference with prospective economic advantage against UBS. In his complaint, Mr. Munizzi alleged that "[w]hen registered employees are terminated, a summary of the U5 appears on FINRA's widely publicized BrokerCheck database," and that "[s]tatements about the termination of Registered Persons which indicate that an employee was incompetent or dishonest can severely impair their ability to obtain employment in the financial services industry." Mr. Munizzi alleged he had been "permanently injured by UBS's false and inaccurate reasons for termination" and that UBS had injured Mr. Munizzi "knowingly and with reckless disregard for [his] wellbeing and future ability to find employment." Mr. Munizzi sought, as relief, expungement and modification of the form U5, compensatory and punitive damages, attorney fees, and interest.

¶ 12    The parties arbitrated the claims before a three-member panel of the FINRA Office of Dispute Resolution. The hearing occurred over 13 days between June and November 2019 and included testimony from 17 witnesses and the admission of 243 exhibits.

¶ 13    The panel issued its arbitration award on December 11, 2019, finding UBS liable for $3,149,656 in compensatory damages, plus interest on the portion of that award that represented Mr. Munizzi's severance pay; $7.5 million in punitive damages; $496,753.36 in attorney fees; and $24,381.50 in costs. The arbitration award stated that the panel also "recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the form U5" filed by UBS regarding Mr. Munizzi. The arbitration award directed UBS to change the reason for termination to "Other" and the termination explanation to "Terminated without cause." The arbitration award said that this expungement was recommended "based on the defamatory nature of the information."

¶ 14    On December 13, 2019, Mr. Munizzi filed a motion to confirm his arbitration award in the circuit court pursuant to section 11 of the Uniform Arbitration Act (Arbitration Act) (710 ILCS 5/11 (West 2018)).



¶ 15    On January 10, 2020, UBS filed a motion to vacate or modify the arbitration argued then, as it does now, that the award should be vacated because it violate Illinois public policy—namely, the policy "favoring protection of the investing public through the disclosure of information concerning negligent or dishonest securities professionals." UBS also argued that the award should be vacated because it was against the manifest weight of the evidence. In support of its motion, UBS attached excerpts from the arbitration hearing, the form U5 UBS filled out with respect to firing Mr. Munizzi, and Mr. Munizzi's amended statement of claim.

¶ 16    On October 21, 2020, the circuit court granted Mr. Munizzi's motion to confirm the arbitration award and denied UBS's motion to vacate the award. In its oral ruling, the court found that UBS had not shown the arbitration award was against the manifest weight of the evidence. In response to UBS's public policy argument, the court said that, even if there was a public policy exception:

> "I find that UBS has not made the requisite showing that it is entitled to have the award vacated. And that's because after a hearing before three arbitrators there was testimony heard and evidence presented and the panel found that the statements made by UBS were essentially not true. The panel specifically stated that certain portions of the U-5 form should be expunged based on the defamatory nature of the information. And by definition, defamatory means damaging the reputation by writing bad things that are not true.
>
> Also, the panel awarded plaintiff compensatory and punitive damages for his claim of defamation and violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The panel, in short, found that UBS was not truthful and, thus, providing relief to UBS based on the public policy would require this Court to improperly reject the findings of the panel and the Court cannot do that so, therefore, the arbitration award will be confirmed."

¶ 17    On November 5, 2020, the circuit court entered judgment in favor of Mr. Munizzi for a total award of $11,170,790.86 as awarded by the arbitrators, plus additional attorney fees and costs in defending the award of $97,604.30, and $908,965.20 in interest from the date of the award.

¶ 18    This appeal followed.

