**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.01a
## Native Audio Disclosure Slip

**Description:** Native-audio disclosure slip for the FINRA Arbitration No. 24-01208 hearing recordings underlying the S-series transcript exhibits. Identifies the authoritative evidentiary audio source (Zoom MP3 recordings ZOOM0004-ZOOM0033) and the AI-assisted unofficial-transcript methodology used to produce the redacted excerpt packets in S.02 through S.11.

**Relevance:** Establishes chain of custody for the native audio and the limits of the unofficial transcripts; controls over any transcript discrepancy.

**Source:** FINRA Arbitration No. 24-01208 — native Zoom MP3 recordings ZOOM0004 through ZOOM0033 (December 2025 hearing). Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54).

**Disclosures:** Redactions: Public-record redactions applied to derived transcript excerpts (PII, account numbers); native audio preserved unredacted under seal. | Annotations: UNOFFICIAL TRANSCRIPTS — AI-assisted (Whisper / Azure Speech) with human review. Not certified court-reporter transcripts.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

---

# EXHIBIT S.01b
## Key Transcript Excerpts Index

---

**Description:**   Index of witness transcript excerpt packets (S.02a.i through S.11a.iii).

**Relevance:**   Maps witnesses in Zoom appearance order to exhibit packet IDs for Direct, Cross, and Redirect testimony.

**Source:**   FINRA Arbitration No. 24-01208 - native Zoom MP3 recordings (ZOOM0004-ZOOM0033).

**Petition Ref:**   See Exhibit S.01a (native audio disclosure slip).

**Disclosures:**   Redactions: N/A (index only).

**Filing Status:**   Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.02a.i

## Hearing Transcript — Direct Examination of Greg Thompson

**Description:** Hearing transcript excerpt — Direct Examination of Greg Thompson (Employee Conduct Lead, North American Licensing & Registration, JPMorgan Chase Bank, N.A.). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 1 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0004, ZOOM0005, ZOOM0006. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

———————————————

S.02a.i-002
4:26-cv-00381-O
Biering v. JPMS, et al.

DIRECT EXAMINATION
BY MR. IACUONE:

*[ZOOM0004 ~ 00:00:02]*

THE CHAIRPERSON: Good morning, Mr. Thompson. My name is Eric Ross Cromartie. I'm the chair of the panel. Can you hear me?

MR. THOMPSON: Yeah. Good morning.

THE CHAIRPERSON: Can you hear me? Okay. Do you solemnly swear or affirm that the testimony you're about to give in this proceeding will be the truth, the whole truth, and nothing but the truth?

MR. THOMPSON: Yes, I do.

THE CHAIRPERSON: Thank you, and thank you for taking the time to provide your testimony in this proceeding. Counsel, you may proceed.

Q. Please state your name for the record, sir.

A. Yeah, Greg Thompson.

Q. Where are you currently employed?

A. I'm currently employed with JP Morgan Chase Bank NA.

Q. What is your title or role there at Chase?

A. I'm an employee conduct lead with the North American Licensing and Registration Department.

Q. Are you? If I call you a compliance manager, is that fair?

A. Sure, yes.

Q. Would you agree with me that you have to act with the highest level of integrity and ethics?

A. Yes, I do.

Q. You're subject to JP Morgan's code of conduct, are you not?

S.02a.i-003
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   That's correct.

Q.   And would you agree with me that you always have to deal fairly in a good faith with all of JP Morgan's employees?

A.   Yes.

Q.   And that would include Mr. Biering, the claimant in this case, correct?

A.   Correct.

Q.   Would you agree with me that you cannot take advantage of Mr. Biering or other JP Morgan employees with unfair business practices?

A.   Correct.

Q.   Would you agree with me that using the U-5 process to harm a departing employee would be an unethical business practice?

A.   100% agree. Yes.

Q    A firm that's found to have done that should be punished. You'd agree with that, wouldn't you?

THE CHAIRPERSON: Not necessary to answer that. Go on, that's just argument.

Q.   I would think so, yes. As a manager at JP Morgan, you have a heightened responsibility to practice your job ethically.

A.   Yes.

Q.   And you exercise that heightened ethical responsibility?

A.   I do, yes.

Q.   What is the purpose of the U-5?

A.   U-5 is the termination notice for securities industry registration, it is used to terminate the registration of individual, and to detail the reason why an individual left the firm.

Q.   Right. And you agree to me that U-5 is not an HR document, right?

A.   That's correct.

Q.   It's a registration document, right?

S.02a.i-004
4:26-cv-00381-O
Biering v. JPMS, et al.

A. It's a FINRA document, yes, but.

Q. The purpose of a U-5 is to tell the world that a certain individual is no longer associated with the firm in a capacity as a broker, fair?

A. That's fair.

Q. What is your role as far as the marking of JP Morgan U-5's?

A. So my I manage a team of individuals, and part of that team is the filing the form U5's. So my role is essentially to oversee the filing of the form U5.

Q. But the buck stops with you on those files, correct?

A. The U5, I sign off from there, yes.

Q. And when you sign them, you swear that they are accurate and complete, do you not?

A. Yes, to our knowledge, yes.

Q. Well, to your knowledge, Sir? Or do you sign off from them that they're accurate and complete,

THE CHAIRPERSON: OK. You're just quibbling. Go on.

Q. Yes, Sir. Do you take your role in filing U-5 seriously?

A. I do, very seriously.

Q. Do you understand the ramifications on a broker, based on how a U-5 is marked?

A. I don't know how everybody looks at them, but yeah, sure.

Q. It's a serious document for a broker, fair.

A. It can be, yes.

Q. Is the termination of registration different from the termination of employment?

A. Yes.

Q. And sometimes the termination date for registration is different from the HR or employment termination date, am I right?

S.02a.i-005
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  That's correct,

Q.  OK. It will actually pull up - Let's pull up, ██ if you can, claimants 18, CX 18. OK.

THE CHAIRPERSON: Okay, Mr. Thompson, while he's doing that and we're working this out, do you have anybody in the room with you?

A.  No, Sir.

THE CHAIRPERSON: OK. And do you have the ability to share screen and allow him to see documents?

A.  I can see their documents. They're showing.

THE CHAIRPERSON: OK, Thank you. Proceed, Sir.

Q.  Do you recognize claimants 18?

A.  It appears to be my department's termination procedures.

Q.  And you've actually had familiarity or some level of involvement indrafting these procedures, haven't you?

A.  Uh, yes.

Q.  OK, let's turn to 18-44, please, ██ Dash 44. Real quick, not for you, the witness. Jeff. Do we need to move to admit? Or are they just sort of…

[Speaker Tag Uncertain]: No. I've told you already, every document you have got some extraordinary circumstance when we came to admit it.

Q.  You see, let's go up to 6.2 at the top there, ██ And it says "Sometimes, the compliance registration needs to terminate a registration prior to them being terminated with HR." Do you see that?

A.  Yes.

S.02a.i-006
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. And so sometimes, for instance, A JPM employee would no longer be functioning as a broker and their registration would need to be terminated, but yet they're still employed. Is that fair?

A. That could be the case.

Q. When it comes to who marks the U-5, does HR make the final decision on how the U-5 is marked, or do you?

A. Well, we work with our HR legal group to determine what goes on in the U-5.

Q. OK, what is… Well, the language inserted for the terminal explanation field, sir, is provided by you, the compliance registration manager or legal, correct?

A. Yes, in conjunction with HR. Typically yes.

Q. Alright, so my question is: If there is an HR manager who is not a? Lawyer. They do not make the decision or should not make the decision on how U-5 is marked, correct?

A. That's correct, yes.

Q. It would be violating your department's policy if a non-lawyer HR manager interfered with the U-5 marking process, correct?

A. Yeah, we've never had, that I'm aware of, an HR manager assist with completing a U-5.

Q. Have you ever had an HR manager stop the process of filing a U-5? A non-legal HR manager?

A. I mean, that's a tough question because sometimes they'll, you know, there can be extenuating circumstances. I don't have a specific example. I don't know what you mean by stop, but usually we get our direction or always we get our direction from HR law.

Q. HR law. So my question is different. Not HR law. Can an HR manager, not a lawyer, stop the typical U-5 marking process.

A. Not typically.

S.02a.i-007
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK. Have you ever seen that happen, in which an HR manager, not a lawyer, would tell you what to do, as far as when your department for compliance would file or mark a U-5?

A. I can't think of an example, no. I've done over 10,000 of these, so I can't think of anything specific.

Q. But what we do know, according to your own policy, is that either you and or legal only should be making those decisions, correct?

A. What decision are you referring to?

Q. For instance, the termination explanation.

A. Yes.

Q. OK, what about when to file the U-5?

A. That's determined by my team and employee law—or excuse me, HR law

Q. The lawyers, correct?

A. Yeah, but we're—we're bound by FINRA guidelines of 30 days.

Q. Right. So my question is a little different. Not an HR lawyer but just an HR manager, non-lawyer. They cannot tell you when or when not to process a U-5 correct?

A. Well, if—if there's still an ongoing investigation or they're looking for new or additional information, they could ask us to please hold.

Q. The HR manager or the legal team?

A. They could ask us to—to hold momentarily. We're not going to go over our—our 30 day guidelines for them, but if there's information that we need to make an accurate and complete U-5 filing, we may hold. I—I can't think of any specific situation though.

Q. You can't think of the 10,000 when that's ever happened, right?

A. I have nothing specific.

Q. Right. And you would ask the HR manager for more information because you are responsible for the accuracy of the U-5 markings, correct?

A. If—yes, if I needed more information, yes, that's correct.

S.02a.i-008

4:26-cv-00381-O

Biering v. JPMS, et al.

Q. Okay. And I'm going to use some colloquialism. It's not meant to be argumentative, but you're not a rubber stamp, am I right?

A. That's correct. 100%.

Q. You don't just do what legal or HR tells you to do, correct?

A. That's correct.

Q. And when you're marking a Form U-5, you want to know the whole story, not just one side of the story, am I right?

A. We're dependent upon the information we're given because individuals are—are terminated prior to my team getting notified.

Q. Right, but before you mark U-5, sir, you are obligated to review in a fulsome manner all of the relevant information, are you not?

A. What's available to us, yes. We'll do that.

Q. And who provides you that?

A. That could come from global security, that could come from employee relations. They could come from really anywhere. But typically it's—it's employee relations and global security.

Q. And if employee relations or global security decides to withhold information from you, that's not information that goes into your calculation as far as how to mark U-5 correct?

A. Yeah, that's correct.

Q. Have you ever heard of Josh Biering?

A. I have heard of him, yes.

Q. Okay. Was Mr. Biering terminated?

A. Yes.

Q. Did he resign?

A. I believe he started the resignation process, yes.

Q. OK. My question was, did he resign?

A. OK. Yes.

S.02a.i-009
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. He did resign. And that's a voluntary termination—the resignation, correct?

A. Yes, once your—once your obligations have been fulfilled to the firm, yes.

**THE CHAIRPERSON:** Do we need to still have that blocking our view of hi,?

Q. Oh, no, Sir, you can take that down. I apologize that—if that ever happened, please, just letting you know, I apologize. A resignation is a voluntary termination, correct?

A. A resignation is, yes.

Q. OK, a discharge in U-5 parlance is an involuntary termination, am I right?

A. You're right.

Q. So I want to play a logic game with you, sir. How can - on October 28th, to your knowledge, did Mr. Biering submit a voluntary termination saying he no longer wanted to work at JP Morgan. You recall that fact?

A. I vaguely recall—I don't recall the exact dates—but I—I do recall he was suspended or sent home and—and submitted his—his resignation. Yes.

Q. I didn't ask you some of that other stuff. My question is: on October 28th, Mr. Biering submitted, on JP Morgan's system, a voluntary termination, correct? A resignation.

A. I don't—I don't recall the date, but he—at some point he did, yes.

Q. And that was approved and processed by JP Morgan's own internal system, was it not?

A. It—I believe it was, yes.

Q. Well, surely that's information you would have reviewed before marking the U-5, correct?

A. Yeah, that's. Correct.

S.02a.i-010
426-cv-00381-O
Biering v. JPMS, et al.

Q.  Okay. So I want to play a logic game. So on October 28th, Mr. Biering files, which is processed and approved, a voluntary termination saying he no longer wants to work in JP Morgan. Correct?

A.  OK.

Q.  But six weeks later, you filed a U-5 saying that Mr. Biering was involuntarily terminated, that he wanted to stay, but he was pushed out, correct?

A.  I don't think that's what... Is...

[Uncertain Speaker Tag]: I'm sorry, can you repeat that?

Q.  Certainly. A discharge—we've established discharge in U-5 is an involuntary termination of employment, correct?

A.  Correct.

Q.  Is it your position on December 22nd when you marked the U-5, that Mr. Biering wanted to remain employed at JP Morgan?

A.  I—I don't know what his—his thoughts were at that point.

Q.  But you do know, sir, because you knew on October 28th he had submitted a voluntary termination saying he no longer wanted to work there, correct?

A.  What I do know is he was still an employee when his U-5 was submitted.

Q.  That wasn't my question, Sir. The U-5 you marked and told the whole world was that Mr. Biering was involuntarily terminated on December 1st, correct?

A.  We didn't tell the whole world anything.

Q.  You filed on the CRD, for the whole financial world who has access to the CRD, that on—on December 1st, Mr. Biering was involuntarily terminated, correct?

A.  That's in – that's incorrect.

Q.  What's incorrect about that statement?

A. The whole—the whole financial world does not have access to Mr. Biering's CRD. They must have written authorization to see what's on his CRD.

Q. Okay. So any firm that wants to hire Mr. Biering can see his U-5 correct?

A. With his—with his written authorization, yes.

Q. Alright. Thank you for that clarification. My question states: You filed a U-5 that said on December 1st, JP Morgan involuntarily terminated Mr. Biering, correct?

A. That's correct.

Q. But yet you knew six weeks before, because JPM processed it, that Mr. Biering voluntarily terminated—that he no longer wanted to work there, correct?

A. He was still an employee.

Q. So you stand by the position on the U-5 then: on December 1st, Mr. Biering wanted to remain at JP Morgan, but JP Morgan involuntarily terminated him. Is that your testimony?

A. I don't know what his thoughts and wants were. I know he was still an employee as of December 1st.

Q. Let's show—Well, did you – What's the system at JP Morgan when an employee or a broker wants to resign, do you know what that system is.

A. I believe it's called ICM. I'm not sure; we don't have access to it.

Q. You don't have access to it? OK, hold on. I have a few more questions. Do you have access to JP Morgan's system that provides the employment status of its employees?

A. No, we have a process where we're notified when someone is terminated.

Q. OK, that wasn't my question. I understand you're notified—

THE CHAIRPERSON: I think actually, he said no. He did answer your question and then he went on.

S.02a.i-012
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  No, so no, you don't have access to the system. Fair?

A.  I do not have access to the HR system. Correct.

Q.  Is there anything that prevents you from asking HR or anyone for that system information regarding the status of an employee?

A.  Yes, with—we're not entitled to that information. It's HR information. We can ask for. I don't know why you're making a face at me, but we're—we're, you know, a lot of stuff is put in that system that we're not entitled to while people are still employed.

Q.  What about when they resign? Are you given actually—So I apologize, let me go ahead question, I apologize. When an employee resigns, are you given access to the raw data of the resignation into that system?

A.  We are given access to—we're given information that we ask for. We're not given full access to their system.

Q.  For the case of Mr. Biering, did you ask for the resignation form he submitted?

A.  That wasn't in question for us. So no, I didn't.

Q.  The answer is no. OK, so have you to this day seen the JP Morgan—its official system—the resignation form that lists his last day worked and his termination date? Have you seen that?

A.  I believe I have. Yes.

Q.  When did you see that?

A.  I—I don't recall.

Q.  Well, and I don't want to get into what you and your lawyers talk about, but did you see that prior to marking Mr. Biering U-5 or did you see that subsequent to that—after the dispute arose?

A.  I—I don't recall when I saw it or if I saw it. I don't recall any information from it so.

Q.  You signed the U-5 that it's accurate and complete, but you can't recall if you've ever actually seen the resignation form submitted by Mr. Biering, correct?

S.02a.i-013
426-cv-00381-O
Biering v. JPMS, et al.

A.    What resignation form are you referring to?

Q.    The system... You—you—you told me the name of the system, Sir. That's what I'm talking about—remember, I asked you—

A.    So you're… right. I—I... it sounds like you're referring to a written resignation. I'm just trying to clarify.

Q.    Well, let me ask a better question. Before you swore to the accuracy of Mr. Biering's U-5, what information did you review at all regarding the date of his resignation?

A.    So we—all of it. So we are given the data; it's—it's put in our system. So we—we're given the—the date of termination. So that would be—that would automatically feed into my system.

Q.    An HR person inputs that correct.

A.    I—I—I believe so. I think it's an automatic feed, an automated feed from their system, right?

Q.    So my question is a little different—not—not what's inputted.

A.    I didn't say what was inputted, you asked me that.

Q.    OK, new question. As far as JP Morgan's data and systems—official data and systems—when an employee says they want to resign, what of that information did you review prior to marking Mr. Biering's U-5?

A.    Well, we're not going to see anything when someone says they want to resign. What we review is when it's officially in the system that an employee is resigning,or if they're terminated. That is fed to our system automatically.

Q.    So suffice it to say, you don't see the raw data—it's what I'll call it, fair?

A.    Usually we do not.

Q.    OK. Well, let me ask—let me show you specific data, and it's a very important one and I want to know if you saw it. Let's go to claimants 131. I apologize to panel, that [inaudible] the other binder looking, but we'll have it up on the screen. You don't want to flip through this.

S.02a.i-014
4:26-cv-00381-O
Biering v. JPMS, et al.

**[Uncertain Speaker Tag]:** Is there any way that when you put the document up, there's a split screen, where there'e the person and the document…

**Q.** Is there a way to do a split screen?

**[Uncertain Speaker Tag]:** Let me try real quick. Let me try. If you click on view options, isn't that—

**[Uncertain Speaker Tag]:** It's—It's whoever is actually running that...

**Q.** It's ▮▮▮ Oh, it might be.

**[Uncertain Speaker Tag]:** There should be a share screen option—there usually is.

**[Uncertain Speaker Tag]:** So what you're looking at is ▮▮▮ computer.

**[Uncertain Speaker Tag]:** [Inaudible].. at the top right hand corner.

**Q.** You can simply go to view. Top right hand corner, is that view?

**[Uncertain Speaker Tag]:** Can I be multi-speaker view?

**[Uncertain Speaker Tag]:** There you go. [Inaudible]

**Q.** Does that work?

**[Uncertain Speaker Tag]:** Sorry.

**Q.** Yes, of course. No.

**[Uncertain Speaker Tag]:** It just helps to see the person.

**Q.** Oh yeah. Yeah, sure.

S.02a.i-015
4:26-cv-00381-O
Biering v. JPMS, et al.

**[Uncertain Speaker Tag]:** Sure. Is that working Alright?

Q. Yeah. Could you just expand the document just so it looks a little bigger? I think you can make it bigger, you know, there you go. Perfect. Are you familiar, Mr. Thompson, with this type of form? Go up a little more, ███ please. It's the "at JPMC." Are you familiar with this type of form?

A. I've seen them, yes. OK.

Q. Related to Mr. Biering, do you recall receiving a copy of this form before you marked his U-5 and signed it?

A. I do not recall.

Q. Okay. You recall typically seeing this form before you sign a U-5?

A. Not typically, we do not.

Q. Alright. So this is the "New me@JPMC"—if you go to the top, and we've seen this document in opening, I won't belabor it, but on the subject it says "approved resignation." See that?

A. Yes.

Q. In the subject line? OK. And then if we go down under the New me@JPMC, it says "voluntary termination." See that?

A. I do.

Q. And the words—voluntary and termination—does that track with U-5 Question 3?

A. Yes it does.

Q. It actually says "termination full", you mark that and then one of the options is "voluntary," correct?

A. It is, yeah. That's Right.

Q. And below that it says "your resignation was processed." You see that?

A. I do.

Q. Alright. And then it just talks about next steps for leaving the company. You see that? In the next sentence after the process, you

S.02a.i-016
426-cv-00381-O
*Biering v. JPMS, et al.*

will receive an e-mail with a link to tools and next steps for leaving the company. You see that?

A. Yes.

Q. Alright. So it's like you are leaving the company, it's just, they'll talk about the next steps. Is that how you read that?

A. Sure.

Q. Alright, let's go down. And this one's important. See, it says notification date—and I was giving you that date, and you're doing the best you could, but I don't want you to guess—here, it says October 28th, 2023.

A. Yes.

Q. Alright. And let's go below and there's—there's the garden leave date two months later, but it says last day worked. You see that?

A. I see that.

Q. Alright. And can you read that date for the panel?

A. 10/26/23.

Q. And to your knowledge—or did you ask—I don't even know if you've seen this document or not, but did you ask anyone as of 10/26 or 10/28/2023, was Mr. Biering still acting in any way, shape or form as a broker for JP Morgan?

A. I don't know specifically what I asked, but we did discuss the dates here, yes.

Q. Right, so my question is, did you ask anyone in HR: Is Mr. Biering post-resignation in his garden leave, still acting as a broker in that capacity in any way, shape or form? Did you ask anyone that question?

A. We discussed his role. I did not ask specifically if he was acting as a broker, but I did ask if he was still employed.

Q. OK. So you didn't ask that question, if he was still acting as a broker in that capacity after—

A. It wasn't—yeah, it wasn't relevant.

S.02a.i-017
426-cv-00381-O
*Biering v. JPMS, et al.*

Q. It wasn't relevant.

A. It was not. It's not relevant because he was not terminated, he was still employed.

Q. OK. Well, sir, remember we went through this—the purpose of the U-5. Well, there's two things we went through that you agreed with and I showed you: One, the HR termination date can be different from the termination on the registration date on the U-5, correct?

A. Yeah.

Q. That's correct. There you go. And secondly…

A. But you did—your question to me was, was he still acting as a broker?

Q. OK.

A. That's not relevant.

Q. OK. It's not relevant. So the second question is, Sir, the U-5 termination date, right? The day he is terminated, that's the date his association with the firm ends in his capacity as a broker, correct?

A. It's the date we terminate his registration and his affiliation.

Q. So you're saying what I just said is incorrect.

A. No, I said yes. The day he is—it's the day we terminate his registrations and the date he's no longer affiliated with JP Morgan Chase.

Q. In his capacity as a broker, correct?

A. No, incorrect.

Q. And you're the U-5 expert, am I right?

A. I'm registered and I am not a broker.

Q. Well, Sir, you're the one that marks these brokers U-5s, am I right?

A. 100%.

Q. You have their careers in your hands, am I right?

A. I do not. They have their own careers in their own hands.

S.02a.i-018
4:26-cv-00381-O
Biering v. JPMS, et al.

THE CHAIRPERSON: Let me ask—this is the chair again. I just want to clear something up for myself. If an employee who is registered with JP Morgan Securities terminates their employment with the bank on a certain date, do you have 30 days from the termination to file the U-5 because they're no longer functioning as a broker for the securities arm?

MR. THOMPSON: 30 days from termination to file the U-5. However we would use the date they terminated from the bank, typically. So if I—if I resigned on December 1st, we would have till roughly January 1st to file it, but we would put December 1st as the termination date.

THE CHAIRPERSON: OK, so if someone resigned on October 28th? You would have 30 days from that date to file the U-5, typically. Is that correct?

MR. THOMPSON: No, that's—it—in certain cases where there's garden leave, we would have 30 days from their final termination.

THE CHAIRPERSON: OK when someone is on garden leave, are they permitted to conduct securities transactions through JP Morgan Securities?

MR. THOMPSON: That I can't answer. I don't know.

THE CHAIRPERSON: Isn't that - From a FINRA point of view, isn't that an important point with respect to registered brokers?

MR. THOMPSON: Well, you know my—understanding of a garden leave—and we're getting—you know, my understanding of a garden leave is that it's—it's really a period to—to tie up loose ends, allow the broker to—to start moving wherever they're going, allow the company to send out letters, whatever. So it's hard for me to answer that question.

THE CHAIRPERSON: Well, let—let me ask you this. The garden leave, as I understand it, is 60 days, is that correct?

S.02a.i-019
426-cv-00381-O
Biering v. JPMS, et al.

MR. THOMPSON: That's my understanding.

THE CHAIRPERSON: OK. Is it—Would it be typical of you then on a voluntary termination to not file the U-5 until 30 days after the end of garden leave?

MR. THOMPSON: That's typical, yes.

THE CHAIRPERSON: And is the reason for that because the broker, even though on garden leave, might still be doing some things that require registration?

MR. THOMPSON: I—I believe that could be the case. And there's still—I—I can say this: When we're on garden leave, we're still representing the company, we're still employees of the company. So I—I would imagine that's a—a big reason as well.

THE CHAIRPERSON: When you are marking a U-5 that someone was discharged, would it be relevant to you, and would you expect to be notified of whether that employee had attempted to resign prior to the termination for cause?

MR. THOMPSON: Yes. And in this case we—we were aware.

Q. Following up on this line of questions. As a matter of fact, under your policy: if a broker has a clean voluntary—if they resign and it should just be voluntary—that is an expedited process that doesn't go through your department, does it?

A. That's correct. Typically yes, unless—unless there's an ongoing investigation. We reach out and—and then have our operations team not submit the U-5.

Q. So the answer to my question was yes, sir: if there is a simple resignation by a broker and it's voluntary, that is an expedited process U-5 that even skips your department, correct? It's almost pro-forma.

S.02a.i-020

4:26-cv-00381-O

Biering v. JPMS, et al.

A.  It in some cases—most cases, yeah.

Q.  In most cases.

A.  Yes.

Q.  Thank you.

THE CHAIRPERSON: And so, what I asked you about with respect to the garden period, it would not apply in those expedited cases. A U-5 would be generated within 30 days of the voluntary resignation, Is that correct?

A.  So—so if someone's subject to garden leave and it's a straight voluntary, it would be - The U-5 would be processed by our operations team at the date the garden leave ended, within 30 days of that.

THE CHAIRPERSON: Okay. Seems to me I'm getting two different answers here, and it's really not my job, I guess, to figure that out. Go ahead.

MR. THOMPSON: Well, I can—I can explain.

THE CHAIRPERSON: Yeah, please explain. Do you see my dilemma here? If it's an expedited...

A.  Let me try to explain. When someone voluntarily resigns, but they're obligated to a garden leave, that garden leave typically—the voluntary resignation is not—is typically not processed by our operations team until that garden leave ends. They use that garden leave end-date. Same case if—if there's an ongoing investigation and—and I can tell you, Mr. Chairman, FINRA has rules around—you know, voluntary resignations. There's still times when we're required to mark a U-5. This case, you know, there wasn't an internal review that would mark a disclosure on the U-5, but FINRA tries to cover most instances where someone tries to quit or resign, as opposed to having a U-5 disclosure.

S.02a.i-021
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. And that's an important point, it was my next point, because Mr. Dunlap, in the opening talked about, well, he was put on leave, for which he didn't know what the purpose was, but he was put on leave and the next day he resigned. FINRA has a process on the U-5 that if you resign after there's an investigation, one of the questions in box 7 could be checked, correct?

A. It could be, yes.

Q. Only if it relates to securities-related issues, am I right?

A. Typically rules, regulations, yes. We did not mark 7B in this case.

Q. Exactly because the investigation here had nothing to do with anything that FINRA cares about in Box 7—into rules, into regulations, into clients, into customers, into embezzlement, am I right?

A. FINRA cares about all terminations. We're required—required to answer exactly why someone was terminated in all cases.

THE CHAIRPERSON: His question, though, dealt with Box 7.

A. Yeah, Box 7. We would not have answered in the—in the—in the affirmative because this individual was actually terminated, as a result of the conduct.

Q. And my question is, so then the only way there would be an explanation for Mr. Biering's termination is if box 3 is marked discharged, correct?

A. No, there's other...

Q. Permitted to resign? I apologize. Permitted to resign, other, or discharged, correct?

A. Correct.

Q. If Mr. Biering's question 7 was not going to be marked, and you went through that analysis—if Mr. Biering's Box 3 is marked voluntary, there is no explanation provided, correct?

A. If it was a voluntary—way, termination, yes.

S.02a.i-022
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. But if there's some way you can call it a discharge that you have to write an explanation, even though it has nothing to do with the subject matter FINRA cares about in box 7, correct?

A. That's—that's correct, yeah.

Q. And that's what happened here is it, Sir?

A. He was terminated and we were required to provide an explanation, yes.

Q. Following Mr. Biering's resignation—did he perform any broker services at all on behalf of JP Morgan, do you know?

A. I don't know.

Q. Did you ask before you signed the U-5 Sir?

A. It's not applicable to me.

Q. OK, let's go to Mr. Biering's U-5, which is CX Exhibit 1. It should be easy for us. [Inaudible] and I apologize. Exhibit one in the same U-5. Alright, go to the last page where Mr. Thompson signed this U-5, which is in Mr. Biering's file. On CX1, if you can expand that whole thing, thank you. <ake it bigger. CX1- it's really 4 and 5. If you can go up to the [inaudible]. There you go. It says firm acknowledgement 8A—you see that?

A. Yes.

Q. "I verify the accuracy and completeness of the information contained in—with this form." You see that?

A. I do.

Q. And did you sign this document?

A. Yes. Electronic signature, Yes.

Q. And you stand by that, correct?

A. I do, yes.

Q. And what date did you sign that?

A. Looks like 12/22/23.

Q. And you marked Mr. Biering's U-5 as an involuntary termination or discharge, right?

S.02a.i-023
4:26-cv-00381-O
Biering v. JPMS, et al.

A. Correct.

Q. Let's go to what you marked as the date of termination. Please go to Box 4, ▮▮▮ that's CX1-2. And remember, we had discussed that the date of termination of registration sometimes can be different from the date of termination of employment with HR. Remember that?

A. I did.

Q. And you marked date of termination as December 1st, 2023, right? And that's the date of his purported involuntary termination, or his firing by HR correct?

A. That's correct.

Q. OK. But the date of termination for U-5 is different from the HR termination, or can be, correct?

A. It can be.

Q. Alright, so let's read what you're supposed to write for the date of termination. The next paragraph: "A complete date…" if you can get there ▮▮▮ THE CHAIRPERSON: It's there.

Q. Okay, "A complete date of termination is required for full termination. This date represents the date the Firm terminated the Individual's association…" not employment, "…with the Firm in a capacity for which registration is required." Did I read that correct?

A. You did.

Q. And so if JP Morgan on October 27th, 2023 told Mr. Biering "you are no longer a broker here, you are cut off from access, you can't talk to clients, you sit at home and do nothing... you are no longer a broker and you are certainly no longer acting in a capacity as a broker for JP Morgan, in which registration is required"—that date is incorrect, isn't it?

A. I disagree.

Q. So on November 30th, 2023 was Mr. Biering acting in a capacity with JP Morgan that required registration?

S.02a.i-024
4:26-cv-00381-O
Biering v. JPMS, et al.

A.    I don't know what he was doing on that day. He was still employed.

Q.    Great. Assume with me, sir, because this is the fact that it's undisputed that on November 30th, for instance, 2023 Mr. Biering—at JP Morgan's insistence and direction—could no longer perform any type of broker obligations, fiduciary obligations to his clients whatsoever. Assume that with me. Okay, sir?

A.    OK.

Q.    Okay, so on November 30th, 2023, sir, he was not required to be registered in association with JP Morgan, correct?

A.    I would disagree with that again, yes.

Q.    OK, let me…

A.    If someone is suspended, I—I assume that's what you're referring to when he was sent home. I don't know.

Q.    No, sir, that's not what I'm—that's not what—that's not what I'm talking about. I'm talking about.

A.    So I'm—I disagree. I disagree with you.

Q.    I'm going to give you an assumption. So I admit it's an assumption, but I think [inaudible]. On November 30th. Sit home or not, sir, he's still there. He's—he's in—he's in Europe, wherever. On November 30th, 2023, JP Morgan told Mr. Biering: "You are not a broker here. Your access is cut off. You cannot talk to clients." If that's the case, he is not required to be registered in his association with JP Morgan, correct?

A.    I—I don't know because I don't know what their expectations were. I— I... you can laugh and smile. I don't. I don't know their expectation.

Q.    Did you ask?

A.    No, we were given the dates. We were given the dates.

Q.    So it was withheld from you that on…

A.    No we were…

S.02a.i-025
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Let me get get my question in sir. As as of October 27th, through November 30th of 2023, no one told you that Mr. Biering was instructed - not only instructed, but cut off from any and all access whatsoever to act as a broker on behalf of JP Morgan? No one told you that?

A.  I don't know what access he had or did not have.

Q.  Assume that's true, sir. No one told you that?

A.  No one told me what, that he couldn't act…

Q.  In the capacity as a broker for which registration is required. Did anyone tell you that?

A.  No. That could be a temporary thing though, so.

Q.  Well, sir, he'd submitted his resignation. You told me you knew that.

A.  Yes, I did know that.

Q.  Who's Stephanie Steinback?

A.  I believe she's either a... I—I can't remember the exact title, I know her name.

Q.  OK, if I told you she was in human resources at the private bank, would that—would that jog up your memory?

A.  That makes sense.

Q.  I'm going to show you a series of emails, and I want to know if these were shared with you as part of your fulsome investigation regarding the U-5. Let's go to Exhibit 141, please, ▇ The middle one from Jena Cohen, please ▇ at the top there. It's the [induaible] that I told him. I'm going to read this e-mail to you because I want to see if you recall whether you looked at it or not prior to marking U-5, fair?

A.  Yes.

Q.  This here from Jena Cohen, on October 28th—this is the day Mr. Biering resigned. We've seen that document previously to Ms. Steinback. Do you know who Jena Cohen is?

A.  I do.

S.02a.i-026
426-cv-00381-O
Biering v. JPMS, et al.

Q.   She's pretty high up in the HR department, correct?

A.   Sure.

Q.   OK. "I told him to hold and he is waiting on our view so it doesn't need to be this weekend... I just looped in Jeremy. Ben had told him pieces already. Turns out that his…" and that's Mr. Biering, "…resignation is likely to go work to Michael Pirelli at MS or ML, so we should make sure we amend the U-4 ASAP as he likely just cleared their background." You see that?

A.   I do.

Q.   OK. Was this e-mail shared with you?

A.   I don't recall seeing this.

Q.   OK.

A.   I don't know why we would amend his U-4 though, or why they're discussing this.

Q.   Well, that's my question, sir: Was it shared with you that Ms. Cohen wanted to mark Mr. Biering's U-4 because he was about to leave for a competitor?

A.   I don't know what you would mark a U-4 for, to leave for a competitor. I don't understand.

Q.   It's real information, that's her [inaudible] I promise you, but I guess my question is a little different: Did Ms. Cohen or anyone ever share with you—part of the marking of a U-4 or U-5 related to Mr. Biering's desire to go work for a competitor?

A.   No.

Q.   That wasn't shared with you, fair?

A.   Yes, fair.

Q.   And you certainly would never distort the U-5 process to weaponize it to harm a departing FA's ability to go to a competitor, correct?

A.   That is 100% correct.

S.02a.i-027
4:26-cv-00381-O
Biering v. JPMS, et al.

**[Uncertain Speaker Tag]:** I have a question. What is the difference between a U-4 and a U-5?

Q. Sure, so well, the way this answer I can—a U-4 is when you're currently employed. So it's that same kind of document, but you're still employed. So for instance, if there's a customer complaint, you would mark that onto your U-4. A U-5 is a similar document, but it relates to when you leave the firm and the circumstances of why you left.

**[Uncertain Speaker Tag]:** Is that fair, Mr. Thompson?

A. I think. I generally explain it as like the U-4 is kind of like an onboarding, and U-5 is like an off boarding form.

Q. Sure. Would it be a violation of JP Morgan's code of conduct of which you said you were familiar with and obligated, to mark a U-4 or U-5 in a way to interfere with the broker's ability to go to a new firm?

A. Yes.

Q. That would be a lack of ethics and integrity, would it not?

A. I agree, yes.

Q. Did you do, as part of marking the U-5, and this is a little more open for you—do you do an independent analysis as to the completeness or accuracy of the information contained in U-5, or is it dependent on just what is provided to you or not provided to you?

A. So typically... and can I say something real quick? If I see what—I'm getting feedback from myself so I can hear myself talking. So it's— it's just so everybody—I'm trying. I'm not trying to be argumentative or anything. I just haven't—I'm having a really hard time up here.

Q. But you're doing fine.

A. I just—I'm hearing myself before, right as I am.

S.02a.i-028
426-cv-00381-O
*Biering v. JPMS, et al.*

Q.  Let me stop right there. Is there something we can do to help that? Is it—is it an echo?

A.  I think I can just hear myself off of your speakers in there, possibly and there's a delay, but it's—it's fine. I just wanted you guys to know that.

Q.  Fair, and if you ever have an issue with that, let me—let us know.

A.  And now you're on mute.

[Uncertain Speaker Tag]: Yeah, and Mr. Thompson, that's how it is, I think for anybody listening on Zoom, it's just a slight echo.

MR. THOMPSON: Yeah, I just wanted to make sure everybody's aware of that. I'm not trying to, you know, seem difficult or argumentative. It's just frustrating at this point because like...

Q.  You've been doing…

A.  What's that?

Q.  I said you've been doing just fine, Mr. Thompson, and it becomes an issue, please let us know. OK, so my question was, and it was more of an open-ended one for you: prior to you signing the U-5 that it's complete and accurate, do you do some type of independent analysis as to the substance of which you're marking, or is that based on what materials are provided or not provided to you?

A.  Yeah. So—so we depend on the professionals that are trained to do our investigations. We do depend mostly on what's provided to us, but we can go out and ask additional questions.

Q.  Alright. So information is provided to you, but you have the ability for follow up.

A.  That's correct.

Q.  But of course if information is not provided to you and you don't think to ask follow up, then that wouldn't be part of your consideration. Fair?

S.02a.i-029
426-cv-00381-O
Biering v. JPMS, et al.

A. Fair.

Q. Do you know what an opening memo is?

A. In what capacity?

Q. In HR investigation, it's called an opening memo.

A. I don't—I don't know if I'm aware of seeing one of those. I don't—I—I don't know what they're called.

Q. OK, I'll show you claimant's 129. I just want to ask if you were provided this, if you recall, prior to you marking the U-5. If you could zoom in a little bit, please here. So this is October 27th and I'll just say this relates to the explanation in your U-5 as to the "inappropriate behavior." And this is what has been called an opening memo if you look at the subject matter. You see that?

A. OK, OK.

Q. My question is if this was provided to you as part of the materials you reviewed before marking Mr. Biering's U-5.

A. I'm not 100% certain. I would have to see our file.

Q. As you look at it, do you recall seeing it?

A. It's—it's tough. It's been a few years and, and I've... umm. I know I've had meetings to discuss things that I've heard, so I don't know if I've seen it or not. I don't want to answer, you know, if I have for sure or not.

Q. That's fair. Typically are you provided—well, well withdraw that question. My understanding is in HR investigations at JP Morgan, there's typically this thing called an opening memo and a closing memo. So my question is: typically are you provided these memos, do you recall, when there's a termination related these investigations?

A. If it's—if it's an ER or HR investigation, what we'll usually ask for and receive is—is their investigation summary. In most cases.

Q. Right. That's—and that's what I'm getting at, sir. You marked Mr. Biering's U-5 saying it was accurate and complete, based solely on a one-paragraph summary provided to you by Mr. Jacobs, correct?

S.02a.i-030
426-cv-00381-O
Biering v. JPMS, et al.

A.  Incorrect.

Q.  OK. Did you ask for a short summary from Mr. Jacobs as to what happened?

A.  Yeah, Mr.—Mr.—Yes, I did ask from Mr. Jacobs for additional information. We were also given the recommendation of the termination.

Q.  OK. So you were given...

A.  I was also—I was also involved in discussions regarding the investigation.

Q.  Okay. Let's unpack that, because what I have from you is you requesting a summary of what happened from Mr. Jacobs prior to you marking the U-5. You recall that?

A.  I recall asking for additional information from them, yes.

Q.  And it was about one paragraph. You recall that?

A.  Vaguely?

Q.  After you received that one paragraph summary from Mr. Jacobs, you recall requesting any additional information?

A.  Not directly from Mr. Jacobs. I would have had discussions with our HR—HR law group.

Q.  Right, and I don't want to talk would haves. I'm asking what you did. Do you recall asking for a follow up of information?

A.  Yes. I had discussions with our HR law group after Mr. Jacobs sent me the information that he did.

Q.  Because your HR Law Group told you how to mark U-5.

THE CHAIRPERSON: OK.

Q.  He raised the issue.

THE CHAIRPERSON: He did not. Go ahead - and it's not going to make any difference to me.

Q. Understood.

THE CHAIRPERSON: By the way. I understand that the parties – and I appreciate this from both sides, that this is a highly contentious and emotional matter, and my interruptions are not intended to indicate anything of the views of the case, they're to protect the witnesses, just like I'd protect you and your witnesses, or to ascertain the facts. We want to get it right. That's our only concern.

Q. Yes sir, of course. And I'm not going to ask the follow-up question, but other than the summary from Mr. Jacobs, you had discussions – and I don't know what they were, but you had discussions with the HR legal, correct?

THE CHAIRPERSON: You can answer that, yes or no, okay?

   – Correct.

Q. But ultimately you signed the U-5 and swore to its completeness and accuracy, not anyone in HR legal, fair?

A. That's fair.

Q. And you are required, as the compliance VP to conduct or at least review the investigatory materials before signing the U-5, right?

A. That's correct.

Q. Had you ever spoken with Mr. Biering about the a ███ ons in the Question 3 explanation?

A. No, like I explained earlier, the employees are typically gone or are always gone before we're even notified, and there's no regulatory expectation that we conduct independent investigations.

Q. I appreciate that. That's not my question. Did you…

A. I said no. I answered no.

Q. Just—you can stop with that. Thank you. OK, So you did not speak with Mr. Biering about the a ███ ons, correct?

S.02a.i-032
426-v-00381-O
Biering v. JPMS, et al.

**A.** No.

**Q.** Did you ask for Mr. Biering's side—not just JP Morgan's side—regarding the a ███ ons?

**A.** It probably... well let me rephrase that: That would have come up during my discussions with the HR law group.

**Q.** Do you recall receiving any materials documenting Mr. Biering's defense as to how his U-5 should be marked in the a ███ on, sir?

**A.** I recall you working with our HR law group. That's all I recall.

**Q.** Right, so my question is a little different. Do you recall reviewing or being provided those materials, provided to you marking the U-5, yes or no?

**A.** Are you asking me if I recall seeing material from you asking how U-5 was going to be marked?

**Q.** Yes sir, yes sir.

**A.** Yes I did. Yes.

**Q.** Those letters were shared with you?

**A.** I don't recall exactly what was your... shared.

**Q.** Yeah. And I'm sorry, I gotta—I gotta drill down on this, sir, but I want to know - Because those letters contained authority, they contained case law, they contain requests for Mr. Biering to provide information as to his side. So my question is, do you recall actually reviewing those letters prior to signing the U-5?

**A.** I—I don't recall seeing those letters to that depth, no.

**Q.** Yet you signed the U-5 swearing to its accuracy and completeness, correct?

**A.** I did, yes.

**Q.** Wouldn't you...

**A.** Were those letters sent prior to the U-5?

**Q.** Yes, Sir, they were.

**A.** Yeah, I don't—I don't know if I saw them

S.02a.i-033

4:26-cv-00381-O

Biering v. JPMS, et al.

Q.  Correct, because they weren't provided to you, were they, sir?

A.  That's—I'm not going to answer yes or no to that.

Q.  Right. You didn't interview Mr. Biering, correct?

A.  It's not part of my team's obligation.

THE CHAIRPERSON: He just wants to know, did you talk to Mr. Biering?

A.  I've answered that earlier. I said no.

THE CHAIRPERSON: Yeah, I understand. Okay, move on.

Q.  Did you understand that Mr. Biering thought that his U-5 must be marked voluntary, not discharged?

A.  I understand that was an argument, yes.

Q.  Did you understand prior to marking the U-5 that Mr. Biering denied the a ███ ons against him?

A.  I assume, I don't recall though.

Q.  Did you ask for follow-up materials, as was your right, sir, saying, "Hey, I'd like to know the broker whose U-5 I'm about to mark, he's going to have a serious consequence against him—I'd like all the materials setting out his position." Did you ask for that?

A.  We—we thought we had all the relevant material.

Q.  That wasn't my question, Sir.

A.  My—my answer is I did not ask for anything additional that—that we don't have.

Q.  Let's go back to Claimant's 18 which is your NAMRLR full termination procedure. That's claimant's 18, let's go to dash 10..[inaudible]. Do you recall - I'm sure you're familiar with sections 12 and 13.

A.  Yes.

Q.  Did you draft the termination explanation in Box 3 for Mr. Biering's U-5, sir?

S.02a.i-034
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  Did I personally draft it?

Q.  Yes, sir.

A.  No, but I—I had the draft language, initially.

Q.  Okay. If you go to 13, Supervisor Review—and this is you, is it not?

A.  Uh, yes, most cases.

Q.  The Compliance Registration Manager must review and approve involuntary terminations prior to submission, correct?

A.  Yes.

Q.  You must review the draft of the Form U-5, supporting documentation. including previous recommendations. Did I read that correct?

A.  You did.

Q.  Let's go to Claimant's 35, and I want to look at the supporting documentation you use. It's going to be the very top of CX-35-2. And I'll represent this is an e-mail from you to Mr. Jacobs with ████ copied. That top part is from you to Mr. Jacobs. "Thanks, Jonathan. In order to ensure that the U-5 language is accurate, can you please provide me with a summary of the inappropriate conduct involved?" You see that?

A.  I do.

Q.  So for you to ensure that the language listed on Mr. Biering's U-5 was accurate, you asked for a summary, right?

A.  I asked for additional information than we already have, yes.

Q.  Right. And Mr. Jacobs gives you a one-paragraph summary. You see that?

A.  I—I don't see it on the screen.

Q.  There you go.

A.  Yes, I see it there.

Q.  As a matter of fact, Mr. Jacobs emails you: "Good morning, Greg. Please below, if you require any additional information or any important points to be fully detailed or more fully detailed,

S.02a.i-035

426-v-00381-O

Biering v. JPMS, et al.

please let me know and I'm happy to get that to you." And what's your response to Mr. Jacobs?

A.  "Thanks, Jonathan."

Q.  Did you ask him for anything else?

A.  No, but I—I like I've said numerous times, I—I talked with the HR law group for additional details.

THE CHAIRPERSON: This is probably a good time to break.

Q.  It probably is.

THE CHAIRPERSON: We're obviously not going to finish Mr. Thompson before lunch, so why don't we take an hour, and Mr. Thompson, you're free to do something more fun for the next hour, and we will see you later.

MR. IACUONE: Thank you, If I may, briefly, Your Honor. This happens a lot in employment law: Witnesses should not be allowed, when I ask questions that are salient, that are substantive, to say, "Well, legal told me to do it" or "It relied on legal", but then I can't ask what that was when it goes to the salient issue in the case and that… it's a frustration, your honor.

THE CHAIRPERSON: Alright, let me let me share my view of the attorney-client [inaudible]. I think probably if we got rid of it, the world would not be harmed. But we do have it, and I will protect it - and I can pretty much tell you, I've decided a lot of cases and it almost never makes any difference. I understand your frustration, but your position is that this was orchestrated and lawyers orchestrated it, And if they're not going to allow you to have the privilege waived, we are free, as are you, to infer what we think logically happened, and that may or may not be what you or you want, but my experience is it leads to correct decisions.

MR. IACUONE: Yes. Sir.

THE CHAIRPERSON: Without invading the privilege.

MR. IACUONE: Yes, Sir, I understand. Yes, Sir.

[Unidentified Speaker Tag]: Can I ask one other question just for purposes of the hearing generally, does the panel have - and I'm not, not because I'm going to call Greg, but I just want to know going forward: Does the panel have a preference if we're in the middle of a of a witness and we take a break? I would assume your rule is there's no discussion with the witness because, technically, they're still on the stand.

THE CHAIRPERSON: Yes.

[Unidentified Speaker Tag]: Want to make sure. Okay, good.

THE CHAIRPERSON: Although, I'll also tell you that, you know, if you want an expert in the room and whatnot, I'm pretty relaxed on the rule. Again, I don't think the rule really has much practical impact in the world. I'm more concerned with the witnesses' convenience than I am with the rule.

[Unidentified Speaker Tag]: Got it. Thank you.

                    [ZOOM0005 ~ 00:00:18]

THE CHAIRPERSON: Mr. Thompson, let me remind you, you remain under oath. And Counsel, you may proceed.

Q. Thank you, your honor. Mr. Thompson, can you hear me?

A. Yes.

Q. Okay. Prior to you marking and signing Mr. Biering's U-5? How many investigations into Mr. Biering were you aware of?

A. This is the only one that I was aware of, I believe. I don't recall any other ones.

S.02a.i-037
426-cv-00381-O
*Biering v. JPMS, et al.*

Q. Were you told that there was a performance investigation into Mr. Biering in the time just prior to you marking the U-5?

A. No, Sir.

Q. Were you told that there was an expense report or expenses investigation into Mr. Biering in the time right before you marked his U-5?

A. I do recall reading something about that.

Q. Did you ask anyone in HR or otherwise, if Mr. Biering had any prior disciplinary actions against him in the eight years he'd been at JP Morgan.

A. Oh, no.

Q. Did you ask anyone at HR or otherwise why Mr. Biering was being terminated as opposed to a lesser disciplinary sanction such as counseling or suspension?

A. No.

Q. Did you ask anyone at HR or otherwise what policy they were referencing as far as what type of disciplinary punishment he should receive?

A. No.

Q. Do you recall what came about or what the result was for the expense report investigation into Mr. Biering?

A. I don't recall, but it wasn't applicable to my team because he wasn't terminated, and it had expired or ended prior to termination, so there was no obligation on our part.

Q. Sure, and this is not a memory test. I'm not fussing at you, but do you recall Miss - Who's Carla Bush?

A. She reports to me.

Q. And do you recall her informing you or keeping you up to date as to the expense report investigation?


S.02a.i-038
4:26-cv-00381-O
Biering v. JPMS, et al.

A.    I think our only point of that would have been to ensure that it didn't line up regarding a reporting obligation on our part, So I think that's where she would have kept me up to date.

Q:    Let me show you claimants - and this is just to refresh your memory, sir. Claimants 34 CX 34, please, █████ Alright, can you go to the very top [inaudible]. And you'll see this is an e-mail from Mr. Jacobs, who we discussed. And who's Mr. Jacobs?

A.    He's with employee relations.

Q.    And he's the one that emailed you the paragraph summary about the harassment a ███ ons against Mr. Biering? Correct.

A.    Correct.

Q.    On December 5th, I don't know, about two weeks before you mark the U-5, he emailed Carla, and you and Miss Tidwell, who's here in the room with us about the expense report investigation, you see that?

A.    I do.

Q.    And Mr. Jacobs said, in the second sentence, quoting that case's preliminary conclusion, GS determined there is no evidence to support the a ███ ons of theft from the firm or expenses reimbursement. Did I read that correct?

A.    I did

Q.    OK. Can you recall why you were being kept informed as to the expense reported investigation?

A.    The only, the only part I recall is again, it has, no, it's not applicable to this because of the timing, because had the timing lined up, even though it's not supported, FINRA would still make you have a reporting obligation under certain circumstances. So we just wanted to, on our side, make sure that he wasn't terminated for that, that wasn't included, and that's the only reason we're even notified at this point in time.

Q.    Fair enough. Prior to the fall of 2023 - Actually, you know, I'm gonna strike them, save some time - I think you're going to answer that. Let me ask you this, sir. Let's pull up CX 131. We've looked at this document previously.

S.02a.i-039
426-cv-00381-O
Biering v. JPMS, et al.

OK, this is the document. There's the October 28th and it says voluntary termination. You see that? You recall this document?

A.  Yes.

Q.  So there is nothing that prevented you from marking Mr. Biering's U-5 as voluntary, correct?

A.  Well, we weren't ready to file the – I don't, I didn't have this information initially. I'm not following.

Q.  Exactly, sir, that's my point.

A.  No, I'm saying on December 26th, we hadn't gathered to make a decision either way.

Q.  My question is, sir: Under further guidance in the U-5, there is nothing that prevented you from marking Mr. Biering's U-5 as voluntary, i.e, comporting with JP Morgan's own internal records, correct?

A.  On what date?

Q.  On 10/28.

A.  Uh, he was still on garden leave, so the U-5 wasn't filed here.

Q.  Yeah, I asked, sir: There was nothing that prevented you from filing it. You could file U-5 early, can you not?

A.  If there's a reason to.

Q:  So I'll ask my question again: You could have filed a U-5 on October 28th and it would have said voluntary, correct?

A.  Well, I answer it the same way I did a minute ago. He was still employed and under garden leave, so we weren't able to file the U-5 at that point.

Q.  Sir, you keep saying you weren't able to. You are not required to wait the 30 days. You may file a U-5 the day someone departs, correct?

A.  You can, yes.

Q.  OK, so let me ask my question again.

THE CHAIRPERSON: I think we've got the [inaudible]

S.02a.i-040

426-cv-00381-O

Biering v. JPMS, et al.

Q. Yes, yes, sir. To be clear: If you had filed at any point, Mr. Biering's, U-5 as voluntary in box 3, the explanation field would have been left empty, correct?

A. Yes, if it was a voluntary termination.

Q. Are there instances where employees do not honor garden leave?

A. I'm, you know, I'm not part of HR so I don't know. But I would imagine.

Q. Your testimony is you've never had a situation where an FA, even though they have a 60 day garden leave, joins another firm immediately?

A. I don't know that. I can't think of anything specific, but I do know we have terminated people for one reason or another during garden leave.

Q. My question was a little different. If your answer is you don't recall, that's fine. I'm asking.

THE CHAIRPERSON: He did say that in the beginning.

Q. I understand. I understand. I just wanted to clarify. Because I've had clients.

THE CHAIRPERSON: The only people who need clarification are up here and we understood it was the first part of his answer.

Q. Yes, your honor. I find the answer unusual because I've had clients who have not honored garden leave… so let me ask it one more time in the 10,000 U-5s you filed, sir, you're telling me there's never been an instance where you were informed that a broker refused to honor garden leave and immediately joined a new firm? Is that your testimony?

A. I didn't say that, I said I don't recall anything specifically, but I know there has been instances where we've terminated individuals

S.02a.i-041

426-cv-00381-O

Biering v. JPMS, et al.

during garden day for one reason or another. That could include someone not honoring their garden leave.

Q. Well, sir, if another firm picks up their registration, you wouldn't terminate it, would you? Their U-5?

A. If another firm picked up their form? They filed a U-4?

Q. Yes Sir.

A. They would be duly registered and we would get notification from FINRA.

Q. Thank you, I want to show you something. I want to know if you have access to this system or if you did before marking the U-5. This is claimant's 57. If you [inaudible]. And this looks to be an HR document and there's a few that have been produced. They look very similar. My question is, are you familiar with this type of document? This type of HR document?

A. I'm not familiar with that document.

Q. Specific as to Mr. Biering, do you recall HR sharing a document like CX-57 with you prior to marking his U-5?

A. I don't recall, no.

Q. Well, let's look at the CX-57. Up in the date it says run date and time. See that?

A. I see it, yes.

Q. And it's March 6/20/24, correct?

A. That appears to be yes, the date.

Q. Approximately. 3 1/2 months after you marked Mr. Biering's U-5. Correct?

A. Correct.

Q: Alright, let's go down. See, it's his last day worked again, and it says that October 26, 2023. See that?

A. Yes.

Q: Okay. In the H service subtype for this document generated 3 1/2 months after you marked Mr. Biering's U-5 as an involuntary

S.02a.i-042

426-cv-00381-O

*Biering v. JPMS, et al.*

termination or discharge, what does it say In JP Morgan's HR records?

A. Resignation.

Q. Was this ever shown to you after you marked the U-5?

A. It was not.

Q. As a matter of fact, you have the ability to amend a U-5 if it's incorrect, don't you?

A. We do, yeah.

Q. You can take that down now. Are you aware – I'm going to ask you about JP Morgan's… Well, one question. To your knowledge, was Mr. Biering ever an employee of JP Morgan Securities LLC?

A. Well, I don't believe so.

Q. Right he was an employee of a private bank, correct?

A. JP Morgan Chase Bank, Yes.

Q. But JP Morgan Securities LLC is the entity that held his license, right?

A. Correct. Yes, correct.

Q. And so the only association that Mr. Biering would have with JP Morgan Securities LLC. is in that they hold his registration for him to act as a broker, correct?

A. Hold his registration, correct.

Q. He has no other affiliation with JP Morgan Securities LLC other than registration and acting as a broker, correct?

A. Well, I answered this before: I'm registered, I'm not a broker. So it doesn't matter if you're – it's associated, you're associated.

Q. I'll use the exact term that's fair. Mr. Biering's only association with JP Morgan Securities LLC who holds his license is his association with JP Morgan Securities LLC at a capacity for which registration is required, correct?

A. Correct.

S.02a.i-043
426-cv-00381-O
Biering v. JPMS, et al.

Q. And so if Mr. Biering is no longer in a capacity or acting in any way, shape or form in which he would have to be licensed, he no longer has the need for that association with JP Morgan Securities, correct?

A. Hypothetically.

Q. Under JP Morgan's garden leave policy, because you testified as to that little bit, can JP Morgan waive that notice period?

A. I'm not familiar to that level.

Q. And that's fair. That's fair. I appreciate that candor. Let me ask you this: Have you known of instances in which you were informed that someone licensed with JP Morgan Securities needed to U-5'd prior to the 60 days with regard to the period.

A. I can think of one. I can think of a case, yes.

Q. Okay. Let's move on to what you reviewed and considered in marking the U-5. If we could please, ███ pull up the claimant's 38.

**[Uncertain Speaker Tag]:** Yes, sorry, for some reason the [inaudible] function just froze, so I'll pull it up as soon as I can.

Q. OK, we'll wait till that comes up. I'll ask you some different questions while waiting on that. Do you recall, Mr. Thompson, you directly dealing with other issues regarding Mr. Biering and his U-4 or U-5, separate, apart from the one you signed on December 22nd 2023?

A. No, I don't recall.

Q. Do you recall maybe there that Mr. Biering had a service-connected disability and that that was marked as a discharge on his U-4?

A. I don't recall that.

Q. Well, I'll show you some documents that you [inaudible]. Now I'll go backwards [inaudible] too. Perfect. So this is dated December 6, 2023. You see that, this letter?

A. I see it, yes.

S.02a.i-044
426-cv-00381-O
Biering v. JPMS, et al.

Q. And it's addressed to Ms. Tidwell-Neal, the assistant General Counsel. You see that?

A. Yes.

Q. And December 6, 2023 is about… it's more than two weeks prior to you marking Mr. Biering's U-5, am I right?

A. It appears to be yes.

Q. And I think you had testified that you – and I don't know, I do not know the substance of them, but you had discussions with Miss Tidwell-Neal about this issue with Mr. Biering's U-5, fair?

A. Yes.

Q. I have a very specific question. Did… And I don't want to know by who, but by anybody, was this letter, for instance, shared with you prior to you marking Mr. Biering's U-5?

A. I don't recall.

Q. Do you recall the case law in the FINRA rules, cited within any correspondence from me or Mr. Biering regarding how his U-5 should be marked?

A. I don't.

Q. For instance, if we go to page, it's 38-3, ███ That says "Obviously, JPM may exercise its right to move the final date of Biering's employment forward this option, but under prevailing law, Biering's termination must be reported on the U-5 and the regulatory filing is a voluntary resignation. Some cases are cited there. Do you recall reviewing any cases that stood for that proposition or any kind of [Inaudible]

A. Sir, I don't recall seeing this letter.

Q. Alright. Fair enough, fair enough. Let's go to CX-39. And this is a similar letter sent from me to Ms. Tidwell-Neal, you see that?

A. Yes, I see that.

Q. It's a different date. This is 6 days later, but still 10 days before you marked Mr. Biering's U-5, fair?

S.02a.i-045

426-cv-00381-O

Biering v. JPMS, et al.

A.  Yes.

Q.  And it sets – the filename is Biering JPMS. You see that, the right one?

A.  Yeah.

Q.  OK. So I know you haven't seen Exhibit 38. Have you seen Exhibit 39, which was maybe 10 days before you marked the U-5, or do you recall?

A.  I don't. It looks the same to me. I don't recall.

Q.  Let's go to – and I just have maybe one more, CX-40 please, ███ And this is an e-mail from me on December 13th, this is a day later, maybe 9 days prior to marking Mr. Biering's U-%. See that?

A.  Yes.

Q.  And I copied a whole mess of folks there at JP Morgan. I'll admit you were not on there. But my question is, do you recall if, and I know you haven't seen the letters, but if this e-mail was forwarded to you by anyone in JP Morgan if you recall.

A.  I don't recall. It doesn't I, I don't recall seeing that.

Q.  And I'll just briefly go through the first section. It says "Today I received the following from Ms. Tidwell-Neal as the proposed language of the U-5. During notice period, [inaudible] was terminated for inappropriate behavior not related to sales, securities and customer complaints. This is a rank mismarking and intended to harm Mr. Biering." And then below that paragraph, it says it violates FINRA rules. JPMS cannot discharge him 33 days after he's resigned. The only appropriate marking is voluntary. You see that?

A.  Yes.

Q.  And very quickly I'll be done with this, the last paragraph of this page, "Despite repeated requests which is hereby demanded again, very [inaudible]  counter the dispositive authority of the attached letter, none has been provided. Do you see that?

S.02a.i-046
426-cv-00381-O
Biering v. JPMS, et al.

A. Yes.

Q. Did you - I'm not saying it's to a lawyer, but did you ask anyone for follow-up authority on whether or not you should mark Mr. Biering U-5 voluntary or discharge?

A. We yes, it was discussed.

Q. With lawyers, I don't need to know, I just said I don't need to know.

THE CHAIRPERSON: By authority, I think he probably means FINRA rules or cases. Did you ask for any FINRA rules or cases in connection with making your decision to mark the U-5?

A. Not specifically, no.

Q. Lunches are good sometimes because I marked out a lot of my outlines, I'm almost done. And I'd asked you about Mr. Biering and his past U-4 issues and you said you didn't recall, and I get it because you handle a lot of these. Let's go to Claimant 68. And on Claimant 68, this is 3-4 - that's not fair. 4-5 months before what we've been discussing previously. So we're now in May of 2023. And in the middle e-mail, Mr. Ramirez emails you. "Hello Greg, are you familiar with the 4/13/20 update to the interpretive guidance on compromises with creditors. Any thoughts as to whether or not this individual service-connected disability qualifies for removal of the student loan compromise that's currently on the U-4?" You see that?

A. I do.

Q. Do you see the subject line? This says J. Biering?

A. Yes, OK.

MS. RISTER: Does that refresh your memory at all?

A. Not at all.

Q. OK, OK. Well. Does it refresh your memory that Mr. Biering had a service-connected disability, so some of his student loans were

S.02a.i-047
4:26-cv-00381-O
Biering v. JPMS, et al.

discharged, and JP Morgan marked that on his U-5 under 14K as a past compromise with creditors. Does that ring a bell?

A.  It doesn't, but it would be on form U-4.

Q.  Alright, we'll go there. Sure, sure. I mean the form U-4, that's actually that's accurate. Let's go to CX-65, please. And that's the U-4 form, correct?

A.  Yeah, that's a U-4 doc.

Q.  And and if we go to 65-2, you'll see your signature. And this is the form U-4 for Mr. Biering. You see that?

A.  Of course, yes.

Q.  Yeah, May 3rd, 2018. And if we go to 65-8, please ██████ There it is. Up financial disclosures. Down there, there you go. Yeah, right there. Financial services, you see it says "Within the past 10 years, have you made a compromise with creditors while at bankruptcy petition of for the subject of involuntary bankruptcy petition. See that?

A.  I do.

Q.  And what did you mark that?

A.  It was marked yes.

Q.  And that ultimately was an incorrect marking, was it not?

A.  I have no idea.

Q.  For brokers, that's a pretty serious – if you as a broker who's entrusted with money and your U-4 has been marked as basically they're having a bankruptcy, a compromise with creditors, that can be a a serious issue, right?

A.  There's thousands and thousands and thousands of brokers out there with that same question [inaudible]. So I don't know if I agree.

Q.  FINRA will ask, won't they?

A.  FINRA usually doesn't specifically ask about a compromise or a bankruptcy as statement.

S.02a.i-048
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK. Let's go to claimant 69. And this is June of 2023. You recognize this series of emails?

A. I don't.

Q. And the one for Ms. Reynolds to you, the very bottom paragraph, she says this is about Mr. Biering. "Looks like if a balance is forgiven in full, there aren't any reporting obligations. Just want to run it past you first before I file the amendment", and you responded. "It sounds like it to me." Do you see that?

A. I do yes.

Q. And you admitted, to your credit, to making an error in filing that question 14, an error on Mr. Biering's U-4, did you not?

A. I would have to explain the preclearance background processes. I wouldn't say it's an error, no, it comes up on a credit report a certain way.

Q. OK, it's not an error. Let's go to claimant 70, CX-70.

A. Now to get it off, we would say filed in error.

Q. Right you know, what it's going to show you, it was filed in error, was it not?

A. After we received additional documentation and information, yes. And got guidance from FINRA, yes.

Q. Let's zoom in. This is June 16. To Mr. Biering there's been Stewart's name relates to Mr. Biering's U-4. You see that on the subject line?

A. Of course.

Q. It says financial student loan compromise. [Inaudible] disclosures. DRP filed in error, since the full student loan balances were forgiven. Did I read that correct?

A. You did.

Q. And what was filed in error was that initial 2018 U-4 that you signed showing that Mr. Biering had had a compromise with creditors or bankruptcy correct?

S.02a.i-049
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   That's what showed off on his credit report, yes. And we had to get guidance from FINRA.

**MS. RISTER:** How do you know that showed up on this credit report, sir?

A.   Because we receive copies of the credit report from a third party, that's part of the process of preclearance.

Q.   Did you ask Mr. Biering about those student loan compromises?

A.   There probably would have been a letter of explanation in the file regarding those. Yes.

Q.   Do you know why there were student loan compromises?

A.   I don't, it doesn't matter to my department. We just want to make sure that they were on the U-4 if they were supposed to be.

Q.   Okay, that the compromise was because he was disabled. He had done tours in Afghanistan. Did you ask him about that?

A.   Why would we ask about tours in Afghanistan and if someone was disabled?

Q.   Because Mr. Biering informed JP Morgan repeatedly he wanted that off of his U-4, do you recall that, Mister Thompson?

A.   Sure, and once we became aware of that information, we removed it from his form U-4.

**THE CHAIRPERSON:** You've answered the question… just.

Q.   Thank you, Mr. Chair. Greg, can you hear me?

A.   Yeah.

Q.   OK, great. Where are you seated right now, Greg?

A.   I'm in my, actually in my Home Office today in ███ Center, Ohio.

Q.   What major city is ███ Center, Ohio, close to?

A.   Suburb of Columbus, Ohio.

Q.   Do you have securities licenses, Greg?

S.02a.i-050
426-cv-00381-O
Biering v. JPMS, et al.

A.   Yes.

Q.   Explain to the panel what licenses you have, please.

A.   I have my Series 6, Series 7, Series 24, Series 26, series 63, series 65 and my Ohio life, health and annuity.

Q.   Have any of those licenses been suspended or revoked for any reason, Greg?

A.   No, they have not.

Q.   How long have you worked with JP Morgan?

A.   I think today is my 25th work anniversary.

Q.   Explain generally to the panel, and I don't need specific dates and things, but tell them about the jobs that you've handled and held over the course of your 25 years with the firm.

A.   Sure. I actually started right out of school on the trade desk, and then I just got promoted on the supervisory side up. I've been in my current position for, I think going on 12 years now.

Q.   How many people do you have on your team, if you will, that assist you in some form or fashion with forms U-4 and forms U-5.

A.   Well, so we have a large registration department. I believe it's close to 100 people. On my team, we are an advisory capacity and there are 7 people on my team.

Q.   OK, we saw the the name Carla Bush earlier. Is Carla on your team?

A.   Yeah, she is.

Q.   What's her role generally?

A.   Carla handles our terminations U-5 filings from an administrative standpoint.

Q.   Alright. Does FINRA provide broker dealers like JP Morgan Securities? An expectation of what it expects when a Form U-5 is being completed.

A.   Yes.

Q.   What form does that expectation take?

S.02a.i-051
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  What's the form called?

Q.  Is there guidance?

A.  Yeah, they guide us to make timely, accurate and complete filings.

Q.  Is the document where you find that named something?

A.  Yes, it's regulatory notice 10-39

Q.  OK, I'd like to turn to Exhibit PP please, in the respondents book, Double P. Yes, please. OK. You can leave it right there. Greg, can you see what we put on the screen?

A.  Yes.

Q.  Okay. Is this Regulatory Notice 10-39 what you were just referring to a minute ago?

A.  Yes.

Q.  What do the numbers 10 and 39 signify on this document?

A.  The 10 signifies the year and 39 is the number of the regulatory notice this doc is.

Q.  And indeed, underneath those numbers it gives a date. What date is on the document?

A.  September 2010.

Q.  On the left, under Form U-5, read for the record what it says in bold there, starting with obligation.

A.  "Obligation to provide timely, complete and accurate information on FORM U-5.

Q.  And if we could Scroll down a little bit, ▮▮▮ Do you see the back? There we go. Do you see the background and discussion? Right there on the left? A.  Yes, yeah.

Q.  In terms of timeliness, do you see the first sentence there?

A.  Yeah.

Q.  Read that for the record if you would.

S.02a.i-052
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  Under Article 5, Section 3 of the FINRA Bylaws, firms are required to file Form U-5 no later than 30 days after terminating an associated person's registration.

Q.  OK. Did you do that in this case?

A.  Yes.

Q.  Ho down to the next paragraph that starts with the word with the words Form U-5.

A.  OK, you want me to read that?

Q.  Please.

A.  Form U-5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA.

Q.  In this case, are you the "appropriate signatory" of JP Morgan Securities to verify the accuracy of his Form U-5?

A.  Yes.

Q.  Ok.Let's let's go to the next page if we could, ███ OK, do you see there at the top? Tell me if I read this correctly, the first sentence "FINRA notes that each question on Form U-5 stands on its own. And firms should carefully read each question on the form and respond appropriately to each question." Did I read that correctly?

A.  Yes.

Q.  To a professional who's been doing this as long as you have, what does that mean?

A.  Well, so when we're completing a Form U-5, it would specifically be the questions under Section 7, it tells us that we need to read those questions independently to determine if they're applicable.

Q.  Read for the record, if you would, what it says in bold there at the bottom of that paragraph.

A.  "In this regard, FINRA notes that with respect to factual situations that would cause a reasonable person to answer affirmatively any disclosure question on Form U-5, a firm may not parse through the



S.02a.i-053
4:26-cv-00381-O
Biering v. JPMS, et al.

questions in a manner that would allow the firm to avoid responding affirmatively to the question.

Q. Again, to somebody who does this for a living and has been doing it for a living as long as you have. What is that telling you?

A. Well, it's telling us that after we read the questions and the reason for termination, that we need to answer those questions appropriately if they're applicable and we have to review them independently of each other.

Q. Let's go to the last page of 10-39, The Reg. notice if we can. OK, right above the word end notes in bold there, Read that for the record. That sentence.

A. "FINRA notes that firms may be subject to administrative and civil penalties for failing to provide complete and accurate information on Form U-5 in a timely manner."

Q. What is that saying?

A. Well, basically if we don't file within the 30 days of termination, they could start administrative penalties, and then if the information is inaccurate in their eyes, then we could be subject to civil penalties as well.

Q. OK, you can take that down, ▮▮▮ Greg, I think it's probably clear from the record, but just for the record, were you in any way involved in the decision to terminate Mr. Biering's employment?

A. Not at all.

Q. Is that part of your job responsibilities?

A. It is not. We don't even know until someone's already been terminated.

Q. We saw the piece in 10-39, which says that you have to file a Form U-5 within 30 days after terminating an associated person's registration. How does the process start with you? When do you start thinking about a Form U-5 with respect to somebody at JP Morgan?

S.02a.i-054

426-cv-00381-O

Biering v. JPMS, et al.

A.  So we're notified when somebody either has been terminated, discharged or if they resign while they are under [inaudible].

Q.  OK. So if somebody just tenders A resignation e-mail, does that start your your clock ticking?

A.  It does not.

Q.  If somebody gets into the system at JP Morgan and clicks resignation, we saw an e-mail earlier today and there will be more about that later, does that start your system or your time ticking?

A.  It does not.

Q.  Who notifies you in compliance registration that it's time to start looking into a Form U-5?

A.  HR.

Q.  Alright, We talked a little bit about how it is you learn what happens in order to to contemplate U-5. I want to take a look at a couple of documents in that regard. :et's go to exhibit BB, please. double B. OK. And if you could Scroll down please. This is a document, Greg, that you were asked about on cross examination, and I want to just take a look at that top e-mail first there. Do you see where it says "Hi, Carla" from Jonathan Jacobs?

A.  Yes.

Q.  Is it unusual for you and your team to get information from HR to enable you to complete the Form U-5? And in this case with some more specificity perhaps than what you got out-of-the-box.

A.  Is it unusual to get information from HR about a termination?

Q.  Yes.

A.  It's not.

Q.  So if we scroll down here, can we scroll down to the next E-mail? Stop right there. Do you see on Tuesday, December 5th when Carla Bush from your team sent Mr. Jacobs, ███████ and you an e-mail?

A.  Yes.

Q.  Read that for the record if you would.

S.02a.i-055
426-cv-00381-O
Biering v. JPMS, et al.

A.  "Thank you, Jonathan. After reviewing the RFT, the global GS case number ECNA 1020239740 is not mentioned in the RFT. However, the disposition is listed that as a termination for misconduct. Was the GS part of the termination case?

Q.  So what is Carla trying to discern right there? What's she asking?

A.  Uh, I believe that she's asking if the, uh, the global security investigation regarding the credit card was part of the termination.

Q.  And what was the answer?

A.  It was not.

Q.  When she says or makes reference to RFT, what does that refer to?

A.  That's an HR document. It refers to the Recommendation For Termination.

Q.  OK, we'll take a look at that here in a and let's look at that here in a second. Let's go and let's look at Exhibit AA, please. Alright, we, we saw this also very briefly on your cross examination. Can we Scroll down so that the big e-mail is all on the screen, or most of it [inaudible]. So go up a little bit to capture the top of the e-mail. I'm sorry, go down. I just want to capture the the to and from on that e-mail. OK, great. So can you see that on the screen there, Greg?

A.  Yeah.

Q.  Jonathan Jacobs sent you an e-mail on Wednesday, December 6th, along with ███ and Carla.

Q.  Do you see that?

A.  Yes.

Q.  What's the subject?

A.  Term-U5.

Q.  And Jonathan says "Good morning, Greg, absolutely please below." Is this where he's sending you a summary of what happened or what occurred?

S.02a.i-056

4:26-cv-00381-O
Biering v. JPMS, et al.

S.02a.i-056

S.02a.i-057

4:26-cv-00381-O
*Biering v. JPMS, et al.*

S.02a.i-057

S.02a.i-058
426-cv-00381-O
Biering v. JPMS, et al.

**[Uncertain Speaker Tag]:** I know I'm not supposed to object, I just a point of clarification.    Mr. Thompson is not on these emails. [inaudible].

Q.  Do you see where it says recommendation for termination of employment of, whose name is below that?

A.  Joshua Biering

Q.  And then at the bottom of this recommendation for termination, we have a an electronic signature of somebody, who is that?

A.  I can't see the bottom.

Q.  Can you scroll it a little bit. There we go.

A.  Jonathan Jacobs.

Q.  And what date did he sign it?

A.  November 30th, 2023.

Q.  OK, he says, in the middle box there "I'm recommending that Joshua Biering be terminated from employment for misconduct." Do you see that at the top?

A.  Yes.

Q.  And did you read the recommendation for termination prior to completing Mr. Biering's Form U-5?

A.  Yes.

Q.  OK. It says JPMC's annual code of conduct reinforces to employees our commitment to integrity in work dealings and our expectations of employees with regard to their personal and professional conduct. Do you see that?

A.  Yes.

Q.  Are you subject to the Code of Conduct?

A.  Yes.

S.02a.i-059
426-cv-00381-O
Biering v. JPMS, et al.

Q. OK, it goes on to say the firm also has in place its equal opportunity anti-discrimination and anti-harassment policy paren the policy effective March 3rd, 2023. Do you see that?

A. Yes.

Q. It references the code of conduct and the fact that. Mr. Biering's conduct exposes the bank to risk and negatively impacts the customer and work experience there. What role did this document play in your preparing the Form U-5?

A. I mean this is the main, one of the main pieces that we use to determine what goes on in form U-5.

Q. Does to your knowledge, does this document get given to the employee who is the subject or the former employee?

A. It does not.

Q. OK is it an internal document?

A. It is.

Q. Alright. Let's go to Exhibit NN. We'll just do a quick one with the actual Form U-5, because we saw that before. OK. At Exhibit NN, which we have up on the screen, we see the filing date on the top right is what date?

A. December 22nd, 2023.

Q. That is how many days after December 1st, when the termination took place? A. 21 days.

Q. Was that therefore timely under Reg Notice 10-39?

A. Yes.

Q. OK. And then we saw if you scroll down. Keep going to we get all of Section 3 in there. Oh, just a little bit further. Almost. There we go. Do you see the Section 3 area there, Greg?

A. Yes.

Q. Is that the Section 3 area that Reg notice 10-39 was referencing just a few minutes ago when we went over that?

S.02a.i-060
426-cv-00381-O
Biering v. JPMS, et al.

A.  Yes, correct.

Q.  When you and your team complete Form U-5 for a registered individual, are you accountable to that individuals lawyer?

A.  No.

Q.  Who are you accountable to when you complete Form U-5?

A.  Our regulator.

Q.  Who is the regulator?

A.  FINRA.

Q.  In this case, Greg, is everything that's on Mr. Biering's Form U-5 true and accurate?

A.  Yes.

Q.  Did you do anything differently or your team, did your team do anything differently when you completed this Form U-5, than when you've completed forms U-5 for others. You've said you've done many, many, many.

A.  No.

Q.  Did a woman named Jena Cohen have anything to do with how you completed the Form U-5?

A.  No.

Q.  Did a woman named Stephanie Steinback have anything whatsoever to do with how you completed Form U-5?

A.  No.

Q   Was JP Morgan in any way sanctioned or disciplined by FINRA in connection with its filing of Mr. Biering's Form U-5?

A.  No.

Q.  One last exhibit. Let's go to Exhibit E, please. Oh, you know what? I think it's EE. Let me just make sure. Give me a second. It's actually OO. Sorry. Double O. It's the broker check. OK. We put up on the screen, Greg, the first page of what's called Broker Check Report. Do you see that?

S.02a.i-061

426-cv-00381-O

Biering v. JPMS, et al.

A.   Yes.

Q.   Whose broker check report is this?

A.   Mr. Biering's.

Q.   What does CRD number - And there's a series of numbers. What does that mean?

A.   It's the central central registration depository number, basically our FINRA number.

Q.   OK, let's go to the third page. Well, before we do that, what is broker check? Greg, what is it?

A.   Broker check is a FINRA website where you can go out and check on individuals or firms that you might want to do business with.

Q.   So when you say you, anybody who is aware that FINRA has a website can go and check up on people by just getting on the on the Internet, is that what you're saying?

A.   Yes, it's available to the public.

Q.   OK, let's go to the third page of this if we could. There you go. Do you see the third page here where it says report summary for this broker?

A.   I do.

Q.   Over to the left, do you see the name Raymond James and Associates, Inc. next to both a brokerage and an investment advisor?

A.   Yes.

Q.   What does FINRA report to people was the date that Mr. Biering was registered with Raymond James?

A.   1/11/2024.

Q.   OK. And that was approximately how long after his termination on December 1?

A.   A month.

Q.   That was how long after you completed Form U-5 on December 22?

A.   What 3 weeks? 2 weeks?

S.02a.i-062
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q. OK, let's continue through broker check. And let's arrive - there's very small page numbers on the bottom right of the documents. Let's go to page 6. OK, keep going, keep scrolling. Very bottom right there's - that's 4. That's 5. There we go. Do you see here where it shows what particular supervisory or other exams Mr. Biering has completed or passed over the course of his career?

A. Yes.

Q. Are those, are those the licenses that he would have?

A. Correct.

Q. Let's go then to the next page, would be page 8, bottom right. OK, here we have a registration history and an employment history. And you see there at the very top of the employment history, it says from 1 of 24 to the present, he's been a registered representative with Raymond James in Fort Worth.

A. Yes.

Q. And then finally, let's go to the next page, which is essentially the end. And you can show that the very last page has no comments or anything on it. End of report. Do you see any mention on this broker check report for Mr. Biering, Greg, of the reason for his termination from JP Morgan?

A. No.

Q. Why isn't that on there?

A. It's not public. This type of termination is not publicly available on Broker Check.

Q. So if Mr. Biering met somebody at a cocktail party and they wanted to check him out, they can go to Broker check but they would never see what happened vis a vis JP Morgan. Is that what you're saying?

A. That's correct.

Q. OK, if I could have a moment, Mr. Chair?

S.02a.i-063
426-cv-00381-O
*Biering v. JPMS, et al.*

**THE CHAIRPERSON:** Why don't we take a 10 minute break, and that way you can organize your redirect, and you can check…

Q. 2:15.

**[Uncertain Speaker Tag]:** I don't know if I need much, if you want to get Jena ready.

**[Uncertain Speaker Tag]:** Alright, off the record.

*[ZOOM0006 ~ 00:00:02]*

Q. Greg, we're going to begin again and I have two finishing questions. Number one is, is it JP Morgan's normal practice to file a Form U-5 prior to the end of somebody'd notice period?

A. It's not.

Q. Would it be uncommon to file a Form U-5 during a notice period?

A. It would be uncommon, yes.

Q. Nothing further, Mr. Chair.

**[Uncertain Speaker Tag]:** Redirect.

Q. Very briefly, maybe one or two questions briefly. On that notice 10-39, which is PP. If you'd be so good as to pull it up just because I can't, I just can't pull up your exhibits for him to see. Let's see, we get up a little bit. Down. I'm sorry, second page. Yeah, I apologize. There we go. Wonderful.  So the first little hash or or arrow point there, Can you testify that your job is to strictly comply with FINRA rules and this rec notice 10-39, correct?

A. Correct.

Q. Alright. And we saw the request for termination and that e-mail chain you were on? And the request for termination listed a violation of the code of conduct, and the anti harassment policy, you recall that?

**A.** Yes I do.

**Q.** So the first hash says a firm must provide sufficient detail when responding to Form U-5 questions, such that a reasonable person may understand the circumstances that triggered the affirmative response. For example, for purposes of Section 3, which is what we're discussing in Form U-5, it is not sufficient for a firm to report only that a person's registration was terminated because that person violated firm policy. If a firm is obligated to report that a registered person was terminated because he or she violated a firm policy, and that's what the RFT says in this case, right? That Mr. Biering was terminated because he violated multiple firm policies, correct?

**A.** That was part of it, yes.

**Q.** OK. The firm must identify the policy. You see that?

**A.** Yes.

**Q.** OK. Did JP Morgan identify this those same policies cited in the RFT in its Section 3 explanation on the U-5?

**A.** No, so we didn't have to. Because we said it was inappropriate behavior, which he was also in the RFP.

**Q.** Well, sir. But it has to be complete, doesn't it? And accurate.

**A.** It is complete. It is complete. FINRA reviews a 100% of these.

**Q.** I don't know what that means. FINRA doesn't know why he's fired or not. Sir, my question is different. If a firm is obligated to report that a registered person's terminated because he or she violated a firm policy, which is exactly what happened here, right? JP Morgan says he violated a firm policy, correct?

**A.** Sure.

**Q.** It listed the two firm policies in the RFT, did it not.

**A.** It did.

**Q.** OK, the firm must identify the policy, but that's not what happened here, is it?

S.02a.i-065
4:26-cv-00381-O
Biering v. JPMS, et al.

S.02a.i-065

S.02a.i-065

S.02a.i-066

426-cv-00381-O

Biering v. JPMS, et al.

**A.** I've told you repeatedly, I was in discussions with our HR legal group.

**THE CHAIRPERSON:** OK, let let me try and do this.

**Q.** Yes.

**THE CHAIRPERSON:** Do you recall any of the information that Mr. Biering's counsel provided to JP Morgan? Regardless of how you learned of that information, do you recall any of it?

**A.** I don't recall now at this time, no.

**THE CHAIRPERSON:** But you do recall that information that was provided by Mr. Biering's Council was provided to you in some form by JP Morgan Council, is that correct?

**A.** Yeah, we would have had discussions, yes.

**THE CHAIRPERSON:** OK.

**Q.** And a follow-up question. Sir, as we've said this case, words matter. I want to know - not discussions with legal counsel, were the letters that we went through and the case cites and the authority and block quotes and federal regulatory notices cited - were those forwarded to you and provided to you or did legal counsel just have a discussion with you about it?

**A.** I already answered that.

**THE CHAIRPERSON:** He already said he did not recall any of the letters that you showed to him. I will, as a courtesy, ask one follow-up question maybe getting towards what you're after: Did you take into account, when exercising your decision to mark the U-5, any of the information that was conveyed to you by your counsel that had been conveyed to them by Mr. Biering's counsel?

S.02a.i-067

426-cv-00381-O

Biering v. JPMS, et al.

A.  We take everything into account, yes.

THE CHAIRPERSON: Do you recall, as you sit here today, any specific information that Mister Biering's counsel had provided that you recall being provided to you?

A.  I don't recall specific information at this point.

THE CHAIRPERSON: Do you recall generally anything that Mister Biering's council had said to to JP Morgan that was passed along to you?

A.  Yeah, I recall the discussion about the voluntary termination dates compared to the actual termination date, that sort of thing. But I don't recall anything about case cites or anything along those lines.

Q.  Do you recall any factual positions that Mr. Biering or I took that controverted the one-sided positions and the one paragraph summary from Mr. Jacobs, to you.

A.  I don't recall.

Q.  Did you, Sir, say there seems to be a huge dispute of the law and the facts in this circumstance. I have independent follow up requests for information in analysis. Did you ever do that?

A.  That's not an obligation. That's not an obligation or expectation. That's why I did not.

THE CHAIRPERSON: He said he did not.

MR. IACUONE: OK. No further questions. Thank you.

[Uncertain Speaker Tag]: OK, nothing further.

THE CHAIRPERSON: OK, Mr. Thompson, thank you for your time. Unless the parties have any reason, I'm going to dismiss this witness and let

S.02a.i-068
4:26-cv-00381-O
Biering v. JPMS, et al.

him go about his life. Alright. Mr. Thompson, thank you. You may go. Thank you. Next witness.

**MR. IACUONE:** Claimant will call Jena Cohen to the state.

**THE CHAIRPERSON:** Will she be here physically?

**MR. IACUONE:** She's yeah, she's here.

**[Uncertain Speaker Tag]:** It will just take her two minutes to get here.

**MR. IACUONE:** She'll come up.

Uncertain Speaker Tag]:    I'm. Going to go off the record then.

### UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.02a.ii

## Hearing Transcript — Cross Examination of Greg Thompson

**Description:** Hearing transcript excerpt — Cross Examination of Greg Thompson (Employee Conduct Lead, North American Licensing & Registration, JPMorgan Chase Bank, N.A.). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 1 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0004, ZOOM0005, ZOOM0006. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

_____

S.02a.ii-002
4:26-cv-00381-O
Biering v. JPMS, et al.

**CROSS EXAMINATION**
**BY MR. DUNLAP:**

Q. Thank you, Mr. Chair. Greg, can you hear me?

A. Yeah.

Q. OK, great. Where are you seated right now, Greg?

A. I'm in my, actually in my Home Office today in ████ Center, Ohio.

Q. What major city is ████ Center, Ohio, close to?

A. Suburb of Columbus, Ohio.

Q. Do you have securities licenses, Greg?

A. Yes.

Q. Explain to the panel what licenses you have, please.

A. I have my Series 6, Series 7, Series 24, Series 26, series 63, series 65 and my Ohio life, health and annuity.

Q. Have any of those licenses been suspended or revoked for any reason, Greg?

A. No, they have not.

Q. How long have you worked with JP Morgan?

A. I think today is my 25th work anniversary.

Q. Explain generally to the panel, and I don't need specific dates and things, but tell them about the jobs that you've handled and held over the course of your 25 years with the firm.

A. Sure. I actually started right out of school on the trade desk, and then I just got promoted on the supervisory side up. I've been in my current position for, I think going on 12 years now.

Q. How many people do you have on your team, if you will, that assist you in some form or fashion with forms U-4 and forms U-5.

A. Well, so we have a large registration department. I believe it's close to 100 people. On my team, we are an advisory capacity and there are 7 people on my team.

S.02a.ii-003
426-cv-00381-O
Biering v. JPMS, et al.

Q. OK, we saw the the name Carla Bush earlier. Is Carla on your team?

A. Yeah, she is.

Q. What's her role generally?

A. Carla handles our terminations U-5 filings from an administrative standpoint.

Q. Alright. Does FINRA provide broker dealers like JP Morgan Securities? An expectation of what it expects when a Form U-5 is being completed.

A. Yes.

Q. What form does that expectation take?

A. What's the form called?

Q. Is there guidance?

A. Yeah, they guide us to make timely, accurate and complete filings.

Q. Is the document where you find that named something?

A. Yes, it's regulatory notice 10-39

Q. OK, I'd like to turn to Exhibit PP please, in the respondents book, Double P. Yes, please. OK. You can leave it right there. Greg, can you see what we put on the screen?

A. Yes.

Q. Okay. Is this Regulatory Notice 10-39 what you were just referring to a minute ago?

A. Yes.

Q. What do the numbers 10 and 39 signify on this document?

A. The 10 signifies the year and 39 is the number of the regulatory notice this doc is.

Q. And indeed, underneath those numbers it gives a date. What date is on the document?

A. September 2010.



S.02a.ii-004
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. On the left, under Form U-5, read for the record what it says in bold there, starting with obligation.

A. "Obligation to provide timely, complete and accurate information on FORM U-5.

Q. And if we could Scroll down a little bit, ▮▮▮ Do you see the back? There we go. Do you see the background and discussion? Right there on the left? A. Yes, yeah.

Q. In terms of timeliness, do you see the first sentence there?

A. Yeah.

Q. Read that for the record if you would.

A. Under Article 5, Section 3 of the FINRA Bylaws, firms are required to file Form U-5 no later than 30 days after terminating an associated person's registration.

Q. OK. Did you do that in this case?

A. Yes.

Q. Ho down to the next paragraph that starts with the word with the words Form U-5.

A. OK, you want me to read that?

Q. Please.

A. Form U-5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA.

Q. In this case, are you the "appropriate signatory" of JP Morgan Securities to verify the accuracy of his Form U-5?

A. Yes.

Q. Ok.Let's let's go to the next page if we could, ▮▮▮ OK, do you see there at the top? Tell me if I read this correctly, the first sentence "FINRA notes that each question on Form U-5 stands on its own. And firms should carefully read each question on the form and respond appropriately to each question." Did I read that correctly?

S.02a.ii-005
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   Yes.

Q.   To a professional who's been doing this as long as you have, what does that mean?

A.   Well, so when we're completing a Form U-5, it would specifically be the questions under Section 7, it tells us that we need to read those questions independently to determine if they're applicable.

Q.   Read for the record, if you would, what it says in bold there at the bottom of that paragraph.

A.   "In this regard, FINRA notes that with respect to factual situations that would cause a reasonable person to answer affirmatively any disclosure question on Form U-5, a firm may not parse through the questions in a manner that would allow the firm to avoid responding affirmatively to the question.

Q.   Again, to somebody who does this for a living and has been doing it for a living as long as you have. What is that telling you?

A.   Well, it's telling us that after we read the questions and the reason for termination, that we need to answer those questions appropriately if they're applicable and we have to review them independently of each other.

Q.   Let's go to the last page of 10-39, The Reg. notice if we can. OK, right above the word end notes in bold there, Read that for the record. That sentence.

A.   "FINRA notes that firms may be subject to administrative and civil penalties for failing to provide complete and accurate information on Form U-5 in a timely manner."

Q.   What is that saying?

A.   Well, basically if we don't file within the 30 days of termination, they could start administrative penalties, and then if the information is inaccurate in their eyes, then we could be subject to civil penalties as well.

S.02a.ii-006

426-cv-00381-O

Biering v. JPMS, et al.

Q. OK, you can take that down, ▇▇▇ Greg, I think it's probably clear from the record, but just for the record, were you in any way involved in the decision to terminate Mr. Biering's employment?

A. Not at all.

Q. Is that part of your job responsibilities?

A. It is not. We don't even know until someone's already been terminated.

Q. We saw the piece in 10-39, which says that you have to file a Form U-5 within 30 days after terminating an associated person's registration. How does the process start with you? When do you start thinking about a Form U-5 with respect to somebody at JP Morgan?

A. So we're notified when somebody either has been terminated, discharged or if they resign while they are under [inaudible].

Q. OK. So if somebody just tenders A resignation e-mail, does that start your your clock ticking?

A. It does not.

Q. If somebody gets into the system at JP Morgan and clicks resignation, we saw an e-mail earlier today and there will be more about that later, does that start your system or your time ticking?

A. It does not.

Q. Who notifies you in compliance registration that it's time to start looking into a Form U-5?

A. HR.

Q. Alright, We talked a little bit about how it is you learn what happens in order to to contemplate U-5. I want to take a look at a couple of documents in that regard. :et's go to exhibit BB, please. double B. OK. And if you could Scroll down please. This is a document, Greg, that you were asked about on cross examination, and I want to just take a look at that top e-mail first there. Do you see where it says "Hi, Carla" from Jonathan Jacobs?

A. Yes.

S.02a.ii-007

4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Is it unusual for you and your team to get information from HR to enable you to complete the Form U-5? And in this case with some more specificity perhaps than what you got out-of-the-box.

A.  Is it unusual to get information from HR about a termination?

Q.  Yes.

A.  It's not.

Q.  So if we scroll down here, can we scroll down to the next E-mail? Stop right there. Do you see on Tuesday, December 5th when Carla Bush from your team sent Mr. Jacobs, ███ and you an e-mail?

A.  Yes.

Q.  Read that for the record if you would.

A.  "Thank you, Jonathan. After reviewing the RFT, the global GS case number ECNA 1020239740 is not mentioned in the RFT. However, the disposition is listed that as a termination for misconduct. Was the GS part of the termination case?

Q.  So what is Carla trying to discern right there? What's she asking?

A.  Uh, I believe that she's asking if the, uh, the global security investigation regarding the credit card was part of the termination.

Q.  And what was the answer?

A.  It was not.

Q.  When she says or makes reference to RFT, what does that refer to?

A.  That's an HR document. It refers to the Recommendation For Termination.

Q.  OK, we'll take a look at that here in a and let's look at that here in a second. Let's go and let's look at Exhibit AA, please. Alright, we, we saw this also very briefly on your cross examination. Can we Scroll down so that the big e-mail is all on the screen, or most of it [inaudible]. So go up a little bit to capture the top of the e-mail. I'm sorry, go down. I just want to capture the the to and

S.02a.ii-008

4:26-cv-00381-O

Biering v. JPMS, et al.

S.02a.ii-009

4:26-cv-00381-O

Biering v. JPMS, et al.

S.02a.ii-009

S.02a.ii-009

OK, at Exhibit V and the Bates number, you can't see it, but it's JPMS 00023615. Do you see – what is this document, Greg?

A.   This is the recommendation for termination.

Q.   At the top in the in the box to the left. What is that representing?

A.   It was prepared by Jonathan Jacobs on behalf of Ben Stewart.

Q.   And Jonathan Jacobs being with what department at JP Morgan?

A.   Employee relations.

Q.   And Ben Stewart being whom?

A.   That would have been Mr. Biering's direct manager.

Q.   What date was the recommendation for termination prepared?

A.   November 30th, 2023.

**[Uncertain Speaker Tag]:** I know I'm not supposed to object, I just a point of clarification.     Mr. Thompson is not on these emails. [inaudible].

Q.   Do you see where it says recommendation for termination of employment of, whose name is below that?

A.   Joshua Biering

Q.   And then at the bottom of this recommendation for termination, we have a an electronic signature of somebody, who is that?

A.   I can't see the bottom.

Q.   Can you scroll it a little bit. There we go.

A.   Jonathan Jacobs.

Q.   And what date did he sign it?

A.   November 30th, 2023.

Q.   OK, he says, in the middle box there "I'm recommending that Joshua Biering be terminated from employment for misconduct." Do you see that at the top?

A.   Yes.

S.02a.ii-011
426-cv-00381-O
Biering v. JPMS, et al.

Q. And did you read the recommendation for termination prior to completing Mr. Biering's Form U-5?

A. Yes.

Q. OK. It says JPMC's annual code of conduct reinforces to employees our commitment to integrity in work dealings and our expectations of employees with regard to their personal and professional conduct. Do you see that?

A. Yes.

Q. Are you subject to the Code of Conduct?

A. Yes.

Q. OK, it goes on to say the firm also has in place its equal opportunity anti-discrimination and anti-harassment policy paren the policy effective March 3rd, 2023. Do you see that?

A. Yes.

Q. It references the code of conduct and the fact that. Mr. Biering's conduct exposes the bank to risk and negatively impacts the customer and work experience there. What role did this document play in your preparing the Form U-5?

A. I mean this is the main, one of the main pieces that we use to determine what goes on in form U-5.

Q. Does to your knowledge, does this document get given to the employee who is the subject or the former employee?

A. It does not.

Q. OK is it an internal document?

A. It is.

Q. Alright. Let's go to Exhibit NN. We'll just do a quick one with the actual Form U-5, because we saw that before. OK. At Exhibit NN, which we have up on the screen, we see the filing date on the top right is what date?

A. December 22nd, 2023.

S.02a.ii-012

426-cv-00381-O

Biering v. JPMS, et al.

**Q.** That is how many days after December 1st, when the termination took place? A. 21 days.

**Q.** Was that therefore timely under Reg Notice 10-39?

**A.** Yes.

**Q.** OK. And then we saw if you scroll down. Keep going to we get all of Section 3 in there. Oh, just a little bit further. Almost. There we go. Do you see the Section 3 area there, Greg?

**A.** Yes.

**Q.** Is that the Section 3 area that Reg notice 10-39 was referencing just a few minutes ago when we went over that?

**A.** Yes, correct.

**Q.** When you and your team complete Form U-5 for a registered individual, are you accountable to that individuals lawyer?

**A.** No.

**Q.** Who are you accountable to when you complete Form U-5?

**A.** Our regulator.

**Q.** Who is the regulator?

**A.** FINRA.

**Q.** In this case, Greg, is everything that's on Mr. Biering's Form U-5 true and accurate?

**A.** Yes.

**Q.** Did you do anything differently or your team, did your team do anything differently when you completed this Form U-5, than when you've completed forms U-5 for others. You've said you've done many, many, many.

**A.** No.

**Q.** Did a woman named Jena Cohen have anything to do with how you completed the Form U-5?

**A.** No.

S.02a.ii-013

426-cv-00381-O
Biering v. JPMS, et al.

Q.    Did a woman named Stephanie Steinback have anything whatsoever to do with how you completed Form U-5?

A.    No.

Q    Was JP Morgan in any way sanctioned or disciplined by FINRA in connection with its filing of Mr. Biering's Form U-5?

A.    No.

Q.    One last exhibit. Let's go to Exhibit E, please. Oh, you know what? I think it's EE. Let me just make sure. Give me a second. It's actually OO. Sorry. Double O. It's the broker check. OK. We put up on the screen, Greg, the first page of what's called Broker Check Report. Do you see that?

A.    Yes.

Q.    Whose broker check report is this?

A.    Mr. Biering's.

Q.    What does CRD number - And there's a series of numbers. What does that mean?

A.    It's the central central registration depository number, basically our FINRA number.

Q.    OK, let's go to the third page. Well, before we do that, what is broker check? Greg, what is it?

A.    Broker check is a FINRA website where you can go out and check on individuals or firms that you might want to do business with.

Q.    So when you say you, anybody who is aware that FINRA has a website can go and check up on people by just getting on the on the Internet, is that what you're saying?

A.    Yes, it's available to the public.

Q.    OK, let's go to the third page of this if we could. There you go. Do you see the third page here where it says report summary for this broker?

A.    I do.

S.02a.ii-014
426-cv-00381-O
Biering v. JPMS, et al.

Q.  Over to the left, do you see the name Raymond James and Associates, Inc. next to both a brokerage and an investment advisor?

A.  Yes.

Q.  What does FINRA report to people was the date that Mr. Biering was registered with Raymond James?

A.  1/11/2024.

Q.  OK. And that was approximately how long after his termination on December 1?

A.  A month.

Q.  That was how long after you completed Form U-5 on December 22?

A.  What 3 weeks? 2 weeks?

Q.  OK, let's continue through broker check. And let's arrive - there's very small page numbers on the bottom right of the documents. Let's go to page 6. OK, keep going, keep scrolling. Very bottom right there's - that's 4. That's 5. There we go. Do you see here where it shows what particular supervisory or other exams Mr. Biering has completed or passed over the course of his career?

A.  Yes.

Q.  Are those, are those the licenses that he would have?

A.  Correct.

Q.  Let's go then to the next page, would be page 8, bottom right. OK, here we have a registration history and an employment history. And you see there at the very top of the employment history, it says from 1 of 24 to the present, he's been a registered representative with Raymond James in Fort Worth.

A.  Yes.

Q.  And then finally, let's go to the next page, which is essentially the end. And you can show that the very last page has no comments or anything on it. End of report. Do you see any mention on this

S.02a.ii-015
4:26-cv-00381-O
Biering v. JPMS, et al.

broker check report for Mr. Biering, Greg, of the reason for his termination from JP Morgan?

A.   No.

Q.   Why isn't that on there?

A.   It's not public. This type of termination is not publicly available on Broker Check.

Q.   So if Mr. Biering met somebody at a cocktail party and they wanted to check him out, they can go to Broker check but they would never see what happened vis a vis JP Morgan. Is that what you're saying?

A.   That's correct.

Q.   OK, if I could have a moment, Mr. Chair?

THE CHAIRPERSON: Why don't we take a 10 minute break, and that way you can organize your redirect, and you can check…

Q.   2:15.

[Uncertain Speaker Tag]: I don't know if I need much, if you want to get Jena ready.

[Uncertain Speaker Tag]: Alright, off the record.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.02a.iii

## Hearing Transcript — Redirect Examination of Greg Thompson

**Description:** Hearing transcript excerpt — Redirect Examination of Greg Thompson (Employee Conduct Lead, North American Licensing & Registration, JPMorgan Chase Bank, N.A.). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 1 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0004, ZOOM0005, ZOOM0006. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

S.02a.iii-001
426-cv-00381-O
*Biering v. JPMS, et al.*

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

—————————————

S.02a.iii-002
426-cv-00381-O
Biering v. JPMS, et al.

**REDIRECT EXAMINATION**
**BY MR. IACUONE:**

Q. Greg, we're going to begin again and I have two finishing questions. Number one is, is it JP Morgan's normal practice to file a Form U-5 prior to the end of somebody'd notice period?

A. It's not.

Q. Would it be uncommon to file a Form U-5 during a notice period?

A. It would be uncommon, yes.

Q. Nothing further, Mr. Chair.

[Uncertain Speaker Tag]: Redirect.

Q. Very briefly, maybe one or two questions briefly. On that notice 10-39, which is PP. If you'd be so good as to pull it up just because I can't, I just can't pull up your exhibits for him to see. Let's see, we get up a little bit. Down. I'm sorry, second page. Yeah, I apologize. There we go. Wonderful.  So the first little hash or or arrow point there, Can you testify that your job is to strictly comply with FINRA rules and this rec notice 10-39, correct?

A. Correct.

Q. Alright. And we saw the request for termination and that e-mail chain you were on? And the request for termination listed a violation of the code of conduct, and the anti harassment policy, you recall that?

A. Yes I do.

Q. So the first hash says a firm must provide sufficient detail when responding to Form U-5 questions, such that a reasonable person may understand the circumstances that triggered the affirmative response. For example, for purposes of Section 3, which is what we're discussing in Form U-5, it is not sufficient for a firm to report only that a person's registration was terminated because that person violated firm policy. If a firm is obligated to report

S.02a.iii-003
4:26-cv-00381-O
*Biering v. JPMS, et al.*

S.02a.iii-004
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. So your testimony is you violated federal policy and Regulatory Notice 10-39 to help Mr. Biering?

A. No, I think you're misinterpreting what the form says. What this is put in place for is firms just put Joe was terminated for violating the Code of conduct. That's not acceptable. If you put what policy they violated, FINRA says you must go on to put additional information. That's the the spirit of this rule.

Q. That's the spirit of the rule.

A. That's correct.

Q. There was a question that said you're not accountable to Mr. Biering or Mr. Biering's lawyer in marking the U-5. You recall that question from Mr. Dunlap?

A. I do

Q. OK. You did review information in marking the U-5, did you not?

A. From you?

Q. Yeah, from me - Well, that's it, Greg. Did you review any information that Mister Biering or I provided?

A. If the firm reviews information from a lawyer or someone who was terminated, it's as a courtesy, it's not because we're obligated.

Q. That wasn't my question, Sir, so let me ask you again.

A. OK. We did review information from you, yes.

Q. But you did?

A. I've told you repeatedly, I was in discussions with our HR legal group.

THE CHAIRPERSON: OK, let let me try and do this.

Q. Yes.

THE CHAIRPERSON: Do you recall any of the information that Mr. Biering's counsel provided to JP Morgan? Regardless of how you learned of that information, do you recall any of it?

A.   I don't recall now at this time, no.

THE CHAIRPERSON: But you do recall that information that was provided by Mr. Biering's Council was provided to you in some form by JP Morgan Council, is that correct?

A.   Yeah, we would have had discussions, yes.

THE CHAIRPERSON: OK.

Q.   And a follow-up question. Sir, as we've said this case, words matter. I want to know - not discussions with legal counsel, were the letters that we went through and the case cites and the authority and block quotes and federal regulatory notices cited - were those forwarded to you and provided to you or did legal counsel just have a discussion with you about it?

A.   I already answered that.

THE CHAIRPERSON: He already said he did not recall any of the letters that you showed to him. I will, as a courtesy, ask one follow-up question maybe getting towards what you're after: Did you take into account, when exercising your decision to mark the U-5, any of the information that was conveyed to you by your counsel that had been conveyed to them by Mr. Biering's counsel?

A.   We take everything into account, yes.

THE CHAIRPERSON: Do you recall, as you sit here today, any specific information that Mister Biering's counsel had provided that you recall being provided to you?

S.02a.iii-006
426-cv-00381-O
Biering v. JPMS, et al.

A.   I don't recall specific information at this point.

THE CHAIRPERSON: Do you recall generally anything that Mister Biering's council had said to to JP Morgan that was passed along to you?

A.   Yeah, I recall the discussion about the voluntary termination dates compared to the actual termination date, that sort of thing. But I don't recall anything about case cites or anything along those lines.

Q.   Do you recall any factual positions that Mr. Biering or I took that controverted the one-sided positions and the one paragraph summary from Mr. Jacobs, to you.

A.   I don't recall.

Q.   Did you, Sir, say there seems to be a huge dispute of the law and the facts in this circumstance. I have independent follow up requests for information in analysis. Did you ever do that?

A.   That's not an obligation. That's not an obligation or expectation. That's why I did not.

THE CHAIRPERSON: He said he did not.

MR. IACUONE: OK. No further questions. Thank you.

[Uncertain Speaker Tag]: OK, nothing further.

THE CHAIRPERSON: OK, Mr. Thompson, thank you for your time. Unless the parties have any reason, I'm going to dismiss this witness and let him go about his life. Alright. Mr. Thompson, thank you. You may go. Thank you. Next witness.

MR. IACUONE: Claimant will call Jena Cohen to the state.

THE CHAIRPERSON: Will she be here physically?

S.02a.iii-007
426-cv-00381-O
Biering v. JPMS, et al.

**MR. IACUONE:** She's yeah, she's here.

**[Uncertain Speaker Tag]:** It will just take her two minutes to get here.

**MR. IACUONE:** She'll come up.

Uncertain Speaker Tag]:    I'm. Going to go off the record then.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.03a.i
## Hearing Transcript — Direct Examination of Jena Cohen

**Description:** Hearing transcript excerpt — Direct Examination of Jena Cohen (Head of HR, U.S. Private Bank, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 2 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0007, ZOOM0008. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.03a.ii

## Hearing Transcript — Cross Examination of Jena Cohen

**Description:** Hearing transcript excerpt — Cross Examination of Jena Cohen (Head of HR, U.S. Private Bank, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 2 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0007, ZOOM0008. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.03a.iii

## Hearing Transcript — Redirect Examination of Jena Cohen

**Description:** Hearing transcript excerpt — Redirect Examination of Jena Cohen (Head of HR, U.S. Private Bank, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 3, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 2 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0007, ZOOM0008. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.04a.i

## Hearing Transcript — Direct Examination of Stephanie Stainback

| | |
|---|---|
| **Description:** | Hearing transcript excerpt — Direct Examination of Stephanie Stainback (HR Business Advisor / Team Lead, Houston, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025. |
| **Relevance:** | Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 3 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a). |
| **Source:** | FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0010, ZOOM0011. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/. |
| **Petition Ref:** | App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index). |
| **Disclosures:** | Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls. |
| **Filing Status:** | Public - not sealed |

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.04a.ii

## Hearing Transcript — Cross Examination of Stephanie Stainback

**Description:** Hearing transcript excerpt — Cross Examination of Stephanie Stainback (HR Business Advisor / Team Lead, Houston, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 3 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0010, ZOOM0011. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.04a.iii

## Hearing Transcript — Redirect Examination of Stephanie Stainback

**Description:** Hearing transcript excerpt — Redirect Examination of Stephanie Stainback (HR Business Advisor / Team Lead, Houston, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 3 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0010, ZOOM0011. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.05a.i
## Hearing Transcript — Direct Examination of Jonathan Jacobs

**Description:** Hearing transcript excerpt — Direct Examination of Jonathan Jacobs (Vice President, Employee Relations, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025; December 5, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 4 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0012, ZOOM0013, ZOOM0014, ZOOM0015. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.05a.ii

## Hearing Transcript — Cross Examination of Jonathan Jacobs

**Description:** Hearing transcript excerpt — Cross Examination of Jonathan Jacobs (Vice President, Employee Relations, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025; December 5, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 4 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0012, ZOOM0013, ZOOM0014, ZOOM0015. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.05a.iii
## Hearing Transcript — Redirect Examination of Jonathan Jacobs

**Description:**    Hearing transcript excerpt — Redirect Examination of Jonathan Jacobs (Vice President, Employee Relations, JPMorgan Chase). FINRA Arbitration No. 24-01208 hearing day(s): December 4, 2025; December 5, 2025.

**Relevance:**    Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 4 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:**    FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0012, ZOOM0013, ZOOM0014, ZOOM0015. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:**    App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:**    Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:**    Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.06a.i
## Hearing Transcript — Direct Examination of Ben Stewart

**Description:**  Hearing transcript excerpt — Direct Examination of Ben Stewart (Market Team Lead, Fort Worth Market, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 5, 2025.

**Relevance:**  Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 5 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:**  FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0016, ZOOM0017, ZOOM0018. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:**  App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:**  Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:**  Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.06a.ii

## Hearing Transcript — Cross Examination of Ben Stewart

**Description:** Hearing transcript excerpt — Cross Examination of Ben Stewart (Market Team Lead, Fort Worth Market, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 5, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 5 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0016, ZOOM0017, ZOOM0018. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.06a.iii
## Hearing Transcript — Redirect Examination of Ben Stewart

**Description:** Hearing transcript excerpt — Redirect Examination of Ben Stewart (Market Team Lead, Fort Worth Market, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 5, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 5 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0016, ZOOM0017, ZOOM0018. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.07a.i
## Hearing Transcript — Direct Examination of Kyle Hitchcock

**Description:** Hearing transcript excerpt — Direct Examination of Kyle Hitchcock (Head of Investments and Advice, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 6 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0019, ZOOM0020. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.07a.ii

# Hearing Transcript — Cross Examination of Kyle Hitchcock

**Description:** Hearing transcript excerpt — Cross Examination of Kyle Hitchcock (Head of Investments and Advice, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 6 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0019, ZOOM0020. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.07a.iii

## Hearing Transcript — Redirect Examination of Kyle Hitchcock

**Description:** Hearing transcript excerpt — Redirect Examination of Kyle Hitchcock (Head of Investments and Advice, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 6 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0019, ZOOM0020. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.08a.i

## Hearing Transcript — Direct Examination of Michael Spindler

**Description:** Hearing transcript excerpt — Direct Examination of Michael Spindler (Senior Managing Director, Forensic Accountant (Claimant's damages expert), GlassRatner Advisory & Capital Group (B. Riley Advisory Services)). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 7 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0021, ZOOM0022, ZOOM0023. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.08a.ii

## Hearing Transcript — Cross Examination of Michael Spindler

**Description:** Hearing transcript excerpt — Cross Examination of Michael Spindler (Senior Managing Director, Forensic Accountant (Claimant's damages expert), GlassRatner Advisory & Capital Group (B. Riley Advisory Services)). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 7 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0021, ZOOM0022, ZOOM0023. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.08a.iii

## Hearing Transcript — Redirect Examination of Michael Spindler

**Description:** Hearing transcript excerpt — Redirect Examination of Michael Spindler (Senior Managing Director, Forensic Accountant (Claimant's damages expert), GlassRatner Advisory & Capital Group (B. Riley Advisory Services)). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 7 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0021, ZOOM0022, ZOOM0023. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
|    *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
|    *Respondents.* | § | |

# EXHIBIT S.09a.i

## Hearing Transcript — Direct Examination of Joshua D.S. Biering

**Description:** Hearing transcript excerpt — Direct Examination of Joshua D.S. Biering (Claimant; former Private Client Advisor, Fort Worth, formerly J.P. Morgan Private Bank; currently Raymond James). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025; December 12, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 8 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0024, ZOOM0025, ZOOM0026, ZOOM0027, ZOOM0028, ZOOM0029. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

———————————————

S.09a.i-002
4:26-cv-00381-O
Biering v. JPMS, et al.

**DIRECT EXAMINATION**
**BY MR. IACUONE:**

*[ZOOM0024 ~ 00:00:01]*

**THE CHAIRPERSON:** Mr. Biering, please recall that you are under oath. Counsel, you may continue.

Q.   Thank you. Mr. Biering, the last thing we talked about before the break was your interest in Merrill Lynch. Merrill Lynch, is that a competitor to J.P. Morgan?

A.   Yes.

Q.   Why did that matter as far as when it comes to leaving J.P. Morgan to go to Merrill Lynch?

A.   First and foremost, the ability to service clients across the full spectrum of products and solutions, and not only that, but across the line of business partners and functionalities and, you know, people are people, executives are people, brand prestige or [unaudible].

Q.   Did you know some of the folks at Merrill Lynch in Fort Worth?

A.   Yes.

Q.   How did you know them?

A.   We first met and spent time together in the Fort Worth office of the Private Bank.

Q.   ...of J.P. Morgan.

A.   Correct.

Q.   So you knew a couple of former J.P. Morgan Fort Worth folks now at Merrill Lynch?

A.   Yes.

Q.   How were their [inaudible]departures from J.P. Morgan?


S.09a.i-003
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  Both unique. █████████ was in Fort Worth, left for the LA office and then came back to Fort Worth, then left. When he went from Fort Worth to LA, they zeroed him out on compensation. Michael Parelly came to Fort Worth and left to go back to Dallas to be a producer, where he left for Merrill Lynch and that put a bad taste in management's mouth, and Parelly was also zeroed out on compensation.

Q.  I think Mr. Parrelly explained he had a lot smaller [inaudible] than you.

A.  yes.

Q.  OK, let's look at Exhibit 103. And while we turn there, Mr. Biering, at what time now were you seriously considering joining Merrill Lynch?

A.  Late September. Early October.

Q.  Here we're looking at a text message on the screen, October 11, 2023 with you and █████████ Who's █████████

A.  █████████ ran the entire region of the Texas Capital Private Wealth unit. Q.  He's reaching out to you on the 11th about the opportunity to follow up with you, you explained, generally speaking, it looks like y'all are coordinating the meeting, is that about right?

A.  That's correct.

Q.  I specifically turn to page 2. What is 103-2? Towards the bottom. The bottom few messages. October 19th, 2023. On October 19th, you tell him what?

A.  "Thank you for your time yesterday. Eager to keep the discussion going, motivated to move very quickly. Having my discussions yesterday made me realize how unhappy I am at J.P. Morgan and excited for the next chapter."

Q.  OK, let's look at Exhibit 92. Here we're looking at a text message string with you, █████████ and Michael Parelly in the room?

A.  That's correct.



Q.  These are the two guys you just mentioned who are, at this time, in October 2023, they're former JP Morgan now ███

A.  Michael Parelly was still Merrill Lynch, but I was hoping to call them partners. ███████ left Merrill Lynch and the industry to pursue his passion in real estate, but we stay in touch to this day.

Q.  At this time though, in October 2023, they were both at…?

A.  Merrill Lynch.

Q.  Ok. [inaudible] reading all these text messages, what were the impressions from the conversations you were having as to Merrill Lynch being a legitimate option for you to go to?

A.  I always knew they were a great firm and Michael Parelly and Will ███ were doing incredibly well. I mean, in the Fort Worth office, we saw the ACATS go out over the last year and a half, so I knew how well he was doing. And ███████ lived in Fort Worth, and we saw each other frequently. Michael Parelly lived in Dallas, but I mean, we heard Parelly's testimony. I mean, I was all in after that.

Q.  And this is October 17th, these text messages we're looking at. When did you go meet with these folks at the Merrill Lynch office?

A.  Shortly thereafter. At the Meryll lynch office, the first one was October 27th, Friday.

Q.  Okay, so Friday, October 27th - so 10 days after these messages, you meet in person at the office. What are you doing out there that day?

A.  That was the earliest I could get in front of ███████ the complex manager of Merrill Lynch.

Q.  And what else did you do that day?

A.  I showed up early. Our meeting with Merrill Lynch was—my meeting with ███████ wasn't slotted till like 3:30 or 4 that afternoon.

Q.  Let me ask you, [inaudible]. Did you have any onboarding that day?

S.09a.i-004

S.09a.i-005
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** Yes.

**Q.** Documents?

**A.** Yes.

**Q.** Like what?

**A.** I did the background check, the fingerprinting deal, pulling the U-4, attestations to having gone through their diligence, to ensure you met their product partners. There's a handful and I've [inaudible]. I regrettably did not keep a copy.

**Q.** So that meeting on October 27th— if we're going to get to that timeline right now—that week leading to that Friday meeting at Merrill Lynch, okay? Did you have any discussions— I'll make it simpler. When you had the meeting on the 27th at Merrill Lynch, it's a Friday, so that's the week beginning Monday, October 23rd. Any discussions with your superiors at J.P. Morgan the week of the 23rd?

**A.** Well, 23rd was my birthday, and that was at the town hall, Nashville town hall, where I was recognized as a gold producer across the country. The 24th, I had a meeting with ███████████ She had oversight on a client document. That client was frustrated and missed his signature. Similar to what my mentor did to me, and I do to all my partners, I want them to see firsthand what it was like with a client correction like that. So we went to go to Chase.

**Q.** I'm going to stop you. You're talking about Tuesday [inaudible] the 23rd [inaudible]

**A.** And this is Tuesday morning.

**Q.** Tuesday 24th you and Ms. ██████ go meet at a clients?

**A.** At Chase branch with the client to sign docs.

**Q.** OK.

**A.** And we come back and I - We drove together, and I told ██████ I was resigning and to not be alarmed. When we get there, I'm going to be walking into Ben Stewart's office and I'm resigning, so don't be alarmed.



S.09a.i-006
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. So before you head to Mr. Stewart's office, let's talk about Exhibit 19. So also the morning, this is also during the morning of the 24th, that Tuesday, that morning, we're seeing some text messages here between you and your and Mr. Hitchcock, is that right?

A. That's right.

Q. These text messages on the 24th we see at 11:08 AM some messages, right?

A. And without us just reading everything, it appears y'all are coordinating a meeting for coffee?

Q. Yes, I emailed him the night before asking to meet to clarify some frustrations I had to where the few times he was responsive was on a client e-mail, and based off his response indicated that we dropped the ball with a client and that was not the case. I felt slighted.

Q. And so did you all meet?

A. We met for coffee around 11:35. He was coming from ▅▅▅▅ and was running a little late.

Q. And we heard Mr. [inaudible] testify, first y'all met a ▅▅▅▅ then you walked over to it was busy, went to Starbucks, had your meeting there.

A. Yes.

Q. He, he, he, him. And I referred to this as the ▅▅▅▅ resignation meeting, right?

A. Yes.

OK. What did you tell him? What did you tell Mr. Hitchcock in these meetings? Around 11:30 on Tuesday the 24th?

A. I was overwhelmed. And the toxicity continued to grow, and it, and it finally became too much. We had a pretty emotional conversation, we shared a lot and we even hugged it out. And I told him, "Hey, I'm going to go visit with Aughinbaugh and Stewart to submit my resignation."



S.09a.i-007
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   Why not just tell Mr. Hitchcock in that meeting right there, I'm resigning right this second. I'm out.

A.   He wasn't my manager, nor was he in my chain of command.

Q.   And so the conversation, how'd the conversation - you said you all hugged it out at the end and then you were going to go resign, tell Mr. Stewart and Mr. Aughinbaugh?

A.   Yes.

Q.   Ok. What happened as soon as that coffee meeting, the ███████ resignation meeting - What happened next?

A.   Went back to the office, walking distance, two or three blocks. Walked to Ben's office.

Q.   Ben Stewart.

A.   Ben Stewart, and, "Hey Ben, I'd like to talk to you." And he said "What's up?? ":ook, I'd like to, I'd like to resign. But would like to discuss my options for the incentive compensation for the year that I had already completed and performed well."

Q.   When you told him you wanted to know about, you had questions about the incentive comp., what was his response to you?

A.   "I can't talk about this without my partner, JT, present." I said, "OK, when can we talk?" He said, "Well, let me see, JT's at a client meeting. He should be back around 1:00 or so", and I said "So do I go grab my stuff or what do I do?" He's like, and then he responded again, "Like I said, I can't have this conversation without my partner, JT. And I said I'll go wait for you guys in the client center", and then Ben says, "OK".

Q.   So that conversation ended. From Mr. Stewart's office, where did you go next?

A.   We all - outside of the three leadership, we all sat on investment desk, trading desk, type seating, open seating. I went to my desk, which was like a caddy corner and I picked up my things. So it's like a like a picture, like a Number one Dad coffee mug or something, and I walked out to the client center.

S.09a.i-008
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Once you got, you grabbed your personal belongings from your desk, gone on to the Conference Center. Now you're waiting for Mr. Stewart and Mr. Aughinbaugh, who you see next?

A. I'm waiting in there for a while. Melissa Hayes was the receptionist. I kind of stayed close there to ask for their status, if they're coming. And then while I was in there, Mark Roberts came and saw me.

Q. Ok. What did you all discuss?

A. Mark knew I was resigning to join Parelly in Lynch. And he was trying to essentially talk me off the ledge and think about my son. "Make sure you think it through this", and I was like, "Man, I have to do this, I just had enough."

Q. I'm assuming your conversation ends. Who do you talk to next?

A. I wait for a while longer and then Aughinbaugh and Stewart were in a conference room next door to that in the client center, and came out and came in to.

Q. OK, what happened in the conversation between you, Mr. Your boss, Mr. Stewart, and his boss, Mr. Aughinbaugh?

A. They sat across the table from me. I asked them - It was hard for me to have that conversation. I was like, "Look. I have mouths to feed. We know that this has been going on for some time. It's not a good fit. What are the options because I do not want to forgo the incentive compensation that I have earned for a gold year. What can we do?" And Aughinbaugh then replies, "We're not at liberty to discuss incentive compensation at this time." And I asked, "So what do we do?" "Well, like I said, we'll have to get back to you", and was like, "So what do I do? And he replies, "Business as usual." And at that time I could tell - it felt a little hostile and uncomfortable. So at that time I walked out to my car to go home.

Q. What about? What about resignation? [inaudible]

A. Oh, like I said, like I plan to resign. Like I want to resign, but I don't want to forego my incentive compensation that I've earned from a gold year.



S.09a.i-009
4:26-cv-00381-O
Biering v. JPMS, et al.

**Q.** So you discussed that you wanted to resign, you asked about the incentive comp. And how does the conversation end?

**A.** I walked out after it was definitely awkward and kind of hostile.

**Q.** Why not just say, "I'm out right this second? I'm resigning right now and I'm out the door. You guys figure out the rest"?

**A.** This was my first call out of the Army and my parents didn't come from corporate America. I didn't know what I was doing. It was like breaking up with a girlfriend. It was hard, and I didn't want to forgo my incentive compensation and I genuinely didn't know what that looked like. We had other advisors that departed before me. Some had gotten incentive compensation, still others stayed to help transition clients or close up loose ends. And I was seeking guidance genuinely from the leadership that I trusted.

**Q.** So that's Tuesday 24, right?

**A.** Yes.

**Q.** The next day, Wednesday the 25th, did you get – They told you that they get back to you with an update about your incentive question.

**A.** That's – yeah.

**Q.** OK. On Wednesday the 25th? Did they get back to you with any kind of update or response about your incentive conversation?

**A.** No.

*[ZOOM0024 ~ 00:14:33]*

**Q.** What happened that day, the 25th, Wednesday?

**A.** I had a lunch scheduled in Carrollton with ▇▇▇▇▇▇▇▇

**Q.** At ▇▇

**A.** Right around there with ▇▇▇▇▇▇▇▇ around MB 2 and then meeting with ▇▇▇▇▇ afterwards. Justin had to cancel lunch and he indicated that Kyle and I believe Belen Garren came and saw him.

**Q.** Did you say lunch was cancelled?

S.09a.i-010
4:26-cv-00381-O
Biering v. JPMS, et al.

A. He had to cancel lunch. Yeah.

Q. Mr. ▇▇▇▇ canceled. Mr. ▇▇▇▇▇ at ▇▇ canceled a scheduled lunch with you.

A. Yes.

Q. OK. After he cancelled that scheduled lunch, you met with him?

A. Him, ▇▇▇▇▇▇▇▇▇▇▇ the CFO, and then ▇▇▇▇ the founder, together collectively at ▇▇

Q. Did you get any indication why your scheduled lunch that day had been cancelled with MB 2?

A. At that time, no, because ▇▇▇▇ was around ▇▇▇▇ ▇▇▇▇ obviously wanted him to have the company [inaudible] and it wasn't until later when ▇▇▇ and ▇▇▇▇ who introduced me, had indicated Kyle had visited them before.

Q. Kyle who?

A. Hitchcock.

Q. OK. So the lunch you were scheduled to have got cancelled because it turns out Hitchcock from JP Morgan was having a meeting with the ▇▇ folks.

A. That's my understanding, but I wasn't there.

Q. OK. So at the time where your lunch got canceled, did it seem crazy?

A. I mean, people are busy, they're executives of a billion dollar company, I just didn't think anything of it.

Q. Looking back now, what's your impression of ▇▇ canceling lunch so they could meet with Hitchcock and meet with you later that day?

A. Well, sort of a range of emotions.

Q. What's it seem like what happened?

A. It seemed they got wind that I was resigning, they knew I had a strong relationship with all of MB 2, especially…

Q. They, Hitchcock and JP. Morgan?

A. Yes.



S.09a.i-011
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   OK. What's your indication of what JP Morgan did that day with regards to that lunch with ███  The client you had sourced?

A.   Again, I wasn't there. However. The communication from ███ to me was Hitchcock was being "a snake" and had indicated that Biering was going to no longer be with JP Morgan.

*[ZOOM0024 ~ 00:17:00]*

Q.   OK. The next day is Thursday, October 26th, right?

A.   Yes.

Q.   OK. What did you do that morning, Thursday the 26th?

A.   [inaudible] I had divorce court that morning. And I had lunch that afternoon that I was tentative on, because it was with another ███ shareholder, about $40 billion of ███ He was also on the Survivor Thailand, which is interesting, but I got out of divorce court around 11:00-11:30, this is Fort Worth, Tarrant County. And then I chatted over to Dallas to actually make the lunch. And then I had the lunch.

Q.   Let's look at Exhibit 20.

A.   I'm there.

Q.   Exhibit 20 on page 2. This is an e-mail string between mostly you and Ben Stewart, right?

A.   Yes.

Q.   OK. Page 2. The bottom half of the page. There was an e-mail from you to Ben Stewart on Thursday at 1:05 PM. See that?

A.   Yes.

Q.   You informed Mr. Stewart what?

A.   My plans to take time off the following day, Friday October 27th.

Q.   On Thursday at this time 26 - What's showing on your work calendar for your plans on Friday the 27th?

S.09a.i-012
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  I had my calendar blocked off that afternoon. In the calendar: Invite appointment read "Intro to ML/MP."

Q.  ML meant what?

A.  Merrill Lynch.

Q.  MP meant who?

A.  Michael Parelly.

Q.  OK so again this e-mail we're looking at, you send the e-mail Thursday 1:05 PM about taking next day on Friday, right?

A.  Yes.

Q.  Let's look at what happens 29 minutes later, same day. Exhibit 122 [inaudible]. Exhibit 122. We've seen this one previously. And blow up that top half, thank you. On the right hand side, this is a ticket submitted by Stephanie Stainback, an HR ticket - Employee Relations. On the right hand side with these shaded boxes, if you can show all those shaded boxes on the right there. We've seen Ms. Steinback submit an HR ticket at what time?

A.  134 Central PM.

Q.  So how many minutes after you had reached out about taking PTO the next day do we see an HR ticket suddenly get submitted against you?

A.  29 minutes.

Q.  On Thursday, still the same day, Thursday. You're still waiting for Aughinbaugh and Stewart to give you the update [inaudible] about your incentive comp question, do you hear from them on Thursday the 26th?

A.  No.

Q.  [inaudible]. Anything at all from Aughinbaugh and Stewart on Thursday.

A.  Not that I recall.

Q.  Only you telling Stewart you want take a PTO next day.

A.  Correct.



S.09a.i-013
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's talk about the next day, Friday, October 27th. You just told everybody the PTO was for Friday the 27th. We talked about it 10 minutes ago. What were you going to do on Friday, October 27th?

A. Meet with Merrill Lynch.

Q. Again, what was the purpose of the meeting with Merrill Lynch?

A. To essentially take next steps to joining the tribe, as ███████ called it.

Q. While you're at Merrill Lynch on Friday, October 27th, do you get any communication from JP Morgan?

A. Several ominous ones. When I walked in around lunch to visit Will and Parelly to have lunch and then meet the rest of the floor - While walking in, I received an e-mail from JP Morgan. My tech hub saying my virtual workspace has been accessed. I thought that was weird, but I remember looking at that like "I don't really care." And I kept meeting everyone. And then around, I think 2:45-ish PM, I get a missed call from Ben Stewart. And then I get a subsequent text when I didn't answer, "Call me at the office immediately or ASAP." And I looked at Will and Parelly and I was like, "What is this about?" And then I met up with ███████ Our meeting with Chris ███████ and Parelly - Parelly was in there, ███████ was not [inaudible].

Q. Before you get into this, how many people on this Friday the 27th - How many people do you see at the Merrill Lynch offices that day?

A. At least 8. 10. Several.

Q. Sorry, you were about to tell us that you returned the call to Mr. Stewart while you were at Merrill Lynch Offices.

A. Yes. So after our my meeting with ███████ his branch associate, his right hand man had me sign a bunch of documents, [inaudible], and once that was done, I went to go meet Parelly in his office because Parelly left a little early. And then it was me Parelly and ███████ at Parelly's office.

*[ZOOM0024 ~ 0:22:56.9]*

S.09a.i-014
4:26-cv-00381-O
Biering v. JPMS, et al.



And I looked at them and I said, "Alright, guys, hold on. I gotta call Ben Stewart." So I called him and put him on speakerphone and Parelly and ▮▮▮▮▮ were in there while I was on speakerphone. And Stewart – That's when I had the call, with no context at like 4:45 PM on a Friday.

Q.  What did Stewart tell you?

A.  "Josh. You are being placed on a paid involuntary administrative leave. This is all I can say at this time. Someone from employee relations will be in touch with you." And that was it.

Q.  What was your response?

A.  I was confused. I was like "What are you talking about? This makes zero sense. What are you talking about? I'm Resigning. I need to speak with someone, give me a contact number", and he gave me a number. That's the only thing he did, and it ended up being an employee assistance program or EAP phone number that wasn't helpful.

Q.  Besides him giving you that number, did you ask him for the reason for you being placed on paid leave?

A.  He couldn't. He wouldn't tell me. He repeated what he said, saying that's all he could say at this time.

Q.  OK, I understand you got that contact information. The most recent conversation you had with him was Tuesday, when you had asked him for information about incentive comp. Anything in that conversation about incentive comp?

A.  No. No.

Q.  So the call ends. You're standing there with Mr. Parelly. What happened next? What happens next in that room?

A.  We just looked at each other like, what the hell just happened? And Parelly says, "Bro, I told you that is what they do!" And I said "What?" And I was like, "What do I do? Do I go tell Chris?" And Parrelly, ▮▮▮▮▮ and I went back and they're like, "Dude, you gotta tell Chris." I'm like, "OK." And I went and told ▮▮▮▮▮ and he went "Did they say why? I was like "No." And he said "Are you sure?" it's like, "Well, I think it's because they caught wind

S.09a.i-015
4:26-cv-00381-O
Biering v. JPMS, et al.

I was leaving. I mean, they knew." And he said, "Did you submit a formal resignation?" I was like, "I told them I was resigning, but I needed feedback on my incentive comp." Chris was like, "Well, you need to put that in writing." And "I was like, yes sir, I'll do that first thing in the morning", because I had to figure out what the hell is going on.

Q. So when did you give that formal written notice to JP Morgan?

Q. Let's look at that one exhibit 132. That's [inaudible] If you look at 132 you see your e-mail on – this is Saturday morning, October 28th, is that right?

A. Yes.

Q. OK. Generally speaking, this is what?

A. 10:45 AM.

Q. What is this e-mail?

A. A formal resignation letter e-mail to Ben, JT and Kyle…

Q. That's not real names. Who are these folks?

A. My leadership market-wise and then regional leadership. Elaine Agather is the CEO and Chairman of the DFW JP Morgan.

Q. Why – you put Stewart, Aughinbaugh and Hitchcock? Why include their leadership as well?

A. Well, I don't think my resignation went very far when just including Ben and Aughinbaugh and Hitchcock.

Q. You write formal. "I'm writing to inform you of my formal resignation" Why formal.

A. The written formality that ███████ advised I do in addition to my [inaudible] discussion,

Q. OK. We'll take Exhibit 131. In that e-mail, in your formal resignation written notice there, you explained that you're also concurrently submitting a resignation on the JP Morgan system. What are we looking at in 131?

S.09a.i-016
4:26-cv-00381-O
Biering v. JPMS, et al.

A. That's the me@JPMC HR system resignation app.

Q. OK. We show that the – When did you submit this?

A. On the morning of the 29th – or 8th – Excuse me.

Q. Saturday the 28th.

A. Yes.

Q. And you get a response or confirmation when?

A. Immediately get confirmation, well, however long I submitted it, right around the e-mail time.

Q. OK, so in that confirmation of your resignation we see the last day working, last day worked was what?

A. December 20– Excuse me…

Q. October.

A. October 26th.

Q. October 26th, on that Thursday, because Friday you were taking PTO.

A. That's correct.

Q. OK. When you submitted your – when you sent the e-mail, and you provided the resignation notice, did you know whether you were under an investigation for some kind of wrongdoing?

A. No I did not.

Q. If you didn't know you were under investigation for some kind of wrongdoing, why submit the resignation the next day after the call from Stewart?

A. That genie was out of the bottle. I was resigning.

Q. After you resigned – Let's talk about your communication with Merrill Lynch about this. Exhibit 93. Once you resigned, once you give this formal written notice about resignation to JP Morgan, did you think it's a good idea to help Merrill Lynch as well?

A. Of course.

S.09a.i-017
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK, so Exhibit 93 is an e-mail between you and ██████████ Who is Mr. ██████?

A. He was my [inaudible] be my complex manager in Merrill.

Q. Same person you just mentioned about the Friday meeting, right?

A. That's right.

Q. Top of 93-3, Page 3. The top here. We see your e-mail to Mr. ██████ "I did want to inform you I recently submitted my notice to JP Morgan leadership this morning. I have a [inaudible] garden leave. I have not heard back from management but it just now happened." And you can give full transparency that you've been told you're being placed on an involuntary paid administrative leave. Is that a fair summary?

A. Yes.

Q. OK. On page 2, we see the response from Mr. ██████ He asked why. What's your response to Mr. ██████?

A. Is that confirming new tribes? Oh, sorry.

Q. I'm. Sorry, he asked you if JP Morgan told you why you're being placed on paid leave.

A. I said "They did not give me any detail, they advised employee relations would reach out. I suspect because they caught wind I was interviewing new employers/homes." and [inaudible] tribes, is what he referred to the team as.

Q. Regarding this period, it's how long, or up to how long, how many days?

A. 60 days.

Q. During your garden leave, before the the rest – during your garden leave, were you paid a salary?

A. For the first 30 days, yes.

Q. During those 30 days of garden leave, what were all your job responsibilities?

A. 0.

S.09a.i-018
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q. What was all your access to JP Morgan system?

A. 0.

Q. What did JP Morgan inform you about any service for JP Morgan clients?

A. Absolutely no services.

Q. Did you do your job at all during that garden leave period?

A. No.

Q. Were you hearing much from JP Morgan during that garden leave?

A. From JP Morgan, three touch points.

Q. Were you having discussions with Merrill Lynch?

A. Actively.

Q. Exhibit 94 The. Next one on your [inaudible] there. Exhibit 94, the text message string with you and Mr. █████  Do you see that?

A. Yes.

Q. October 31st, we see Mr. █████ reached out asking for a conversation. See that?

A. Yes.

Q. What was the discussion?

A. Next steps – "Hey any update on your U-5? We can't really do anything until the U-5, but I don't want to stop progress. Come back [inaudible].

Q. Then looking further down, still on 94 Page 1. Go down to November 3rd, it says good morning.

A. I'm sorry, on page one?

Q. Yeah, page one, left hand side, Mr. █████ says good morning. Going over there.

A. Sorry, I got distracted, on 94-1?

Q. Yes.

A. Yes, sorry.



Q. Okay Mr. ▓▓▓ said good morning. Finishing. He asked for an update from JPM. You see that?

A. I do.

Q. OK. What do you let him know?

A. No update.

THE CHAIRPERSON: Actually, could you go ahead and read that, because for the contrast, it's hard to read.

A. I said no updates but my attorney has been putting out feelers. His gut is they are stalling and we should hear something early next week. Did I owe you any numbers or anything prior to our briefing? JPM Council did affirm with my attorney they would be in touch in advance of any formal U-5 filings to discuss language, if applicable.

Q. To Exhibit 97. We saw this one with Mr. Parelly. This is the... Generally, what is this document?

A. The agenda of our meeting on November 23rd.

Q. Roughly how many folks did you meet with at Merrill on November [inaudible]?

A. At least 10.

Q. OK. What were the discussions around? This meeting we're looking at for November [inaudible].

A. ▓▓▓ said I had to meet with all these folks, even though I was familiar with the platform, so compliance and HR required that he at least had those discussions.

Q. More for onboarding.

A. Yes.

Q. OK, look at Exhibit 98.

A. In there.

S.09a.i-020
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. This here is an e-mail string with you and Mr. ███ at Merrill Lynch, do you see that?

A. Yes.

Q. Starting from the page the bottom of Page 1. You see that? You send an e-mail that continues on the pages two and three. You see that? We're not going to read this entire e-mail. If you could please just summarize the information you're providing to Mr. ███

A. My business plan, my needs in the summary, because as we saw it's really plug and play based off of my confidence of business will dictate what number we plug and play for the comp.

Q. Let's look at number pages 98.6 and. 98.7.

A. I'm there.

Q. Similarly, what information are you providing here to Mr. ███

A. As he requested, as would any other receiving brokerage employer, a copy of the scorecard and he was very specific to state redacted to have no client information, and then my transition plan which I outlined on 98-7 in full [inaudible].

Q. So we've got your business transition plan, your analytics, all provided and then back to Page 1. Page 1, the bottom again. That's your e-mail on the 9th to Mr. ███ Your e-mail continues the top of page 2.

A. Yes.

Q. Top half of page 2. You also write that you're going to coordinate from your council regarding status, direction of transition and U-5, you see that?

A. Yes. And you provide your attorney, Mr. Iacuone's information with regards to any necessary updates. Do you see that?

A. Yes.

Q. Why?

S.09a.i-021
4:26-cv-00381-O
Biering v. JPMS, et al.


A. Mr. ████ s request – The only last domino was U-5 language, and given Mr. ████ s experience, he asked that we loop an attorney and his attorney so we can maintain a privileged discussion.

Q. Okay, let's go to Exhibit 94. We're going back to the text messages between you and Mr. ████

A. I'm there.

Q. 94 and turn the page to Page 3. November 28th. In the middle, it said on the left hand side. Hi Josh.

A. Yes.

Q. We'll read that. I'll be Mr. ████ "Hi Josh, any update on U-5? Hope you are well." Chris.

A. "Morning Chris. Nothing yet. Today is the 30 day mark. I have a call with my attorney at 2:30 PM and can give you a call after?".

Q. I think it's fairly obvious why was this date a significant day with regards to your U-5?

A. Oh man, there's, I would say there's three things that happened that day. I believe that's the day that then – First and foremost, that was the 30-day mark from October 28th, of my understanding of filing form U-5 as well as ████ and their counsel. ████ execs and shareholders are calling me and texting me, "Hey call me when you can." And they informed me that JP Morgan had sent the JP Morgan "bus" to the ████ headquarters, and then I learned they doubled the same line of credit I struggled to get from 10 to 20 million that day, that ████ texted me, "I got the 20", and I said "Good job." And then I believe this day or the following is when J.T. Aughinbaugh emailed me with Stewart copied to schedule a time on December 1st for a call, which was the termination call.

Q. So the first point you made about this is this was the 30 day mark that you thought would be coming?

A. Yes.

S.09a.i-022
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Ok. The second point you made. You said there was - what have you been trying to get for ███ that you've been getting pushed back on when you were still at JP Morgan?

A. Well. Private stock loan. A $10,000,000 private stock loan.

Q. So when you were JP Morgan, you were getting pushback on trying to get this $10 million private stock loan.

A. [inaudible]

Q. After you resign. During the garden leave period, you find out that the 30 day mark, what has JP Morgan suddenly done for ███

A. Delivered a term sheet to increase that line of credit from 10 million to 20 million.

Q. And actually, the third Point you made was that you finally heard on the November 30th that you're going to get - well, what did you hear? The 28th you get an e-mail from who again...

A. Aughinbaugh and Stewart, plus or minus a day from this date, I believe. Maybe the 29th.

[ZOOM0024 ~ 0:39:07.1]

Q. And when's the next time you had a conversation?

A. December 1st.

Q. Who called you on December 1st?

A. JT or it was Ben. "Hey, Josh this is Ben and JT"

Q. You recorded the calls. We'll play this, it's Exhibit 173 on there. So during that call, you get the call, they told you they're going to call you Aughinbaugh and Stewart, they call you, you record the call. That's the call we're going to listen to. OK?

A. Yes, it's going to start the 13 second mark. The 1st 13 seconds is quiet and then the calls start.

MR BIERING:    This is Josh.

**MR. STEWART AND MR. AUGHINBAUGH:** Hey, Josh, it's Ben and JT.

S.09a.i-023
4:26-cv-00381-O
Biering v. JPMS, et al.

MR BIERING:       Hey, guys.

**MR. STEWART AND MR. AUGHINBAUGH:** Hey. So want to keep this quick and get to the point. Josh, today you're employment with JP Morgan Chase is being terminated effective December 1st. You've been terminated because following employee relations investigation it was found that you violated the firm's code of conduct and anti-harassment policy.

MR BIERING:       OK. Are there any reports or facts that I can, within my employee rights, review as well as submit rebuttals and/or evidence to counter these potential client and a ▮▮▮ ons?

**MR. STEWART AND MR. AUGHINBAUGH:** We can provide you with HR and employee assistance and legal, and I think [inaudible] that you're going to take from this point forward, [inaudible] at this point.

MR BIERING:       OK. And that would also include the - Those would be my contacts to discuss the timing and the language on my form U-5?

**MR. STEWART AND MR. AUGHINBAUGH:** [Inaudible] Yes, Correct. OK.

**MR. BIERING:** Any other information that you can share?

**MR. STEWART AND MR. AUGHINBAUGH:** That [inaudible]. That's all we can say.

**MR. BIERING:** Terrific. Thank you so much. I appreciate the information.

**MR. STEWART AND MR. AUGHINBAUGH:** Thank you Josh.

**MR. BIERING:** Bye.

Q. Mr. Biering, why did you record the call?

A. I didn't trust him.

Q. The last time you spoke with both of those guys, they told you they'd follow up about the incentive comp question, right?

A. Yes.

S.09a.i-024
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. What fears, if any, did you have about your employment prospects as a result of this call, and being told – them using the word [inaudible].

A. My heart sank.

Q. Why?

A. You don't get hired with the form U-5 marked.

Q. The company, so the company at this point – You're about in the middle of the garden leave period. At this point, the company waived the remainder of the garden leave period, how much time is left on it?

A. 30 days.

Q. OK. Let's look at Exhibit 16. We'll go to top of Page 3. The notice period policies has come up in the case before the garden leave. Look at the top of Page 3, the first paragraph. It says generally, the firm will seek to enforce its notice period policy. You see that?

A. Yeah.

Q. In certain cases, however, the firm may, and its sole discretion does that decide to waive all or any part of your notice period instead of earlier termination date. Did I read that correctly?

A. Yes.

Q. Is that what happened to the company waived the remainder of the notice period?

A. Looking back, yes.

Q. OK. Next sentence. It says if this waiver occurs, you will be paid in lieu of notice, and receive a lump sum payment equivalent to your base salary for all of the remaining part of the applicable notice period. See that?

A. I do.

Q. When JP Morgan waived the remainder of the notice period garden leave. Did you then get paid in lieu of notice and received a lump sum

S.09a.i-025
4:26-cv-00381-O
Biering v. JPMS, et al.

payment equivalent to your base salary for all of the remaining part of the applicable notice period?

A. No.

Q. Did they ever follow up with you? Aughinbaugh and Stewart told you on the 24th they'd follow up with you about your incentive comp. question. Did they every do that?

A. Next I heard about that topic was with Jena Cohen, the head of the United States private bank HR.

Q. What did she tell you?

A. By terminating my employment and resigning, I'm no longer an employee at JP Morgan Chase at the time that incentive compensation is paid, I forfeit my rights to said incentive compensation.

Q. Because you resigned.

A. That's correct.

Q. OK. How soon after the Aughinbaugh and Stewart conversation did you reach out to Merrill Lynch?

A. Immediately.

Q. OK. What was it – Who in Merrill Lynch did you reach out to?

A. ███████ and Parelly and ███████ and a guy named [inaudible], who is a very large producer that went to West Point.

Q. What was the response from Mr. ███████

A. Look, brother. I suggest you start interviewing with other firms. You got to take care of your family. Merril Lynch – I don't think I can hire you.

Q. Why?

A. We don't hire form U-5 discharged brokers.

Q. Did he tell you anything about why Merrill wouldn't hire someone with a U-5 marked discharge?

a. They just can't remember the last time they did.



S.09a.i-026
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Going back to 94, the text messages with ███████ 94 page 4. This is your text message string with ██████████ the managing director at Merrill Lynch. A. Yes.

Q. What did you tell him here about your U-5?

A. Uh God. No reference to harassment will be defining or mentioned. It'll be failure to disclose workplace relationship, non-securities related.

[Speaker tag uncertain]:    Can you read the whole thing?

Q. I'm sorry Mr. Biering, can you read the top right message you sent.

A. From the bottom up maybe? Or [inaudible], "I spoke too soon. Not sure if this matters at this point. No reference of harassment will be defining or mentioned. It'll be failure to disclose workplace relationship non-securities related.

Q. Why did you say, "Not sure if it matters at this point."

A. This was me reaching out yet again after he told me Merrill Lynch doesn't hire discharge or advisors with the discharge U-5.

Q. Exhibit 99

*[ZOOM0045 ~ 0:46:35.1]*

Q. Before you leave, can I ask a quick question? Sorry, this is the first one of all day. What was the basis for your statement there that it was going to be written this way versus how they wrote it?

A. My discussion with my attorney, he's been in touch with JP Morgan Council or in-house counsel, Mrs. Tidwell-Neale.

Q. And was that your understanding that that was a representation made by JP Morgan?

A. That was my understanding. Yes ma'am.

Q. When did you learn that there was this issue with the relationship.

A. Around November 7th, was the first time I heard anything. My council had been in touch with Ms. Tidwell-Neal in which that's how we

S.09a.i-027
4:26-cv-00381-O
Biering v. JPMS, et al.



learned responsively. Well, there's two issues. One is the expense policy and the second is the inappropriate relationship.

MS. CLEMENT: And then also the investigator testified that he talked to you about the relationship. When did that conversation happen?

A.  The first time, he emailed me with no context on around November second or third. I've got to look at the emails but then we had our interview call right around November 7th or so. I don't have the exact date, but it's around then.

Q.  Let's look at Exhibit 99. See emails at the bottom from you on December 2nd. At the top, the response, Mr. ▇▇▇▇    The bottom, your e-mail, the first one. Earlier one. You tell Mr. ▇▇▇ that you had a great introductory call with a recruiter, Bill Willis. What's the context here?

A.  Right after I got off the phone with ▇▇▇▇▇ about the U-5 and he said take care of your family, you gotta start looking - I got on LinkedIn and messaged a recruiter that reached out to me a long time ago, Michael [inaudible] and he called me immediately. And when I shared with him I was subject to a potential marked U-5, he said "I need to schedule a time with my partner and boss Bill Willis. He's familiar with this case."

Q.  In response, Mr. ▇▇▇ says he's a good person. Great partner. Wishes you luck.

A.  Yes, Bill Willis's son actually works in ▇▇▇▇▇ s complex, and ▇▇▇▇▇ was a lifer, had a very long career at Merrill Lynch.

Q.  So now within basically 24 hours of JP Morgan waiving the rest of the rest of the notice period, calling in a termination. You're doing what?

A.  Scrambling for a job.

Q.  Exhibit 177. Another binder. From there, you just talked about Bill Willis. Here we see what?

S.09a.i-028
4:26-cv-00381-O
Biering v. JPMS, et al.

A.    This was my initial e-mail. So Mike was my initial contact. He asked for details and I provided a very detailed outline of the of the events, as well as my resume essentially, and my credentials.

Q.    OK, So this is this is the same day. You got recruiter contacts, you're immediately working. Trying to find work. What about Texas Capital Bank?

A.    They pulled out.

Q.    Why?

A.    They were already suspicious because of the U-4 bankruptcies and discharges, like who's this guy? And now with a looming U-5, it wasn't a risk they were willing to explore further.

Q.    The discharge.

A.    That's correct.

Q.    Let's look at exhibit one. We talked about it, the U-5 being marked discharge. We've seen this already. So I'm trying not to be redundant, and we made it a few points about it. This is U-5 we've seen before, the bottom section, Section 3, Morgan marked "reason for termination: discharged." Is that false?

A.    Yes.

Q.    Why?

A.    I resigned.

Q.    At the top of the next page: JP Morgan wrote a termination explanation, do you see that?

A.    Yes.

Q.    "After RR submitted resignation, but before expiration of the notice period, RR was terminated for inappropriate behavior not related to the sales, securities or any customer complaints." Is that explanation false?

A.    Yes.

S.09a.i-029
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Besides just submitting a resignation, had you actually specifically resigned?

A. I resigned.

Q. Had you provided* a formal resignation?

A. Yes.

Q. How about the date of termination? It shows 12-1-23. Is that false?

A. Yes.

Q. Under the data of termination it explains that complete date of termination is required for full termination. This date represents the date the firm terminated the individual's association with the firm in a capacity for which registration is required. You see that language?

A. I do.

Q. What's the last date you did anything for JP Morgan in a capacity for which registration is required?

A. Really the 24th, because the 25th and 26th were just lunches.

Q. So is that that December 1st day false?

A. Yes.

Q. Before this marking by JP Morgan. And just to go through a question you were kind of asked also, was your council in contact repeatedly with JP Morgan before JP Morgan ever market or submitted the U-5.

A. Yes.

Q. Let's look at Exhibit 38. Exhibit 38 is a letter from your attorney, Mr. Iacuone, right? It's sent to Ms. Tidwell-Neal, the attorney for JP Morgan, right?

A. Yes.

Q. Ok. On the first page , here the second paragraph. Mr. Iacuone writes that you demand JP Morgan mark the U-5 in the correct and honest way, which is voluntary termination, right?

S.09a.i-030
4:26-cv-00381-O
Biering v. JPMS, et al.

A. Yes.

Q. Same page, paragraph 3. We've been told JP Morgan could likely mark as involuntary discharge, that would be incorrect both factually and legally, and constitute U-5 weaponization with defamation, disparagement and tortious interference. See that?

A. I do.

Q. Same page, next paragraph. JP Morgan does not intend correctly to mark question 7F on the U-5. Is that your understanding as well?

A. Yes.

Q. On the third page of Mr. Iacuone's letter, this is 38-3. Mr. Iacuone cites 3, 4 different case law opinions. You see all that?

A. I do.

Q. You're aware of JP Morgan repeating those?

THE CHAIRPERSON: OK, go on, move on to something that's not stuff between the lawyers about precedent.

Q. About precedent, yes, I'm going to touch a few letters, but I'll not do the the legal precedent points. Is that OK?

THE CHAIRPERSON: Yes.

Q. Thank you. Please turn to Exhibit 39, same binder, next exhibit.

A. I'm there.

Q. This is another letter for Mr. Iacuone, December 12th, right?

A. Yes.

Q. Again to JP Morgan's lawyer?

A. Yes.

Q. Page 2. The first paragraph, you see that?

A. I do.

S.09a.i-031
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Your attorney explains that marking the U-5 as discharged would be factually and legally incorrect and the height of bad faith.

A. Yes.

Q. Exhibit 40.

A. I'm there.

Q. In the middle you can see a December 13th e-mail from Mr. Iacuone to Ms. Tidwell.

A. Yes.

Q. He explains that he has received Ms. Tidwell's proposed language for the U-5. You see that?

A. Yes.

Q. He explains that this proposal is still a ranked mismarking intending to harm him.

A. Yes.

Q. Is that your understanding as well?

A. Yes.

Q. Exhibit 41.

A. I'm there.

Q. On Exhibit 41, the bottom, the e-mail on December 19th from Mr. Iacuone.

A. Yes.

Q. He admits he still hasn't gotten a response about the U-5 correct marking.

A. I see that.

Q. He responds right above there. He responds to his own e-mail later that day noting that no one's responded to the letters and U-5 issue.

A. Yes.

Q. And then you respond as well about that.

S.09a.i-032

4:26-cv-00381-O

Biering v. JPMS, et al.

A.  I did.

[ZOOM0024 ~ 0:56:40.1]

Q.  How is this affecting you, your career, your emotions?

A.  It was very emotional. I still do… Looking back, my entire livelihood flashed before my eyes. I was 30 days or 20 days in at this point without an income for my family. I was going through a divorce and I needed that income for my family. And JP Morgan did that. And not only did I get my salary and money to provide taken away, I was getting stonewalled on any responses whatsoever.

Q.  Next is Exhibit 42. Mr. Iacuone's e-mail on December 20th, you see that?

A.  I do.

Q.  On the bottom here he copies and pastes an e-mail from Ms. Tidwell: Has Josh had a chance to review your letters? You see that?

A.  Yes, but referring to Josh Iacuone.

Q.  Thank you. Turn the page please. Page 2. On the top there Ms. Tidwell's e-mail is copied and pasted in there, it goes on. And then the first full paragraph from Mr. Iacuone, it says "First, your statement…" Do you see that?

A.  I do.

Q.  It says "First, your statement that Mr. Biering's own emails contradict the notion he was unaware he was under investigation at the time he submitted his resignation is false. He was told and only told prior to his resignation that he was being put on an involuntary paid admin leave, not told there was an investigation, not told the scope." Is that true and accurate to your understanding.

A.  I wasn't told anything. So, yes, it is true.

Q.  Ultimately, after your council demanded there be a reference to your resignation, JP Morgan notes that you had submitted a resignation

S.09a.i-033
4:26-cv-00381-O
Biering v. JPMS, et al.



and then added this other additional language, unrelated to securities, right?

**THE CHAIRPERSON:** Excuse me, are you talking about how U-5 was actually submitted?

**Q.** Eventually, yes.

**THE CHAIRPERSON:** OK. The way you just phrase your question, it said that U-5 referred to his resignation, and I don't think it did, unless I missed something. I think it just said he was terminated for conduct.

**Q.** The U-5 writes "After RR submitted resignation…"

**THE CHAIRPERSON:** OK. Thank you.

**Q.** "But before expiration of the notice period…"

**THE CHAIRPERSON:** OK.

**Q.** When did JP Morgan mark your U-5?

**A.** December 22nd.

**Q.** Exhibit 43 in the middle.

**A.** I'm there.

**Q.** E-mail in the middle there from Mr. Iacuone to Ms. Tidwell, the day before the U-5 is finally marked and submitted, Mr. Iacuone again, on your behalf demands that JP Morgan correct and mark the U-5 as voluntary, concerned that they, JP Morgan are going to mismark as discharge, you see that?

**A.** I do, and [inaudible]. I can also note, during the Stonewall period, we didn't get a response. I even personally printed these letters out and got a tracking number overnight delivery, for UPS delivery



S.09a.i-034
4:26-cv-00381-O
Biering v. JPMS, et al.

to Ms. Tidwell's office address, in the event that there is a basis on not having access to emails.

Q. [inaudible] December, after Merrill, despite of the onboarding, inform you that they couldn't move forward with the U-5, what employers did Mr. Willis help you interview with?

A. Not many were willing to entertain. The employers that did entertain, were so [inaudible] that did not make sense, out of Dallas, as well as Raymond James and RBC.

Q. Who at Raymond James did you discuss potential employment with?

A. After Bill Willis introduced me, █████████ complex manager.

Q. Exhibit 72, please. These are emails from December 15th between you and Mr. █████ , is that right?

A. That's correct.

Q. If you'll flip pages, 1, 2, 3, 4.

A. That's right. I'm there.

Q. Can you please just summarize what information you're providing Mr. █████

A. "I know my clients like the back of my hand and I know what needs and solutions are required to service them", and I enumerated what those were, just to ensure Raymond James' capabilities could support my clients in their needs.

Q. What was your reaction to what Raymond James could do to offer or provide for your clients?

A. The reaction was more so just hope and wait that they can address the majority of them because I wasn't in a position to choose; and they did communicate a lot of abilities that later I found out weren't really the capabilities, and the lending was lackluster.

Q. You said lending… Merrill can't do what that JP Morgan can? I'm sorry – Raymond James can't do what that Merrill Lynch can?

A. Well, the lack of a brick and mortar retail banking structure for my elderly clients that are ultra-high net worth that prefer

S.09a.i-035
4:26-cv-00381-O
Biering v. JPMS, et al.

[inaudible] visiting the branch, technology platform, merchant services, credit cards, banking. I simplify it to 4 buckets: banking, investment management, lending, wealth transfer, trust and estates and the ancillary services that come with that. Raymond James was described to me—or excuse me, JP Morgan, [inaudible] a bank that [inaudible] a financial services advisory. Raymond James was described to me as a financial services advisory arm that came from a financial planning firm that owned a small bank that was there to allegedly support the advisors and clients, so less infrastructure, less capabilities and less [inaudible].

Q. How about type of loans Merrill can do that Raymond James can't?

A. Part of my - to answer your question directly, it's: I was empowered to have more lending capabilities at Merrill Lynch, which I was excited about and I confirmed that on my 27th meeting, where I had like an in-depth hour and a half discussion with the Merrill Lynch lender that we nerded out on lending.

Q. How about complex transactions compared, Raymond James versus Merrill?

A. I talked with the - his name is Guido, actually. He was on the derivatives trading desk for the investment bank and derivatives team for Merrill Lynch, and we walked through the nuances and the mechanics of that 170 million dollar derivatives trade I [inaudible] due for renewal in January, which is why again that was more of a sense of urgency, and I think it's a big function, is why Raymond James hired me with a scarlet letter because I was a million and a half of production come January.

Q. The scarlet letter refers to what?

A. The scarlet letter is a U-5.

Q. Ok. Exhibit 73. The next, next one there, emails on January 3rd with you and Mr. ███ at Raymond James. Generally, what do we have here?

A. He copied ███████ who's his boss, who again I think is a big reason why the scarlet letter they hired me despite that I was a

S.09a.i-035

S.09a.i-036

4:26-cv-00381-O

Biering v. JPMS, et al.

West Point grad, and this is back and forth, his answers are in red on my questions on capabilities.

Q. [inaudible] So you'd ask the questions in black, Mr. ███    Mr ███ responded in red.

A. Yes.

Q. Ok. Did you decide to accept an offer for Raymond James?

A. I didn't have a choice.

Q. Why not?

A. I had to feed my family and service my clients, and every day that went by, I didn't have the luxury of not taking any job, particularly with attorney fees and the family.

Q. Exhibit 75, we'll turn to next. This is your offer letter from Raymond James.

A. That's right.

Q. So, the start date of what?

A. January 11th I believe. Yep, January 11th.

Q. January 11th, 2024.

A. Yes.

Q. Is that when you started?

A. Yes.

Q. Let's also look at some deal documents. Exhibit 80. 8-0, yeah 80.

A. On there.

Q. Exhibit 80 is, what is this document?

A. This is a promissory note agreement.

Q. We see it's dated February 10th, 2024, right?

A. Yes.

Q. Ok, Exhibit 81.

A. On there.

S.09a.i-037
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  What do we have here?

A.  Acknowledgement of the loan.

Q.  Ok. A loan from who?

A.  Raymond James to myself as the Borrower.

Q.  Exhibit 80.

A.  80?

Q.  We did 80 and we did 81.

A.  Oh, sorry. I was looking at – no, that was 81.

Q.  Okay, let's go to 78.

A.  I'm there.

Q.  What is this?

A.  A loan agreement.

Q.  And the date at the top.

A.  Oh, February 27, 2024.

Q.  And Exhibit 79.

A.  It's the second – It's loan A and loan B. This is loan B loan agreement March 4th, 2024.

Q.  Can you explain the difference between these various loan agreements, how they factor into your deal with Raymond James?

A.  These were what are typically – an unscathed U-5 transferring advisor essentially agrees on what their production number will be, and that dictates what size loan that they give you up front for a transition loan, which is standard unscathed U-5. Given them taking a chance on me, they viewed me as higher risk and had questions ranging from U-$ bankruptcies, compromises and now inappropriate behavior, [inaudible] suspect of what that was. My loan agreements were not awarded on the front end. They were only awarded after I hit certain hurdles, and I remember this clearly I was rushing to do whatever I can to get the loan agreement at any process because I was about to miss my mortgage payment.

S.09a.i-038
4:26-cv-00381-O
Biering v. JPMS, et al.


Q. What are some of the key aspects of your deal with Raymond James – Salary, production percentage?

A. They gave me what ▮▮▮▮▮▮ described as uh, "to keep the lights on salary" for two years, 120 grand, 10 grand a month. I got the loan A, and loan B umm. Having showed him my transition plan, I was very confident. If it weren't for J.P. Morgan's interference, I would be able to bring at least 4 million of production with me quickly. And I shared what that impact would be to my book conservatively. I said conservatively, I can get you 2 million , two and a half million. So they priced me at a $1,000,000 which dictates how much you get in [inaudible] loan package.

A. And I said… I couldn't… I had no bargaining power, so I was like, man, like, I'm really good at what I do. Can you work with me? So they increased it to 1.25 million, trailing 12, which, if Raymond James had the capabilities of Merrill Lynch, I would have [inaudible] in one fell swoop of that transaction [inaudible]. But that was another story. And I didn't get my - Another standard is you get for whatever restricted stock units you had, whether they were invested or not in the JP Morgan stock, you essentially get that in kind for Bank of America stock. And I didn't get, I didn't get any.

Q. Let's turn to Exhibit 77. It's the pro forma from Raymond James.

A. I'm right there.

Q. This pro forma document, what is this?

A. This is a stand… industry standard illustration package for compensation, package for advisors or for prospective advisors or recruits.

Q. When you turn to page 2. Does this - Does this tie into what you're just discussing about you're not being given upfront comp. which is what you certainly would have expected with a clean U-5?

A. Yes.

Q. How's Raymond James commission advisors' performance?


S.09a.i-039
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   Trailing 12 production. And for this, the purposes of asset hurdles for your bonuses is a percentage there of your AUM, your assets under management. So in order to achieve those, you have to reach your percentage of assets.

Q.   The gross production revenue AUM.

A.   That's correct.

Q.   OK, let's look at Exhibit A4.

A.   I'm there.

Q.   This is a financial advisor statistical analysis from Raymond James. You see that?

A.   I do.

Q.   The monthly client analysis for you, January 24 to August 25. See that one?

A.   I do.

Q.   Ok. Let's turn to eighty…, and then next is Exhibit 85. You see that one?

A.   I do.

Q.   Similarly, there's another statistical analysis, but this one is client segmentation by account, right?

A.   Yes, [inaudible] based on revenue.

Q.   Ok. Let's look at your production now. Let's look at Exhibit 77. Page 3.

A.   I'm there.

Q.   77. Page 3. We're seeing what Raymond James [inaudible] pro forma. This is what Raymond James anticipated would be your Year 1 production, right?

A.   Yes.

Q.   In year 1. Is that the first column there?

A.   Yes.

S.09a.i-040
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Year one, first column. What did Raymond James anticipate would be your… your low?

A. 1,062,500 gross production.

Q. And then column one, year one. You're down, the bottom 4 rows that are not shaded. Total Aggregate-Club Level, you see club-level?

A. Yes.

Q. That's blank, right?

A. Under Year One, yes.

Q. OK. So let's talk about their projection. Their projection in year 1 was that your gross revenue would be 1.062 million, right?

A. Yes.

Q. What was your actual Year 1 gross production?

A. Just over 2 million.

Q. Far exceeded expectations.

A. Yes, double.

Q. Same thing at column one, they expected that your club level, you don't attain any club level, right?

A. That's right.

Q. What club level did you actually attain during year one?

A. I was on the bubble of Presidents Club, but of three leadership clubs I got Leadership Club 3.

Q. So what's the lowest leadership club?

A. 1.

Q. So it was Leadership Club 1, Leadership Club 2. Leadership Club 3 is the highest of the three?

A. Yes.

Q. In year 1 they thought you'd hit none and you hit what?

A. 3.

S.09a.i-041
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Overall, have you exceeded Raymond James' expectations about your job performance?

A.  Yes.

Q.  What about transitioning clients? How's that been?

A.  Well, there's over here not as many clients that I thought would for sure follow me due to circumstances. And there was a lot of friction and interference during the transition process.

Q.  Exhibit 90.

THE CHAIRPERSON: OK, let me direct you. What percentage of your equity book, if you will, followed you eventually from JP Morgan to Raymond James?

A.  35%.

THE CHAIRPERSON: OK, thanks.

A.  And they're concentrated and skewed towards lesser known. like the Pareto principle, 20% versus 80%.

THE CHAIRPERSON: So by that you mean smaller accounts versus larger?

A.  There's a wider skew towards, basically they have concentration risk and higher net worth, OK.

THE CHAIRPERSON: OK.

Q.  Let's go to Exhibit 90. Actually, that question, before I get to Exhibit 90, that question ties in with something that came up earlier. Mr. Dunlap asked Mr. Spindler a question. Mr. Dunlap asked Mr. Spindler, he said, "Well, Mr. Biering had all these clients at JP Morgan and now Mr. Biering is at Raymond James, where they don't have certain capabilities such as lending or whatever else." And Mr. Dunlap said to Mr. Spindler, "Well, some of your former clients

S.09a.i-042
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. could just give you a piece of their business. They could just do investable assets with you, even though you can't do all of the services that your former clients want and need." Is that about right?

A. Oh. I asked. I was like...

Q. Well that's the question that Mr. Spindler got, right?

A. Yes.

Q. OK. And so Mr. Spindler said "Well… [inaudible] as far as these clients, your former clients just breaking off a piece of their business and sending it to you at Raymond James. That was the [inaudible].

A. Yes.

Q. OK. So the question that just came up kind of ties with that. You know better than anybody: Your clients that were at JP Morgan. When it comes to just breaking out a piece of the business and send it to Raymond James, is that practical at all?

A. I, in good faith, could not ask a client for assets knowing how all my clients are strategic borrowers. They borrow not because they need to, because they're strategic. And if I genuinely had to hand – my clients are my family and friends. I can't go to a client and ask them to trust me with their balance sheet investments if I know I'm not going to be able to trust them with mine or Raymond James. So I did not, in good faith. And I couldn't ask those clients to come knowing I would disappoint them on the lending side.

Q. So what about just them just breaking out the piece of their business and giving it to you at Raymond James, what's the issue with that?

A. They… they couldn't. Whenever you have custom credit, wherever you go in any reputable firm, there's covenants. Within the covenants, it has an unencumbered liquidity requirement held in custody at the lender, and #2 is the… the low hanging fruit of lending is typically your lines of credit are secured by a marketable securities portfolio, and your pricing breakpoints are based off of how much of the [inaudible] size your marketable securities could



S.09a.i-043
4:26-cv-00381-O
Biering v. JPMS, et al.

support. So breaking off a piece was not feasible, nor did I have the—I couldn't have asked them in good faith to do that.

Q. Any benefit to those large clients at JP Morgan, staying at JP Morgan where they could do everything - or transferring all their business that you've gone to Merrill Lynch, and taking all of it with you as well there. What benefit do they have from having all there - from having a significant amount of their book all in one place?

A. Upside of a One stop shop, during my discussions on the 27th and subsequent discussions, I had already secured better pricing on all the lines of credit on all of the, the products and solutions that I knew my clients needed.

Q. Do those clients have leverage to negotiate because they've got so much business, let's say at 1 warehouse?

A. Yeah - The more tentacles and by tentacles, is the crosslines of businesses - the more lines of business that touch a client relationship, the more streamlined and bespoke products and solutions you can provide, whether that's investment banking, commercial banking, business banking, all the things.

*[ZOOM0024 ~ 1:19:07.0]*

Q. I'm going to bring up the [inaudible]

[Speaker tag uncertain]:    Before you go to that, do you know if the 65% of your clients that didn't follow you stayed with JP Morgan or if they went elsewhere? I assume you've had some [inaudible].

A. I stayed very close with them. We're very good friends. They maintain their relationships. I would say maybe two or three left to go to like a Goldman because they had a bad taste in their mouth, and I respect them for being truthful with me versus "Yeah, we just were concerned that Raymond James can't serve us [inaudible].

[Speaker tag uncertain]:    But you believe they stayed with JP Morgan?

A. I know that they did. They still send me statements and ask for a second set of eyes, and I continue to try and get [inaudible].

S.09a.i-044
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. These, these clients we're talking about too, for example, the Point Energy Partners. Look at a press release behind you, Mr. Biering. Behind you, you see a press release – Can you look at the screen? September 23rd, 2024. Point Energy Partner.

A. 1.1 billion.

Q. That the kind of business you could support in Merrill Lynch?

A. That's the type of business I knew I would support at Merrill Lynch.

Q. Let's look at the other one from…

[Speaker tag uncertain]:    Sorry, I have one more question. Those people that stayed, those clients that stayed, that 65% – who took over the business for you?

A. I think 85% of the advisors that took over that business were promoted that year, and I believe we have an exhibit to go through on the Teams team.

[Speaker tag uncertain]:    But it was divided up. It wasn't just attributed to one particular…

A. Correct – Yes ma'am.

[Speaker tag uncertain]:    That and you can get to it. I'm sorry, it just triggered that question.

Q. The Point Energy Partners, $1.1 billion sale. There is also the ████ announcement. They announced a recapitalization event.

A. 3 1/2 billion, yes.

Q. That the kind of business you could support in Merrill Lynch?

A. Yes, that's the type of business I knew I could support at Merril Lynch.

Q. Let me take those. We're going to go to Exhibit 90.

A. I'm there.

Q. Exhibit 90 is an e-mail string that you [inaudible] Raymond James and who else?

A. This particular one is the Custom, the head of the custom lending group at Raymond James, Scotty Axelrod, and one is [inaudible], David Wilkinson.

S.09a.i-045
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Without us going through all the back and forth, we can see it goes on for pages where you're looking for support, for help, and eventually – why don't you just tell us what happened with this this e-mail string?

A.  I knew I had a lot of customized [inaudible] complex. That's why we're in the business that we do, and I'm 34 years old [inaudible] business is figuring out the complex, and I knew I would have some explaining to do until I got my skins on the wall, but I view it as starting off at the top of the pyramid with a complex lending solution like a private stock loan, then you go down on unsecured, and never did I think I was going to have trouble getting a mortgage, $800,000 mortgage for someone worth $150 million.

Q.  So eventually the folks at Raymond James told you this is a deal you couldn't do. It was not a supported solution.

A.  Yeah, I mean, you know, there were several. It's like "What about this?" "That's not a supported solution in this case either."

Q.  That the kind of work you could do in Merrill Lynch?

A.  I pre-approved it and pre-cleared the terms before. I had it written on the business case, pretty much.

Q.  Let's look at Exhibit 114. That's a second [inaudible]. From there, this is January 2024 e-mail string with you and some folks at ███ Dental, right?

A.  Yes.

Q.  OK. So after you start at Raymond James, you're still in contact with ███ folks, is that right?

A.  That's right.

Q.  Exhibit 114, the most recent emails from Jeff ██████ right?

A.  I'm sorry, say that again?

Q.  The most recent e-mail at the top?

A.  That's from ████████ the CFO.

S.09a.i-046
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Thank you. So the CFO ████████ ████

A. The 3 1/2 billion dollar company.

Q. And they had sent you what?

A. They reached out to me. Well, you'll see from the text messages: "Where the hell did you go? What happened? We're following you, Merrill Lynch? Let's go." And then this is what I needed to kick off the process of replicating lending solutions like the private stock loan, the aircraft loan, which is Air Floss One, and other lending solutions that I already had essentially the green light for at Merrill Lynch.

Q. Where is this e-mail going to? Is it going to Raymond James?

Q. This is a Raymond James e-mail that… this is third party Raymond James produced with some redactions. That's the [inaudible].

A. This was when I was at Raymond James and they learned where I was at, they reached out to me.

Q. Let me… the [inaudible] question. It's from him, Mr. Biering at Raymond James to Mr. ████████ at - I'm sorry, from Mr. ████████ at ████ to Josh Biering at Raymond James.

A. And copied ████████████ the president of ████

Q. So the cap table is providing you what kind of information?

A. The cap table provided me with the basic building block of a private stock loan. Who are your borrowers and how much do they have?

Q. Exhibit 115. What is this?

A. That is the cap cable but updated after I left as of December 31st, 2023.

Q. That ████ cap table what's that, estimated - what is CMD.

A. Current market value.

Q. What is their estimated current market value?

A. At this time it's significantly increased at $2.50 a share. I believe it's risen up to 1.8 billion or  - no? Yeah. 1.8 billion.

S.09a.i-047
4:26-cv-00381-O
Biering v. JPMS, et al.

**Q.** 1.8 billion for…

**A.** The top shareholders as well as the institutional – not in between [inaudible institutional. Charles Bank was the former Harvard endowment group that spun off the alternatives [inaudible]…

**Q.** The ▮ investors that you would source a relationship with?

**A.** Yes.

**Q.** Let's look at Exhibit 118. 118, we see an e-mail from you to the folks where?

**A.** Our investment bank partners and our banking partners and my complex management, as well as our private institutional client group that I was told could do things for clients.

**Q.** Did you think there's a serious possibility you could try to get this business of ▮ over to Raymond James?

**A.** I was excited, I was hitting the ground running, ready to go and this was the start of the excitement until rejections started coming in.

**Q.** Did MB 2 move their business to Raymond James?

**A.** Not at all.

**Q.** What is your understanding of why they didn't follow you at Raymond James?

**A.** They told me they were concerned with the narrative around my departure and things that they were hearing, as well as two more things: the lack of capabilities to service their needs and, the quite frankly, "Sorry brother, I mean, it's Raymond James," he said, quote, "Every time I say Ray J ha, I laugh."

**Q.** Meaning the brand compared to Merril Lynch.

**A.** That's correct.

**Q.** Let's look at Exhibit 113.

**A.** Please know, I'm not dogging on Raymond James, [inaudible].

**Q.** You're quoting someone else. Exhibit 113 is a text message string with who?



S.09a.i-048
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** ████████████ his nickname is Donk. He was one of the first dentists between him and Gabe █████ that partnered at █████ with █████ They're all best friends.

**Q.** In the middle, on the left hand side, you see "lol". He writes "lol when were you going to tell us where are you moving and why you were going to get canned?"

**A.** And I do want to make sure we highlight that he reached out to me saying call me. And yes, I do see that in the middle.

**Q.** You ask "Canned?" - he says - Well, you be you and I'll be at canned. So you say "Canned?"

**A.** "Canned?"

**Q.** I say "Canned."

**A.** "What! Who said that?"

**Q.** "All your peeps man. What you mean? Is it not true?"

**A.** "My peeps? Like JP Morgan people? You're messing with me!"

**Q.** Mr. █████ responds by putting exclamation points on your text.

**A.** That's right.

*[ZOOM0024 ~ 1:28:47.1]*

**Q.** Let's look at Exhibit 212. 212. Sorry. Exhibit 113. [inaudible] Sorry. Put Exhibit 212. [inaudible] 212 as a declaration.

[Speaker tag uncertain]:    Can I be heard on this?

**THE CHAIRPERSON:** You may.

[Speaker tag uncertain]:    This is a declaration from this Mr. █████ I obviously have no way of cross-examining Mr. █████ on a declaration, and I was waiting to see if this would come because it's his unilateral saying something, and I have no way of cross-examining him. If they wanted Mr. █████ his good friend, to come in and testify, they certainly had the opportunity to do that. This is just a one-sided declaration that I have no way of addressing.

**THE CHAIRPERSON:** I understand your objection and your concern, although you didn't say objection, but I assume that's what you're doing -



and if this were a court and the rules of evidence applied, it would certainly be well-taken. I will also comment that just as they had the opportunity to bring him, so could have you. Umm, I will accept it. And I will accept it with the understanding that it's not subject to cross examination and we will give it whatever weight the panel believes it deserves under those circumstances.

[Speaker tag uncertain]: Fair.

**THE CHAIRPERSON:** You may proceed.

Q. Thank you. Who is ███████

A. Former CFO, ████████ insurance, best man at my wedding. It was actually him with us at the [inaudible] event in a capacity as friends. He's a fellow board member of ███████ and he is now the Chief Capital Markets Officer at ███████ tasked with preparing ███████ for an IPO.

Q. Page 1, he explains on page one his role as a Chief Capital Markets Officer for ███████ He goes on, describes meeting you in his former role as CFO, ███████ Insurance. At the bottom, the second to last paragraph in April 2022, he explains he introduced you to executives and shareholders at ███████ Is that right?

A. That's right.

Q. The next final paragraph on page one he says, "I have discussed with other ███████ executives…" you see that?

A. I do.

Q. He writes ███████ has expressed" – well he swore ███████ has expressed repeated concerns that Raymond James could not provide the capacity required to support ███████ s needs or the needs of the executives and major investors' personal financial solutions" you see that?

A. Financial situations, yes.

Q. Sorry. Did you agree with that?

A. I do.

S.09a.i-050
4:26-cv-00381-O
Biering v. JPMS, et al.



Q.  Further, during these conversations, ██████████ executives and major shareholders, including the founder of ██████████ and its President expressed concerns about the circumstances of Joshua Biering's departure from JP Morgan and Raymond James's limited capabilities. Is that right?

A.  Yes.

Q.  It was clear to me based on these discussions and because of these concerns, ██████████ executives and major shareholders did not transfer their personal banking or investment advisory relationships with Joshua Biering at Raymond James, do you agree with that?

A.  Yes.

Q.  Finally, he says he served on the board of ██████████ with you, right?

A.  That's right.

Q.  And then at the November 11, 2023 gala. The guest list confirmed you were at a table with ██████████ ██████████ and Michael Parelly. Is that right?

A.  Yes.

Q.  Michael Parelly we've talked about quite a few times. Who is John ██████?

A.  Fellow West Pointer, co-founder and CFO of Point Energy Partners for $1.1 billion sale in 2024.

Q.  And who is David Lagat?

A.  ██████████ a very good friend of mine now. He's first generation Kenyan commercial real estate professional. He is one who I think of when I genuinely say I can't ask you to bring business with me because I can't give you lending. John Savia's worth about 250 million. He was going to move with me. He went to Goldman. David ██████ hasn't open accounts with me. He's worth about 350 million and I was introduced to him by Ben Stewart to save the relationship as ██████████ was exiting JP Morgan. And then Michael Parelly is

S.09a.i-051
4:26-cv-00381-O
Biering v. JPMS, et al.

my hopeful - at the time, my partner I had hoped to join at Merrill Lynch.

Q. So ███ was a - wait how'd you originally meet ███

A. Introduction through Ben Stewart. ████████ was Ben Stewart's client and then David was getting ready to exit the bank due to lack of service.

Q. But he didn't exit because why?

A. I took over the relationship.

Q. We'll talk about a different topic.

THE CHAIRPERSON: OK, just - I'll make a comment. I hadn't seen this before, obviously, but I don't see anything in this that's not largely cumulative of other testimony we've heard. Am I missing something?

Q. No.

CHAIRPERSON:    OK, thanks.

Q. The very bottom of this page, you see the produced [inaudible] number on there, you see that?

A. Yes.

**Q.**    Different topic. We've heard about U-4 at certain times, right?
[Speaker tag uncertain]:    Can we take a quick brake? I'm sorry - before you go onto a different topic…

THE CHAIRPERSON: Yes. Yes, we may. Actually.

Q. Perfect timing.

THE CHAIRPERSON: And I had actually, I'm glad you said that because I had actually intended to break at 2:30 and it's 2:34. So let's take a 15-minute break. Is that okay? All right?

*[ZOOM0025 ~ 00:00:01]*


S.09a.i-052
4:26-cv-00381-O
Biering v. JPMS, et al.

Q: Thank you, Mr. Biering. We're going to go back in time to 2022. In April 2022, a customer made a… customer made a complaint a U-4, ended up being a U-4 . Briefly, what was that customer complaint?

A. It was by Mr. ███████ I was the banker, Hitchcock was the investment specialist and we had a… it's been… across the industry, the search for yield interest rate environment was near 0, and there were not many places for a safe haven initially. We put the client in a… Kyle put the client in a short duration bond fund. And shortly thereafter, Mr. ██████ put like $15 million in a bond fund, and interest rates started spiking. He just came into a liquidity event and we… and the interest rates hiked, the little bond fund 14,000,000 fell by 70 pips, point 7 because of the inverse relational pricing. And Mr. ███████ wrote a written customer complaint.

Q. That written customer complaint, was it reviewed by JP Morgan?

A. Yes.

Q. What was the… what was their conclusion?

A. Unfounded by the Wealth Management Executive Iffice. In fact, we were praised by how meticulous the notes were.

Q. Did you ultimately obtain an [inaudible] expungement?

A. I did, yes.

Q. Exhibit 27. Let me know if you're there. Here we see an expungement award.

A. Ok.

Q. You know what does this order mean?

A. That the three person panel viewed that the customer complaint was erroneous, factually unsubstantiated and false and awarded expungement.

Q. Ok. In this case… yes ma'am.

[Unidentified Speaker Tag]: What Exhibit is this?

Q. 27.

S.09a.i-053
4:26-cv-00381-O
Biering v. JPMS, et al.

**[Unidentified Speaker Tag]:** Oh, thank you.

Q. In this case, so this expungement has already been determined. In this case before the three-arbitrator panel in this room, what relief are you requesting?

A. The legal fees associated with pursuit of expungement promised me by JP. Morgan.

Q. Who at JP Morgan promised they would pay your attorney fees tied to that U-4 expenditure?

Q. David Nolet, market manager at the time, Scott Lydick, head of investments and advice, and Cara Aber, who is associate general counsel at JP Morgan was in the conversations as well.

Q. Mr. Nolet, does he work at JP Morgan anymore?

A. No.

Q. Let's look at CX-26, the prior e-mail. Exhibit 26.

**THE CHAIRPERSON:** I'm sorry – What was the date of the expungement award?

**MR. IACUONE:** The very final page, 27th is – the Date of Service October 25th, 2024.

**THE CHAIRPERSON:** Thank you.

**[Unidentified Speaker Tag]:** And how much were the fees that…

A. 96,000. There was also the…

**[Unidentified Speaker Tag]:** I'm sorry, what was that?

A. 96,000.

Q. To answer that question, we'll look at Exhibit 28. Exhibit 28 is a declaration from Mr. Iacuone, did he represents you in that U-4 expungement?

S.09a.i-054

4:26-cv-00381-O

Biering v. JPMS, et al.

A.   Yes.

Q.   Ok. Turn the page 28-6. Paragraph 18, you see that?

A.   Yes.

Q.   What was the total amount of reasonable and necessary attorney fees that you incurred in the U-4 expungement?

A.   $95,709.38.

Q.   This declaration is from Mr. Iacuone, your attorney?

A.   Yes.

Q.   OK. Let's look at Exhibit 26.

A.   Yes, I'm there.

Q.   Exhibit 26. The e-mail string.

THE CHAIRPERSON: Are… are you moving on and leaving this topic behind?

A.   No, this is still the U-4 topic.

THE CHAIRPERSON: Oh, okay. Go ahead, sorry.

Q.   Exhibit 26, we see a e-mail sting. Pretty lengthy. I want to look at the May 1st, 2023 emails. The very first page there, see that?

A.   Yes.

Q.   Who are you emailing with there?

A.   At the top?

Q.   Yes.

A.   Brandi Watson, human Resources, partnered with Stephanie Stainback.

Q.   And what did… What did you find out in this e-mail string?

A.   Well, as background, this was May 2023. The original customer complaint was made in April 2022 at the… per the guidance of Cara Aber, JP Morgan Associate Counsel on this matter, in the same discussion in which it was agreed that JP Morgan would cover legal

S.09a.i-055
4:26-cv-00381-O
Biering v. JPMS, et al.

fees pursuant to expungement, the condition was we wanted… we needed to wait 12 months to… to determine if there was any subsequent or follow-up client action, particularly because it was the estate that has not been settled yet with the estate of Tom ▇▇▇▇

Q.  Mr. ▇▇▇▇ had passed away, and that made the U-4 expungement fairly complex.

A.  That along with the bankruptcies and compromises due to student loan discharge.

Q.  Did JP Morgan actually say...

THE CHAIRPERSON: Okay, let me… During that same expungement, were you seeking expungement of the disclosures with respect to the discharge of your military situation?

A.  Yes, sir. So that's where we learned – FINRA shared that there wasn't a formal process in FINRA's procedures to formally remove the… the items. However, Mr. Iacuone after several lengthy deliberations with FINRA Council, rather than having – JP Morgan had already had the five items archived, and then they were still accessible by employers. So Mr. Iacuone, the extent that he could have done was collapse them into one item, which is why we're here to also include that.

THE CHAIRPERSON: Yeah, no, yeah because I thought I heard testimony earlier that that issue had been successfully resolved.

MR IACUONE:     No, so that was one reason there was a long back and forth with FINRA. We were also attempting to have the loan discharges expunged. FINRA would not allow us to make that part of the expungement because they were archived. And we went back and forth and we said there must be a way that a panel can expunge them even though they're archived, and I spoke in many conversations [inaudible] Richardson. with FINRA's high up lawyers saying you're telling me I can't get these expunged on the Archive CRD? And they went back and forth, and we went back - We were looking at memos and FINRA guidance, and they basically said, yeah, there's no way

S.09a.i-056
4:26-cv-00381-O
Biering v. JPMS, et al.

to do it if it's archived, we can't get rid of them, but it still showed up on the CRD.

THE CHAIRPERSON: So did they get archived as a result of a request from JP Morgan because it was an error to begin with? I thought I heard something there. A.   Yes, sir, they were filed in error, yes sir…

THE CHAIRPERSON: No, no, you just stay quiet for a while. Let me talk to the lawyers about this one.

A.   Yes, sir.

Q.   Yes, your honor. So they were filed in error. There was - we saw from Mr. Thompson when they finally admitted that they were filed in error. And then what JP Morgan did is they then archived those, and then we saw… and to JP Morgan's credit, they didn't fight us trying to expunge the archived. So after they go it's filed an error, it was - I think the issue was it was too late after the fact. And so then they went to the archived on the CRD, and JP Morgan didn't fight it, but we said, hey, we need to get these expunged.

THE CHAIRPERSON: Ok. And you're telling me that even though they were archived, they were still accessible in our broker check?

Q.   Yes. And on the CRD and FINRA, and we went back and forth and tried to find guidance and with the lawyers on - this makes no sense to me. I don't care that they're archived. We should be able to get them expunged in the CRD and ultimately the lawyers at FINRA were like. You can't, I'm sorry. And they wouldn't allow us to make that part of this expungement, which was sort of twofold. It was that issue and it was the customer.

THE CHAIRPERSON: So what is the status of the incorrect loan information that's been archived, it's still archived?

A.   Yes, sir.

Q.   Yes, sir.

S.09a.i-057
4:26-cv-00381-O
Biering v. JPMS, et al.

**THE CHAIRPERSON:** Is that… you're consistent with your understanding?

**[Unidentified Speaker Tag]:** That is consistent with my understanding, and just for the record, I did not handle that...

**THE CHAIRPERSON:** No, I think it was in-house from the testimony earlier.

**[Unidentified Speaker Tag]:** It was handled by one of my partners in Chicago.

**[Unidentified Speaker Tag]:** Heidi, it was Heidi.

**[Unidentified Speaker Tag]:** Heidi VonderHeid

**THE CHAIRPERSON:** Oh OK, I know her. She's been on this case from time to time.

**[Unidentified Speaker Tag]:** Yes.

**THE CHAIRPERSON:** OK, I now understand stuff and you get to answer questions again.

Q. On this e-mail in front of you, is there a promise that JP Morgan will pay your attorney fees? In this e-mail.

A. No.

Q. Who made that promise again?

A. David Nolet and Scott Lydick.

Q. When?

A. Right before the U-4 was filed, and Mr. Hitchcock originally was the only advisor that was required to get the U-4 complaint filed.

Q. Did you rely on their promise?

A. Yes.

S.09a.i-058
4:26-cv-00381-O
Biering v. JPMS, et al.

**Q.** Would you have pursued that expungement if they had not made the promise to reimburse your attorney fees?

**A.** No.

**Q.** To date, has JP Morgan ever paid your attorney fees that you incurred in pursuing the expungement?

**A.** No.

**Q.** When did you learn JP Morgan, despite the promises from Lydick and Nolet, would not pay your attorney fees?

**A.** Through my counsel; I can't recall the specific date.

**Q.** Go back to, still 26, page 1. Actually, I think this… [inaudible]question just got answered, so just give me one minute, while I [inaudible] ask, I just got the answer.

**THE CHAIRPERSON:** While he's looking, the expungement was – request for expungement was filed while he was still employed at JP Morgan or subsequent?

**Q.** Subsequent.

**THE CHAIRPERSON:** Okay.

**Q.** Once you moved to Raymond James, do you continue to have to deal with the erroneous JP Morgan disclosures regarding the loans?

**A.** Yes, and I still am. I have a client in Tennessee that we closed a life insurance deal for, and I had to get licensed in Tennessee with The State of Tennessee Insurance Department, and it's been four months and I still haven't been approved because my… my background or whatever is under review because of said disclosures.

**Q.** Look at Exhibits 86 through 89. 86, do you see the letter from the State of Missouri Securities Division?

**A.** Yes.

**Q.** 87, similar from the State of Hawaii.

S.09a.i-059
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** Yes.

**Q.** 88. Similar letter from Colorado, Colorado Department of Regulatory Agencies, Division of Securities; and Exhibit.

**A.** Yes.

**Q.** And 89, similar from the Commonwealth of Massachusetts Securities Division. Is that right?

**A.** Yes.

**Q.** What are these?

**A.** Letters of inquiry requesting more information on the customer complaint that was discharged and expunged, the five bankruptcies and compromises, as well as more detailed clarification on the inappropriate behavior on the Form U-5.

**Q.** Let's look at Exhibit 30.

**[Unidentified Speaker Tag]:** [inaudible] What's the bankruptcies? The five bankruptcies?

**A.** I had student loans, ma'am, that were for five semesters, so five student loans, and JP Morgan filed them individually as bankruptcies and compromises, when per my [inaudible], I had them expunged, or excuse me, the loans were discharged.

**THE CHAIRPERSON:** And by the way, JP Morgan's testimony was that they agree with his position on that. It doesn't sound like FINRA has been very cooperative, but you don't really… I take it you're not really blaming JP Morgan for the failure to remove that?

**A.** Sir, if I may…

**THE CHAIRPERSON:** I'm just asking your counsel right now.

**Q.** Not failure to remove, our position is they should have never reported them…

S.09a.i-059

S.09a.i-060
4:26-cv-00381-O
Biering v. JPMS, et al.

THE CHAIRPERSON: Because it was an error.

Q. Yes, because it was part of the discharge for military service and that shouldn't have been... And so the problem was…

THE CHAIRPERSON: OK, understanding that everybody would probably be unhappy about that, you're not attributing any specific damages to that. I didn't hear any from your expert.

Q. I think that's correct, sir. Not on compensatory damages.

[Unidentified Speaker Tag]: So can I ask a question, just theoretically between counsels? If something gets archived—say it gets archived in error—is there not a way to reverse the archive that you bring it back up such as that you can then expunge it?

[Unidentified Speaker Tag]: And again, I wasn't involved.

[Unidentified Speaker Tag]: I Understand… I…

MR. IACUONE: We spent time with the highest echelons of FINRA counsel to say, "Why can't we expunge an archived…"

[Unidentified Speaker Tag]: And I get that where if it's designated as archived, you wouldn't necessarily, whatever their policy is… But if I falsely or accidentally archive something that shouldn't be archived, and it's still designated as archived – How do I correct that error? Like you can't correct it, and it's just archived forever and you can't unarchive it? That seems bizarre to me. But nonetheless, that's what you're test... or saying, not testifying.

MR. IACUONE: Yes, your Honor.

THE CHAIRPERSON: I'd like to say I'm surprised, but I'm not really.

S.09a.i-061
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Exhibit 30, please. We're going to look at Mr. Spindler's damage schedule without rehashing everything. Are you familiar with this damage schedule?

A. I am.

Q. Why do your lost earnings – and this is a question I got asked a couple of times: Why do your lost earnings calculations rely so heavily on your potential earnings at Merrill, Merrill Lynch?

A. If it hadn't have been for JP Morgan's interference and U-5 mismarking, I would have been at Merrill Lynch and earned much more than what I earn now.

Q. And there's a lot more to your answer, but we also testified about some of that. We're not going to say the same things we've been saying all afternoon. So, the higher analysis. The higher range. Mr. Spindler gave a $10 million – a $10.7 million dollar and an $18 million higher range. That was based on what assumption of what?

A. Of the liquidity events that did take place, per the press releases only from ███████ and only for clients I had already onboarded, this doesn't include the pipeline of prospective opportunities.

Q. Do you believe the panel should award you [inaudible] damages related to JP Morgan accounts in your JP Morgan pipeline that did not move their accounts [inaudible]?

A. Believing is one thing, but we're not asking for those damages.

Q. Let's look at Exhibit 3. Exhibit 3 is your scorecard from JP Morgan. We'll look at a couple things that stand out.

A. 2023, August?

Q. Yes, this is your final scorecard at JP Morgan, August 2023.

A. Yes.

Q. On Exhibit 3, page 5.

A. Alright. I'm there.

Q. What are the biggest things that stand out here?

S.09a.i-062
4:26-cv-00381-O
Biering v. JPMS, et al.

A. The black redacted boxes. The… are you talking about the new DMs?

Q. Yes.

A. Yeah. So on that top box, on the new DMs on top of page 5, the decision makers - So I have several line items that are ███ but there's a lot of plugged in ███ shareholders on how we do the financing, and that's the extent of the discovery we saw. But you'll see that starting in the months of January, February and March, a lot of the new business was coming to fruition and that's when I won the execs, the C-Suite and then.. But I'd get onesie and twosie intros before that broader ███ e-mail went out. So a lot of that is the new clients or new DMs but the new DMS includes more than just ███ as well.

[Unidentified Speaker Tag]: Can you just blow that up just a tad because I can't read the exhibit even with my glasses or that one, so...

A. And I would highlight the… I'm sorry, I didn't mean to interrupt.

[Unidentified Speaker Tag]: No, I'm just asking…

A. And what stuck out to me, to answer your question.

Q. The top, the top.

[Unidentified Speaker Tag]: I can't, it's just so [inaudible]

A. There's that number there in the bottom, right, far right, right in the middle. It's hard to see, but it says 230% growth year over year, solely from new clients that I have sourced. [inaudible] inherited. That I had sourced and that were fully committed to following me. 230% growth, which addresses Mr. Spindler's analysis and I believe Mr. Dunlap's questions of that in terms of what I was getting paid at JP Morgan versus Raymond James. A 230% for greatest conservative and doesn't account for 10 months of unrealized revenue. And what also didn't reflect in my JP Morgan pay statement, it was the incentive compensation that I had earned for



S.09a.i-063
4:26-cv-00381-O
Biering v. JPMS, et al.

2023 metric [inaudible] that I had already completed. So I was antic- I was anticipating a very large bonus, which would have put me at least in line with what I was making at Raymond James.

Q. Back to Exhibit 30, Mr. Spindler's summary. I promise we wouldn't go back through every single thing. The $10 million analysis that sits at the lower range, did that include Point Energy Partners?

A. No.

Q. So Point Energy, Point Energy Partners was a client in your pipeline at JP Morgan, and that is excluded from the analysis in the Spindler...

A. No, they were existing clients. I had already onboarded ██████ a year or two ago prior to this, and then Bryan Moody sent me his Know Your Client information for onboarding just the week prior.

Q. Did you have every chance to bring Point Energy to Merrill?

A. Yeah, ██████ was a good friend. He was at the ██████ table with me and David, and Michael Parelly was introducing himself to ██████ as my partner.

Q. So these numbers would be even higher, including Point Energy, a partner you sourced and brought to JP Morgan.

A. Yes, these numbers are conservative.

Q. Why not include them here?

A. I wanted to be in good faith, and be as extra conservative as we could in good faith.

Q. How much are you asking the panel to award you in lost earnings damages?

A. 18 million and whatever seems just inevitable.

Q. If the panel finds that the ██████ investors should not be part of your earnings analysis, alternatively, how much you're asking this panel to award you in lost earnings and damages?

A. 10.7 million.

S.09a.i-064
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's look at Exhibit 202, or the [inaudible] from 2016 through 2024, right?

A. I believe so, yes.

Q. And then we're going to turn to 207. 207 is your Raymond James [inaudible] A.   Yes.

Q. And Mr. Dunlap asked Mr. Spindler about this for quite a while: Are you making more money or less money at Raymond James now than you were at JP Morgan?

A. Based off of the stub year, more technically, but again I anticipated at least getting the same if not more. Should I have been awarded my incentive compensation for the metric year that ended September 30th, 2023.

Q. So the misleading part of those questions with Mr. Spindler earlier were…

THE CHAIRPERSON: Ok. Ask it some other way.

Q. The comp. you had, that was shown for JP Morgan, did not include what?

A. The larger portion of my all-in compensation and [inaudible] incentive compensation.

Q. And how many months of comp., of salary?

A. Two months missing, [inaudible].

Q. The last two months. So the last two months of salary, plus the incentive comp. not paid.

A. Yes. Or maybe no [inaudible] December, yeah.

Q. Exhibit 1, we're going to… Can you go to Exhibit 1 please? This is the U-5.

   MS.  CLEMENT:    Can we go back real quick? How much would you expect that you're instead of compensation bonus is going to?

A. It would be speculation because that's based off of a compensation pool, but I had one of the top years. I made the… I would have made

S.09a.i-065
4:26-cv-00381-O
Biering v. JPMS, et al.

the career of the broker of [inaudible] times 5 for a lifetime, so I was expecting at least $1 million.

Q. Exhibit 1. The U-5. On page one, reason for termination, it says discharge. What are you asking this panel to do with regards to your reason for termination on the U-5?

A. Change the marking from discharge to voluntary, as I voluntarily resigned.

Q. Ok. Still on the U-5. Top of page 2. JP Morgan provided a "reason for explanation." What are you asking this panel to change the termination explanation to?

A. To remove the comments in their entirety and leave blank.

Q. On page 2 is date of termination, which again, this is based on the final date of your capacity for which your registration was required at JP Morgan. You asked that that date be changed from 12/1/2023 to what?

A. October 28th, 2023.

*[ZOOM0025 ~ 0:24:18.2]*

Q. Ok. The ███████████ a █████ ons. Let's talk about those. Before you resigned on October 28th, 2023, did you have any idea Miss ████████ had made any a █████ ons against you?

A. No.

Q. Generally, what was the nature of your relationship with Miss ███████

A. Professional when we were in a professional setting, and friends and we developed a very close relationship outside of professional settings.

Q. Outside of the professional setting, what were you both going through?

A. Marital Issues.

Q. What do you mean marital issues?

A. I was going through a divorce, and ████████ confided in me that she was unhappy in her marriage, she had her own share of marital

S.09a.i-066
4:26-cv-00381-O
Biering v. JPMS, et al.

issues. She had gotten married right out of college, and [inaudible] a separate type of relationship with another JP Morgan employee out of ███.

Q. I'm sorry, did you just say she had a relationship with… a separate one from her husband?

A. Yes. Ma'am. Yes, ma'am.

Q. To the extent your relationship with Miss ███ became romantic, was it mutual?

A. Yep, I'd say so.

Q. Was it ever physical?

A. No.

Q. Professionally did she reach out… Or just as a friend, she reached out to you for advice, guidance, anything else?

A. Yes.

Q. Let's look at Exhibit 110.

A. I'm there.

Q. Exhibit 110 on page 2 is an e-mail string with you and Miss ███ on page two - Let me know if you're there.

A. I'm there.

Q. She sends you a draft e-mail, it's a draft. [inaudible] Thank you. She sends you a… It says draft - hi Ben and JT, but they're not on there. She's [inaudible] to you, right?

A. Yes.

Q. And right above there she says recirculating for your opinions. See that? A. I do.

Q. What was she asking you to do?

A. Part of the private bank model is to highlight positive things you're working on in community engagement, particularly in Fort Worth, is a very huge tenant. And I brought my partners, ███ and

S.09a.i-067
4:26-cv-00381-O
*Biering v. JPMS, et al.*

then Aimee Stone, who's now with Bank of America, to a meeting with the center of influence of mine, who is the CEO and chairman of the HEB Euless-Bedford Chamber of Commerce. And we just had a launch, an introductory lunch to see how we can partner and get more engaged in the community. And ████████ had asked me if she could just run with it and I was like, that's a great idea. And then she had asked me to set, to review a draft of the e-mail of what that would look like.

Q. And then she responds… you respond in the first page. What was her response back?

A. "Let's connect next week. Love the idea of you getting involved and engaged with the community. Discussion topics for us."

Q. You have to read all three of those. What are you providing? What are you describing to her?

A. Recommendations on how to approach JT and Ben...

Q. What was her response?

A. OK, sounds good. Appreciate your help and guidance on this?

Q. Ok. You just had a question about the associate in ██████ Let's move over to that. In the respondents binders there's a section, there's one tab, MM, so it's at the bottom on your right. It says MM – the bigger binder from the respondents.

A. I'm there.

Q. OK, this is M like Mary, M like Mary. What are these documents?

A. The text messages that I provided JP Morgan between myself and ████████

Q. Did you ask Mr. Jacobs to look at the text messages between me and Ms. ██████

A. Multiple times. Yes.

Q. What happened with that?

A. Based off his testimony and discovery, he did not consider them.

S.09a.i-068

4:26-cv-00381-O

Biering v. JPMS, et al.

S.09a.i-068

A.  The next day.

Q.  So we're turning to page labelled 2 1… -21892.

A.  I'm there.

Q.  I think we won't be able to pull that one up on the screen because we don't have... There. Ok. I'll read her messages at the top left and you'll respond. I'm not going to use a voice. OK? So Ms. ▮▮▮▮ writes, "Thank you for French fries and ranch water.", exclamation points, good… good convo of course. This is by the way, August 25th, 2023. She writes "and good convo, of course." Your response?

A.  ▮▮ let me know how ▮▮▮▮ goes."

Q.  Right. She disliked it. You write…?

A.  "I think I'm getting drunk with management."

Q.  Alright, we're going to touch on drunk with management. Who's the management guys you're getting drunk with?

A.  Aughinbaugh and Stewart.

Q.  OK, so we're going to… we're going to touch on that here in just a second. Let's back up to the ▮▮▮▮ thing. Where were y'all on August 25th?

A.  All four of us were at Buff Bros, across the street from the office, a frequent happy hour spot.

Q.  You… You, ▮▮▮▮

A.  So Aughinbaugh and Stewart were at the bar, and we were having separate discussions, it wasn't planned. And then ▮▮▮▮ and I were at a separate table catching up.

Q.  You and ▮▮▮▮ at one table, Aughinbaugh and Stewart at the bar?

A.  Yes, and the conversation with Ms. ▮▮▮▮ And this is all in what… Where's this bar?

A.  Across the street from the office.

Q.  In Fort Worth.

A.  That's right.

S.09a.i-070
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q. OK.

A. In this conversation that evening... You tell us – What's the word █████ mean?

A. It's her… The JP Morgan flame she had that lives in █████ is out of the █████ office.

Q. █████ refers to a guy.

A. Yes, [inaudible] I believe.

Q. And he works where?

A. JP Morgan, █████ Office.

Q. What was the relationship between this JP Morgan employee in █████ and Ms. █████

A. At an event in New York City, 6-8 months prior to this, it was a two week overnight event with a lot of different advisors from across the country, they had a fling in one of the hotel rooms. That's the extent. I don't know if there was any sort of sexual interaction or intercourse. She did share that she stayed a night in his hotel room, and I was asking who the hell are you Teams messaging and Snapchatting all the time?

Q. Ok. Is that the first time you two had talked about this? August 25th when you were at the at the bar talking about this guy █████ was that the first time you talked about him?

Q. No.

A. How long did you and Ms. █████ talk about this guy… this guy in █████ and Ms. █████ having whatever their relationship was?

A. Can't remember for certain but seems like a few weeks.

Q. Ok. Now in the same string… We'll keep on reading. You wrote. "I think I'm getting…" right there.

A. "I think I'm getting drunk with management."

Q. "Are you still there?"

A. "Yes, I'm told I've run my partners too hard."

S.09a.i-071
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. "What? What are they saying? Which partners?"

A. "I'm pretty sure I just quit."

Q. "Joshua David. I leave you with management for a FEW HOURS."

A. "I quit. I'm unemployed."

Q. Ms. ███████ sends a rolling eyes emoji and she writes "Not on my watch."

A. I'm out. Enjoy your alibi.

Q. Y'all, y'all go back and forth and I think you mentioned a few times – I'm out, I'm out and she's asking you questions about being out of the bar. What's going on? Right?

A. Yes.

Q. OK. What happened?

A. ███████ left to go, I guess meet up with ███████ and after she left I went over to link up with Stewart and Aughinbaugh at the bar to have drinks with them.

Q. OK, what happened in that conversation?

A. Stewart and I were still on good terms, and he left strategically in efforts for me Aughinbaugh to try to do a little team-building deal, and it ended up being one of those couples therapy, like, "I hear you, but have you thought about this?" And then more drinks started flowing. He's about 6'6", [inaudible], and I wasn't blessed with those traits, and we both were a few deep and things started escalating. He started accusing me of inciting an insurgency with other advisors, and trying to leave, accused me of working my partners too hard. And I walked out. I got up, I said "Fuck you. If you keep treating your top producers like this, you're going to…" or "If you keep treating people like this, you're going to lose your top producers."

Q. What happened next between you and Aughinbaugh?

A. I went home. The next morning, I was calling Ben Stewart. I was like, man, like this happened. I just don't know what it is, like it's

S.09a.i-072
4:26-cv-00381-O
Biering v. JPMS, et al.

just Aughinbaugh, it just escalated. We had a few drinks. And Ben calmed me down. 'Everything's going to be OK, everything's going to be OK." And then the next morning I had taken the day off because my son was sick or I was working on my hardwood floor or something. And uh. He called me and he said "I figured if you were a man, you would have come up and apologized or something." And I told him I was out and I was like, "Let's have a conversation in person." So I dropped everything, and then I got some pants or something on and then rolled over to his office. And,  yeah...

Q.  Did he reports you to HR or take any action against you?

A.  Not that I know of.

Q.  You faced any consequences for this?

A.  Not that I know of.

*[ZOOM0025 ~ 0:37:20.0]*

Q.  OK. Exhibit 152. I'll go back to the Claimant binder CX-152.

A.  I'm there.

Q.  We're jumping ahead to after you resigned on the 28th. We see an e-mail you received from Jonathan Jacobs, on November 2nd to set up a time to discuss a "confidential investigation." You see that subject line?

A.  I do.

Q.  When did Mr. Jacobs first reach out to you about a "investigation"?

A.  I believe it was November 2nd. I believe it was this, November 2nd.

Q.  What other details were you given about this "investigation"?

A.  None.

Q.  As of November 2nd, 2023, did you have any idea what the subject was of the investigation?

A.  No.

Q.  Go to Exhibit 155. What is this exhibit?

S.09a.i-073
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.**  This is a e-mail exchange between me and Mr. Jacobs coordinating the time and date of the… the zoom.

**Q.**  155, page 3, very bottom. Final e-mail. The e-mail on the bottom of the page, your e-mail on November 2nd, you wrote, "Thank you. I welcome the opportunity to visit as soon as possible. [inaudible] myself available." You see that?

**A.**  I think I got like something in my eye, sorry.

**[Unidentified Speaker Tag]:**  Do you want to take a break and go…

**Q.**  I don't think we need a break.

**A.**  Unless… No? I'm OK.

**Q.**  You sure?

**A.**  Yeah. It's like [inaudible].

**Q.**  Did you push back at all with Mr. Jacobs against… against… refusing to have a meeting?

**A.**  No, I was trying to coordinate schedules between Mr. Jacobs and Mr. Iacuone's Availability, asking my attorney to be a part of it.

**Q.**  And then eventually, the most recent one, page one, there will be a – the meeting is scheduled. It's going to happen over Zoom. At this point, did you still know the subject of the investigation?

**A.**  No, I did not. No, I did not.

**Q.**  Once you learned of the nature of Miss ███████ a ██████ ons against you, what was your reaction?

**A.**  Shocked.

**Q.**  Are they all true?

**A.**  No, They were not.

**Q.**  Did you attempt on multiple occasions to submit information and evidence to refute that you were inappropriate with her?

**A.**  I absolutely did, all the way through the end of 2024 and into 2025.

S.09a.i-074
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's look briefly at some of this. Exhibit 228. 228. Some of this evidence that you have requested the company… I' going to talk about the text messages that the investigator wouldn't look at. What other kind of evidence did you ask the investigator to look at?

A. I sent a very detailed timeline. I sent a list of individuals to interview with detailed questions, and then the employee opinion review - excuse me, the peer review feedback that I had gotten, everything.

Q. OK. Exhibit 228 is feedback for you from 2020 through 2025. You see that? A.    I do.

Q. Obviously, in 2025 you were gone, you resigned on October 2023.

A. Yes.

Q. Let's look at Exhibit 228, page 3.

A. I'm there.

Q. You'd requested on October 3rd - You had requested Ms. ███ provide feedback. When did she provide that feedback?

A. October 10th, 2023. Thank you so much.

Q. Now, previously there was testimony about a golf trip where you supposedly engaged in improper behavior. Recall that?

A. I do.

Q. what was the dates that were mentioned?

A. September 10th, 11th and 12th, 2023.

Q. So here the feedback provided is how much longer after the golf event?

A. Almost a month.

Q. OK. By the way, was she the only person that you invited on that golf trip?

A. No, she was third down the list.

Q. Who else?

S.09a.i-075
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** Austin Barr - didn't get the hall pass from his wife, and then actually ████████ s manager Will Brawley.

**Q.** Men at JP Morgan dating women at JP Morgan. Do men at a higher pay grade ever date women at JP Morgan with a lower pay grade?

**A.** All the time. In fact, it's actually touted on national calls. Whenever we would have senior leadership, we had weekly calls, typically in the morning calls, introducing products, partners, leadership. And whenever there were senior leadership, some CEO's of units would say, "There I was, 20 years ago on the floor, and there's my analyst partner. Now we're married for 20 years." So it was definitely, I guess, encouraged in some places and others not.

**Q.** In JP Morgan, people date co-workers of various pay grades, dating, going on trips, socializing?

**A.** The head of investments and advice, ████████ in the Dallas office, he was my associate peer at the time. He was hooking up with his analyst for a time and now they're married, and they still work in the Dallas office, and he's now their Head of Investments and Advice.

**Q.** What's his name?

**A.** ████████

**Q.** First, Miss ████████ discusses some qualitative wins among y'all. Is that right, in the feedback?

**A.** Yes.

**Q.** OK. On 228-6. I want to talk about the mentorship.

**A.** I'm there.

**Q.** OK, she says that you're a hands-on mentor, first hand witnessed mentorship to India, offshore analyst, summer intern, heard from past analysts.

**A.** Sorry, confirming 224?

**Q.** 228-4, yeah.

**A.** I'm there.

S.09a.i-076
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. You agree with with her feedback about you?

A. Yes.

Q. Anything negative indicated at all?

A. No.

Q. She touts at you. She says, "Speaking for myself, Josh looped me into almost every single client e-mail, a multitude of client meetings, internal meetings and so on." Right?

A. Yes.

Q. 228 page 6. Her feedback goes on for a couple of pages. Eventually at the top she wrote a conclusion: Overall, Josh Biering has been an excellent mentor to work under and it has been a privilege to be on his team. Learned from the variety of complex client needs that he solves right?

A. Yes.

Q. Based on this feedback from Ms. ▮▮▮ what, a few weeks after the golf trip give you any reason to believe Ms. ▮▮▮ had any issues, a ▮▮▮ ons, concerns against you?

A. No, but I'd like to highlight she supported multiple teams, not just mine. And if there were more reviews provided, you would see she had to write reviews for other bankers across the floor that she supported as well.

Q. Who was her… Were you her direct supervisor?

A. No.

Q. Who was?

A. Will Brawley.

Q. Why was it important for JP Morgan to investigate… to look at this peer review in connection with the investigation about her a ▮▮▮ ons against you?

A. Well, their primary claim was that I was a sexual predator and committed inappropriate behavior towards her, which these would be, again, exculpatory

S.09a.i-077
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's go to Exhibit 226. We see a text message string between you and Ms. ███████ right?

A. Yes.

Q. And what date?

A. These are September 10th.

Q. Ok. Again, the gold trip was September 10th through 12th, right?

A. Yeah, and this is September 10th and 12th on the same page.

Q. Ok. At the very middle here, the text messages start 9/12/2023, the earliest ones at 8:04.

A. 8:08.

Q. 8:08 AM.

A. Yeah.

Q. I'll read hers, you read yours. She writes, "Thank you again for inviting me" exclamation points. "I had a great time, and really enjoyed getting to play" exclamation points.

A. "Thank you so much for coming"

Q. She loved your comment.

A. "Let me know when Jackie," her mom—I met her at Houston a few weeks back—"…wants to open those accounts." Double emoji, double emoji.

Q. She says "You'll be the first to know" emoji.

A. "Are you back on the road?"

Q. She says. "Yes, sir." Alright, anything to indicate here that there should be any kind of concern or problem with how that golf trip would go?

A. No, and actually, after the gold trip, I had dropped her off at her parents' house and came inside and visited for about an hour and a half. Her mother and her grandmother wanted me to be their banker and open accounts.

Q. The next page, and this is still the same day, September 12th. The top. I'll read hers, she writes. "I was coerced…" Wait, I'm sorry,

S.09a.i-078
4:26-cv-00381-O
Biering v. JPMS, et al.

yeah this is still the same day, September 12th, okay? She writes "I was coerced into coming to this bowling thing :) But I'll log on tonight.

A. "No need to. How's the bowling thing?"

Q. "Well, not much bowling is happening" Emoji. "It's good though." Exclamation points. "Food is mid but drinks are good."

A. "Nice."

Q. "This place is close to you I think."

A. "Yeah, it's in Clearfork. I'm way too tired, unfortunately cannot make it."

Q. "Lame, but understandable. I too am exhausted."

A. "How's everyone's morale?"

Q. And y'all go back and forth. Anything to indicate she has any concern issues with you on the evening after the golf trip.

A. No.

Q. In fact, she's inviting you to come hang out for drinks, food and bowling. A.    Yes.

Q. 2/26. Page 4. This is the next day, September 13th. She refers to her— this is the top, five down from her on the left. She writes, "Just can't eat, sleep lately but it'll go away. You should take your time off", you see that?

A. I do.

Q. What was your response?

A. Question, exclamation point. Question, exclamation point. "How can I help?"

Q. What do you mean? Why are you offering to help?

A. We confided in each other and commiserated on things more than marital struggles; stress in all forms. I wanted to make sure I was returning the favor and help.

Q. And she responds that she appreciates you, right?

S.09a.i-079
4:26-cv-00381-O
Biering v. JPMS, et al.

A.    Yes.

Q.    Any indication of any problems between you two?

A.    Not at all.

Q.    These are the same text messages you wanted the investigators to look at, right?

A.    Yes.

Q.    OK, next it's on page 7. 226-7.

A.    I'm there.

Q.    September 14th. You had told her about taking some time off.

A.    I did.

Q.    OK, was her response?

A.    "Hey, I just wanted to say take literally as much time as you want/need. And don't feel like you have to worry about me or anything. Just don't be gone so long that you forget about me lol. But really, and we didn't get to talk much tonight, but please always feel like you can talk to me about whatever is going on. I'm here for you, Josh." Exclamation, exclamation.

Q.    Did you believe her?

A.    Yeah.

Q.    Turn to page 226-14. The bottom left.

A.    On there.

Q.    This is September 25th, 2023. You're discussing potential job opportunities for her in Washington, DC?

A.    Yes.

Q.    What did she tell you about that? I'm sorry, this is the middle, [inaudible] Kind of the big [inaudible] in the middle. Not to be dramatic.

A.    She shared she and her husband are going up to DC. And I was like, "Oh, what's going on in DC?" "Well, I just want to go visit the DC office and see how they operate." And I'm like, "OK, what else?"

S.09a.i-080
4:26-cv-00381-O
Biering v. JPMS, et al.

Paul Dawson, her husband, was interviewing for a economic… economics Department of Defense role, and then she shared that he submitted an application and they don't know yet if he's going to get it or not but. That's where he left off. And then I said, "Man, that would sure be a bummer to lose you, but I totally understand, mobility is important."

Q. And she had written "Not to be dramatic lol but the thought of anything pulling me off of your team makes me borderline emotional." Those were her words?

A. Yeah, that's what she texted.

Q. Next on 226-16. This is October 4th. The very bottom. There have been no texts from you that day on October 4th, she sends you a text at 11:30. She writes "Nothing important but just thinking of you and hoping you were having a peaceful day." You see that?

A. I do.

Q. You know what prompted them?

A. No.

Q. To next page, 226-17. Bottom left on October 5th. She writes.. It's the first message – I'm sorry. This is October 5th 6:06 PM, she writes. "Thought about you a lot today and just hope that you're doing OK." What was your response?

A. "Thank you. Ironically enough, I think I'm physically sick with like the flu or something haha. Nothing marital related, just sick."

Q. Were you missing work that day?

A. I took off.

Q. Next 22618. Top. Top half. She sent you, about the middle there. October 6th, she sent you a baseball emoji. See that?

A. Yes.

Q. What did that mean to you?

A. We use that to switch messaging to signal.

Q. What's Signal?

S.09a.i-081

S.09a.i-081

4:26-cv-00381-O
*Biering v. JPMS, et al.*



S.09a.i-082
4:26-cv-00381-O
Biering v. JPMS, et al.

kind of find it in the binder. It's the second blue slip sheet. After the second blue slip sheet will be an e-mail from - It's not redacted, Mr. Dunlap to [Inaudible].

*[ZOOM0025 ~ 0:55:53.6]*

A. Yup.

Q. OK. This is the e-mail you sent November 13, 2024, right?

A. Yes.

Q. OK. You send this e-mail and on the last page we've got a drawing here from you, right?

A. Yes.

Q. Ok. Spend a lot of time on this the other day. What's this? What's this copying or what are you referring to? What's this from? Inspired by?

A. MacGruber. The movie MacGruber.

Q. OK how did the movie MacGruber inspire this?

A. Umm, well, I was hanging out with...

Q. Well, [inaudible] Macgruber is is a movie?

A. It's a movie, a comedy.

Q. Ok, starring who?

A. Will Forte.

Q. Ok. Will Forte is a comedian. We know him from what TV show?

A. Saturday Night Live.

Q. He gets [inaudible] be a comedian. Do you?

A. No.

Q. Ok. He's the star of the movie MacGruber. And the movie MacGruber [inaudible]...

A. Draw this picture, slightly different.


S.09a.i-083
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   Okay. Did it have the same comedic effect? Did your drawing have the same comedic effect as MacGruber's in the comedy?

A.   No, it was childish.

Q.   The other side keeps bringing up drawings like this from you or emails from you in 24? Does that… does it have anything to do with JP Morgan weaponizing a U-5 against you?

A.   No, it was being stressful. And these were right around the time they were delaying discovery issues. More delays, more legal fees, and more time in which JP Morgan held on to my clients because of their narrative.

Q.   Speaking of that, going back to our binder, Exhibit 113. 113, brought up this text earlier, but I missed something important about it. Exhibit 113 is a text between you and ████████ ████████ is at ██ Dental?

A.   Yes, ████████████ he had about 50 million.

Q.   OK. In this text message, November 28th, Mind scrolling down a bit to [inaudible].

THE CHAIRPERSON: You're there right now [inaudible]

Q.   November 28th, 2023. Had you been informed by JP Morgan that you've been fired?

A.   No.

Q.   What do you know about November 28th, 2023 when it comes to ██

A.   They visited ██ 3 times and then ████ that day, and then we're headed to ██ the next day for ██████

Q.   What's going on the 28th with ██ What did you find out?

A.   Oh, that same line of credit that I fought so hard for and got so much pushback, they delivered a term sheet to double it to 20 million.

Q.   You mentioned a bus earlier, what were you talking about?

A.   He referred to them as peeps. Typically that refers...

S.09a.i-084
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q. The bus, what was the bus earlier?

A. A metaphor for all of the JP Morgan advisors and team that they were going to smother [inaudible].

Q. Ok. On the 28th. On the 28th had anybody at JP Morgan told you you've been canned or fired?

A. My assistant, Katie Lynn texted me saying why the hell were you fired? And that was like days afterwards. But outside of that...

THE CHAIRPERSON: I'm sorry, days after November 28th?

A. No, days after October 28th. She asked "Why the hell were you even fired?" I was like, "I didn't know that I was fired."

Q. Ok, so you resigned on the 28th. Between October 28th you resigned. What was the date you were called and told that JP Morgan is waving the rest of the garden leave policy and taking a position that you're terminated?

A. December 1st.

Q. OK. We're looking at the text on November 28th from ██ asking you about being canned. How many days before – how many days later do you learn from JP Morgan that you've been, that they're "terminating" you?

A. Either 30 or 31 days, in November.

Q. Two or three?

A. Yes.

Q. So two or three days before you're told by JP Morgan that they're ending your garden leave and taking a position that you're terminated, they've already been telling your client ██

A. Yeah, this was just one of them.

Q. Best witness.

*[ZOOM0025 ~ 1:00:32.9]*

S.09a.i-085
4:26-cv-00381-O
Biering v. JPMS, et al.

THE CHAIRPERSON: OK, I have a few questions and I think the panel does too. Let's go back to the least controversial first and work through. Is there any writing of any kind, an e-mail, a letter and agreement to evidence the agreement by JP Morgan to pay for your attorneys fees in connection with the expungement?

A. Not that's been produced. No, Sir.

THE CHAIRPERSON: Have you ever seen one?

A. I recalled one vaguely, but I can't sit here and say affirmatively there was one. So in short, no.

THE CHAIRPERSON: Ok. Was a – and I don't care whether you answer this or your council does, but was there a written demand sent to JP Morgan to reimburse Mr. Biering for his fees?

MR. IACUONE: Yes, Your Honor, we sent a letter to JP Morgan saying, hey, you need to pay these fees. The response we got back was not. "We never said that." The response we got back was "We can't find anything where we said that in writing", were the exact words.

THE CHAIRPERSON: OK, are those documents in the exhibit binders?

MR. IACUONE: I can find out on a break, yeah. We can find that on the break.

THE CHAIRPERSON: Alright, let's move on to…

(Speaker tag uncertain):    Before you move on.
THE CHAIRPERSON: OK, go ahead. Sorry.

(Speaker tag uncertain):    When was that demand? Sorry, when was that demand?
MR. IACUONE: I'll double check. I think there was a there was a request before and after be.

S.09a.i-086
4:26-cv-00381-O
Biering v. JPMS, et al.

(Speaker tag uncertain):    Before and after the termination?

MR. IACUONE: No, no, no, no, no. During the expungement process. Yes, yes, during the expungement process.

(Speaker tag uncertain):    Sorry.

THE CHAIRPERSON: Oh, that's OK. Alright, let's go to the golf event of September 10, 11 and 12. First of all, where did it take place?

A.

THE CHAIRPERSON: ██████████ is what I would say is an elite private.

A.    It's Tiger Woods's private venue, yes.

THE CHAIRPERSON: How many clients were at that…?

A.    My clients were Mike and Mark, but they're like brothers to me and we were not there on client capacity, client-advisor capacity.

THE CHAIRPERSON: OK. How many JP Morgan clients were there?

A.    Zero that I know of outside of Mike and Mark, which were my friends.

THE CHAIRPERSON: Okay, and was Mr. Brawley on the trip?

A.    No, but Mr. Brawley knew of the trip. I had emailed Ben Stewart, Will Brawley and Brooke Reeb and copied ██████ that we were taking the day off to go to this event, and Brooke Reeb replied, "Got it, have fun." But that email has not been produced.

THE CHAIRPERSON: And I really don't care about that. Thank you, though. But so the only people from JP Morgan on the trip were you and ██████

A.    Yes, sir.

THE CHAIRPERSON: Alright, and how many nights did you spend at the clients home?

A. It wasn't the clients home, which is the first clarification. It was not a clients home.

THE CHAIRPERSON: What was it?

A. It was the lodging provided for by the venue and the event. Every, every attendee had their own lodging provided.

THE CHAIRPERSON: So ▮▮▮▮▮ has cottages or some such thing for… for its members.

A. Yes, sir. And guests.

THE CHAIRPERSON: And… But how many nights did you and ▮▮▮▮▮ spend at ▮▮▮▮▮

A. All of us spent two nights.

THE CHAIRPERSON: OK. And during both of those nights, did you and ▮▮▮▮▮ share a room?

A. Yes, sir.

THE CHAIRPERSON: That's all I have, do you have any questions?

(Speaker tag uncertain): I do. Were the clients going to be… were they your friends? Were you taking them there with the purpose to have them become clients or was it simply just an event?

A. It was just an event. So Mark is my client, he was on - he's the chairman of the board, and I'm on the board. ▮▮▮▮▮

(Speaker tag uncertain):    And he was with you or not with you?

A. He was with us, it was Mark and his brother Mike, but…

(Speaker tag uncertain):   They were both in the cottage or whatever with you guys.

A.   We gave them the other two rooms, yes, ma'am.

(Speaker tag uncertain): And one of them was a client and one of them was not?

A.   I mean they're both clients of mine.

(Speaker tag uncertain): At the time that you attended the event?

A.   Yes Ma'am.

(Speaker tag uncertain): Okay, it just wasn't clear from the questions.

THE CHAIRPERSON: So when she said she enjoyed playing, you guys played as a foursome?

A.   No, she was my partner, scramble partner, and we got paired randomly. It was like a tournament format for a day and a half. It was… it's called the Lone Star Invitational. It was the Dallas Fort Worth chapter against the Houston chapter, ██████████ [inaudible]

THE CHAIRPERSON: So it was a ██████████ event.

A.   Yes, sir, we're on the board of ██████████

THE CHAIRPERSON: And did you seek reimbursement from JP Morgan for any of your expenses associated with that event?

A.   No sir, I paid out of pocket. JP Morgan has a firm policy on not sponsoring golf events.

THE CHAIRPERSON: Ok.

(Speaker tag uncertain): I have additional questions. Different topic, real quick. So Texas Capital – when did they pull back the offer that they made?

A.   It was ██████████ It was before Merrill Lynch, but it was shortly after the ominous administrative leave call. So they were spooked earlier because of the U-4 bankruptcies and compromises, and they

viewed me as a problem child as soon as we shared there's most likely U-5 language coming.

(Speaker tag uncertain):    So after the call that you were put on administrative leave, but before you were terminated.

A.   Yes, ma'am.

(Speaker tag uncertain):    Would you consider Texas Capital as the same type of business entity as Raymond James?

A.   Different, but more capabilities than Raymond James. Rob Holmes was the CEO and chairman, is the CEO and Chairman of Texas Capital now, and he came from JP Morgan. He was one of the heirs of parents to Jamie Dimon and similar to Matt Zames and several, they didn't know when Jamie Dimon was leaving, so he had this opportunity at Texas Capital, and they are in high growth form. I actually introduced – I kind of regret it, but the recruiter I spoke with, I spoke with them about ideas I had about Texas Capital becoming the name brand lender for the ████████████████████ because that was one of my haves. And they were, and I turned up, I ran into Rob Holmes at the grand opening and said congratulations, but he's building a mini JP Morgan, and they're in huge growth mode and it was exciting…

(Speaker tag uncertain): So more capacity than Raymond James, but less capacity than JP Morgan and Merrill Lynch as two services being offered?

A.   It's different and I didn't – as soon as Merrill Lynch was the front runner, you know, the back runner was Texas Capital. But as soon as I called them after Merrill Lynch, the weren't interested.

(Speaker tag uncertain):    And did you ever get a formal – formal – I'm losing my voice – Formal offer letter from Texas Capital?

A.   No formal offer letter pending claim U-5.

(Speaker tag uncertain):    Ok, and I touched on this briefly when I interrupted and apologized, but I asked about what happened with your clients, the 65%, and I think there was supposed to be an exhibit, but I didn't see it. So you said it was split between various people. Did the vast majority of those people stay-that it got split between-were they all within the Fort Worth office? And I know you said 12 brokers subsequently left. I don't care about the particular brokers per se, but did it all stay in the Fort Worth office?

S.09a.i-090
4:26-cv-00381-O
Biering v. JPMS, et al.

A. It's a great question. And I can be detailed or succinct, but there were a handful that they transitioned to the Dallas office, to the other private bank. And there were some clients they identified as high risk of leaving, and the way their metrics work that they transition those clients before they leave to a Chase private client partner, they- they're not dinged on their scorecard. So that happened to several clients. And the unique part of this is the former Bear Stearns unit JP Morgan acquired. Their brokerage arm was JP Morgan Securities out of the Dallas Crescent, which they're more institutional and they operate more like a wirehouse. I have a great relationship with them. In fact, they were my bankers until JP Morgan kicked me out of the bank. I had moved the █████ relationship and several of my clients from the Fort Worth JP Morgan private bank to be serviced by JP Morgan Securities in Dallas. So for these complex derivative transactions, we linked arms and we have a fantastic working relationship and we still do.

A. I had moved the █████ relationship and several of my clients. From the

(Speaker tag uncertain):    But did the Fort Worth office get credit for that notwithstanding they were being handled by the Dallas office?

A. They tried to. They actually…

(Speaker tag uncertain):    It's just a yes or a no.

A. Yes, Ma'am, sorry. I don't know if they got compensated, sorry.

(Speaker tag uncertain):    You don't know if it was attributed to Fort Worth overall success in that regard.

A. For the first trade, it did.

(Speaker tag uncertain):    OK. And then out of all those people that stayed in the Fort Worth office, do you know what percentage went to JT?

A. JT as the market manager was unloading his book because his metrics were tied to the broader market. All my █████ relationships went to Tye McClure. There's an exhibit where he gets 200 million. The $12 million of Mike [inaudible] that was singing the praises went to █████ Biley, part of Ben's team, and then Point Energy Partners went to Jake Schneider and Parker [inaudible], part of JT's team. So they got all the credit.

S.09a.i-091

4:26-cv-00381-O

*Biering v. JPMS, et al.*

(Speaker tag uncertain):    So Ben didn't get any other additional – or those declines that weren't transferred to Ben, but they were transferred to Ben's subordinates, it's fair to say? Or team I should say?

**A.**  So Ben did inherit some clients, but I don't know what the breakdown was.

(Speaker tag uncertain):    Ok. Sorry, I just… I had notes so I tried not to interrupt as much. I believe that's it.

**THE CHAIRPERSON:** All right, let's take a... Let's be back here at 4:10 and to commence your cross.

(Speaker tag uncertain): OK.

**THE CHAIRPERSON:** Alright? Thank you.

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.09a.ii

## Hearing Transcript — Cross Examination of Joshua D.S. Biering

**Description:** Hearing transcript excerpt — Cross Examination of Joshua D.S. Biering (Claimant; former Private Client Advisor, Fort Worth, formerly J.P. Morgan Private Bank; currently Raymond James). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025; December 12, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 8 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0024, ZOOM0025, ZOOM0026, ZOOM0027, ZOOM0028, ZOOM0029. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

S.09a.ii-001
4:26-cv-00381-O
*Biering v. JPMS, et al.*

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

———————————

S.09a.ii-002
4:26-cv-00381-O
Biering v. JPMS, et al.

**CROSS EXAMINATION**
**BY MR. DUNLAP:**

*[ZOOM0026 ~ 00:00:00]*

THE CHAIRPERSON: And you may start your cross.

Q.   Thank you, Mr. Chair. Mr. Biering, your council asked you about the selection of emails behind AAA. I'd like you to turn to AAA in our book, please. A. Yes sir, I'm there.

Q.   So we have a number of emails here and they are split up by a blue sheets. Why didn't you stop sending these when you were asked to stop sending them?

A.   JP Morgan kept delaying and stonewalling. I thought this would get the attention and some of these are childish.

Q.   OK, so you're aware, are you not, that I asked your counsel, Mr. Iacuone, on 2 separate occasions to get you to stop emailing us, correct?

A.   I don't know.

Q.   You don't know?

MR. IACUONE: Why are you talking about attorney-client communications between us? That's not going to happen.

THE CHAIRPERSON: Well OK, but that isn't what he really asked for... He wants to know whether your client was aware that he had asked you to have him stop sending communications. In other words, did you pass along his request?

     MR. IACUONE.    Did you ask him to?

MR. DUNLAP: I can't talk to your client. You represent him.

MR. IACUONE: We're all on the emails together.

S.09a.ii-003
4:26-cv-00381-O
Biering v. JPMS, et al.

**MR. DUNLAP:** I can't talk to your client.

**THE CHAIRPERSON:** OK. I will say all of this is of - most of it I've already, we've already seen, and most of this is frankly of marginal interest. Clearly some of it I think Mr. Biering has already said was childish and he probably wishes he hadn't done it. But I'm not going to cut you off. But I'm going to tell you, I really hope you're not planning to linger over this, because it is, strictly speaking, just color and not relevance.

Q. OK. The... My partner who handled the expungement matter was Heidi VonderHeid, correct?

A. Yes, Sir.

Q. And you included her in some of these emails, correct?

A. I believe so.

Q. She, on behalf of JP Morgan, did not contest the U-4 expungement matter. Correct.

A. To my knowledge, yes.

Q. Have you ever testified under oath before?

A. Yes.

Q. How many times?

A. Per proceeding or per days? Two per proceeding. Well, correction, there's three per proceeding.

Q. Explain to me what you mean by that.

A. When I was in the military, part of the UCMJ, did some work and my divorce court.

Q. Ok. You recognize, therefore, testifying like you are here today, this is under the penalty of perjury?

A. Yes, sir.

Q. Alright, where do you live?

A. I live in Fort Worth, TX.

S.09a.ii-004

4:26-cv-00381-O

Biering v. JPMS, et al.

Q.   What? Give me your specific address please?

A.   4635 Washburn Ave. Fort Worth, TX 76107. That address was different at this time.

Q.   You just said that address was different at this time. What does that mean?

A.   I had a different homestead during 2023.

Q.   OK, so you've lived at the Washburn Ave. location for how long?

A.   March of 2024.

Q.   Who do you live there with?

A.   My dogs Teddy and Woody and my son part time.

Q.   Is that a home or is that a... an apartment or is that a townhouse? What is it?

A.   It's a home.

Q.   OK. Do you have any plans to move from that location as you sit here today?

A.   Not that I know of, no plans.

Q.   Alright. You were born October the 23rd 1989, correct?

A.   That's correct.

Q.   So therefore in 2023. You were 34 years old, correct?

A.   Yes, sir.

Q.   Ok just I'm... I'm gonna just ask you to just let me finish before you answer, OK? Fair enough?

CHAIRPERSON:    I understand. You can get some background, I'm aware of concerns and I'll let it go for some time.

MR. IACUONE: I'll just say, he's answering the questions.

MR. DUNLAP: I'm just, I'm just trying to get a break between... between when I... I finish and he answers.

THE CHAIRPERSON: Yup.

S.09a.ii-005
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. You... You secured securities licenses while you were employed by JP Morgan, didn't you?

A. Yes.

Q. You have a series 763 and 65, correct?

A. Yes, and a few more.

Q. OK, the... the 763 and 65 were secured at JP Morgan, correct?

A. Yes.

Q. What other securities licenses do you have?

A. Security specific from JP Morgan or currently?

Q. What do you have currently, and then I'll break it down from there?

A. Umm, the Texas Department of Insurance and license in various States and I have, uh, is the, uh. Interest rates and derivatives securities certifications.

Q. Did it… Did you secure any of those after leaving JP Morgan on December 1st of 2023?

A. The interest rate swaps and derivatives I did.

Q. So just that license.

A. Yes, Sir.

Q. Is that a license or is that a certificate or a certification?

A. That's about my pay grade.

Q. OK, so you don't know if for example it corresponds to a specific number.

A. Not that I know of.

Q. When you... when you got these licenses, you were paid by JP Morgan to study for your licenses, correct?

A. I studied for my licenses while completing all my obligations as an associate and going to school.

Q. And JP Morgan sent you to school to study for those licenses, correct?

A. No.

S.09a.ii-006
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK. Did you... did you pay for the license exams themselves? Or did JP Morgan give you that money?

A. JP Morgan did not give me money.

Q. Did JP Morgan reimburse you for your licenses?

A. The... we're talking securities license, correct?

Q. The... the Series 763 and 65 that you got when you were an associate at JP Morgan, that's what I'm talking about.

A. In some shape or form, I believe JP Morgan did cover the cost. How... I'm not sure.

Q. Now you, you, you testified to this on direct. You accepted a position with JP Morgan in February of 2016, correct?

A. Correct.

Q. But you didn't start working with JP Morgan until, you said this spring, and I'm... I'm going to suggest you May of 2016. Does that sound right?

A. Yes, Sir.

Q. What happened between February and May of 2016?

A. I was on my terminal leave for the army.

Q. OK. Did you... were you affiliated with JP Morgan in any way, shape or form?

A. Just accepted the offer.

Q. So did you, did you get training during that time?

A. Through JP Morgan.

Q. Yes.

A. I can't recall.

*[ZOOM0026 ~ 0:08:00.6]*

S.09a.ii-007

4:26-cv-00381-O

Biering v. JPMS, et al.

Q. OK. I... I want to take a look in the smaller book that we have there at Exhibit A, please. You recognize Exhibit A, do you not, Mr. Biering?

A. Yes.

Q. If you go to the second page of Exhibit A, you can see this is JPMS 578 bottom right. Do you see that?

A. Yes.

Q. And this shows that the offer letter that you received from JP Morgan is dated February 18th of 2016. Do you see that?

A. I do.

Q. OK, It is addressed to you, Joshua Biering at 1514 Habersham St. in Sa ████ , GA. Do you see that? Do you see that?

A. I do.

Q. OK. If we go - you can hold that first page because I'm going to come back to it, but if we go to JPMS 583.

A. In the same tab?

Q. In the same tab.

A. I'm there.

Q. You signed this document on February 18th, 2016, did you not?

A. Yes, that's what it says.

Q. And you understand, don't you, that when you signed this, you were signing a contract with JP Morgan, correct?

A. That's my understanding, yes.

Q. When you signed this, you were intending to abide by the terms and conditions in this contract, correct?

A. That's my understanding, yes.

Q. OK, go back to that first page please.

A. I'm there.

S.09a.ii-008
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK, here if you look at the second line. It says there "You will join us as a Military Officer, Executive Development Program Associate, Dallas, TX at Chase Bank USA NA, which we'll refer to as Chase." Do you see that?

A. Yes.

Q. So you knew at that time that you were going to join as an associate and you were working with Chase Bank, correct?

A. I did not know the difference at the time. It's very convoluted. I view it as one company, JP Morgan and Chase.

Q. You recognize, don't you, sir, that you while you were at JP Morgan, you were an employee of JP Morgan Chase Bank, NE- Excuse me, NA, correct?

A. Yes.

Q. And you recognized correctly that when you were there, the securities licenses that we discussed, those were held by the broker dealer JP Morgan Securities, correct?

A. I understand that now. Yes,

Q. OK. It says here your manager will be Jeffrey Hassman. Do you see that in the first paragraph?

A. I do.

Q. How long were you managed by Mr. Hassman?

A. Three days.

Q. OK. Do you see where it says your pay over to the left in bold?

A. I do.

Q. Your starting annual base salary was $100,000. Do you agree with that?

A. I do.

Q. And then the next bolded area down special cash award. JP Morgan gave you a one time sign on award of $25,000, correct?

A. Yes.

Q. Alright, let's go to the second page please. OK. I want to look under terms and conditions there. Tell me if I read this correctly, and I'm looking at the third paragraph there. "This offer of employment is subject to all the terms, conditions and attachments included in this document, the binding arbitration agreement and all Chase policies and procedures, including but not limited to the JP Morgan Chase Code of Conduct." Did I read that correctly?

A. Yes.

Q. So you knew back in 2016 when you signed the contract, that your employment there was subject to all the policies that would apply to you, including the law of conduct, correct.

A. To the letter of the law here, no. But that's just what any standard person in my position would assume. There's procedures and code of conducts.

Q. I'm not sure I understand what you just said. I'm asking you if when you signed this contract, you agreed to abide by all the policies, including the Chase code of conduct.

A. That's correct.

Q. You, you did. You did agree, correct?

A. I did.

Q. OK. Alright. The next paragraph there…

A. On which page sir?

Q. The same page... the next paragraph. You're on the same page. OK? It indicates that your first 90 days would be an introduction, but if you look at the second line over to the right, it says you're an "at will" employee both during and after this introductory period, which means that either you or Chase can end your employment at any time for any or no reason. So you realize that you were going to be in that will employment – An at will employee the entire time that you were with Chase, correct?

A. Yes.

S.09a.ii-010
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Let's... let's go down to the very bottom there and keep going a little bit. There you go. Thank you, sir. So there - you would agree with me, would you not, that in your contract there were a couple of what we call restrictive covenants or limitations on your post-employment conduct, correct?

A.  I do see that.

Q.  OK, So the first one where it says that on JPMS 579 where it says non solicitation. Do you see that?

A.  I do.

Q.  Basically this what this says is for a year after you leave, you cannot poach away JP Morgan's employees, correct?

A.  That's what it reads, yes.

Q.  OK. And then if we turn to the next page at the top where there's a paragraph that says "Additionally." Read, if you will, the first four lines there out loud.

A.  "Additionally, during your appointment and for one year after you leave Chase, you agree you won't interfere with current Chase customers, suppliers, or other persons or entities that do business with Chase. By interfere we mean attempt to or actually solicit, induced to leave Chase, divert from doing business with Chase, or otherwise interfere with the business relationship any party has with Chase. This includes parties you directly worked with while employed at Chase, or whose names you know because you worked at Chase."

Q.  OK. So you knew when you signed this contract, Mr. Biering, that in addition to a limitation for a year on poaching away employees, you were not to solicit or try to divert any customers you worked with at Chase to leave and go elsewhere, correct?

A.  Correct.

Q.  And the next paragraph or next sentence, if you will, says you agree not to conduct these activities personally or on behalf of anyone else directly or indirectly. Do you see that?

S.09a.ii-011
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I do.

Q.   Alright. If you go to the bottom of that page, so we'll scroll a little bit on the screen behind you, OK? Do you see at the bottom there where it says if you have any questions please contact our pre-employment team and it gives an 877 number.

A.   I do.

Q.   Did you contact 877 with any questions?

A.   At this time?

Q.   Yeah.

A.   No, I contacted Reggie Brown below in the signature block.

Q.   Who is Reggie Brown?

A.   He was the HR point of contact and liaison for that... the Military Officer Executive Development Program.

Q.   And... and what did you contact Mr. Brown about?

A.   Where do I get my badge? Where's the bathroom? Just basic, you know, but wet behind the ears type questions.

Q.   OK, let's go to the next page please, ███████  So now we're at JPMS 581. Do you see that?

A.   I do.

Q.   OK. The top sentences there say, and I quote, it says "The following provides a summary of how JP Morgan Chase and Co its affiliates and its subsidiaries and the entity that employs you or for which you provide services collectively, JPMC, conducts systems monitoring." Do you see that?

A.   I do.

Q.   It goes on here to talk about the monitoring activities, and so you were aware when you signed this contract that JP Morgan would be monitoring your emails, correct?



S.09a.ii-012
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I did, and I was aware of a monitoring system. Following my resignation. I asked for clarification and did not receive that from Ms. Tidwell and team.

Q.   OK. And it says there like 4 lines from the bottom. It says "JPMC may at all times monitor, access, retrieve, record and review information obtained from the monitoring activities for various purposes, such as preventing and investigating activities that may violate JPMC's policies and ensuring compliance with legal or regulatory obligations." I read that correctly, did I not?

A.   Yes.

Q.   So you knew at that time that there was a possibility that you would have communications that JP Morgan would look at, so that they could make sure that if there were legal or regulatory problems, they would deal with it, correct?

A.   I didn't know what platforms that entailed. I even got a new phone in order to make sure there was a delineation, which is why I got a new phone number.

Q.   The next paragraph there, it says the monitoring activities paren including JPM C's collection and processing of personal or other information. End paren are required for purposes of your employment or work assignment to promote adherence to applicable policies and regulations. Do you see that?

A.   I do.

Q.   And then finally, the paragraph right below that, this is above the last paragraph, second line. It says, information obtained from the monitoring activities may be used as the basis to take disciplinary actions up to and including termination or other legal action for violations of JPMC's policies or applicable laws. Do you see that?

A.   I do.

Q.   So you knew at that time that to the extent that you did something by way of e-mail or other communications, you could be disciplined up to and including termination for that activity, correct?

S.09a.ii-013
4:26-cv-00381-O
Biering v. JPMS, et al.

A. I would assume yes.

Q. Alright, let's go to the next page. So if you can scroll it a little bit more, ███ to getting acceptance and code. OK, great. Right there. Alright at the bottom of JPMS 582, we see "acceptance and code affirmation" in bold to the left. Do you see that?

A. [inaudible] on my copy. Oh yes, I do, yes I do.

Q. OK. So read, if you would, the first two lines there under that.

A. Upon signing this letter, I accept the terms described above. I also affirm that I have read and understand the JP Morgan Chase conduct, and agree as a condition of employment to comply with the code as amended and revised from time to time.

Q. OK, so by signing this, you were affirming the code of conduct and agreeing to abide by its terms and conditions, correct?

A. That's what this says, yes.

Q. OK. And then the next bullet says, I understand that I can access the code via the Internet and it gives an HTTP: address there. Do you see that?

Q. I do. I also accessed the How we do business principles and (Speaker tag uncertain): [inaudible].

A. Yes I did.

Q. OK, and it also says then, and in the second, the next line down. And through the firm's intranet, once I begin employment, do you see that?

A. I do.

Q. So you knew at that time that the code of conduct is achievable from anybody or by anybody by looking at the Internet, but when you got to your employment, you would go to the intranet to see that, correct?

A. Correct, both are the same.

Q. OK. If you go down to the third bullet there in this contract, do you see where it says as a JP Morgan Chase employee?

S.09a.ii-014
4:26-cv-00381-O
Biering v. JPMS, et al.

A.  Yes.

Q.  Read that for the record if you would.

A.  As a JP Morgan Chase employee, I understand that the code requires me to report any known or suspected violation of the code of internal firm policies or of laws or regulations applicable to the firm's business. I understand that failure to do so can result in disciplinary action up to and including termination of employment.

Q.  So another thing you understood by signing this contract is that if you... or… observed anything that could possibly be a violation of the code, you had an obligation to report that, otherwise you could be disciplined up to and including termination, correct?

A.  Correct.

Q.  OK, the next line there says I understand that all employees have post employment responsibilities regarding confidential information. Do you see that? A. I do.

Q.  OK and what did you understand your post employment confidential information, you know obligations to be?

A.  Not contain any client sensitive or personal identifiable... identifiable information, [inaudible].

Q.  OK. Did do you think you were allowed to keep JP Morgan information once you left?

A.  That's a broad… If it's sensitive client information, no, I was not allowed to keep it.

Q.  OK, Go to the next page if you would ███ please, which is JPMS 583. This is where we saw your electronic signature and the data February 18th of 2016. Do you see that?

A.  I do.

Q.  And then below that, let me read for the record what it says in the I understand. It says I understand my employment is subject to my and JP Morgan Chase's agreement to submit employment related disputes that cannot be resolved internally to binding arbitration is set

S.09a.ii-015
4:26-cv-00381-O
Biering v. JPMS, et al.

forth in the binding arbitration agreement detail below. Do you see that?

A. I do.

Q. And then by signing below, I acknowledge and agree that I have read and understand the binding arbitration agreement, have accepted its terms and understand that it is a condition of my employment with JP Morgan Chase. Do you see that?

A. I see that's what it says, yes.

Q. And then I'm not going to go through it, but here we have a number of pages that go on to JP Morgan 589, which is a separate arbitration agreement that you signed, by which you agreed to take your employment-related claims to another arbitrable forum, correct?

A. Can you rephrase that question?

Q. This arbitration agreement,

A. Yes.

Q. …that starts here below where you know, below your signature where it says binding arbitration agreement that's a... that's an agreement by which you agreed to arbitrate employment-related claims if you have them, correct?

A. Yes, depending forums.

Q. Yes what?

A. Yes, depending on the claim, there are different forums available for the arbitration.

Q. OK. And... and as you sit here right now, you have an, you have a charge of discrimination pending in the EEOC, do you not?

A. That's correct.

Q. And you signed that arbitration agreement, if we look at JPMS 589, you signed that on also February 18th of 2016, correct?

A. That's correct.

S.09a.ii-016
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Alright, I want to turn in that same book, if you would, and this time you don't have to have it the other way. Go to Exhibit C, please.

A. I am there.

Q. OK. I'm... I'm looking at prior to the blue split sheet, because this is a group exhibit at C, and we'll go to the very first page, which is JPMS 29285.

A. I'm there.

Q. OK. So here we have a series 1, 2, 3, 4, 5, 6, 7, 8. We have 8 what they call code of conduct affirmations, do you see that?

A. I do.

Q. OK, and they go from 2016 through and including 2023. Just confirm that for me.

A. Confirmed.

Q. OK? So let's look at the 2016 affirmation, which is up on the screen behind you. Read if you would, what it says in the first 3 lines there, Mr. Biering.

A. Paragraph one?

Q. Yes, please.

A. I hereby affirm that I have read, understand in compliance with the JP Morgan Chase JPMC Code of Conduct and all internal JPMC policies that apply to me. I agree, as a condition of my employment, to remain in compliance with the Code and all applicable JPMC policies as amended from time to time.

Q. OK. And you would agree with me, would you not that these are not wet signed with a with a pen, but they're signed electronically there at the bottom. Do you see that?

A. I don't.

Q. OK, so let's Scroll down, please. Do you see where this document has your standard ID number that was applicable when you were at JP Morgan?

A. Yes, but the department is wrong.

S.09a.ii-017
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  OK. And so do you see where you signed it, where it says Biering, Joshua, do you see that?

A.  It doesn't look like a signature to me, so I'm not certain.

Q.  OK, well, confirm it for me if you would that for… from 2016 through 2023 all these affirmations look pretty much the same with a Joshua Biering's name, an affirmation date and your standard ID.

A.  I can't attest this was me because the department is wrong and that department was not in effect until 2023.

Q.  OK, that wasn't my question. Confirm for me if you would, if you go through all of these, that each one of them have an affirmation date, your name and a standard ID.

A.  Yes. Below the incorrect department.

THE CHAIRPERSON: Do you remember getting these affirmation forms periodically?

A.  They were part of the slug of emails, sir, where you just click it.

(Speaker tag uncertain): Answer this, answer [inaudible].

THE CHAIRPERSON: OK. I don't... I don't need your help. OK?

A.  Yes, sir, I do.

THE CHAIRPERSON: Thank you.

Q.  OK, let's go to the 2023 affirmation if... if we can.

A.  I'm there.

Q.  OK, now I'm going to read for you the… the first paragraph here. I hereby affirm that I have read, understand and am in compliance with the JP Morgan Chase JPMC Code of Conduct and all internal JPMC policies that apply to me. I agree, as a condition of my employment, to remain in compliance with the Code of Conduct and all applicable JPMC policies. I read that correctly, didn't I, sir?

A.  Yes, sir.

S.09a.ii-018
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q.  So when you affirmed in 2023 the Code of Conduct, you knew that what you were... what you were signing to is that you would remain in compliance with the Code of conduct and all other policies that applied to you, correct?

A.  Probably.

Q.  Okay, including the notice period policy, correct?

A.  I knew of a numerous period policy. But I did… and I knew it was 60 days, but I do not recall what it contained, and I wasn't certain, and neither was ███████████ if it applied to me, given my - the channel, I came to the bank through, the Military Officer Executive Development Program, which was also not subject to [Inaudible].

Q.  And ███████████ he didn't work at JP Morgan, did he?

Q.  No, but he had experience hiring from JP Morgan.

MR. DUNLAP.    OK, so let's take a look. I'm... I'm going to hand out some pages that were produced in Discovery, because they're not in our book and I'm going to ask him about this document as well. So can I give you 3 for the panel?

THE CHAIRPERSON: And...

MR. DUNLAP: And then opposing counsel? And then can you give one to Mr. Biering, please?

(Speaker tag uncertain):    For the record, are you going to mark it?

MR. DUNLAP: Yeah, we'll... we'll mark it as Triple B.

Q.  I'll give you a chance to take a look at that for a second.

A.  Yes, sir, I think I know where you're going. That link didn't work.

THE CHAIRPERSON: OK, wait until he asks the question.

A.  Yes sir, I'm sorry.

THE CHAIRPERSON: You may be right, but you may not be.

S.09a.ii-019
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.**   Yes Sir, Sorry about that.

**THE CHAIRPERSON:** So let's just wait.

**Q.**   Have you looked at it? You ready?

**A.**   I'm familiar with the document.

**Q.**   OK good. So at the top left of this document which says 2022 annual compensation summary for Joshua Biering, at the top left, do you see your standard ID number at JPMorgan, correct?

**A.**   I do.

**Q.**   OK. You can see in that first box that there are some representations of your total compensation, your salary, your incentives, etcetera, etcetera. And then it says in the second box: Effective February 123. Do you see that?

**A.**   I do.

**Q.**   And here this coincides with when you moved from your position as a Vice president to your position as an executive director, correct?

**A.**   If there's a technical term when I'm moved from, I'm not familiar but I was promoted to Executive director.

**Q.**   OK. And indeed, it says EXECDIR over to the right in that box, correct?

**A.**   Correct.

**Q.**   OK, there are a series of notes here at the bottom of this document, and I want to take a look to begin with at the third bullet there. Do you see that third bullet?

**A.**   I do.

**Q.**   Let me read this for the record. Tell me if I read it correctly. You will not receive an incentive award if you are not employed by JP Morgan Chase on the payment date and/or the grant date, or if you have given notice of termination prior to those dates, do you see that?

S.09a.ii-020
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** I do.

**Q.** OK. And then if we go down to the next bullet there, the 4th bullet and if we go down 4 lines in that bullet. Kind of 1/3 of the way over, do you see where it says you will be provided an opportunity to decline awards. If you do not decline by the specified date, you will be deemed to have accepted the terms and conditions. Do you see that?

**A.** I do.

**Q.** OK. And then finally, we'll skip the next bullet and then go to the 12345, the 6th bullet here on this page. Tell me if I read this correctly. Due to the change in your grade and or corporate title, your notice period may change effective February 1, 2023. By accepting this change, you are agreeing to any notice period change. Please refer to the Global Notice Period overview chart. Do you see that?

**A.** I do, and that link did not work.

**Q.** And so what this is telling you is when you move from your position as a vice president to the position of executive director, your notice period is likely to change. And by accepting the change, you're agreeing to the notice period change. Do you see that?

**A.** Sorry, that was a lot. I do see the language.

**Q.** OK. And we... we have seen and I'll, I'll reference it again, but you had seen that notice period chart where it tells you the length of notice period depending on the titles of people?

**A.** No sir, I have not seen that chart.

**Q.** Did you see that it's in your books?

**A.** Excuse me, are you talking about the time of my employment? I've seen it since then... Sorry, I apologize for the confusion, but that was June '23.

**Q.** So it's in your books here and it's also in our books, you realize that, right?

**A.** Yes sir, I do.

S.09a.ii-021
4:26-cv-00381-O
Biering v. JPMS, et al.

*[ZOOM0030 ~ 0:35:42.7]*

Q. OK. I want to go to Exhibit B in our book, which is the actual code of conduct.

A. IS that B as in Bravo?

Q. That is B as in Bravo. Behind Exhibit B is the code of conduct for 2023. Do you see that?

A. I do.

Q. OK. And I won't go through it in great detail because we've been through it, but you, you saw when I was going through this with another witness last week, you saw the emphasis, did you not, on integrity at JP Morgan?

A. Live it everyday.

Q. OK, you saw the emphasis on acting ethically, correct?

A. Everyday. Yes, sir.

Q. Go to Page 3, it's a little 3 at the bottom right.

A. Within B?

Q. Yeah, and it's JPMS 10, the bates. ████ is there a way to switch the view on that?

A. I'm on it, the bates label's helpful.

Q. OK, good, the bates label's fine. OK. We talked about this before, but I just want to reinforce this for the record. Do you see on the left hand side above section 1.3.1 that says "manager responsibilities"? Do you see that paragraph that says "we all have"?

A. Yes.

Q. Do you see that? So the second line there, third sentence says action may be taken against employees who violate the code or who fail to report the violations of others up to and including termination of employment. Do you see that?

A. I do, and I submitted 3 myself.

S.09a.ii-022
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. So you knew by submitting 3 yourself that if you witnessed conduct or behavior that was potentially in violation of the code of conduct and you swept it under the rug or didn't report it, you could be in trouble for doing that, correct?

A. I agree.

Q. OK, and your managers... either Mr. Stewart or Mr. Aughinbaugh, they under the next provision here, they had even greater levels of responsibility, didn't they?

A. I could not agree more.

Q. OK, so if you go down in that next sentence or that next section, I should say, if you go down 6 lines. It says there…

A. In the blue box?

Q. No, in the paragraph under 1.3.1 manager responsibilities, it says there they may be held responsible for their failure to report misconduct, escalate appropriately or take steps to address or remediate an issue. Do you see that?

A. Asbsolutely.

Q. Therefore, for example, if, if, if one of your managers… If Mr. Stewart thought that there was some impropriety with respect to your expense reports, he was obligated by the Code of Conduct to report that to somebody, correct?

A. In good faith, which the code of conduct outlines, yes.

Q. OK, Alright. Let's go over to sharing concerns 1.4. There in that in that first paragraph it says in the second line: Promptly report any potential or actual violations of the code, firm policy, law or regulation related to our business. Do you see that?

A. Yes.

Q. So the obligation that's on folks at JP Morgan is not simply to report any potential violations but to report them promptly, correct?

A. And to investigate wholly, yes.

Q. So to report them promptly, correct?

S.09a.ii-023

4:26-cv-00381-O

Biering v. JPMS, et al.

**A.** Yes.

**Q.** Alright. Go down to the bottom of that right column of paragraphs, and I want to look at the paragraph that starts with "you are required to report violations." Do you see that?

**A.** I do.

**Q.** Read that out loud, if you would, for the record, please, Mr. Biering.

**A.** The whole paragraph?

**Q.** Yeah, the whole paragraph.

**A.** You are required to report violations, whether they involve you or someone else, including other employees, consultants, contract or temporary workers, business partners or agents or our customers or suppliers. Do not investigate potential violations yourself. Reported it and the matter will be investigated by the appropriate parties. You must cooperate as directed by our firm in any investigation p[inaudible].

**Q.** OK. And in this particular case, you did cooperate with the investigators whether they were GS or employee relations, correct?

**A.** for which investigation?

**Q.** For any of the investigations.

**A.** Yes, sir. I cooperated.

**Q.** Alright. Alright. Let's switch gears. What time is it? OK, we got 5 minutes or whatever, 7 minutes. During your years in the financial industry, financial services industry, both before you moved to Raymond James, when you were at JP Morgan and at Raymond James, you received a fair amount of training, did you not?

**A.** Can you be a little more specific?

**Q.** Well, at JP Morgan specifically, you trained with respect to JP Morgan's products, didn't you?

**A.** I became familiar with their products, yes.

**Q.** And... and you trained on their products, correct?


S.09a.ii-024
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I don't think trained is the right word.

Q.   OK. You trained with respect to their policies and their rules, correct? A.    Again. I don't know if trained is the right word.

Q.   OK. We'll look at your training transcript here in a second. We'll see.

A.   So like an online training, yes.

Q.   OK. I didn't ask you what kind of training. We'll get to that in a second. You trained with respect to Chase's code of conduct, correct?

A.   Yes.

Q.   You trained with respect to various illegal banking activities, like for example, money laundering, correct?

A.   Correct.

Q.   You trained with respect to how to complete documents working as a banker, correct?

A.   Yes.

Q.   OK, let's take a look at exhibit C, again, stay where you were. We have again... these things are... are split up by blue sheets and I want to take a look at the last 5 pages in Exhibit C. And I realize and recognize that the last five pages are small print, as are some of the documents in this case.

A.   You have a bates label for that?

Q.   No, they're... they're not Bates labeled.

A.   For Exhibit C?

Q.   Yeah, go. It's behind the last blue split.

A.   I'm on Exhibit C and I see the code of conduct affirmation.

Q.   Yeah, yeah, keep going in the, in the same.

A.   Then I go to D.

Q.   Oh.

S.09a.ii-025

4:26-cv-00381-O

Biering v. JPMS, et al.

THE CHAIRPERSON: Yeah, I was going to say.

MR. DUNLAP: Can we see if…?

MR. BIERING: Or can you put it on the screen?

(Speaker tag uncertain): This is [inaudible]
MR. DUNLAP.      It's that right there that...
(Speaker tag uncertain): What is that [inaudible]
MR. DUNLAP: It's the last document in C.

(Speaker tag uncertain): It's unreadable to me so you can have mine.
MR. DUNLAP: Yeah.

THE CHAIRPERSON: Do you guys have it?

MR. IACUONE: I think so. The spreadsheet?

MR. DUNLAP: Yeah, it's a lot of…

MR. IACUONE: A spreadsheet with no bates.

MR. DUNLAP: Yes, correct.

MR. IACUONE: It wasn't produced.

MR. DUNLAP: It wasn't produced because you didn't ask us for it.

MR. IACUONE: You're trying to use a document that wasn't produced?

MR. DUNLAP: You didn't ask us for it in discovery.

THE CHAIRPERSON: OK, wait for... stop for a second. The 20 day exchange requires the parties to exchange all documents which they intend to use at the hearing.

S.09a.ii-026
4:26-cv-00381-O
Biering v. JPMS, et al.

**MR. DUNLAP:** Crrect.

**THE CHAIRPERSON:** This is a document apparently that you intended to use at the hearing.

**MR. DUNLAP:** Correct.

**THE CHAIRPERSON:** So it was… Was it exchanged during the 20 day period?

**MR. DUNLAP:** I think it was…

**THE CHAIRPERSON:** What the heck is it so I know if I even care?

**MR. DUNLAP:** It's... it's a training transcript of the training that he took at JP Morgan.

**THE CHAIRPERSON:** OK, I don't care. You can use it.

**Q.** OK. Alright. You have the document that's… that's right there, correct?

**A.** Yes.

**Q.** Do you see over to the very left? Do you see where it says standard ID top left.

**A.** On which page?

**Q.** The very first page.

**THE CHAIRPERSON:** I think it's a one page document, isn't it? No, it's a multi-page?

**MR. DUNLAP:** It's like. OK, it's 1... 2... 3... it's 5 pages.

**THE CHAIRPERSON:** OK...

**MR. DUNLAP:** OK. And then we'll end with this.

S.09a.ii-027

4:26-cv-00381-O

*Biering v. JPMS, et al.*

**THE CHAIRPERSON:** OK.

Q.  Do you see where it says standard ID over to the left, you see that? Do you see 1662283?

A.  No. It's an I-662283...

Q.  What was your standard ID at JP Morgan?

A.  I as in India, I62283.

Q.  OK. I got it. So you would agree with me that your standard ID is replicated there on all 5 pages, correct?

A.  It appears so, yes.

Q.  And you would agree if you look over to the right…

A.  On which page?

Q.  The first page, do you see over to the right? Do you see some status dates there? Top.

A.  Yeah, they're hard to see, but yes.

Q.  And you can see where there's several in 2016 and then there's several in 2023 and it moves backwards to 2022, 2021, 2020 all the way to the fifth page. Do you see that?

A.  [inaudible] Yes sir.

Q.  OK. And then just look on the first page, look at the third line down in the middle. Terms of training, do you see where it says 2016 Code of conduct?

A.  I do.

Q.  OK. And if you go down about, oh, I don't know, eight more from there, do you see a reference to 2015 Code of conduct new hires?

A.  Yup.

Q.  I... I won't go through them... But would you agree with me – and take a look... and if not, we can pick up tomorrow, – but you can see several references throughout this to your code of conduct training over the years that you were there.

S.09a.ii-028
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.** Absolutely [inaudible].

**Q.** OK. Do you want to... do we want to call it at that or do you want me to keep going?

**THE CHAIRPERSON:** That's fine, that's fine - We can go off the record.

*[ZOOM0027 ~ 00:00:00]*

**THE CHAIRPERSON:** I'll remind you that you remain under oath, and council, you are in cross examination.

**Q.** Thank you, Mr. Chair, and before I... I start the examination, I did want to note for the record that pursuant to your comment in our September 3rd, 2025 20 day letter prior to the cancellation, pursuant to 13514 of the Rules, I did list the documents that we might use, and I included in #9: Claimants training transcript, which is being produced here with... so it took me by surprise a little bit yesterday, but I... I thought, wait I produced that. And I just wanted to make sure for the record that that was clear.

**THE CHAIRPERSON:** OK, thank you. And as you know, I already said we consider it so…

**Q.** Right. OK. Good morning, Mr. Biering.

**A.** Good morning.

**Q.** I do want to ask one or two more questions about that transcript and then we'll move on. So if you could take the little book, please. The, the skinnier book and turn to Exhibit C and take up the last document in Exhibit C behind the… the blue split sheet.
(Speaker tag uncertain): Did you guys add it to that book, because yesterday the quality was not enough?

**MR. DUNLAP:** You you gave him yours, didn't you?

(Speaker tag uncertain):    Yeah, but I took mine back.

**Q.** OK.

S.09a.ii-029
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I believe you. I'll take your word for it.

Q.   Well, I want you to see it real quick.

A.   Sure. Thank you. I'm sorry. Thank you.

Q.   Alright, we looked at this very briefly yesterday. It's a 5-page document that has an admittedly small print here, but this is a document that spans from 2016 to 2023 if you look over to the right. Would you please confirm that for me?

A.   Confirmed.

Q.   OK. And again, I'm not going to go through the... the process of... of pointing it out because there's no numbers to these lines, but there's probably upwards of 10 to a dozen references to the code of Conduct training. Do you see that?

A.   I'll take your word for it.

Q.   So this training that you did at JP Morgan, you're aware that everybody had to go through code of conduct training at JP Morgan on a yearly basis, correct?

A.   I believe that was the expectation, yes.

Q.   OK. And the way that you trained on the code of conduct back then is you got to a computer and there was a module that told you various aspects of the code of conduct, correct?

A.   It wasn't every year. I think it was every two years, but every other year – Every year there was an attestation, as I recall, but the training was not every year..

Q.   OK, when you did that training, let's focus on the training itself. In order to get past that and move on, you had to actually take a little quiz associated with the code of conduct and pass that in order for that to show up as being completed, correct?

A.   The only answer or prompt was a one-quiz question and that was the attestation as I recall.

S.09a.ii-030
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. So it's your testimony that for all of this training, you didn't have to take little quizzes and answer questions and get them right to move on - Is that your testimony?

A. For all of the different classes, no, there were quizzes that were bespoke, but you asked about the code of conduct.

Q. Right.

A. My answer stands.

Q. OK. OK. Did you... do you recall undergoing other types of training at at JP Morgan other than the computer modules?

A. The computer modules on this... My mentor and I, Randall Rose, we went to an off-site training deal for a week in New York.

Q. That's one of the areas. Did you... did you guys do huddles in the morning at the location?

A. Before work?

Q. Yes.

A. Weekly team meetings on Monday afternoons and then morning calls on Monday, that attendance was not required so it was sporadic on who attended.

Q. Did you get bulletins while you were there from Chase about various things that might affect your business?

A. Similar to FINRA bulletins that come out, random emails, yes.

Q. OK. You would agree with me, would you not, Mr. Biering, that the financial services industry is a very heavily regulated industry?

A. Yes.

Q. And indeed, for example, where we are here, FINRA is a regulator, correct? A.     An SRO, Yes.

Q. OK. That's a self regulatory organization, correct?

A. Yes, an SRO.

Q. Okay, the SEC is a regulator, correct?

A. Yes, that overseas, that's the SRO of FINRA. Correct.

S.09a.ii-031
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  OK. And state securities divisions are regulators, correct?

A.  At the state level for those that fall within their jurisdiction based off of AUN and all the things.

Q.  And people like you who are registered representatives, you have to take license exams and pass them, correct?

A.  For for FINRA, yes. Not for the state. Every state is unique.

Q.  Do you have to take continuing education for those licenses

A.  Yes.

Q.  While you worked at JP Morgan, you were subject to JP Morgan's equal opportunity, anti-discrimination and anti-harassment policy, correct?

A.  That's my understanding, yes.

Q.  OK. And given your ultimate title that you had when you were there, Executive Director, you were also subject to the JP Morgan notice policy. Notice period policy, correct?

A.  I understood there was a policy that 60 days was tied in executive director, but the underlying terms in verbiage - That's why I had asked for a copy of the terms and conditions after I resigned.

Q.  So you said you understood there was a policy. My question was slightly different. You were subject to that policy, correct?

A.  That's my understanding looking back, but I had questions if I was because of my channel that I came up through was not your traditional channel [inaudible].

Q.  So when you went from associate to vice president, you became subject to that policy in terms of a garden leave, correct?

A.  I believe so, yes.

Q.  And then when you went from vice president to executive director, you became subject to a slightly different garden leave policy, correct?

*[ZOOM0027 ~ 0:07:15.5]*

S.09a.ii-032

4:26-cv-00381-O

Biering v. JPMS, et al.

A. I believe so, yes.

Q. OK. We had mentioned briefly the chart and I would like you to take a look at Exhibit F if you would.

A. I'm there.

Q. This is also in your books. We looked at this briefly before, but if you look at this, it says JP Morgan Chase and Co Notice Period Policy Overview chart updated July 2023. Do you see that at the top?

A. I do.

Q. AOkay, and. This sets forth in kind of the, the under the blue bar there, the specific periods of time when people who are vice presidents or executive directors, or moving up from there managing directors or senior vice presidents when they have their, their notice period. Do you see that?

A. Yes, and this was the genesis of my confusion, as long as ████ says there are zeros next to Chase Wealth Management and JPMA, JP Morgan Financial Advisors.

Q. Okay, so if we look at the first line there, you see where it says all businesses and functions except below.

A. I do.

Q. And then so for a vice president, when you were a vice president, you had a 30-day leave period, correct?

A. That's what that says for all business functions, but again there is confusion between Chase Wealth Management and JP Morgan financial advisors having 0 days.

Q. And so when you became an executive director, that's when you became subject to a 60-day garden leave, correct?

A. That is what I understand based off of these proceedings.

Q. And if you had progressed to managing director at JP Morgan, you would have been subject to a 90-day garden leave, correct?

A. That's what it says for all businesses and functions except for all.

S.09a.ii-033
4:26-cv-00381-O
Biering v. JPMS, et al.

[ZOOM0027 ~ 09:09.50]

Q. Alright. So let's... let's talk about the events that led to your termination. And I know we've been over this, but I want to make sure that we cover certain things for purposes of the record. You attended a golf outing from September 10th to September 12th, 2023, didn't you?

A. Yes.

Q. The golf outing was attended by you, ██████████ and then I think you said Mike and ██████████ correct?

A. Correct, but I'd like for their names to clearly be anonymous, please.

Q. So the ████s, as I understand from what you said, were your close personal friends correct?

A. Correct.

Q. One of them, and I'll ask you to remind me which one, was the best man at your wedding, correct?

A. No.

Q. Was he in your wedding?

A. Yes.

Q. OK. Who was that?

A. ██████████

Q. ██████████ And, and so those were your personal friends. Mark was in your wedding, but they weren't personal friends of ██████████ ████████ Correct?

A. No. That is correct that they where not.

Q. That's what I thought you meant. OK at that time in September of 23, you described yourself as an avid golfer, correct?

A. An aspiring single digit golfer with a long way to go.

Q. So that's the same as an avid golfer, correct?

A. I'm not sure what happened...

S.09a.ii-034

S.09a.ii-034
4:26-cv-00381-O
Biering v. JPMS, et al.

S.09a.ii-034

S.09a.ii-035
4:26-cv-00381-O
Biering v. JPMS, et al.

S.09a.ii-036
4:26-cv-00381-O
Biering v. JPMS, et al.

A. That is when we started partnering together, and Aughinbaugh and Hitchcock, they periodically review the analysts alignments, and that's when she was aligned to support my team in addition to 3 or 4 other teams.

Q. So at that time you would acknowledge, would you not that you were 34 years old and she was 24 years old, correct?

A. Around that age for her, but I was 34, yes.

Q. OK. At that time, you and Ms ▮▮▮ were both married, correct?

A. Yes.

Q. What was her husband's name?

A. Dawson. They didn't share a last name together. He was ▮▮▮ and she was ▮▮▮

Q. You would acknowledge, would you not, that in the fall of 2023 Ms ▮▮▮ did the lion's share of her work with you, correct?

A. Incorrect.

Q. In the fall of 2023, you yourself, you were going through a divorce, correct?

A. Yes.

Q. Ok. And that divorce was a contested divorce, correct?

A. Yes.

Q. OK, let's turn in...

A. Correction. Legally, it was not a contested divorce, but people are messy and personally, it is contested. We're not on each other's Christmas lists.

Q. OK, turn in the book to Exhibit H, please.

A. I remember this e-mail, I'm there.

Q. OK. So at the top of Exhibit H, which is a several page document that goes from JPMS 20,841 to 20,846, we're going to look at the very top e-mail there. We've seen it before, don't have to go long over it, but on October 25th of 23, you sent an e-mail to Mr.


S.09a.ii-037
4:26-cv-00381-O
Biering v. JPMS, et al.



Q. Aughinbaugh, Mr. Stewart, Brooke Reeb and that's where you told them that you were going through a divorce, correct?

A. But this was roughly the second time I shared with Mr. Aughinbaugh included, and Mr. Stewart knew from the get go, and we talked about it frequently. First time Brooke Reeb knew.

Q. OK, so why... why did you send this e-mail at that time if they had already talked about it with you?

A. May I answer more than just a quick correction? So we had a... I had a lunch with ▮▮▮▮ and ▮▮▮▮▮▮▮ of ▮▮▮▮▮ that day and I had divorce court the next morning, the 26th, and the 26th afternoon, another lunch with the top ▮▮ shareholder. Brooke Reeb was asking me why I started becoming… wavering on the firmness of that meeting... those meetings. And I was wavering because I was leaving and that's why I sent it. And I also didn't trust Ben and Aughinbaugh, so I wanted to make sure I communicated exactly why I was out that morning of the 26th.

Q. Why didn't you trust Ben and JT?

A. Well. Those came to fruition and I had yet to hear back from them on my compensation plan, and I mean the ongoing struggles I had with Aughinbaugh.

Q. So, you didn't trust them, so you included them in the e-mail. Is that the answer?

A. This e-mail doesn't mean I trust them. This e-mail means I was covering my bases.

*[ZOOM0027 ~ 0:18:18.6]*

Q. OK. Now we... we know that over the course of the time that you worked at JP Morgan, you texted Ms ▮▮▮▮ quite frequently, correct?

A. Mutually, yes.

Q. OK. I want to go through a number of your texts and I'll ask you therefore to turn to Exhibit MM in the bigger book.

A. I'm there.

Q.  Alright, we're at Exhibit MM. And for the record - You, Josh Biering, you didn't send these text messages to Jonathan Jacobs, did you?

A.  They wouldn't accept them. I did not to Jonathan Jacobs.

Q.  OK, so let's go to the first page of MMM. And do you see at the very top, we can see that your messages are on the right in the in the darker cells and hers are on the left. Do you see that?

A.  I do.

Q.  And the... what's the date of the first text message here?

A.  I apologize, I missed it by 11 days. December 21st, 2022.

Q.  OK. Let's turn and we'll go to... we'll go to JPMS 21783, bottom right, a couple of pages in.

A.  I'm there.

Q.  OK. On that particular page, at the top, there is a text message from January the 27th of 23.

THE CHAIRPERSON: Other way. Sorry.

Q.  It's 21783... we're just... we're just adjusting the screen.

)Speaker tag uncertain):    What page is [inaudible].

Q.  Page 8. OK, right there. OK. Do you see here over to the left there is a message from ███████ and she says, "I also loved getting to meet your stunning wife. She was so sweet." Do you see that? Look at the top and there's kind of a redacted -

A.  Yes, I see that.

Q.  Was that the first time that Ms ███████ met your wife?

A.  Yes, as I recall.

Q.  OK. Now I'm going to have you move to - Go to - This is… ███████ this is page 24, and it's JPMS 21799.

A.  I'm there.

Q.  While she's doing that, she'll get there. At the top over to the right, there's a text message from you. You say on - it looks like



April 5th of 23. "By the way, did you want to join me for ███ on Ice with clients tomorrow night?" She says "Yes. What time?", You said "Starts at 7:00, no pressure." Do you see that?

A.  I do.

Q.  Did you guys go to ███ on Ice with clients?

A.  Yes, that is the Dickies Suite JP Morgan has, and there's like 8 ███ on ice shows and the Aughinbaugh team is like, "you guys better go fill seats so it's not empty." And ███ on Ice is one of the entertainment events that we invited clients and their families to.

Q.  OK, let's move forward in the texts to page 39 of the 183 pages of text. A.   I'm there.

Q.  That's 21814 bottom right.

A.  Yes, sir, I'm there.

Q.  We just have to wait for everybody else [inaudible].

THE CHAIRPERSON: That's OK, you can go ahead. I can listen.

Q.  OK. I just wanted to wait for the other arbitrator as well. OK, on this particular page, we're kind of middle of the page and this is 21814 bottom right.

A.  Yup.

Q.  Yeah... yeah... yeah, you've got 804. So let's just go. So if you look to the kind of the middle of the page you wrote, "Had a good catch up today with Ben and JT, my message was that you are killing it and you better be one of our top recognized analysts come." Is it como?

A.  Como and I corrected it to comp. season.

Q.  OK come comp. season OK, so you had a good catch up on May 31st of 23 with both Ben and JT correct?

A.  Correct.

S.09a.ii-040
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's move to the 41st page which is if you just turn the page, it's on the right. This is 21816, and at the very top, you're writing to Ms. ▇▇▇▇ and in the third line you said "JP Morgan is first class and is competitive." Do you see that?

A. I do, in addition to two other bankers she supports referenced here.

Q. And when you wrote that to her, you meant that, correct?

A. You never... you gotta maintain the the company line. Yes, sir.

Q. So is that a "yes, Sir, I meant that" or is "yes, sir, I was maintaining the company line"?

A. Yes.

THE CHAIRPERSON: By that do you mean it was both?

A. Yes.

Q. OK, alright, turn the page to JPMS 21817.

A. I'm there.

Q. At the bottom, and this is page 42 of the texts.

A. Where the selfie is on 43. Or sorry, 42.

Q. 42. Do you see at the very bottom it says, "Hmm. would you want to golf with me and a prospect if Mitch falls through?" Do you see that?

A. Yes. Not the September event, but yes I do see that.

Q. And that was, according to the texts, sent when?

A. June 7th, 2023.

Q. OK and then you wrote to her. "OK, never mind. ▇▇▇▇ can join. LOL." Do you see that?

A. I do.

Q. Who was Mitch?

A. Mitch was the lender that doubled the line of credit after I left the day before I got the termination call.

S.09a.ii-041
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Who was ███?

A. ███ was another Advisor that reported to Ben Stewart that inherited about 15 to 20 million of my clients.

Q. OK, so go to the next page.

A. I'm there.

Q. And do you see at the bottom? Keep scrolling if you would, ███ That picture right there, that is ███ correct?

A. Yes.

Q. OK. Let's turn to the next page. And I want to go to the next page which is 21819.

THE CHAIRPERSON: Hold on,

MR. IACUONE: Maybe a point for the record, that the picture was sent by Ms ███

THE CHAIRPERSON: OK.

Q. Go... go to the bottom of the next page please... please, which is 21819. It's page 44.

A. I'm there.

Q. Keep scrolling please. OK, there you go. Alright, do you... do you see here on what looks to be June 8th of '23 at 4:50?

A. 4:59?

Q. ████████████████████

A. I do.

S.09a.ii-042
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   And then if we go to the top of the next page. Stop about right there. You wrote, "Shaking my head, no loyalty. 0 loyalty." That's what you wrote to her, correct?

A.   Correct.

Q.   ▌

A.   Yes.

Q.   Scroll down a little further. And then there you wrote "Dead to me." Do you see that?

A.   I did.

Q.   She asked you after that, keep scrolling, ▌ "What do you mean? Hello? waiting for context", do you see that?

A.   Yes.

Q.   OK. ▌

A.   Yes.

Q.   OK, ▌

A.   Yes.

Q.   She asked you "About what?" and you said "I don't know, thought you were going a different direction." Do you see that?

S.09a.ii-043
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**A.** I do.

**Q.** Then she wrote, "Gotta keep you on your toes." And you wrote, "OK, I dunno." Meaning "I don't know", Correct?

**A.** Yes.

**Q.** Alright. She says "I must say I'm shocked that you recruited ███ to play", and you wrote "K, you're playing us against each other." Do you see that?

**A.** Yes.

**Q.** By that you meant ███ and you, correct?

**A.** Yes.

**Q.** And then she asked you, "You and ███ How so?" And you said "I won't put any of this in a text. We can catch up later." Do you see that?

**A.** Mhm, yes.

**Q.** OK. Let's scroll to the bottom of this page. Keep going. OK, stop there. Do you see where she wrote, "You can't be saying stuff like this and give me no context." And you wrote. "I'm so confused." She wrote. "I'm more confused." You wrote "Same. What's the issue?" Do you see that?

**A.** Yes.

**Q.** And then scroll to the top of the next page, please, ███ And you said, "Just making sure we keep this professional so we don't get in trouble." Do you see that?

**A.** Yes.

**Q.** OK. Let's go to page 49 of the texts and this is 21824.

**A.** I am there.

**Q.** OK, there in the texts at the left you can see in the second paragraph, Ms ███ says in the second line, "We spent a good amount of time talking about how great it's been to be mentored by Josh Biering." Do you see that?

**A.** I do.

Q. And that was on June 9th of 23, wasn't it?

A. Yes, but... but that's looked at in a vacuum.

THE CHAIRPERSON: OK. Just answer his question.

A. Yes.

Q. OK. And then if we scroll down a little further. Where... keep going... keep going. OK, stop there. Do you see over to the right you said "You can" and then you said "You should. It's helpful for me because I tend to not know limits sometimes." Do you see that?

A. Yes, and can I add color?

Q. No it's cross. And... and then she says "you and me both lol" do you see that?

A. Yes.

Q. OK. Scroll down. OK, right there. She writes, over to the left. "But thank you. Your support means so much, Josh", you wrote "For sure, and I know ██████ wants to steal you." Do you see that?

A. I do.

Q. Was ██████ an executive director?

A. I believe so at this time.

Q. OK, let's go to the next page at the top, which is JPMS 21825, and right there at the top, do you see where it says, and again we're on the 9th of June, do you see where it says "Hope you don't think this is too forward for me to ask, but I think it's important. How's the workload going on the family front? I'd feel bad if it's negatively impacting it." Do you see that?

A. I do.

Q. OK, So you were asking her, in essence, how's the workload that you have at work and how, if at all, is that affecting your family life, correct?

A. Yes, that's what it says.

S.09a.ii-045
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK. Go to the next page which is page 51 of the texts and stop at the bottom of it. OK, let's go up a little bit. Do you see there? June 13th at it looks like 8:05 in the morning. Do you see that?

A. I do.

Q. You wrote to her. "Hey, thanks for holding it down. I'm going through some stuff on the home front right now that's causing me to be distracted. Needed to step away. Please keep that between me and you." Do you see that?

A. I do.

Q. That's referring to the marital troubles that you were going through, correct?

A. Partially.

Q. OK. Go to JPMS 21830 which is page 55 of the texts.

A. I'm there.

Q. OK. We're going to go to the very bottom. That's where you are, good, ███ And there to the right, you wrote "Miss me?!" with an with a question mark and an exclamation point. And she wrote, "Is that even a question?" Do you see that?

A. I do.

Q.

A. I do.

Q. And your response is you asked her "When is your birthday?" She told you - Scroll down ███ - she told you "October 16th, mark your

S.09a.ii-046
4:26-cv-00381-O
Biering v. JPMS, et al.

calendar." She asked you "When is yours, and you wrote 10/23." Do you see that?

**A.** I do.

**Q.** And she said, "And you were born in 89, right?" You said "Yup." And she said, "Wow, you're just a few days off from being exactly 10 years older than me. Wild." Do you see that?

**A.** I do.

**Q.** OK. And that that is true, is it not?

**A.** I believe so.

**Q.** OK. Go to page. 59 and this is 21834. We're going to stay at the top of that. Do you see there on what looks to be – 6 – June 23rd, she wrote to the left. "Proud to be your analyst." Do you see that?

**A.** I do.

**Q.** OK. And you wrote back, "Thank you. Couldn't ask for a better partner. You're doing an awesome job." Do you see that?

**A.** I do.

**Q.** Alright. I'm going to turn ahead a bit. And I'm going to go to JPMS 21850 which is page 75.

**A.** I'm there.

**Q.** OK. At the very top of that page. ▇▇▇▇▇▇▇▇▇ writes to you. "I have an unsolicited opinion, but I'm sharing this because I care. You have worked hard this year and done a lot of impressive things. Don't want that to be overshadowed by times that people see you get frustrated with people in the office. You're my favorite person in this entire office. So I would be remiss. It would be remiss of me. To… to… not to say it." Do you see that?

**A.** I do.

**Q.** And you said "Thank you for that. Did someone say something?" That's a that's a question that you asked her, correct?

**A.** That's asking for feedback.

S.09a.ii-047
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   And she wrote, "Not that I know of. This is just my observation. I'm 100% always on your side though. I just want to be real with you also." Do you see that?

A.   I do.

Q.   And then you wrote, "I appreciate it. I probably overdid it and could have taken a calmer approach. I get very frustrated when our partners aren't operating to a certain standard." Do you see that?

A.   I do.

Q.   Let's turn ahead to JPMS 21856. And that is page 81.

A.   I'm there.

Q.   And we're going to be at the top of the page, ████ OK, Ms ████ and now we are - We moved ahead to July 27th of 23. At the top of that page, Ms ████ writes, "It's a crime that I was not taken on this client trip, but what can one do?" And you wrote "People love me." And she wrote "Evidently so", do you see that?

A.   Yes.

Q.   Let's turn ahead to JPMS 21868, which is page 93 of the texts. And when you get there, ████ will be at like kind of the first third of the of the page. So on 21868, over to the right. Do you see where you wrote - "Make sure" - So go down a little bit further, ████ Right there. Do you see where you wrote, "Make sure you get out of the office early. I can't afford you leaving me due to burnout." Do you see that?

A.   I do.

Q.   Next page if we could. Over to the left toward the bottom. And this is page 94 of the texts. Keep going a little bit more. There you go. Perfect. At the top. Do you see where you wrote, "From your position, did I come off too hot with JT on the phone?" And this is August 16th of 23. Do you see that?

A.   She wrote "Warm, but not too hot." You said, "Yikes." She said, "You just sounded frustrated, that's all." And you wrote, "Yeah, it's

S.09a.ii-048
4:26-cv-00381-O
Biering v. JPMS, et al.

been a theme, hopefully I'm not told to pack my bags." Do you see that?

A. I do.

Q. Let's go to the next page please. Do you see the PDF over to the right? Keep going. And it says Lone Star Invitational sponsorship letter. Do you see that?

A. I do.

Q. That references the September golf outing, correct?

A. Yes.

Q. Below that you asked her, ███████ "You in?", and she wrote "I'm afraid that I have hyped my golf abilities too much." Do you see that?

A. Yes.

Q. And then if we Scroll down a bit, ███████ Do you see, you go "Eh, it's a fun time", she said, "I play very casual" - or I think she meant casually. "Are you going to be OK with it if I suck? Be honest.", and you wrote "It's a scramble, let me put out feelers with Brawley." Brawley being her boss at the time, correct?

A. Her manager and my second invite, but he declined.

Q. OK. And then if over to the left. She wrote, "If you're OK with carrying this team on your back, then I'm one or 10,000% in. I think it would be fun but I don't want to embarrass you lol." You wrote, "Just try to contain yourself." She laughed at that and she said "I'll try my best." Do you see that?

A. I do.

Q. Let's move ahead. To JPMS 21873 which is page 98.

A. I'm there.

Q. OK, all the way at the bottom of page 98. OK, over to the right, you wrote, "You're following me to my next gig?" and she said "I told you I would." Do you see that?

S.09a.ii-049
4:26-cv-00381-O
Biering v. JPMS, et al.

A. Yes.

Q. OK, go to the next page please. Go to the bottom. And right there. Do you see to the right, you wrote. "Don't get salty like me." Do you see that?

A. Yes.

Q. Let's continue. Let's go to the next page which is 21875, page 100. And we're going to go kind of halfway down right there, a little bit more. Do you see where you wrote to the bottom of that, "But like how, I've been known to fight back." Do you see that?

A. Yes.

Q. And if you keep scrolling down ███ at the very bottom of the page, now we're on. Looks like August 18th you wrote, "If you haven't left your house yet, please bring me a belt from Dawson." Do you see that?

A. Yes.

Q. OK. Let's go to JPMS 21878 please, which is page 103. OK. And there we're going to go like to the middle of the page. Right there is fine and then we'll scroll from there Do you see here now we continue to be on August 18th and you wrote, "That golf tournament is a pretty cool thing." Do you see that?

A. I do.

Q. Let's Scroll down a little bit, please, ███ And you wrote. Keep going. You wrote, "I need to figure out the logistics etc. like transportation. We probably drive, but I'm told lodging is provided. I think those are cottages on the course, not sure." And she says "Worst case we can stay with my parents, and you wrote, "Well I was thinking worst case you'll have the room, and I'll take the couch. We are good." Do you see that?

A. Yes.

Q. And as I asked you before, you didn't take the couch, correct?

A. Correct.

S.09a.ii-049

S.09a.ii-050
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Then she wrote "Loved. Well, I was thinking worst case you'll have the…" it starts RO for room. "We'll figure it out." You wrote, "Yep, I'll confirm logistics, etc. And she said "Perfect", you see that?

A. I do.

Q. Ho to the top of the next page. There, she said. "I'm excited" you wrote ██ same. I don't want to send the wrong signal, so I don't want to broadly communicate. Makes sense?", she wrote. "Good point. Yes, makes sense. I haven't told anybody about it." You asked her "Hubby? Gotta make sure he's good." And she wrote, "I'll bring it up TN," which apparently means tonight, correct?

A. Yes.

Q. And then you wrote ██ .. good. This feels sneaky, but it shouldn't." And she wrote "I don't feel sneaky, so we good." Do you see that?

A. I do.

Q. Let's go to JPMS 21882.

A. I'm there.

Q. At the very top, which is page 107 of the text messages between you and Ms ██████ Do you see there where you said "Yeah – Don't be salty. Don't let let me rub off on you." Do you see that?

A. I do.

Q. Go to the next, page which is page 108 and kind of halfway down where – Let's see, it says you need to cut yourself. Oh, there you go. Keep going. OK, right there. You wrote, "You need to cut yourself a lot more slack. You're a 1.5 years in," Do you see that?

A. I do.

Q. And by that, you meant that she was a year and a half into her work at JP Morgan as an analyst at that time, correct?

A. Yes.

S.09a.ii-051
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  Let's go to the next page at the top. Stop there. You wrote here, "I know you are. The politics can be stressful, I know. But once you take a step back and realize you're working at the best bank in the world, and a bazillion people wish they had your job, it's kind of cool." Do you see that?

A.  Yes.

Q.  And that's something that you just told Ms ██████ you didn't tell, you know, your boss, Mr. Stewart, or, or his boss, JT, correct?

A.  No, I'd have discussions like that with Stewart. And honestly, Aughinbaugh. I would tell Aughinbaugh I wanted to make it work here because this is the best bank in the world. Having JP Morgan... I was proud to have JP Morgan on the business card.

Q.  Alright, let's move ahead. To...We saw this one yesterday, I believe.

A.  What page?

Q.  We're going to go to JPMS 21892, which is page 117 of the texts, and now we're going to August the 25th of 23.

A.  I'm there.

Q.  OK. This is the one where you were talking about I think I'm getting drunk with management and you said I'm told I've run my partners too hard. Do you see that?

A.  I do.

Q.  This is… this is the time when you were at Buff Brothers. And, and Mr. Stewart and Mr. Aughinbaugh were in one location, you and Ms ██████ were at another, correct?

A.  That's right.

Q.  Alright. So if we if we move down the page, I think you went over some of this with your council yesterday. Let's go to the bottom third of that page. OK, stop right there. If we go, this is where you were saying, in essence, I think I just quit. Do you remember that?

A.  I do.

S.09a.ii-052

4:26-cv-00381-O

*Biering v. JPMS, et al.*

Q. OK. And at the very bottom of the page that's on the screen behind you, it says "I'm out." And Ms ████ asks you "Out of the bar? Out of your mind? Out of what?" And questioned that. And then you wrote, "K, I'm out." And she wrote to you. "So cryptic." Do you see that?

A. I do.

Q. Then on the August 26th, the next day you wrote "Ugh". She wrote "Good morning." You wrote "You're gonna need to find a new banker. I'm too much of a liability." She wrote "A liability? How?" And you wrote "I'm being dramatic, I'll explain later." Do you see that?

Q. Yes, I was being dramatic.

Q. Let's go to JPMS 21896, which is the 121st page of your text with Ms ████ OK, there's some redactions. And then we're going to go to the very bottom of the page, right where you were. Yep. Good. Do you see there on 831, August 31st of 23 you wrote, you wrote. "We should talk because I feel like I received missed signals. Sounds like you're not happy with the current coverage", she wrote. "Huh? What are you talking about?" And you wrote "Like we are running too hard, let's talk tomorrow." Do you see that?

A. I do.

Q. At the top of the next page, you can see that she writes a number of texts, in the second bubble, if you will. Toward the bottom, she wrote. "Personally, I'd rather just cover you." Do you see that?

A. Yes, she didn't cover just me.

Q. And then let's go to the very bottom of that page, please. OK, so here again, we're in. I think this is August 31st, she wrote to you on the left. "I'd be really angry if I hear that you tried to replace me with another analyst", you wrote. "Let's talk about it. You don't get to play…" It says do.

A. It should have been "both,"

Q. "…both sides of the coin." She wrote "Literally, don't make me mad." And you wrote, "No, you're too important. We're going to find you

S.09a.ii-053
4:26-cv-00381-O
Biering v. JPMS, et al.



A.    I do

Q.    Let's go to the top of 126 which is 21900.

A.    I'm there.

Q.    And now we are September the 1st of '23 at the very top of that page and I don't think you're there.

THE CHAIRPERSON: There you go. Go up. He's… he wants to talk about something in 21/9.

Q.    Correct, at the very top of it. There you go. OK, great. She wrote there, "I love being your partner and it challenges me in ways that I need to be challenged."  Do you see that?

A.    Yes.

Q.    Let's move ahead. We're going to go to 21908, which is page 133 of the texts.

A.    I'm there.

Q.

A.    I do.

Q.    And so the two of you did not drive to that September golf outing together, correct?

S.09a.ii-054
4:26-cv-00381-O
Biering v. JPMS, et al.



A.

Q.

A.

Q.

A.

Q.

A.    I do.

Q.

A.    I do.

Q.

S.09a.ii-055
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I do.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.



S.09a.ii-056

4:26-cv-00381-O
Biering v. JPMS, et al.



Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

Q.

A.

S.09a.ii-057
4:26-cv-00381-O
Biering v. JPMS, et al.



S.09a.ii-058
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**A.** I do.

**Q.** OK, go to…

**THE CHAIRPERSON:** I'm going to take a break. How much longer do you have reading texts to us?

**MR. DUNLOP:**    Probably about 1/3 of what I just did.

**THE CHAIRPERSON:** OK, let's take, let's take 10 minutes – and I'm starting to lose focus. So that's not a good thing. I need to pay attention.

**MR. DUNLOP:**    Ok.
**[ZOOM00****27**** ~ ****0****:0****0****:****00****.****0****]**

**THE CHAIRPERSON:** You may proceed.

**Q.** Thank you, Mr. Chair. OK, so let's turn in the... the book there in the... in the texts and... and MMM to 21920, which is page 145.

**A.** I'm there.

**Q.** You see on the previous page that this is September the 13th, still, of 2023?

**A.** Yes.

**Q.** OK.

**A.** And if we go down to the bottom of this page... over to the left, go up a little bit more, right there. Do you see where Ms. ▇▇▇▇ said... asks you "So I seem anxious a lot?" And you wrote "Ugh, no. Doesn't help I am... I have a lot of thoughts." She wrote, "Like what?" And you wrote "Don't know, just philosophically confused about life." What does ooo mean?

**A.** Auto correct for lol.

**Q.** Oh ok, I got it. And then she wrote. "Don't get me started on life philosophy lol. You know I'll go on and on." Go to the next page which is 21921. Right there. You see where you wrote, "I just genuinely want to make sure you're OK"? She wrote, "Yeah, I don't know. I'll be fine, though. I don't feel like you have to worry.

S.09a.ii-059
4:26-cv-00381-O
Biering v. JPMS, et al.

Genuinely. I don't want to add to your plate right now." Do you see that?

A. Yes.

Q. OK. Below that you wrote, "I assure you you're not. Tell me." She wrote, "How are you doing?" You wrote, "No, I asked you." She said, "I mean, I'm not doing great right this minute, but I'll be fine. Just side effects of anxiety." And then you wrote, "Seriously, how can I help? I'll do whatever you want. If you want to broadly communicate, I'm good." She wrote, "No, really, it's OK. I mean it. I'll be fine. I really am sorry to even be bringing this up." And you wrote, "No, I want to know." And she wrote, "I refuse to add me to the list of things you have to stress out about haha. If you're worried that I'm going to broadly communicate, don't worry about that. I won't, so don't stress about that." Do you see that?

A. I do.

Q. Let's then turn ahead. And we'll go to JPMS 21929 which is… which is page 154. If you look at the previous page here, Mr. Biering, you're going to see that we are now moved ahead a couple of days to September the 15th of 2023. And if we go to the top of page 154 to the left, do you see where she wrote, "Yes. I'm sorry if I'm not seeming like my normal self, but yes, I'll be fine. Don't let me add any stress to your plate. This is so opposite. I want to be here for you. Don't worry about me at all." Do you see that?

A. Yes. I wonder if this is when her husband involved...

THE CHAIRPERSON: OK, all you need to say is yes.

A. Yes Sir.

THE CHAIRPERSON: And they can ask you questions later.

A. Understood. Sorry. Yes, Sir.

THE CHAIRPERSON: It's OK.

S.09a.ii-060
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's move to 157, which is JPMS 21932. Come.

A. [inaudible] I'm there.

Q. Do you see… Scroll down a little bit, ▮▮▮▮ Keep going. Right there. Do you... do you see where you said over to the right, "This convo seems very surface level lol"? She wrote ":ol there's purpose in it. I got to know what time to stop blowing up your phone haha." You wrote "No you're never blowing me up. There's a lot of things I want to say but don't want it in text." Do you see that?

A. I do.

Q. Scroll down. She... you wrote "Lol so what do I do?" She wrote, "I unfortunately do not have a solution, but if you find one, let me know." And you wrote "Signal app", do you see that?

A. I do. And that's where you… you switched over to using Signal, correct?

A. She switched over to text me on Signal, yes.

Q. Then she wrote, "Look who learned how to use invisible ink?" And you wrote "It took me a sec." Do you see that?

A. Yes.

Q. OK. And then she wrote, "Have you used that app before?" and laughed at "It took me a second." You wrote, "Yup to text buddies," do you see that?

A. Yes.

Q. OK. Let's go ahead then to JPMS 21934, which is page 159. OK, right there, you see at the top there where you wrote, "Can you forward me your latest draft of your year-end review?" She wrote, "Yes, sir." You wrote, "Do you also have a copy of the guidance on…" it says what? "S versus on track for analysts." Is that what it says?

A. That's what it reads.

Q. What did you mean by that

A. That's. Those are ratings for year-end review preparation.



S.09a.ii-061
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK, she wrote. "Yeah, let me find it, one SEC. What is considered average for most analysts? On track for every category? You wrote "Yes. My goal is to help you get as many strengths as possible." You see that?

A. Yes.

Q. And then she wrote "It's common for… is it common for people to get some strings? I think I came just after everyone's review last year. Thank you also for helping me with this." And… read what you said back.

A. "I'd say I want you to strive for at least 2. Great success would be 3 out of 3, which is what we want for you."

Q. OK. And then below that she says "Thank you. I will always appreciate your honest feedback." Do you see that?

A. I do.

Q. Alright. Let's continue. Go to JPMS 21938 which is page 163.

A. I'm there.

Q. We're going to go to the bottom. And... You just… Ok stop there, Ms ▮▮▮▮ says – Kind of the third bubble there from the top, she says, "I'm glad you're doing good, though," you wrote "Agreed. And yourself, how are you holding up? She says "I'm doing alright." I'm... you wrote "I'm confused with the back and forth." And she asked you "The back and forth of what?" Do you see that?

A. I do. I don't know if she asked me that, but I do see it.

Q. OK, let's move ahead. To JPMS 21942 which is page 167.

A. I'm there.

Q. We're going to start at the top. Over to the right, you wrote "Wrong channel." And then on what appears to be September the 23rd of 23, you wrote, "I'm guessing we can't - we still can't", and she wrote "Wouldn't be wise." And then if you skip down she wrote, "The only thing I need from you, if you have the time, is to just fill out my feedback thing online, but it doesn't need to be super long or anything. And if you'd rather, you can just e-mail it to

S.09a.ii-062
4:26-cv-00381-O
Biering v. JPMS, et al.

Brooke/Will," you wrote. "I'll have a better idea of when I'll be back in later this evening. We know BS need to sit down and review your year-end review you wrote before you sit down with Brawley and Brooke. When is that?" What… was there, again, an auto correct? "We know BS". What did you mean by that?

A.  We needed to sit down and review your year-end review. Probably an autocorrect.

Q.  OK, OK. And then if we scroll a little bit further, you're talking about doing it on Wednesday, and she wrote, "Would it be more convenient for you to just e-mail me bullet points of changes I need to make? I don't want you to feel like you have to come in or anything or jump on a Zoom just for this. But I'm flexible, so you just let me know." Do you see that?

A.  I do.

Q.  And you told her that "I'll be doing bullet points, but this is an important process because I've been on the other side as an analyst manager. This is how they'll see everything you've done relayed to…", I think you mean "…related to your peers." Do you see that?

A.  I do.

Q.  OK. Let's skip ahead. Let's go to JPMS 21945, which is page 170. Go to the bottom.

A.  Where the Spotify link is or?

Q.  Let's go to – Do you see where it says, ▮▮▮▮ "Loved"? Yeah – right, oh, you had it. Yep, you wrote "Loved. Not to be dramatic lol, but the thought of anything" and then you wrote "Signal app" or Signal – it says SignalAi or signal something. No – actually it says sign AL, do you see that?

A.  I do.

Q.  That… that – is that auto correct for going to Signal app?

A.  I couldn't… probably.

S.09a.ii-063

4:26-cv-00381-O

Biering v. JPMS, et al.

Q. OK, let's go to 21948 please, which is 173. Couple more here and we're done. There I'm going to go kind of to the middle of the page.

A. Of 21948.

Q. Yes, that's correct. Okay. Scroll down a little bit further, that's where I want to go. Start right there. Do you see over to the left where she says… ▮ says "Yes. Sorry you caught me at a weird time lol. I was just thinking a lot about some things. You write , do... do share the 'inside baseball.' The next... or the... it looks like the next day 9/29 "is Shay in the office?" "She just walked in." And you asked "What?" and you say "I did your review, make sure you got it." Do you see that?

A. Yes, the peer end… the peer year-end review, not the performance review.

Q. OK, let's move to... Let's go to the second to the last page of the text, which is JPMS 21957. Page 182.

A. I'm there, almost there.

Q. Alright on this page on 10/25, over to the left,  keep going down. OK, great. Do you see there where she says "Feeling about the same, not sure if I'm going to make it in tomorrow honestly"? And you wrote "You need to take all of the time you need. Do not rush it." She wrote, "Thank you." You wrote "Your head space doing alright? How are you doing?" And she wrote "Still not feeling great, trying to get rested up", and you wrote "OK then why are you working? You should unplug 100% and get some rest." Do you see that?

A. I do.

Q. The next day, at the bottom of that page, she told you that she's still not feeling well. Do you see that?

A. I do.

Q. OK. Alright. Thanks for bearing with me on that.

A. You bet.

Q. We got to get some evidence in... in these cases.

S.09a.ii-064
4:26-cv-00381-O
Biering v. JPMS, et al.

*[ZOOM0028 ~ 0:13:29.2]*

Q. Alright. In the book, the bigger book that you have there, let's go to exhibit ZZ, please.

A. I'm there.

Q. So this… at the very first page of this is Biering 1776, and I think this is where you were texting with Mark Roberts, the investor in the Fort Worth office?

A. In his capacity as associate manager, yes.

Q. OK. And toward if you go to the bottom - Right there, stop. On April the 11th of 23. You… read the first two things that you said there.

A. On what date?

Q. April 11th at toward the bottom.

A. "These are my army roots coming out. I'm about to flip my shit, associate manager. Fingers are hot. I'm ready to type a angry e-mail, but I'm practicing restraint." He asked you "What happened?", and you said "Where the R fuck are all the associates? Everyone is shifting on the analysts, and all tasks are rolling downhill. Zero associates in the office except Borer. I got Allison telling ██████ she now needs to cover Loki while Mao is out, is that so Loki can come into the office from 10:00 to 3:30 and GTFO?", means get the F out, correct?

A. Yes.

Q. OK. That was in April of 23, correct?

A. Yes.

Q. You had, during the year '23… You had a decent working relationship with Ben Stewart, did you not?

A. Yes, I would say so.

Q. And what kind of a working relationship did you have with JT Aughinbaugh?

A. A working relationship.

S.09a.ii-065
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.  What kind?

A.  A working relationship to where I work with Ben Stewart.

Q.  Did you respect Mr. Aughinbach?

A.  I respect everyone.

Q.  OK. Do you think he respected you?

A.  I couldn't speak for Mr. Aughinabugh.

Q.  Did you… Were you personal friends with him?

A.  No.

Q.  OK. You did have the... the situation where you guys were across the street having drinks that one time that we saw in the... in the text, correct?

A.  In August, yes.

Q.  Had you had drinks with him previously?

A.  Yes. Frequently.

Q.  And it's true, is it not, that Mr. Aughinbaugh accepted the market manager position in Fort Worth in just January of 23? Correct?

A.  I don't know when he officially did, but right around then.

Q.  OK. And we saw the... the blow up that you had with Mr. Aughinbaugh and August, where you used the F word. Did you ever apologize to him for that?

A.  I did.

Q.  OK. When did that take place?

Q.  Within 24 to 36 hours after.

Q.  OK, stay in that exhibit, ZZ and I want to go behind the blue split sheet there to Biering 1787.

A.  I'm there.

Q.  OK. I'm sorry? You got to talk a little louder.

[Speaker tag uncertain]: [inaudible] the page.[inaudible]



**MR. DUNLAP:** 1787. So you have to go past the split sheet? Yeah, keep going. There you go. You're… you're… OK.

Q. We had seen this before, but this is… appears to be some text messages between you and Mr. Stewart in April of 23.

**THE CHAIRPERSON:** I'm seeing May on this…

Q. I'm sorry, you're right. It's so small. It's May of 23. Do you see that?

A. I do.

Q. OK. And this is where you and he were talking about how you felt, etc., etc., in May of '23? You see that?

A. Yes, Sir.

Q. And you would agree with me, would you not if you scroll to the bottom, ███ that at this particular time Mr. Stewart was being supportive of you, correct?

A. That's correct.

Q. Let's turn past that to the next set of texts, which is Biering 1241.

A. I'm there.

Q. OK, now these are text messages with Austin Barr.

Q. Do you agree?

A. Yes, that's what it says.

Q. OK and what was his position?

A. At the time, vice president, banker, recently promoted executive director. Q.   OK, at the very top of this, you wrote to him on August the 7th, "JT and I get into it yet again", do you see that?

A. I do.

Q. And he laughed at that, and then on the 8th if you scroll down you wrote "Dude, this is getting exhausting. I don't know how much more

S.09a.ii-067
4:26-cv-00381-O
Biering v. JPMS, et al.

I can take." And he asked you, "Home life or JT?", and you wrote "Both lol. I almost resigned today. JT and I had another blowout disagreement in his office." Do you see that?

A.    Yes.

Q.    OK, so this is not about what happened at the restaurant across the street. This is about some disagreement that you had with him in his office.

A.    If I recall, it was the ████████████████████ $150 million prospect opportunity I was securing.

Q.    OK. And the… what was the nature of the disagreement?

A.    He wouldn't let me present before the client review forum because it was a quasi-government nonprofit entity, and I had gotten a confirmation from the head of our onboarding team that it was procedurally the next thing to do. And I also confirmed with multiple managing director bankers in the Northern Virginia and Washington, DC offices that they do cover several quasi-government entities because of the nature of the defense services contracting business in that area. And he wouldn't let me… He wouldn't let me present in the standing weekly client review form.

Q.    OK. And to the extent that he wouldn't let you present, that was his prerogative as… as the market manager, correct?

A.    I believe so, yeah, his discretion.

Q.    Let's go to the bottom of that page, please. Keep going. Over to the left, you see where it says, "I think" – Mr. Barr told you…

A.    Excuse me, what page?

Q.    We're on the same page,  OK, At the bottom, over to the left, this is on August 8th, Mr. Barr wrote, "I think you should go in and apologize to JT. You're a great banker, but he is the boss." And you wrote, "Man, I don't know, we will see." And then the next day on the ninth, you wrote, "I sucked it up and apologized." And he wrote, "Way to go." Do you see that?

S.09a.ii-068

4:26-cv-00381-O

Biering v. JPMS, et al.

**A.** I do.

**Q.** Now, you… we obviously talked a lot about this, but you were investigated with respect to the golf outing in September, correct?

**A.** Hardly called an investigation, but yes.

**Q.** And the discussion that you had with Mr. Jacobs that took place on November the 7th of 2023, did it not?

**A.** 7th or 8th, but yes.

**Q.** OK. That came after that Friday, October 27th, when you were told that you were on… being paid, placed on paid leave, correct?

**A.** No, I resigned.

**Q.** Yeah, so listen to my question again.

**THE CHAIRPERSON:** Alright. Sequentially, you had your meeting with the investigator after… after you've been notified that you were placed on administrative leave.

**A.** Yes, that's fair.

**A.** OK. And then on Saturday morning, you then tendered your resignation that we've seen a number of times. You recall that?

**A.** I submitted my formal written resignation.

**Q.** OK. And at that time you knew that that started what… what you called your garden leave, correct?

**A.** I presumed so, yes.

**Q.** Let's go in that same exhibit there. The fifth set of emails here. Or text messages.

**A.** Is it tabbed?

**Q.** Yeah, it is behind – Well, it's Biering 1295.

**A.** What tab is that?

**Q.** It's at ZZ, where you are. Double Z.

S.09a.ii-069
4:26-cv-00381-O
Biering v. JPMS, et al.

A. I'm in ZZ.

Q. So go to Biering 1295. You'll just have to turn - It's like the fifth set of communications back. It's an e-mail with ███████

A. I'm there.

Q. OK. At the bottom of this page, do you see where - keep going. There you go. Do you see where you wrote on that day, Saturday, October 28th to ████████ an e-mail, and you said "Thank you Chris, I did want to inform you I recently submitted my notice to JP Morgan leadership this morning. I have a 60-day garden leave and I have not heard back from management, but it just now happened." Do you see that?

A. That's what it reads.

Q. So the day after you were placed on leave, October 28th, after you submitted your resignation, you told Mr. ██████ at 10:11 in the morning that you had a 60-day garden leave, correct?

A. Yes. Not for the first time though.

Q. So you knew about that even before you sent your resignation, correct?

A. That's been undisputed. I knew that there was a general 60-day garden leave, but that was the extent of the knowledge of it. I had no idea of the details, such as the waiver.

THE CHAIRPERSON: OK. We get it.

Q. The… the interview that you had with Mr. Jacobs, as we saw in some previous emails, that took a bit of time to get scheduled, maybe about 5 days, right?

A. Yes, we were scheduling at the advice of Council for his availability to join us as well, but ultimately Mr. Jacobs did not let my council join.

Q. Right, And you understand why, correct?

A. [inaudible]

Q. OK. The… the interview took place with Mr. Jacobs being involved and Mr. Chris McGee being involved, correct?

A. That's who I was told was on the call. Yes.

Q. OK. And Mr. McGee was from what they call global security at JP Morgan, correct?

A. That's what I recall.

Q. OK. That interview took about an hour, didn't it?

A. That was a blur. Roughly, maybe.

Q. OK, let's take a look in in the smaller book at exhibit J, please.

A. I'm there.

Q. And in exhibit J, I want you to go to JPMS 1299. It's toward the back of the document, maybe 4 pages from the end, please.

A. I'm there.

Q. And this is an interview summary from that Tuesday, November 7th, 2023 at 2:30 in the afternoon interview that you had with Mr. McGee. It's 1299.

A. The incomplete interview summary, yes.

MR. DUNLAP: Mr. Chair, could I just ask for the commentary to stop?

THE CHAIRPERSON: No, that's fine.

Q. OK. Do you see at the top, it… it mentions along with threat management part- partner Christopher McGee, that Mister Jacobs interviewed you?

A. Yes, the first time I have seen threat management used. I heard global securities but not threat management.

Q. And if you come down a couple of pages, no, no, I'm sorry, a couple of lines, I'm sorry. Do you see where we're 5 lines down, and it says he resigned from the firm on October 28th 23, and it and is on his "garden leave" until December 26th of 2023. You see that?

S.09a.ii-071
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   Yes.

Q.   OK, Now, and again, it's unfortunate because these things are not numbered, but if you come down to about the middle of that page – over to the right, there is a sentence that says, starts with "Subject says four people stayed". Tell me when you see that.

A.   I'm there.

Q.   OK. Read that for the record, if you would. That sentence and the next sentence.

A.   Subject said four people stayed in his cottage, which had three bedrooms.

Q.   Keep going.

A.   He shared a bedroom with ERC, who he described as an analyst and partner who was assigned to support his book of business. [inaudible]

Q.   OK. and ERC, do you understand that from previous documents to be Employee Raising Complaint?

A.   Yes.

Q.   OK. Let's go down in this to, I don't know, 16 lines from the bottom where we're going to stay on that page, and it… there is a sentence that starts with "Subject said that he and the non-JPMC…"

A.   Say that again?

Q.   There's a sentence that says "Subject said that he and the non-JPMC…"

A.   Yep, I'm there. Tell me if I read this correctly. "Subject said that he and the non-JPMC guests in the cottage are males and really good friends, and did a lot of joking, handshakes, hugging and a collegial pat on the back with ERC – employee raising complaint – He noted that they had drinks in conjunction with all of the other guests at the event, and sat close to each other. Do you see that?

A.   I do.

S.09a.ii-072
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. Let's go to the next page please. At the top, 3 lines down. Read for the record if… 2 lines down. Read for the record if you would what it says with "Leading up to…"

A. "Leading up to the tournament, he knew that – ERC knew that he was an avid golfer and she said that she was a good golfer and was excited to join him on the trip."

Q. OK. If we… again.. try to find –if you go down, there's a… there's a sentence that says "Subject said that it was over" to the right.

A. Yup, I'm there.

Q. OK. Tell me if I read this correctly. "Subject said that it was a "very professional relationship". That progressed into something "very romantic, but was not sexual in any way", Recently the two went to dinner and it was "the most romantic dinner". Do you see that?

A. I do, but the way you read that, the emphasis was misinterpreted.

Q. Go…

THE CHAIRPERSON: That's fine, go on.

Q. Go to the bottom of this page please. And I think you have to scroll up a little bit, ███   There is a sentence that starts with "For texting" over to the right, "ERC and subject."

A. I'm there.

Q. OK. Tell me if I read this correctly: "For texting, ERC and subject used an app called Signal which has encrypted texting." Do you see that?

A. I do.

Q. OK. And then if we move down a bit. There… there is a sentence that… that starts with "Subject was the one who suggested signal." Do you see that? Tell me when you see that.

A. That's what it reads. Yeah.

S.09a.ii-073
4:26-cv-00381-O
*Biering v. JPMS, et al.*



Q. OK. It says "Subject was the one who suggested Signal. Subject said that he is no longer texting or Signaling ERC as she has blocked his texts and blocked him on social media. He had asked for selfies via Signal because she had sent him selfies, but he did not send, "sexual requests". Subject said that the two did talk about sexual and physical things in person and over Signal, and that the two exchanged a ton of messages on Signal which were a "wide spectrum" from day-to-day views on religion, marriage, Alcoholics Anonymous, Erc's "Spiritual journey", as well as romantic. Did I read that correctly?

A. You did.

Q. OK. And just for the record, if we look at the very top of this interview summary, let's go to the top of it.

A. [inaudible].

Q. It's on 1299. Stop there. It, the… the interview started, we can see in that first line, at 2:30 in the afternoon, 2:30 PM. Do you see that?

A. It says here, yup.

Q. And then if you go to the end of it, you can see that it concluded at 3:21 in the afternoon, correct?

A. Yes, there's not an end date on ███████ interview, though, or time.

Q. Wait, what did you say?

A. There's not an end time on ███████ interview, so I'm not sure if that's a standard practice.

Q. OK. We heard the termination meeting that you had with JT and Mr. Stewart, correct?

A. Yes.

Q. OK. Did you ask them if you could record that meeting?

A. I don't. I didn't need to. No, I didn't ask them.

S.09a.ii-074
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK. And you heard Mr. Stewart tell you that you were being terminated because you violated the code of conduct and JP Morgan's anti-harassment policy, correct?

A. Yes, and that was downgraded from the sexual assault a ███ on.

Q. I want to go to Exhibit ZZ, please. Back to that one. And I want to go to the document that is second from the back.

A. Before AAA.

Q. Yeah. Second document or second leaflet?

Q. The second document from the back.

A. 1832.

Q. It is… it's Biering 922.

A. Oh, excuse me, excuse me. I have a lot of [inaudible] these labeled documents and…

Q. You remember how you wrote kind of an explanatory letter?

A. One moment, please. Oh. Yes, I had sent a detailed timeline begging for reconsideration on, yeah, 921. I sent a very detailed timeline insisting that they [inaudible].

Q. OK. Let me… let me just get to a question.

A. Yes, sir.

Q. Alright on 922, at the bottom you wrote there "33 days after I submitted my voluntary resignation, Aughinbaugh and Stewart terminated me on 12/1/23 for violation of the JP Morgan conduct and anti-harassment policies." Do you see that?

A. On the bottom of 921?

Q. It's 922.

A. I see that yes, it's in bold.

Q. And it continues to the top of 923. Do you see that?

A. I do you.

S.09a.ii-075

4:26-cv-00381-O

*Biering v. JPMS, et al.*

Q. And there you have a footnote in your document where you cite to the voicemail recording of the telephone call, correct?

A. That is correct [inaudible].

Q. Now we saw this before, so I'm not going to belabor the point, but fair to say that after that termination, you continued to send emails to, for example, Jena Cohen, correct?

A. Yes.

Q. And a couple of points, Miss Cohen, as we saw when she was here testifying last week, she was asking you to just go through the lawyers, but you continue to text her or to e-mail her, correct?

A. Correct, legal fees are stacking up.

Q. OK. You, you sent - You can take that down, sir. You sent the text message that we saw last week to Ms ███████████ in December of 23. Do you remember that?

THE CHAIRPERSON: I don't know which text message you're referring to, so can you help me?

MR. DUNLAP: It was literally going to turn to it.

THE CHAIRPERSON: Ok.

Q. Yep. So you sent a text message in December of 23 to Ms ██████ correct? A.    December 1st or 2nd saying [inaudible].

Q. OK turn to exhibit EE please.

A. I'm there.

Q. OK. And behind Exhibit EE. We'll wait for ████ for a second here. It's JPMS 25397.

A. Uh, you're talking about the one to Kyle or the screenshot below?

Q. So Scroll down to it. Keep going. OK this is the text message that I was referring to. So this is on Thursday December the 21st, 4 days



S.09a.ii-076
4:26-cv-00381-O
Biering v. JPMS, et al.

before Christmas. You wrote "You ruined my career. Hope you find peace in that." Correct?

A.  Where is the date?

Q.  If you look at the top of the text message above the numbers 542. Do you see Thursday, December the 21st?

A.  That's the date the screenshot was taken? Yes.

Q.  And it you wrote, "You ruined my career. Hope you find peace in that," correct?

A.  That's what it reads. "Maybe Josh Biering."

Q.  I'm sorry, say that again?

A.  It says "Maybe Josh Biering. I hope – You ruined my career. I hope you find peace in that."

Q.  That's what you texted to ████████████ correct?

A.  That's what it reads.

THE CHAIRPERSON: OK, Did you do that text?

A.  Yes, I recall that I texted her that, yes.

THE CHAIRPERSON: OK.

Q.  Alright. After you were terminated, you appealed the termination itself, correct?

A.  No, I submitted A retaliation claim through the Code of Conduct hotline number.

Q.  Did you want JP Morgan to reexamine the issues surrounding your termination.

A.  I wouldn't call it reexamine, I would call it examine in general.

Q.  OK. Let's look at exhibit JJ, please. Behind Exhibit JJ are a series of emails. Between you and a woman by the name of ████████████ correct?

S.09a.ii-077
4:26-cv-00381-O
*Biering v. JPMS, et al.*

**A.** Yes. That's what I see.

**Q.** And in… in these emails you were emailing with her as she was talking to you about her taking a look at the termination decision and reexamining it. Correct?

**A.** Mr. Chair, may I add color behind that?

CHAIRPERSON:    Try to answer his question with a yes or no. All he's really doing with most of your cross examination is reading documents for our benefit and having you confirm that that's what they say.

**A.** Yes, but it was intercepted by Jena Cohen's [inaudible] originally after I had submitted the code of conduct hotline retaliation claim. It was assigned to a third party independent of group, but Miss Cohen intercepted that ticket, as the evidence will show, and then reassigned it to ▮▮▮▮▮▮ who was within Ms. Cohen's and Ms. Stainbacks, I guess, reporting structure -is my understanding.

**THE CHAIRPERSON:** OK. I've lost your question. What was your question?

**Q.** That… that these were the series of texts with Ms ▮▮▮▮ about examining the issues, where they're trying to get together on it.

**A.** They are emails, a series of emails.

**Q.** I'm sorry, emails.

THE CHARIPERSON: Okay.

**Q.** Okay, if you look at the bottom of 26079, you text or you emailed Ms ▮▮▮▮ on January the 10th of 2024, Do you see that?

**A.** On which page? [inaudible] 26078?

**Q.** It's 26079 at the bottom of the page.

**A.** Yeah, January 10th of 2024.

**Q.** Right. And then if we go to the next page you, you sent to her an e-mail, you said, "I just sent you an e-mail with attachments and I appreciate "e-mail of record", below. Do you see that?

**A.** I do.

S.09a.ii-078

4:26-cv-00381-O

*Biering v. JPMS, et al.*

Q. OK. And then if you go back to 26079, you can see where she texted you on Thursday, January the 11th.

A. E-mail.

Q. I keep saying text as we were on so many texts. She emailed you on that day and read what she said in the first sentence please.

A. "As you requested, I am confirming receipt of this e-mail and the one you sent with several attachments. The date stamp on that e-mail is 6:22 PM. I don't know if that's [i] standard, which is one minute before the one you sent below.

Q. And then she wrote, "As mentioned in my e-mail yesterday below, I will e-mail you after I've had the chance to read through the attachments in your e-mail." Do you see that?

A. I do.

Q. Then if you move up the page, she's telling you on the 11th that now she's had the chance to read through the attachments. Do you see that?

A. I do.

OK. And she says "Thank you for sending the details. I will look into the concerns you raised and I will circle back with you soon." Do you see that?

A. I do.

Q. Then go to the previous page, which is 26078.

A. I'm there.

Q. On Sunday, January 14th, you wrote to Ms ████ "Let me guess, the findings will be inconclusive." Do you see that?

A. Yes.

Q. And then if we turn to the next page? Read – Yeah, read what you wrote in the rest of that e-mail.

A. The one with Jamie Dimon or above it?

Q. The – the one that we're continuing from the one you just started.

A. OH [inaudible] 26079.

S.09a.ii-079
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.   That's correct.

A.   OK, I'm there.

Q.   So read for the record what you said to her.

A.   I am very glad that JP Morgan reports record earnings. "Our game plan? We get rid of top producers right before we need to compensate them accordingly. Too easy." The Fort Worth office is nothing but toxic, [inaudible] terribly inconsistent and very contradictory to your own policies. Regards, JB.

Q.   OK. And then if we come forward in this series of emails, you can see that Ms ████ provides - and I realize you're not on this, but she provides sort of a recap of some things on the first 2 pages there as to what's going on. Do you see that?

A.   On the bates label 76 and 77?

Q.   Correct.

S.   I see some emails. Yeah.

Q.   OK. Then let's go to exhibit double L, please.

A.   I'm there.

Q.   On double L - at the very bottom, and this is 26385. So scroll to the bottom of that page. There you go. Do you see where Ms ████ sent to you an e-mail, she copied Ms. Cohen, Ms. Tidwell-Neal and Mr. Dunn, and she wrote, "Joshua. My review into your concerns is still pending, but as previously mentioned, I will be circling back to you as soon as possible once complete." Do you see that?

A.   I do.

Q.   And then you responded that day, and you said, "And will that also include the release of the inadequate and biased investigation used to weaponize my Form U-5?" Do you see that?

A.   I do.

Q.   OK. And at the top, she told you on the 30th of January, read the first sentence = the two sentences, please.

S.09a.ii-080
4:26-cv-00381-O
Biering v. JPMS, et al.

A. "Joshua, as promised, I am circling back to you regarding the concerns you reported to employee relations regarding your termination, based on a review of information gathered, the involuntary termination outcome will stay."

Q. And then she wrote, "Also after careful review of additional concerns you reported, I did not find information that would support your claims." Do you see that?

A. I read that, yes.

Q. And then read what she said in the last paragraph.

A. "Lastly, based on your request, you asked for more information as to the conduct that violated the firm's code of conduct. It was determined that as an executive director, your interactions with an analyst who primarily supported your book of business was not appropriate." Not citing [inaudible].

THE CHAIRPERSON: OK, just read what it says.

A. "Such conduct did not meet the firm's expectations with regard to personal and professional conduct. Best regards, █████ "

Q. I want to… You had an interview with Ms █████ as a part of the investigative work that she was doing, correct?

A. It lasted maybe 45 seconds. She hung up after I asked to record the call.

Q. Let's turn to Exhibit Z, please.

A. Single Z, correct?

Q. Single Z please. And then… and there. We are going to go to….

A. This is a complete document.

THE CHAIRPERSON: He hasn't asked you anything about it yet other than to turn to it.

A. Yes sir. I'm there. 29178.

S.09a.ii-081
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. So let's go to 29197 at the bottom right.

A. I'm there.

Q. Alright, good. We're going to go to the very bottom. There you go. Do you see there on 29197 there's an interview summary of you. Do you see that?

A. Yes.

Q. And it starts out by saying Joshua paren goes by Josh and paren Biering, shared the following on 1/9 at 4:29 PM central time, Paren. ▮▮▮ called Josh on his cell phone and the call lasted for 21 minutes. Do you see that?

A. I do, but that's not what I recall.

Q. So then she said the ERP, the employee relations professional, ▮▮▮ ▮▮▮ let Josh know that she will be looking into concerns he raised. Do you see that?

A. Yeah, that goes into 29198.

Q. Correct.

A. Yes.

Q. Read the next sentence if you would.

A. Josh confirmed that he does not agree with this termination, that he did not act inappropriately, and that the termination was because of retaliation due to concerns he raised about the work environment, inclusive of compensation and asking for more help covered support.

Q. OK. And then if we go down a couple of lines there, you can see where she, as part of her summarizing your interview, she wrote: "Josh further stated that he was retaliated and humiliated by many, not just by J.T. Aughinbaugh. Josh said Ben used to be his champion, but JT had told Ben to not speak to Josh without JT's knowledge or presence." Do you see that?

A. I do.

S.09a.ii-082

4:26-cv-00381-O

Biering v. JPMS, et al.

Q. I want to skip down to kind of the bottom half of this and there is a sentence that starts with "When ERP ████ asked Josh."

A. I'm there.

Q. OK, read that sentence and the next sentence please, for the record.

A. "When ERP ████ asked Josh to spell the last names of the witnesses, Josh asked ████ what was the point and what really is going to be the outcome of all this."

Q. Keep going.

A. ████ explained to Josh what her role is. That she's gathering information from Josh in order to look into his concerns and that she does not have an outcome to share with him at this time."

Q. OK. And then she wrote, ████ asked Josh what outcome is he ideally looking for? And Josh stated he wants a written apology and acknowledgement from all of the wrongdoers. JT, Ben, Kyle. Jena Cohen, Elaine Agather, Peter Chillian and ████ Tidwell-Neal." And then there's a paren. Please note that Joshua did not provide any details or examples how Jena Cohen or ████ Tidwell-Neal are wrongdoers, inappropriate behavior by them. Do you see that?

A. Yes.

Q. So you told her by my count that there were 7 wrongdoers at JP Morgan, correct?

A. As the evidence shows, yes.

Q. OK – and then if you... If you go down a couple of sentences right where you had it, do you see there's a hyphen? "Josh then asked".

A. U-5 expunged?

Q. Yeah, right after that, so it says "Josh then asked ████ if they could reschedule their call because he was getting charged up and wanted the opportunity to speak to his attorney." Do you see that?

A. Yes.

Q. And that did happen, correct?

A. Yes.

S.09a.ii-083
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK, let's go to… well at the very bottom of that, and then kind of split the pages. There you go. Good. Do you see where at the very bottom it says ████ told Josh that she does not record calls and does not consent to having a call recorded?" Do you see that?

A. I do.

Q. You recall that happening?

A. Yes, but I' in Texas.

Q. OK. And then 5 lines down on the next page it says "Josh stated that he already knows what is going to happen. Nothing." Do you see that?

A. I do.

Q. And at the very bottom it says, "Josh then stated that 'this is not about money, this is about you guys fucked up." Do you see that?

A. Those weren't my words, but I see it.

Q. She – she listed them as your words because she put him as quote… in quotation marks, correct?

A. That's my understanding of quotations.

Q. Now following your termination, you... Texted Mr. Aughinbaugh and Mr. Stewart, and in that text you accused them of being malicious and cruel, correct?

A. I did.

Q. And you... you threatened them in that text, did you not?

A. No.

Q. OK, Did you say anything like "You'll be seeing me again?"

A. Yes, that's not a threat.

Q. OK, let's look at exhibit ZZ please.  And I want to go to that timeline of yours that you prepared.

A. And which blue sheet?

S.09a.ii-084

4:26-cv-00381-O

Biering v. JPMS, et al.

Q. It's the second, well, let's see here. It's the second to the last document in the… in the group exhibit, and it has Biering 932 at the bottom right as a as a bates stamp.

A. I'm there.

Q. So according to your timeline on this page. And let's Scroll down to 12/21 please. You wrote. I'm not proud about this, but I texted J.T. Aughinbaugh and Ben Stewart, "You're all malicious, cruel, and you will be seeing me again, and you are cowards for not responding like men. Stakeholders and constituents will realize this very quickly." Do you see that?

A. Yes, but not with the emphasis used.

Q. And by the way, you wrote  – you… these are your words throughout this document, correct?

A. 100%. I pleaded for them to reconsider.

Q. Go to exhibit EE please. And behind EE there's the three pages. I want to go to 25398.

A. 25398.

Q. Yeah.

A. I'm there.

Q. You see that? And this is where you sent the text. There you can… Doesn't continue, but "You are all malicious, cruel, and you'll be seeing me again." Do you see that?

A. Yes, as we confirmed.

Q. And that was on... 12/21 of 23 according to your timeline, correct?

A. Yup, that's right.

Q. Now let's talk about following your termination. Following your termination from JP Morgan…

A. October 28th? Following…

THE CHAIRPERSON: OK. Just give him a date or something to go to what you want to do.

S.09a.ii-085
4:26-cv-00381-O
Biering v. JPMS, et al.

[ZOOM0027 ~ 0:57:27.6]

Q. Following December 1 of 2023, it did not take you long to secure a new position in the financial services industry, correct?

A. Correct.

Q. In January of 24, you began working at Raymond James and Associates, didn't you?

A. I did.

Q. And that was in a registered position, not a non-registered position, correct?

A. Yes, but the licensing, if I recall, was delayed.

Q. So what is your job title, as you sit here today, with Raymond James and Associates?

A. Senior Vice President, Wealth Management.

Q. OK. You work in Fort Worth, correct?

A. I bounce around all over. I'm licensed in all 50 states. I have two offices, one in Fort Worth and one in ███████. I officed in ██████████ predominantly during the transition because at that time Raymond James was on the top floor of the same building the private bank was on, and we were moving to a new office space in the Crescent in Fort Worth, and I specifically asked my complex manager Jeremy if I could work out of ████████ instead until we were moved into the Crescent.

Q. And you realize the fact that you were working in the same office that the others in the private bank were working in caused concern by those people who were working there, correct?

A. I did not realize that.

Q. Did you realize it through the the process of this case?

A. No, I was working at ████████ as I just shared.

Q. Alright. Take a look at Exhibit XX please.

A. That's my… Got it. I' there. The January 9, 2024 letter.

S.09a.ii-086

4:26-cv-00381-O

Biering v. JPMS, et al.

Q.  This is the offer letter that you received from Raymond James, is it not?

A.  Yes, sir.

Q.  OK. And if we go to the Biering 1293 page, you can see that you signed this on February the 4th of 2024. You see that?

A.  I do. May I provide context?

**THE CHAIRPERSON:** No. Just answer that.

A.  Yes.

Q.  Go to the first page of the document. That letter, as you said, is dated January the 9th, and it's sent to you at 3900 Bent Elm Lane in Fort Worth. Did you see that?

A.  I do.

Q.  OK. You would agree, would you not, that this outlines the terms and conditions of your employment at that time with… with Raymond James?

A.  Generally speaking, yes.

Q.  OK. And we can see there, if you Scroll down, ███ the start date that was anticipated was January the 11th of 24, correct?

A.  Yes.

Q.  That was a little over a month after December 1st of 2023, your last day with JP Morgan, correct?

A.  That's correct.

Q.  OK. And it shows your title, Senior Vice President, Wealth Management, and then it goes through, you know, upfront compensation payout, etcetera, etcetera, etcetera. Do you see that?

A.  Yes.

Q.  Did this particular document go through multiple drafts or did they send it to you in one draft and you signed?

S.09a.ii-087
4:26-cv-00381-O
Biering v. JPMS, et al.

A. As the background, it was multiple drafts. It had to go all the way up to the CEO of Raymond James for approval. And that was the delayed signature.

Q. OK. And then if we go to the third page which is Biering 1291.

A. I'm there.

Q. Do you see where it says Book Ownership, and they say, At RJA, Raymond James and Associates, you own your book of business, meaning that if you'd like to terminate, that Raymond James will not solicit your client relationships for a period of 60 calendar days, do you see that?

A. Yes.

Q. OK. And then below that, they make it known to you that your employment with Raymond James will be "At will". Do you see that?

A. And the third line down there, it's in that paragraph, it says – I'm sorry, the second line. My bad. Over to the right. "In the event your employment terminates for any reason, all rights to future compensation are forfeited." Do you see that?

A. I do.

*[ZOOM0027 ~ 1:02:25.5]*

Q. OK. Alright then. You obviously received your Form U-5 after, after your time with JP Morgan was up, correct?

A. I accessed it, yes.

Q. And you're not satisfied with the contents of that U-5, are you?

A. It's false.

Q. So my question is you're not satisfied with the contents of your Form U-5, correct?

A. No. You are correct, it's unacceptable.

Q. OK. And we saw the emails yesterday, so I won't belabor the point, but you apparently knew what the Form U-5 was likely to contain, before it was filed on December the 22nd, correct?

S.09a.ii-088

4:26-cv-00381-O

Biering v. JPMS, et al.

S.09a.ii-088

Q. OK, and if we Scroll down to the bottom of that page on 12/13, December 13th, that's about 9 days before your U-5 was filed, you wrote "Morning, John I have an update for you regarding U-5 etcetera, if you're still interested. Many thanks, Josh.", do you see that?

A. I do.

Q. OK. Now the next document, so turn behind this blue split sheet, is the follow up with Mr. ▮ do you see that?

A. 1295?

Q. It's 1295 and then we, we want to go past that. And then you have some texts with Mr. ▮ And so we'll end up at 1285.

A. Yes, yes, I'm there.

A. OK. And on 1285I. It goes from 1285 Biering 1285 to 1288. Do you see that?

A. I do.

Q. This is in October and the beginning of November, your text messages with Mr. ▮ Do you see that?

A. I do.

Q. OK. if we go to the bottom and it's I'll… we'll go through it because the green doesn't show up. But do you see the bottom of 1285 where you wrote "JPM council did affirm with my attorney they would be in touch in advance of any formal U-5 filings to discuss language if applicable," Do you see that?

Q. Let's go to the next page, which is 1287.

Q. Do you see where I. In the middle, kind of in the middle of the page on the 28th of November. Mr. ▮ is saying hi, Josh. Any updates on the form on on U-5? Do you see that?

A. I do.

Q. Okay, let's go to the top of the next page. You asked him a question over to the right. What did you ask him?

A.   Can I share a scorecard via email?

Q.   and what did he say?

A.   As long as it doesn't have client names, no client data, only practice management data.

Q.   OK. Let's go to the next page, which is 1287 – Do you see where kind of in the middle of the page on the 28th of November, Mr. ▮▮▮▮ is saying "Hi Josh, any updates on the form… on the U-5?" Do you see that?

A.   I do.

Q.   And we had seen this before. That's where you responded. Today's the 30th day, etcetera, etcetera. Let's go to the last page of this, which is Biering 1288.

A.   I'm there.

Q.   OK. There at the top on the 1st of December. You said "I spoke too soon but not sure if this matters at this point. No reference of harassment will be a finding or mentioned it. It'll be failure to disclose workplace relationship, non-securities related." He wrote, "Understood." And then you said, "With your permission I have approval from my attorney to share with you the letter we sent to JPM today." He said "I would prefer to chat about it and not be in discovery given there is no attorney privilege here." Do you see that?

A.   I do.

Q.   And you wrote "Understood available whenever." Do you see that?

A.   I do.

Q.   OK. Now you… you indicated that you do not like the contents of your form. U-5, correct?

A.   I think it's false, so I don't like it.

Q.   Well, you most certainly would not want your U-5 to say that you were terminated because you sexually harassed a female analyst who was 10 years younger than you, correct?

S.09a.ii-091
4:26-cv-00381-O
Biering v. JPMS, et al.

S.09a.ii-091

Q. Got it. And turn, if you would, to exhibit ZZ, we're going to go back to that where you were texting on Biering 1581 with RBC.

A. Excuse me [inaudible]

Q. After the blue split sheet. We're going to go to 1581.

A. One second, please. Ok there we go, I'm on 1581.

Q. OK and that's this is your text messages with RBC ███████████

A. ██████

Q. ██████ Let's go to the second page of this text string and go to 1582.

A. I'm there.

Q. At the very bottom, do you see where ████████ – keep going. Right there. Where ████████ wrote: "Need a little more 'color' quote on U-5 language. What event prompted the term language? If you can just put that in your own words." Do you see that?

A. Yes.

Q. And you wrote, "OK, how about that? I just don't want any of that to be misconstrued. I genuinely have been told very little, which has made me incredibly suspicious." Do you see that?

A. I do.

Q. So did you… did you call her and tell her what happened? Because I didn't see any explanation of it here.

A. I believe you see the coordination of Ascension Coffee, and then I have one more meeting prior to the witch hunt panel I had before their heads of reputational risk AML, and their CEO of that unit to explain my side before they decided that was sketchy, and U-5 language was a no-go. So yes, I did explain multiple times

Q. OK, so it sounds from your answer like you had at least two meetings with the folks at RBC, correct?

A. I had 4 or 5.

S.09a.ii-093

4:26-cv-00381-O
*Biering v. JPMS, et al.*

S.09a.ii-093

S.09a.ii-094
4:26-cv-00381-O
Biering v. JPMS, et al.

MR. DUNLAP: I've got nothing further.

THE CHAIRPERSON: OK. Do… does the panel have any questions before I turn him back over to his lawyer?

[Speaker tag uncertain]:    Are you going to redirect?

MR. IACUONE: Yes.

[Speaker tag uncertain]:    OK, I'll wait till after.
                            *[ZOOM0027 ~ 1:16:04.3]*

[Speaker tag uncertain]:    I do have one question: When do you normally expect the bonus?

A.   They are… discussions are had for talent review, and sometimes managers as a talent retention will give you the unofficial heads up number in November, December, which is why we asked for that Skype message. But the bonus is officially released with those compensation letters, the day - or the same day immediately following JP Morgan's Q4 earnings call, which is January 7th.

[Speaker tag uncertain]:    OK. So it would be sometime in January?

A.   First week of January. Yes, ma'am.

THE CHAIRPERSON: I don't have any questions. I assume your redirect might take more than 20 minutes?

MR. IACUONE: Yes.

THE CHAIRPERSON: OK. Why don't we then take an early lunch and return here at, say a quarter to one? Does that suit everybody?

[Speaker tag uncertain]:    Okay, off the record.

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.09a.iii

## Hearing Transcript — Redirect Examination of Joshua D.S. Biering

**Description:** Hearing transcript excerpt — Redirect Examination of Joshua D.S. Biering (Claimant; former Private Client Advisor, Fort Worth, formerly J.P. Morgan Private Bank; currently Raymond James). FINRA Arbitration No. 24-01208 hearing day(s): December 11, 2025; December 12, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 8 of 10.

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0024, ZOOM0025, ZOOM0026, ZOOM0027, ZOOM0028, ZOOM0029. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## DISCLOSURE AND CERTIFICATION

This transcript was generated from audio recordings of proceedings in FINRA Arbitration No. 24-01208, Biering v. J.P. Morgan Securities, LLC, et al., using artificial-intelligence speech recognition technology (Azure AI Speech and OpenAI Whisper), followed by human review, speaker attribution, and quality assurance.

This transcript is NOT a certified court reporter transcript. No certified court reporter was present at the FINRA arbitration hearing. This document represents a best-efforts reconstruction of the hearing record from the official FINRA Zoom recordings.

Speaker attributions were established through voice-print enrollment, cross-referenced against the hearing record, and manually verified. Timestamps reference the source Zoom recording.

This document is filed under seal pursuant to the Court's order. It contains confidential arbitration proceedings and is subject to FINRA Rule 12800 confidentiality requirements. Unauthorized disclosure, distribution, or reproduction is prohibited.

Petitioner certifies that this transcript is a true and accurate representation of the recorded hearing proceedings to the best of Petitioner's knowledge and ability.

———————————————

S.09a.iii-002
4:26-cv-00381-O
Biering v. JPMS, et al.

**REDIRECT EXAMINATION**
**BY MR. IACUONE:**

*[ZOOM0029 ~ 00:00:00]*

**THE CHAIRPERSON:** Council, your witness.

[speaker tag uncertain]:    Thank you.

Q.  Mr. Biering, look at the CX1U5. You got a little muddle on some of the questions, so let's be crystal clear. You're asking for expungement on three grounds. What are those 3 grounds?

A.  Three things: #1 correctly mark my termination as a voluntary resignation, #2 removing in its tire… entirely any commentary, since I had resigned - none's required, and nonetheless, what is included...included is incredibly false, and #3 correctly mark my termination date to my resignation date of October 28th 2023, when I terminated my employment and no longer had any job producer functions.

Q.  You were asked by Mr. Dunlap about looking for a new job when you've got a U-5 mismarked. So well what - Why don't you just explain more about this and...and talk about all the reasons that are listed here? There's kind of that longer question, what's...what's really the bottom line about all this?

A.  For any bulge bracket and tier one firm, which I was hopeful to go to for my clients is, regardless of any commentary, it could be [inaudible] color blue: If there's discharge marking, we're not hiring you.

Q.  That was, we've heard that repeatedly about what company specifically?

A.  Merrill Lynch.

Q.  Different topic. We heard about the... about Ms. ███████ and the alleged investigation. What company does she work for?

A.  JP Morgan.

S.09a.iii-003
4:26-cv-00381-O
*Biering v. JPMS, et al.*

Q. When she contacted you. Did you inform her – Did she know that you had an attorney?

A. Yes.

Q. And did you inform her that you intended to pursue litigation or any kind of lawsuit against JP Morgan?

A. Yes.

Q. Did you inquire about a third party investigator who's not affiliated with JP Morgan performing this actual – an actual investigation?

A. Yes, which is why I submitted through the code of conduct hotline, the third party. JD.

Q. Did JP Morgan use a third party investigator?

A. That's my knowledge.

*[ZOOM0029 ~ 0:02:13.1]*

Q. Different topic. You were asked. The...the verbiage was a little bit off on the… on your cross examination. When it comes to Ms. ████████ Y'all worked at the same office, right?

A. Yes.

Q. The question you got was about reviews or feedback. What was it that you gave her about her job?

A. Insight 360 peer review feedback.

Q. Does that word mean what we all – How we all use it? Does that mean, the word peer...peer feedback? Does peer feedback mean what we think it means?

A. I would hope. I gave more than just ████████ peer feedback. It was at least 15 to 20 peers.

Q. Did Ms. ████████ give you peer feedback?

A. Yes.

Q. Different topic. The golf tournament was for what organization?

S.09a.iii-004
4:26-cv-00381-O
Biering v. JPMS, et al.

**A.**

**Q.** That golf tournament, ██████████ Was it associated with JP Morgan in any way?

**A.** No.

**Q.** How many JP Morgan clients were actually at that tournament?

**A.** 2.

**Q.** Why were they there?

**A.** In my capacity as friends with those brothers, and ██████████ and I serve on the board together. Me board member, him chair.

**Q.** OK. Was he there because he's on the ██████████ board?

**A.** Yes.

**Q.** Let's look at some text messages. This is… MM… the bigger bigger from...from the respondent. M like Mary, M like Mary. The first page we'll look at is 21856.

**A.** I'm there.

**Q.** And for the panel, these are two texts that got mentioned on cross contamination. Just following up on those. These are not [inaudible] covered.

**A.** Say the page number?

**Q.** 21856.

**A.** [inaudible] There.

**Q.** 21856 you were asking questions about these on cross examination and then after these texts, about 10 plus pages were skipped. So I want to look at a couple of the pages that were skipped. Just turn 2 pages, turn twice to 21859.

**A.** There.

**Q.** 21859. On the bottom left, what do you… what are you receiving from Ms. ██████

**A.** Pictures and videos, selfie pictures and videos of her trip to Paris.

Q.  OK. The icon there that the video… the video at the time is accessible?

A.  Yes, and on the following page.

Q.  OK. Let's turn to the following page. The top...top pictures are what again?

A.  Selfies and videos of her trip to Paris.

Q.  Mr. Jacobs testified that he bases the ground for them claiming to terminate you after your resignations was that you were asking for selfies, right?

A.  Yes.

Q.  Had Ms. ███████ been sending you selfies for a long time?

A.  Yes.

Q.  Those voluntary, mutual?

A.  Yes.

*[ZOOM0029 ~ 0:05:26.4]*

Q.  Ok. Just [inaudible] 21870. On 21870.

A.  I'm there.

Q.  You were shown… you were shown this page on cross examination as well. You were shown basically the bottom half of this page. Let's look at the top half. The third message from Ms. ███████ Well, the first one she talks about JT, JT refers to who?

A.  JT Aughinbaugh, market manager.

Q.  And she wrote "He's not my favorite person", and goes on. See that?

A.  I do.

Q.  Can you give some more context for Ms. ███████ saying that J.T. Aughinbaugh is not her favorite person?

A.  Similar theme of… topic of conversation. She typically would say along the lines of him being an abrasive manager.

S.09a.iii-006
4:26-cv-00381-O
Biering v. JPMS, et al.

Q. OK, let's turn the page to 21910. So we'll go ahead 21910.

A. I'm there.

Q. Look at the bottom half of this one please. There's 4 messages from you on the right, sort of. [inaudible] "I think you've changed," see that?

A. Yes.

Q. And then your fourth message is longer. "Probably got a little weird when you told me about █████████ , the questions you got were a little bit confusing. ████████ refers to who?

A. I'll answer that question, but I just want to make sure I get an opportunity for the Houston trip. The ██████ is a JP Morgan employee based out of the JP Morgan private bank office in █████ that Ms. ██████ confided in me she had a fling with.

Q. [inaudible]

A. Oh, and the Houston trip, earlier, I believe yesterday we were asked if it was… or Mr. Hitchcock was asked if juniors and seniors or whoever peers went on trips together, the Houston office and the ██████ office were hubs of our support staff, whether it be onboarding, new accounts and KYC. And then ██████ was that and Houston was where our service teams were, and it was common to visit as pods, your Houston service team for two days or so and shadow them just to, you know, build that relationship. So that's what that Houston trip is.

*[ZOOM0029 ~ 0:07:49.7]*

Q. OK. Let's switch to 21917. [inaudible] 21917. You were asking questions about this one. Look at the top half of this one please. 21917 you were asking questions. Generally speaking, y'all had gotten back from the golf trip and you exchanged messages, exchanged messages about the golf trip coming up in the office, right?

A. Yes.

S.09a.iii-007
4:26-cv-00381-O
Biering v. JPMS, et al.

Q.    You tell us what's… what's the context of this… this exchange?

A.    Well, it wasn't any secret that we went on a golf trip.

Q.    Anybody… and here, listed as people who knew, who were asking about y'all going on a golf trip include JT Aughinbaugh, Larry Blaze, other analysts and [inaudible] right.

A.    Yeah, and our manager Will Brawley.

Q.    In fact, if you scroll down a little bit, even JT Aughinbaugh was asking about it. He asked specifically about what?

A.    ████████    Nashville, the Tiger Woods course.

                    *[ZOOM0029 ~ 0:08:47.2]*

Q.    OK. Let me take that [inaudible] down, can we please? Thank you. Different topic, you were asking questions about your EEOC claim. Did you attempt to litigate that claim in this arbitration as well?

A.    Yes, extensively.

Q.    Why is it not part of this arbitration?

A.    JP Morgan's letter. "We refuse to arbitrate for this one."

Q.    You say we refuse, who refused?

A.    JP Morgan.

Q.    OK.

                    *[ZOOM0029 ~ 0:09:12.7]*

THE CHAIRPERSON: OK. So since that's been thrown out on the table, and I wasn't asking… actually going to ask, is that action still pending?

    [speaker tag uncertain]:    Yeah.
    MR. BIERING.    EEOC Yes.
MR. IACUONE: There's no arbitration.

THE CHAIRPERSON: No, I get that, and I understand why. Is he the plaintiff in the EEOC case?

MR. IACUONE: Yes.

[speaker tag uncertain]:   The Claimant. The charging party. Yes, sir.

THE CHAIRPERSON: OK. That's all I wanted. Thanks.

MR. IACUONE: Can I approach you with the exhibit.

THE CHAIRPERSON: Sure, of course.

Q. Exhibit that I'm passing out is Exhibit 246. This is a Teams chat. You see at the top there, between a couple of folks at JP Morgan. Ben Stewart, ████ November 30th, 2023. You see that?

A. Yes.

Q. We're bringing this up because you've been asked – You were asked about how JP Morgan divided up your book, right?

A. Yes.

Q. In other words, you were gone. They...they marked your U-5. Oh, we recapped, we all know. Let me just ask the questions. As we see in JP Morgan's chat here at the top. The first message, there's some… from ████ it's some numbers, you see the ID numbers. The first content message says SC flows $50 million plus, ████ Will and Joe. What does that mean?

A. Well, first it's November 30th, the day before the call. [inaudible] SC means Single Coverage, which is Ben's team – and 50 million to ████ Will and Joe.

Q. Meaning what?

A. Meaning the Fort Worth market benefited from those flaws.

Q. This is the day before they're telling you you're being… that they're waiving the rest of your garden leave policy.

THE CHAIRPERSON: OK. You keep saying that, and I'll let you keep saying that. I just need you to understand, at least from my point of

S.09a.iii-009
4:26-cv-00381-O
Biering v. JPMS, et al.

view: That's not what happened that he was terminated on that day, which is different than a voluntary termination of the period under the garden policy, that could have been done for somebody who wasn't terminated. He was an At Will employee, and so I don't see that as a "waiver" as you've been characterizing it. That's just my opinion.

MR. IACUONE: Well, I'm...I'm quoting from garden leave policy itself. The garden leave policy says JP Morgan can waive the remaining…

THE CHAIRPERSON: It does say that, but I don't think JP Morgan did.

MR. IACUONE: I understand.

THE CHAIRPERSON: OK. I'm just… and you keep conflating those two. I may be wrong, but my opinion and my reading of that is not the conflated one that you've been putting forward.

Q:  I understand, I understand. Next on the same exhibit. PC flows, $200 million. What does that mean?

A. Partner coverage?

Q. OK. And give us more context here about what that? Means here.

A. Partner coverage is what… reported directly to JT Aughinbaugh, but broader Fort Worth market and the 200 million flows went to Tye, Marcus and [inaudible]. Q.  OK. And the third one right under there, new high Tier 5+ ███ what does that mean?

A. ███ was a junior analyst or associate who I helped seed some of her clients prior to my departure.

Q. Thank you [inaudible].

*[ZOOM0029 ~ 0:12:37.6]*

MR. DUNLAP: I just have one question. In your book, GG. Exhibit GG.

A. I am there.

**Q.** On the third page of GG, which is JPMS 22397.

**A.** Yeah.

**Q.** On Wednesday, December the 27th. You sent an e-mail to Jena, CCing Ms. Tidwell-Neal and your lawyer. Do you see that?

**A.** I do.

**Q.** And in the 3rd… 4th to the last sort of paragraph from the bottom, you said "I resigned knowing I'd forfeit the compensation earned in January. That didn't matter to me," correct?

**A.** I said that.

**Q.** OK, nothing further.

**THE CHAIRPERSON:** OK, I assume you have no…

**MR BIERING:** I'd like to comment.

**THE CHAIRPERSON:** I'm sorry, do you want to say something?

**A.** Yes, sir if that's okay, about that last question.

**THE CHAIRPERSON:** That's OK. Go ahead.

**A.** That's because I was willing to forfeit that knowing I'd be making I'd exponentially more at Merrill Lynch if it hadn't have been for JP Morgan's interference.

**THE CHAIRPERSON:** OK. Do you have any questions for us?

*[ZOOM0029 ~ 0:14:06.7]*

**MS. CLEMENT:** I do. Were you done? You're not going to read it? Ok. I do. So if the golf tournament was non-work related, why was Ms. ███ invited with you?

S.09a.iii-011
4:26-cv-00381-O
Biering v. JPMS, et al.

A.   I mean, it was not uncommon to invite coworkers to events like that. I invited Austin Barr first, he couldn't go. I invited Will Brawley, he couldn't go. And then I invited ███.

MS. CLEMENT: OK. So whatever form of the relationship you took, you had with Ms. ███ – Was… did it exist at the time that you invited her to the golf tournament?

A.   It was. It did.

MS. CLEMENT: Yes?

A.   Prior, yes.

MS. CLEMENT: Prior to the golf tournament. In some of your text messages – I'm not going to make you go back to them – She suggested that she was stressed. Was that… And that was around September 9th. Was she… Did she ever disclose to you that she was considering leaving her husband?

A.   She had talked about it. Yes.

MS. CLEMENT: And then she makes a comment about anxiety levels. What was the base at that same time period? What was your understanding of why she was anxious?

A.   Twofold. One, we were both anxious because we were working in a fast-paced environment, especially things were picking up, and two, she had said she's felt like she was emotionally cheating on her husband.

MS. CLEMENT: OK, and in one of your text messages, she said something about talking to her husband, disclosing something. Was that about your relationship with her?

A.   And her feelings in general. Yes, ma'am.

S.09a.iii-012

4:26-cv-00381-O

Biering v. JPMS, et al.

MS. CLEMENT: OK, because she made a comment about not throwing JB under the bus, or you - I have it as my initials but not throwing you under the bus. What was your understanding that that meant?

A.   Just like that, between both of our spouses.

MS. CLEMENT: I don't have any further questions.

MS. RISTER: I don't have any questions.

[ZOOM0029 ~ 0:16:03.4]

MR. DUNLAP: I did, based on one question that was asked. Mr. Biering, you expensed the mileage for the golf tournament at ███████ didn't you?

A.   I expensed the mileage because I met with clients beforehand in that area, several clients of mine lived in or around Texas A&M.

MR. DUNLAP: Thank you.

THE CHAIRPERSON: I have no questions. You're not exactly excused because you're the party, but you can return to your seat, and you can call your next witness.

MR. IACUONE: We'll call Mr. Heller [inaudible].

THE CHAIRPERSON: OK, This is...this is the guy about the impact of the marking of the…

MR. IACUONE: He's the industry expert, and he will speak on the U-5 and other issues.

[speaker tag uncertain]:    Do you want me to go off the record while we get this set up.

MR. IACUONE: It might take [inaudible].

S.09a.iii-013
4:26-cv-00381-O
Biering v. JPMS, et al.

THE CHAIRPERSON: Yeah, let's go off the record.

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.10a.i
## Hearing Transcript — Direct Examination of Jonathan Heller

**Description:** Hearing transcript excerpt — Direct Examination of Jonathan Heller (Industry Expert (FINRA rules and securities-industry standards), Independent Consultant). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 9 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0030, ZOOM0031. Direct Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

---

# EXHIBIT S.10a.ii

## Hearing Transcript — Cross Examination of Jonathan Heller

---

**Description:** Hearing transcript excerpt — Cross Examination of Jonathan Heller (Industry Expert (FINRA rules and securities-industry standards), Independent Consultant). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 9 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0030, ZOOM0031. Cross Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.10a.iii
## Hearing Transcript — Redirect Examination of Jonathan Heller

**Description:** Hearing transcript excerpt — Redirect Examination of Jonathan Heller (Industry Expert (FINRA rules and securities-industry standards), Independent Consultant). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:** Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 9 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:** FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0030, ZOOM0031. Redirect Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:** App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:** Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:** Public - not sealed

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.11a.i
## Hearing Transcript — Direct Examination of J.T. Aughinbaugh

**Description:**  Hearing transcript excerpt — Direct Examination of J.T. Aughinbaugh (Market Manager / Managing Director, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:**  Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 10 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:**  FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0032, ZOOM0033. Direct Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:**  App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:**  Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:**  Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.11a.ii

## Hearing Transcript — Cross Examination of J.T. Aughinbaugh

**Description:**   Hearing transcript excerpt — Cross Examination of J.T. Aughinbaugh (Market Manager / Managing Director, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:**   Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 10 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:**   FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0032, ZOOM0033. Cross Examination by Iacuone. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:**   App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:**   Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:**   Public - not sealed

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| *Petitioner, Pro Se,* | § | Case No. 4:26-cv-00381-O-BP |
| **v.** | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | FINRA Case No. 24-01208 |
| **JPMORGAN CHASE & CO., and** | § | EEOC Charge No. 450-2024-04743 |
| **JPMORGAN CHASE BANK, N.A.,** | § | Arbitration Case No. 01-26-0000-7215 |
| *Respondents.* | § | |

# EXHIBIT S.11a.iii

## Hearing Transcript — Redirect Examination of J.T. Aughinbaugh

**Description:**   Hearing transcript excerpt — Redirect Examination of J.T. Aughinbaugh (Market Manager / Managing Director, Fort Worth, J.P. Morgan Private Bank). FINRA Arbitration No. 24-01208 hearing day(s): December 15, 2025.

**Relevance:**   Curated transcript excerpt postured for the public ECF record (redacted). Witness sequence per Zoom appearance order; witness 10 of 10. Numbering reserved — full transcript not yet curated for this ECF round; native audio remains the authoritative evidentiary source (see S.01a).

**Source:**   FINRA Arbitration No. 24-01208 — Zoom MP3 recording(s): ZOOM0032, ZOOM0033. Redirect Examination by Dunlap. Native audio: Azure Blob jbvjpmazstorage/hearing-recordings/2025-12/.

**Petition Ref:**   App. A S.1 (Dkt. 11 p. 54) — Hearing Transcript Excerpts; see also S.01a (native audio disclosure) and S.02b (key excerpts index).

**Disclosures:**   Redactions: Public-record redactions applied (PII, account numbers, and limited confidentiality items) per the redaction log; native audio preserved unredacted under seal. │ Annotations: UNOFFICIAL TRANSCRIPT — AI-assisted (Whisper / Azure Speech) with human review. Not a certified court-reporter transcript. Native Zoom audio controls.

**Filing Status:**   Public - not sealed