

18

*Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) (similar); *Walmsley v. Federal Trade Comm'n*, 117 F.4th 1032, 1039–1040 (8th Cir. 2024) (Where a statute gives the government agency "broad power to subordinate the [private entity's] enforcement activities, the statute is not unconstitutional in all of its applications.").

Typically, SEC oversight of FINRA disciplinary actions involves the SEC "conduct[ing] its own review" of any final decision or sanction. *Saad*, 873 F.3d at 300; *see* 15 U.S.C. § 78s(e); *see also PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1064 (D.C. Cir. 2007) (Federal law requires the SEC "to review *de novo* a disciplinary sanction imposed by [FINRA.]"). That review includes an "independent review of the record" to determine whether the FINRA member "engaged in the conduct FINRA found," "whether that conduct violated the rules specified in FINRA's determination," and whether the discipline otherwise accords with the Exchange Act. *Devin Lamarr Wicker*, Exchange Act Release No. 100148, 2024 WL 2188603, at *7 (S.E.C. May 15, 2024). In addition, the SEC can approve, disapprove, or modify FINRA's actions. *Saad*, 873 F.3d at 300; 15 U.S.C. § 78s(e)(1)(A).

2

Review of expulsions imposed through FINRA's expedited proceedings, however, functions differently. Alpine has shown, on the record before us, that the SEC does not exercise ultimate control over FINRA's decisions to expel its members in expedited proceedings because those orders take effect immediately, before the SEC can review them, and the severe consequences associated with expulsion can make any later review by the SEC a largely academic exercise.

To begin, the SEC does not conduct any review of an expulsion order in an expedited proceeding before it goes into

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 18 (D.C. Cir. Nov. 22, 2024).

*Highlighted: Although SEC review of FINRA discipline is typically de novo,* ***review of expulsions imposed through FINRA's expedited proceedings "functions differently"****; later review can be reduced to* ***"a largely academic exercise."***

19

effect. Under FINRA rules, an expulsion takes effect immediately upon the issuance and "prompt" service of FINRA's decision. FINRA Rules 9360, 9559(*o*)(5), (q)(4)–(5). Federal law, on the other hand, specifies that SEC review must wait until *after* FINRA has issued its final decision and imposed any sanction. 15 U.S.C. § 78s(d)(1)–(2). Taken together, those provisions mean that SEC review can come only after, not before, the expulsion takes effect.

Yet delayed SEC review of expulsion orders will almost always be too little too late. With limited exceptions, federal law prohibits entities from trading securities unless they are a member of a registered securities association. 15 U.S.C. § 78*o*(b)(1). FINRA is the only such association in the United States, meaning that, as a practical matter, securities traders must be members of FINRA to conduct their business. As a result, expulsion from FINRA effectively amounts to expulsion from the securities industry as a whole. Expelled FINRA members may not trade securities on behalf of themselves or their clients. Barred from pursuing their trade, many expelled FINRA members could be forced out of business before they can obtain SEC review of the merits of FINRA's decision. That is the fate that Alpine claims will befall it. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023) ("An expulsion order against Alpine * * * would force Alpine to close its business."); *see also* Oral Arg. Tr. 58:5–8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

To be sure, the SEC can stay the effectiveness of an expulsion order. *See* 15 U.S.C. § 78s(d). But the SEC's stay authority likely is insufficient to satisfy the constitutional requirements of meaningful SEC merits review for two reasons.

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 19 (D.C. Cir. Nov. 22, 2024).

*Highlighted: Delayed SEC review of an expedited expulsion order will* ***"almost always be too little, too late"****; under FINRA rules, expulsion takes effect immediately upon issuance and service of FINRA's decision.*



20

First, a stay is not automatic. Under both FINRA rules and federal law, petitioning the SEC for review does not itself stay an expulsion order. FINRA Rule 9559(r); 15 U.S.C. § 78s(d)(2); 17 C.F.R. § 201.420(d). Instead, unless the SEC chooses to act on its own, the expelled FINRA member must file a separate written request for a stay after filing its application for SEC review, *see* 17 C.F.R. §§ 201.401(a), (d), and prove that it is entitled to a stay. While the SEC rules provide that it will expedite consideration of stay requests, *see id.* § 201.420(d)(3), the process still takes time, during which the total bar on securities trading will already be taking its toll.

At oral argument, counsel for FINRA represented that the SEC granted Alpine a stay in two business days in a prior FINRA disciplinary matter. Oral Arg. Tr. 58:10–14. That is a quick turnaround, but that stay appears to have been the discretionary issuance of an interim, administrative stay just to allow for full consideration of Alpine's stay motion. *Alpine Sec. Corp.*, Exchange Act Release No. 86719, 2019 WL 3933691, at *1 (S.E.C. Aug. 20, 2019). Plus, this preliminary record does not reveal how often such interim stays are entered or the standard for their issuance. Full consideration of stay motions appears to take longer, with the SEC taking weeks or even months before acting. *See, e.g.*, *Michael Clark*, Exchange Act Release No. 92521, 2021 WL 3210138, at *1 (S.E.C. July 29, 2021) (denying stay three months after filing); *Scottsdale Cap. Advisors Corp.*, Exchange Act Release No. 83783, 2018 WL 3738189, at *1 (S.E.C. Aug. 6, 2018) (granting stay two weeks after filing). Because expulsion from FINRA carries with it a moratorium on all securities trading, even a few days or weeks may be too long for an expelled FINRA member to stay afloat.