## II. JURISDICTION

¶ 20    The circuit court granted Mr. Munizzi's motion to confirm the arbitration award and denied UBS's motion to vacate the award on October 21, 2020, entering final judgment against UBS on November 5, 2020. UBS timely filed a notice of appeal on November 17, 2020. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

## III. ANALYSIS

¶ 22    A reviewing court will vacate an arbitration award "only in extraordinary circumstances" (*Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 564 (2005)), and must construe such awards, whenever possible, "so as to uphold their validity" (*Rauh v. Rockford Products*



*Corp.*, 143 Ill. 2d 377, 386 (1991)). The limited circumstances under which a rev can modify or vacate an arbitration award are set forth in the Arbitration Act, whi

> "(a) Upon application of a party, the court shall vacate an award where:
>
> (1) The award was procured by corruption, fraud or other undue means;
>
> (2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any one of the arbitrators or misconduct prejudicing the rights of any party;
>
> (3) The arbitrators exceeded their powers;
>
> (4) The arbitrators refused to postpone the hearing upon sufficient cause being shown thereof or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of Section 5, as to prejudice substantially the rights of a party; or
>
> (5) There was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection ***." 710 ILCS 5/12 (West 2018).

¶ 23    Judicial review of an arbitration award is "more limited than appellate review of a trial court's decision." *Rauh*, 143 Ill. 2d at 394. When reviewing arbitration awards, "there is a presumption that the arbitrator did not exceed [their] authority." *Id.* at 386. Additionally, an award will not be set aside "because of errors in judgment or a mistake of law or fact." *Galasso v. KNS Cos.*, 364 Ill. App. 3d 124, 130 (2006). This limited scope of review reflects the principle that an "arbitration award should be the end, not the beginning, of litigation." *Perkins Restaurants Operating Co. v. Van Den Bergh Foods Co.*, 276 Ill. App. 3d 305, 309 (1995).

¶ 24    UBS does not cite any of the bases set out in the Arbitration Act for overturning an arbitration award. Instead, UBS urges this court to vacate or modify the arbitration award because it violates a "well-defined and dominant" public policy favoring the disclosure of information regarding negligent or dishonest conduct of securities professionals. UBS also argues that the award should be vacated because the circuit court erroneously concluded that it was bound by the arbitrators' findings. Finally, UBS argues in the alternative that this court should vacate the punitive damages award because it was excessive and contrary to public policy and the law regarding defamation. We consider each of these arguments in turn.

¶ 25                           A. Public Policy Exception

¶ 26    UBS argues that the arbitration award should be vacated because it "contravenes Illinois's well-defined and explicit public policy favoring the protection of the public through the full disclosure of information concerning dishonest or negligent conduct by securities professionals." UBS argues that the arbitration award penalizes it for "acting in direct furtherance" of this public policy and that enforcing the award will "chill the very conduct that federal and state law and Illinois public policy demands." Mr. Munizzi responds that public policy arguments are limited to arbitration awards arising from a collective bargaining agreement (CBA), and since this award does not arise from a CBA, the public policy exception does not apply here.

¶ 27    The Arbitration Act specifically distinguishes awards arising from a CBA from other arbitration awards. Section 12(e) of the Act states:

> "Nothing in this Section or any other Section of this Act shall apply to the vacating, modifying, or correcting of any award entered as a result of an arbitration agreement

X.02f-006

4:26-cv-00381-O

*Biering v. JPMS, et al.*

which is *a part of or pursuant to a collective bargaining agreement*; and
for vacating, modifying, or correcting such an award shall be those which
to the enactment of this Act." (Emphasis added.) 710 ILCS 5/12 (West 2018).

¶ 28    Since the Arbitration Act was enacted in Illinois in 1961, our courts have continued to recognize the rationale, grounded in common law, to vacate arbitration awards that are "repugnant to *** public policy" when they arise in collective bargaining cases. *American Federation of State, County & Municipal Employees, Council 31 v. Department of Central Management Services*, 173 Ill. 2d 299, 307 (1996) (*AFSCME*). As those courts have recognized, applying the public policy exception requires a two-step analysis in which the reviewing court must determine (1) "whether a well-defined and dominant public policy can be identified" and, if so, (2) "whether the arbitrator's award, as reflected in his interpretation of the agreement, violated the public policy." *Id.* at 307-08. In addition to being well-defined and dominant, the public policy identified must also be ascertainable "by reference to the laws and legal precedents and not from generalized considerations of supposed public interests." (Internal quotation marks omitted.) *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983).