Stays are also not easily obtained. Like courts, the SEC starts from the premise that a stay is an "extraordinary

24

Finally, the dissenting opinion's reasoning melds the private nondelegation doctrine with Alpine's Appointments Clause arguments. The latter, though, is where the Supreme Court has housed the "significant executive authority" inquiry on which the dissenting opinion relies. *See Lucia v. SEC*, 585 U.S. 237, 245–246 (2018); *Freytag v. Commissioner*, 501 U.S. 868, 881-882 (1991); *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II].") (quoting U.S. Const. Art. II, § 2, cl. 2); *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010).

The dissenting opinion notably cites just one district court opinion applying its "significant executive authority" test to a private nondelegation challenge. Dissenting Op. at 8 n.28. An argument never advanced by the party requesting a preliminary injunction and unsupported by a single case from the Supreme Court, this court, or any appellate court cannot establish the likelihood of success necessary to permit the issuance of a preliminary injunction.

B

The remaining preliminary-injunction factors—irreparable harm, the balance of equities, and the public interest—also support Alpine.

Alpine faces irreparable harm because it faces a grave risk of being forced out of business before full SEC review, rendering any opportunity for later review at best inadequate and, at worst, moot. A business's "destruction in its current form" commonly qualifies as irreparable harm. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *see In re NTE Conn., LLC*, 26 F.4th

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 20 (D.C. Cir. Nov. 22, 2024).

*Highlighted:* ***A stay is not automatic****; the expelled member must separately apply, and* ***the process "takes time, during which"*** *the harm continues to accrue.*

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 24 (D.C. Cir. Nov. 22, 2024).

*Highlighted: Appointments-Clause framework: private adjudicatory authority tested against the* ***"significant executive authority"*** *inquiry (Lucia, Freytag, Buckley v. Valeo, Free Enter. Fund).*



25

980, 990 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date[.]") (formatting modified); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm" if "the loss threatens the very existence of the movant's business.").

Here, Alpine has shown that its expulsion from FINRA will effectively amount to exclusion from the securities industry, forcing it to shutter its operations immediately. *See* Decl. of Maranda E. Fritz ¶ 7, ECF 46 (May 9, 2023); *see also* Oral Arg. Tr. 58:5–8 (FINRA's counsel explaining that Alpine would violate the Exchange Act if it continued to trade securities after expulsion).

Neither FINRA nor the government disputes this reality or its crushing consequences for Alpine's business operations. To be sure, FINRA's counsel at oral argument assured that Alpine could "reinstate their business in the event that the SEC ultimately reverses FINRA's determination." Oral Arg. Tr. 57:18–20. That argument blinks reality. As FINRA's counsel conceded, full review by the SEC could take months, if not longer. Oral Arg. Tr. 57:24–25; *see, e.g.*, *Devin Lamarr Wicker*, 2024 WL 2188603, at *1 (affirming bar against an individual over two years after appeal was filed). It is not realistic to expect that Alpine, choked of any income or business from securities trading, could simply reopen its doors months, if not years, after FINRA locked them shut.

The magnitude of Alpine's injury also tips the balance of equities in favor of Alpine. FINRA unquestionably has an interest in enforcing its own rules. *See* 15 U.S.C. § 78*o*-3(b)(6) (self-regulatory organizations must "protect investors and the public interest"). FINRA argues that its interest may be

!!!! J.B.'s damages
My Business is crushed
US = exclusion
"That Argument Blinks Reality"
fire!

28

appealing, even when doing so subjects them to significant burdens.") (quotation marks omitted). For that reason, Alpine has not demonstrated at this time that it is entitled to a preliminary injunction against any sanctions short of expulsion that FINRA may impose in the expedited proceeding.

Expulsion from FINRA, though, is unique because federal law requiring membership in a self-regulatory organization, 15 U.S.C. § 78*o*(b)(1), forces expelled FINRA members, without any governmental review of the merits, to shut down their securities-trading businesses—a harm that can have immediate and often financially devastating consequences that cannot be adequately remedied later. That is true at least for companies like Alpine that do not engage in any other significant business that could sustain their operations. *See* BrokerCheck Report: Alpine Securities Corporation, *supra*, at 10 ("This firm does not engage in other non-securities business.").[3]

Third, this opinion does not speak to either FINRA's own ability to delay the effectiveness of its expulsion orders in

[3] FINRA will also sometimes bar individuals from associating with a FINRA member. *See* FINRA Rule 8310(a)(5). Such a bar may be meaningfully different from expulsion of a FINRA member firm since a person barred from trading securities can pursue other work while appealing to the SEC, while a firm organized for the purpose of trading securities cannot.