¶ 29    The primary cases cited by both parties involve arbitration awards arising from a CBA. In *AFSCME*, the Illinois Supreme Court stated that "the historical context of the [public policy] exception is grounded in common law" and, therefore, "a court will not enforce a *collective-bargaining agreement* that is repugnant to established norms of public policy." (Emphasis added.) *AFSCME*, 173 Ill. 2d at 307. Rather than focusing on the award itself, these cases also tend to center on whether the CBA, as interpreted by the arbitrator, violates an explicit public policy. For example, in *City of Chicago v. Fraternal Order of Police*, 2020 IL 124831, ¶ 25, the court noted that "[t]he public-policy exception is a narrow one—one that is to be invoked only when a party clearly shows enforcement of the contract, as interpreted by the arbitrator, contravenes some explicit public policy." In that case, our supreme court found that an arbitration award requiring the city to destroy disciplinary records after five years violated an explicit public policy regarding the preservation of such records. Obviously, these concerns about interpreting an ongoing CBA do not directly apply in this case.

¶ 30    UBS primarily relies on two cases to support its argument that the public policy exception extends to awards not arising from a CBA: *Heatherly v. Rodman & Renshaw, Inc.*, 287 Ill. App. 3d 372 (1997), and *Colmar v. Fremantlemedia North America, Inc.*, 344 Ill. App. 3d 977 (2003). According to UBS, the *Heatherly* and *Colmar* courts "expressly held that the public policy exception applied to non-CBA arbitrations" because that determination was "the essential first step in the legal analysis applied by both courts, and therefore constitutes a holding of both courts."

¶ 31    We reject UBS's reading of these cases. Both cases do indeed involve arbitration awards that do not arise from a CBA, but neither case comes anywhere close to "expressly" holding that the public policy exception applies outside of CBA arbitrations. Rather, both cases found the exception inapplicable and did so with no analysis of whether the exception might apply outside of the CBA context.

¶ 32    In *Colmar*, the court's "analysis" of the public policy exception was limited to four sentences, in which it described the exception, stated the test, then concluded that the plaintiff "fail[ed] to meet its burden by not identifying a well-defined and dominant public policy."

X.02f-007

4:26-cv-00381-O

*Biering v. JPMS, et al.*



*Colmar*, 344 Ill. App. 3d at 993. There was no express "determination" in that public policy exception applied.

¶ 33    The court in *Heatherly* included more discussion of the exception, beginning with the two-step test used to determine if the award violated public policy. 287 Ill. App. 3d at 376. The court discussed several cases in which a "well-defined and dominant" public policy was or was not identified. (Internal quotation marks omitted.) *Id.* at 377. However, every case cited in *Heatherly* in support of this analysis involved an arbitration award arising from a CBA. See *id.* at 376-79 (cases cited therein). The *Heatherly* court did not acknowledge this, but instead determined that the acts at issue did "not rise to the level of the sort of immoral or illegal acts that are so repugnant to public policy that an arbitration award based upon them must be vacated." *Id.* at 378.

¶ 34    In neither of these cases did the court specifically consider whether the public policy exception applies outside of the CBA context. In short, although UBS is correct that both *Colmar* and *Heatherly* considered the public policy exception in the context of arbitration awards not arising from a CBA, the courts found that the exception did not apply. Moreover, the courts in those cases offered no rationale for extending the public policy exception to non-CBA arbitrations, nor did they give any consideration to the fact that the Arbitration Act treats CBAs differently and lists five specific bases for vacating a non-CBA arbitration award.

¶ 35    The language of the Arbitration Act strongly suggests that the public policy exception has no application in this case. Rather, the Arbitration Act specifies different treatment for awards arising from a CBA and gives five specific reasons in section 12(a) that *other* arbitration awards can be modified or vacated. Supreme court cases that have applied the public policy exception have stressed the fact that there is an ongoing CBA and that it would be contrary to the public policy of this state to apply that CBA in the manner that the arbitrator's ruling mandated. UBS has offered no precedent in which a court has vacated an arbitration award on public policy grounds, outside of the collective bargaining context. Thus, we are not convinced that there is any basis for applying the public policy exception in this case.