We also note that membership in a registered securities association like FINRA is not mandatory for securities traders that only trade on one exchange. 15 U.S.C. § 78*o*(b)(1). Such firms can instead be members of the exchanges on which they trade. *Id.* Alpine does not trade exclusively on one exchange. We therefore express no view as to the constitutional implications of FINRA's expulsion of a firm that trades on only one exchange and chooses to be a member of both FINRA and that exchange.

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 25 (D.C. Cir. Nov. 22, 2024).

*Highlighted:* ***Financial injury can be irreparable*** *where "no relief will be available"; recoverable monetary loss may constitute irreparable harm if it* ***"threatens the very existence of the movant's business"*** *(Wisconsin Gas, 758 F.2d at 674).*

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 28 (D.C. Cir. Nov. 22, 2024).

*Highlighted:* ***Expulsion from FINRA is unique****: federal law requiring SRO membership forces immediate shutdown with* ***"immediate and often financially devastating consequences that cannot be adequately remedied later."***



WALKER, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

Article II of the Constitution begins, "The executive Power shall be vested in a President of the United States of America." That means private citizens cannot wield significant executive authority. Nor can anyone in the government, except for the President and the executive officers appointed and removable consistent with Article II.

The Financial Industry Regulatory Authority is a nominally private corporation. It investigates, prosecutes, and adjudicates violations of federal securities laws. Those laws generally forbid broker-dealers from doing business unless they belong to FINRA.

Today, the majority holds that the Constitution likely requires government review before FINRA may expel a company from its ranks and thereby put that company out of business. That holding is a victory for the Constitution.

But it is only a partial victory because the problems with FINRA's enforcement proceedings run even deeper. FINRA wields significant executive authority when it investigates, prosecutes, and initially adjudicates allegations against a company required by law to put itself at FINRA's mercy. That type of executive power can be exercised only by the President (accountable to the nation) and his executive officers (accountable to him).

By flouting that principle through an "illegitimate proceeding, led by an illegitimate decisionmaker,"[1] FINRA imposes an irreparable injury that this court should prevent by granting the requested preliminary injunction in its entirety.

[1] *Axon Enterprise, Inc. v. FTC*, 143 S. Ct. 890, 903 (2023).

6

orally, in writing, or electronically."[18] It also can force a broker's employees to "testify at a location specified by FINRA staff, under oath or affirmation."[19]

After that, FINRA may initiate a formal enforcement proceeding to fine members or expel them from FINRA.[20] Because FINRA membership is mandatory, expulsion from FINRA is, in effect, expulsion from the securities industry. From a broker's perspective, it's the "corporate death penalty."

These enforcement proceedings come in two forms. In the ordinary proceeding, a member may appeal an unfavorable ruling first to an internal appellate tribunal and then to the SEC.[21] But in an expedited proceeding, sometimes overseen by only one hearing officer, internal review of the decision is discretionary, and the hearing officer's decision to expel a member takes effect immediately, before the member can appeal to the SEC.[22]

This panoply of enforcement powers requires no contemporaneous oversight by the SEC. The SEC does not control FINRA's investigations, its prosecutions, or its initial adjudications. Until the SEC accepts an appeal from a final FINRA decision, FINRA wields its enforcement powers unilaterally.

[18] FINRA Rule 8210(a)(1).

[19] *Id.*

[20] FINRA Rules 8310(a), 9211(a).

[21] FINRA Rules 9311(a), 9349(a), 9370(a).

The FINRA Board may, at its discretion, choose to review a case heard by the internal appellate tribunal and affirm, modify, or reverse its decision. FINRA Rule 9351(a), (d).

[22] FINRA Rule 9559(d), (q), (n), (r).

**Alpine Sec. Corp. v. FINRA**, No. 23-5129 (D.C. Cir. Nov. 22, 2024) (Walker, J., concurring in the judgment in part and dissenting in part).

*Highlighted: Article II foundation: **"private citizens cannot wield significant executive authority"**; FINRA's adjudicative role measured against constitutional structure.*

**Alpine Sec. Corp. v. FINRA**, No. 23-5129, slip op. at 6 (D.C. Cir. Nov. 22, 2024) (Walker, J., concurring in the judgment in part and dissenting in part).