¶ 36    Moreover, we agree with the circuit court that, even if the public policy exception did apply, the award in this case does not violate any "well-defined and dominant" public policy. UBS argues that the award should be overturned or modified because it violates an explicit Illinois public policy "favoring protection of the investing public through the disclosure of information concerning negligent or dishonest securities professionals." UBS states that the "[f]orm U5's effectiveness *** depends on employers making full and frank disclosures" and that FINRA's by-laws make clear that "[c]andid and accurate disclosure of a regulatory or disciplinary problem *** is critical" See Nat'l Ass'n of Securities Dealers, Notice to Members 97-77 (Nov. 1997), https://www.finra.org/sites/default/files/NoticeDocument/p004412.pdf [https://perma.cc/3HHS-ST93].

¶ 37    The arbitration panel recommended the expungement of the reason for termination and termination explanation on the form U5 "based on the defamatory nature of the information." In doing so, it cited *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004), which states that to succeed on a defamation claim under Illinois law, the plaintiff must show "that the defendant *** made a false statement concerning him" (internal quotation marks omitted) that was then published and caused damage to the plaintiff. Thus, the arbitration award reflects that the arbitration panel found that UBS made false statements about Mr. Munizzi. Therefore, the disclosures on the form U5 were neither "frank" nor "accurate."

There is no public policy favoring false or defamatory disclosures by employers.

## B. The Arbitration Panel's Findings

UBS also argues the circuit court erred in determining that the arbitration panel's factual findings "were binding on the court." UBS argues that courts can overturn arbitration awards when "the record *** belies the arbitrator's conclusions" (*Chicago Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill. App. 3d 168, 180 (2001)) and contends that here the circuit court erroneously refused to consider the "undisputed facts of record."

We note that courts have authority to vacate an arbitration award only on limited bases (710 ILCS 5/12 (West 2018)) and that courts are generally "bound by the arbitrator's view of the facts" (*County of De Witt v. American Federation of State, County & Municipal Employees, Council 31*, 298 Ill. App. 3d 634, 639 (1998)).

In this case, UBS has forfeited any argument that the arbitrators' factual findings were not supported by the record because UBS failed to supply this court with a complete record of the arbitration hearing. Illinois Supreme Court Rule 323(a) (eff. July 1, 2017) requires that the record on appeal "include all the evidence pertinent to the issues on appeal." However, as noted above, UBS did not provide a complete and official record. Instead, UBS provided this court with portions of documents and excerpts of testimony. Thus, this court has no basis for comparing the arbitrators' factual conclusions with the evidence presented, and the circuit court correctly recognized that the arbitrators' factual findings are therefore binding.

## C. Punitive Damages

UBS does not dispute that the FINRA arbitration panel was authorized to award punitive damages. Instead, UBS argues, again relying on public policy, that if the award is not vacated in its entirety, it should be modified to eliminate the punitive damages. According to UBS, enforcing punitive damage awards based on form U5 disclosures "would eviscerate" Illinois public policy favoring protection of the public by encouraging disclosure of information about the competence of securities professionals. UBS argues that, if punitive damages are permissible when "the undisputed record establishes that the information disclosed on the form U5 was fully supported by the facts," then securities firms will be "strongly discourage[d] *** from providing full and frank information on the form U5."

Again, this court is bound by the arbitrators' finding that UBS's disclosure was defamatory. Thus, this court cannot accept UBS's premise that it disclosed information that was "fully supported by facts." This is particularly true where, as here, we have not been provided with a full record. We therefore reject the argument that this award would disincentivize securities firms from providing complete and accurate information on similar disclosures. Moreover, for all the reasons outlined above, we are not convinced UBS's public policy argument plays any role in this case.

UBS also argues that this court should reverse because the arbitrators made a legal error, where an award of punitive damages requires that the defamatory statements were made with "actual malice," which UBS asserts was not found in this case. There are two flaws in this argument.