*Highlighted: Expedited proceedings **"sometimes overseen by only one hearing officer"**; internal review is limited, and **"expulsion takes effect immediately, before the member can"** obtain review.*

*Biering v. J.P. Morgan Sec. LLC, No. 4:26-cv-00381-O (N.D. Tex., Fort Worth Div.)* *Attachment — p. 5 of 11*

(Slip Opinion) OCTOBER TERM, 2023 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

SUPREME COURT OF THE UNITED STATES

Syllabus

SECURITIES AND EXCHANGE COMMISSION *v.* JARKESY ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–859. Argued November 29, 2023—Decided June 27, 2024

In the aftermath of the Wall Street Crash of 1929, Congress passed a suite of laws designed to combat securities fraud and increase market transparency. Three such statues are relevant: The Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers. Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

To enforce these Acts, Congress created the Securities and Exchange Commission. The SEC may bring an enforcement action in one of two forums. It can file suit in federal court, or it can adjudicate the matter itself. The forum the SEC selects dictates certain aspects of the litigation. In federal court, a jury finds the facts, an Article III judge presides, and the Federal Rules of Evidence and the ordinary rules of discovery govern the litigation. But when the SEC adjudicates the matter in-house, there are no juries. The Commission presides while its Division of Enforcement prosecutes the case. The Commission or its delegee—typically an Administrative Law Judge—also finds facts and decides discovery disputes, and the SEC's Rules of Practice govern.

One remedy for securities violations is civil penalties. Originally, the SEC could only obtain civil penalties from unregistered investment advisers in federal court. Then, in 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. The Act authorized the SEC to impose such penalties through its own in-house

≠pretext?
fraud?
Would judge
Remand?
Admin Law Judge?
≠EFAA

**SEC v. Jarkesy**, 603 U.S. 109 (2024) (syllabus).

*Highlighted: **Seventh Amendment / Article III limits** on agency in-house adjudication of statutory claims that resemble suits at common law — backdrop against which judicial review of arbitral and other private adjudications operates.*

2 SEC *v.* JARKESY

Opinion of the Court

881, 78a *et seq.*; 54 Stat. 847, 80b–1 *et seq.* These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers. Their protections are mutually reinforcing and often overlap. See *Lorenzo* v. *SEC*, 587 U. S. 71, 80 (2019). Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

The three antifraud provisions are Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Section 206 of the Investment Advisers Act. Section 17(a) prohibits regulated individuals from "obtain[ing] money or property by means of any untrue statement of a material fact," as well as causing certain omissions of material fact. 15 U. S. C. §77q(a)(2). As implemented by Rule 10b–5, Section 10(b) prohibits using "any device, scheme, or artifice to defraud," making "untrue statement[s] of . . . material fact," causing certain material omissions, and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 CFR §240.10b–5 (2023); see 15 U. S. C. §78j(b). And finally, Section 206(b), as implemented by Rule 206(4)–8, prohibits investment advisers from making "any untrue statement of a material fact" or engaging in "fraudulent, deceptive, or manipulative" acts with respect to investors or prospective investors. 17 CFR §§275.206(4)–8(a)(1), (2); see 15 U. S. C. §80b–6(4).

To enforce these Acts, Congress created the SEC. The SEC may bring an enforcement action in one of two forums. First, the Commission can adjudicate the matter itself. See §§77h–1, 78u–2, 78u–3, 80b–3. Alternatively, it can file a suit in federal court. See §§77t, 78u, 80b–9. The SEC's choice of forum dictates two aspects of the litigation: The procedural protections enjoyed by the defendant, and the remedies available to the SEC.

**SEC v. Jarkesy**, 603 U.S. 109 (2024) (opinion of the Court).

*Highlighted: Statutory backdrop: the three federal **"antifraud provisions"** (§§ 17(a), 10(b), 206) — targeting the same basic conduct of misrepresenting or concealing material facts.*



16 SEC v. JARKESY

GORSUCH, J., concurring

To get there took a dash of fiction and a pinch of surmise. From time to time, the Court observed, judges appoint their own special "masters and commissioners" to prepare reports on fact issues or damages. *Id.*, at 51. These reports are nonbinding and "essentially . . . advisory." *Ibid.* Judges themselves remain the decisionmakers. In *Crowell*, the Court embraced the fiction that Executive Branch officials might similarly act as assistants or adjuncts to Article III courts. And because judges often adopt the proposed findings of their masters and commissioners, the Court surmised, Article III posed no bar to Congress taking a further step and *requiring* judges to treat the findings of Executive Branch officials as essentially "final." *Id.*, at 46. "To hold otherwise," the Court reasoned, "would be to defeat the obvious purpose of the legislation": "to furnish a prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Ibid.*

*Crowell* itself only went so far, however. The case fell within federal courts' admiralty jurisdiction, and tribunals sitting in admiralty in England and America alike had long heard certain matters falling within the public rights exception. See *Culley*, 601 U. S., at 398 (GORSUCH, J., concurring). In deciding those matters, courts had long tolerated some flexibility in procedures, had long restricted appellate review of factual findings, and had always proceeded without a jury. *Crowell*, 285 U. S., at 45, 53.