X.02f-009
4:26-cv-00381-O
*Biering v. JPMS, et al.*

¶ 46    First, an error of law does not provide a basis for overturning an arbitrati
*Galasso*, 364 Ill. App. 3d at 130 ("[A]n arbitrator's award will not even be set a
of errors in judgment or a mistake of law or fact.").

¶ 47    Second, UBS has not persuaded us that any legal error was made here or that the arbitrators did not find "actual malice." The arbitration award states that punitive damages are awarded "pursuant to *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717 (7th Cir. 2004) and *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir. 1994)." In *Republic Tobacco*, the Seventh Circuit specifically said that "[p]unitive damages are available under Illinois law upon proof of actual malice." *Republic Tobacco*, 381 F.3d at 735. In *Baravati*, the Seventh Circuit held that in an arbitration which, like this case, involved a defamation claim by a terminated securities broker, the arbitrators did not exceed their powers in awarding punitive damages. *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 710-11 (7th Cir. 1994). The arbitrators' statement in this case that the punitive damages were awarded "pursuant to *Republic Tobacco*" reflects the arbitrators' understanding that punitive damages are available when there is proof of actual malice and defeats UBS's argument that the arbitrators failed to find such proof in the case before them.

¶ 48                                    D. Attorney Fees

¶ 49    Mr. Munizzi requests that, pursuant to section 14 of the Wage Act (820 ILCS 115/14 (West 2018)), we remand to the circuit court to allow him to present a petition for fees incurred during this appeal. UBS has not responded to this request, and we see no basis for denying it.

¶ 50                                    IV. CONCLUSION

¶ 51    For the foregoing reasons, we affirm the judgment of the circuit court and remand for Mr. Munizzi to file a petition for fees incurred during this appeal.

¶ 52    Affirmed and remanded.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.02g.ii

## Luckett News Coverage - InvestmentNews Feb. 2022

## X.02g.ii-001 – X.02g.ii-001

| | |
|---|---|
| **Description:** | InvestmentNews article reporting the FINRA defamation award against J.P. Morgan Securities in Luckett. |
| **Relevance:** | Provides public coverage of the Luckett comparator award and explains the Form U5 defamation context. |
| **Source:** | InvestmentNews, Bruce Kelly, Feb. 11, 2022 |
| **Petition Ref:** | Relevant to comparator damages and Form U5 reputational-harm allegations in Dkt. 11. |
| **Disclosures:** | Annotations: None – reproduced as produced, no added markings |
| **Filing Status:** | Public - not sealed |

CONFIDENTIAL

**InvestmentNews**

X.02g.ii-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

NEWS  Industry News

# J.P. Morgan loses $1.4 million defamation case to adviser



The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022   *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According to **to the arbitration award** by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called **a Form U5,** that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's **BrokerCheck profile,** he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: **Judge rips Wells, Finra, in decision over arbitration claim**]



404
## Audio Not Found

▶

Related Topics: **J.P. Morgan Securities**

Learn more about **reprints and licensing** for this article.

## Newslett____

Subscribe for original
and analysis of the iss
advice community, fro

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | AAA Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT X.04

## Cohen Email Response to U5 Correction Demands JPM refusal

## X.04-001 – 004

| | |
|---|---|
| **Description:** | Industry-pattern / prior-award / pattern-and-practice record. |
| **Relevance:** | Industry-pattern and prior-award precedent bearing on the JPMS U5-wording pattern argument. |
| **Source:** | CX-049 |
| **Petition Ref:** | App. A p. 56 ("Cohen EM Response to U5-Correction Demands – JPM refusal (Dec. 29, 2023)") |
| **Disclosures:** | None — reproduced as produced, no added markings |
| **Filing Status:** | Public – not sealed |

X.04-001
4:26-cv-00381-O
Biering v. JPMS, et al.

Biering v. JPMS, et al.