Soon, though, none of that mattered. Almost in a blink, the admiralty limitation was discarded, and more and more agencies began assuming adjudicatory functions previously reserved for judges and juries, employing novel procedures that sometimes bore faint resemblance to those observed in court. Along the way, prominent voices in and out of government expressed concern at this development. Consider just two typical examples. Were an agency endowed with

FINRA requires orders/awards be confirmed by a court of competent jurisdiction... but no due process benefits

Exactly dogging on FINRA

process that is formally avail but practically delays, fragmented,

Traditions of FAA appeal exceedingly narrow

Process that is formally available but practically delayed, fragmented, or structurally incomplete can still violate fundamental fairness - especially when consequences attach immediately + publicly

**SEC v. Jarkesy**, 603 U.S. 109 (2024) (Gorsuch, J., concurring).

*Highlighted: **"Judges themselves remain the decisionmakers"** under Article III; the Crowell "adjunct" fiction does not authorize private adjudicators to make final binding determinations on core Article III questions.*

Case: 22-10235 Document: 162-1 Page: 1 Date Filed: 08/26/2024

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals Fifth Circuit

**FILED**

August 26, 2024

Lyle W. Cayce Clerk

No. 22-10235

RALPH S. JANVEY, *in his Capacity as Court-Appointed Receiver for* THE STANFORD INTERNATIONAL BANK LIMITED, *et al.*,

*Plaintiff—Appellee,*

*versus*

GMAG, L.L.C.; MAGNESS SECURITIES, L.L.C.; GARY D. MAGNESS; MANGO FIVE FAMILY INCORPORATED, *in its Capacity as Trustee for* THE GARY D. MAGNESS IRREVOCABLE TRUST,

*Defendants—Appellants,*

CONSOLIDATED WITH

No. 22-10429

SECURITIES AND EXCHANGE COMMISSION, *et al.*,

*Plaintiffs,*

*versus*

GMAG, L.L.C.; GARY D. MAGNESS IRREVOCABLE TRUST; GARY D. MAGNESS; MAGNESS SECURITIES, L.L.C.,

*Defendants—Appellants,*

**Janvey v. GMAG, L.L.C.**, No. 22-10235, slip op. at 1 (5th Cir. Aug. 26, 2024).

*Highlighted: Federal courts retain **"inherent equitable authority to grant relief ancillary to their jurisdiction"** when a designated forum is unavailable (Janvey II, 847 F.3d 585, 595).*

Case: 17-30772 Document: 00514432353 Page: 1 Date Filed: 04/17/2018

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals Fifth Circuit
FILED
April 17, 2018
Lyle W. Cayce
Clerk

No. 17-30772

APTIM CORPORATION,

Plaintiff–Appellee,

versus

DORSEY RON MCCALL,

Defendant–Appellant.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, SMITH, and OWEN, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

The Shaw Group ("Shaw") sued Dorsey McCall, its former employee, in state court for allegedly violating noncompete and nonsolicitation agreements. After being acquired in part by Aptim Corporation ("Aptim"), Shaw sought to dismiss its state action while Aptim pursued a federal-court action to enforce the arbitration clause in McCall's employment contract. The federal district court declined to abstain, it compelled arbitration, and it stayed the state-court

[Handwritten annotations: "Reindeer games. Fraud; non-native forms; disc delays..."; "Shaw"; "Competitor"; "Facts / Merits"; "... Not nec., stat disc"; "I argue; JPMD DID waive its AAA rights"]

**Shaw Grp., Inc. v. Aptim Corp.**, No. 17-30772, slip op. at 1 (5th Cir. Apr. 17, 2018).

*Highlighted: Federal-court action to **enforce the arbitration clause** in an employment contract notwithstanding parallel state proceedings; the district court "declined to abstain, it compelled arbitration, and it stayed the state-court" action.*

[Handwritten: "Two Prong Equitable Estoppel Test for NON-SIGNATORIES."]

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 98-51016

CHARLES O. GRIGSON, as Trustee for "The Texas Chainsaw Massacre"; RIVER CITY FILMS, INC.; ULTRA MUCHOS, INC.,

Plaintiffs-Appellants,

versus

CREATIVE ARTISTS AGENCY, L.L.C.; MATTHEW DAVID McCONAUGHEY,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Texas

April 24, 2000

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Solely at issue is whether the district court abused its discretion by applying equitable estoppel to compel arbitration for an action centered on tortious interference with a contract with an arbitration clause, brought by signatories to the contract against non-signatories, the court holding that, because this action is intertwined with, and dependent upon, that contract, its arbitration agreement should be given effect. We **AFFIRM**.

[Handwritten: "can't relitigate what has already been litigated."; "against 'non-signatories' of contract."]

**Grigson v. Creative Artists Agency, L.L.C.**, 210 F.3d 524 (5th Cir. 2000).

*Highlighted: 5th Circuit's **two-prong equitable-estoppel test** — claims must be **"intertwined with" and "dependent upon"** the contract — for non-signatory motions to compel arbitration.*

the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U. S. C. §706. It further requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." §706(2)(A).

The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "*all* relevant questions of law" arising on review of agency action, §706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions. That omission is telling, because Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential. See §706(2)(A) (agency action to be set aside if "arbitrary, capricious, [or] an abuse of discretion"); §706(2)(E) (agency factfinding in formal proceedings to be set aside if "unsupported by substantial evidence").