Message

**From:**    Cohen, Jena B [jena.b.cohen@jpmorgan.com]
**Sent:**    12/29/2023 4:12:36 AM
**To:**      Josh Biering [██████g@gmail.com]
**Subject:** RE: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Hi Josh,

I'm taking everyone else off the chain and emailing directly. Typically when someone engages a lawyer, all communications go between your counsel and ours from that point on. To the extent it's helpful; I wanted to recap the findings:

My understanding is that Ben and or JT spoke with you on 12/1 to communicate the termination.  Your termination was based on **inappropriate conduct with another employee**. I understand that the termination came while you were on garden leave post resignation. You remain an employee of the firm during that time period.  We have an obligation to review and adjudicate any claims made against employees. That review included your own personal interview and the termination that followed was based on the investigation and findings of our employee relations team.

We are also obligated to file a U5; you are a registered representative within a regulated industry at a regulated company.  The language in your U5 does not prevent you from being hired elsewhere - I know this firsthand as we selectively hire individuals who have U5 comments once we understand and are ok with the related rationale.

While I know from your emails that you may not agree with that decision, your conduct was the cause of the termination. I have shared your emails with our Employee Relations team who is the proper team to review this matter further.

Someone from that team will be in touch with you, although I ask for your patience as many of the team are out on vacation and returning the week of January 8th.

The same team is also in review of comments made in your exit survey.

Regards
Jena

---

**From:** Josh Biering <██████@gmail.com>
**Date:** Thursday, Dec 28, 2023 at 6:39 PM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Josh Iacuone <iacuone@roggedunngroup.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

I want to proceed with my claim- and I want to pursue as an 'excluded claim' through the National Labor Relations Act- as to not be bound by the arbitration agreement. This needs to come to light- all of it.

I won't allow myself, or others, to fall victim.

My contact is:

*Maxie Gallardo Miller* (she/her/hers)
Field Attorney
National Labor Relations Board, Region 16
819 Taylor Street, Room 8A24
Fort Worth, Texas 76102
TEL: (682) 703-7222
FAX: (817) 978-2928

X.04-001


X.04-002
4:26-cv-00381-O
Biering v. JPMS, et al.

Biering v. JPMS, et al.

**From:** Josh Biering <j█████████@gmail.com>
**Sent:** Thursday, December 28, 2023 11:49 AM
**To:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>; Josh Iacuone <iacuone@roggedunngroup.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** Re: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Why was I wrongfully terminated and blackballed from the industry?

Regards,

JB

---

**From:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Sent:** Thursday, December 28, 2023 11:47:06 AM
**To:** Josh Iacuone <iacuone@roggedunngroup.com>; Josh Biering <j█████████@gmail.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Josh I - please let us know what lingering questions you have and Rachel and I would be happy to answer them next week when we are back.

---

**From:** Josh Iacuone <iacuone@roggedunngroup.com>
**Date:** Thursday, Dec 28, 2023 at 11:16 AM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>, Josh Biering █████████@gmail.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

I haven't spoken with anyone at JPMS, which has just been Rachel, for I believe a couple weeks now or more.

Joshua J. Iacuone
**Rogge Dunn Group P.C.**
500 N. Akard, Ste. 1900
Dallas, Texas 75201
DD: 214-239-2763
Cell: 214-274-8393

**From:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Sent:** Wednesday, December 27, 2023 11:12 AM
**To:** Josh Biering <j█████████@gmail.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>; Josh Iacuone <iacuone@roggedunngroup.com>
**Subject:** RE: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Hi Josh, it was shared verbally and if you have any lingering questions, please have Josh follow up and we'd be happy to clarify.

---

**From:** Josh Biering <j█████████@gmail.com>

X.04-002

X.04-003

4:26-cv-00381-O

*Biering v. JPMS, et al.*

*Biering v. JPMS, et al.*

**Date:** Wednesday, Dec 27, 2023 at 11:11 AM
**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Cc:** Tidwell-Neal, Rachel L (Legal, USA) <rachel.l.tidwell-neal@jpmchase.com>, Josh Iacuone <iacuone@rc
**Subject:** Re: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Thank you, Jena.

If your email suggests a separate communication was sent after my Form U5 was filed to my attorney, Josh Iacuone, I have not received any notice nor do I think Josh Iacuone has. If I am mistaken, I apologize in advance.

I appreciate your kind words, but my family and I have not had an enjoyable few months, as you can imagine.