In a statute designed to "serve as the fundamental charter of the administrative state," *Kisor* v. *Wilkie*, 588 U. S. 558, 580 (2019) (plurality opinion) (internal quotation marks omitted), Congress surely would have articulated a similarly deferential standard applicable to questions of law had it intended to depart from the settled pre-APA understanding that deciding such questions was "exclusively a judicial function," *American Trucking Assns.*, 310 U. S., at 544. But nothing in the APA hints at such a dramatic departure. On the contrary, by directing courts to "interpret constitutional and statutory provisions" without differentiating between the two, Section 706 makes clear that

FINRA has power too big for their britches.

**Loper Bright Enters. v. Raimondo**, 603 U.S. 369 (2024) (slip op. at 14).

*Highlighted:* ***"Courts, not agencies, will decide all relevant questions of law"*** *arising on review (5 U.S.C. § 706) — APA codification of Marbury; judicial primacy in statutory interpretation.*

Brief for Respondents in No. 22–1219, pp. 13, 37–38; *post*, at 4–15 (opinion of KAGAN, J.). Presumptions have their place in statutory interpretation, but only to the extent that they approximate reality. *Chevron*'s presumption does not, because "[a]n ambiguity is simply not a delegation of law-interpreting power. *Chevron* confuses the two." C. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 405, 445 (1989). As *Chevron* itself noted, ambiguities may result from an inability on the part of Congress to squarely answer the question at hand, or from a failure to even "consider the question" with the requisite precision. 467 U. S., at 865. In neither case does an ambiguity necessarily reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question. And many or perhaps most statutory ambiguities may be unintentional. As the Framers recognized, ambiguities will inevitably follow from "the complexity of objects, . . . the imperfection of the human faculties," and the simple fact that "no language is so copious as to supply words and phrases for every complex idea." The Federalist No. 37, at 236.

Courts, after all, routinely confront statutory ambiguities in cases having nothing to do with *Chevron*—cases that do not involve agency interpretations or delegations of authority. Of course, when faced with a statutory ambiguity in such a case, the ambiguity is not a delegation to anybody, and a court is not somehow relieved of its obligation to independently interpret the statute. Courts in that situation do not throw up their hands because "Congress's instructions have" supposedly "run out," leaving a statutory "gap." *Post*, at 2 (opinion of KAGAN, J.). Courts instead understand that such statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning. That is the whole point of having written statutes; "every statute's meaning is fixed at the time of enactment." *Wisconsin Cen-*

Jurisdictional Paradox!

**Loper Bright Enters. v. Raimondo**, 603 U.S. 369 (2024) (slip op. at 22).

*Highlighted:* ***"An ambiguity is simply not a delegation of law-interpreting power. Chevron confuses the two."*** *(quoting Sunstein, 103 Harv. L. Rev. 405, 445 (1989)).*

24 LOPER BRIGHT ENTERPRISES *v.* RAIMONDO

GORSUCH, J., concurring

the law, *Chevron* deference engenders constant uncertainty and convulsive change even when the statute at issue itself remains unchanged.

Nor are these antireliance harms distributed equally. Sophisticated entities and their lawyers may be able to keep pace with rule changes affecting their rights and responsibilities. They may be able to lobby for new "reasonable" agency interpretations and even capture the agencies that issue them. *Buffington*, 598 U. S., at ___, ___ (slip op., at 8, 13). But ordinary people can do none of those things. They are the ones who suffer the worst kind of regulatory whiplash *Chevron* invites.

Consider a couple of examples. Thomas Buffington, a veteran of the U. S. Air Force, was injured in the line of duty. For a time after he left the Air Force, the Department of Veterans Affairs (VA) paid disability benefits due him by law. But later the government called on Mr. Buffington to reenter active service. During that period, everyone agreed, the VA could (as it did) suspend his disability payments. After he left active service for a second time, however, the VA turned his patriotism against him. By law, Congress permitted the VA to suspend disability pay only "for any period for which [a servicemember] receives active service pay." 38 U. S. C. §5304(c). But the VA had adopted a self-serving regulation requiring veterans to file a form asking for the resumption of their disability pay after a second (or subsequent) stint in active service. 38 CFR §3.654(b)(2) (2021). Unaware of the regulation, Mr. Buffington failed to reapply immediately. When he finally figured out what had happened and reapplied, the VA agreed to resume payments going forward but refused to give Mr. Buffington all of the past disability payments it had withheld. *Buffington*, 598 U. S., at ___–___ (slip op., at 1–4).