Nevertheless, I'm not sure what corrective action can be taken now that the U5 has been officially filed, incorrectly with a "discharged" box selected instead of the appropriate "voluntary discharge".  That was the nail on the coffin, which I still view as entirely unjustified. The Scarlet "U5" is officially printed on my back...

Shame on me for trusting the team. I volunteered to have a U4 complaint despite not being required to have one, thinking I was a team player and supporting Kyle. I ignorantly shared my 5 student loans that were discharged and forgiven due to my 100% student loan discharge benefits to compliance thinking I was "adhering to the regulations and rules" but got incorrectly tarnished with "5 discharged/bankruptcy loans' on my U4.

Jokes on me, I guess. Hard to get hurt falling out of a basement window, but one would think 2024 couldn't get any worst...

I resigned knowing I'd forfeit the compensation earned in January. That didn't matter to me. I just wanted to start my next chapter, in peace. What I did not plan for,  much to my chagrin, JPMorgan would play U5 reindeer games.

Wishing for a miracle, but as I face the facts, this will be a very stressful and difficult 12-18 months as I try and clear my name and expunge the maliciously filed U5.

I pray other JPMorgan Advisors don't fall victim to this despite the "rays" and "sunshine" facade used to recruit folks.

God Bless,

Josh

---

**From:** Cohen, Jena B <jena.b.cohen@jpmorgan.com>
**Sent:** Tuesday, December 26, 2023 7:53 PM
**To:** Josh Biering <j▮▮▮▮▮▮▮g@gmail.com>
**Cc:** Tidwell-Neal, Rachel L <rachel.l.tidwell-neal@jpmchase.com>
**Subject:** RE: [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Hi Josh,
Thank you for your email and well wishes - the same to you and your family.  I have notes into a few people but most are out this week, as am I.
Your lawyer has details around the questions you are asking below.  Please clarify with him and if needed, circle back next week and I'll ensure you get answers.
Jena

---

**From:** Josh Biering <j▮▮▮▮▮▮@gmail.com>
**Date:** Tuesday, Dec 26, 2023 at 7:58 AM

X.04-003

JPMS_00022397

X.04-004
4:26-cv-00381-O
*Biering v. JPMS, et al.*

*Biering v. JPMS, et al.*

**To:** Cohen, Jena B (WM, USA) <jena.b.cohen@jpmorgan.com>
**Subject:** [EXTERNAL]Josh Biering- Employee Rights- JPMorgan

Jena-

I hope you had a wonderful Christmas and time to enjoy with your family.

First and foremost, I want to thank you for your time. I willingly and knowingly am writing to you against the advice of my Counsel, because I am fighting for my well-being and livelihood, and know firsthand that the judicial system is inefficient and will undoubtedly bankrupt me and drag out.

I'm running out of options before I become a victim of the blackhole of the 'system.' I've been in touch with the office of Senator Cruz and drafted the attached letter. I am open to your feedback/comments prior to my submission and follow up as planned with Senator Cruz's office.

Quite frankly, I don't think I can afford an attorney much longer. As the leadership team is well aware, despite a narrative on the U5, my job prospects in the industry are DEAD. I was excited to join Merrill Lynch, but that dream was quickly doomed as soon as the investigation was pinned on me, unjustly. Certainly, you can see that foul play is afoot.

I'm going to have to sell my house just to make ends meet, and I have no idea what the future will hold for me.

Hence, my heightened stress and anxiety to take whatever action possible to clear my name, which I am adamant has been unfairly tarnished.

I implore you to revisit the facts and evidence, which I have not been afforded the chance to review or rebut. I know you have always done the right thing and held all of your partners accountable. I admired your courage when you hosted the National Call to hold a very senior Regional Manager accountable for her behavior.

I am not perfect; I certainly have made mistakes. But those mistakes did not warrant a death sentence.

With hope and faith,

Josh Biering

This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.
This message is confidential and subject to terms at: https://www.jpmorgan.com/emaildisclaimer including on confidential, privileged or legal entity information, malicious content and monitoring of electronic messages. If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

X.04-004