Mr. Buffington challenged the agency's action as inconsistent with Congress's direction that the VA may suspend disability payments only for those periods when a veteran

Case: 24-10699 Document: 49-1 Page: 5 Date Filed: 06/24/2025

No. 24-10699

nullified that approach: the arbitration-favoring policy "does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Id.* Rather, that policy merely "place[s] such agreements upon the same footing as other contracts." *Id.* (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)). Therefore, the relevant question is whether "an ordinary procedural rule . . . would counsel against enforcement of an arbitration contract." *Id.* at 418. As the Supreme Court defined it, waiver is "the intentional relinquishment or abandonment of a known right." *Id.* at 417 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

We have not revisited our test for waiver of an arbitration agreement since *Morgan*.[3] We do so here. If we excise the prejudice prong from our pre-*Morgan* test, there is only one way to show waiver in the arbitration context: demonstrating that a party "substantially invoke[d] the judicial process." *Miller*, 781 F.2d at 497. To be sure, this does not facially conflict with *Morgan*'s holding that there be no special procedural rules governing arbitration agreements. But such a conclusion would still, at least partially, fly in the face of *Morgan*'s holding. Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan*, 596 U.S. at 417 (quoting *Olano*, 507 U.S. at 733). If waiver of an arbitration agreement *only* occurred when a party substantially invoked the judicial process, we would be "devis[ing] novel rules to favor arbitration over litigation" by limiting the number of ways to prove waiver—precisely what *Morgan* counsels against. *Id.* at 418.

[3] We have only encountered one arbitration waiver matter in the wake of *Morgan*, in *Pumphrey v. Triad Life Sciences, Inc.*, No. 24-60028, 2024 WL 4100495, at *2 (5th Cir. Sept. 6, 2024). In that unpublished opinion, a panel of this court stated that a party "can waive its contractual right to arbitration by 'substantially invok[ing] the judicial process.'" *Id.* (alteration in original) (emphasis added) (quoting *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991)). But we chose not to otherwise define waiver in light of *Morgan*, nor did we discuss *Morgan* at all.

**Loper Bright Enters. v. Raimondo**, 603 U.S. 369 (2024) (opinion of the Court).

*Highlighted: Chevron deference **"engenders constant uncertainty and convulsive change"** even where the statute itself remains unchanged — illustrated by Buffington v. McDonough.*

**5th Cir. No. 24-10699**, slip op. at 5 (5th Cir. June 24, 2025).

*Highlighted: Post-Morgan waiver standard: arbitration agreements on "the same footing as other contracts"; waiver is **"the intentional relinquishment or abandonment of a known right"** by **"substantially invok[ing] the judicial process."***

No. 24-10699

in discovery, attending mediation, and expressly representing to the Court in the parties' Joint Report that [they] did not intend to pursue arbitration of Garcia's claims." Because the magistrate judge's report and recommendation found that the Restaurant Defendants waived their right to arbitrate, it did not consider whether a valid arbitration agreement existed.

The Restaurant Defendants objected to the report and recommendation, arguing, among other things, that while *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022), "eliminated . . . the presumption against a finding of waiver," all contracts benefit from a presumption against waiver. The district court considered the Restaurant Defendants' objections and overruled them, accepting the magistrate judge's findings and recommendations as its own. The Restaurant Defendants timely appealed.

II

Before we consider whether the Restaurant Defendants waived their right to arbitrate, we must address the sea change in the law governing arbitration waiver following *Morgan v. Sundance*. 596 U.S. 411. This court has long embraced an arbitration waiver test rooted in prejudice: Waiver of an arbitration agreement occurs where "[(1)] the party seeking arbitration substantially invokes the judicial process [(2)] to the detriment or prejudice of the other party." *Miller Brewing Co. v. Fort Worth Dist. Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986); *see also E.C. Ernst, Inc. v. Manhattan Const. Co. of Tex.*, 559 F.2d 268, 269 (5th Cir. 1977). The prejudice prong of this analysis "derives from the FAA's 'policy favoring arbitration.'" *Morgan*, 596 U.S. at 414. But *Morgan* upended that portion of the analysis.

In *Morgan*, the Supreme Court considered the Eighth Circuit's arbitration-specific rule, which was grounded in the FAA policy favoring arbitration. *Id.* at 417. The Eighth Circuit, like most others, had adopted a prejudice requirement premised on that same policy. *Id.* at 418. But *Morgan*

No. 24-10699

nullified that approach: the arbitration-favoring policy "does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Id.* Rather, that policy merely "place[s] such agreements upon the same footing as other contracts." *Id.* (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)). Therefore, the relevant question is whether "an ordinary procedural rule . . . would counsel against enforcement of an arbitration contract." *Id.* at 418. As the Supreme Court defined it, waiver is "the intentional relinquishment or abandonment of a known right." *Id.* at 417 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

We have not revisited our test for waiver of an arbitration agreement since *Morgan*.[3] We do so here. If we excise the prejudice prong from our pre-*Morgan* test, there is only one way to show waiver in the arbitration context: demonstrating that a party "substantially invoke[d] the judicial process." *Miller*, 781 F.2d at 497. To be sure, this does not facially conflict with *Morgan*'s holding that there be no special procedural rules governing arbitration agreements. But such a conclusion would still, at least partially, fly in the face of *Morgan*'s holding. Waiver "is the intentional relinquishment or abandonment of a known right." *Morgan*, 596 U.S. at 417 (quoting *Olano*, 507 U.S. at 733). If waiver of an arbitration agreement *only* occurred when a party substantially invoked the judicial process, we would be "devis[ing] novel rules to favor arbitration over litigation" by limiting the number of ways to prove waiver—precisely what *Morgan* counsels against. *Id.* at 418.

[3] We have only encountered one arbitration waiver matter in the wake of *Morgan*, in *Pumphrey v. Triad Life Sciences, Inc.*, No. 24-60028, 2024 WL 4100495, at *2 (5th Cir. Sept. 6, 2024). In that unpublished opinion, a panel of this court stated that a party "*can* waive its contractual right to arbitration by 'substantially invok[ing] the judicial process.'" *Id.* (alteration in original) (emphasis added) (quoting *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991)). But we chose not to otherwise define waiver in light of *Morgan*, nor did we discuss *Morgan* at all.

**5th Cir. No. 24-10699**, slip op. at 4 (5th Cir. June 24, 2025).

*Highlighted: Joint-Report representation that defendants **"did not intend to pursue arbitration"** (together with discovery, mediation, and other litigation conduct) cited as evidence of waiver.*

**5th Cir. No. 24-10699**, slip op. at 5 (5th Cir. June 24, 2025) (companion scan).

*Highlighted: Companion view of the post-Morgan waiver-standard page; preserves petitioner marginalia not visible on the prior plate.*

No. 24-10699

waive their right to arbitrate. *Id.* at 948–49. But as the Restaurant Defendants admit, the parties in *Pacheco* never mentioned arbitration in their joint report. And we took no notice of the form report's failure to mention arbitration.

The facts here are distinguishable. The parties stated that they were "not considering arbitration to resolve this litigation," and the Restaurant Defendants specifically noted that they were "not aware of any arbitration agreements." This statement is an "overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Nicholas v. KBR, Inc.*, 565 F.3d 904, 907 (5th Cir. 2009) (quoting *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 484 (5th Cir. 2002)). Then, *after* stating that they were not considering arbitration, the Restaurant Defendants took several steps confirming that intended course of action. They participated in discovery. They mediated, as suggested by the court. They remained in court for three months. And before this all, they filed an answer that failed to preserve an arbitration defense.

It is generally true that participation in discovery does not weig[h] heavily in favor of waiver. We have previously stated that "[p]arties cann[ot] enjoy the benefits of federal discovery, and then, after doing so, seek t[o] enforce a decision through private resolution" due to the potential f[or] prejudice. *Janvey v. Alguire*, 847 F.3d 231, 244 (5th Cir. 2017). After a[ll,] alternative dispute resolution is often justified through its "avoidance of ... litigation costs, including discovery." *Id.* Here, the parties exch[anged a] set each of interrogatories, requests for production, and ... "the minimal discovery" that we ... waive arbi...

5th Cir. No. 24-10699, slip op. at 9 (5th Cir. June 24, 2025).

*Highlighted:* ***Overt in-court representations*** *of non-pursuit ("we were not pursuing arbitration" in the parties' Joint Report) treated as evidence of waiver;* ***facts distinguished from Pacheco****.*

No. 24-10699

"move[] for . . . summary judgment," *Price*, 791 F.2d at 1162, or wait until the district court "gave very strong indications that [it] favored" the opposing party's position, *Petrol. Pipe*, 575 F.3d at 481.

But context controls, and the Restaurant Defendants litigated for three months after declaring their intent *not* to arbitrate. We frown upon attempts "to switch judicial horses in midstream" due to "poor judgment . . . or poor foresight." *Walker*, 938 F.2d at 577. As we discuss below, the Restaurant Defendants' failure to discover the possibility of arbitration in their own files is poor foresight. This delay, within the context of the above acts, suggests an intent to remain in court.[9]

The Restaurant Defendants did not assert an arbitration defense in their answer, expressly stated they would not seek arbitration, and subsequently engaged in typical litigative processes. These acts were intentionally taken, and, together, constitute abandonment of the right to arbitrate.

C

The Restaurant Defendants protest that they knew not of their arbitration rights when they submitted the joint report and engaged in the subsequent litigation conduct. So, they argue, they cannot possibly have

[9] Because we no longer consider prejudice, delay by itself will rarely move the needle in this analysis. Instead, it is the activity *accompanying* the delay that will usually invoke the judicial process to sufficiently waive a right to arbitrate. Even in cases in which a party waits until the eve of trial—one of the clearest examples in which delay would weigh in favor of waiver—waiver may be premised more on the parties' significant discovery, motions practice, and trial preparation. Such is the case here. It is not the time *itself* that contributes to our holding, but that the parties engaged in traditional litigative practice in federal court for three months after clearly stating that they did not intend to arbitrate.

5th Cir. No. 24-10699, slip op. at 13 (5th Cir. June 24, 2025).

*Highlighted:* ***"We frown upon attempts to switch judicial horses in midstream"*** *due to* ***"poor judgment ... or poor foresight"*** *(Walker, 938 F.2d at 577).*