|  | X |  |
| --- | --- | --- |
| **JOSHUA DAVID SAPPI BIERING,** | **:** | **Case No. 4:26-cv-381-O** |
| **Claimant,** | **:** | **FINRA Case No. 24-02444** |
| **v.** | **:** |  |
| **J.P. MORGAN SECURITIES LLC,** *et al.*, | **:** |  |
| **Respondent.** | **:** |  |
|  | X |  |

## RESPONDENTS' APPENDIX TO THEIR RESPONSE IN OPPOSITION TO THE AMENDED VERIFIED PETITION TO CONFIRM, MODIFY, AND VACATE IN PART A FINRA ARBITRATION AWARD, AND TO RETAIN JURISDICTION

Respondents, J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase Bank, N.A. ("Chase"), and JP Morgan Chase & Co. ("JPMC") (collectively "Respondents"), by and through undersigned counsel, and pursuant to LR 7.1(i), hereby submit this Appendix to their Response in Opposition to the Amended Verified Petition to Confirm, Modify, and Vacate in Part A FINRA Arbitration Award, and to Retain Jurisdiction.

Respectfully submitted,

/s/Jeffrey S. Dunlap
Jeffrey S. Dunlap
Ohio Bar No. 0067923,
*Admitted Pro Hac Vice*
Kyle W. Rea
Ohio Bar No. 0101812
*Admitted Pro Hac Vice*
UB GREENSFELDER LLP
Skylight Office Tower
1660 West 2nd Street - Suite 1100
Cleveland, Ohio 44113-1448
Phone (216) 583-7000
Fax (216) 583-7001
jdunlap@ubglaw.com
krea@ubglaw.com

Christopher S. Dodrill
Texas Bar No. 24110696
Elizabeth A. Bones
Texas Bar No. 24074026
GREENBERG TRAURIG LLP
2200 Ross Ave., Ste. 5200
Dallas, Texas 75201
Phone (214) 665-3600
Fax (214) 665-3601
christopher.dodrill@gtlaw.com
beth.bones@gtlaw.com

*Attorneys for Respondents,*
*J.P. Morgan Securities LLC, JPMorgan*
*Chase & Co., and JP Morgan Chase Bank,*
*N.A.*

## CERTIFICATE OF SERVICE

I certify that on May 26, 2026, the foregoing was filed and served through PACER's ECF system.

/s/Jeffrey S. Dunlap

*One of the Attorneys for Respondents,*
*J.P. Morgan Securities LLC, JPMorgan*
*Chase & Co., and JP Morgan Chase Bank,*
*N.A.*

## **INDEX**

1. Petitioner's Statement of Claim, Appx., Appx. 1

2. Petitioner's First Amended Statement of Claim, Appx. 106.

3. FINRA Letter, dated August 13, 2024, Appx. 202.

4. FINRA Letter Regarding JPMorgan Chase Bank, N.A., dated September 13, 2024, Appx. 204.

5. FINRA Letter Regarding JPMorgan Chase & Co., dated September 13, 2024., Appx. 205.

6. FINRA Letter, dated September 6, 2024, Appx. 206.

7. Petitioner's Second Amended Statement of Claim. 208

8. The Arbitration Award., Appx. 304.

4919-6443-1526, v. 1

| | |
|---|---|
| In the Matter of<br>Arbitration between<br><br>JOSHUA DAVID SAPPI BIERING,<br><br>Claimant,<br><br>- and -<br><br>J.P. MORGAN SECURITIES, LLC,<br><br>Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     FINRA No. _____<br>§<br>§<br>§<br>§<br>§ |

## STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following Statement of Claim ("SOC" or this "Pleading") seeking more than $10 million against J.P. Morgan Securities LLC ("J.P. Morgan" or "JPM") and, in support thereof, respectfully states as follows:

## EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1. Biering is a well-respected registered representative and financial advisor (hereinafter, "FA") with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for J.P. Morgan for 8 years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

2. Biering **_resigned_** from J.P. Morgan on October 28, 2023. Following his resignation, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Biering honored the Garden Leave.[1] However, on December 1, 2023, J.P. Morgan informed Biering that

---

[1] Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

---

he was "terminated" for violating JPM's "anti-harassment policy." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his *voluntary* resignation—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate resignation, with the goal of smearing Biering with other firms/clients.

3.      Moreover, after learning that Biering planned to leave J.P. Morgan, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, <u>*after*</u> Biering already resigned, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a female colleague. Refusing to provide any further details so that Biering could rebut any baseless accusations against him, JPM questioned Biering regarding the nature of the relationship. Given the seriousness of JPM's ultimate investigative "findings," JPM's secrecy was entirely improper. Had JPM conducted its "investigation" in good faith and treated Biering the same as his female colleague, JPM could not have reasonably concluded that Biering violated an "anti-harassment policy" or, as JPM falsely disclosed to the public, engaged in "inappropriate behavior." JPM's wording was intentionally incendiary.

4.      Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even *fired*?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs *falsely* informed Biering's clients that he had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

5.      JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after <u>repeated</u> demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure was "Voluntary." Even worse, JPM gave the following explanation in support:

**Termination Explanation:**

After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

6.      JPM's clear and intentional weaponization of Biering's U5 was beyond egregious. JPM used Biering actually honoring (unlike many FAs) his Garden Leave against him so that JPM could tarnish his name and ensure that it would keep his clients. Indeed, JPM was well aware that Biering's pipeline of business opportunities indicated more than $300 million in anticipated AUM for 2024.

7.      J.P. Morgan's defamation, including its weaponization of Biering's U5, has caused catastrophic damage to Biering's career. As a direct result of JPM's false disclosures on Biering's U5 and tortious interference with Biering's business, Biering's job offers from two firms were rescinded, and multiple other firms stopped considering him. Likewise, Biering has lost prominent clients that do not want to associate with someone who was purportedly "terminated for inappropriate behavior."

8.      As a result of J.P. Morgan's intentional and wrongful conduct, Biering had no choice but to file this Arbitration[2] and seek to hold J.P. Morgan accountable.

---

[2]      This "Arbitration" or "Action" refers to the present arbitration that Biering is instituting against J.P. Morgan.

## FACTS

9. Biering is a proud Brazilian American, a veteran, and an accomplished FA.

10. After graduating from the prestigious United States Military Academy at West Point, Biering served honorably in the United States Army for five years. As part of his service to our country, Biering completed a tour to Afghanistan in support of Operating Enduring Freedom, after which he was humbly awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Biering consistently received exemplary evaluations throughout his military career (as outlined in his annual Officer Evaluation Reports). Biering was honorably discharged, and the Department of Veteran Affairs has deemed Biering to be a 100% service-connected, disabled Veteran.

### Biering Joins and Excels at J.P. Morgan

11. Biering joined J.P. Morgan through its military hiring initiatives in May 2016. Throughout Biering's eight-year tenure with the Firm, JPM recognized Biering as a top performer and quickly promoted him from Associate to Vice President and, most recently, Executive Director. Biering's strong performance at JPM was consistently outlined in his annual year-end performance reviews and further supported through formal and documented peer review feedback.

12. For the last 8 years, Biering worked at JPM's Fort Worth Private Bank office.[3] Biering managed a sizeable book of business that generated $5.4 million in annual revenue, and Biering oversaw $975 million of assets and credit positions.

---

[3] J.P. Morgan Chase consists of two separate wealth management arms—J.P. Morgan Advisors, which utilizes a traditional wire house and commission-based FA model, and the J.P. Morgan Private Bank, which utilizes a base salary and annual bonus model. Biering worked in the J.P. Morgan Private Bank arm. However, J.P. Morgan Securities LLC held Biering's licenses and mismarked his U5 at the direction of the J.P. Morgan Private Bank.

13.     In addition, Biering was promoted on an accelerated basis and served in various leadership roles, both formally and informally. For example, Biering was partnered with and mentored various Analysts[4] over the years, including a female Analyst who has since been promoted to a prestigious position with J.P. Morgan's New York office. Additionally, Biering's former Executive Administrative Assistant was promoted to the role of Onboarding Associate for the Fort Worth office, and she has since accepted a Senior Client Service Associate role, supporting Biering at his new Firm.

14.     Biering's investment in the careers of his female colleagues at JPM extended beyond the Fort Worth Private Bank office. Specifically, after J.P. Morgan implemented a program with offshore partners in India to support Analysts, the Fort Worth office received negative feedback for underutilizing their offshore partners (who both were women). Not until Biering assumed the role of Analyst Manager did the Fort Worth office utilization metrics and offshore partnership feedback drastically improve. The offshore analyst program leadership praised Biering for his efforts.[5]

**JPM Assigns Kelly Ann Kimball to Support Biering**

15.     In or around February 2023, JPM assigned Kelly Ann Kimball ("Kimball") to support Biering. As he had done in the past with his female (and male) colleagues, Biering took strides to mentor Kimball, and the two worked with each other closely. Together, they managed a sizeable book of business relative to their peers and often required (and requested) additional

---

[4]     J.P. Morgan's corporate titles, in ascending order, are: Analyst, Associate, Vice President, Executive Director, and Managing Director.

[5]     Biering invested in the careers of his male colleagues as well. For example, after being mentored by Biering, Biering's male Analyst secured a role with the prestigious "23 Wall" team in JPM's New York office.

support from management. In fact, Biering repeatedly expressed concerns to his superiors regarding his and Kimball's increased workload and lack of coverage.

16. Given that they were both experiencing similar marital struggles, Biering and Kimball developed a friendship in addition to their working relationship. In connection with same, Biering and Kimball communicated frequently during 2023 via text message (many of which were sent via an encrypted messaging app so that Kimball could hide these messages from her husband).

17. In September 2023, Biering and Kimball attended an overnight charity event together. Prior to the event, Biering and Kimball received *express* approval from her managers and Stewart to attend. After the event, Biering and Kimball continued their friendship and regularly spent time together at and outside of work.

**Despite His Success, Biering Could Not Ignore JPM's Toxic Work Environment**

18. As set forth above, Biering managed a large book of business, and he was further responsible for bringing in substantial new accounts. In fact, toward the end of his time at J.P. Morgan, Biering forecasted that several new business opportunities were expected to close in 2024 (*i.e.*, "hot" pipeline entries). Most notably, the onboarding of a $3.5 billion dental rollup (hereinafter, "XYZ Dental")[6] was expected to bring in more than $300 million in assets under management. In Q3 of 2023 (*i.e.*, shortly before Biering's resignation from JPM), Biering had already begun onboarding XYZ Dental's top shareholders.

19. Biering's success at J.P. Morgan was not due to the Firm's resources or support. Instead, Biering grew increasingly frustrated with JPM's recently appointed leadership at the Fort Worth office, including the promotions of Kyle Hitchcock ("Hitchcock") to Head of Investments and Advice and John Aughinbaugh ("Aughinbaugh") to Market Manager. Specifically, among

---

[6] To preserve client confidentiality, "XYZ Dental" serves as a pseudonym for the client at issue.

numerous other things, Hitchcock openly reprimanded Biering in front of fellow FAs and Aughinbaugh repeatedly criticized Biering's business development efforts (and baselessly disagreed with Biering's management of client relationships). Likewise, Biering's frustrations with Ben Stewart, Jr. ("Stewart") also grew. In his capacity as Single Coverage Team Lead for the Fort Worth office, Stewart served as Biering's immediate manager, and he routinely ignored Biering's requests for support due to Biering's excessive workload.

20.     More specifically, with respect to Hitchcock, Biering was chastised in front of his colleagues and faced baseless accusations of overworking Kimball. In truth, Hitchcock was well aware of Kimball's *and Biering's* repeated requests for support from management due to their excessive workloads. In addition, Hitchcock (along with Aughinbaugh) spearheaded the plot to discriminate against Biering and try to fabricate reasons to purportedly terminate him.

21.     With respect to Aughinbaugh, when Biering pursued XYZ Dental (via both its CEO and President) as a large prospective client, Biering requested Aughinbaugh's support and asked for a brief internal meeting to discuss. Aughinbaugh first accused Biering of wasting his time but then later scolded Biering when Aughinbaugh felt that he was unprepared for a meeting with XYZ Dental (*i.e.*, the meeting for which Biering *tried* to prepare Aughinbaugh before being accused of wasting Aughinbaugh's time). Aughinbaugh further denied Biering's request for sponsorship support for a charity event, despite that Aughinbaugh knew that this very event previously resulted in new business from XYZ Dental.[7] XYZ Dental was not the only prospective client about which Biering and Aughinbaugh had disagreements. In approximately August 2023, Aughinbaugh refused to let Biering present a prospective client (*i.e.*, a $100 million endowment opportunity for

---

[7]     Ironically, after Biering resigned from J.P. Morgan, Fort Worth office leadership—including Aughinbaugh—agreed to sponsor the event.

a quasi-government entity) to JPM's Client Review Forum for onboarding approval, which was the standard onboarding operating procedure.[8]

22. With respect to Stewart—with whom Biering repeatedly conveyed his dissatisfaction with JPM's toxic work environment—Biering received zero support when he reached out for assistance with his massive workload. Even worse, after learning that Biering intended to join a competitor, Stewart turned his back on Biering, joined JPM's witch hunt to fabricate reasons to support an alleged termination of Biering and jumped on the bandwagon to frame Biering. In addition, for months leading up to Biering's resignation, Stewart shared personal items about Biering, which Biering told Stewart *in confidence*, with Hitchcock and Aughinbaugh.

23. Stewart, Hitchcock, and Aughinbaugh all used their knowledge of Biering's personal issues to discriminate against Biering and treat him differently from his colleagues. For example, when Biering requested reasonable accommodations and FMLA leave due to his personal struggles, Human Resources and leadership told Biering that if he chose to take FMLA leave, he would be prohibited from contacting clients. Oddly enough, Aughinbaugh told Biering that he did not think FMLA leave was the "right move" for Biering weeks later. Upon information and belief, many non-disabled, female employees were permitted to contact clients at their discretion while they were on leave. Biering, however, was not offered the same accommodation or opportunity. Given that there were upcoming liquidity events and substantial new business, Biering knew that he could not take FMLA leave under these circumstances.

24. The aforementioned examples are merely a glimpse into the long list of consistent scrutiny and harassment Biering faced from his leadership.

---

[8] Notably, this denial occurred swiftly after Aughinbaugh spoke with one of Biering's colleagues— a white female—regarding the prospect.

25. Put simply, this new leadership created a hostile, toxic work environment and culture that became unsustainable for Biering. As a result, Biering considered resigning *numerous* times from January 2023 through October 2023 (*i.e.*, when he ultimately did resign). Indeed, in the months preceding his resignation, Biering *repeatedly* told Stewart and several other J.P. Morgan colleagues that he was unhappy and discouraged with his work environment and that he was considering resigning.

**Biering Explores Other Opportunities**

26. In the months preceding his resignation, Biering actively explored opportunities with multiple firms. Specifically, Biering interviewed with and received offers from Merrill Lynch and Texas Capital. Upon information and belief, Stewart had actual knowledge that Biering was communicating with Merrill Lynch regarding potential employment.[9]

**Biering Resigns from J.P. Morgan**

27. On October 24, 2023, Biering informed Stewart and Aughinbaugh that he planned to resign from JPM. Biering further expressed that he felt he nonetheless deserved incentive compensation due to his strong 2023 performance.[10] In response, Aughinbaugh and Stewart unfairly accused Biering of acting in a way that did not align with "team culture" (which was ironic, given Aughinbaugh's and Stewart's recent actions that violate their own "How We Do Business Principles").

28. On October 25, 2023, Biering informed Stewart that he intended to take paid time off from October 25 through October 27, 2023.

---

[9] In fact, Stewart called Biering during what Stewart *knew* was an interview and meeting with Merrill Lynch on October 27, 2023. Biering also submitted PTO requests to Stewart and reported his time off.

[10] Incentive compensation paid in January 2024 is awarded for performance from the Q3 2022 to Q3 2023—the period during which Biering exuded stellar performance recognized by executive leadership.

29.     On October 27, 2023 (*i.e.*, the day before Biering's resignation from JPM), Biering informed Merrill Lynch that he accepted its generous terms, subject to Merrill Lynch's review of JPM's marking of Biering's U5.

30.     That *same day*, Stewart called Biering and informed him that he was being placed on an "involuntary administrative leave." When Biering asked Stewart for additional information regarding the purpose of the administrative leave, Stewart refused to provide it. Further, when Biering tried to contact JPM's Human Resources department, he received no response. Given that Stewart called Biering late on a Friday afternoon and no one would respond to him, Biering could only speculate as to the reason he was placed on leave. In Biering's view, the only possible reason was because JPM knew that Biering was planning to leave to join a competitor, and JPM wanted to retain his significant book of business.

31.     This unexpected administrative leave—on which Biering was placed with zero context, despite his requests for same—was the final straw. It was clear to Biering that management was retaliating against him for informing them that he planned to resign. Biering therefore had no choice but to do what was in his and his clients' best interests and finally resign.

32.     On October 28, 2023, Biering voluntarily **resigned** from J.P. Morgan. Specifically, Biering submitted a written resignation via e-mail and JPM's HR system (*i.e.*, "me@JPMC").

33.     Biering's resignation could not have been clearer. Indeed, he stated: "I am writing to inform you of my formal resignation." J.P. Morgan recognized that Biering resigned by stating: "Your resignation was processed." In addition, upon information and belief, JPM's internal reporting system reflects that Biering's "Last Day Worked" was October 26, 2023. As such, there

can be no question that—at the very latest—Biering resigned from J.P. Morgan on October 28, 2023.[11]

**Biering's Garden Leave**

34. Following his resignation, Biering was required to honor a 60-day notice period (*i.e.*, the Garden Leave), during which Biering was not allowed to solicit clients.

35. Despite the fact that it was incredibly broad and that most FAs do not honor this "sit out" period, Biering honored the Garden Leave to ensure an amicable departure and smooth transition for his clients.

**JPM's Investigation (*i.e.*, Witch Hunt) of Biering**

36. On or about November 1, 2023, Biering learned—via his counsel—that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy, and (2) an alleged violation of JPM's expense report policy."[12] This was the first time that Biering learned he was being investigated for anything. Thus, at the time that Biering resigned from JPM, Biering clearly was not under investigation.[13] Instead, Biering learned, after he resigned, JPM tried to find anything that would "stick" to end Biering's career in wealth management.

---

[11] It is Biering's position that, at a minimum, JPM—via Aughinbaugh and Stewart—had actual knowledge of Biering's intended resignation on October 24, 2023. Stewart was aware of Biering's intended resignation for months.

[12] Specifically, as part of its witch hunt, JPM investigated certain expense reports that Biering submitted (which JPM had already approved). Biering answered all JPM's questions truthfully, and he further offered examples of systemic abuse of expense policies by leadership throughout the Private Bank. Unsurprisingly, JPM concluded that Biering did not violate JPM's expense report policy and dropped the issue altogether.

[13] To the extent JPM claims that Biering was already under investigation when he resigned, he was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave).

37.     On November 2, 2023, Biering received an initial e-mail from Jonathan Jacobs ("Jacobs"), an investigator with JPM Employee Relations.

38.     On November 7, 2023, Jacobs interviewed Biering. Specifically, Jacobs asked Biering various questions regarding his relationship with Kimball. However, Jacobs did not provide any details regarding the purpose of the investigation or why he was asking about the relationship between Biering and Kimball.

39.     Upon information and belief, after JPM was made aware of the fact that Biering and Kimball developed a friendship and spent time together at and outside of work, Kimball— almost certainly to save face and continue hiding her and Biering's close, personal relationship from her husband—fabricated allegations against Biering. Indeed, given that Kimball and Biering exchanged numerous text messages (and "selfies") in which Kimball made it clear that she liked and felt comfortable around Biering, there can be no other plausible explanation.

40.     In addition, it is clear that JPM did not conduct *any* investigation into Kimball's actions or place her on administrative leave. To the extent JPM suggests that any of its policies required disclosure of Biering's and Kimball's relationship with each other, then Kimball should have faced the same investigation that Biering had to endure. Likewise, Kimball should have been placed on an involuntary administrative leave and denied access to clients and JPM systems just like Biering. But neither of these things occurred. Instead, JPM apparently accepted all of Kimball's statements as true and refused to share any information with Biering so that he could dispute any baseless accusations against him. Biering offered exculpatory text messages with Kimball and insisted that JPM consider these messages as evidence, but JPM emphatically refused.

41.     Despite that he was without crucial details regarding JPM's purported investigation, Biering informed Merrill Lynch of the situation. Though Biering had already signed employment

onboarding documents, Merrill Lynch told Biering that it would need to see how JPM marks Biering's U5 before finalizing Biering's offer and employment agreement.

42. Throughout November 2023, Merrill Lynch asked Biering several times if JPM provided any updates regarding JPM's plan to mark Biering's U5. Biering and Merrill Lynch had nearly finalized Biering's deal structure, and they were anxious to complete the hiring process.

43. On November 13, 28, and 29, 2023, Biering asked Jacobs for an update on the investigation. Jacobs refused to provide one.

44. On November 29, 2023, JPM denied Biering's requests for copies of his personnel records and a copy of the Garden Leave policy.

### J.P. Morgan Attempts to Baselessly "Terminate" Biering

45. On December 1, 2023—*i.e.*, 33 days into Biering's Garden Leave, which directly followed his voluntary resignation—Aughinbaugh and Stewart called Biering and purported to "terminate" him. Specifically, Aughinbaugh and Stewart told Biering that, following the investigation performed by JPM's Employee Relations department, Biering was being terminated for violating the Firm's Code of Conduct and "anti-harassment policy."

46. As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already <u>resigned</u>***.

47. Even if Biering could have been terminated (he could not), the reasons for Biering's purported termination were unquestionably fabricated and discriminatory.

48.     First, given the facts and nature of Biering's and Kimball's relationship (as evidenced by the numerous text messages they exchanged), Biering could not have violated JPM's "anti-harassment" policy. Upon information and belief, violations of JPM's "anti-harassment" policy include, for example:

- Engaging in conduct that creates "a hostile or offensive environment, or can reasonably be expected to cause an individual to feel uncomfortable, intimidated, humiliated, or distressed"; and/or

- Engaging in "unwelcome sexual advances, requests for sexual favors and other verbal or nonverbal behavior or physical contact of a sexual nature."

49.     As set forth above, to the extent Kimball experienced any "distress," that was because management disregarded both her _and Biering's_ requests for support with their workloads. Further, had JPM investigated in good faith, it would have quickly seen that Biering's and Kimball's relationship was entirely consensual. Indeed, had JPM reviewed any of the numerous text messages that Kimball and Biering exchanged, JPM would have learned that Kimball was "proud to be [Biering's] analyst," that Kimball was incredibly comfortable around Biering, and that Kimball welcomed and enjoyed any personal attention she received from Biering. To the extent that JPM concluded otherwise, then Kimball had to have fabricated allegations against Biering (in a likely attempt to save her marriage and after being coerced by JPM leadership), which JPM simply took at face value without even attempting to hear and consider Biering's side of the story.

50.     Likewise, to the extent that J.P. Morgan claims that, in light of his relationship with Kimball, Biering violated a policy regarding required disclosure of personal relationships with other employees, that too would be suspect. Upon information and belief, Kimball was not

investigated for having a "personal relationship" with a fellow employee, and she certainly was not placed on administrative leave, disciplined, or terminated for her failure to disclose same. In fact, it appears that Kimball was permitted to work remotely during JPM's entire sham investigation. JPM cannot claim—in good faith—that Biering, but not Kimball, violated a policy that makes no distinction between employees (*i.e.*, via gender or corporate job title) when it comes to disclosing personal relationships.[14]

51. Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

**JPM's Campaign of Defamation and Weaponization of Biering's U5**

52. To that end, as if JPM's witch hunt and bogus, one-sided investigation into Biering's relationship with Kimball, as well as JPM's illegitimate attempted termination of Biering, were not enough, JPM instituted a campaign of defamation against Biering during the Garden Leave. And JPM has not stopped.

53. First, during the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was <u>false</u>. Clearly, given that Biering was on

---

[14] In addition, JPM has routinely given employees a "grace period" to disclose personal relationships. In fact, upon information and belief, prior to promoting him, JPM allowed the Head of Investment and Advice of the Private Bank Dallas market—who is white and, to Biering's knowledge, is not disabled— adequate time to report his inter-office relationship with a junior partner to management. Moreover, this individual was praised and promoted. Biering, who is a Brazilian-American citizen and a disabled veteran, was not afforded the same grace period. Instead, he was purported terminated for engaging in "inappropriate behavior."

---

Garden Leave—which was *solely* triggered because Biering resigned—Biering was not and could not have been fired.

54. JPM, however, would not stop there. In an effort to ensure that it could retain Biering's clients and irreparably harm his business, JPM further intentionally and maliciously mismarked and weaponized Biering's U5.

55. Shortly after JPM's illegitimate, purported termination of Biering, Biering caught wind that JPM planned to mismark Biering's U5 to indicate that he was discharged, rather than that he resigned voluntarily.

56. On December 6, 2023, Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was *voluntary*. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

57. On December 12, 2023, Biering's counsel *again* demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

58. On December 13, 2023, JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

> "During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

59. Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he *already resigned*. Biering's counsel further put

JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

60. On December 19, 2023, Ms. Tidwell-Neal provided a short response to Biering's counsel's letters. Specifically, she indicated that JPM maintains its position that it terminated Biering *"immediately"* following the results of an investigation and, as such, was not required to mark Biering's U5 as a "voluntary" termination. Even worse, she incorrectly stated that Biering knew he was under investigation the day before he resigned and that his resignation was not "effective" until after the Garden Leave period. Notably, however, JPM did not provide any legal authority supporting its positions.

61. On December 20, 2023, Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, during Stewart's call to Biering late on a Friday afternoon—when Stewart *knew* Biering was taking paid time off and interviewing with a competitor—Stewart refused to explain why Biering was being placed on administrative leave. Biering was <u>not</u> told that he was under investigation. Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with *zero* context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

62. Also on December 20, 2023, and only after JPM refused to make the correct U5 marking of "voluntary," to attempt to limit the damage of JPM's false and defamatory "discharged" marking Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

63. Biering's counsel then implored JPM to follow FINRA guidance and the uncontroverted case law presented in Biering's demand letters.

64. On December 22, 2023, JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all of the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary").

65. First, J.P. Morgan marked that Biering was "Discharged":

**Reason for Termination:** Discharged

66. JPM then provided the following explanation for Biering's purported "Discharge."

**Termination Explanation:**

After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

67. To date, J.P. Morgan has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed their tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering).

**Prospective Employers Rescind Their Offers and Interest in Biering**

68. After J.P. Morgan—via Aughinbaugh and Stewart—purported to terminate Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Immediately, Merrill Lynch stopped the onboarding process and rescinded Biering's offer, stating that it could not hire Biering with "Discharged" on his U5 as the reason for his termination. Unfortunately, the deal

structure Merrill Lynch had offered Biering (which he then lost due to JPM's wrongful conduct) was incredibly favorable. The structure not only gave credit to Biering for new AUM but also counted loan positions, whether mortgages or outstanding lines of credit balances, towards the "asset hurdles" baked into the offer. Furthermore, a significant portion of Biering's business required banking and complex lending solutions only provided by larger banks, such as Merrill Lynch.

69.     Likewise, before JPM finalized the language it marked on Biering's U5, Texas Capital pulled its interest in hiring Biering. Specifically, Texas Capital cited concerns with the uncertainty surrounding JPM's imminent disclosures on Biering's U5.[15] Texas Capital viewed Biering as high-risk and rescinded its offer to hire Biering.

70.     Biering also interviewed with Morgan Stanley, UBS, and RBC. When they learned about JPM's disclosures on Biering's U5, Morgan Stanley referred to Biering as a "walking AdvisorHub news article waiting to happen," and UBS did not even follow up with Biering. While Biering was able to have several interviews with RBC, ultimately RBC became suspicious that Biering did not have more detail regarding the alleged "inappropriate behavior" referenced on his U5. However, Biering could not provide same because *J.P. Morgan* refused to give Biering any information that he requested. Under the circumstances, RBC concluded that hiring Biering was too risky.

**Raymond James Takes a Chance on Biering**

71.     Ultimately, Raymond James agreed to take a chance on Biering and hire him. However, Biering's interview process was significantly more intensive than the standard process.

---

[15]     Texas Capital also expressed concern regarding various disclosures on Biering's U4. Specifically, J.P. Morgan filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged.

72.     Further, Biering's employment offer was much less favorable than that offered to other FAs and what he was originally offered at Merrill Lynch. Specifically, while most FAs' asset bonuses are paid on the front end prior to a candidates onboarding, Biering is only being paid a salary for two years (which is more than 2x less than his JPM salary) and will only receive asset bonuses following the transition of client assets. In addition, unlike Merrill Lynch's offer, Raymond James did not give credit to Biering for loan positions or compensate Biering for unvested deferred compensation.

**Ongoing Detriment to Biering's Business**

73.     Initially, several of Biering's prominent clients intended to transfer their business to Biering at his new firm. Biering relied on the transfer of these clients to achieve asset goals at Raymond James to even come close to the financial upside offered by Merrill Lynch. However, once the clients learned that Biering was purportedly "Discharged" due to engaging in "inappropriate behavior," the clients chose not to join Biering.

74.     For various clients that agreed to take a risk and join Biering at Raymond James, JPM has still found a way to interfere. Specifically, JPM has rejected lines of credit payoff letters and ACAT forms without legitimate reason. In so doing, JPM has not only frustrated Biering's clients but further caused some clients to pay higher interest on lines of credit, which has made them question Biering's competency and firm's capabilities. Further, upon information and belief, JPM has instructed its derivatives team to delay their responses to Biering regarding upcoming transactions in order to buy time for the incumbent JPM FA to "save the relationship." These actions are wholly improper and are designed to further interfere with Biering's business.

75. Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor:

**COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND
VIOLATION OF FINRA RULES**

76. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

77. During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired. [16]

78. Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

79. All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's

---

[16] Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

mandate against "overly broad or misleading narratives" but intentionally was left vague to cause reasonable readers to assume nefarious behavior.[17]

80.     Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10.  By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

81.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

82.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

### COUNT 2: BUSINESS DISPARAGEMENT

83.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

84.     J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and

---

[17]     To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory).

directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

85. JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

86. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

87. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## <u>COUNT 3:</u> TORTIOUS INTERFERENCE

88. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

89. Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

90. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

91. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

92. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

93. JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

94. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

95. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

96. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

97. Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

98. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 6: WEAPONIZATION OF U5

99.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

100.    FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

101.    J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just one month ago, a FINRA Panel found[18] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[19]

102.    Further, just a few weeks ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[20] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the

---

[18]    *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

[19]    Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[20]    *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defamed the ex-FA by mismarking the U5.[21]

103. In 2022, another FINRA Panel again found[22] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts. Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[23] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[24]
>
> [R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

---

[21]   *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, ___ N.Y.S.3d ___, 2024 WL 2061527, at *1 (N.Y. App. Div. May 9, 2023).

[22]   *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[23]   *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

[24]   *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

---

104. In 2018, another FINRA Panel granted expungement (and an award of $28,867 in attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[25]

105. It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business. JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing. FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5. Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[26] UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the defamation and punitive damages.[27] The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

106. JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

107. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

---

[25] *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[26] *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

[27] *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

108. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 7: NEGLIGENT INVESTIGATION

109. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

110. At all times relevant to this Action, J.P. Morgan owed a duty to Biering to exercise reasonably prudent and ordinary care in the investigation of Biering's and Kimball's relationship (and Kimball's allegations which, presumably, resulted in such investigation). JPM violated this duty by negligently investigating the nature of Biering's and Kimball's relationship and by failing to act as a reasonably prudent person under the same or similar circumstances, including, but not limited to:

(a) Negligently investigating Biering's and Kimball's relationship;

(b) Failing to conduct a proper and thorough investigation of such relationship; and

(c) Terminating Biering on the basis of an inadequate investigation.

111. Had JPM performed proper investigation of Biering's and Kimball's relationship, JPM would have clearly seen that the relationship was entirely consensual. Further, JPM could not have reasonably concluded that Biering violated JPM's "anti-harassment" policy.

112. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 8: BREACH OF CONTRACT

113. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

114. When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

115. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

116. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

117. As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

<u>COUNT 9: SEX DISCRIMINATION</u>
**(Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act)**

118. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

119. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA").

120. Biering is a member of a protected class under Title VII and TCHRA because of his sex.

121. By virtue of the conduct alleged herein, Respondent discriminated against Biering based on Biering's sex, in violation of Title VII and TCHRA. Specifically, JPM discriminated against Biering because of his sex in connection with the terms, conditions, and privileges of

employment and limited Biering in a manner that deprived him or tended to deprive him of employment opportunities and adversely affected his status as an employee.

122. First, J.P. Morgan conducted a one-sided, sham investigation into the relationship between Biering and Kimball. In so doing, JPM failed to investigate in good faith and give Biering an opportunity to share his side of the story. Had JPM acted in a fair and non-discriminatory manner, it would have treated Kimball the same as it treated Biering. Specifically, JPM would have investigated Kimball, placed Kimball on administrative leave, and applied the same policies to Kimball that it applied to Biering. But JPM wholly failed to do so. It is therefore without question that Biering was treated less favorably than similarly situated female employees.

123. As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

124. Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

125. Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[28]

<div align="center">

**COUNT 10: DISABILITY DISCRIMINATION**
**(Americans with Disabilities Act and the Texas Commission on Human Rights Act)**

</div>

126. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

---

[28] With respect to this claim, a Right to Sue letter from the Texas Workforce Commission ("TWC") is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

127. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and TCHRA.

128. At all times during his employment, Biering met the ADA's definition of "disability" and was qualified for the position he had. Though Biering's disability was 100% service-connected, as a veteran, he is entitled to protections under the ADA even if his disability was not service-connected. As a veteran, Biering further has the right to reasonable accommodations in the workplace due to his disability.

129. J.P. Morgan discriminated against Biering based on his disability and treated Biering less favorably than similarly situated non-disabled employees. J.P. Morgan further violated the ADA and TCHRA by failing to grant Biering reasonable accommodations for his disability even though they would not have caused a significant difficulty or expense on their operations.

130. As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

131. Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

132. Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[29]

---

[29] With respect to this claim, a Right to Sue letter from the TWC is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

<u>**COUNT 11: QUANTUM MERUIT AND UNJUST ENRICHMENT**</u>

133. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

134. Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ Dental's business to JPM. Yet, Biering received zero compensation for his successful efforts.

135. By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

136. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

<u>**COUNT 12:**</u> **ILLEGAL FORFEITURE OF EARNED COMPENSATION**

137. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

138. JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

139. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

<u>**COUNT 13:**</u> **FORFEITURE OF DEFERRED COMPENSATION**
**(VIOLATION OF ERISA)**

140. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

141. J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

142.  As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 14: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS

143.  Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

144.  Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

145.  As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## ATTORNEYS' FEES

146.  Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

147.  JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

148.  Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

149.  As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

150.  J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM

has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

151.    Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead *knowingly* and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

152.    Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

(1)    In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2)    In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

153.    The defamatory statements at issue were published in Biering's CRD.

154.    Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

155.    Claimant requests damages against Respondent to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

(a)    Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

(b)  Expungement as set forth herein;

(c)  Lost or forfeited deferred compensation;

(d)  Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(e)  Statutory penalties and damages;

(f)  Liquidated damages;

(g)  Punitive damages;

(h)  Damages to Claimant's reputation;

(i)  Past lost earnings;

(j)  Future lost earnings;

(k)  Consequential damages;

(l)  Mental anguish and emotional distress damages;

(m)  Future lost earning capacity;

(n)  The highest pre- and post-judgment interest permitted by law on all damages;

(o)  FINRA forum and other fees; and

(p)  Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

## REPRESENTATION BY COUNSEL
## AND REPRESENTATIVE'S CURRENT ADDRESS

156.  Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

## VENUE

157. Claimant worked for Respondent in Texas and was working in Fort Worth, Texas when all or part of Respondent's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

## AMOUNT IN DISPUTE AND AMOUNT
## REQUESTED FOR DAMAGES, AWARD, AND RELIEF

158. Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

159. The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By:   */s/ Joshua J. Iacuone*
      Joshua J. Iacuone
      Texas State Bar No. 24036818
      Anna Olin Richardson
      Texas State Bar No. 24102947
      4925 Greenville Ave., Ste. 700
      Dallas, Texas 75206
      Telephone: (214) 960-2832
      Email:   josh@imcplaw.com
              anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**


**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Michael C. Nolan | <u>Case Number</u>: 23-00446 |
| vs. | |
| <u>Respondent</u><br>J.P. Morgan Securities, LLC | <u>Hearing Site</u>: Philadelphia, Pennsylvania |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Michael C. Nolan ("Claimant"): Todd Gutfleisch, Esq., Harris St. Laurent & Wechsler LLP, New York, New York.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Kevin B. Leblang, Esq., and Amelia B. Munger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: February 21, 2023.
Amended Statement of Claim filed on or about: March 22, 2023.
Claimant signed the Submission Agreement: February 19, 2023.

Statement of Answer filed by Respondent on or about: May 19, 2023.
Respondent signed the Submission Agreement: May 19, 2023.

## CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: defamation; tortious interference with prospective contractual relations; violation of FINRA Rule 1122; advancement/indemnification; and injunctive relief.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the defamatory language on Claimant's Form U5 and the filing of a substitute Form U5 stating that his employment termination was "voluntary"; and: (1) in box 7F "no" answers to all questions, and (2) in the box 7B DRP, question 5B ("How was the internal review concluded") that there was "no violation of internal policies"; compensatory and punitive damages in the amount of $10,000,000.00; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

In the Statement of Answer, Respondent requested that the Amended Statement of Claim be dismissed in its entirety; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

At the hearing, Claimant requested: $5,174,324.00 in compensatory damages; $1,000,000.00 in additional damages for emotional distress; $555,000.00 in legal fees, including fees/costs incurred during Respondent's internal investigation, through the end of this hearing; and up to 10 times the amount of compensatory damages in punitive damages.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On January 3, 2024, Claimant filed a Motion for Sanctions ("Motion"). On January 10, 2024, Respondent filed a response opposing Claimant's Motion. On January 12, 2024, Claimant filed a reply in further support of the Motion. On January 16, 2024, the Chairperson heard oral arguments on the Motion, as well as a previously filed Claimant's Motion to Compel. By Order dated January 16, 2024, the Chairperson, on behalf of the panel, denied Claimant's Motion for Sanctions in its entirety.

The evidentiary hearings were conducted in-person on February 26-29, 2024, and by videoconference on April 2-3, 2024.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $250,000.00 in compensatory damages, which includes the claim for advancement/indemnification.

2. The Panel recommends the expungement of all references to Occurrence Numbers 2244047 and 2244048 from the registration records maintained by the Central Registration Depository ("CRD") for Michael C. Nolan (CRD Number 1082281). Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Michael C. Nolan must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee      =$ 2,300.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

Member Surcharge      =$ 3,850.00
Member Process Fee      =$ 7,050.00

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

March 1 and 4, 2024, postponement requested by Respondent      =$ 1,575.00

Total Postponement Fees      =$ 1,575.00

The Panel has assessed the total postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

Four (4) pre-hearing sessions with a single Arbitrator @ $450.00/session      =$ 1,800.00
Pre-Hearing Conferences: August 30, 2023      1 session
                         November 29, 2023      1 session
                         January 16, 2024      1 session
                         February 8, 2024      1 session

One (1) pre-hearing session with the Panel @ $1,575.00/session      =$ 1,575.00

Appx. 40

Pre-Hearing Conference:   June 27, 2023                     1 session

Twelve (12) hearing sessions @ $1,575.00/session                          =$ 18,900.00
Hearings:                    February 26, 2024        2 sessions
                             February 27, 2024        2 sessions
                             February 28, 2024        2 sessions
                             February 29, 2024        2 sessions
                             April 2, 2024            2 sessions
                             April 3, 2024            2 sessions

Total Hearing Session Fees                                                =$ 22,275.00

The Panel has assessed $11,137.50 of the hearing session fees to Claimant.

The Panel has assessed $11,137.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 41

## ARBITRATION PANEL

| | | |
|---|---|---|
| Peter George Erdely | - | Public Arbitrator, Presiding Chairperson |
| Paul J. Leis | - | Public Arbitrator |
| Edward Turner Borer | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_**Peter George Erdely**_        **04/08/2024**

Peter George Erdely        Signature Date
Public Arbitrator, Presiding Chairperson

_**Paul J. Leis**_        **04/09/2024**

Paul J. Leis        Signature Date
Public Arbitrator

_**Edward Turner Borer**_        **04/08/2024**

Edward Turner Borer        Signature Date
Non-Public Arbitrator

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 10, 2024
Date of Service (For FINRA Dispute Resolution Services use only)



S&P 500 Earnings
(https://www.advisorhub.com/wall-street-is-sending-a-bullish-signal-for-sp-500-earnings/)

(https://www.advisorhub.com)



(https://www.advisorhub.com)

NEWS

# Ex-J.P. Morgan Broker Clears Record of 'Defamatory' Allegations, Wins $250K in Damages

- News ⌄

by Karmen Alexander (https://www.advisorhub.com/team/karmen-alexander/)    April 11, 2024

- Deals & Comp(/deals-and-comps/)

- Breakaway Center(/breakaway-center/)

(/#linkedin)      (/#x)      (/#facebook)      (/#email)

- Asset Management(https://www.advisorhub.com/asset-manager/)

- Events(https://www.advisorhub.events/)

- Rankings ⌄

- More ⌄

Appx. 43

*Michael Nolan, who can now clear his record of defamatory
allegations written on his U5 form by J.P. Morgan.*

J.P. Morgan Securities was ordered to pay $250,000 in damages to a New York City broker over claims that the bank defamed him in a regulatory filing when he left the firm in 2022, according to a Financial Industry Regulatory Authority arbitration award finalized on Wednesday.

The arbitrators also ruled that Michael C. Nolan, who managed $1 billion in client assets (https://www.advisorhub.com/rbc-nets-billion-dollar-father-son-team-from-j-p-morgan-in-nyc/) when he moved to RBC Wealth Management-U.S., could clear his record of the defamatory allegations.

J.P. Morgan in a U5 filing had accused Nolan of a swath of potential violations, including sharing material nonpublic information with a customer, failing to properly disclose an outside business activity and using an unapproved channel to communicate with clients. The allegations appeared in an "employment separation after allegations" disclosure on his public BrokerCheck report.

Those claims, which Nolan denied, interfered with his ability to prospect customers at RBC and also violated Finra Rule 1122 prohibiting the filing of misleading information, Nolan argued, according to the award. Submit a Tip 💬 (/submittip/)

The arbitrators ordered his record be revised to identify his departure as "voluntary" and note there was "no violation of internal policies," according to the settlement. The panel did not provide a reason for their decision as is customary unless both parties request an explained award.

A J.P. Morgan spokesperson declined to comment.

The $250,000 is far less than the total damages that Nolan had sought. He requested more than $6.7 million in compensatory damages and legal fees, including $1 million due to emotional distress, and punitive damages equal to 10 times the compensatory damage claim.

"The fact that there was any form of a monetary award in a claim primarily seeking expungement goes to show that the panel thought there was at least some level of wrongdoing on behalf of the company," said Nolan's lawyer, Todd Gutfleisch of Harris St. Laurent & Wechsler in New York.

Nolan did not respond to a request for comment sent through social media. "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage my reputation," he had written in a comment appended to the BrokerCheck disclosure.

At RBC, Nolan runs an eponymous team with his son, Brian M. Nolan, and two client associates, according to their website. He splits time between New York and Bryn Mawr, Pennsylvania, according to his LinkedIn.

The elder Nolan started his career in 1983 with Goldman Sachs, moved in 1984 to Morgan Stanley and seven years later joined J.P. Morgan's Bear Stearns predecessor, according to his BrokerCheck report.

Nolan is required to have the expungement approved by Finra's Credentialing, Registration, Education and Disclosure Department before it is effective. The panel split the $22,275 in hearing session fees evenly between J.P. Morgan and Nolan.

**Tags:**    *Arbitration (https://www.advisorhub.com/tag/arbitration/)*    *Finra (https://www.advisorhub.com/tag/finra/)*    *JP Morgan (https://www.advisorhub.com/tag/jp-morgan/)*    *RBC (https://www.advisorhub.com/tag/rbc/)*

## Like this article? Let AdvisorHub come to you! SIGN UP

Appx. 44

## COMMENTS (5)

on Apr 11 2024, Herb R (https://www.advisorhub.com/author/) says:

For anyone looking to change firms (and for all the right reasons) brace yourself for the potential of this kind of attack on the way out. The very individuals who are recruiting in advisors with red carpet treatment, will often seek to crush good advisors who are recruited out.
So much for the Golden Rule…

Reply to Herb R

on Apr 11 2024, Retiring soon (https://www.advisorhub.com/author/) says:

Your point is particularly salient as it relates to advisor moves between UBS and Morgan Stanley. Both firms withdrew from the Broker Protocol agreement and now regularly try to sue each other out of existence for daring to take the other's advisors. The hypocrisy of such actions is glaring but continues unabated. Why anyone would go to either firm knowing it would amount to indentured servitude is beyond the rest of us.

Reply to Retiring soon

on Apr 11 2024, stuart pankin (https://www.advisorhub.com/author/) says:

Because both of those are the highest gross per advisor firms, not chumps looking for a check. Your sister Minnie Mouse was looking for you.

Reply to stuart pankin

on Apr 11 2024, Lou Mannheim (https://www.advisorhub.com/author/) says:

Anyone that moves and takes a check was obviously motivated to move by the amount of the check. The firms all do and offer the same thing. Is it really any different for the client from firm to firm? We can remove "chump" from that last comment and just say everyone is moving for the check. If you were not getting a check, would you move? The grass isn't greener. All of these wire houses are going to change your comp every year and tell you who you can't do business with anymore (account minimums).

Reply to Lou Mannheim

on Apr 12 2024, Advhub (https://www.advisorhub.com/author/) says:

If you, as you say, are the highest gross per advisor. The highest grossing advisor would realizes they are lowest Net advisor.
At this point in their career, they should realize the Firm needs them, more than them needing the Firm.

Reply to Advhub

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name** *

**Email** *

Appx. 45

**Website**

Post Comment

---

**Related News**



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

---

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

Appx. 46

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

---

## Creating More Scale and Efficiency in Your Practice



Appx. 47

(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ⌄                                              **AdvisorHub RIA(/resource_type/ria-resource-center/)**

**Deals & Comp(/deals-comps/)**                          **More** ⌄

**Breakaway Center(/breakaway-center/)**                 **About Us(/about-us/)**

Appx. 48

Appx. 49



EXHIBIT
C

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

<u>Claimant</u>                                                           <u>Case Number</u>: 18-02978
Liet Han

        vs.

<u>Respondent</u>                                                       <u>Hearing Site</u>: New York, New York
J.P. Morgan Securities, LLC

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

**RELIEF REQUESTED**

In the Statement of Claim, Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

**OTHER ISSUES CONSIDERED AND DECIDED**

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

**AWARD**

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

   The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

3. Any and all claims for relief not specifically addressed herein, including any requests for and attorneys' fees, are denied.

## Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making. The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior. Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false. The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit. He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit. Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back. A "pull-back" the undisputed record showed, is a red flag for unlawful structuring. Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth. I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which investigation also found that he engaged in unlawful structuring, and he again used the pronoun "we" when trying to explain the circumstances surrounding the transaction in a letter he sent to prospective employers. In addition, the Claimant falsely stated

in the Statement of Claim that his prior record was "spotless," while the evidence clearly showed that he previously received a warning and letter of education for other rules violations, with respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was).  I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR.  It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant.  They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact.  They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it.  There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect.  In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so.  All of the steps Respondent took were entirely the result of Claimant and his wife's deliberate and unlawful actions on July 3 and July 5, 2017. Nevertheless, the majority has decided to award an unconscionable $2,500,000 to the Claimant

Appx. 53

for "compensation." One can only look incredulously at this record and ask "compensation for Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:
### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                         =$ 2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the following:

Member Surcharge                                                =$ 3,025.00
Member Process Fee                                              =$ 6,175.00

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

November 18-22, 2019, postponement requested by the parties      =$ 1,400.00
February 8-14, 2022, postponement requested by the parties            Waived

Total Postponement Fees                                          =$ 1,400.00

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session      =$   450.00
Pre-Hearing Conference:  October 7, 2019              1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session      =$  5,600.00
Pre-Hearing Conferences: January 23, 2019            1 session
                         May 5, 2020                 1 session
                         March 2, 2021               1 session

|  | October 27, 2022 | 1 session |  |
|---|---|---|---|

| Four (4) hearing sessions @ $1,400.00/session | | | =$  5,600.00 |
| Hearings: | June 12, 2023 | 2 sessions | |
| | June 13, 2023 | 1 session | |
| | June 14, 2023 | 1 session | |

| Total Hearing Session Fees | =$ 11,650.00 |
|---|---|

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

*Linda J. Baer*
_____

06/26/2023
_____

Linda J. Baer
Public Arbitrator

Signature Date

*Sean F. Monahan*
_____

06/26/2023
_____

Sean F. Monahan
Non-Public Arbitrator

Signature Date

### Concurring In-Part, Dissenting In-Part Arbitrator's Signature
Arbitrator dissented on the award for compensatory damages

*Mitchell Regenbogen*
_____

07/06/2023
_____

Mitchell Regenbogen
Public Arbitrator, Presiding Chairperson

Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

July 07, 2023
_____

Date of Service (For FINRA Dispute Resolution Services use only)

Appx. 56



2024 WL 2061527

Supreme Court, Appellate Division,

First Department, New York.

In the Matter of Liet HAN,

Petitioner–Respondent,

v.

J.P. MORGAN SECURITIES,

LLC, Respondent–Appellant,

Financial Regulatory

Authority, Inc., Respondent.

2249–, 2250

|

Index No. 653456/23

|

Case Nos. 2023-05480, 2023-06156

|

Entered: May 9, 2024

**Attorneys and Law Firms**

Orrick, Herrington & Sutcliffe LLP, New York (Daniel A. Rubens of counsel), for appellant.

Rasco Klock Perez & Nieto, LLC, New York (Blaine Bortnick of counsel), for respondent.

Manzanet–Daniels, J.P., Singh, Kapnick, Gesmer, Rodriguez, JJ.

**Opinion**

**\*1** Judgment, Supreme Court, New York County (Andrea Masley, J.), entered November 29, 2023, in favor of petitioner and against respondent in the amount of $2,590,550, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered October 2, 2023, which granted petitioner's petition to confirm an arbitration award and denied respondent's notice of cross-petition to vacate the award and motion for a stay and for leave to file a supplemental memorandum, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Regardless of any procedural deficiencies in respondent's cross-petition to vacate the arbitration award (CPLR 402), the court had jurisdiction over the proceeding and could either confirm or vacate the award (*see* CPLR 304[a], 7510, 7511).

After petitioner commenced the proceeding, respondent could oppose the award "either by motion ... to vacate or modify the award ... or by objecting to the award in opposition to an application to confirm the award" (*Matter of Pine St. Assoc., L.P. v. Southridge Partners, L.P.,* 107 A.D.3d 95, 100, 965 N.Y.S.2d 15 [1st Dept. 2013]). Although the court found the cross-petition was not procedurally proper, it nonetheless proceeded to review the merits of the petition to confirm the award.

Respondent has not shown that the court improvidently exercised its discretion in declining its request for a stay or adjournment of the proceeding to confirm the arbitration award pending the availability of the arbitration record and denying respondent leave to file a supplemental memorandum (*see Pena–Vazquez v. Beharry,* 82 A.D.3d 649, 649, 919 N.Y.S.2d 336 [1st Dept. 2011]; *see also Matter of Steven B.,* 6 N.Y.3d 888, 889, 817 N.Y.S.2d 599, 850 N.E.2d 646 [2006]; *Marquez v. 171 Tenants Corp.,* 220 A.D.3d 575, 576, 198 N.Y.S.3d 324 [1st Dept. 2023]). Respondent points out that CPLR 7511 grants a party 90 days to make an application to vacate or modify an arbitration award, and the Federal Arbitration Act (FAA) likewise provides a three-month window to move to vacate (9 USC § 12). However, respondent cites no authority for treating these statutory limitations periods as entitling it to a stay of a court's consideration of a timely petition.

Respondent also fails to demonstrate that the court improvidently exercised its discretion in denying its request for a stay under these circumstances, when the arbitration record was received six days before it filed its brief in opposition to the petition to confirm. Thus, respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration.

On this record, respondent has not shown that the court erred in confirming the award and rejecting its arguments that the arbitration panel showed a "manifest disregard of the law" (*Matter of Nexia Health Tech., Inc. v. Miratech, Inc.,* 176 A.D.3d 589, 590–591, 110 N.Y.S.3d 420 [1st Dept. 2019]). The New York choice-of-law provision in the parties' arbitration agreement did not dictate the substantive defamation law to be applied so unambiguously as to make the arbitration majority's apparent application of New Jersey law to petitioner's claim an "egregious impropriety on the part of the arbitrators" (*id.* at 591, 110 N.Y.S.3d 420). The majority did not provide an explanation for its award, and because petitioner's defamation claim was a "justifiable ground for the

decision," respondent's manifest-disregard arguments as to petitioner's other claims are unpersuasive (*see Tullett Prebon Fin. Servs. v. BGC Fin., L.P.,* 111 A.D.3d 480, 481–482, 975 N.Y.S.2d 18 [1st Dept. 2013], *lv denied* 22 N.Y.3d 864, 2014 WL 1243636 [2014]).

**\*2** We have considered respondent's remaining arguments and find them unavailing.

**All Citations**

--- N.Y.S.3d ----, 2024 WL 2061527, 2024 N.Y. Slip Op. 02594

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.


**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant
Dustin B. Luckett

    vs.

Respondents
 J.P. Morgan Securities, LLC and
Todd G. Fannin

Case Number: 19-03075

Hearing Site: Louisville, Kentucky

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealing. The causes of action related to events occurring after the conclusion of Claimant's employment with JPMS.

Unless specifically admitted in the Statement of Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00. Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction. The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2. JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. The Panel recommends the expungement of the Termination Explanation in Section 3 of Dustin Blake Luckett's (CRD Number 5126374) Form U5 filed by J.P. Morgan Securities

LLC on June 29, 2017 and maintained by CRD. The Reason for Termination shall remain the same and the Termination Explanation shall be replaced with the following language: "Non-investment related. After a dispute about a clerical process, RR became disillusioned with the company's atmosphere requiring separation of his at-will employment." This directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number 1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4. Claimant's claims against Fannin are denied.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

## Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                =$      2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

## Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, JPMS is assessed the following:

Member Surcharge                                                     =$      3,025.00
Member Process Fee                                                   =$      6,175.00

## Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session        =$       450.00
Pre-Hearing Conference:   July 27, 2021            1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session              =$      5,600.00
Pre-Hearing Conferences: February 4, 2020           1 session

|  | February 2, 2021 | 1 session |  |  |
|---|---|---|---|---|
|  | February 11, 2021 | 1 session |  |  |
|  | December 9, 2021 | 1 session |  |  |

| Eight (8) hearing sessions @ $1,400.00/session | | | =$ | 11,200.00 |
|---|---|---|---|---|
| Hearings: | January 25, 2022 | 2 sessions | | |
|  | January 26, 2022 | 2 sessions | | |
|  | January 27, 2022 | 2 sessions | | |
|  | January 28, 2022 | 2 sessions | | |

| Total Hearing Session Fees | =$ | 17,250.00 |
|---|---|---|

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 62

### ARBITRATION PANEL

David F. Barrett      -      Public Arbitrator, Presiding Chairperson
Linda W. Hester      -      Public Arbitrator
John R. Michael, II      -      Non-Public Arbitrator

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

| | |
|---|---|
| *David F. Barrett* | **02/04/2022** |
| David F. Barrett | Signature Date |
| Public Arbitrator, Presiding Chairperson | |

| | |
|---|---|
| *Linda W. Hester* | **02/04/2022** |
| Linda W. Hester | Signature Date |
| Public Arbitrator | |

| | |
|---|---|
| *John R. Michael, II* | **02/04/2022** |
| John R. Michael, II | Signature Date |
| Non-Public Arbitrator | |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

February 04, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

Appx. 63

**NEWS** Industry News

# J.P. Morgan loses $1.4 million defamation case to adviser





The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022    *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According *to the arbitration award* by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called *a Form U5,* that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's *BrokerCheck profile,* he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: *Judge rips Wells, Finra, in decision over arbitration claim*]



Investing IN Change | EP36
What do C-suite execs think about climate change?

00:00 — 17:22

1X    PRIVACY  SHARE  SUBSCRIBE

Related Topics: *J.P. Morgan Securities*

Learn more about **reprints and licensing** for this article.

## Newsletters

Subscribe for original insights, commentary and analysis of the issues facing the financial advice community, from the InvestmentNews

Appx. 64

team.

---

**Recent Articles by Author**



### Merrill data bungle hits Walmart 401(k) plan

'We're hearing more horror stories' about clients becoming targets after a data breach, one attorney says.



### Starwood latest nontraded REIT with concerns

Nontraded REITs are facing hurdles, higher interest rates, headlines about half-empty office buildings, and investors pulling their money from products.



### Miami advisors fight over book of business

'Handshake' deal goes wrong for two south Florida advisors.



### Wisc. broker facing charges over stealing town's money

In twist, the broker has blamed other members of a town board for allegedly allowing the theft.



### Interactive Brokers latest B-D to report data breach

'Sophisticated hackers for last 10 years have constantly improved their ability to breach systems,' compliance consultant says.

Appx. 65


**EXHIBIT G**

2023 WL 6050230
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

J.P. MORGAN SECURITIES LLC, Plaintiff

v.

Dustin LUCKETT, Defendant

Civil Action No. 3:22-cv-137-RGJ
|
Signed September 14, 2023
|
Filed September 15, 2023

**Attorneys and Law Firms**

Alyson Terrell, Pro Hac Vice, Ulmer & Berne LLP, Columbus, OH, Jeffrey Scott Dunlap, Pro Hac Vice, Ulmer & Berne LLP, Cleveland, OH, Jesse R. Lipcius, Ulmer & Berne LLP, Cincinnati, OH, for Plaintiff.

Hayden A. Holbrook, Michael A. Valenti, Valenti Hanley, PLLC, Louisville, KY, for Defendant.

## MEMORANDUM OPINION & ORDER

Rebecca Grady Jennings, District Judge

**\*1** Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id.*]. Luckett is a citizen of Kentucky. [*Id.*]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in the "district court wherein the award was made." 9 U.S.C. § 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

### I. BACKGROUND[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky. [DE 16 at 126]. JPMS and Chase are affiliates. [DE 16 at 126]. JPMS is a member of the Financial Industry Regulatory Authority ("FINRA"). Luckett was employed by Chase, but his securities licenses were held by JPMS. [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].

**\*2** Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. He also asserted that JPMS breached an implied covenant of good faith and fair dealing by not facilitating his right to rollover funds in his 401(k) account. [*Id.* at 73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")].

The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id.*]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.' " [*Id.*]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id.*]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

## II. ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1. Motion to Vacate Arbitration Award Standard

The Federal Arbitration Act ("FAA") expresses a federal policy in favor of enforcing arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result

or believes the arbitrator made a serious legal or factual error." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

**\*3** The FAA sets out only four situations in which an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The Sixth Circuit recognizes an additional ground for vacating an award where the arbitrators "manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2. Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

 **\*4** "To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.' " *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros*, 70 F.3d at 421). "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis for their award. Generally, arbitrators are not required to explain their decisions. *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it *must* be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained decision has been described as "all but impossible." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable basis on which the arbitrators could have based their award, the reviewing court should decline vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471,

483–485 (6th Cir. 2006) (declining to vacate an arbitration panel's unexplained decision because plaintiff identified two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision. Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v. Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties may request an explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

 **\*5** The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N. Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed " 'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.' " *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic*

*Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id.* at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision ... [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. The Court notes that this element may be less supported in the record than the others. However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36). There is thus a plausible basis from which the Panel could have found this element satisfied.

**\*6** As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS

acted with either the sole purpose of harming him or by means that were dishonest, unfair, or improper. [DE 16 at 150]. This element may be satisfied by a showing that the defendant's actions amounted to an independent tort. *See Carvel Corp.*, 818 N.E.2d at 1103. In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts. In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature." [DE 1-2 at 10]. Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient ... Rather, the decision must fly in the face of clearly established legal precedent."). JPMS has failed to establish the Panel's decision necessarily "flies in the face" of New York law if it was based on Luckett's tortious interference claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that

one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

**3. Exceeded Powers**

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi, 244 F. App'x at 714* ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

**4. Motion to Confirm Arbitration Award Standard**

 **\*7** Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such

an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Sixth Circuit has held that "the plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale, 125 F. App'x at 676.* JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

**III. CONCLUSION**

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

3. The Court will enter separate judgment.

**All Citations**

Slip Copy, 2023 WL 6050230

Footnotes

1 The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination. Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award. Many of the contested characterizations are not relevant given the standard of review for arbitration awards. As a result, the Background includes only those facts agreed upon by the parties.

2 The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan, 835 F.3d at 600*; *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 n.3 (2010)* (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp., 2023 WL 5002875, at \*6 (W.D. Ky. Aug. 4, 2023)* ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a 'manifest disregard of the law.' ") (citation omitted).

3 It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If,

under New York law, the tortious interference claim could plausibly support the Award, then the Court must confirm it. *Jaros*, 70 F.3d at 421.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Appx. 71    6



**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                                          Case Number: 18-01879
Rose Mascarenhas

   vs.

Respondent                                       Hearing Site: Chicago, Illinois
J.P. Morgan Securities, LLC

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Rose Mascarenhas ("Claimant"): Marc D. Schifanelli, Esq. and Gordana Schifanelli, Esq., Schifanelli Law, LLP, Annapolis, Maryland.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio and Scott R. Koch, Esq., JPMorgan Chase Bank, NA, Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: May 16, 2018.
Claimant signed the Submission Agreement: May 16, 2018.

Statement of Answer filed on or about: August 6, 2018.
Respondent signed the Submission Agreement: July 30, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following cause of action: defamation. The cause of action relate to Claimant's allegation that the statements made by Respondent in Claimant's Form U4 and U5 caused Claimant to suffer great financial loss and to be unable to find comparable employment in the financial industry.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested $740,000.00 in compensatory and punitive damages, reimbursement of costs and attorneys' fees, and expungement and

modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD").

In the Statement of Answer, Respondent requested that the Panel deny Claimant's claims and request for expungement and damages, assess all costs and forum fees against Claimant, and award any other relief that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Arbitrators have provided an explanation of their decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The Panel recommends expungement of the Termination Explanation in Section 3 of the Form U5 of Rose Mascarenhas (CRD# 5487635) filed by J.P. Morgan Securities, LLC on April 4, 2018, and maintained by the CRD. The Termination Explanation shall be changed to the following: "Terminated by Affiliate Bank – Not securities related. Reg. rep. as an affiliate bank employee opened two checking accounts for a long-time customer who had previously opened over 70 accounts. To accommodate the customer, and consistent with the branch practice prior to the recent arrival of a new manager, Reg. rep. opened the accounts without customer being present for the entire opening process, other than appearing to execute the account documents, which was contrary to policies of the Bank." The Reason for Termination shall remain the same.

   In addition, the Panel recommends the expungement of the "Yes" answer to question 7F(1) of the foregoing Form U5. The "Yes" answer shall be changed to "No" and the accompanying Termination Disclosure Reporting Page shall be deleted in its entirety.

   The above recommendations also apply to all subsequent disclosures concerning this event.

   The Panel recommends expungement based on the defamatory nature of the information. The Form U5 is not automatically amended to include the changes indicated above. Rose Mascarenhas must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

2. Respondent is liable for and shall pay to Claimant the sum of $28,867.00 in attorneys' fees pursuant to the parties' submission agreements, in which they agreed to "submit the present matter in controversy, as set forth in the attached statement of claim [and] answer." Claimant requested an award of attorneys' fees in her Statement of Claim. Respondent's submission agreement therefore created a de facto arbitration agreement that included the authority for the arbitrators to award attorneys' fees if Claimant should prevail. The Panel further notes that Respondent did not oppose Claimant's request for attorneys' fees, other than to object to certain time entries, which the Panel has overruled.

3. Respondent is liable for and shall pay to Claimant the sum of $974.72 in costs.

4. Respondent shall reimburse Claimant for the non-refundable portion of Claimant's filing fee in the amount of $425.00.

5. Respondent is liable for and shall pay to Claimant the sum of $1.00 in compensatory damages.

6. Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

## ARBITRATORS' FINDINGS

Relevant Facts

Claimant was a long-time employee of Respondent and the principal banker for a family business which was a very large and active customer of the bank, having opened over 70 accounts over the years. The policies and procedures of the bank provide a 14-part computer process for opening business accounts, the first step of which is to verify at the beginning of the process that the customer is present in the bank in person. If the "in person" button is not pressed, the account opening process cannot proceed.

It is undisputed that under Claimant's prior bank manager (and perhaps more than one prior bank manager), it was generally allowed that for large, well-known customers such as these, the banker (including Claimant) was allowed to perform most of the process with the customer not present, including pressing the "in person" button. This allowed the account opening procedure, which can take as long as 40 minutes for each account, to be completed without the customer having to be present for the entire process, arriving only to sign the account opening documents. Respondent presented testimony that the branch manager who assumed her responsibilities on January 8, 2018 insisted that the account opening procedure no longer occur without the customer present for the entire process of opening the account.

The customers here contacted Claimant and requested that she prepare two new checking accounts on February 3, 2018 for two separate out-of-state branches of their business, and asked that they be required to appear only for so long as necessary to sign documents. Claimant agreed to do that, as she had on prior occasions, and prepared the

materials for their signature. It appeared undisputed that prior to the arrival of the customers, she performed each of the electronic tasks called for in the process with respect to the first account she opened that day, including pressing the "submit" button for that account. She then set aside the signature documents that had been created by the computer in the course of that process, and began the account opening process for the second account. It was not clear whether the "submit" button was pressed for the second account prior to the customers' arrival. It was further undisputed that the customers appeared that day, sometime after the "submit" button had been pressed for the first account, and signed the account opening documents for both accounts. There was no allegation that there was anything irregular about any aspect of the accounts or the opening procedure, other than the dispute about whether the customer needed to be present for the entire process.

Respondent terminated Claimant on March 16, 2018 as a consequence of her conduct on February 3. Claimant was a licensed banker, holding Series 6 and 63 licenses. As a consequence, the bank submitted a Form U5, which included an answer to Section 3, regarding "Termination Explanation" which Claimant alleged was false and defamatory.

In addition, Claimant alleged that the answer to question 7F(1) was false and defamatory.

## NATURE OF THE CLAIM

Claimant contends that the Termination Explanation and the answer to question 7F(1) in the U5 were false and defamatory in that the first implied that the account was opened without customer approval and the second falsely asserts that Claimant was alleged to have violated an investment-related regulation when the offending conduct involved only opening a checking account. Beyond citing the language itself, Claimant presented documentary evidence from a prospective subsequent employer which showed that those bank officials had read the U5 as reporting that Claimant had been terminated for opening an account without customer authorization.

## AWARD

a. Termination Explanation

The Panel finds that the explanation contained in the U5 Form is defamatory in that it incompletely and inaccurately describes the reason for termination.

Respondent argued that that the statement was accurate because Respondent considered the account to be "open" at the moment the "submit" button was pressed and it was pressed for the first account before the customer appeared. That is an unfairly literal reading of that language. It omits facts sufficient to give the reader an understanding of what actually occurred, and how it constituted inappropriate conduct. The statement is therefore incomplete and inaccurate and defamatory in allowing the impression that the account was opened without customer approval.

It is notable in this regard that the representative of the registration department testified that the only information in their possession regarding the basis for the termination was the report from the HR department that "Rose opened an account for a customer without them

being present." The representative and her team were therefore unaware of whether the customer knew about the account, was there for part of the time or was there for none of the time. In the context of the long history of the bank with that customer, the description of what occurred was therefore false and defamatory and the individual who prepared and submitted the U5 did so with an incomplete and therefore inaccurate understanding of the basis for the discharge.

(The expungement recommendation is stated above in the Award section.)

   b.  Answer to Question 7F(1)

The answer to question 7F(1) should be "no" because the opening of a checking account was not "investment-related." Respondent relies upon FINRA Regulatory Notice 10-39 as requiring that any allegation related to the products of a Bank are drawn within the definition of "investment-related" by the third bullet point of the second page of RN 10-39 where it states as follows:

> A firm should err on the side of interpreting the term "investment-related" in an expansive manner in line with the scope of the term when reporting information on Form U5. The scope of the term pertains to securities, commodities, banking, insurance or real estate (including, but not limited to, acting as or being associated with a broker-dealer, issuer, investment company, investment advisor, futures sponsor, bank or saving association." Accordingly, a firm may be required to provide an affirmative answer to a question even if the matter is not securities related.

The panel concludes that this language is intended to convey to the reporting entity that it should not focus on the nature of the institution at which the alleged misconduct occurs, but rather on the nature of the financial event being addressed. It was undisputed here that a checking account is not an investment. Respondent's witness testified that a checking account was not an investment. The fact that it was opened as part of "banking" cannot logically make it "investment-related."

Respondent was also unable to identify any particular statute, regulation, rule or industry standards of conduct that was violated. Respondent's position appeared to be that Claimant's conduct violated its Code of Conduct, which barred employees from falsifying company records which Respondent argued occurred when Claimant pressed the "in person" button when the customer was in fact not present in person. The panel was persuaded that, because the prior branch manager(s) had accommodated this very large and demanding customer to allow them not to be present for the entire account opening, that the customers were present to complete the process and none of the information submitted to create the accounts was inaccurate, there was no falsified record but rather a technical violation that had theretofore been allowed by management. Critically, the internal investigation performed by Respondent determined that there had been no violation of the Code of Conduct precisely because of the context in which the events occurred.

## **FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### **Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

|  |  |
|---|---|
| Initial Claim Filing Fee | =$ 1,725.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### **Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

|  |  |
|---|---|
| Member Surcharge | =$ 2,475.00 |
| Member Process Fee | =$ 5,075.00 |

### **Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers
with one (1) arbitrator @ $200.00/decision ............................................. =$ 200.00

Respondent submitted one discovery-related motion.

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees to Respondent.

### **Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with the Panel @ $1,300.00/session ........ =$ 1,300.00
Pre-hearing conference: August 24, 2018        1 session

Four (4) hearing sessions @ $1,300.00/session ............................ =$ 5,200.00
Hearing Dates:        April 2, 2019        2 sessions
        April 3, 2019        2 sessions

| | |
|---|---|
| Total Hearing Session Fees | =$ 6,500.00 |

The Panel has assessed $6,500.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures


_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

5-10-19
_____
Signature Date


_____
Victoria Wolf
Public Arbitrator

_____
Signature Date


_____
Nancy L. Hendrickson
Non-Public Arbitrator

_____
Signature Date


May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

_____        Signature Date

_____        5/10/19
Victoria Wolf                            _____
Public Arbitrator                        Signature Date


_____        _____
Nancy L. Hendrickson                     Signature Date
Non-Public Arbitrator


May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

_____
Victoria Wolf
Public Arbitrator

Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

May 10, 2019
Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)



**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                                                                Case Number: 18-02179
Mark Munizzi

vs.

Respondent                                                          Hearing Site: Chicago, Illinois
UBS Financial Services Inc.

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch Thompson LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, that Respondent's inaccurate Form U5 filing will interfere with Claimant's ability to obtain commensurate future employment.

Unless specifically admitted in the Statement of Answer and Statement of Answer to Amended Statement of Claim, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the Form U5 filed by Respondent, an award of compensatory damages and punitive damages in an amount to be determined at hearing, and all other appropriate relief. In the Amended Statement of Claim, Claimant requested the same relief as the Statement of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for severance pay; $3,149.00 for interest on the severance pay, with interest accruing at $187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the amount of $23,419.13; punitive damages of ten times the compensatory damages; and that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim ("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-hearing conference on March 13, 2019, in a written order dated March 14, 2019, the Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00 in compensatory damages.

2.  Respondent is liable for and shall pay to Claimant interest on $112,500.00 of the above-stated compensatory damages award, which represents severance pay, at the rate of 5% per annum from the date of this Award through and

including the date on which that portion of the compensatory damages award is paid in full.

3. Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4. Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5. Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6. Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

8. Any and all claims for relief not specifically addressed herein are denied.

Appx. 83

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

      Initial Claim Filing Fee                         =$ 1,575.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

      Member Surcharge                       =$ 1,900.00
      Member Process Fee                     =$ 3,750.00

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

September 28, 2019, postponement requested jointly by parties     =$ 1,125.00

Total Postponement Fees                       =$ 1,125.00

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

### Last Minute Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

September 28, 2019, postponement requested jointly by parties     =$ 1,800.00

Total Last Minute Cancellation Fees             =$ 1,800.00

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

### Discovery-Related Motion Fee
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers
with one (1) arbitrator @ $200.00/decision              =$ 200.00

One (1) decision on a discovery-related motion on the papers
with three (3) arbitrators @ $600.00 /decision          =$ 600.00

Claimant submitted (2) two discovery-related motions

_____

| Total Discovery-Related Motion Fees | =$ 800.00 |
|---|---|

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

## Hearing Session Fees and Assessments

The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session =$ 450.00
Pre-hearing Conference: March 13, 2019     1 session

One (1) pre-hearing session with the Panel @ $1,125.00/session =$ 1,125.00
Pre-hearing Conference: October 16, 2018     1 session

Twenty-six (26) hearing sessions @ $1,125.00/session =$ 29,250.00

| Hearing Dates: | | |
|---|---|---|
| June 11, 2019 | 2 sessions |
| June 12, 2019 | 2 sessions |
| June 13, 2019 | 2 sessions |
| June 14, 2019 | 2 sessions |
| June 17, 2019 | 2 sessions |
| June 18, 2019 | 2 sessions |
| September 24, 2019 | 2 sessions |
| September 25, 2019 | 2 sessions |
| September 26, 2019 | 2 sessions |
| September 27, 2019 | 2 sessions |
| November 19, 2019 | 2 sessions |
| November 20, 2019 | 2 sessions |
| November 21, 2019 | 2 sessions |

_____

| Total Hearing Session Fees | =$ 30,825.00 |
|---|---|

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. Thompson | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_Lisa M. Krimen_
_____
Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019
_____
Signature Date

_Donald M. Thompson_
_____
Donald M. Thompson
Public Arbitrator

12/11/2019
_____
Signature Date

_Craig D. Cook_
_____
Craig D. Cook
Non-Public Arbitrator

12/11/2019
_____
Signature Date

December 11, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

EXHIBIT

J



All Quiet on the Stock Market Front
(https://www.advisorhub.com/resources/all-
quiet-on-the-stock-market-front/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

NEWS

# UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award

by **Miriam Rozen**    April 19, 2022

- **News** ⌄

  - Deals & Comp(/deals-and-comps/)

- **Breakaway Center**(/breakaway-center/)

- **Asset Management**(/#linkedin)    (/#email)    (https://www.advisorhub.com/asset-manager/)

- **Events**(https://www.advisorhub.events/)

- **Rankings** ⌄

- **More** ⌄



Submit a Tip 💬(/submittip/)

*JHVEPhoto - stock.adobe.com*

A drawn-out legal dispute that has spanned four years and multiple appeals has concluded with a $14.1 million wire transfer from UBS Wealth Management USA to a former compliance officer in Chicago.

UBS Financial Services paid the total on April 12 to Mark Munizzi, its former regional compliance manager in Chicago, whom it had fired in 2018. Munizzi sued later that year for defamation and won $11.1 million in an arbitration award the following year.

UBS waged lengthy court battles (https://www.advisorhub.com/ubss-appeal-to-vacate-11-mln-finra-award-faces-uphill-battle-lawyers/) that were seen as a message to others who may consider taking on the firm in court, but ultimately failed to vacate the award. On March 31, the Supreme Court of Illinois denied UBS its final appeal without offering an explanation.

Because of the lengthy appeals process, UBS added about $3 million to the amount it ultimately paid Munizzi as interest continued to accrue, as well as attorney fees UBS was required to cover under the terms of the award, according to Munizzi's lawyer Stephen Gomberg of Lynch Thompson in Chicago.

A spokesperson for UBS declined to comment. The firm would have had to petition the U.S. Supreme Court for a hearing to continue with any appeal.

Appx. 88

In his arbitration complaint filed in June 2018, Munizzi alleged UBS defamed him on his U5 termination filing, which accused him of failing to supervise employees executing uncovered options strategy in accounts and of giving "varied responses" during the firm's review of his activities.

Munizzi, who had been earning roughly $200,000 a year, according to his lawyer, asserted that he was not properly informed by the firm's central supervision office of margin calls against brokers in UBS's Madison, Wisconsin branch. He had been one of several fired in the wake of a junior broker's naked options trades that were said to have cost $3.7 million in losses in employee-related accounts.

In the December 2019 award, which was the largest employee arbitration penalty that year, the Financial Industry Regulatory Authority arbitration panel had ordered UBS Financial Services to pay Munizzi $7.5 million in punitive damages, $3.1 million in compensatory damages for severance and almost $497,000 of attorneys' fees—a total of about $11.1 million.

In January 2020, a court upheld the award and entered a judgment for $12,177,360, which included an additional $908,965 of statutory interest and attorneys' fees and costs of $97,604, Gomberg said. The judge in that case also did not provide a written explanation, although courts are often deferential to arbitrators and have narrow grounds to overturn awards.

Munizzi was "very much relieved" with UBS's final payment and he "has enough money to retire," but he had been through an ordeal, Gomberg said. The U5 mark-up left him unemployable, according to the lawyer.

"He hasn't gotten a job, or even gotten an interview," Gomberg said.

The favorable outcome could embolden others to bring cases, according to Gomberg, who said he has seen signs of an "uptick" in employment disputes between brokerages and brokers relating to terminations as well as complaints filed with defamation claims.

Since the news of Munizzi's initial win before the Finra panel first surfaced, firms have also begun issuing more "carefully worded" U5s to avoid defamation claims, he added.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/) Defamation (https://www.advisorhub.com/tag/defamation/)*

## Like this article? Let AdvisorHub come to you! SIGN UP

## COMMENTS (4)

**on Apr 19 2022, Tired of Large Firm CYA-Hot Potato Game (https://www.advisorhub.com/author/) says:**

I'm very happy to hear the Compliance Officer won this battle. Its terrible how expensive it is in legal costs for the fired employee. I know far too many people who have lost their jobs so that senior executives at large firms could make it look like they took action for the regulators. I'm looking at you JPM.

Reply to Tired of Large Firm CYA-Hot Potato Game

**on Apr 19 2022, So tired of CYA Hot Potato Games! (https://www.advisorhub.com/author/) says:**

you are indeed a kindred spirit!

Reply to So tired of CYA Hot Potato Games!

**on Apr 20 2022, Not a Choosen one (https://www.advisorhub.com/author/) says:**

Happy for this guy. UBS is notorious for trashing employees and mid level mangers while they protect the inner circle choosen few. Sadly for every win like this there are many more who never get their justice due to cost and how like the big bank can fight for...

Reply to Not a Choosen one

**on Apr 20 2022, Arl (https://www.advisorhub.com/author/) says:**

Wow, makes me wonder if I have a case. My former broker dealer made mark on my U5 on my record from email and client said he was wrong and then a very large potential client saw
my U5 before it was removed and didn't hire me and recently had FINRA remove.

Reply to Arl

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

Appx. 90

**Name \***

**Email \***

**Website**

| Post Comment |

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

Appx. 91

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

# Creating More Scale and Efficiency in Your Practice

Appx. 92

Appx. 93

Appx. 94

(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ⌄                                              **AdvisorHub RIA(/resource_type/ria-resource-center/)**

**Deals & Comp(/deals-comps/)**                          **More** ⌄

**Breakaway Center(/breakaway-center/)**                 **About Us(/about-us/)**

Careers(/careers/)                                       Contact Us(/contact-us/)

Advertise(/advertise-2nd-level/)



February 18, 2016

Joshua Biering
1514 Habersham St
Savannah, Georgia 31401

Dear Joshua:

We are very pleased to formally present our employment offer. In this letter we have included the details of your position, your compensation and the terms and conditions of your offer. You will also find information about your next steps. You will join us as a Military Officer Executive Development Program Associate - Dallas, TX at Chase Bank USA, NA, which we'll refer to as "Chase". Your manager will be Jeffrey T Hassman, whom you can reach at ███.

We're planning to have you start on April 25, 2016. Whenever we mention start date in this letter, we are referring to the date of the first day you actually start working for us. Touch base with your manager before you start to make sure you have everything you need to know for your first day.

## Your pay

Your annual base salary as of your start date is $100,000.00 (less applicable taxes). While your hours will vary based on business needs, your salary covers all hours you work during any week. You are not eligible for any overtime payments in this position. You will be paid consistent with Chase's payroll practices.

## Special cash award

You will be paid a one-time sign-on award of $25,000. This award is subject to applicable taxes. We'll make this payment within 30 days after your start date. If your employment with Chase ends for any reason other than job elimination within a year after your start date, you would need to repay this sign-on award. The repayment is due within ten days of our request for repayment. You agree that Chase may withhold all or part of the repayment amount as allowed by law from any remaining salary or other payments owed to you at the time you leave. Chase will also be entitled to any costs and attorneys' fees associated with enforcing your repayment obligations.

## Other benefits

We offer a comprehensive benefits program to our U.S. benefits-eligible employees, including health care and insurance plans, a cash balance pension plan, a 401(k) plan, and discounted Chase products. In addition, you will be eligible for paid time off, including vacation, based on your role and time working for us.

We provide some of our benefits materials electronically - by e-mail or on the company Intranet, which is accessible from work or from home. When you accept this offer, you agree to receive documents for the JPMorgan Chase Benefits Program electronically. This includes the summary plan descriptions, plan prospectuses and other documents. You may request a paper copy for a benefit plan at any time. The contact information you will need for each benefits plan is available in the Highlights of the JPMorgan Chase U.S. Benefits Program under a section called Benefits at a Glance. After completion of the Onboarding process, we will make this information available to you on our My Welcome site which is covered in more detail in the Next Steps section of this offer letter.

## Terms & Conditions

Appx. 95

In this section, we will cover the terms and conditions of this employment offer.

We need you to review all the information in this letter to check that it reflects our discussions to date. That's because this document will legally supersede anything we've communicated previously verbally or in writing. If anything needs to change, we'll need a new document that refers to this offer and both you and Chase will need to sign it.

This offer of employment is subject to all the terms, conditions and attachments included in this document, the Binding Arbitration Agreement and all Chase policies and procedures, including but not limited to the JPMorgan Chase Code of Conduct.

### Introductory period and "at-will" employment
Your first 90 days on the job are an introductory period. It lets us evaluate how you're adjusting to your new job and our organization. Plus it's the time during which we can make sure that you understand your role and responsibilities and our performance standards and policies. You are an "at-will" employee both during and after this introductory period, which means that either you or Chase can end your employment at any time, for any or no reason.

### Other conditions
When you accept this offer, you're confirming that there's nothing restricting you from accepting employment or performing any duties with Chase, whether by contract (express or implied) or otherwise. You confirm you are not restricted from soliciting customers or from hiring employees of your former employer or any other party.

You're also acknowledging that you understand and agree that if you have any obligations with your former or current employers that they can enforce, Chase doesn't seek to violate those obligations.

You are affirming that you won't disclose to Chase or use in connection with your employment at Chase any protected trade secrets or protected confidential or proprietary materials of another entity, including any prior employer.

### Non-solicitation
During your employment and for one year after you leave Chase, you agree you won't solicit, induce or encourage any current Chase employee to apply for employment elsewhere or to leave Chase. You confirm that you will not hire any employee who was working at Chase on the day you left unless that person left Chase more than six months before you wish to hire him or her, or because Chase eliminated his or her job.

Additionally, during your employment and for one year after you leave Chase, you agree you won't interfere with current Chase customers, suppliers, or other persons or entities that do business with Chase. By interfere we mean attempt to or actually solicit, induce to leave Chase, divert from doing business with Chase, or otherwise interfere with the business relationship any party has with Chase. This includes parties you directly worked with while employed at Chase or whose names you know because you worked at Chase. If required to be enforceable under any applicable law, your obligations in this paragraph will be interpreted to apply only when you use our confidential or proprietary information or any of our trade secrets.

You agree not to conduct these activities personally or on behalf of anyone else, directly or indirectly. If you do not meet or threaten not to meet the non-solicitation agreements mentioned above, Chase may seek monetary damages or equitable relief as appropriate.

### Next Steps

### Pre-employment requirements to complete
We have a number of pre-employment processes you'll need to start shortly. They include various background checks, fingerprint processing and drug screening, as well as several onboarding forms. For example, you will need to establish your identity and valid employment eligibility by completing Form I-9 on My Welcome and presenting your ID and employment eligibility documents on or before your start date. We'll use the E-Verify Program to electronically compare your Form I-9 information against Social Security Administration and Department of Homeland Security records. We'll keep you updated about all the steps you need to take throughout the pre-employment process.

Appx. 96

This offer and continued employment is based on you successfully completing all pre-employment processes.

**Before your first day**
As a new hire, learning how to find resources and information is critical to your success. To help you get started, we've created a new hire website called My Welcome. On this site you will find more information about our pre-employment requirements and the benefits of joining Chase. After you start you'll continue to have access to the site to get you settled.

**On your first day**
Your manager will provide your ID badge and your employee Standard ID number that will be used to access the information and resources that are available to you.

If you have any questions, please contact our Pre-Employment team at ████████████

With the formalities covered, let us say again that we look forward to having you join us.

Sincerely,

████████████

**Appendix: Systems Monitoring Activities and Cross-Border Transfers**

The following provides a summary of how JPMorgan Chase & Co., its affiliates and its subsidiaries and the entity that employs you, or for which you provide services (collectively, ?JPMC?), conducts Systems monitoring. JPMC may conduct monitoring to the extent permitted by applicable law.

JPMC conducts monitoring of JPMC?s physical facilities and its equipment and systems (collectively, the ?Systems?). System monitoring applies to your JPMC equipment, your personal equipment when accessing the Systems, and the communications, information, and materials conveyed or accessed using the Systems. Monitoring activities may include the monitoring and logging of traffic and usage data of all electronic communications; monitoring of telephone calls to or from JPMC work telephones as permitted by applicable laws and subject to any required notices; monitoring of the contents of electronic communications, files, databases, applications, and internet usage; and logging hours worked and physical presence at JPMC?s facilities if applicable. JPMC may at all times monitor, access, retrieve, record and review information obtained from the monitoring activities for various purposes, such as preventing and investigating activities that may violate JPMC?s policies and ensuring compliance with legal or regulatory obligations. While conducting monitoring activities, JPMC may obtain and process personal information about you and others that may reside on the Systems.

The monitoring activities (including JPMC?s collection and processing of personal or other information) are required for purposes of your employment or work assignment to promote adherence to applicable policies and regulations. Subject to applicable laws and regulations, if you object to this processing, JPMC may prohibit you from using the Systems; terminate offers of employment or work assignment; and, for employees, take disciplinary action against you, up to and including termination of your employment with JPMC.

JPMC may disclose the information it obtains in connection with monitoring activities to JPMC affiliates and to third parties, service providers, regulators, supervisory bodies, law enforcement and other government agencies. Information obtained from the monitoring activities may be used as the basis to take disciplinary actions, up to and including termination or other legal action, for violations of JPMC?s policies or applicable laws.

In addition to the monitoring activities discussed above, JPMC may obtain and store other information related to your employment or other working relationship, such as your compensation information, performance information, benefits information and other workplace-related data. JPMC may transfer such information, and the information it obtains in

Appx. 97

file:///Naeast.ad.jpmorganchase.com/...s_Completed/110123-113023█████I662283_Hire_Offer%20Letter_2016-02-18_Biering_11.html[11/15/2023 12:26:20 PM]

connection with monitoring activities, to countries other than the country in which the information originally was collected, including to the United States.

**Understanding Obligations under the Firm?s Personal Account Dealing Policy (PAD):**

**New hires NOT subject to PAD at joining:**

Employees are expected to understand the firm?s Personal Account Dealing (PAD) Policy, which helps to protect the firm's reputation and maintain the highest standards of integrity when employees conduct personal investment activities. Details of the Policy can be reviewed here.

**Hires Subject to PAD at time of joining:**

Employees are expected to understand the firm?s Personal Account Dealing (PAD) Policy, which helps to protect the firm?s reputation and maintain the highest standards of integrity when employees conduct personal investment activities. Details of the Policy can be reviewed here.

The position you are being offered is considered to be subject to the Personal Account Dealing Policy and, as such, you, your covered family members and anyone with an associated account* will need to be familiar with the obligations set forth in this policy, including, but not limited to, the requirements, once you are employed here, to disclose personal trading accounts and private investments, to pre-clear trades, to limit investment strategies to those approved within this policy and to maintain trading accounts at JPMorgan Chase Approved Brokers. Please note that all trading restrictions that apply to you, including but not limited to the prohibition against day trading, also apply to your spouse/domestic partner, covered family members and anyone with an associated account*.

**Seasonal Worker model for individuals joining in formal seasonal/Short term programs:**

JPMorgan Chase requires that seasonal workers refrain from trading in any personal or ?associated*? accounts for the time period that you are employed in a short term training program. Please verify that you will comply with the following personal trading requirements:

1. For the duration of the short term program I am joining I will not trade in any of my personal or ?associated? accounts.
2. I understand that the Firm has the right to request account information for any of my accounts or ?associated? accounts.
3. If there is an extenuating circumstance that would compel me to place a trade in my personal or ?associated? account, I will obtain pre-approval of the trade by the Personal Account Dealing Group and I would be responsible for supplying all confirmations and statements to the Personal Account Dealing Group for that trade.

*The term ?associated accounts? refers to any securities accounts no matter where they are located and includes, but is not limited to, those accounts that are established, maintained or controlled (either directly or indirectly) by you, your spouse, domestic partner or minor children (even if financially independent), anyone to whom you provide significant financial support, and in which the employee has a direct or indirect financial interest.*

**Acceptance and Code Affirmation:**

Upon signing this letter I accept the terms described above. I also affirm that I have read and understand the JPMorgan Chase Code of Conduct, and agree as a condition of employment to comply with the Code as amended and revised from time to time.

- I understand that I can access the Code via the Internet at http://www.jpmorganchase.com/ >About Us>Governance>Code of Conduct prior to joining the firm, and through the firm's intranet once I begin employment.

Appx. 98

- I acknowledge that the Code requires that certain outside activities be approved in writing after I begin employment, and I agree that, if any such required approval is denied, I will cease the relevant activity immediately.
- As a JPMorgan Chase employee I understand that the Code requires me to report any known or suspected violation of the Code, of internal firm policies, or of laws or regulations applicable to the firm's business. I understand that failure to do so can result in disciplinary action up to and including termination of employment.
- I understand that all employees have post-employment responsibilities regarding confidential information.
- I acknowledge that the Code also requires that I safeguard confidential information, including anything that I created while working for my previous employer(s). I understand that I am not allowed to bring any of this with me to use at JPMorgan Chase or disclose any confidential information from a prior employer unless it has already been made public through no action of my own.
- I understand my offer of employment is contingent upon a determination by JPMorgan Chase that neither the offer nor my employment would violate, or create the appearance of violating, the firm's Code of Conduct, Anti-Corruption Policy, or Human Resources policies and practices, or any applicable laws or regulations
- I understand further if I am a Senior-Level Employee*, that Senior-Level Employees have certain additional responsibilities that continue after their employment with the firm terminates, including restrictions on solicitation and hiring of the firm's employees and solicitation of certain customers. I understand that I am responsible for knowing which post-employment responsibilities apply to me and I agree to comply with all applicable requirements.

*The term "Senior-Level Employee" is currently defined as any employee whose (a) annual base salary rate is US$150,000 (or the local currency equivalent) or higher, OR (b) annual total cash compensation is US$250,000 (or the local currency equivalent) or higher.*

**Independent Auditor Tax Services to Employees of JPMorgan Chase and its Affiliates:**

To be in compliance with the Public Company Accounting Oversight Board (PCAOB) Rule 3523 it is JPMorgan Chase's (JPMC) policy that PricewaterhouseCoopers (PwC) cannot provide any tax services to employees of JPMC or any of its controlled entities (hereafter referred to as JPMC employee). This restriction is regardless of whether the individual is in a financial reporting oversight role or not, and whether PwC is engaged by the individual or by JPMC. PwC is also prohibited from providing any tax services to a spouse of a JPMC employee if the work is related to a joint tax return. Exceptions to this policy will be reviewed on a case-by-case basis and will require the approval of the JPMC Controller.

Signature: _Joshua Biering_    Date: __18-Feb-2016__

I understand my employment is subject to my and JPMorgan Chase's agreement to submit employment-related disputes that cannot be resolved internally to binding arbitration, as set forth in the Binding Arbitration Agreement detailed below. By signing below I acknowledge and agree that I have read and understand the Binding Arbitration Agreement, have accepted its terms and understand that it is a condition of my employment with JPMorgan Chase.

**BINDING ARBITRATION AGREEMENT:**
JPMorgan Chase believes that if a dispute related to an employee's or former employee's employment arises, it is in the best interests of both the individual and JPMorgan Chase to resolve the dispute without litigation. Most such disputes are resolved internally through the Firm's Open Communication Policy. When such disputes are not resolved internally, JPMorgan Chase provides for their resolution by binding arbitration as described in this Binding Arbitration Agreement ("Agreement"). "JPMorgan Chase" and the "Firm" as used

Appx. 99

in this Agreement mean JPMorgan Chase & Co. and all of its direct and indirect subsidiaries.

This Agreement will be governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. ? 1 et seq.

As a condition of and in consideration of my employment with JPMorgan Chase & Co. or any of its direct or indirect subsidiaries, I agree with JPMorgan Chase as follows:

1. **SCOPE:** Any and all "Covered Claims" (as defined below) between me and JPMorgan Chase (collectively "Covered Parties" or "Parties", individually each a "Covered Party" or "Party") shall be submitted to and resolved by final and binding arbitration in accordance with this Agreement.

2. **COVERED CLAIMS:** "Covered Claims" include all legally protected employment-related claims, excluding those set forth below in Paragraphs 3 and 4 of this Agreement, that I now have or in the future may have against JPMorgan Chase or its officers, directors, shareholders, employees or agents which arise out of or relate to my employment or separation from employment with JPMorgan Chase and all legally protected employment-related claims that JPMorgan Chase has or in the future may have against me, including, but not limited to, claims of employment discrimination or harassment if protected by applicable federal, state or local law, and retaliation for raising discrimination or harassment claims, failure to pay wages, bonuses or other compensation, tortious acts, wrongful, retaliatory and/or constructive discharge, breach of an express or implied contract, promissory estoppel, unjust enrichment, and violations of any other common law, federal, state, or local statute, ordinance, regulation or public policy, including, but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866 and 1991, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act of 1990, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, the Fair Labor Standards Act of 1938, the Equal Pay Act of 1963, Section 1981 of the Civil Rights Act, and the Worker Adjustment and Retraining Notification Act.

3. **EXCLUDED CLAIMS:** This Agreement does not cover, and the following claims are not subject to arbitration under this Agreement: (a) any criminal complaint or proceeding, (b) any claims covered by state unemployment insurance, state or federal disability insurance, and/or state workers' compensation benefit laws, except that claims for retaliation pursuant to these laws shall be subject to arbitration under this Agreement, (c) any claim under the National Labor Relations Act, and (d) claims for benefits under a plan that is governed by Employee Retirement Income Security Act of 1974 ("ERISA").

Further, this Agreement also does not cover any action seeking only declaratory and/or emergency, temporary or preliminary injunctive relief (including a temporary restraining order) in a court of competent jurisdiction in accordance with applicable law, so long as that action is brought on an individual basis and not on a consolidated basis or as part of a collective or class action, and subject to the following:

- In the event such relief is sought by a Covered Party, who is not otherwise subject to the arbitration requirements of the Financial Industry Regulatory Authority ("FINRA"), after the court issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered Claim to arbitration pursuant to this Agreement, and

- In connection with any such action related to post-employment restrictions (e.g., actions to enforce rights to trade secrets, or agreements not to compete or solicit customers or employees) on a Covered Party who is otherwise subject to the arbitration requirements of FINRA (absent this Agreement), in order for the Covered Parties to have available to them the expedited arbitration procedures provided by FINRA, after the court issues a ruling concerning emergency, temporary or preliminary injunctive relief, the parties must submit such claim if otherwise considered a Covered

Appx. 100

Claim to arbitration before FINRA in accordance with its expedited arbitration procedures under FINRA Rule 13804.

**4. CLASS ACTION/COLLECTIVE ACTION WAIVER:** All Covered Claims under this Agreement must be submitted on an individual basis. No claims may be arbitrated on a class or collective basis unless required by applicable law. Covered Parties expressly waive any right with respect to any Covered Claims to submit, initiate, or participate in a representative capacity or as a plaintiff, claimant or member in a class action, collective action, or other representative or joint action, regardless of whether the action is filed in arbitration or in court. Furthermore, if a court orders that a class, collective, or other representative or joint action should proceed, in no event will such action proceed in the arbitration forum, subject to applicable law. Claims may not be joined or consolidated in arbitration with disputes brought by other individual(s), unless agreed to in writing by all parties or required by applicable law. To the extent there is a question of enforceability of class or collective arbitration, it shall be decided only by a court, not an arbitrator.

The arbitrator's authority to resolve disputes and make awards under this Agreement is limited to disputes between: (i) an individual and JPMorgan Chase; and (ii) the individual and any current or former officers, directors, employees and agents, if such individual is sued for conduct within the scope of their employment. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

I retain the right to challenge the validity of this Agreement upon grounds that may exist at law or equity and will not be subject to any form of retaliation for asserting such rights.

**5. ADMINISTRATIVE AGENCIES:** I understand that this Agreement does not preclude me from filing an administrative claim or charge with the Equal Employment Opportunity Commission ("EEOC") and/or state and local human rights agencies to investigate alleged violations of laws enforced by the EEOC or those agencies. However, I understand that I am not required to initiate an administrative proceeding before pursuing a Covered Claim under this Agreement. In the event I file such an administrative proceeding, I understand that I cannot pursue Covered Claims under this Agreement without first exhausting all required administrative remedies, such as obtaining a right to sue notice from the EEOC in order to arbitrate federal discrimination claims that require such a notice. By responding to administrative agencies, JPMorgan Chase does not waive its right to enforce this Agreement and the arbitrator shall treat a decision of an administrative agency in the same manner as it would be treated by a court of law.

**6. INITIATING ARBITRATION:** Arbitration under this Agreement shall be conducted before a single neutral arbitrator of the American Arbitration Association ("AAA")(unless the Parties agree upon another mutually acceptable arbitrator, in which case the arbitration will be conducted before such mutually acceptable arbitrator) in accordance with and selected pursuant to the rules and procedures of the Employment Arbitration Rules of the AAA ("AAA Rules") to the extent the AAA Rules do not conflict with the terms of this Agreement or applicable law. The AAA Rules will govern issues not explicitly addressed by this Agreement. Where there is a conflict between this Agreement and the AAA Rules, this Agreement will govern. Where there is a conflict between applicable law and the AAA rules and/or this Agreement, the applicable law will govern. I understand that arbitration under this Agreement will occur in the state where I am currently or was most recently employed by the Firm, unless otherwise agreed by the Parties. Information about AAA is available from its website www.adr.org. A Covered Party may contact them directly at ▬▬▬▬▬▬ A Covered Party who is otherwise subject to the arbitration requirements of FINRA who wishes to pursue arbitration of a Covered Claim, must file such Covered Claim with AAA (or other mutually acceptable arbitrator), except as otherwise provide in Paragraph 3 of this Agreement.

To initiate arbitration:

Appx. 101

- A Covered Party must send a written demand for arbitration to any office of the AAA (or if another mutually acceptable arbitrator has been agreed to by the Parties, to the offices of such other arbitrator). The Covered Party submitting the demand for arbitration must also simultaneously send a copy of the written demand for arbitration to the other Party (if being sent to JPMorgan Chase, the copy should be sent to the following address: JPMorgan Chase & Co. Legal Department, c/o Legal Papers Served, 4 Chase Metrotech Center, Floor 18, Brooklyn, NY 11245).
- Both of the following must be included in the demand for arbitration:

(a) A statement of the nature of the dispute, including the alleged act or omission at issue, the names of the parties involved in the dispute, the amount in controversy, if any, the remedy sought to resolve the issue (including the dollar amount, if any), the mailing address for future correspondence and the legal counsel, if any, and

(b) Any required filing fee. If a Covered Claim is filed by me, the filing fee is $100 payable by check, money order or any other method of payment permitted by the AAA (or another mutually acceptable arbitrator agreed to by the parties). In the event the filing fee required by the state or federal court in which the Covered Claim could have been brought is less than $100, JPMorgan Chase agrees to refund to me the difference between $100 and such state or federal court filing fee within 30 days of receiving notice of payment. Any demand received by the AAA (or another mutually acceptable arbitrator agreed to by the Parties) that is not accompanied by the required filing fee will be returned.

Nothing in this Agreement releases a Covered Party from any obligation to comply with timely filing requirements and statutes of limitations under applicable law, statutes, or regulations. Thus, whether or not a Covered Party chooses to file with administrative agencies, his/her arbitration must still be initiated as an arbitration within the applicable administrative, statutory or judicial filing time frame, as required by law, and the demand for arbitration must be received at the address above within the time period allowed pursuant to the statute, regulation or other law applicable to the alleged act or omission giving rise to the dispute. Nothing in this Agreement is intended or should be construed to shorten or extend the statute(s) of limitations and/or filing periods that exist under applicable law.

The submission and timing of any response to an arbitration demand shall be in accordance with AAA's Rules, which currently provides that a response be filed within 15 days after the date of the letter from the AAA (or other mutually agreed to arbitrator) acknowledging receipt of the demand for arbitration.

**7. ARBITRATION PROCEEDINGS:** The arbitrator will conduct the hearing as expeditiously as possible, while ensuring that all Parties have the opportunity to present evidence and arguments and ensuring that the Agreement is followed. The arbitrator will set the date, time, and place of the hearing, and AAA (or other arbitration provider mutually agreed to by the parties) will notify the Parties at least 30 calendar days in advance, unless the Parties otherwise agree. In the event the hearing cannot reasonably be completed in one day, the arbitrator will schedule the hearing to be continued on a date or dates that is/are convenient to both Parties. The arbitrator will make every effort to select a reasonably convenient location for the continued arbitration, without incurring additional expense, if possible.

**(a) Fees:** All ordinary and reasonable administrative expenses of the arbitration, including fees for a single arbitrator, hearing room expenses, travel expenses of the arbitrator, the AAA representatives (if applicable), and any witnesses produced at the arbitrator's specific request and not otherwise called by a party, will be paid completely by JPMorgan Chase. The fees and expenses of any witness, expert, consultant, interpreter and others retained or consulted by a party shall be paid by the party requiring the presence of such persons, subject to applicable law. JPMorgan Chase will not pay for fees or costs incurred as a result of deliberate and inappropriate delay or absence caused by employees or their counsel, as

Appx. 102

file:///Naeast.ad.jpmorganchase.com/...s_Completed/110123-113023/▮▮▮▮I662283_Hire_Offer%20Letter_2016-02-18_Biering_11.htm[11/15/2023 12:26:20 PM]

determined by the arbitrator and permitted by applicable law. Except as otherwise provided by law, all attorney's fees shall be paid by the party that incurs them. Nothing in this Agreement is intended or should be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

**(b)** **Legal Representation and Language Interpreter:** The Parties (if desired) may use the services of legal counsel and/or a language interpreter. The Parties utilizing such services are responsible for making and paying all fee and other arrangements directly with the legal counsel and/or interpreter, subject to applicable law. Nothing in this Agreement is intended or should be construed to require employees to bear any type of expense that they would not otherwise bear if the Parties were to litigate a Covered Claim in a court of law.

**(c)** **Attendance at and Confidentiality of Arbitration Hearing:** The Covered Party, a JPMorgan Chase corporate representative of its choosing, and the arbitrator must be present at the hearing. In addition, an official recorder and legal counsel (for any party) also may attend the hearing. Further, the Parties may call witnesses to testify at the arbitration. Unless the parties agree otherwise, the arbitrator shall exclude witnesses (other than the represented Parties) from the hearing during the testimony of any other witness. The arbitrator, the Parties and their representatives must maintain the confidentiality of the hearings unless the law provides otherwise.

**(d)** **Discovery:** Discovery requests and the provision of discovery must be consistent with this Agreement, general standards of due process, the Rules of AAA and the expedited nature of arbitration. The guidelines below are only guidelines, do not establish a minimum or maximum of discovery, and will be applied subject to these principles. Thus, there may be cases which warrant more or less discovery than that outlined below.

- At least 20 days before the arbitration hearing, the Parties must submit the names and addresses of the witnesses each party intends to produce and any documents each party intends to present. The Parties may add to such information up to 10 days before the hearing. All such submissions are final after that point absent a finding of good cause by the arbitrator.

- In general, the Parties may take the depositions of all expert witnesses and up to 3 other individuals. Any individual who certifies he/she has no direct knowledge of the facts should not be deposed as a fact witness. At least 10 days' prior notice should be given by the party requesting a deposition and advance efforts should be made to mutually agree on deposition dates, including the time and place for any depositions to be taken. The party requesting the deposition is responsible for all related costs for that deposition. Discovery must be completed at least 20 days before the hearing. The arbitrator may alter the timing and scope of discovery as necessary or upon request of the Parties.

- The arbitrator will resolve discovery disputes and may expand or restrict the scope of discovery within his or her reasonable discretion, and the rules of AAA consistent with the expedited nature of arbitration.

**(e)** **Prehearing Motions:** The arbitrator is authorized to consider and rule on prehearing motions, including discovery motions, motions to dismiss and summary judgment on the claims, provided that the other party has reasonable notice and time to respond to any such prehearing motions. Any dispute which fails to state a claim upon which relief may be granted under applicable law (including, but not limited to claims that are barred by the applicable statute of limitations or mandated timeframe for filing such claim, or that are barred by an enforceable release, or involve a claim against someone who was not associated with the conduct at issue) is subject to dismissal without an evidentiary hearing. Any ruling regarding such motion

Appx. 103

shall be made consistent with the Form of Decision and Scope of Relief sections in this Agreement.

**(f)     Time of Decision:** The arbitrator will make the decision within 30 days of the close of the hearing or as soon as possible thereafter, unless otherwise agreed to by the Parties or otherwise specified by law.

**(g)     Form of Decision:** The decision will be in writing and signed by the arbitrator. Unless otherwise agreed to by the Parties, the decision will include a summary of claims arbitrated and decided, a reasoned opinion setting forth any findings of fact or conclusions of law, and damages and other relief (if any) granted. All decisions shall be executed in the manner required by law. The decision will be final and binding upon the Parties, and appeal of the decision to a court shall be limited as provided by the FAA.

**(h)     Scope of Relief:** The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, including the award of monetary damages and the imposition of requirements on the Parties (including injunctive relief), as permitted by applicable law. The arbitrator may award only such relief as may be granted for a Covered Claim brought in court on an individual basis under applicable law. The arbitrator may award punitive or exemplary damages or attorneys' fees as provided or limited by applicable law.  Nothing in this Agreement is intended or should be construed to limit the remedies that otherwise would be available to the Parties in a court of law.

**(i)     Enforcement of Arbitration Decision/Judicial Procedure:** The decision of the arbitrator may be enforced under the terms of the FAA to the maximum extent possible. Either party may have an arbitration decision enforced in a court of law in accordance with applicable the FAA. If this occurs, neither the arbitrator nor AAA will be involved in the court proceedings.

If a court determines that the decision is not completely enforceable, it will be enforced and binding on both parties to the maximum extent permitted by law.

**8.  SEVERABILITY:** If any part of this Agreement is held to be void or unenforceable, the remainder of the Agreement will be enforceable and any part may be severed from the remainder as appropriate, to the extent permitted by law. For example, if a court determines that a particular provision of this Agreement is in conflict with a mandatory provision of applicable law in that jurisdiction, such provision(s) will not be enforced in that jurisdiction, but the exclusivity of the Agreement and its use of arbitration as the sole and exclusive forum for all Covered Claims within its scope shall not be affected. Any dispute as to the arbitrability of a particular issue or claim pursuant to this Agreement is to be resolved in arbitration. Notwithstanding the foregoing, any issue concerning the validity of the class, collective, or representative or joint action waiver provided in Paragraph 4 of this Agreement must be decided by a court with jurisdiction over the Parties, and an arbitrator does not have authority to consider the issue of the validity of the waiver. If for any reason the class, collective, or representative or joint action waiver is found to be unenforceable, the class, collective, or representative or joint action may only be heard in court and may not be arbitrated under this Agreement

**9.  AMENDMENT OR TERMINATION OF AGREEMENT:** JPMorgan Chase reserves the right to amend, modify or discontinue this Agreement at any time in its sole discretion to the extent permitted by applicable law. Such amendments may be made by publishing them on the JPMorgan Chase Intranet or by separate notification to me and shall be effective 30 calendar days after such amendments are provided to me and will apply on a going-forward basis only.  Amendment, modification or discontinuation of the Agreement will not affect pending arbitration proceedings. Continuation of my employment after receiving such amendments or modifications will be considered my acceptance of the amended terms.

This Agreement does not alter the voluntary ("at will") nature of my employment relationship with the Firm, nor does it afford any rights or remedies not otherwise available under applicable law. Of course, this Agreement does not require that JPMorgan Chase initiate arbitration before taking corrective action of any

Appx. 104

kind, including termination of employment.

Signature: _*Joshua Biering*_    Date: __**18-Feb-2016**__

file:///Naeast.ad.jpmorganchase.com/...s_Completed/110123-113023/███████I662283_Hire_Offer%20Letter_2016-02-18_Biering_11 html[11/15/2023 12:26:20 PM]

Appx. 105

| | |
|---|---|
| In the Matter of<br>Arbitration between<br><br>**JOSHUA DAVID SAPPI BIERING,**<br><br>Claimant,<br><br>- and -<br><br>**J.P. MORGAN SECURITIES, LLC,<br>JPMORGAN CHASE & CO., and<br>JPMORGAN CHASE BANK, N.A.,**<br><br>Respondents. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     **FINRA No. 24-0108**<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## FIRST AMENDED STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following First Amended Statement of Claim ("SOC" or this "Pleading") seeking more than $10 million against J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMorgan Chase"), JPMorgan Chase Bank, N.A. ("Chase Bank") (collectively, "J.P. Morgan, "JPM," or "Respondents") and, in support thereof, respectfully states as follows:

## EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1. Biering is a well-respected registered representative and financial advisor (hereinafter, "FA") with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for J.P. Morgan for 8 years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

2. Biering _**resigned**_ from J.P. Morgan on October 28, 2023. Following his resignation, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Garden Leave is just that – Biering no longer had any job duties, no longer had access to JPM's systems,

and could no longer perform any job functions – he was to sit at home. During Garden Leave, Biering certainly could not execute any trades or professional services for clients, which is the ***very purpose of his FINRA license***, and for JPM holding his license. Biering honored the Garden Leave.[1] However, on December 1, 2023, J.P. Morgan informed Biering that he was "terminated" for violating JPM's "anti-harassment policy." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his *voluntary* resignation—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate resignation, with the goal of smearing Biering with other firms/clients.

3.       Moreover, after learning that Biering planned to leave J.P. Morgan, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, <u>after</u> Biering already resigned, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a female colleague. Refusing to provide any further details so that Biering could rebut any baseless accusations against him, JPM questioned Biering regarding the nature of the relationship. Given the seriousness of JPM's ultimate investigative "findings," JPM's secrecy was entirely improper. Had JPM conducted its "investigation" in good faith and treated Biering the same as his female colleague, JPM could not have reasonably concluded that Biering violated an "anti-harassment policy" or, as JPM falsely disclosed to the public, engaged in "inappropriate behavior." JPM's wording was intentionally incendiary.

---

[1]       Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

4. Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even *fired*?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs *falsely* informed Biering's clients that he had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

5. JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after repeated demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure was "Voluntary." Even worse, JPM gave the following explanation in support:

> **Termination Explanation:**
>
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

6. Had JPM correctly marked Biering's U5 as "Voluntary," there would have been no "Termination Explanation" or any other "explanation" as to Biering's departure (as Biering was not under investigation for any regulatory or compliance issues). JPM knew this. JPM perverted Biering's clear resignation – and Biering's decision to honor Garden Leave – into a "Discharge" so JPM would be "required" under U5 rules to smear him with the "Termination Explanation."

7. JPM's clear and intentional weaponization of Biering's U5 was beyond egregious. JPM used Biering actually honoring (unlike many FAs) his Garden Leave against him so that JPM could tarnish his name and ensure that it would keep his clients. Indeed, JPM was well aware that

Biering's pipeline of business opportunities indicated more than $600 million in anticipated AUM for 2024.

8. J.P. Morgan's defamation, including its weaponization of Biering's U5, has caused catastrophic damage to Biering's career. As a direct result of JPM's false disclosures on Biering's U5 and tortious interference with Biering's business, Biering's job offers from two firms were rescinded, and multiple other firms stopped considering him. Likewise, Biering has lost prominent clients that do not want to associate with someone who was purportedly "terminated for inappropriate behavior."

9. As a result of J.P. Morgan's intentional and wrongful conduct, Biering had no choice but to file this Arbitration[2] and seek to hold J.P. Morgan accountable.

## FACTS

10. Biering is a proud Brazilian American, a veteran, and an accomplished FA.

11. After graduating from the prestigious United States Military Academy at West Point, Biering served honorably in the United States Army for five years. As part of his service to our country, Biering completed a tour to Afghanistan in support of Operating Enduring Freedom, after which he was humbly awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Biering consistently received exemplary evaluations throughout his military career (as outlined in his annual Officer Evaluation Reports). Biering was honorably discharged, and the Department of Veteran Affairs has deemed Biering to be a 100% service-connected, disabled Veteran.

**Biering Joins and Excels at J.P. Morgan**

12. Biering joined J.P. Morgan through its military hiring initiatives in May 2016.

---

[2] This "Arbitration" or "Action" refers to the present arbitration that Biering is instituting against J.P. Morgan.

Throughout Biering's eight-year tenure with the Firm, JPM recognized Biering as a top performer and quickly promoted him from Associate to Vice President and, most recently, Executive Director. Biering's strong performance at JPM was consistently outlined in his annual year-end performance reviews and further supported through formal and documented peer review feedback.

13. For the last 8 years, Biering worked at JPM's Fort Worth Private Bank office.[3] Biering managed a sizeable book of business that generated $5.4 million in annual revenue, and Biering oversaw $975 million of assets and credit positions.

14. In addition, Biering was promoted on an accelerated basis and served in various leadership roles, both formally and informally. For example, Biering was partnered with and mentored various Analysts[4] over the years, including a female Analyst who has since been promoted to a prestigious position with J.P. Morgan's New York office. Additionally, Biering's former Executive Administrative Assistant was promoted to the role of Onboarding Associate for the Fort Worth office, and she has since accepted a Senior Client Service Associate role, supporting Biering at his new Firm.

15. Biering's investment in the careers of his female colleagues at JPM extended beyond the Fort Worth Private Bank office. Specifically, after J.P. Morgan implemented a program with offshore partners in India to support Analysts, the Fort Worth office received negative feedback for underutilizing their offshore partners (who both were women). Not until Biering assumed the role of Analyst Manager did the Fort Worth office utilization metrics and offshore

---

[3] J.P. Morgan consists of two separate wealth management arms—J.P. Morgan Advisors, which utilizes a traditional wire house and commission-based FA model, and the J.P. Morgan Private Bank, which utilizes a base salary and annual bonus model. Biering worked in the J.P. Morgan Private Bank arm. However, JPMS held Biering's licenses and mismarked his U5 at the direction of the J.P. Morgan Private Bank, Chase Bank, and/or JPMorgan Chase.

[4] J.P. Morgan's corporate titles, in ascending order, are: Analyst, Associate, Vice President, Executive Director, and Managing Director.

partnership feedback drastically improve. The offshore analyst program leadership praised Biering for his efforts.[5]

**JPM Assigns Kelly Ann Kimball to Support Biering**

16.     In or around February 2023, JPM assigned Kelly Ann Kimball ("Kimball") to support Biering. As he had done in the past with his female (and male) colleagues, Biering took strides to mentor Kimball, and the two worked with each other closely. Together, they managed a sizeable book of business relative to their peers and often required (and requested) additional support from management. In fact, Biering repeatedly expressed concerns to his superiors regarding his and Kimball's increased workload and lack of coverage.

17.     Given that they were both experiencing similar marital struggles, Biering and Kimball developed a friendship in addition to their working relationship. In connection with same, Biering and Kimball communicated frequently during 2023 via text message (many of which were sent via an encrypted messaging app so that Kimball could hide these messages from her husband).

18.     In September 2023, Biering and Kimball attended an overnight charity event together. Prior to the event, Biering and Kimball received *express* approval from her managers and Stewart to attend. After the event, Biering and Kimball continued their friendship and regularly spent time together at and outside of work.

**Despite His Success, Biering Could Not Ignore JPM's Toxic Work Environment**

19.     As set forth above, Biering managed a large book of business, and he was further responsible for bringing in substantial new accounts. In fact, toward the end of his time at J.P. Morgan, Biering forecasted that several new business opportunities were expected to close in 2024

---

[5]     Biering invested in the careers of his male colleagues as well. For example, after being mentored by Biering, Biering's male Analyst secured a role with the prestigious "23 Wall" team in JPM's New York office.

(*i.e.*, "hot" pipeline entries). Most notably, the onboarding of a $3.5 billion dental rollup (hereinafter, "XYZ Dental")[6] was expected to bring in more than $300 million in assets under management. In Q3 of 2023 (*i.e.*, shortly before Biering's resignation from JPM), Biering had already begun onboarding XYZ Dental's top shareholders.

20. In addition, Biering highlighted a separate hot pipeline entry (which was also visible and closely reviewed by management) for more than $400 million of new AUM from the two co-founders of a Fort Worth-based exploration and production oil and gas company (hereinafter, "XYZ Energy Partners").[7] Biering individually sourced these clients, introduced a $150 million lending deal to his investment bank colleagues, and secured the business of both co-founders.[8]

21. Biering's success at J.P. Morgan was not due to the Firm's resources or support. Instead, Biering grew increasingly frustrated with JPM's recently appointed leadership at the Fort Worth office, including the promotions of Kyle Hitchcock ("Hitchcock") to Head of Investments and Advice and John Aughinbaugh ("Aughinbaugh") to Market Manager. Specifically, among numerous other things, Hitchcock openly reprimanded Biering in front of fellow FAs and Aughinbaugh repeatedly criticized Biering's business development efforts (and baselessly disagreed with Biering's management of client relationships). Likewise, Biering's frustrations with

---

[6] To preserve client confidentiality, "XYZ Dental" serves as a pseudonym for the client at issue.

[7] To preserve client confidentiality, "XYZ Energy Partners" serves as a pseudonym for the client at issue.

[8] Oddly enough, as Biering's hot pipeline entry indicated to senior leadership, XYZ Energy Partner's $1.1 billion sale to Vital Energy and Northern O & G (both publicly traded companies), was announced on July 29, 2024. In fact, the morning that Biering expressed his plans to leave J.P. Morgan, Biering received the onboarding information from XYZ Energy Partners' CEO to open personal Private Bank accounts with Biering's team. With Biering's absence, a senior Managing Director Investment Specialist Biering introduced to BM intercepted the email to replace Biering.

Ben Stewart, Jr. ("Stewart") also grew. In his capacity as Single Coverage Team Lead for the Fort Worth office, Stewart served as Biering's immediate manager, and he routinely ignored Biering's requests for support due to Biering's excessive workload.

22. More specifically, with respect to Hitchcock, Biering was chastised in front of his colleagues and faced baseless accusations of overworking Kimball. In truth, Hitchcock was well aware of Kimball's *and Biering's* repeated requests for support from management due to their excessive workloads. In addition, Hitchcock (along with Aughinbaugh) spearheaded the plot to discriminate against Biering and tried to fabricate reasons to purportedly terminate him.

23. With respect to Aughinbaugh, when Biering pursued XYZ Dental (via both its CEO and President) as a large prospective client, Biering requested Aughinbaugh's support and asked for a brief internal meeting to discuss. Aughinbaugh first accused Biering of wasting his time but then later scolded Biering when Aughinbaugh felt that he was unprepared for a meeting with XYZ Dental (*i.e.*, the meeting for which Biering *tried* to prepare Aughinbaugh before being accused of wasting Aughinbaugh's time). Aughinbaugh further denied Biering's request for sponsorship support for a charity event, despite that Aughinbaugh knew that this very event previously resulted in new business from XYZ Dental.[9] XYZ Dental was not the only prospective client about which Biering and Aughinbaugh had disagreements. In approximately August 2023, Aughinbaugh refused to let Biering present a prospective client (*i.e.*, a $100 million endowment opportunity for a quasi-government entity) to JPM's Client Review Forum for onboarding approval, which was the standard onboarding operating procedure.[10]

---

[9] Ironically, after Biering resigned from J.P. Morgan, Fort Worth office leadership—including Aughinbaugh—agreed to sponsor the event.

[10] Notably, this denial occurred swiftly after Aughinbaugh spoke with one of Biering's colleagues—a white female—regarding the prospect.

24. With respect to Stewart—with whom Biering repeatedly conveyed his dissatisfaction with JPM's toxic work environment—Biering received zero support when he reached out for assistance with his massive workload. Even worse, after learning that Biering intended to join a competitor, Stewart turned his back on Biering, joined JPM's witch hunt to fabricate reasons to support an alleged termination of Biering and jumped on the bandwagon to frame Biering. In addition, for months leading up to Biering's resignation, Stewart shared personal items about Biering, which Biering told Stewart *in confidence*, with Hitchcock and Aughinbaugh.

25. Stewart, Hitchcock, and Aughinbaugh all used their knowledge of Biering's personal issues to discriminate against Biering and treat him differently from his colleagues. For example, when Biering requested reasonable accommodations and FMLA leave due to his personal struggles, Human Resources and leadership told Biering that if he chose to take FMLA leave, he would be prohibited from contacting clients. Oddly enough, Aughinbaugh told Biering that he did not think FMLA leave was the "right move" for Biering weeks later. Upon information and belief, many non-disabled, female employees were permitted to contact clients at their discretion while they were on leave. Biering, however, was not offered the same accommodation or opportunity. Given that there were upcoming liquidity events and substantial new business, Biering knew that he could not take FMLA leave under these circumstances.

26. The aforementioned examples are merely a glimpse into the long list of consistent scrutiny and harassment Biering faced from his leadership.

27. Put simply, this new leadership created a hostile, toxic work environment and culture that became unsustainable for Biering. As a result, Biering considered resigning *numerous* times from January 2023 through October 2023 (*i.e.*, when he ultimately did resign). Indeed, in the months preceding his resignation, Biering *repeatedly* told Stewart and several other J.P.

Morgan colleagues that he was unhappy and discouraged with his work environment and that he was considering resigning.

**Biering Explores Other Opportunities**

28.     In the months preceding his resignation, Biering actively explored opportunities with multiple firms. Specifically, Biering interviewed with and received offers from Merrill Lynch and Texas Capital. Upon information and belief, Stewart had actual knowledge that Biering was communicating with Merrill Lynch regarding potential employment.[11]

**Biering Resigns from J.P. Morgan**

29.     On October 24, 2023, Biering informed Stewart and Aughinbaugh that he planned to resign from JPM. Biering further expressed that he felt he nonetheless deserved incentive compensation due to his strong 2023 performance.[12] In response, Aughinbaugh and Stewart unfairly accused Biering of acting in a way that did not align with "team culture" (which was ironic, given Aughinbaugh's and Stewart's recent actions that violate their own "How We Do Business Principles").

30.     On October 25, 2023, Biering informed Stewart that he intended to take paid time off from October 25 through October 27, 2023.

31.     On October 27, 2023 (*i.e.*, the day before Biering's resignation from JPM), Biering informed Merrill Lynch that he accepted its generous terms, subject to Merrill Lynch's review of JPM's marking of Biering's U5.

---

[11]     In fact, Stewart called Biering during what Stewart *knew* was an interview and meeting with Merrill Lynch on October 27, 2023. Biering also submitted PTO requests to Stewart and reported his time off.

[12]     Incentive compensation paid in January 2024 is awarded for performance from the Q3 2022 to Q3 2023—the period during which Biering exuded stellar performance recognized by executive leadership.

32. That *same day*, Stewart called Biering and informed him that he was being placed on an "involuntary administrative leave." When Biering asked Stewart for additional information regarding the purpose of the administrative leave, Stewart refused to provide it. Further, when Biering tried to contact JPM's Human Resources department, he received no response. Given that Stewart called Biering late on a Friday afternoon and no one would respond to him, Biering could only speculate as to the reason he was placed on leave. In Biering's view, the only possible reason was because JPM knew that Biering was planning to leave to join a competitor, and JPM wanted to retain his significant book of business.

33. This unexpected administrative leave—on which Biering was placed with zero context, despite his requests for same—was the final straw. It was clear to Biering that management was retaliating against him for informing them that he planned to resign. Biering therefore had no choice but to do what was in his and his clients' best interests and finally resign.

34. On October 28, 2023, Biering voluntarily **resigned** from J.P. Morgan. Specifically, Biering submitted a written resignation via e-mail and JPM's HR system (*i.e.*, "me@JPMC").

35. Biering's resignation could not have been clearer. Indeed, he stated: "I am writing to inform you of my formal resignation." J.P. Morgan recognized that Biering resigned by stating: "Your resignation was processed." In addition, upon information and belief, JPM's internal reporting system reflects that Biering's "Last Day Worked" was October 26, 2023. As such, there can be no question that—at the very latest—Biering resigned from J.P. Morgan on October 28, 2023.[13]

---

[13] It is Biering's position that, at a minimum, JPM—via Aughinbaugh and Stewart—had actual knowledge of Biering's intended resignation on October 24, 2023. Stewart was aware of Biering's intended resignation for months.

**Biering's Garden Leave**

36.     Following his resignation, Biering was required to honor a 60-day notice period (*i.e.*, the Garden Leave), during which Biering was not allowed to solicit clients.

37.     Despite the fact that it was incredibly broad and that most FAs do not honor this "sit out" period, Biering honored the Garden Leave to ensure an amicable departure and smooth transition for his clients.

**JPM's Investigation (*i.e.*, Witch Hunt) of Biering**

38.     On or about November 1, 2023, Biering learned—via his counsel—that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy, and (2) an alleged violation of JPM's expense report policy."[14] This was the first time that Biering learned he was being investigated for anything. Thus, at the time that Biering resigned from JPM, Biering clearly was not under investigation.[15] Instead, Biering learned, after he resigned, JPM tried to find anything that would "stick" to end Biering's career in wealth management.

39.     On November 2, 2023, Biering received an initial e-mail from Jonathan Jacobs ("Jacobs"), an investigator with JPM Employee Relations.

40.     On November 7, 2023, Jacobs interviewed Biering. Specifically, Jacobs asked Biering various questions regarding his relationship with Kimball. However, Jacobs did not

---

[14]     Specifically, as part of its witch hunt, JPM investigated certain expense reports that Biering submitted (which JPM had already approved). Biering answered all JPM's questions truthfully, and he further offered examples of systemic abuse of expense policies by leadership throughout the Private Bank. Unsurprisingly, JPM concluded that Biering did not violate JPM's expense report policy and dropped the issue altogether.

[15]     To the extent JPM claims that Biering was already under investigation when he resigned, he was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave).

---

provide any details regarding the purpose of the investigation or why he was asking about the relationship between Biering and Kimball.

41. Upon information and belief, after JPM was made aware of the fact that Biering and Kimball developed a friendship and spent time together at and outside of work, Kimball—almost certainly to save face and continue hiding her and Biering's close, personal relationship from her husband—fabricated allegations against Biering. Indeed, given that Kimball and Biering exchanged numerous text messages (and "selfies") in which Kimball made it clear that she liked and felt comfortable around Biering, there can be no other plausible explanation.

42. In addition, it is clear that JPM did not conduct *any* investigation into Kimball's actions or place her on administrative leave. To the extent JPM suggests that any of its policies required disclosure of Biering's and Kimball's relationship with each other, then Kimball should have faced the same investigation that Biering had to endure. Likewise, Kimball should have been placed on an involuntary administrative leave and denied access to clients and JPM systems just like Biering. But neither of these things occurred. Instead, JPM apparently accepted all of Kimball's statements as true and refused to share any information with Biering so that he could dispute any baseless accusations against him. Biering offered exculpatory text messages with Kimball and insisted that JPM consider these messages as evidence, but JPM emphatically refused.

43. Despite that he was without crucial details regarding JPM's purported investigation, Biering informed Merrill Lynch of the situation. Though Biering had already signed employment onboarding documents, Merrill Lynch told Biering that it would need to see how JPM marks Biering's U5 before finalizing Biering's offer and employment agreement.

44. Throughout November 2023, Merrill Lynch asked Biering several times if JPM provided any updates regarding JPM's plan to mark Biering's U5. Biering and Merrill Lynch had

nearly finalized Biering's deal structure, and they were anxious to complete the hiring process.

45.     On November 13, 28, and 29, 2023, Biering asked Jacobs for an update on the investigation. Jacobs refused to provide one.

46.     On November 29, 2023, JPM denied Biering's requests for copies of his personnel records and a copy of the Garden Leave policy.

### J.P. Morgan Attempts to Baselessly "Terminate" Biering

47.     On December 1, 2023—*i.e.*, 33 days into Biering's Garden Leave, which directly followed his voluntary <u>resignation</u>—Aughinbaugh and Stewart called Biering and purported to "terminate" him. Specifically, Aughinbaugh and Stewart told Biering that, following the investigation performed by JPM's Employee Relations department, Biering was being terminated for violating the Firm's Code of Conduct and "anti-harassment policy."

48.     As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already <u>resigned</u>***.

49.     Even if Biering could have been terminated (he could not), the reasons for Biering's purported termination were unquestionably fabricated and discriminatory.

50.     First, given the facts and nature of Biering's and Kimball's relationship (as evidenced by the numerous text messages they exchanged), Biering could not have violated JPM's "anti-harassment" policy. Upon information and belief, violations of JPM's "anti-harassment" policy include, for example:

- Engaging in conduct that creates "a hostile or offensive environment, or can reasonably be expected to cause an individual to feel uncomfortable, intimidated, humiliated, or distressed"; and/or

- Engaging in "unwelcome sexual advances, requests for sexual favors and other verbal or nonverbal behavior or physical contact of a sexual nature."

51. As set forth above, to the extent Kimball experienced any "distress," that was because management disregarded both her *and Biering's* requests for support with their workloads. Further, had JPM investigated in good faith, it would have quickly seen that Biering's and Kimball's relationship was entirely consensual. Indeed, had JPM reviewed any of the numerous text messages that Kimball and Biering exchanged, JPM would have learned that Kimball was "proud to be [Biering's] analyst," that Kimball was incredibly comfortable around Biering, and that Kimball welcomed and enjoyed any personal attention she received from Biering. To the extent that JPM concluded otherwise, then Kimball had to have fabricated allegations against Biering (in a likely attempt to save her marriage and after being coerced by JPM leadership), which JPM simply took at face value without even attempting to hear and consider Biering's side of the story.

52. Likewise, to the extent that J.P. Morgan claims that, in light of his relationship with Kimball, Biering violated a policy regarding required disclosure of personal relationships with other employees, that too would be suspect. Upon information and belief, Kimball was not investigated for having a "personal relationship" with a fellow employee, and she certainly was not placed on administrative leave, disciplined, or terminated for her failure to disclose same. In fact, it appears that Kimball was permitted to work remotely during JPM's entire sham investigation. JPM cannot claim—in good faith—that Biering, but not Kimball, violated a policy

that makes no distinction between employees (*i.e.*, via gender or corporate job title) when it comes to disclosing personal relationships.[16]

53.     Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

**JPM's Campaign of Defamation and Weaponization of Biering's U5**

54.     To that end, as if JPM's witch hunt and bogus, one-sided investigation into Biering's relationship with Kimball, as well as JPM's illegitimate attempted termination of Biering, were not enough, JPM instituted a campaign of defamation against Biering during the Garden Leave. And JPM has not stopped.

55.     First, during the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was <u>false</u>. Clearly, given that Biering was on Garden Leave—which was *solely* triggered because Biering resigned—Biering was not and could not have been fired.

56.     JPM, however, would not stop there. In an effort to ensure that it could retain Biering's clients and irreparably harm his business, JPM further intentionally and maliciously

---

[16]     In addition, JPM has routinely given employees a "grace period" to disclose personal relationships. In fact, upon information and belief, prior to promoting him, JPM allowed the Head of Investment and Advice of the Private Bank Dallas market—who is white and, to Biering's knowledge, is not disabled—adequate time to report his inter-office relationship with a junior partner to management. Moreover, this individual was praised and promoted. Biering, who is a Brazilian-American citizen and a disabled veteran, was not afforded the same grace period. Instead, he was purported terminated for engaging in "inappropriate behavior."

mismarked and weaponized Biering's U5.

57.    Shortly after JPM's illegitimate, purported termination of Biering, Biering caught wind that JPM planned to mismark Biering's U5 to indicate that he was discharged, rather than that he resigned voluntarily.

58.    On December 6, 2023, Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was *voluntary*. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

59.    On December 12, 2023, Biering's counsel *again* demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

60.    On December 13, 2023, JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

> "During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

61.    Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he *already resigned*. Biering's counsel further put JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

62. On December 19, 2023, Ms. Tidwell-Neal provided a short response to Biering's counsel's letters. Specifically, she indicated that JPM maintains its position that it terminated Biering *"immediately"* following the results of an investigation and, as such, was not required to mark Biering's U5 as a "voluntary" termination. Even worse, she incorrectly stated that Biering knew he was under investigation the day before he resigned and that his resignation was not "effective" until after the Garden Leave period. Notably, however, JPM did not provide any legal authority supporting its positions.

63. On December 20, 2023, Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, during Stewart's call to Biering late on a Friday afternoon—when Stewart *knew* Biering was taking paid time off and interviewing with a competitor—Stewart refused to explain why Biering was being placed on administrative leave. Biering was <u>*not*</u> told that he was under investigation. Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with *zero* context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

64. Also on December 20, 2023, and only after JPM refused to make the correct U5 marking of "voluntary," to attempt to limit the damage of JPM's false and defamatory "discharged" marking Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

65. Biering's counsel then implored JPM to follow FINRA guidance and the uncontroverted case law presented in Biering's demand letters.

66. On December 22, 2023, JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all of the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary").

67. First, J.P. Morgan marked that Biering was "Discharged":

**Reason for Termination:** Discharged

68. JPM then provided the following explanation for Biering's purported "Discharge."

**Termination Explanation:**

After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

69. To date, J.P. Morgan has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed their tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering).

**Prospective Employers Rescind Their Offers and Interest in Biering**

70. After J.P. Morgan—via Aughinbaugh and Stewart—purported to terminate Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Immediately, Merrill Lynch stopped the onboarding process and rescinded Biering's offer, stating that it could not hire Biering with "Discharged" on his U5 as the reason for his termination. Unfortunately, the deal structure Merrill Lynch had offered Biering (which he then lost due to JPM's wrongful conduct) was incredibly favorable. The structure not only gave credit to Biering for new AUM but also

counted loan positions, whether mortgages or outstanding lines of credit balances, towards the "asset hurdles" baked into the offer. Furthermore, a significant portion of Biering's business required banking and complex lending solutions only provided by larger banks, such as Merrill Lynch. Since joining Raymond James in January 2024, Biering can trace more than $500,000 of lost production in six months because Raymond James Bank did not offer similar banking and lending solutions required by Biering's clients (which were otherwise available at Merrill Lynch).

71. Likewise, before JPM finalized the language it marked on Biering's U5, Texas Capital pulled its interest in hiring Biering. Specifically, Texas Capital cited concerns with the uncertainty surrounding JPM's imminent disclosures on Biering's U5.[17] Texas Capital viewed Biering as high-risk and rescinded its offer to hire Biering.

72. Biering also interviewed with Morgan Stanley, UBS, and RBC. When they learned about JPM's disclosures on Biering's U5, Morgan Stanley referred to Biering as a "walking AdvisorHub news article waiting to happen," and UBS did not even follow up with Biering. While Biering was able to have several interviews with RBC, ultimately RBC became suspicious that Biering did not have more detail regarding the alleged "inappropriate behavior" referenced on his U5. However, Biering could not provide same because *J.P. Morgan* refused to give Biering any information that he requested. Under the circumstances, RBC concluded that hiring Biering was too risky.

**Raymond James Takes a Chance on Biering**

73. Ultimately, Raymond James agreed to take a chance on Biering and hire him. However, Biering's interview process was significantly more intensive than the standard process.

---

[17] Texas Capital also expressed concern regarding various disclosures on Biering's U4. Specifically, J.P. Morgan filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged.

74.     Further, Biering's employment offer was much less favorable than that offered to other FAs and what he was originally offered at Merrill Lynch. Specifically, while most FAs' asset bonuses are paid on the front end prior to a candidates onboarding, Biering is only being paid a salary for two years (which is more than 2x less than his JPM salary) and will only receive asset bonuses following the transition of client assets. In addition, unlike Merrill Lynch's offer, Raymond James did not give credit to Biering for loan positions or compensate Biering for unvested deferred compensation.

**Ongoing Detriment to Biering's Business**

75.     Initially, several of Biering's prominent clients intended to transfer their business to Biering at his new firm. Biering relied on the transfer of these clients to achieve asset goals at Raymond James to even come close to the financial upside offered by Merrill Lynch. However, once the clients learned that Biering was purportedly "Discharged" due to engaging in "inappropriate behavior," the clients chose not to join Biering.

76.     For various clients that agreed to take a risk and join Biering at Raymond James, JPM has still found a way to interfere. Specifically, JPM has rejected lines of credit payoff letters and ACAT forms without legitimate reason. In so doing, JPM has not only frustrated Biering's clients but further caused some clients to pay higher interest on lines of credit, which has made them question Biering's competency and firm's capabilities. Further, upon information and belief, JPM has instructed its derivatives team to delay their responses to Biering regarding upcoming transactions in order to buy time for the incumbent JPM FA to "save the relationship." These actions are wholly improper and are designed to further interfere with Biering's business.

77.     Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor:

## COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

78.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

79.     During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired. [18]

80.     Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

81.     All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's

---

[18]     Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

mandate against "overly broad or misleading narratives" but intentionally was left vague to cause reasonable readers to assume nefarious behavior.[19]

82.     Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10.  By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

83.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

84.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

## COUNT 2: BUSINESS DISPARAGEMENT

85.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

---

[19]     To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 115 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory). Indeed, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*

86.     J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

87.     JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

88.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

89.     Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

### COUNT 3: TORTIOUS INTERFERENCE

90.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

91.     Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

92.     As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

93. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

94. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

95. JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

96. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

97. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

98. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

99. Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

100. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

COUNT 6: WEAPONIZATION OF U5
# COUNT 6: WEAPONIZATION OF U5

101.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

102.    FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

103.    J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just one month ago, a FINRA Panel found[20] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[21]

104.    Further, just a few weeks ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[22] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the

---

[20]    *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

[21]    Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[22]    *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

FIRST AMENDED STATEMENT OF CLAIM                                    PAGE 26

appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defamed the ex-FA by mismarking the U5.[23]

105.    In 2022, another FINRA Panel again found[24] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts.  Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[25] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[26]
>
> [R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

---

[23]     *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, ___ N.Y.S.3d ___, 2024 WL 2061527, at *1 (N.Y. App. Div. May 9, 2023).

[24]     *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[25]     *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

[26]     *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

---

106.    In 2018, another FINRA Panel granted expungement (and an award of $28,867 in attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[27]

107.    It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business.  JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing.  FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5.  Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[28]  UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the defamation and punitive damages.[29]  The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

108.    JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

109.    As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

---

[27]    *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[28]    *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

[29]    *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

110. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 7: NEGLIGENT INVESTIGATION

111. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

112. At all times relevant to this Action, J.P. Morgan owed a duty to Biering to exercise reasonably prudent and ordinary care in the investigation of Biering's and Kimball's relationship (and Kimball's allegations which, presumably, resulted in such investigation). JPM violated this duty by negligently investigating the nature of Biering's and Kimball's relationship and by failing to act as a reasonably prudent person under the same or similar circumstances, including, but not limited to:

   (a)   Negligently investigating Biering's and Kimball's relationship;

   (b)   Failing to conduct a proper and thorough investigation of such relationship; and

   (c)   Terminating Biering on the basis of an inadequate investigation.

113. Had JPM performed proper investigation of Biering's and Kimball's relationship, JPM would have clearly seen that the relationship was entirely consensual. Further, JPM could not have reasonably concluded that Biering violated JPM's "anti-harassment" policy.

114. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 8: BREACH OF CONTRACT

115. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

116. When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

117. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

118. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

119. As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

<u>COUNT 9</u>: SEX DISCRIMINATION
**(Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act)**

120. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

121. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA").

122. Biering is a member of a protected class under Title VII and TCHRA because of his sex.

123. By virtue of the conduct alleged herein, Respondent discriminated against Biering based on Biering's sex, in violation of Title VII and TCHRA. Specifically, JPM discriminated against Biering because of his sex in connection with the terms, conditions, and privileges of

employment and limited Biering in a manner that deprived him or tended to deprive him of employment opportunities and adversely affected his status as an employee.

124. First, J.P. Morgan conducted a one-sided, sham investigation into the relationship between Biering and Kimball. In so doing, JPM failed to investigate in good faith and give Biering an opportunity to share his side of the story. Had JPM acted in a fair and non-discriminatory manner, it would have treated Kimball the same as it treated Biering. Specifically, JPM would have investigated Kimball, placed Kimball on administrative leave, and applied the same policies to Kimball that it applied to Biering. But JPM wholly failed to do so. It is therefore without question that Biering was treated less favorably than similarly situated female employees.

125. As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

126. Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

127. Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[30]

### COUNT 10: DISABILITY DISCRIMINATION
**(Americans with Disabilities Act and the Texas Commission on Human Rights Act)**

128. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

---

[30] With respect to this claim, a Right to Sue letter from the Texas Workforce Commission ("TWC") is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

---

129. Pursuant to Federal and Texas law, Biering pleads a cause of action for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and TCHRA.

130. At all times during his employment, Biering met the ADA's definition of "disability" and was qualified for the position he had. Though Biering's disability was 100% service-connected, as a veteran, he is entitled to protections under the ADA even if his disability was not service-connected. As a veteran, Biering further has the right to reasonable accommodations in the workplace due to his disability.

131. J.P. Morgan discriminated against Biering based on his disability and treated Biering less favorably than similarly situated non-disabled employees. J.P. Morgan further violated the ADA and TCHRA by failing to grant Biering reasonable accommodations for his disability even though they would not have caused a significant difficulty or expense on their operations.

132. As a direct and proximate result of JPM's wrongful conduct and unlawful discrimination described herein, Biering has suffered damages. Biering seeks such damages from JPM.

133. Further, JPM acted with malice and with willful and reckless indifference for Biering's protected rights. Biering is therefore entitled to recover punitive damages and liquidated damages as a result of JPM's unlawful discrimination.

134. Biering has met all procedural prerequisites for bringing this claim. Biering filed an EEOC Charge related to these violations and has or will obtain a Right to Sue letter from the EEOC relating to this claim.[31]

---

[31] With respect to this claim, a Right to Sue letter from the TWC is not required. Biering will submit the Right to Sue letter from the EEOC via the Portal upon receipt.

## COUNT 11: QUANTUM MERUIT AND UNJUST ENRICHMENT

135. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

136. Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ Dental's business to JPM. Yet, Biering received zero compensation for his successful efforts.

137. By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

138. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 12: ILLEGAL FORFEITURE OF EARNED COMPENSATION

139. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

140. JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

141. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 13: FORFEITURE OF DEFERRED COMPENSATION
### (VIOLATION OF ERISA)

142. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

143. J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

144. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

### COUNT 14: VIOLATION OF TEXAS AND/OR NEW YORK LABOR AND WAGE LAWS

145. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

146. Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

147. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

### ALTER EGO AND/OR PIERCING THE CORPORATE VEIL

148. JPMorgan and Chase Bank are jointly and severally liable for all wrongful conduct alleged herein that is or could be attributed to JPMS.

149. JPMS and Chase Bank are both subsidiaries of JPMorgan. In fact, JPMS and Chase Bank are subject to JPMorgan's Code of Conduct, which JPM claims Biering purportedly violated:

> The Code of Conduct ("Code") sets forth the expectation that employees conduct themselves with integrity, at all times. It provides employees with the principles to help govern their conduct with clients, customers, suppliers, vendors, shareholders, fellow employees, regulators, markets, and the communities in which we operate. The Code applies to the employees and directors of JPMorgan Chase & Co. ("firm" or "JPMorganChase") and its direct and indirect subsidiaries.

150. Upon information and belief, in mismarking Claimant's U5, JPMS relied upon information and evidence purportedly obtained during an investigation performed by and/or at the direction of JPMorgan and/or Chase Bank. As such, JPMS will undoubtedly rely upon such

evidence and/or present testimony from representatives or employees of JPMorgan and/or Chase Bank to defend against Claimant's claims in this Arbitration.

151. To prevent the use of corporate fiction as an unfair device to inflict injustice upon Claimant and to achieve equity, the separate corporate identities of JPMS, JPMorgan, and Chase Bank must be disregarded, and Respondents should be treated as one and the same with respect to Claimant's claims in this Arbitration.

## ATTORNEYS' FEES

152. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

153. JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

154. Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

155. As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

156. J.P. Morgan has engaged in a _pattern_ of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

157. Even worse, here JPM received _repeated_ requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM

ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead *knowingly* and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

158. Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

(1) In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

(2) In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

159. The defamatory statements at issue were published in Biering's CRD.

160. Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

161. Claimant requests damages against Respondent to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

(a) Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

(b) Expungement as set forth herein;

(c) Lost or forfeited deferred compensation;

(d) Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(e)     Statutory penalties and damages;

(f)     Liquidated damages;

(g)     Punitive damages;

(h)     Damages to Claimant's reputation;

(i)     Past lost earnings;

(j)     Future lost earnings;

(k)     Consequential damages;

(l)     Mental anguish and emotional distress damages;

(m)     Future lost earning capacity;

(n)     The highest pre- and post-judgment interest permitted by law on all damages;

(o)     FINRA forum and other fees; and

(p)     Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

**REPRESENTATION BY COUNSEL
AND REPRESENTATIVE'S CURRENT ADDRESS**

162.    Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

**VENUE**

163.    Claimant worked for Respondent in Texas and was working in Fort Worth, Texas when all or part of Respondent's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

## AMOUNT IN DISPUTE AND AMOUNT
## REQUESTED FOR DAMAGES, AWARD, AND RELIEF

164. Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

165. The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By: _/s/ Joshua J. Iacuone_
Joshua J. Iacuone
Texas State Bar No. 24036818
Anna Olin Richardson
Texas State Bar No. 24102947
4925 Greenville Ave., Ste. 700
Dallas, Texas 75206
Telephone: (214) 960-2832
Email: josh@imcplaw.com
anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

## CERTIFICATE OF SERVICE

This pleading is being served upon all counsel of record in the DR Portal on the date recorded therein, and all other interested persons as set-forth herein.

/s/ Joshua J. Iacuone
Joshua J. Iacuone



**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Michael C. Nolan | <u>Case Number</u>: 23-00446 |
| vs. | |
| <u>Respondent</u><br>J.P. Morgan Securities, LLC | <u>Hearing Site</u>: Philadelphia, Pennsylvania |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Michael C. Nolan ("Claimant"): Todd Gutfleisch, Esq., Harris St. Laurent & Wechsler LLP, New York, New York.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Kevin B. Leblang, Esq., and Amelia B. Munger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: February 21, 2023.
Amended Statement of Claim filed on or about: March 22, 2023.
Claimant signed the Submission Agreement: February 19, 2023.

Statement of Answer filed by Respondent on or about: May 19, 2023.
Respondent signed the Submission Agreement: May 19, 2023.

## CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: defamation; tortious interference with prospective contractual relations; violation of FINRA Rule 1122; advancement/indemnification; and injunctive relief.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Amended Statement of Claim and asserted various affirmative defenses.

Appx. 145

**RELIEF REQUESTED**

In the Statement of Claim, as amended, Claimant requested expungement of the defamatory language on Claimant's Form U5 and the filing of a substitute Form U5 stating that his employment termination was "voluntary"; and: (1) in box 7F "no" answers to all questions, and (2) in the box 7B DRP, question 5B ("How was the internal review concluded") that there was "no violation of internal policies"; compensatory and punitive damages in the amount of $10,000,000.00; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

In the Statement of Answer, Respondent requested that the Amended Statement of Claim be dismissed in its entirety; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

At the hearing, Claimant requested: $5,174,324.00 in compensatory damages; $1,000,000.00 in additional damages for emotional distress; $555,000.00 in legal fees, including fees/costs incurred during Respondent's internal investigation, through the end of this hearing; and up to 10 times the amount of compensatory damages in punitive damages.

**OTHER ISSUES CONSIDERED AND DECIDED**

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On January 3, 2024, Claimant filed a Motion for Sanctions ("Motion"). On January 10, 2024, Respondent filed a response opposing Claimant's Motion. On January 12, 2024, Claimant filed a reply in further support of the Motion. On January 16, 2024, the Chairperson heard oral arguments on the Motion, as well as a previously filed Claimant's Motion to Compel. By Order dated January 16, 2024, the Chairperson, on behalf of the panel, denied Claimant's Motion for Sanctions in its entirety.

The evidentiary hearings were conducted in-person on February 26-29, 2024, and by videoconference on April 2-3, 2024.

**AWARD**

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $250,000.00 in compensatory damages, which includes the claim for advancement/indemnification.

2. The Panel recommends the expungement of all references to Occurrence Numbers 2244047 and 2244048 from the registration records maintained by the Central Registration Depository ("CRD") for Michael C. Nolan (CRD Number 1082281). Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Michael C. Nolan must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,300.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,850.00 |
| Member Process Fee | =$ 7,050.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| March 1 and 4, 2024, postponement requested by Respondent | =$ 1,575.00 |
| Total Postponement Fees | =$ 1,575.00 |

The Panel has assessed the total postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Four (4) pre-hearing sessions with a single Arbitrator @ $450.00/session | | | =$ 1,800.00 |
| Pre-Hearing Conferences: August 30, 2023 | 1 session | | |
| November 29, 2023 | 1 session | | |
| January 16, 2024 | 1 session | | |
| February 8, 2024 | 1 session | | |
| | | | |
| One (1) pre-hearing session with the Panel @ $1,575.00/session | | | =$ 1,575.00 |

Pre-Hearing Conference:   June 27, 2023                    1 session

Twelve (12) hearing sessions @ $1,575.00/session                              =$ 18,900.00
Hearings:                    February 26, 2024         2 sessions
                             February 27, 2024         2 sessions
                             February 28, 2024         2 sessions
                             February 29, 2024         2 sessions
                             April 2, 2024             2 sessions
                             April 3, 2024             2 sessions

_____

Total Hearing Session Fees                                                   =$ 22,275.00

The Panel has assessed $11,137.50 of the hearing session fees to Claimant.

The Panel has assessed $11,137.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 148

## ARBITRATION PANEL

| | | |
|---|---|---|
| Peter George Erdely | - | Public Arbitrator, Presiding Chairperson |
| Paul J. Leis | - | Public Arbitrator |
| Edward Turner Borer | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

### Concurring Arbitrators' Signatures

*Peter George Erdely*
Peter George Erdely
Public Arbitrator, Presiding Chairperson

**04/08/2024**
Signature Date

*Paul J. Leis*
Paul J. Leis
Public Arbitrator

**04/09/2024**
Signature Date

*Edward Turner Borer*
Edward Turner Borer
Non-Public Arbitrator

**04/08/2024**
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 10, 2024
Date of Service (For FINRA Dispute Resolution Services use only)





S&P 500 Earnings
(https://www.advisorhub.com/wall-street-is-
sending-a-bullish-signal-for-sp-500-
earnings/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

**NEWS**

# Ex-J.P. Morgan Broker Clears Record of 'Defamatory' Allegations, Wins $250K in Damages

- News ⌄

by Karmen Alexander (https://www.advisorhub.com/team/karmen-alexander/)    April 11, 2024

- Deals & Comp(/deals-and-comps/)

- Breakaway Center(/breakaway-center/)

  (/#linkedin)    (/#x)    (/#facebook)    (/#email)

- Asset Management(https://www.advisorhub.com/asset-manager/)

- Events(https://www.advisorhub.events/)

- Rankings ⌄

- More ⌄

Appx. 150

*Michael Nolan, who can now clear his record of defamatory*
*allegations written on his U5 form by J.P. Morgan.*

J.P. Morgan Securities was ordered to pay $250,000 in damages to a New York City broker over claims that the bank defamed him in a regulatory filing when he left the firm in 2022, according to a Financial Industry Regulatory Authority arbitration award finalized on Wednesday.

The arbitrators also ruled that Michael C. Nolan, who managed $1 billion in client assets (https://www.advisorhub.com/rbc-nets-billion-dollar-father-son-team-from-j-p-morgan-in-nyc/) when he moved to RBC Wealth Management-U.S., could clear his record of the defamatory allegations.

J.P. Morgan in a U5 filing had accused Nolan of a swath of potential violations, including sharing material nonpublic information with a customer, failing to properly disclose an outside business activity and using an unapproved channel to communicate with clients. The allegations appeared in an "employment separation after allegations" disclosure on his public BrokerCheck report.

Those claims, which Nolan denied, interfered with his ability to prospect customers at RBC and also violated Finra Rule 1122 prohibiting the filing of misleading information, Nolan argued, according to the award.

**Submit a Tip** 💬 (/submittip/)

The arbitrators ordered his record be revised to identify his departure as "voluntary" and note there was "no violation of internal policies," according to the settlement. The panel did not provide a reason for their decision as is customary unless both parties request an explained award.

A J.P. Morgan spokesperson declined to comment.

The $250,000 is far less than the total damages that Nolan had sought. He requested more than $6.7 million in compensatory damages and legal fees, including $1 million due to emotional distress, and punitive damages equal to 10 times the compensatory damage claim.

"The fact that there was any form of a monetary award in a claim primarily seeking expungement goes to show that the panel thought there was at least some level of wrongdoing on behalf of the company," said Nolan's lawyer, Todd Gutfleisch of Harris St. Laurent & Wechsler in New York.

Nolan did not respond to a request for comment sent through social media. "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage my reputation," he had written in a comment appended to the BrokerCheck disclosure.

At RBC, Nolan runs an eponymous team with his son, Brian M. Nolan, and two client associates, according to their website. He splits time between New York and Bryn Mawr, Pennsylvania, according to his LinkedIn.

The elder Nolan started his career in 1983 with Goldman Sachs, moved in 1984 to Morgan Stanley and seven years later joined J.P. Morgan's Bear Stearns predecessor, according to his BrokerCheck report.

Nolan is required to have the expungement approved by Finra's Credentialing, Registration, Education and Disclosure Department before it is effective. The panel split the $22,275 in hearing session fees evenly between J.P. Morgan and Nolan.

**Tags:**
Arbitration (https://www.advisorhub.com/tag/arbitration/)
Finra (https://www.advisorhub.com/tag/finra/)
JP Morgan (https://www.advisorhub.com/tag/jp-morgan/)
RBC (https://www.advisorhub.com/tag/rbc/)

## Like this article? Let AdvisorHub come to you! SIGN UP

Appx. 151

## COMMENTS (5)

on Apr 11 2024, Herb R (https://www.advisorhub.com/author/) says:

For anyone looking to change firms (and for all the right reasons) brace yourself for the potential of this kind of attack on the way out. The very individuals who are recruiting in advisors with red carpet treatment, will often seek to crush good advisors who are recruited out.
So much for the Golden Rule...

*Reply to Herb R*

on Apr 11 2024, Retiring soon (https://www.advisorhub.com/author/) says:

Your point is particularly salient as it relates to advisor moves between UBS and Morgan Stanley. Both firms withdrew from the Broker Protocol agreement and now regularly try to sue each other out of existence for daring to take the other's advisors. The hypocrisy of such actions is glaring but continues unabated. Why anyone would go to either firm knowing it would amount to indentured servitude is beyond the rest of us.

*Reply to Retiring soon*

on Apr 11 2024, stuart pankin (https://www.advisorhub.com/author/) says:

Because both of those are the highest gross per advisor firms, not chumps looking for a check. Your sister Minnie Mouse was looking for you.

*Reply to stuart pankin*

on Apr 11 2024, Lou Mannheim (https://www.advisorhub.com/author/) says:

Anyone that moves and takes a check was obviously motivated to move by the amount of the check. The firms all do and offer the same thing. Is it really any different for the client from firm to firm? We can remove "chump" from that last comment and just say everyone is moving for the check. If you were not getting a check, would you move? The grass isn't greener. All of these wire houses are going to change your comp every year and tell you who you can't do business with anymore (account minimums).

*Reply to Lou Mannheim*

on Apr 12 2024, Advhub (https://www.advisorhub.com/author/) says:

If you, as you say, are the highest gross per advisor. The highest grossing advisor would realizes they are lowest Net advisor.
At this point in their career, they should realize the Firm needs them, more than them needing the Firm.

*Reply to Advhub*

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name** *

**Email** *

Appx. 152

**Website**

Post Comment

---

### Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

---

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

Appx. 153

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

---

## Creating More Scale and Efficiency in Your Practice



(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ⌄

**Deals & Comp(/deals-comps/)**

**Breakaway Center(/breakaway-center/)**

**AdvisorHub RIA(/resource_type/ria-resource-center/)**

**More** ⌄

**About Us(/about-us/)**

Appx. 155

Appx. 156



EXHIBIT
C

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant
Liet Han

Case Number: 18-02978

vs.

Respondent
J.P. Morgan Securities, LLC

Hearing Site: New York, New York

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

   The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

3. Any and all claims for relief not specifically addressed herein, including any requests for and attorneys' fees, are denied.

## Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making. The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior. Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false. The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit. He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit. Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back. A "pull-back" the undisputed record showed, is a red flag for unlawful structuring. Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth. I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which investigation also found that he engaged in unlawful structuring, and he again used the pronoun "we" when trying to explain the circumstances surrounding the transaction in a letter he sent to prospective employers. In addition, the Claimant falsely stated

Appx. 159

in the Statement of Claim that his prior record was "spotless," while the evidence clearly showed that he previously received a warning and letter of education for other rules violations, with respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was). I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR. It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant. They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact. They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it. There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect. In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so. All of the steps Respondent took were entirely the result of Claimant and his wife's deliberate and unlawful actions on July 3 and July 5, 2017. Nevertheless, the majority has decided to award an unconscionable $2,500,000 to the Claimant

for "compensation." One can only look incredulously at this record and ask "compensation for Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.


## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:
### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,000.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*


### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,025.00 |
| Member Process Fee | =$ 6,175.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| November 18-22, 2019, postponement requested by the parties | =$ 1,400.00 |
| February 8-14, 2022, postponement requested by the parties | Waived |

| | |
|---|---|
| Total Postponement Fees | =$ 1,400.00 |

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | | =$ 450.00 |
| Pre-Hearing Conference: October 7, 2019 | 1 session | | |

| | | | |
|---|---|---|---|
| Four (4) pre-hearing sessions with the Panel @ $1,400.00/session | | | =$ 5,600.00 |
| Pre-Hearing Conferences: January 23, 2019 | 1 session | | |
| May 5, 2020 | 1 session | | |
| March 2, 2021 | 1 session | | |

Appx. 161

|  | October 27, 2022 | 1 session |  |
|---|---|---|---|

| Four (4) hearing sessions @ $1,400.00/session | | | =$ 5,600.00 |
|---|---|---|---|
| Hearings: | June 12, 2023 | 2 sessions | |
| | June 13, 2023 | 1 session | |
| | June 14, 2023 | 1 session | |

| Total Hearing Session Fees | =$ 11,650.00 |
|---|---|

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

<div align="center">

**<u>ARBITRATION PANEL</u>**

</div>

| | | |
|---|---|---|
| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

**<u>Concurring Arbitrators' Signatures</u>**


*Linda J. Baer*                                                        **06/26/2023**
_____                    _____
Linda J. Baer                                                        Signature Date
Public Arbitrator


*Sean F. Monahan*                                                **06/26/2023**
_____                    _____
Sean F. Monahan                                                  Signature Date
Non-Public Arbitrator

**<u>Concurring In-Part, Dissenting In-Part Arbitrator's Signature</u>**
Arbitrator dissented on the award for compensatory damages


*Mitchell Regenbogen*                                          **07/06/2023**
_____                    _____
Mitchell Regenbogen                                            Signature Date
Public Arbitrator, Presiding Chairperson

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


 July 07, 2023
_____
 Date of Service (For FINRA Dispute Resolution Services use only)



**EXHIBIT D**

2024 WL 2061527
Supreme Court, Appellate Division,
First Department, New York.

In the Matter of Liet HAN,

Petitioner–Respondent,

v.

J.P. MORGAN SECURITIES,

LLC, Respondent–Appellant,

Financial Regulatory

Authority, Inc., Respondent.

2249–, 2250
|
Index No. 653456/23
|
Case Nos. 2023-05480, 2023-06156
|
Entered: May 9, 2024

**Attorneys and Law Firms**

Orrick, Herrington & Sutcliffe LLP, New York (Daniel A. Rubens of counsel), for appellant.

Rasco Klock Perez & Nieto, LLC, New York (Blaine Bortnick of counsel), for respondent.

Manzanet–Daniels, J.P., Singh, Kapnick, Gesmer, Rodriguez, JJ.

**Opinion**

**\*1** Judgment, Supreme Court, New York County (Andrea Masley, J.), entered November 29, 2023, in favor of petitioner and against respondent in the amount of $2,590,550, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered October 2, 2023, which granted petitioner's petition to confirm an arbitration award and denied respondent's notice of cross-petition to vacate the award and motion for a stay and for leave to file a supplemental memorandum, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Regardless of any procedural deficiencies in respondent's cross-petition to vacate the arbitration award (CPLR 402), the court had jurisdiction over the proceeding and could either confirm or vacate the award (*see* CPLR 304[a], 7510, 7511).

After petitioner commenced the proceeding, respondent could oppose the award "either by motion ... to vacate or modify the award ... or by objecting to the award in opposition to an application to confirm the award" (*Matter of Pine St. Assoc., L.P. v. Southridge Partners, L.P.,* 107 A.D.3d 95, 100, 965 N.Y.S.2d 15 [1st Dept. 2013]). Although the court found the cross-petition was not procedurally proper, it nonetheless proceeded to review the merits of the petition to confirm the award.

Respondent has not shown that the court improvidently exercised its discretion in declining its request for a stay or adjournment of the proceeding to confirm the arbitration award pending the availability of the arbitration record and denying respondent leave to file a supplemental memorandum (*see* *Pena–Vazquez v. Beharry,* 82 A.D.3d 649, 649, 919 N.Y.S.2d 336 [1st Dept. 2011]; *see also* *Matter of Steven B.,* 6 N.Y.3d 888, 889, 817 N.Y.S.2d 599, 850 N.E.2d 646 [2006]; *Marquez v. 171 Tenants Corp.,* 220 A.D.3d 575, 576, 198 N.Y.S.3d 324 [1st Dept. 2023]). Respondent points out that CPLR 7511 grants a party 90 days to make an application to vacate or modify an arbitration award, and the Federal Arbitration Act (FAA) likewise provides a three-month window to move to vacate (9 USC § 12). However, respondent cites no authority for treating these statutory limitations periods as entitling it to a stay of a court's consideration of a timely petition.

Respondent also fails to demonstrate that the court improvidently exercised its discretion in denying its request for a stay under these circumstances, when the arbitration record was received six days before it filed its brief in opposition to the petition to confirm. Thus, respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration.

On this record, respondent has not shown that the court erred in confirming the award and rejecting its arguments that the arbitration panel showed a "manifest disregard of the law" (*Matter of Nexia Health Tech., Inc. v. Miratech, Inc.,* 176 A.D.3d 589, 590–591, 110 N.Y.S.3d 420 [1st Dept. 2019]). The New York choice-of-law provision in the parties' arbitration agreement did not dictate the substantive defamation law to be applied so unambiguously as to make the arbitration majority's apparent application of New Jersey law to petitioner's claim an "egregious impropriety on the part of the arbitrators" (*id.* at 591, 110 N.Y.S.3d 420). The majority did not provide an explanation for its award, and because petitioner's defamation claim was a "justifiable ground for the

decision," respondent's manifest-disregard arguments as to petitioner's other claims are unpersuasive (*see Tullett Prebon Fin. Servs. v. BGC Fin., L.P.,* 111 A.D.3d 480, 481–482, 975 N.Y.S.2d 18 [1st Dept. 2013], *lv denied* 22 N.Y.3d 864, 2014 WL 1243636 [2014]).

**\*2** We have considered respondent's remaining arguments and find them unavailing.

**All Citations**

--- N.Y.S.3d ----, 2024 WL 2061527, 2024 N.Y. Slip Op. 02594

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



**Award**
**FINRA Dispute Resolution Services**

---

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Dustin B. Luckett | <u>Case Number</u>: 19-03075 |
| vs. | |
| <u>Respondents</u><br>J.P. Morgan Securities, LLC and<br>Todd G. Fannin | <u>Hearing Site</u>: Louisville, Kentucky |

---

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealing. The causes of action related to events occurring after the conclusion of Claimant's employment with JPMS.

Unless specifically admitted in the Statement of Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00. Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction. The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2. JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. The Panel recommends the expungement of the Termination Explanation in Section 3 of Dustin Blake Luckett's (CRD Number 5126374) Form U5 filed by J.P. Morgan Securities

LLC on June 29, 2017 and maintained by CRD. The Reason for Termination shall remain the same and the Termination Explanation shall be replaced with the following language: "Non-investment related. After a dispute about a clerical process, RR became disillusioned with the company's atmosphere requiring separation of his at-will employment." This directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number 1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4. Claimant's claims against Fannin are denied.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## **FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$    2,000.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, JPMS is assessed the following:

| | |
|---|---|
| Member Surcharge | =$    3,025.00 |
| Member Process Fee | =$    6,175.00 |

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | | =$      450.00 |
| Pre-Hearing Conference:   July 27, 2021 | 1 session | |
| | | |
| Four (4) pre-hearing sessions with the Panel @ $1,400.00/session | | =$    5,600.00 |
| Pre-Hearing Conferences: February 4, 2020 | 1 session | |

|  | February 2, 2021 | 1 session |  |  |
|--|--|--|--|--|
|  | February 11, 2021 | 1 session |  |  |
|  | December 9, 2021 | 1 session |  |  |

| Eight (8) hearing sessions @ $1,400.00/session |  |  | =$ | 11,200.00 |
|--|--|--|--|--|
| Hearings: | January 25, 2022 | 2 sessions |  |  |
|  | January 26, 2022 | 2 sessions |  |  |
|  | January 27, 2022 | 2 sessions |  |  |
|  | January 28, 2022 | 2 sessions |  |  |

| Total Hearing Session Fees |  | =$ | 17,250.00 |
|--|--|--|--|

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 169

## ARBITRATION PANEL

| | | |
|---|---|---|
| David F. Barrett | - | Public Arbitrator, Presiding Chairperson |
| Linda W. Hester | - | Public Arbitrator |
| John R. Michael, II | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*David F. Barrett*                                **02/04/2022**

David F. Barrett                                    Signature Date
Public Arbitrator, Presiding Chairperson

*Linda W. Hester*                                **02/04/2022**

Linda W. Hester                                    Signature Date
Public Arbitrator

*John R. Michael, II*                             **02/04/2022**

John R. Michael, II                                 Signature Date
Non-Public Arbitrator

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

February 04, 2022

Date of Service (For FINRA Dispute Resolution Services use only)

NEWS Industry News

# J.P. Morgan loses $1.4 million defamation case to adviser


EXHIBIT
F



The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022   *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According *to the arbitration award* by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called *a Form U5,* that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's *BrokerCheck profile,* he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: *Judge rips Wells, Finra, in decision over arbitration claim*]



Related Topics: *J.P. Morgan Securities*

Learn more about **reprints and licensing** for this article.

## Newsletters

Subscribe for original insights, commentary and analysis of the issues facing the financial advice community, from the InvestmentNews

team.

## Recent Articles by Author



### Merrill data bungle hits Walmart 401(k) plan

'We're hearing more horror stories' about clients becoming targets after a data breach, one attorney says.



### Starwood latest nontraded REIT with concerns

Nontraded REITs are facing hurdles, higher interest rates, headlines about half-empty office buildings, and investors pulling their money from products.



### Miami advisors fight over book of business

'Handshake' deal goes wrong for two south Florida advisors.



### Wisc. broker facing charges over stealing town's money

In twist, the broker has blamed other members of a town board for allegedly allowing the theft.



### Interactive Brokers latest B-D to report data breach

'Sophisticated hackers for last 10 years have constantly improved their ability to breach systems,' compliance consultant says.

Appx. 172



**EXHIBIT**
**G**

2023 WL 6050230
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.

J.P. MORGAN SECURITIES LLC, Plaintiff

v.

Dustin LUCKETT, Defendant

Civil Action No. 3:22-cv-137-RGJ
|
Signed September 14, 2023
|
Filed September 15, 2023

**Attorneys and Law Firms**

Alyson Terrell, Pro Hac Vice, Ulmer & Berne LLP, Columbus, OH, Jeffrey Scott Dunlap, Pro Hac Vice, Ulmer & Berne LLP, Cleveland, OH, Jesse R. Lipcius, Ulmer & Berne LLP, Cincinnati, OH, for Plaintiff.

Hayden A. Holbrook, Michael A. Valenti, Valenti Hanley, PLLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION & ORDER**

Rebecca Grady Jennings, District Judge

**\*1** Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id.*]. Luckett is a citizen of Kentucky. [*Id.*]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in

the "district court wherein the award was made." 9 U.S.C. § 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

**I. BACKGROUND**[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky. [DE 16 at 126]. JPMS and Chase are affiliates. [DE 16 at 126]. JPMS is a member of the Financial Industry Regulatory Authority ("FINRA"). Luckett was employed by Chase, but his securities licenses were held by JPMS. [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].

**\*2** Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. He also asserted that JPMS breached an implied covenant of good faith and fair dealing by not facilitating his right to rollover funds in his 401(k) account. [*Id.* at 73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")].

The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id.*]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.' " [*Id.*]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id.*]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

### II. ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1. Motion to Vacate Arbitration Award Standard

The Federal Arbitration Act ("FAA") expresses a federal policy in favor of enforcing arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result

or believes the arbitrator made a serious legal or factual error." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

**\*3** The FAA sets out only four situations in which an arbitration award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The Sixth Circuit recognizes an additional ground for vacating an award where the arbitrators "manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2. Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

 **\*4** "To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.' " *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros,* 70 F.3d at 421). "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Jaros,* 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis for their award. Generally, arbitrators are not required to explain their decisions. *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it *must* be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside.

*Jaros,* 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained decision has been described as "all but impossible." *Dawahare v. Spencer,* 210 F.3d 666, 669 (6th Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.,* 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable basis on which the arbitrators could have based their award, the reviewing court should decline vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.,* 442 F.3d 471,

483–485 (6th Cir. 2006) (declining to vacate an arbitration panel's unexplained decision because plaintiff identified two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision. Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v. Gorter,* 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties may request an explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros,* 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.,* 244 F. App'x 708, 714 (6th Cir. 2007).

 **\*5** The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.,* 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.,* 590 N.Y.S.2d 460, 461 (N. Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed " 'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.' " *Zdenek Marek v. Old Navy (Apparel) Inc.,* 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic*

*Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id.* at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision ... [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. The Court notes that this element may be less supported in the record than the others. However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36). There is thus a plausible basis from which the Panel could have found this element satisfied.

 **\*6** As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS

acted with either the sole purpose of harming him or by means that were dishonest, unfair, or improper. [DE 16 at 150]. This element may be satisfied by a showing that the defendant's actions amounted to an independent tort. *See Carvel Corp.*, 818 N.E.2d at 1103. In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts. In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature." [DE 1-2 at 10]. Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient ... Rather, the decision must fly in the face of clearly established legal precedent."). JPMS has failed to establish the Panel's decision necessarily "flies in the face" of New York law if it was based on Luckett's tortious interference claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that

one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

### 3. Exceeded Powers

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi, 244 F. App'x at 714* ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

### 4. Motion to Confirm Arbitration Award Standard

**\*7** Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Sixth Circuit has held that "the plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale,* 125 F. App'x at 676. JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

### III. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

3. The Court will enter separate judgment.

### All Citations

Slip Copy, 2023 WL 6050230

### Footnotes

1    The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination. Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award. Many of the contested characterizations are not relevant given the standard of review for arbitration awards. As a result, the Background includes only those facts agreed upon by the parties.

2    The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan, 835 F.3d at 600; see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 672 n.3 (2010) (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp.,* 2023 WL 5002875, at \*6 (W.D. Ky. Aug. 4, 2023) ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a 'manifest disregard of the law.' ") (citation omitted).

3    It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If,

under New York law, the tortious interference claim could plausibly support the Award, then the Court must confirm it. *Jaros*, 70 F.3d at 421.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---



**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                                              Case Number: 18-01879
Rose Mascarenhas

     vs.

Respondent                                           Hearing Site: Chicago, Illinois
J.P. Morgan Securities, LLC

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Rose Mascarenhas ("Claimant"): Marc D. Schifanelli, Esq. and Gordana Schifanelli, Esq., Schifanelli Law, LLP, Annapolis, Maryland.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio and Scott R. Koch, Esq., JPMorgan Chase Bank, NA, Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: May 16, 2018.
Claimant signed the Submission Agreement: May 16, 2018.

Statement of Answer filed on or about: August 6, 2018.
Respondent signed the Submission Agreement: July 30, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following cause of action: defamation. The cause of action relate to Claimant's allegation that the statements made by Respondent in Claimant's Form U4 and U5 caused Claimant to suffer great financial loss and to be unable to find comparable employment in the financial industry.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested $740,000.00 in compensatory and punitive damages, reimbursement of costs and attorneys' fees, and expungement and

modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD").

In the Statement of Answer, Respondent requested that the Panel deny Claimant's claims and request for expungement and damages, assess all costs and forum fees against Claimant, and award any other relief that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Arbitrators have provided an explanation of their decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The Panel recommends expungement of the Termination Explanation in Section 3 of the Form U5 of Rose Mascarenhas (CRD# 5487635) filed by J.P. Morgan Securities, LLC on April 4, 2018, and maintained by the CRD. The Termination Explanation shall be changed to the following: "Terminated by Affiliate Bank – Not securities related. Reg. rep. as an affiliate bank employee opened two checking accounts for a long-time customer who had previously opened over 70 accounts. To accommodate the customer, and consistent with the branch practice prior to the recent arrival of a new manager, Reg. rep. opened the accounts without customer being present for the entire opening process, other than appearing to execute the account documents, which was contrary to policies of the Bank." The Reason for Termination shall remain the same.

   In addition, the Panel recommends the expungement of the "Yes" answer to question 7F(1) of the foregoing Form U5. The "Yes" answer shall be changed to "No" and the accompanying Termination Disclosure Reporting Page shall be deleted in its entirety.

   The above recommendations also apply to all subsequent disclosures concerning this event.

   The Panel recommends expungement based on the defamatory nature of the information. The Form U5 is not automatically amended to include the changes indicated above. Rose Mascarenhas must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

2. Respondent is liable for and shall pay to Claimant the sum of $28,867.00 in attorneys' fees pursuant to the parties' submission agreements, in which they agreed to "submit the present matter in controversy, as set forth in the attached statement of claim [and] answer." Claimant requested an award of attorneys' fees in her Statement of Claim. Respondent's submission agreement therefore created a de facto arbitration agreement that included the authority for the arbitrators to award attorneys' fees if Claimant should prevail. The Panel further notes that Respondent did not oppose Claimant's request for attorneys' fees, other than to object to certain time entries, which the Panel has overruled.

3. Respondent is liable for and shall pay to Claimant the sum of $974.72 in costs.

4. Respondent shall reimburse Claimant for the non-refundable portion of Claimant's filing fee in the amount of $425.00.

5. Respondent is liable for and shall pay to Claimant the sum of $1.00 in compensatory damages.

6. Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

## ARBITRATORS' FINDINGS

<u>Relevant Facts</u>

Claimant was a long-time employee of Respondent and the principal banker for a family business which was a very large and active customer of the bank, having opened over 70 accounts over the years. The policies and procedures of the bank provide a 14-part computer process for opening business accounts, the first step of which is to verify at the beginning of the process that the customer is present in the bank in person. If the "in person" button is not pressed, the account opening process cannot proceed.

It is undisputed that under Claimant's prior bank manager (and perhaps more than one prior bank manager), it was generally allowed that for large, well-known customers such as these, the banker (including Claimant) was allowed to perform most of the process with the customer not present, including pressing the "in person" button. This allowed the account opening procedure, which can take as long as 40 minutes for each account, to be completed without the customer having to be present for the entire process, arriving only to sign the account opening documents. Respondent presented testimony that the branch manager who assumed her responsibilities on January 8, 2018 insisted that the account opening procedure no longer occur without the customer present for the entire process of opening the account.

The customers here contacted Claimant and requested that she prepare two new checking accounts on February 3, 2018 for two separate out-of-state branches of their business, and asked that they be required to appear only for so long as necessary to sign documents. Claimant agreed to do that, as she had on prior occasions, and prepared the

materials for their signature. It appeared undisputed that prior to the arrival of the customers, she performed each of the electronic tasks called for in the process with respect to the first account she opened that day, including pressing the "submit" button for that account. She then set aside the signature documents that had been created by the computer in the course of that process, and began the account opening process for the second account. It was not clear whether the "submit" button was pressed for the second account prior to the customers' arrival. It was further undisputed that the customers appeared that day, sometime after the "submit" button had been pressed for the first account, and signed the account opening documents for both accounts. There was no allegation that there was anything irregular about any aspect of the accounts or the opening procedure, other than the dispute about whether the customer needed to be present for the entire process.

Respondent terminated Claimant on March 16, 2018 as a consequence of her conduct on February 3. Claimant was a licensed banker, holding Series 6 and 63 licenses. As a consequence, the bank submitted a Form U5, which included an answer to Section 3, regarding "Termination Explanation" which Claimant alleged was false and defamatory.

In addition, Claimant alleged that the answer to question 7F(1) was false and defamatory.

NATURE OF THE CLAIM

Claimant contends that the Termination Explanation and the answer to question 7F(1) in the U5 were false and defamatory in that the first implied that the account was opened without customer approval and the second falsely asserts that Claimant was alleged to have violated an investment-related regulation when the offending conduct involved only opening a checking account. Beyond citing the language itself, Claimant presented documentary evidence from a prospective subsequent employer which showed that those bank officials had read the U5 as reporting that Claimant had been terminated for opening an account without customer authorization.

AWARD

a. Termination Explanation

The Panel finds that the explanation contained in the U5 Form is defamatory in that it incompletely and inaccurately describes the reason for termination.

Respondent argued that that the statement was accurate because Respondent considered the account to be "open" at the moment the "submit" button was pressed and it was pressed for the first account before the customer appeared. That is an unfairly literal reading of that language. It omits facts sufficient to give the reader an understanding of what actually occurred, and how it constituted inappropriate conduct. The statement is therefore incomplete and inaccurate and defamatory in allowing the impression that the account was opened without customer approval.

It is notable in this regard that the representative of the registration department testified that the only information in their possession regarding the basis for the termination was the report from the HR department that "Rose opened an account for a customer without them

being present." The representative and her team were therefore unaware of whether the customer knew about the account, was there for part of the time or was there for none of the time. In the context of the long history of the bank with that customer, the description of what occurred was therefore false and defamatory and the individual who prepared and submitted the U5 did so with an incomplete and therefore inaccurate understanding of the basis for the discharge.

(The expungement recommendation is stated above in the Award section.)

    b. Answer to Question 7F(1)

The answer to question 7F(1) should be "no" because the opening of a checking account was not "investment-related." Respondent relies upon FINRA Regulatory Notice 10-39 as requiring that any allegation related to the products of a Bank are drawn within the definition of "investment-related" by the third bullet point of the second page of RN 10-39 where it states as follows:

> A firm should err on the side of interpreting the term "investment-related" in an expansive manner in line with the scope of the term when reporting information on Form U5. The scope of the term pertains to securities, commodities, banking, insurance or real estate (including, but not limited to, acting as or being associated with a broker-dealer, issuer, investment company, investment advisor, futures sponsor, bank or saving association." Accordingly, a firm may be required to provide an affirmative answer to a question even if the matter is not securities related.

The panel concludes that this language is intended to convey to the reporting entity that it should not focus on the nature of the institution at which the alleged misconduct occurs, but rather on the nature of the financial event being addressed. It was undisputed here that a checking account is not an investment. Respondent's witness testified that a checking account was not an investment. The fact that it was opened as part of "banking" cannot logically make it "investment-related."

Respondent was also unable to identify any particular statute, regulation, rule or industry standards of conduct that was violated. Respondent's position appeared to be that Claimant's conduct violated its Code of Conduct, which barred employees from falsifying company records which Respondent argued occurred when Claimant pressed the "in person" button when the customer was in fact not present in person. The panel was persuaded that, because the prior branch manager(s) had accommodated this very large and demanding customer to allow them not to be present for the entire account opening, that the customers were present to complete the process and none of the information submitted to create the accounts was inaccurate, there was no falsified record but rather a technical violation that had theretofore been allowed by management. Critically, the internal investigation performed by Respondent determined that there had been no violation of the Code of Conduct precisely because of the context in which the events occurred.

## **FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### **Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

|  |  |
|---|---|
| Initial Claim Filing Fee | =$ 1,725.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### **Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

|  |  |
|---|---|
| Member Surcharge | =$ 2,475.00 |
| Member Process Fee | =$ 5,075.00 |

### **Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers
with one (1) arbitrator @ $200.00/decision =$ 200.00

Respondent submitted one discovery-related motion.

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees to Respondent.

### **Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with the Panel @ $1,300.00/session =$ 1,300.00
Pre-hearing conference: August 24, 2018      1 session

Four (4) hearing sessions @ $1,300.00/session =$ 5,200.00
Hearing Dates:     April 2, 2019     2 sessions
               April 3, 2019     2 sessions

| | |
|---|---|
| Total Hearing Session Fees | =$ 6,500.00 |

The Panel has assessed $6,500.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____     5-10-19
James J. Stamos                                Signature Date
Public Arbitrator, Presiding Chairperson


_____     _____
Victoria Wolf                                  Signature Date
Public Arbitrator


_____     _____
Nancy L. Hendrickson                           Signature Date
Non-Public Arbitrator


May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

_____
Victoria Wolf
Public Arbitrator

5/10/19
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Victoria Wolf
Public Arbitrator

_____
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

May 10, 2019
_____
Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

Appx. 187



EXHIBIT
I

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                        Case Number: 18-02179
Mark Munizzi

     vs.

Respondent                  Hearing Site: Chicago, Illinois
UBS Financial Services Inc.

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch Thompson LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, that Respondent's inaccurate Form U5 filing will interfere with Claimant's ability to obtain commensurate future employment.

Unless specifically admitted in the Statement of Answer and Statement of Answer to Amended Statement of Claim, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the Form U5 filed by Respondent, an award of compensatory damages and punitive damages in an amount to be determined at hearing, and all other appropriate relief. In the Amended Statement of Claim, Claimant requested the same relief as the Statement of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for severance pay; $3,149.00 for interest on the severance pay, with interest accruing at $187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the amount of $23,419.13; punitive damages of ten times the compensatory damages; and that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim ("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-hearing conference on March 13, 2019, in a written order dated March 14, 2019, the Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant interest on $112,500.00 of the above-stated compensatory damages award, which represents severance pay, at the rate of 5% per annum from the date of this Award through and

including the date on which that portion of the compensatory damages award is paid in full.

3. Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4. Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5. Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6. Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

8. Any and all claims for relief not specifically addressed herein are denied.

Appx. 190

## **FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### **Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### **Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 1,900.00 |
| Member Process Fee | =$ 3,750.00 |

### **Postponement Fees**
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,125.00 |
| Total Postponement Fees | =$ 1,125.00 |

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

### **Last Minute Cancellation Fees**
Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,800.00 |
| Total Last Minute Cancellation Fees | =$ 1,800.00 |

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

### **Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$ 200.00 |
| One (1) decision on a discovery-related motion on the papers with three (3) arbitrators @ $600.00 /decision | =$ 600.00 |

Claimant submitted (2) two discovery-related motions

_____

Total Discovery-Related Motion Fees                                    =$     800.00

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is
any meeting between the parties and the arbitrator(s), including a pre-hearing
conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with
these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session     =$     450.00
Pre-hearing Conference:   March 13, 2019                 1 session

One (1) pre-hearing session with the Panel @ $1,125.00/session            =$   1,125.00
Pre-hearing Conference:   October 16, 2018               1 session

Twenty-six (26) hearing sessions @ $1,125.00/session                      =$ 29,250.00

| Hearing Dates: | | |
|---|---|---|
| | June 11, 2019 | 2 sessions |
| | June 12, 2019 | 2 sessions |
| | June 13, 2019 | 2 sessions |
| | June 14, 2019 | 2 sessions |
| | June 17, 2019 | 2 sessions |
| | June 18, 2019 | 2 sessions |
| | September 24, 2019 | 2 sessions |
| | September 25, 2019 | 2 sessions |
| | September 26, 2019 | 2 sessions |
| | September 27, 2019 | 2 sessions |
| | November 19, 2019 | 2 sessions |
| | November 20, 2019 | 2 sessions |
| | November 21, 2019 | 2 sessions |

_____

Total Hearing Session Fees                                             =$ 30,825.00

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon
receipt.

Appx. 192

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. Thompson | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

**_Lisa M. Krimen_**
_____
Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019
_____
Signature Date

**_Donald M. Thompson_**
_____
Donald M. Thompson
Public Arbitrator

12/11/2019
_____
Signature Date

**_Craig D. Cook_**
_____
Craig D. Cook
Non-Public Arbitrator

12/11/2019
_____
Signature Date

December 11, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

Appx. 193




All Quiet on the Stock Market Front
(https://www.advisorhub.com/resources/all-
quiet-on-the-stock-market-front/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

NEWS

# UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award

by **Miriam Rozen**    April 19, 2022

- **News** ⌄

- **Deals & Comp**(/deals-and-comps/)

- **Breakaway Center**(/breakaway-center/)

- (/#linkedin)  (/#email)
  **Asset (https://www.facebook.com/asset-
  Management** **manager/)**

- **Events**(https://www.advisorhub.events/)

- **Rankings** ⌄

- **More** ⌄

Appx. 194



Submit a Tip 💬(/submittip/)

*JHVEPhoto - stock.adobe.com*

A drawn-out legal dispute that has spanned four years and multiple appeals has concluded with a $14.1 million wire transfer from UBS Wealth Management USA to a former compliance officer in Chicago.

UBS Financial Services paid the total on April 12 to Mark Munizzi, its former regional compliance manager in Chicago, whom it had fired in 2018. Munizzi sued later that year for defamation and won $11.1 million in an arbitration award the following year.

UBS waged lengthy court battles (https://www.advisorhub.com/ubss-appeal-to-vacate-11-mln-finra-award-faces-uphill-battle-lawyers/) that were seen as a message to others who may consider taking on the firm in court, but ultimately failed to vacate the award. On March 31, the Supreme Court of Illinois denied UBS its final appeal without offering an explanation.

Because of the lengthy appeals process, UBS added about $3 million to the amount it ultimately paid Munizzi as interest continued to accrue, as well as attorney fees UBS was required to cover under the terms of the award, according to Munizzi's lawyer Stephen Gomberg of Lynch Thompson in Chicago.

A spokesperson for UBS declined to comment. The firm would have had to petition the U.S. Supreme Court for a hearing to continue with any appeal.

Appx. 195

In his arbitration complaint filed in June 2018, Munizzi alleged UBS defamed him on his U5 termination filing, which accused him of failing to supervise employees executing uncovered options strategy in accounts and of giving "varied responses" during the firm's review of his activities.

Munizzi, who had been earning roughly $200,000 a year, according to his lawyer, asserted that he was not properly informed by the firm's central supervision office of margin calls against brokers in UBS's Madison, Wisconsin branch. He had been one of several fired in the wake of a junior broker's naked options trades that were said to have cost $3.7 million in losses in employee-related accounts.

In the December 2019 award, which was the largest employee arbitration penalty that year, the Financial Industry Regulatory Authority arbitration panel had ordered UBS Financial Services to pay Munizzi $7.5 million in punitive damages, $3.1 million in compensatory damages for severance and almost $497,000 of attorneys' fees—a total of about $11.1 million.

In January 2020, a court upheld the award and entered a judgment for $12,177,360, which included an additional $908,965 of statutory interest and attorneys' fees and costs of $97,604, Gomberg said. The judge in that case also did not provide a written explanation, although courts are often deferential to arbitrators and have narrow grounds to overturn awards.

Munizzi was "very much relieved" with UBS's final payment and he "has enough money to retire," but he had been through an ordeal, Gomberg said. The U5 mark-up left him unemployable, according to the lawyer.

"He hasn't gotten a job, or even gotten an interview," Gomberg said.

The favorable outcome could embolden others to bring cases, according to Gomberg, who said he has seen signs of an "uptick" in employment disputes between brokerages and brokers relating to terminations as well as complaints filed with defamation claims.

Since the news of Munizzi's initial win before the Finra panel first surfaced, firms have also begun issuing more "carefully worded" U5s to avoid defamation claims, he added.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/) Defamation (https://www.advisorhub.com/tag/defamation/)*

# Like this article? Let AdvisorHub come to you! **SIGN UP**

Appx. 196

## COMMENTS (4)

**on Apr 19 2022, Tired of Large Firm CYA-Hot Potato Game (https://www.advisorhub.com/author/) says:**

I'm very happy to hear the Compliance Officer won this battle. Its terrible how expensive it is in legal costs for the fired employee. I know far too many people who have lost their jobs so that senior executives at large firms could make it look like they took action for the regulators. I'm looking at you JPM.

Reply to Tired of Large Firm CYA-Hot Potato Game

**on Apr 19 2022, So tired of CYA Hot Potato Games! (https://www.advisorhub.com/author/) says:**

you are indeed a kindred spirit!

Reply to So tired of CYA Hot Potato Games!

**on Apr 20 2022, Not a Choosen one (https://www.advisorhub.com/author/) says:**

Happy for this guy. UBS is notorious for trashing employees and mid level mangers while they protect the inner circle choosen few. Sadly for every win like this there are many more who never get their justice due to cost and how like the big bank can fight for...

Reply to Not a Choosen one

**on Apr 20 2022, Arl (https://www.advisorhub.com/author/) says:**

Wow, makes me wonder if I have a case. My former broker dealer made mark on my U5 on my record from email and client said he was wrong and then a very large potential client saw
my U5 before it was removed and didn't hire me and recently had FINRA remove.

Reply to Arl

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

Appx. 197

**Name** *

**Email** *

**Website**

Post Comment

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

Appx. 198

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

---

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

# Creating More Scale and Efficiency in Your Practice

Appx. 199

Appx. 200

(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ⌄                                          **AdvisorHub RIA(/resource_type/ria-resource-center/)**

**Deals & Comp(/deals-comps/)**                        **More** ⌄

**Breakaway Center(/breakaway-center/)**               **About Us(/about-us/)**

Careers(/careers/)                                     Contact Us(/contact-us/)

Advertise(/advertise-2nd-level/)

Appx. 201



| **TO:** | Joshua J. Iacuone, Esq. |
|---|---|
| **CC:** | Jeffrey S. Dunlap, Esq. |
| **From:** | Aracelly Y. Hernandez<br>Case Specialist |
| **Subject:** | FINRA Dispute Resolution Services Arbitration Number 24-01208<br>Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC |
| **Date:** | August 13, 2024 |

This office is in receipt of your submission, dated August 12, 2024. However, we note the following deficiencies:

Pursuant to Rule 12309(a)/13309(a), please provide proof your pleading has been served on each party including any newly added parties.

Please note that FINRA does not have jurisdiction over non-member of FINRA. Please provide an arbitration agreement or court order compelling arbitration for the newly added parties. Absent the aforementioned, the non-members participation will be voluntary.

Please also note that the Amended Statement of Claim references the incorrect case number.

Please correct the deficiencies on the DR Portal within 30 days.

**ALL CORRESPONDENCE (INCLUDING CHECKS) <u>MUST</u> BE CLEARLY MARKED WITH THE APPROPRIATE CASE NUMBER.**

If you have any questions, please do not hesitate to contact me at 212-858-4388 or by email at Aracelly.Hernandez@finra.org.

AXB:stm:LC15B
idr: 03/14/2024

RECIPIENTS:
Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700, Dallas, TX 75206
On Behalf Of: Joshua D. Biering

Investor protection. Market integrity.     FINRA Dispute Resolution Services     Brookfield Place     t  212 858 4200
Northeast Regional Office     200 Liberty Street     www.finra.org
New York, NY 10281

Appx. 202

CC:

Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland,
    OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC



**TO:** Joshua J. Iacuone, Esq.

**CC:** Jeffrey S. Dunlap, Esq.

**From:** Aracelly Y. Hernandez
Case Specialist

**Subject:** FINRA Dispute Resolution Services Arbitration Number 24-01208
Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC, JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A

**Date:** September 13, 2024

This letter is to inform you that we have not received a voluntary submission from JPMorgan Chase Bank, N.A, a named Respondent in the above entitled action. JPMorgan Chase Bank, N.A is not compelled by the Code of Arbitration Procedure to arbitrate disputes with you in this forum.

The arbitration panel will only have the power to render an enforceable award against Respondent JPMorgan Chase Bank, N.A if Respondent JPMorgan Chase Bank, N.A agrees to submit voluntarily to FINRA's jurisdiction. In the absence of such a voluntary submission, FINRA has no alternative except to proceed with this action without the participation of JPMorgan Chase Bank, N.A and to advise you to pursue your remedies against this Respondent in another forum which does have jurisdiction over this Respondent.

If you have any questions, please do not hesitate to contact me at 212-858-4388 or by email at Aracelly.Hernandez@finra.org.

AXB:axb:LC17A
idr: 04/03/2020

RECIPIENTS:
Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700, Dallas, TX 75206
On Behalf Of: Joshua D. Biering

CC:
Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland, OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC

Investor protection. Market integrity.

FINRA Dispute Resolution Services
Northeast Regional Office

Brookfield Place
200 Liberty Street
New York, NY 10281

t 212 858 4200
www.finra.org

Appx. 204



**TO:**        Joshua J. Iacuone, Esq.

**CC:**        Jeffrey S. Dunlap, Esq.

**From:**        Aracelly Y. Hernandez
                Case Specialist

**Subject:**    FINRA Dispute Resolution Services Arbitration Number 24-01208
                Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC,  JPMorgan Chase & Co.,
                and JPMorgan Chase Bank, N.A

**Date:**        September 13, 2024

This letter is to inform you that we have not received a voluntary submission from JPMorgan Chase & Co., a named Respondent in the above entitled action. JPMorgan Chase & Co. is not compelled by the Code of Arbitration Procedure to arbitrate disputes with you in this forum.

The arbitration panel will only have the power to render an enforceable award against Respondent JPMorgan Chase & Co. if Respondent JPMorgan Chase & Co. agrees to submit voluntarily to FINRA's jurisdiction. In the absence of such a voluntary submission, FINRA has no alternative except to proceed with this action without the participation of JPMorgan Chase & Co. and to advise you to pursue your remedies against this Respondent in another forum which does have jurisdiction over this Respondent.

If you have any questions, please do not hesitate to contact me at 212-858-4388 or by email at Aracelly.Hernandez@finra.org.

AXB:axb:LC17A
idr: 04/03/2020

RECIPIENTS:
Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700,
      Dallas, TX 75206
On Behalf Of: Joshua D. Biering

CC:
Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland,
      OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC

**Investor protection. Market integrity.**    FINRA Dispute Resolution Services    Brookfield Place    t  212 858 4200
                             Northeast Regional Office    200 Liberty Street    www.finra.org
                                            New York, NY 10281

Appx. 205



**TO:**  Joshua J. Iacuone, Esq.

**CC:**  Jeffrey S. Dunlap, Esq.

**From:**  Aracelly Y. Hernandez
Case Specialist

**Subject:**  FINRA Dispute Resolution Services Arbitration Number 24-01208
Joshua David Sappi Biering vs. J.P. Morgan Securities, LLC

**Date:**  September 6, 2024

In accordance with FINRA rules, a statutory employment discrimination, sexual assault, or sexual harassment claim may be arbitrated only if the parties have agreed to arbitrate it either before or after the dispute arose. A statutory employment discrimination, sexual assault, or sexual harassment claim may also be arbitrated if a court of competent jurisdiction has ordered the parties to arbitrate.

We have received the pre-dispute arbitration agreement attached to Claimant's Statement of Claim filed on June 3, 2024.  Upon review, the agreement specifies that statutory employment discrimination claims are to be arbitrated at AAA.  Absent a post-dispute agreement to arbitrate or a court order compelling arbitration at FINRA, we do not have jurisdiction over these claims.

Please amend your Statement of Claim by deleting all causes of action or requests for relief based on statutory employment discrimination, sexual assault, or sexual harassment by September 20, 2024 or this case will be closed without prejudice.

Please disregard the arbitrator ranking forms that were sent to the parties on July 24, 2024. These ranking forms were sent in error. New ranking forms will be sent at a later date.

If you have any questions, please do not hesitate to contact me at 212-858-4388 or by email at Aracelly.Hernandez@finra.org.


AXB:axb:LC53A
idr: 02/18/2020

RECIPIENTS:
Joshua J. Iacuone, Esq., Iacuone McAllister Potter PLLC, 4925 Greenville Ave, Suite 700, Dallas, TX 75206
On Behalf Of: Joshua D. Biering

**Investor protection. Market integrity.**

FINRA Dispute Resolution Services
Northeast Regional Office

Brookfield Place
200 Liberty Street
New York, NY 10281

t  212 858 4200
www.finra.org

Appx. 206

CC:
Jeffrey S. Dunlap, Esq., UB Greensfelder LLP, 1660 West 2nd Street, Suite 1100, Cleveland, OH 44114-1406
On Behalf Of: J.P. Morgan Securities, LLC

| | | |
|---|---|---|
| In the Matter of | § | |
| Arbitration between | § | |
| | § | |
| **JOSHUA DAVID SAPPI BIERING,** | § | |
| | § | |
| Claimant, | § | |
| | § | |
| - and - | § | **FINRA No. 24-01208** |
| | § | |
| **J.P. MORGAN SECURITIES, LLC,** | § | |
| **JPMORGAN CHASE & CO., and** | § | |
| **JPMORGAN CHASE BANK, N.A.,** | § | |
| | § | |
| **Respondents.** | § | |

## SECOND AMENDED STATEMENT OF CLAIM

Claimant Joshua David Sappi Biering ("Claimant" or "Biering") submits the following Second Amended Statement of Claim ("SOC" or this "Pleading") seeking no less than $10 million[1] against J.P. Morgan Securities LLC ("JPMS"), JPMorgan Chase & Co. ("JPMorgan Chase"), JPMorgan Chase Bank, N.A. ("Chase Bank") (collectively, "J.P. Morgan, "JPM," or Respondents") and, in support thereof, respectfully states as follows:

### EXECUTIVE SUMMARY: WHAT THIS ARBITRATION IS ABOUT

1.      Biering is a proud Brazilian American, honorably discharged U.S. Army Captain, West Point graduate, Bronze Star Medal recipient, and most recently, an accomplished financial advisor (hereinafter, "FA"). Biering has consistently received stellar marks and distinguished recognition throughout his 15-year professional career.

---

[1]     The exact amount Claimant seeks is to be determined through evidence and discovery presented during Arbitration.

2. Biering is also a well-respected registered representative and financial advisor with a long and successful track record of dedication to his clients and leadership within the firm. Biering worked for JPM for eight years. Biering ultimately wanted to retire at JPM but was forced to leave after months of wrongful treatment, lack of support, and discrimination from management.

3. This abrupt and dramatic deterioration in Biering's treatment can be traced to two primary causes:

- **A toxic work environment created by new leadership**, led by John Aughinbaugh ("Aughinbaugh") and Kyle Hitchcock ("Hitchcock"), who consistently ignored Biering's request for support.

- **Biering's well-known dissatisfaction and his repeated pleas for support**, which were ignored by management, ultimately leading to his resignation.

4. JPM's actions reflect a clear pattern of wrongful treatment and deliberate misconduct. From fostering a toxic work environment, retaliating against Biering's resignation, and fabricating claims of misconduct, to continuing a campaign of defamation, JPM's objective was to retain Biering's business while damaging his professional reputation. Despite Biering's years of exemplary service, JPM sought to remove him from the firm in a manner that would discredit him and protect JPM's interests. This Arbitration[2] seeks to hold JPM accountable for its actions and the harm caused to Biering's career and reputation. This, in fact, is what this Arbitration is all about.

5. Biering **resigned** from J.P. Morgan on October 28, 2023. Following his **resignation**, Biering was required to honor a 60-day notice period (hereinafter, the "Garden Leave"). Garden Leave is just that – Biering no longer had any job duties, no longer had access to

---

[2] This "Arbitration" or "Action" refers to FINRA No. 24-01208.

JPM's systems, and could no longer perform any job functions – he was to sit at home. During Garden Leave, Biering certainly could not execute any trades or professional services for clients, which is the very purpose of his FINRA license, and for JPM holding his license. Biering honored the Garden Leave.[3] However, on December 1, 2023, or nearly five weeks after Biering already resigned from JPM and could no longer perform any duties (including as a registered advisor) for JPM, JPM informed Biering that he was "*terminated*" for violating JPM's "*anti-harassment policy*." This purported termination not only made zero sense—as Biering was on a Garden Leave that was triggered by his **voluntary resignation**—but it was clearly engineered in direct retaliation to Biering's concerns raised to his management several months before his ultimate **resignation**, with the goal of smearing Biering with other firms and clients.

6.     Moreover, after learning that Biering planned to leave JPM, JPM initiated a witch hunt in hopes of uncovering wrongful conduct that could support JPM's premeditated, illegitimate termination of Biering. Specifically, ***after Biering already resigned***, JPM informed Biering's counsel that it was conducting an investigation into Biering's friendship with a female colleague and into his submitted, yet approved weeks prior, expense reports.

7.     Biering's demise was planned for months before the suspect investigation "concluded." Within days of Biering's resignation, former colleagues texted Biering asking him, "why were you even fired?!" As if JPM's sham investigation/witch hunt during Biering's Garden Leave was not enough, JPM further directed its FAs to contact Biering's clients and smear his name. Specifically, during the Garden Leave, JPM's FAs falsely informed Biering's clients that he

---

[3]     Biering maintains that this Garden Leave (or "sit out" period) was incredibly broad, non-specific, and improper. Biering requested a copy of the terms and conditions of his Garden Leave several times but did not receive a copy of the terms until weeks later. In addition, JPM FAs often ignored it. However, Biering desired to leave J.P. Morgan on good terms and to ensure a smooth transition for his clients, so he nonetheless chose to honor it.

had been fired. It is without question that JPM hoped that its FAs' defamatory statements to clients would allow JPM to steal Biering's clients and substantial assets under management ("AUM").

8.     JPM's defamation of Biering did not stop there. On December 22, 2023, shortly after JPM's attempted improper "termination" of Biering, and after repeated demands from Biering and his counsel to tell the truth, JPM intentionally mismarked Biering's U5 to indicate that he was "Discharged, (*i.e.*, fired), rather than the truth that Biering's departure was "Voluntary" (*i.e.*, resigned). Even worse, JPM gave the following explanation in support:

**Reason for Termination:** Discharged

**Termination Explanation:**
If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

9.     Had JPM correctly marked Biering's U5 as "Voluntary," there would have been no "*Termination Explanation*" or any other "explanation" regarding his departure, as there were no regulatory or compliance issues in question. JPM knew this.  Instead, JPM distorted Biering's clear resignation and his decision to honor Garden Leave into a "Discharge," knowing this would trigger the U5 rules, requiring JPM to provide a "Termination Explanation," which JPM weaponized to defame Biering.

10.    JPM's deliberate and malicious weaponization of Biering's U5 was beyond egregious. By honoring his Garden Leave (unlike many FAs), Biering became vulnerable to JPM's tactics to tarnish his reputation and retain his clients. Indeed, JPM knew that Biering's pipeline of business opportunities indicated more than $600 million in anticipated AUM for 2024. The false U5 disclosure was a strategic move to prevent Biering from transitioning clients and furthering his career elsewhere.

11. JPM's defamatory actions, particularly the weaponization of Biering's U5, have inflicted catastrophic damage on Biering's career. As a direct consequence of these false disclosures and tortious interference with his business, Biering lost job offers from two major firms, and several other firms stopped considering him for employment. Additionally, prominent clients and prospective clients distanced themselves from Biering, unwilling to associate with someone purportedly "terminated for inappropriate behavior," further compounding the financial and reputational damage caused by JPM's deceitful actions.

12. As a result of JPM's intentional and wrongful conduct, Biering had no choice but to file this Arbitration and seek to hold JPM accountable.

## FACTS

### A. Biering's Career Before, During, and After West Point

13. Biering's long-established professional career—spanning over 15 years—consisted of exemplary performance and unblemished evaluations. A sudden shift in his character and behavior simply does not add up. How does such a drastic change occur? For someone who earned a 4.0 GPA in high school, achieved the rank of Eagle Scout, was accepted into the prestigious United States Military Academy at West Point (where only the top candidates are admitted), and served as a decorated officer during five years in the U.S. Army, including active combat, such a shift seems highly improbable.

14. After graduating from West Point, Biering served honorably in the United States Army, completing a tour in Afghanistan in support of Operation Enduring Freedom. He was awarded the Bronze Star Medal for his service as a Route Clearance Platoon Leader. Throughout his military career, Biering consistently received exemplary marks in his annual Officer Evaluation

Reports. Upon his honorable discharge, Biering had achieved the rank of Captain and was later deemed a 100% service-connected, disabled Veteran by the Department of Veterans Affairs.

**B.** **Biering's Professional Success at JPM**

15. Biering joined JPM in May 2016 through its prestigious Military Officer Executive Development Program. Throughout his eight-year tenure, he quickly distinguished himself as a top performer. Biering's consistent, high-level contributions earned him rapid promotions, advancing from Associate to Vice President, and ultimately to Executive Director.[4] Biering's year-end performance reviews and documented peer feedback consistently highlighted his leadership, work ethic, and ability to drive results across the firm.

16. By August 2023, Biering was managing a substantial book of business that generated $5.4 million in annual revenue, representing a 14% year-over-year growth, significantly outpacing the Fort Worth market's growth of 8% and the broader U.S. Private Bank's 6% growth. Biering's performance was continually highlighted in the firm's internal weekly finance reports circulated widely along with his Banker Scorecard, published monthly. In fact, Biering was recognized as a "gold" producer on the national U.S. Private Bank Town Hall on **October 23, 2024**. A brief snapshot of Biering's scorecard and respective metrics are as follows:

| | A | Risk Adj. Rev 33% | B | Flows 33% | C | Total Pts 33% | | Overall |
|---|---|---|---|---|---|---|---|---|
| Metric Results | 455 | 14.4% | | 65.05 | | 31 | | |
| Tier | | Gold | | Silver | | Silver | | Gold |
| Gold Breakpoint | | 8.5% | | 72.1 | | 38 | | |

18. As an Executive Director Biering managed nearly $1 billion in total client asset and credit positions across 51 key relationships. He played a critical role in driving revenue growth for the broader Fort Worth office, personally contributing to 21.34% of the overall revenue generated

---

[4] JPM's corporate titles, in ascending order, are Analyst, Associate, Vice President, Executive Director, and Managing Director.

by his peers, emphasizing the imbalance of support resources. This further underscored his value to the firm and his ability to deliver results, making Biering a vital contributor to JPM's overall success in Fort Worth and the Central Region.

19. In addition to his client-focused work, Biering played a pivotal role as a leader and mentor within JPM. He took an active role in mentoring junior colleagues, including analysts and associates, providing guidance on how to approach and manage relationships with high-net-worth clients, such as public company executives. For instance, Biering led efforts to train and mentor newly hired FAs, equipping them with tailored prospecting strategies to successfully engage larger prospects. His leadership extended beyond his immediate team, as he worked across JPM's global teams to facilitate cross-functional partnerships. Notably, Biering led the integration of an offshore partner, which significantly improved the offshore resource utilization metrics for the Fort Worth office, further demonstrating his leadership capabilities.

20. JPM required FAs to maintain a "pipeline" of anticipated new business opportunities, which was reviewed monthly by management. Biering excelled in this area, consistently building a strong pipeline of prospective deals. In mid to late 2024, he had several "hot" opportunities expected to close, including two major transactions. One involved a $3.5 billion dental rollup (hereinafter, "XYZ Dental")[5] and the other an estimated $1.5 billion Fort Worth-based oil and gas exploration company (hereinafter, "XYZ Energy Partners").[6]

21. Biering successfully negotiated a $10 million private stock secured line of credit for XYZ Dental's CEO, despite internal resistance and political hurdles. Biering's ability to push

---

[5] To preserve confidentiality, "XYZ Dental" serves as a pseudonym for the client at issue. "Dr. XYZ, XYZ President, XYZ Dr., serve as pseudonyms for key stakeholders, clients, and prospects.

[6] To preserve confidentiality, "XYZ Energy Partners" serves as a pseudonym for the clients at issue. "Smith" serves as an alias to preserve confidentiality, in addition to "XYZ Energy CEO" for the second co-founder.

through these obstacles and deliver for his clients demonstrated his dedication to their success. XYZ Dental's President text to Biering is definitive proof of these accolades:

> 1/13/2024 10:08:53 AM
>
> As I've told every person including JPM people. Josh is the only financial person I've ever felt actually goes to bat for his clients.

22.     As a result, Biering not only secured the loyalty of top executives at XYZ Dental but also received high-value referrals from their leadership team.

23.     In addition to XYZ Dental, Biering had also secured a significant opportunity with XYZ Energy Partners, a Fort Worth-based oil and gas company. This "hot" pipeline entry was closely reviewed by JPMorgan's management and involved over $400 million in new AUM from XYZ's two co-founders. Biering was instrumental in positioning XYZ Energy Partners for its eventual sale, introducing a $150 million lending deal to his investment bank colleagues and successfully securing the business of both co-founders. The sale of XYZ Energy Partners to a pair of public companies closed on September 20, 2024, following a public announcement on July 29, 2024.

24.     On the very morning that Biering informed JPM of his intention to resign, the CEO of XYZ Energy emailed Biering onboarding information to open personal Private Bank accounts. Suspiciously, a Senior Managing Director, whom Biering had introduced to the relationship in a supporting role as an investment specialist, intercepted the email, even though it was directly addressed to Biering. This unusual intervention strongly suggests that JPM was already plotting to terminate Biering, with the intent to retain control over his clients, despite Biering not having officially resigned at this point. The timing and nature of this intervention indicate that JPM was working to secure the client relationship before Biering could transition it elsewhere.

25.      Biering's relationship with XYZ Energy Partners' co-founder, "Smith," began before Biering's time at JPM, as both Biering and Smith were West Point graduates from the same tight-knit community. Their shared background, combined with the professional successes Biering delivered for Smith at JPM, led Smith to fully intend to follow Biering to Merrill Lynch. In fact, Smith even attended a veteran charity gala in November 2022 as Biering's guest, along with Biering's soon-to-be Merrill Lynch partner. Leading up to XYZ Energy Partners' liquidity event, Biering sent investment proposals to Smith, reinforcing their strong professional relationship. However, on September 24, 2024, Smith called to inform Biering that he had chosen Goldman Sachs instead. Smith hinted that uncertainty surrounding Biering's sudden departure, questions about his stability, and concerns about Raymond James'[7] ability to handle complex clients—compared to firms like Merrill Lynch or Goldman Sachs—were key factors in his decision. This highlights the significant disruption caused by JPM's actions on Biering's long-standing professional relationships and trajectory.

### C.      **JPM Scrambles to Retain Biering's Business**

26.      JPM's actions were driven by a calculated motive to retain the business that Biering had developed while simultaneously attempting to tarnish his professional reputation to ease the transition.

27.      JPM's sudden change n treatment toward Biering coincided with Biering's increasingly vocal dissatisfaction with management and his plans to resign. This pretextual motive became apparent as JPM scrambled to retain the high-value AUM Biering was cultivating. JPM's actions—ranging from a sudden investigation into fabricated misconduct to defamation via false

---

[7]      Raymond James is Biering's new firm, which he joined after two other offers were pulled as a direct result of JPM's defamatory statements on Biering's U5.

U5 disclosures—reveal a coordinated effort to block Biering from taking clients with him so that JPM could retain control over Biering's business for its own benefit.

**D.    The Shift? A Toxic Work Environment and Unaddressed Pleas for Help**

28.    As leadership changed in the Fort Worth office, the work environment became increasingly toxic, driven by the indifference and hostile management of newly appointed leaders, Aughinbaugh and Hitchcock. Despite multiple requests from Biering for support, these pleas went unaddressed. The work environment deteriorated to the point where it became intolerable for many employees. The alarming turnover of key personnel following Biering's departure—combined with the toxic culture perpetuated by new leadership—further reflects the dysfunction JPM allowed to take over the office.

29.    After Biering's resignation, a drove of FAs left the Fort Worth office, further highlighting the severity of the toxic work environment. Despite being fully aware of these ongoing issues, JPM failed to take meaningful action and instead retaliated against those, like Biering, who voiced legitimate concerns. Upon information and belief, the Fort Worth office ranked dead last in the 2022 U.S. JPM Private Bank Employee Opinion Results Survey.

**E.    Biering's Internal Turmoil: To Stay or Resign? . . . RESIGN**

30.    The escalating dysfunction within the Fort Worth office, combined with the increasingly toxic work environment, put Biering in a precarious position. On the one hand, his success as a FA and his long-standing relationships with high-net-worth clients made it difficult to leave a firm where he had built a reputation as a top performer. On the other hand, the unbearable work conditions under the leadership of Aughinbaugh and Hitchcock, along with the lack of support from management, pushed him toward resignation.

31.    In the months leading up to his **resignation**, Biering made several attempts to address the hostile work environment and sought support from both his immediate managers, Stewart, and Aughinbaugh. Despite his proactive efforts to mitigate the issues, including flagging critical concerns regarding the growing toxicity, no action was taken by management despite conversations and text messages between Biering and Stewart. Instead, Biering was met with indifference and, at times, outright reprimand for "failing to align" with the new leadership's vision for the office.

32.    Biering's internal conflict reached a tipping point in October 2023. On October 19, 2023, after months of frustration and feeling trapped in an increasingly hostile environment, Biering decided to depart JPM. Despite his high hopes for a future with JPM, he had reached a breaking point. It was clear that the firm he had once been proud to work for was no longer a place where he could thrive.

33.    On October 24, 2023, during a meeting with Aughinbaugh and Stewart, Biering inquired about his **resignation** options, expressing his dilemma of feeling trapped between staying and enduring the toxic work environment or leaving, despite having earned incentive compensation due in January 2024.[8] During this conversation, Aughinbaugh reprimanded Biering, accusing him of insubordination and "*failing to align with the Fort Worth office's cultures and values.*" It became evident that management was not interested in addressing the root causes of Biering's dissatisfaction but was instead focused on undermining him.

34.    In the following days, Biering submitted his plans for time away in JPM's HR system (hereinafter, me@JPMC) and also emailed Stewart, marking his intent to take paid time

---

[8]    Biering provided a draft of his 2023 Performance Review Self-Assessment to not forfeit his earned compensation. Biering's request for incentive compensation was also later denied by JPMorgan's Head of Human Resources.

off on October 26 and 27, 2023. During this period, Biering met with Merrill Lynch's complex manager (C. Miller) and the Merrill Lynch FAs Biering planned to join (also former JPM Fort Worth colleagues) to discuss Biering's next steps now that Biering signed onboarding documents. Biering finalized his plans to join Merrill Lynch on October 27, 2023.

35.     Ultimately, on October 28, 2023, after careful consideration, Biering submitted his resignation to formalize his discussion with Aughinbaugh and Stewart. Despite his efforts to make things work and his long-standing commitment to the firm, it was no longer feasible for him to stay. The work environment had become untenable, and management's refusal to provide the support he needed left him with no choice but to leave. Biering's resignation triggered the commencement of the 60-day Garden Leave period, during which time his access to the firm's systems and clients was revoked.

36.     Throughout this period, it became increasingly evident that JPM's leadership viewed Biering's potential departure as a significant threat to the firm's profitability. This perception fueled their pretextual actions in the following months, including the fabricated misconduct investigation and the ultimate defamatory actions surrounding his U5 marking, aimed at discrediting him and impeding his ability to transition his business to a new firm.

**F.     JPM's "Investigations" (*i.e.*, Witch Hunt) of Biering**

37.     On or about November 1, 2023, Biering learned that JPM had (conveniently) begun an investigation into Biering regarding "two separate issues": (1) an alleged violation of JPM's "anti-harassment policy",[9] and (2) an alleged violation of JPM's "expense report policy." This was the first time that Biering learned he was being investigated for anything. Thus, at the time that

---

[9]     At JPMS's urging FINRA has not allowed Biering to assert his statutory employment discrimination claims, which allege disparate treatment for the same behavior. Given JPM's refusal to agree to have Biering's claims on these issues heard before this Panel, JPM should be disallowed from attempting to smear Biering on these same issues.

Biering resigned from JPM, Biering clearly was not under investigation.[10] Instead, Biering learned, **_after he resigned_**, that JPM tried to find anything that would "stick" to end Biering's career in wealth management.

(1)    Fabricated Investigation of Biering Expense Report(s)

38.    On October 20, 2023, Biering's manager, Stewart, allegedly "*noticed suspicious expenses*" incurred by Biering. This investigation was entirely fabricated after the fact.[11] Indeed, Biering's expenses were submitted and immediately approved on October 2, 2023, in the same manner he had followed for the previous seven years and in line with the Fort Worth's standard operating procedures regarding expense reports. This demonstrates a clear attempt by JPM to retroactively manufacture a **_pretext for termination_**, especially after Biering had raised concerns regarding lack of support, a toxic work environment, and his internal turmoil of staying versus resigning.

(2)    Alleged Violation of "Anti-Harassment Policy"

39.    While now irrelevant to the claims in this Arbitration, as demanded by JPM and as a result of JPM's refusal to allow Biering to arbitrate his allegations of disparate treatment in the FINRA forum, suffice it to say, Biering denies any "inappropriate behavior" in connection with

---

[10]    To the extent JPM claims that Biering was already under investigation (and especially for any specific reason) when he resigned, Biering was certainly not informed of it (despite his repeated requests for information regarding the purpose of his administrative leave), and it did not relate to any customer or regulatory issues.

[11]    Despite the fabricated expense policy investigation (aka witch hunt), Biering answered the JPMorgan Investigator, Nadia Muraira ("Muraira"), fully and truthfully. In fact, after Mr. Biering emailed Muraira examples of systemic expense policy violations and abuse from broader leadership, Muraira's phone number was *mysteriously* disconnected, and she was no longer reachable. JPM claims they did not pursue the investigation further due to client considerations, but the **_truth_**, shows JPM got caught red handed with **_pretextual motives_**.

his consensual and reciprocated involvement with a female colleague. In any event, JPM's marking of "Discharged" on Biering's U5 is knowingly false and defamatory.

### G. JPM Attempts to Baselessly "Terminate" Biering

40. On December 1, 2023, Aughinbaugh and Stewart informed Biering that he had been "*terminated*" for violating *JPMorgan's Code of Conduct*. These allegations came as a complete shock to Biering, as he had never been subject to any disciplinary action during his nearly eight years with the firm or even in his ***entire professional career***. Moreover, the allegations were entirely unfounded, as there was no evidence to support the claims of misconduct.

41. As an initial matter, JPM's attempted "termination" of Biering was not only invalid but it makes no logical sense. Had Biering not already "voluntarily" resigned, there would have been no Garden Leave. And, had Biering not honored the Garden Leave (unlike most FAs), then Biering would have already been working elsewhere on the date that JPM claims it terminated him. Put simply, ***JPM could not have terminated Biering because Biering already <u>resigned</u>***.

42. Clearly, JPM's purported "termination" of Biering and the fabricated reasons in support of same were engineered once JPM learned that Biering was resigning. It is without question that JPM used Biering's mandatory Garden Leave against him to conduct a sham investigation and to smear his name, steal his clients and AUM, and, ultimately, weaponize his U5 in an effort to retain Biering's business.

### H. JPM's Campaign of Defamation and Weaponization of Biering's U5

#### (1) Immediate Verbal Defamation: The Rumor Mill Begins

43. Upon Biering's resignation from JPM, JPMorgan's internal communications quickly spread false rumors that Biering had been fired. These rumors rapidly damaged Biering's reputation, with both colleagues and clients adopting the false narrative. On November 2, 2023—

only four days after Biering voluntarily resigned—Biering's former executive assistant texted him, stating, "Why in the hell were you even fired???" This confusion was a direct result of internal messaging by JPM management, deliberately framing Biering's departure as a termination rather than a resignation.

44.     The speed at which false rumors spread—well before any purported investigation concluded—contradicts JPM's claims of a fair and impartial process. Every indicator, from the internal communications to the final U5 marking, points to the fact that the "investigation" was nothing more than a formality to justify a premeditated decision: to remove Biering from the firm and end Biering's career in wealth management[12] – while smearing his reputation in the process

(2)     <u>Client Reactions to Defamatory Messaging</u>

45.     Biering and XYZ Dental's President are close friends. Text messages exchanged between Biering and XYZ Dental's President establish that XYZ Dental's President fully intended to follow Biering to his new firm. However, this changed after JPM's campaign of defamation reached the shores of XYZ Dental's headquarters. In various subsequent conversations between Biering and XYZ Dental's President, it became evident that JPM had been actively defaming Biering to prevent his clients from following him to his new firm. These calculated actions were designed to damage Biering's professional relationships, thereby harming his business and reputation while protecting JPM's financial interests.

46.     JPM cannot seriously dispute that it was not the cause of XYZ Dental's decision not to follow Biering to his new firm. After only eight months into the 2023 fiscal year, Biering onboarded $40 million of Dr. XYZ's business with a clear path to at least $250 million by 2024

---

[12]     Indeed, U5 defamation is a common tactic in the industry, used to hinder FA transitions and retain their production f/b/o the firm's profits and bottom line.

year-end.[13] As evident by the multitude of texts from XYZ Dental, Dr. XYZ appreciated Biering's "hustle" and, as a result, Biering thought Dr. XYZ would be one of the first to join Biering at his new firm. This was not the case. Dr. XYZ, along with other top shareholders Biering had already made clients at JPM, expressed concerns regarding the defamatory statements they heard from JPM and, as a result, declined to join Biering at his new firm.

(3)    JPM's FAs' Defamation

47.    During the Garden Leave, J.P. Morgan directed other FAs to call on Biering's clients and smear his name. Specifically, J.P. Morgan's FAs defamed Biering to his clients by stating that Biering had been *fired*. This statement was false. Clearly, given that Biering was on Garden Leave—which was *solely* triggered because Biering *resigned*—Biering was not and could not have been fired.

(4)    U5 Mismarking and Written Defamation

48.    JPM formalized its campaign of defamation in writing by deliberately mismarking Biering's U5. Despite his voluntary resignation, JPM falsely marked him as "discharged" for "inappropriate behavior," a categorization that has caused significant harm to Biering's professional standing. The marking was not only inaccurate but also maliciously timed to coincide with Biering's departure, creating long-lasting reputational damage within the financial industry. A brief timeline of JPM's written campaign of defamation is as follows:

- **December 6, 2023**: Biering's counsel demanded that JPM correctly mark Biering's U5 to reflect that his departure from JPM was voluntary. In support, Biering's counsel outlined and quoted case law involving analogous facts to those at issue here (*i.e.*, a purported termination following a resignation).

---

[13] Upon completion of discovery, the Dr. XYZ investment proposal along with Biering's pipeline entries support the vast business tied to the XYZ Dental relationship.

- **December 12, 2023** - Biering's counsel *again* demanded that JPM indicate on Biering's U5 that his termination was "voluntary" and provide no narrative in connection with same. In support, Biering's counsel presented even more case law supporting Biering's position.

- **December 13, 2023** - JPM's in-house counsel, Rachel Tidwell-Neal, informed Biering's counsel that JPM intended to mark Biering's U5 to indicate that Biering was "Discharged," with the following explanation:

  *"During Notice Period, RR [registered representative] was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."*

  Almost immediately, Biering's counsel responded that this would be a "rank mismarking" and was therefore clearly intended to harm Biering. Specifically, Biering's counsel reminded JPM that Biering had provided uncontroverted legal authority and guidance establishing that JPM could not have fired Biering because he already *resigned*. Biering's counsel further put JPM on actual notice that, if JPM proceeded to mismark Biering's U5, Biering would sustain significant damages, for which JPM would be responsible. JPM proceeded anyway with the false and defamatory U5 marking.

- **December 19, 2023** – Ms. Tidwell-Neal provided a brief response to Biering's counsel (which, notably, failed to cite any legal authority supporting JPM's positions). She asserted that JPMorgan maintained its stance that Biering was "immediately" terminated following the conclusion of JPM's investigation, justifying its refusal to mark Biering's U5 as a "voluntary" termination. However, her response raised several glaring inconsistencies.

  First, she incorrectly claimed that Biering was aware of the investigation the day before his resignation, when in reality Biering had been contemplating resignation for several months. Additionally, she asserted that Biering was terminated "*immediately*" after the investigation concluded. This contention from JPM is false and misleading, as it ignores the actual timeline of events. On November 28, 2023, JPM *conveniently* sent a "JPM bus" of FA replacements to XYZ Dental's headquarters to inform Dr. XYZ that they "appreciated his business" and, as such, decided to increase a private stock secured line of credit exclusively for Dr. XYZ. Then, on December 1, 2023, *only three days later*, JPM purportedly "terminated" Biering (after he had already ***resigned***). By delaying making the

phone call to purportedly "terminate" Biering, JPM strategically waited to ensure that all necessary client outreach was completed, positioning itself as the "white knight" riding in to double Dr. XYZ's private stock line from $10 million to $20 million – a loan that Biering had fought tooth and nail to secure, expending all his political capital and working relentlessly, with limited leadership support. This maneuver was a blatant attempt by JPM to seize control of the situation, saving face while masking its true intentions to retain the business Biering had cultivated.

- **December 20, 2023** – Biering's counsel outlined and disputed the clearly erroneous statements in Ms. Tidwell-Neal's correspondence. As set forth above, Biering *resigned* from JPM on October 28, 2023. A few short days prior, on October 24, Biering met with Aughinbaugh and Stewart to discuss his resignation options. Then, on October 26 and October 27, Biering took PTO. Despite that Stewart knew that Biering was taking PTO and meeting with a competitor, Stewart called Biering late on a Friday afternoon and informed Biering that he was being placed on administrative leave. However, when pressed, Stewart refused to explain why Biering was being placed on administrative leave, and Biering was *not* told that he was under "investigation." Instead, Biering believed that JPM was retaliating against him for expressing his plans to resign. Given JPM's calculated decision to maliciously inform Biering late on a Friday afternoon of his administrative leave, with zero context or ability to reach out to HR before the weekend, Biering knew that he had no choice but to immediately resign.

- **December 20, 2023** – On the same day, and only after JPM refused to make the correct marking of "voluntary" on Biering's U5, to attempt to limit the damage of JPM's false and defamatory "discharged" marking, Biering's counsel provided a redline to JPM's proposed narrative for Biering's U5 with changes that, at a *minimum*, should be made:

> "After RR voluntarily resigned, but before expiration of ~~During~~ Notice/Garden Leave Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints or regulatory/compliance issues."

Biering's counsel then implored JPM to follow FINRA's guidance and the uncontroverted case law presented in Biering's demand letters.

- **December 22, 2023** – JPM proceeded to not only intentionally mismark Biering's U5 but further did not implement all the redlined changes from Biering's counsel (which were solely intended to ameliorate the damage to Biering's career by refusing the factually correct marking of "voluntary"). First, JPM marked that Biering was "Discharged":

> **Reason for Termination:** Discharged

JPM then provided the following explanation for Biering's purported "Discharge":

> **Reason for Termination:** Discharged
>
> **Termination Explanation:**
> If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:
> After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints.

49. To date, JPM has refused to change and correct the language on Biering's U5 to reflect that his departure from JPM was, in fact, voluntary. JPM slightly changed its tone from violation of "anti-harassment" policies to "inappropriate behavior" (which was strategically timed for prospective employers to pass on Biering). This discrepancy between JPMorgan's actions and their stated justification underscores that the investigation was used as a cover for a termination that was predetermined, long after critical client transitions were completed.

## I. JPM's Loose Interpretation of Disclosure Reporting

50. Further exacerbating the situation, JPM *loosely* interpreted disclosure requirements on Biering's Form U4, marking it with multiple bankruptcies/compromises related to student loan discharges.[14] This loose interpretation of regulatory requirements further demonstrates JPM's

---

[14] JPM filed *five* separate student loan discharges on Biering's U4 as bankruptcies/compromises. JPM has since admitted these disclosures were erroneous. There is also a customer complaint that JPM denied after an investigation of same. Biering is in the process of getting this baseless complaint expunged. JPMorgan, more than one year later, has since admitted these disclosures were erroneous. FINRA does not have a process in place to remove or expunge the bankruptcy or compromises disclosures. At the behest of Claimant's Counsel, FINRA consolidated the five disclosures into a single disclosure as "archived" on Biering's Form U4 (which still unfortunately appears and is accessible by prospective employers).

consistent pattern of harming Biering's professional record through misrepresentation. These false disclosures, combined with the defamatory U5 marking, paint a clear picture of JPM's malicious intent to sabotage Biering's career.

51.     The underlying motive behind Biering's termination was not about upholding ethical standards, but about retaining business and revenue tied to his portfolio. The fabricated investigation and pretextual termination were clear attempts to prevent the transition of clients and protect JPM's bottom line, exposing the company's selective enforcement of policies when it serves *JPM's* financial interests.[15]

### J.     Biering's Job Search and Raymond James' Confidence in Biering

#### (1)     Rescinded Job Offers

52.     After JPM, through Aughinbaugh and Stewart, purportedly terminated Biering on December 1, 2023, Biering contacted Merrill Lynch to provide an update. Merrill Lynch immediately halted the onboarding process and rescinded Biering's offer, citing that they could not hire him with "Discharged" listed on his U5 as the reason for termination, despite that they considered him to be a "first round draft pick." This was a significant loss, as the deal Merrill Lynch offered Biering was highly favorable. For example, Merrill Lynch offered credit for new AUM and loan positions, such as mortgages and outstanding lines of credit, towards the asset hurdles in Biering's compensation structure. In addition, many of Biering's clients required complex banking and lending solutions that only larger institutions like Merrill Lynch could offer. Since joining Raymond James in January 2024, Biering can trace over $500,000 in lost production

---

[15]     Just one recent example (amongst a sea of many) is as follows: a JPM Fort Worth FINRA licensed investment professional was terminated on July 22, 2024, after admitting to forging a client's initials on private equity subscription documents. This is a clear and severe violation of FINRA regulations. Despite the gravity of this offense, Aughinbaugh, a key figure in Biering's termination, fought to retain this individual, even escalating her case to the CEO of JPM's Private Bank, Dave Frame, in an attempt to avoid her termination.

in just six months, primarily due to the limited banking and lending options available at Raymond James (which are otherwise available at Merrill Lynch).

53.     Similarly, before JPM finalized the language on Biering's U5, Texas Capital also withdrew its interest in hiring him. The uncertainty surrounding JPM's imminent U5 disclosures along with the five separate "bankruptcies and discharges" on Biering's U4 made Texas Capital view Biering as a high-risk candidate, leading Texas Capital to rescind its offer.

54.     Biering also interviewed with Morgan Stanley, UBS, and RBC, but their reactions were similar once they learned of JPM's false U5 disclosures. Morgan Stanley referred to Biering as a "walking Advisor Hub news article waiting to happen," and UBS did not even follow up with him. RBC, despite multiple interviews, became suspicious when Biering was unable to provide more details regarding the "inappropriate behavior" referenced on his U5. Since JPM refused to provide Biering with information regarding the allegations, RBC ultimately deemed the risk of hiring Biering too high.

(2)     Raymond James Takes a Chance on Biering

55.     Ultimately, Raymond James agreed to hire Biering, though his interview process was much more intensive than the standard process for most FAs. This heightened scrutiny stemmed from JPM's defamatory markings on Biering's U5, which cast significant doubt on Biering's professional standing and made potential employers wary.

56.     In addition to the increased scrutiny, Biering's employment offer from Raymond James was considerably less favorable than those offered to other FAs or his initial offer from Merrill Lynch. Whereas most FAs receive asset bonuses upfront before onboarding, Biering was only offered a salary for two years—less than half of what he earned at JPMorgan. His asset bonuses would only be paid once client assets transitioned and, unlike Merrill Lynch, Raymond

James did not provide credit for loan positions or compensate him for unvested deferred compensation.

57.     Despite Raymond James' willingness to take a chance on Biering, JPM's false and defamatory U5 markings have made his transition to Raymond James more difficult. After joining Raymond James, Biering received several email inquiries from state regulators questioning the bankruptcy and compromise disclosures on his U4, as well as JPM's "Discharged" U5 marking and termination explanation. These false and suspicious markings, including the reference to "inappropriate behavior," painted Biering in a false light both within his new firm and in the eyes of his new management.

### K.     <u>**Ongoing Detriment to Biering**</u>

58.     Initially, several of Biering's prominent clients intended to transfer their business to him at Raymond James. Biering relied on these client transitions to achieve the asset goals necessary to even approach the financial upside that had been offered by Merrill Lynch. However, once these clients became aware that Biering had been purportedly "Discharged" for "inappropriate behavior," many decided not to follow him, significantly impacting his ability to grow his business at Raymond James.

59.     For the clients who have decided to join Biering at Raymond James, JPM continued to interfere. Specifically, JPM rejected line of credit payoff letters and ACAT transfer forms without legitimate cause, frustrating both Biering and his clients. These delays caused some clients to incur higher interest costs on their lines of credit, further eroding trust in Biering's competency and Raymond James' capabilities. Furthermore, upon information and belief, JPM instructed its derivatives team to delay responses to Biering's inquiries regarding upcoming transactions,

allowing the incumbent JPMorgan FA time to "save the relationship." These actions are improper and clearly designed to sabotage Biering's business.

60.     In response to these ongoing obstacles, JP Morgan Private Bank's Head of HR, Jena Cohen, instructed Biering to communicate directly with Aughinbaugh regarding any client transition issues. As a result, on August 16, 2024, Biering sent a letter to Aughinbaugh documenting JPMorgan's continued attempts to interfere with and discredit his business efforts. This letter has not stopped JPM's interference.

## LEGAL CLAIMS/CAUSES OF ACTION

61.     Based on the activities and actions described herein, Biering asserts the following claims and causes of action, in the alternative, if necessary, for affirmative recovery against J.P. Morgan, and seeks damages therefor.

## COUNT 1: DEFAMATION/DEFAMATION *PER SE* AND VIOLATION OF FINRA RULES

62.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

63.     During Biering's Garden Leave, J.P. Morgan started a campaign of defamation and disparagement against Biering. Specifically, JPM directed its FAs to contact Biering's clients and tell them that Biering was fired.[16]

64.     Moreover, despite repeated requests from Biering and his counsel to tell the truth, J.P. Morgan submitted a U5 that had knowing falsehoods. Specifically, J.P. Morgan intentionally mismarked Biering's U5 to indicate that he was "Discharged," rather than the truth that Biering's

---

[16]     Notably, even JPM's attempted illegitimate termination of Biering had not yet occurred. Clearly, JPM wanted assurances from its remaining FAs that Biering's clients were "secured" even before it "concluded" its sham investigation.

---

departure from JPM was "Voluntary." J.P. Morgan further published a narrative that informed the whole public that Biering was "terminated for inappropriate behavior."

65. All of the foregoing statements are patently false and misleading. Such statements further constitute defamation *per se* because they impart fraudulent and/or dishonest characteristics, conduct, and/or practices on Biering. That language not only violated FINRA's mandate against "overly broad or misleading narratives" but intentionally was left vague to cause reasonable readers to assume nefarious behavior.[17]

66. Further, JPM's defamatory statements, including those regarding the circumstances of Biering's departure from JPM, were designed to prevent clients from transitioning their business to Biering's new firm, in direct violation of FINRA Regulatory Notice 19-10. By filing misleading and false information about Biering, JPM further violated FINRA Rule 1122, which provides that: "No member or person associated with a member shall file with FINRA information with respect to membership or registration which is incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead, or fail to correct such filing after notice thereof."

67. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

---

[17] To that end, even if JPM could convince the Panel that Biering was "discharged," JPM's disclosures on Biering's U5 are nonetheless defamatory. *See Turner v. KTRK Television, Inc.* 38 S.W.3d 103, 115 (Tex. 2000) (noting that the "gist" of a publication as a whole, when construed in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive it, can be false and defamatory). Indeed, "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*

68. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages in an amount to be determined by the Panel.

### COUNT 2: BUSINESS DISPARAGEMENT

69. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

70. J.P Morgan has published disparaging statements concerning, among other things, Biering's integrity and/or business practices. The disparaging statements published by JPM and directed at Biering are false. Such publications are without justification, excuse, or privilege, and they are intended to interfere with the economic interests of Biering.

71. JPM published such falsehoods maliciously, intentionally, and with actual awareness that such statements would cause harm to Biering, or with reckless disregard for the truth or falsity of such statements and the harm that Biering would suffer as a result.

72. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

73. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

### COUNT 3: TORTIOUS INTERFERENCE

74. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

75. Upon Biering's departure from J.P. Morgan, JPM started a campaign of defamation and disparagement against Biering, which tortiously interfered with Biering's previous, current, and prospective business relations with clients. JPM tortiously interfered with such relations with the goal of preventing Biering's clients from transitioning to his new firm.

76. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages to his business and reputation. Biering seeks such damages from JPM.

77. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 4: UNFAIR COMPETITION

78. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

79. JPM's defamatory statements about Biering to his clients and on his U5, which have caused Biering to use clients, constitute unfair competition.

80. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

81. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## COUNT 5: WRONGFUL DISCHARGE

82. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

83. Biering was employed by J.P. Morgan. Biering hoped to retire and end his career at J.P. Morgan. However, Biering was forced to leave after months of wrongful treatment, lack of support, and discrimination from management. For the reasons set forth herein, no reasonable person could have continued to work for JPM in the intolerable, harassing, discriminatory, and hostile environment that JPM created (and even continued after Biering's constructive discharge).

84. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 6: WEAPONIZATION OF U5

85. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

86. FINRA and Panels of Arbitrators have recognized that using the marking of a U5 as a weapon is completely improper. A firm's failure to honestly and accurately mark a U5 is not only wrong but it is actionable by the FA who is affected. Indeed, using the marking of a U5 as a weapon is a serious violation of FINRA Rules and Guidance. For example, in a NASD arbitration, a FA was awarded $625,000 in actual damages, plus $1,250,000 in punitive damages and attorney's fees because his U4 and U5 were improperly marked with defamatory statements. *See Ulrich v. Wharton Whitaker & Eaton Vance Distributors* (NASD).

87. J.P Morgan is well aware of the ramifications and penalties for mismarking a U5. Indeed, just months ago, a FINRA Panel found[18] that JPM defamed an ex-FA by mismarking the

---

[18]     *See* Ex. A, Award from *Michael C. Nolan v. J.P. Morgan Securities, LLC*, Case No. 23-00446 (April 10, 2024).

FA's U5, and the Panel awarded punitive damages against JPM and expunged JPM's false and defamatory U5 marking to "voluntary."[19]

88.     Further, just a few months ago, JPM lost a second appeal in New York claiming (insultingly) that the FINRA Panel[20] committed "manifest disregard of the law" after awarding an ex-FA $2.6 million for U5 defamation and ordering expungement of the FA's U5.  Indeed, the appellate court found that the FINRA Panel was "justif[ied]" in finding that JPM defamed the ex-FA by mismarking the U5.[21]

89.     In 2022, another FINRA Panel again found[22] that JPM defamed an ex-FA by mismarking the FA's U5, and the Panel further awarded $1.4 million in damages to the FA's reputation and expunged JPM's false and defamatory U5 marking to reflect the true facts.  Again, the FA was vindicated in his belief that (*like here*): "[JPM's] assertions on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing clients to remain."[23] Amazingly, JPM appealed this FINRA Panel's carefully considered Award, which a Kentucky federal court denied, noting that JPM knew full-well the benefits to JPM of defaming a departing FA:

> [JPMS] was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude

---

[19]     Eerily similar to JPM's actions here, FA Nolan wrote on BrokerCheck in response to JPM's mismarking: "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage by reputation." *See* Ex. B.

[20]     *See* Ex. C, Award from *Liet Han v. J.P. Morgan Securities, LLC*, Case No. 18-02978 (July 7, 2023).

[21]     *See* Ex. D, *Han v. J.P. Morgan Sec., LLC*, 227 A.D.3d 469, 470 (N.Y. App. Div. 2024).

[22]     *See* Ex. E, Award from *Dustin B. Luckett*, Case No. 19-03075 (February 4, 2022).

[23]     *See* Ex. F, Kelly, Bruce, *J.P. Morgan loses $1.4 million defamation case to adviser*, INVESTMENTNEWS (Feb. 11, 2022), https://www.investmentnews.com/industry-news/news/j-p-morgan-loses-1-4-million-defamation-case-to-adviser-finra-arbitration-217212

---

that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. . . .[24]

[R]ozema testified that Merrill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [Id. at 604-05].

90. In 2018, another FINRA Panel granted expungement (and an award of $28,867 in attorneys' fees) against JPM and for the ex-FA because of JPM's "false and defamatory" marking of the FA's U5.[25]

91. It is JPM's business practice to smear departing FA's so that JPM can unfairly compete for business. JPM knows that a negative marking of a U5 can be highly detrimental to a FA's career, if not career-killing. FINRA Panels are allowed to, and should, punish firms that abuse their power as the sole arbiter in marking a U5. Recently, a FINRA Panel awarded $3,149,656 in compensatory damages, and – more importantly - ***$7,500,000 in punitive damages*** (as well as $496,753 in attorneys' fees and expungement of the false information in the U5) against UBS for "weaponizing" and falsely marking an ex-FA's U5.[26] UBS, like JPM, had no respect for the FINRA Panel's authority, and kept the Award in limbo for years trying fruitlessly to vacate it, before finally in 2022 (after exhausting and losing all appeals) wiring $14.1 million to the ex-FA for the

---

[24]    *See* Ex. G, *J.P. Morgan Sec. LLC v. Luckett,* No. 3:22-CV-137-RGJ, 2023 WL 6050230, at *5 (W.D. Ky. Sept. 15, 2023).

[25]    *See* Ex. H, Award from *Rose Mascarenhas v. J.P. Morgan Sec., LLC*, Case No. 18-01879 (May 10, 2019).

[26]    *See* Ex. I, Award from *Mark Munizzi v. UBS Fin. Servs. Inc.*, Case No. 18-02179 (December 11, 2019).

defamation and punitive damages.[27] The ex-FA lamented that UBS's defamatory U5 made him "unemployable."

92. JPM's false, inaccurate, and misleading marking of Biering's U5 violates FINRA Rules. JPM's actions not only damaged Biering but also misled the public.

93. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

94. Moreover, JPM committed such wrongful acts with malice, willfulness, and/or reckless disregard for Biering's rights. Accordingly, Biering is entitled to exemplary/punitive damages from JPM in an amount to be determined by the Panel.

## <u>COUNT 7:</u> BREACH OF CONTRACT

95. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

96. When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

97. In connection with same, Biering and J.P. Morgan entered into an agreement whereby JPM promised to pay Biering's fees incurred in obtaining the requested expungement.

98. Biering has fully performed under the parties' agreement. JPM, however, has reneged on its promise and refused to pay Biering's fees. JPM has therefore breached the parties' contract.

---

[27] *See* Ex. J, Rosen, Miriam, *UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award*, AdvisorHub (Apr. 19, 2022), https://www.advisorhub.com/ubs-wires-14-1m-to-ex-compliance-officer-capping-off-battle-over-defamation-award/

99.     As a direct and proximate result of JPM's breach of contract, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 8: PROMISSORY ESTOPPEL

100.     Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein. In the alternative to his breach of contract claim (*i.e.*, Count 7 herein), Biering asserts this promissory estoppel claim.

101.     When Biering was still working at J.P. Morgan, a customer filed a baseless complaint against him. Indeed, J.P. Morgan agreed that such complaint was baseless by denying it after an internal review. However, it is still on Biering's U4 and therefore available to the public. As such, Biering has instituted a separate arbitration to expunge this complaint.

102.     In connection with same, J.P. Morgan promised that it would pay Biering's attorney's fees incurred in obtaining an expungement of the customer complaint at issue.

103.     J.P. Morgan knew, or should have known, that Biering would rely on J.P. Morgan's promise to pay Biering's attorney's fees.

104.     Biering instituted a separate arbitration to expunge the customer complaint at issue and incurred attorney's fees as a result of (at least in part) and in reliance on JPM's promise to pay such attorney's fees.

105.     As a direct and proximate result of this reliance, Biering has been injured by JPM's conduct. Injustice can be avoided only by enforcement of the promise made by JPM to pay Biering's attorney's fees incurred in obtaining the requested expungement of the customer complaint at issue. Biering seeks enforcement of such promise made by JPM by an order requiring payment of such attorney's fees.

## COUNT 9: QUANTUM MERUIT AND UNJUST ENRICHMENT

106. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

107. Biering rendered valuable services to JPM, from which JPM benefitted. For example, Biering was instrumental in bringing XYZ Dental's business to JPM. Yet, Biering received zero compensation for his successful efforts.

108. By JPM's actions, JPM has been unjustly enriched to the detriment of Biering.

109. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 10: ILLEGAL FORFEITURE OF EARNED COMPENSATION

110. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

111. JPM unilaterally forfeited Biering's <u>vested</u> right to earned compensation, in violation of Texas and New York law. In so doing, JPM conveniently ignored that it has recently recognized Biering as a "gold" producer relative to his peers.

112. As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

## COUNT 11: FORFEITURE OF DEFERRED COMPENSATION
### (VIOLATION OF ERISA)

113. Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

114. J.P. Morgan appears to have unilaterally forfeited deferred compensation pursuant to a plan that affects Biering's compensation. Such forfeiture violates ERISA laws, as ERISA prohibits forfeiture of an employee's deferred compensation.

115.	As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

<div align="center">

**COUNT 12: VIOLATION OF TEXAS AND/OR NEW YORK
LABOR AND WAGE LAWS**

</div>

116.	Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

117.	Commissions, deferred compensation, and other payments due and owing to Biering cannot be unilaterally altered by JPM to prevent Biering from receiving earned income, and doing so constitutes a violation of Texas and/or New York labor and wage laws.

118.	As a direct and proximate result of JPM's wrongful conduct described herein, Biering has suffered damages. Biering seeks such damages from JPM.

<div align="center">

**ALTER EGO AND/OR PIERCING THE CORPORATE VEIL**

</div>

119.	JPMorgan Chase and Chase Bank are jointly and severally liable for all wrongful conduct alleged herein that is or could be attributed to JPMS.

120.	JPMS and Chase Bank are both subsidiaries of JPMorgan. In fact, JPMS and Chase Bank are subject to JPMorgan's Code of Conduct, which JPM claims Biering purportedly violated:

> The Code of Conduct ("Code") sets forth the expectation that employees conduct themselves with integrity, at all times. It provides employees with the principles to help govern their conduct with clients, customers, suppliers, vendors, shareholders, fellow employees, regulators, markets, and the communities in which we operate. The Code applies to the employees and directors of JPMorgan Chase & Co. ("firm" or "JPMorganChase") and its direct and indirect subsidiaries.

121.	Upon information and belief, in mismarking Biering's U5, JPMS relied upon information and evidence purportedly obtained during an investigation performed by and/or at the direction of JPMorgan Chase and/or Chase Bank. As such, JPMS will undoubtedly rely upon such

evidence and/or present testimony from representatives or employees of JPMorgan Chase and/or Chase Bank to defend against Biering's claims in this Arbitration.

122.    To prevent the use of corporate fiction as an unfair device to inflict injustice upon Biering and to achieve equity, the separate corporate identities of JPMS, JPMorgan Chase, and Chase Bank must be disregarded, and Respondents should be treated as one and the same with respect to Biering's claims in this Arbitration.

## ATTORNEYS' FEES

123.    Claimant realleges and incorporates by reference all of the preceding paragraphs of this Statement of Claim as if fully alleged herein.

124.    JPM's wrongful conduct required Biering to incur attorney's fees to prosecute this Action. Biering therefore seeks recovery of his reasonable and necessary attorney's fees from JPM.

## PUNITIVE DAMAGES

125.    Claimant realleges and incorporates by reference all of the proceeding paragraphs of this Statement of Claim as if fully alleged herein.

126.    As a consequence of the willful and malicious nature of J.P. Morgan's wrongful conduct, Biering is entitled to punitive damages.

127.    J.P. Morgan has engaged in a *pattern* of intentionally mismarking and publishing defamatory statements on FAs' U5s. As set forth above, FINRA Panels have repeatedly hit JPM with sizeable damages awards and ordered expungement of JPM's false U5 markings. Yet JPM has not learned. Instead, it remains JPM's business practice to smear departing FAs so that JPM can unfairly compete for business.

128.    Even worse, here JPM received *repeated* requests from Biering and his counsel to correctly mark Biering's U5. JPM was even given a plethora of legal authority in support. But JPM

ignored all of it. Put simply, JPM had the opportunity to do the right thing but instead *knowingly* and *intentionally* mismarked Biering's U5 in an effort to harm Biering. Punishing this kind of intentional wrongful conduct is the very purpose of punitive damages. Biering therefore requests an award of punitive damages in an amount to be determined by the Panel.

## EXPUNGEMENT

129. Claimant respectfully requests that the Panel enter an order requiring FINRA to expunge all defamatory statements from Claimant's U5 and the registration records maintained by the Central Registration Depository ("CRD") for Claimant, including:

   (1)  In Section 3 of Biering's U5, replace "Discharged" with "Voluntary"; and

   (2)  In Section 3 of Biering's U5, delete the "Termination Explanation" in Section 3 in its entirety and instead leave it blank.

130. The defamatory statements at issue were published in Biering's CRD.

131. Biering specifically requests that a substitute Form U5 be filed that reflects the requested expungement.

## REQUEST FOR RELIEF, DAMAGES, AND AWARD

132. Claimant requests damages against JPM to compensate for the wrongs, claims, and causes of action describe herein and Claimant's actual damages, including:

   (a)  Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;

   (b)  Expungement as set forth herein;

   (c)  Specific performance of JPM's promise to pay Claimant's attorney's fees in connection with expungement of the customer complaint referenced herein (or, alternatively, damages due to JPM's failure to perform such promise);

(d) Lost or forfeited deferred compensation;

(e) Reasonable attorney's fees incurred in the prosecution of Claimant's claims in this Action;

(f) Statutory penalties and damages;

(g) Liquidated damages;

(h) Punitive damages;

(i) Damages to Claimant's reputation;

(j) Past lost earnings;

(k) Future lost earnings;

(l) Consequential damages;

(m) Mental anguish and emotional distress damages;

(n) Future lost earning capacity;

(o) The highest pre- and post-judgment interest permitted by law on all damages;

(p) FINRA forum and other fees; and

(q) Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

## REPRESENTATION BY COUNSEL
## AND REPRESENTATIVE'S CURRENT ADDRESS

133. Claimant is represented in this Action by Joshua J. Iacuone, Anna Olin Richardson, and the law firm of Iacuone McAllister Potter PLLC, 4925 Greenville Ave., Suite 700, Dallas, Texas 75206; (214) 960-2832; josh@imcplaw.com; anna@imcplaw.com

## VENUE

134. Claimant worked for JPM in Texas and was working in Fort Worth, Texas when all or part of JPM's wrongful conduct occurred. Therefore, this matter should be heard in Texas.

## AMOUNT IN DISPUTE AND AMOUNT
## REQUESTED FOR DAMAGES, AWARD, AND RELIEF

135. Claimant's damages are continuing and cannot be determined with precision until near the final arbitration hearing. However, based on the information currently available, Claimant's best estimate of Claimant's damages and the amount in dispute is approximately at least more than $10 million. Claimant will update Claimant's damages by letter the Friday before the final arbitration hearing begins and/or with testimony and damages spreadsheets presented during the final arbitration hearing.

## RESERVATION OF RIGHTS

136. The investigation of J.P. Morgan's improper acts is continuing. Discovery has not yet started in this Action and the extent of JPM's wrongdoings, actions and inactions are not fully known. Accordingly, the right to plead additional causes of action, claims, and relief is hereby fully reserved.

Respectfully submitted,

**IACUONE MCALLISTER POTTER PLLC**

By:   */s/ Joshua J. Iacuone*
      Joshua J. Iacuone
      Texas State Bar No. 24036818
      Anna Olin Richardson
      Texas State Bar No. 24102947
      4925 Greenville Ave., Ste. 700
      Dallas, Texas 75206
      Telephone: (214) 960-2832
      Email:   josh@imcplaw.com
              anna@imcplaw.com

**ATTORNEYS FOR CLAIMANT**

## <u>CERTIFICATE OF SERVICE</u>

This pleading is being served upon all counsel of record in the DR Portal on the date recorded therein, and all other interested persons as set-forth herein.

*/s/ Joshua J. Iacuone*
      Joshua J. Iacuone



**EXHIBIT**

**A**

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Michael C. Nolan | <u>Case Number</u>: 23-00446 |
| vs. | |
| <u>Respondent</u><br>J.P. Morgan Securities, LLC | <u>Hearing Site</u>: Philadelphia, Pennsylvania |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Michael C. Nolan ("Claimant"): Todd Gutfleisch, Esq., Harris St. Laurent & Wechsler LLP, New York, New York.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Kevin B. Leblang, Esq., and Amelia B. Munger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: February 21, 2023.
Amended Statement of Claim filed on or about: March 22, 2023.
Claimant signed the Submission Agreement: February 19, 2023.

Statement of Answer filed by Respondent on or about: May 19, 2023.
Respondent signed the Submission Agreement: May 19, 2023.

## CASE SUMMARY

In the Statement of Claim, as amended, Claimant asserted the following causes of action: defamation; tortious interference with prospective contractual relations; violation of FINRA Rule 1122; advancement/indemnification; and injunctive relief.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the defamatory language on Claimant's Form U5 and the filing of a substitute Form U5 stating that his employment termination was "voluntary"; and: (1) in box 7F "no" answers to all questions, and (2) in the box 7B DRP, question 5B ("How was the internal review concluded") that there was "no violation of internal policies"; compensatory and punitive damages in the amount of $10,000,000.00; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

In the Statement of Answer, Respondent requested that the Amended Statement of Claim be dismissed in its entirety; attorneys' fees, costs and disbursements; and for such other and further relief as deemed just and proper.

At the hearing, Claimant requested: $5,174,324.00 in compensatory damages; $1,000,000.00 in additional damages for emotional distress; $555,000.00 in legal fees, including fees/costs incurred during Respondent's internal investigation, through the end of this hearing; and up to 10 times the amount of compensatory damages in punitive damages.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On January 3, 2024, Claimant filed a Motion for Sanctions ("Motion"). On January 10, 2024, Respondent filed a response opposing Claimant's Motion. On January 12, 2024, Claimant filed a reply in further support of the Motion. On January 16, 2024, the Chairperson heard oral arguments on the Motion, as well as a previously filed Claimant's Motion to Compel. By Order dated January 16, 2024, the Chairperson, on behalf of the panel, denied Claimant's Motion for Sanctions in its entirety.

The evidentiary hearings were conducted in-person on February 26-29, 2024, and by videoconference on April 2-3, 2024.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $250,000.00 in compensatory damages, which includes the claim for advancement/indemnification.

2. The Panel recommends the expungement of all references to Occurrence Numbers 2244047 and 2244048 from the registration records maintained by the Central Registration Depository ("CRD") for Michael C. Nolan (CRD Number 1082281). Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Michael C. Nolan must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,300.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,850.00 |
| Member Process Fee | =$ 7,050.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| March 1 and 4, 2024, postponement requested by Respondent | =$ 1,575.00 |
| Total Postponement Fees | =$ 1,575.00 |

The Panel has assessed the total postponement fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

Four (4) pre-hearing sessions with a single Arbitrator @ $450.00/session =$ 1,800.00
Pre-Hearing Conferences: August 30, 2023     1 session
                       November 29, 2023     1 session
                       January 16, 2024     1 session
                       February 8, 2024     1 session

One (1) pre-hearing session with the Panel @ $1,575.00/session =$ 1,575.00

Appx. 248

Pre-Hearing Conference:   June 27, 2023                          1 session

Twelve (12) hearing sessions @ $1,575.00/session                                =$ 18,900.00
Hearings:                       February 26, 2024          2 sessions
                                February 27, 2024          2 sessions
                                February 28, 2024          2 sessions
                                February 29, 2024          2 sessions
                                April 2, 2024              2 sessions
                                April 3, 2024              2 sessions

_____
Total Hearing Session Fees                                                      =$ 22,275.00

The Panel has assessed $11,137.50 of the hearing session fees to Claimant.

The Panel has assessed $11,137.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 249

## ARBITRATION PANEL

| | | |
|---|---|---|
| Peter George Erdely | - | Public Arbitrator, Presiding Chairperson |
| Paul J. Leis | - | Public Arbitrator |
| Edward Turner Borer | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Peter George Erdely*
_____
Peter George Erdely
Public Arbitrator, Presiding Chairperson

**04/08/2024**
_____
Signature Date

*Paul J. Leis*
_____
Paul J. Leis
Public Arbitrator

**04/09/2024**
_____
Signature Date

*Edward Turner Borer*
_____
Edward Turner Borer
Non-Public Arbitrator

**04/08/2024**
_____
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

April 10, 2024
_____
Date of Service (For FINRA Dispute Resolution Services use only)

Appx. 250



S&P 500 Earnings
(https://www.advisorhub.com/wall-street-is-
sending-a-bullish-signal-for-sp-500-
earnings/)



(https://www.advisorhub.com)

(https://www.advisorhub.com)

**NEWS**

# Ex-J.P. Morgan Broker Clears Record of 'Defamatory' Allegations, Wins $250K in Damages

by Karmen Alexander (https://www.advisorhub.com/team/karmen-alexander/)   April 11, 2024

- **News** ˅

- **Deals & Comp**(/deals-and-comps/)

- **Breakaway Center**(/breakaway-center/)

        (/#linkedin)        (/#x)        (/#facebook)        (/#email)

- **Asset Management**(https://www.advisorhub.com/asset-manager/)

- **Events**(https://www.advisorhub.events/)

- **Rankings** ˅

- **More** ˅

Appx. 251

*Michael Nolan, who can now clear his record of defamatory*
*allegations written on his U5 form by J.P. Morgan.*

J.P. Morgan Securities was ordered to pay $250,000 in damages to a New York City broker over claims that the bank defamed him in a regulatory filing when he left the firm in 2022, according to a Financial Industry Regulatory Authority arbitration award finalized on Wednesday.

The arbitrators also ruled that Michael C. Nolan, who managed $1 billion in client assets (https://www.advisorhub.com/rbc-nets-billion-dollar-father-son-team-from-j-p-morgan-in-nyc/) when he moved to RBC Wealth Management-U.S., could clear his record of the defamatory allegations.

J.P. Morgan in a U5 filing had accused Nolan of a swath of potential violations, including sharing material nonpublic information with a customer, failing to properly disclose an outside business activity and using an unapproved channel to communicate with clients. The allegations appeared in an "employment separation after allegations" disclosure on his public BrokerCheck report.

Those claims, which Nolan denied, interfered with his ability to prospect customers at RBC and also violated Finra Rule 1122 prohibiting the filing of misleading information, Nolan argued, according to the award.

Submit a Tip 💬 (/submittip/)

The arbitrators ordered his record be revised to identify his departure as "voluntary" and note there was "no violation of internal policies," according to the settlement. The panel did not provide a reason for their decision as is customary unless both parties request an explained award.

A J.P. Morgan spokesperson declined to comment.

The $250,000 is far less than the total damages that Nolan had sought. He requested more than $6.7 million in compensatory damages and legal fees, including $1 million due to emotional distress, and punitive damages equal to 10 times the compensatory damage claim.

"The fact that there was any form of a monetary award in a claim primarily seeking expungement goes to show that the panel thought there was at least some level of wrongdoing on behalf of the company," said Nolan's lawyer, Todd Gutfleisch of Harris St. Laurent & Wechsler in New York.

Nolan did not respond to a request for comment sent through social media. "I provided JPMS evidence of the falsity of the allegations long before it made these statements, and JPMS chose to make them solely to damage my reputation," he had written in a comment appended to the BrokerCheck disclosure.

At RBC, Nolan runs an eponymous team with his son, Brian M. Nolan, and two client associates, according to their website. He splits time between New York and Bryn Mawr, Pennsylvania, according to his LinkedIn.

The elder Nolan started his career in 1983 with Goldman Sachs, moved in 1984 to Morgan Stanley and seven years later joined J.P. Morgan's Bear Stearns predecessor, according to his BrokerCheck report.

Nolan is required to have the expungement approved by Finra's Credentialing, Registration, Education and Disclosure Department before it is effective. The panel split the $22,275 in hearing session fees evenly between J.P. Morgan and Nolan.

**Tags:**  Arbitration (https://www.advisorhub.com/tag/arbitration/)   Finra (https://www.advisorhub.com/tag/finra/)   JP Morgan (https://www.advisorhub.com/tag/jp-morgan/)   RBC (https://www.advisorhub.com/tag/rbc/)

## Like this article? Let AdvisorHub come to you! SIGN UP

Appx. 252

## COMMENTS (5)

on Apr 11 2024, Herb R (https://www.advisorhub.com/author/) says:

For anyone looking to change firms (and for all the right reasons) brace yourself for the potential of this kind of attack on the way out. The very individuals who are recruiting in advisors with red carpet treatment, will often seek to crush good advisors who are recruited out.
So much for the Golden Rule...

Reply to Herb R

on Apr 11 2024, Retiring soon (https://www.advisorhub.com/author/) says:

Your point is particularly salient as it relates to advisor moves between UBS and Morgan Stanley. Both firms withdrew from the Broker Protocol agreement and now regularly try to sue each other out of existence for daring to take the other's advisors. The hypocrisy of such actions is glaring but continues unabated. Why anyone would go to either firm knowing it would amount to indentured servitude is beyond the rest of us.

Reply to Retiring soon

on Apr 11 2024, stuart pankin (https://www.advisorhub.com/author/) says:

Because both of those are the highest gross per advisor firms, not chumps looking for a check. Your sister Minnie Mouse was looking for you.

Reply to stuart pankin

on Apr 11 2024, Lou Mannheim (https://www.advisorhub.com/author/) says:

Anyone that moves and takes a check was obviously motivated to move by the amount of the check. The firms all do and offer the same thing. Is it really any different for the client from firm to firm? We can remove "chump" from that last comment and just say everyone is moving for the check. If you were not getting a check, would you move? The grass isn't greener. All of these wire houses are going to change your comp every year and tell you who you can't do business with anymore (account minimums).

Reply to Lou Mannheim

on Apr 12 2024, Advhub (https://www.advisorhub.com/author/) says:

If you, as you say, are the highest gross per advisor. The highest grossing advisor would realizes they are lowest Net advisor.
At this point in their career, they should realize the Firm needs them, more than them needing the Firm.

Reply to Advhub

## LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

**Name** *

**Email** *

**Website**

[ Post Comment ]

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

---

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

---

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

---

Appx. 254

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

---

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

---

## Creating More Scale and Efficiency in Your Practice



Appx. 255

(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ⌄                                              **AdvisorHub RIA(/resource_type/ria-resource-center/)**

**Deals & Comp(/deals-comps/)**                           **More** ⌄

**Breakaway Center(/breakaway-center/)**                  **About Us(/about-us/)**

Appx. 256

Appx. 257

EXHIBIT
C

**Award**
**FINRA Dispute Resolution Services**

---

In the Matter of the Arbitration Between:

Claimant                                           Case Number: 18-02978
Liet Han

    vs.

Respondent                                         Hearing Site: New York, New York
J.P. Morgan Securities, LLC

---

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member

## REPRESENTATION OF PARTIES

For Claimant Liet Han: Blaine H. Bortnick, Esq., and James W. Halter, Esq., Rasco Klock Perez & Nieto, LLC, New York, New York.

For Respondent J.P. Morgan Securities, LLC: Jeffrey S. Dunlap, Esq., and Michael J. Charlillo, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: August 23, 2018.
Liet Han signed the Submission Agreement: August 1, 2018.

Statement of Answer filed by Respondent on or about: November 19, 2018.
J.P. Morgan Securities, LLC signed the Submission Agreement: November 19, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following causes of action: wrongful termination; breach of contract; unjust enrichment and quantum meruit; severance; and defamation.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested compensatory damages in an amount equal to at least $5,000,000.00; interest; attorneys' fees; costs; expungement of his Form U5; and any such other and further relief as the Panel deems just, proper, and appropriate.

In the Statement of Answer, Respondent requested that the Panel dismiss or deny all claims and award Respondent all costs incurred in having to defend this action, as well as any other relief in favor of Respondent and against Claimant that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

An Arbitrator has provided an explanation of the decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. The majority of the Panel finds that Respondent is liable for and shall pay to Claimant the sum of $2,500,000.00 in compensatory damages.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Liet Han's (CRD Number 2691353) Form U5 filed by J.P. Morgan Securities LLC (CRD Number 79) on January 5, 2018 and maintained by the Central Registration Depository ("CRD"). The Reason for Termination shall be changed to "Other" and The Termination Explanation shall be deleted in its entirety and replaced with the following language: "J.P. Morgan Securities LLC or its affiliate exercised its right to terminate the Registered Representative as an At-Will employee." This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of all references to Occurrence Number 1964100 from the registration records maintained by the CRD for Liet Han. Any "Yes" answers should be changed to "No," as applicable.

   The above recommendations are made with the understanding that the registration records are not automatically amended. Liet Han must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

3.  Any and all claims for relief not specifically addressed herein, including any requests for and attorneys' fees, are denied.

## Dissenting Arbitrator's Opinion

The majority ignores the law and the facts, and inappropriately treats the Claimant as a victim, in order to "compensate" the Claimant at the expense of Respondent for a situation that was entirely of the Claimant's making. The Claimant ignored years of training and instructions as a registered representative and a member of the financial services industry, which training included specific and repeated admonitions against the exact behavior he and his wife engaged in on July 3 and July 5, 2017, with the last anti-money laundering training having been taken by Claimant only 24 days prior. Nonetheless, the Claimant and his wife orchestrated an attempt to deposit over $15,000 in cash without complying with the requirement to make a currency transaction report (CTR) for cash transactions over $10,000, an offense that the undisputed record shows is known as unlawful financial "structuring," the first step in the serious crime of money-laundering.

I find the testimony by Claimant and his wife to be incredible, implausible, self-serving and false. The Claimant asserted that all of the trainings in anti-money laundering that included anti-structuring training specifically, Respondent's code of conduct that included anti-structuring, and his own procedure manual that prohibited structuring and his position as an experienced member of the financial industry slipped his mind as he sent his wife to the teller with more than $15,000 in cash to deposit. He testified that his mind kept slipping even when his wife informed him that the teller said that "a form" would be required because of the large cash deposit. Rather than Claimant simply going to the teller and completing the CTR, he and his wife "pulled-back" the cash and deposited an amount under $10,000 in order to avoid the "form," with Claimant depositing on the next business day the exact balance that was pulled back. A "pull-back" the undisputed record showed, is a red flag for unlawful structuring. Yet despite the years of multiple anti-structuring trainings and his deliberate actions on July 3, 2017, to avoid filing the CTR the Claimant testified repeatedly that he was in shock and a fog because he "did not understand" what were the easily foreseeable consequences of his actions.

The Claimant asserts that a written statement in his own handwriting, provided to the Respondent's investigators, admitting that he and his wife structured the transaction "not to look suspicious" and because his wife did not want to be on the CTR, was not his statement because the incriminating portion was "dictated" by the investigator, notwithstanding that the Claimant certified twice on the document that it was the truth. I find that Claimant wrote that statement not, as he contends, because it was "dictated" to him by anyone, but rather because has was faced with evidence that he could not refute and told the truth because he did not yet have enough time to concoct a story with his wife.

During the hearing the Claimant repeatedly tried to shift all responsibility to his wife, which of course his wife was glad to accept considering the millions of dollars in compensation being requested, yet in his handwritten statement he repeatedly uses the pronoun "we" when admitting the unlawful structuring, he again repeatedly used the pronoun "we" in a statement provided to FINRA during a subsequent FINRA investigation wherein he was represented by counsel and which investigation also found that he engaged in unlawful structuring, and he again used the pronoun "we" when trying to explain the circumstances surrounding the transaction in a letter he sent to prospective employers. In addition, the Claimant falsely stated

in the Statement of Claim that his prior record was "spotless," while the evidence clearly showed that he previously received a warning and letter of education for other rules violations, with respect to which he also claims to be a victim and for which he also placed the blame on others.

I find that the only objective evaluation of the Claimant's and his wife's testimony compels the conclusion that they were simply untrue, and that despite the Claimant's assertions of ignorance, absent-mindedness, self-serving excuses and denials of his own statements and trying to foist all of the blame on his wife (this coming from a sophisticated Claimant who kept reminding the Panel that he handled a $147 million book of business for Respondent), the facts speak for themselves: the Claimant and his wife pulled back from the teller their $15,000+ cash transaction at the very moment they were confronted with what the Claimant surely knew was the need to file a CTR, and then immediately structured their cash transaction to avoid the CTR. Importantly, while both the Claimant and his wife maintained during the hearing that the teller only said that a "form" was needed, did not say "CTR" and gave no other information, and despite Claimant's assertion that he had forgotten all of his training, the Claimant apparently remembered enough to know that the deposit needed to be under $10,000 to avoid the CTR, and they deposited approximately $9,700, pulling back $6,000.

I find that Respondent had ample cause to terminate the Claimant, even if the Claimant was not an at-will employee (which he was). I also find that Respondent was unquestionably required to accurately report the reason for the termination, which it did, and I also find that the language reported by Respondent on Claimant's CRD was the least damaging it could have been under the circumstances, even using the term "allegedly."

All of the above being said, no evidence was presented, nor was it suggested by Respondent, that this particular offense of structuring was the first step in a money-laundering scheme. However, the majority seems not to understand, or deliberately chooses to ignore, that the lack of evidence as to actual money-laundering is irrelevant to whether the Claimant engaged in unlawful structuring to avoid a CTR. It is undisputed that the Bank Secrecy Act, the Claimant's repeated anti-money laundering training, repeated training on Respondent's code of conduct, and the Claimant's registered representative manual, all made crystal clear that structuring of *personal* financial transactions, *no matter what the source of fund*s, in order to avoid a CTR was prohibited and a ground for termination.

And yet, the majority has inexplicably decided to effectively nullify the Bank Secrecy Act, discard the specific and mandatory conditions that governed Claimant's employment, and proclaim that the law, Respondent's code of conduct and the Claimant's own procedure manual did not apply to the Claimant. They are giving license to registered representatives to illegally structure transactions, are rendering employer and FINRA investigations meaningless, with the majority's only requirement for doing so being offered self-serving and theatrical stories created after the fact. They are punishing the Respondent for complying with the law and rewarding the Claimant enormously for ignoring it. There is not a scintilla of credible evidence in this record that Respondent did anything untoward, unlawful, improper or wrong that would justify Respondent having to "compensate" Claimant in any respect. In fact, there is no dispute that the Claimant was a high earner for Respondent, and that Respondent had every incentive to retain Claimant if it felt it was able to do so. All of the steps Respondent took were entirely the result of Claimant and his wife's deliberate and unlawful actions on July 3 and July 5, 2017. Nevertheless, the majority has decided to award an unconscionable $2,500,000 to the Claimant

for "compensation." One can only look incredulously at this record and ask "compensation for Respondent having done what"?

I dissent from the award of any monetary compensation to Claimant.


## FEES

Pursuant to the Code of Arbitration Procedure ("Code"), the following fees are assessed:
**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                      =$ 2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the event giving rise to the dispute. Accordingly, as a party, Respondent J.P. Morgan Securities, LLC is assessed the following:

Member Surcharge                                                       =$ 3,025.00
Member Process Fee                                                   =$ 6,175.00

**Postponement Fees**
Postponements granted during these proceedings for which fees were assessed or waived:

November 18-22, 2019, postponement requested by the parties          =$ 1,400.00
February 8-14, 2022, postponement requested by the parties                Waived

_____

Total Postponement Fees                                              =$ 1,400.00

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session       =$    450.00
Pre-Hearing Conference:   October 7, 2019                 1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session       =$  5,600.00
Pre-Hearing Conferences: January 23, 2019          1 session
                         May 5, 2020               1 session
                         March 2, 2021             1 session

Appx. 262

|  | October 27, 2022 | 1 session | |
|---|---|---|---|

Four (4) hearing sessions @ $1,400.00/session =$  5,600.00
Hearings:  June 12, 2023  2 sessions
June 13, 2023  1 session
June 14, 2023  1 session

Total Hearing Session Fees =$  11,650.00

The Panel has assessed $2,800.00 of the hearing session fees to Claimant.

The Panel has assessed $8,850.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 263

## ARBITRATION PANEL

| Mitchell Regenbogen | - | Public Arbitrator, Presiding Chairperson |
|---|---|---|
| Linda J. Baer | - | Public Arbitrator |
| Sean F. Monahan | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Linda J. Baer*
_____

Linda J. Baer
Public Arbitrator

06/26/2023
_____
Signature Date

*Sean F. Monahan*
_____

Sean F. Monahan
Non-Public Arbitrator

06/26/2023
_____
Signature Date

## Concurring In-Part, Dissenting In-Part Arbitrator's Signature
Arbitrator dissented on the award for compensatory damages

*Mitchell Regenbogen*
_____

Mitchell Regenbogen
Public Arbitrator, Presiding Chairperson

07/06/2023
_____
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

July 07, 2023
_____
Date of Service (For FINRA Dispute Resolution Services use only)



227 A.D.3d 469
Supreme Court, Appellate Division,
First Department, New York.

In the Matter of Liet HAN,

Petitioner–Respondent,

v.

J.P. MORGAN SECURITIES,

LLC, Respondent–Appellant,

Financial Regulatory

Authority, Inc., Respondent.

2249–, 2250
|
Index No. 653456/23
|
Case Nos. 2023-05480, 2023-06156
|
Entered: May 9, 2024

**Synopsis**
**Background:** Petitioner filed petition against respondent to confirm arbitration award in favor of petition, and respondent filed notice of cross-petition to vacate award. The Supreme Court, New York County, Andrea Masley, J., 2023 WL 6462923, issued initial judgment granting petitioner's petition, denying respondent's notice of cross-petition and motion for stay, and issued subsequent judgment in favor of petitioner and against respondent in the amount of $2,590,550, representing amount arbitrator awarded petitioner plus interest. Respondent appealed both judgments.

**Holdings:** The Supreme Court, Appellate Division, held that:

[1] trial court had jurisdiction over petitioner's petition;

[2] respondent was not entitled to stay or adjournment pending availability of arbitration record or to leave to file supplemental memorandum under statute granting parties 90 days to apply to vacate or modify an arbitration award, or under the Federal Arbitration Act (FAA);

[3] trial court did not improvidently exercise its discretion in denying respondent's motion for stay; and

[4] trial court did not err in rejecting respondent's arguments that arbitration panel manifestly disregarded law by apparently applying New Jersey law to petitioner's defamation claim.

Appeal of initial judgment dismissed, and subsequent judgment affirmed.

West Headnotes (4)

**[1]** **Alternative Dispute Resolution** ⬦ Application or petition

Trial court had jurisdiction over petitioner's petition against respondent to confirm an arbitration award in favor of petitioner and against respondent in the amount of $2,500,000, even though respondent's cross-petition to vacate the award was not procedurally proper; after petitioner commenced the proceeding, respondent could oppose the award either by a motion to vacate or modify the award, or by objecting to the award in opposition to an application to confirm the award. N.Y. CPLR §§ 304(a), 7510, 7511.

**[2]** **Alternative Dispute Resolution** ⬦ Proceedings

Respondent was not entitled to a stay or adjournment pending availability of the arbitration record or to leave to file a supplemental memorandum under statute granting parties 90 days to make an application to vacate or modify an arbitration award, or under the provision of the Federal Arbitration Act (FAA) providing a three-month window to move to vacate the award, in proceeding on petitioner's timely petition against respondent to confirm the arbitration award in petitioner's favor; statutes merely established limitations periods for motions to vacate or modify arbitration awards. 9 U.S.C.A. § 12; N.Y. CPLR § 7511.

**[3]** **Alternative Dispute Resolution** 🗝 Proceedings

Trial court did not improvidently exercise its discretion in denying respondent's motion for a stay pending availability of the arbitration record, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 arbitration award in petitioner's favor; respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration to its opposition to the petition to confirm, as the arbitration record was received six days before respondent filed its brief in opposition to the petition.

**[4]** **Alternative Dispute Resolution** 🗝 Error of judgment or mistake of law

Trial court did not err in rejecting respondent's arguments that the arbitration panel manifestly disregarded the law by apparently applying New Jersey law to petitioner's defamation claim against respondent, as would support vacatur of the arbitration award, in proceeding on petitioner's petition against respondent to confirm the $2,500,000 award in favor of petitioner; while the arbitration agreement contained a choice-of-law provision choosing New York law, the provision did not dictate the substantive defamation law to be applied so unambiguously as to make the apparent application of New Jersey law an egregious impropriety, the panel did not provide an explanation for its award, and petitioner's defamation claim was a justifiable ground for the decision.

**Attorneys and Law Firms**

**\*\*47** Orrick, Herrington & Sutcliffe LLP, New York (Daniel A. Rubens of counsel), for appellant.

Rasco Klock Perez & Nieto, LLC, New York (Blaine Bortnick of counsel), for respondent.

Manzanet–Daniels, J.P., Singh, Kapnick, Gesmer, Rodriguez, JJ.

**Opinion**

**\*469** Judgment, Supreme Court, New York County (Andrea Masley, J.), entered November 29, 2023, in favor of petitioner and against respondent in the amount of $2,590,550, unanimously affirmed, with costs. Appeal from order, same court and Justice, entered October 2, 2023, which granted petitioner's petition to confirm an arbitration award and denied respondent's notice of cross-petition to vacate the award and motion for a stay and for leave to file a supplemental memorandum, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

**[1]** Regardless of any procedural deficiencies in respondent's cross-petition to vacate the arbitration award (CPLR 402), the court had jurisdiction over the proceeding and could either confirm or vacate the award (*see* CPLR 304[a], 7510, 7511). After petitioner commenced the proceeding, respondent could oppose the award "either by motion ... to vacate or modify the award ... or by objecting to the award in opposition to an application to confirm the award" (*Matter of Pine St. Assoc., L.P. v. Southridge Partners, L.P.,* 107 A.D.3d 95, 100, 965 N.Y.S.2d 15 [1st Dept. 2013]). Although the court found the cross-petition was not procedurally proper, it nonetheless proceeded to review the merits of the petition to confirm the award.

**[2]** Respondent has not shown that the court improvidently exercised its discretion in declining its request for a stay or **\*\*48** adjournment of the proceeding to confirm the arbitration award pending the availability of the arbitration record and denying respondent leave to file a supplemental memorandum (*see* *Pena–Vazquez v. Beharry,* 82 A.D.3d 649, 649, 919 N.Y.S.2d 336 [1st Dept. 2011]; *see also Matter of Steven B.,* 6 N.Y.3d 888, 889, 817 N.Y.S.2d 599, 850 N.E.2d 646 [2006]; *Marquez v. 171 Tenants Corp.,* 220 A.D.3d 575, 576, 198 N.Y.S.3d 324 [1st Dept. 2023]). Respondent points out that CPLR 7511 grants a party 90 days to make an application to vacate or modify an arbitration award, and the Federal Arbitration Act (FAA) likewise provides a three-month window to move to vacate (9 USC § 12). However, respondent cites no authority for treating these statutory limitations periods as entitling it to a stay of a court's consideration of a timely petition.

**[3]** Respondent also fails to demonstrate that the court improvidently exercised its discretion in denying its request

for a stay **\*470** under these circumstances, when the arbitration record was received six days before it filed its brief in opposition to the petition to confirm. Thus, respondent had time to reference or annex the arbitration record or attach relevant exhibits from the arbitration.

 **[4]**  On this record, respondent has not shown that the court erred in confirming the award and rejecting its arguments that the arbitration panel showed a "manifest disregard of the law" (*Matter of Nexia Health Tech., Inc. v. Miratech, Inc.,* 176 A.D.3d 589, 590–591, 110 N.Y.S.3d 420 [1st Dept. 2019]). The New York choice-of-law provision in the parties' arbitration agreement did not dictate the substantive defamation law to be applied so unambiguously as to make the arbitration majority's apparent application of New Jersey law to petitioner's claim an "egregious impropriety on the part

of the arbitrators" (*id.* at 591, 110 N.Y.S.3d 420). The majority did not provide an explanation for its award, and because petitioner's defamation claim was a "justifiable ground for the decision," respondent's manifest-disregard arguments as to petitioner's other claims are unpersuasive (*see Tullett Prebon Fin. Servs. v. BGC Fin., L.P.,* 111 A.D.3d 480, 481–482, 975 N.Y.S.2d 18 [1st Dept. 2013], *lv denied* 22 N.Y.3d 864, 2014 WL 1243636 [2014]).

We have considered respondent's remaining arguments and find them unavailing.

**All Citations**

227 A.D.3d 469, 212 N.Y.S.3d 46, 2024 N.Y. Slip Op. 02594

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.



**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Dustin B. Luckett | <u>Case Number</u>: 19-03075 |
| vs. | |
| <u>Respondents</u><br>J.P. Morgan Securities, LLC and<br>Todd G. Fannin | <u>Hearing Site</u>: Louisville, Kentucky |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Person

## REPRESENTATION OF PARTIES

For Claimant Dustin B. Luckett ("Claimant"): Michael A. Valenti, Esq. and Hayden A. Holbrook, Esq., Valenti Hanley PLLC, Louisville, Kentucky.

For Respondents J.P. Morgan Securities, LLC ("JPMS") and Todd G. Fannin ("Fannin"), hereinafter collectively referred to as "Respondents": Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio.

## CASE INFORMATION

Statement of Claim filed on or about: October 11, 2019.
Claimant signed the Submission Agreement: September 17, 2019.

Statement of Answer filed on or about: January 10, 2020.
JPMS signed the Submission Agreement: January 9, 2020.
Fannin signed the Submission Agreement: January 8, 2020.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by JPMS, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory and asserted the following causes of action: invasion of privacy: false light, tortious interference with prospective business expectancies, and breach of implied covenant of good faith and fair dealing. The causes of action related to events occurring after the conclusion of Claimant's employment with JPMS.

Unless specifically admitted in the Statement of Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award of compensatory damages in excess of $4,200,000.00, the specific amount to be determined by the Panel; an award of punitive damages in an amount subject to the discretion of the Panel; expungement and/or modification of the Form U5 filed by JPMS; an award of his costs, including his reasonable attorney fees; and any further legal or equitable relief to which Claimant may be entitled.

In the Statement of Answer, Respondents requested that all claims be denied in their entirety and that all costs be assessed against Claimant.

At the hearing and in Claimant's Itemization of Damages exhibit, Claimant requested damages of $5,585,353.00, exclusive of interest and costs, including compensatory damages of $3,689,015.00, punitive damages of $500,000.00, and attorneys' fees of $1,396,338.00. Alternatively, Claimant requested damages of $4,402,769.00 exclusive of interest and costs, including compensatory damages of $2,802,077.00, punitive damages of $500,000.00, and attorneys' fees of $1,100,692.00. Claimant withdrew the request for attorneys' fees on the record.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On the record at the hearing, Respondents moved to dismiss Claimant's claim with respect to diminution in value of Claimant's 401K plan ("Motion"), asserting that it was brought against the wrong party and not subject to FINRA jurisdiction. The Panel denied the Motion on the record at the hearing.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. JPMS is liable for and shall pay to Claimant the sum of $1,400,000.00 in compensatory damages.

2. JPMS is liable for and shall pay to Claimant the sum of $600.00 in costs as reimbursement for the non-refundable portion of the filing fee previously paid to FINRA Dispute Resolution Services.

3. The Panel recommends the expungement of the Termination Explanation in Section 3 of Dustin Blake Luckett's (CRD Number 5126374) Form U5 filed by J.P. Morgan Securities

LLC on June 29, 2017 and maintained by CRD. The Reason for Termination shall remain the same and the Termination Explanation shall be replaced with the following language: "Non-investment related. After a dispute about a clerical process, RR became disillusioned with the company's atmosphere requiring separation of his at-will employment." This directive shall apply to all references to the Termination Explanation.

The Panel further recommends the expungement of all references to Occurrence Number 1940121 from the registration records maintained by the CRD for Dustin Blake Luckett. Any "Yes" answers should be changed to "No," as applicable.

The Panel recommends expungement based on the defamatory nature of the information. The above recommendations are made with the understanding that the registration records are not automatically amended. Dustin Blake Luckett must forward a copy of this Award to FINRA's Credentialing, Registration, Education and Disclosure Department for review.

4. Claimant's claims against Fannin are denied.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                    =$    2,000.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, JPMS is assessed the following:

Member Surcharge                                                        =$    3,025.00
Member Process Fee                                                      =$    6,175.00

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single Arbitrator @ $450.00/session     =$      450.00
Pre-Hearing Conference:   July 27, 2021                    1 session

Four (4) pre-hearing sessions with the Panel @ $1,400.00/session           =$    5,600.00
Pre-Hearing Conferences: February 4, 2020                 1 session

Appx. 270

| | February 2, 2021 | 1 session | | |
| | February 11, 2021 | 1 session | | |
| | December 9, 2021 | 1 session | | |

| Eight (8) hearing sessions @ $1,400.00/session | | | =$ | 11,200.00 |
|---|---|---|---|---|
| Hearings: | January 25, 2022 | 2 sessions | | |
| | January 26, 2022 | 2 sessions | | |
| | January 27, 2022 | 2 sessions | | |
| | January 28, 2022 | 2 sessions | | |

| Total Hearing Session Fees | =$ | 17,250.00 |
|---|---|---|

The Panel has assessed the total hearing session fees to JPMS.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 271

**ARBITRATION PANEL**

| David F. Barrett | - | Public Arbitrator, Presiding Chairperson |
| Linda W. Hester | - | Public Arbitrator |
| John R. Michael, II | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

**Concurring Arbitrators' Signatures**

_David F. Barrett_                              **02/04/2022**
David F. Barrett                                Signature Date
Public Arbitrator, Presiding Chairperson


_Linda W. Hester_                              **02/04/2022**
Linda W. Hester                                Signature Date
Public Arbitrator


_John R. Michael, II_                           **02/04/2022**
John R. Michael, II                            Signature Date
Non-Public Arbitrator


Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


February 04, 2022
Date of Service (For FINRA Dispute Resolution Services use only)

# J.P. Morgan loses $1.4 million defamation case to adviser



EXHIBIT
**F**



The former adviser alleged that J.P. Morgan Securities defamed him on the Form U5 it filed when he was discharged in 2017.

February 11, 2022    *By Bruce Kelly*

A Finra arbitration panel ordered J.P. Morgan Securities to pay $1.4 million in damages to a former financial adviser who sued the firm claiming it had dirtied up his employment history when he was "discharged," meaning fired, almost five years ago.

According *to the arbitration award* by the Financial Industry Regulatory Authority Inc. panel, the adviser, Dustin B. Luckett, alleged in his arbitration claim that the employment form, called *a Form U5,* that J.P. Morgan filed was defamatory.

Luckett asserted the following, according to the award: invasion of privacy, tortious interference with prospective business expectancies and other claims after he stopped working at J.P. Morgan Securities in June 2017.

Firms are required to file registration records with regulators when an adviser stops work. It's widely believed by many in the industry that firms can take advantage of the U5 system to harm advisers' reputations.

According to Luckett's *BrokerCheck profile,* he was fired after asking a co-worker to notarize a document a client had signed without the client being present. J.P. Morgan Securities also claimed Luckett "engaged in conduct it deemed inconsistent with its anti-retaliation policies."

The arbitration hearing took place in Louisville, Kentucky.

A spokesperson for JPMorgan Chase declined to comment on the matter.

"Luckett is very pleased with the award," said his attorney, Michael A. Valenti. "A big part of that is to clear his name, and the arbitration panel's recommendation of full expungement with favorable language is what he's been fighting for for years."

The Finra arbitration panel gave no reasoning for its decision, which was dated Feb. 4. Luckett worked at Chase Investment Services Corp. and J.P. Morgan Securities from 2011 to 2017. The panel also recommended that the company expunge or change the language on his employment history to reflect that the reasoning wasn't related to investments but rather a dispute over the clerical process of notarizing.

"I believe all assertions placed on my Form U5 were purposely put there in order to hamper my future employment prospects and coerce existing client to remain" with JPMorgan Chase, Luckett wrote on his BrokerCheck report in response to the firm.

Luckett, who's no longer registered with a brokerage firm, originally asked for more than $4.2 million in damages, according to the award. Valenti, his attorney, said he was working at a bank.

[More: *Judge rips Wells, Finra, in decision over arbitration claim*]



Related Topics: *J.P. Morgan Securities*

Learn more about **reprints and licensing** for this article.

## Newsletters

Subscribe for original insights, commentary and analysis of the issues facing the financial advice community, from the InvestmentNews

team.

---

## Recent Articles by Author



### Merrill data bungle hits Walmart 401(k) plan

'We're hearing more horror stories' about clients becoming targets after a data breach, one attorney says.



### Starwood latest nontraded REIT with concerns

Nontraded REITs are facing hurdles, higher interest rates, headlines about half-empty office buildings, and investors pulling their money from products.



### Miami advisors fight over book of business

'Handshake' deal goes wrong for two south Florida advisors.



### Wisc. broker facing charges over stealing town's money

In twist, the broker has blamed other members of a town board for allegedly allowing the theft.



### Interactive Brokers latest B-D to report data breach

'Sophisticated hackers for last 10 years have constantly improved their ability to breach systems,' compliance consultant says.

Appx. 274

**EXHIBIT**

**G**

2023 WL 6050230

Only the Westlaw citation is currently available.

United States District Court, W.D. Kentucky,

Louisville Division.

J.P. MORGAN SECURITIES LLC, Plaintiff

v.

Dustin LUCKETT, Defendant

Civil Action No. 3:22-cv-137-RGJ

|

Signed September 14, 2023

|

Filed September 15, 2023

**Attorneys and Law Firms**

Alyson Terrell, Pro Hac Vice, Ulmer & Berne LLP, Columbus, OH, Jeffrey Scott Dunlap, Pro Hac Vice, Ulmer & Berne LLP, Cleveland, OH, Jesse R. Lipcius, Ulmer & Berne LLP, Cincinnati, OH, for Plaintiff.

Hayden A. Holbrook, Michael A. Valenti, Valenti Hanley, PLLC, Louisville, KY, for Defendant.

**MEMORANDUM OPINION & ORDER**

Rebecca Grady Jennings, District Judge

**\*1** Plaintiff, J.P. Morgan Securities LLC ("JPMS") moved to vacate arbitration award, to stay any proceedings to enforce arbitration award, and requested oral argument. [DE 1; DE 16]. Defendant, Dustin Luckett ("Luckett"), responded [DE 9; DE 21] and JPMS replied [DE 27]. Luckett also moved to confirm the arbitration award. [DE 29]. JPMS responded [DE 30]. These matters are ripe.

The Court exercises diversity jurisdiction in this case. JPMS is a Delaware Limited Liability Company. [DE 1-1 at 3]. Its sole member is J.P. Morgan Broker-Dealer Holdings Inc., a Delaware corporation with its principal place of business in New York, New York. [*Id.*]. Luckett is a citizen of Kentucky. [*Id.*]. The amount in controversy exceeds $75,000, because Luckett was awarded $1.4 million. [DE 1-2 at 9]. Venue is proper in the Western District of Kentucky because the arbitration took place in Louisville, Kentucky and the Federal Arbitration Act requires parties to file a motion to vacate in

the "district court wherein the award was made." 9 U.S.C. § 10(a).

For the reasons below, Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED** and Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

**I. BACKGROUND**[1]

Defendant Luckett worked as a Private Client Advisor at a J.P. Morgan Chase Bank, N.A. ("Chase") branch in Louisville, Kentucky. [DE 16 at 126]. JPMS and Chase are affiliates. [DE 16 at 126]. JPMS is a member of the Financial Industry Regulatory Authority ("FINRA"). Luckett was employed by Chase, but his securities licenses were held by JPMS. [*Id.* at 128].

On June 19, 2017, Chase terminated Luckett's employment. [*Id.* at 132]. Upon termination of an employee, FINRA requires firms to file a Uniform Termination Notice for Securities Industry Regulation, known as a Form U5. [*Id.* at 127]. JPMS filed Luckett's Form U5 as required. [DE 9-2]. Under the "Termination Explanation" section, JPMS stated Luckett was terminated for:

> Non-securities related. [Luckett] was terminated for having a customer sign a document and then, on the next day, asking a co-worker whether he could notarize the document without customer present; the co-worker then notarized the document for [Luckett] in violation of firm policy. In addition, after the allegations were made regarding the notarization issue, firm concluded [Luckett] engaged in conduct it deemed inconsistent with its anti-retaliation policies.

[DE 16-5 at 297-98]. JPMS marked "Yes" for question 7F.1 of the Form U5, stating Luckett was terminated for "violating investment-related statutes, regulations, rules, or industry standards of conduct." [*Id.* at 300].

**\*2** Luckett filed a Statement of Claim asserting multiple claims against JPMS in the FINRA Dispute Resolution arbitration forum. [DE 9-1]. He asserted that the statements on his form U5 were defamatory, put him in a false light, and interfered with his prospective business expectancies. [*Id.* at 69-71]. He also asserted that JPMS breached an implied covenant of good faith and fair dealing by not facilitating his right to rollover funds in his 401(k) account. [*Id.* at 73-76].

The parties engaged in a four-day in-person arbitration in Louisville, Kentucky in January 2022. [DE 1-2 ("Award")].

The Arbitration Panel ("Panel") rendered the Award on February 4, 2022. [*Id.*]. The Award found JPMS liable to Luckett for $1.4 million in compensatory damages. [*Id.*]. The Award also "recommend[ed] the expungement of the Termination Explanation in Section 3 of [Luckett's] Form U5" and that "any 'Yes' answers should be changed to 'No,' as applicable." [*Id.*]. The Award provided that "the Termination Explanation shall be replaced with the following language: 'Non-investment related. After a dispute about clerical process, [Luckett] became disillusioned with the company's atmosphere requiring separation of his at-will employment.' " [*Id.*]. The Award specified that the Panel recommended expungement "based on the defamatory nature of the information" contained in the Form U5. [*Id.*]. Because neither party requested an explained decision, the Panel did not offer explanation of its decision or indicate on which claims the Award was based.

On March 7, 2022, JPMS filed this action requesting that the Court vacate the Award under 9 U.S.C. §§ 6 and 10 and Fed. R. Civ. P. 7(b). [DE 1; DE 16; DE 27]. Luckett opposed the Motion to Vacate and moved to confirm the Award. [DE 9; DE 21; DE 29].

## II. ANALYSIS

JPMS moves to vacate the Award on grounds that the arbitrators exceeded their powers and manifestly disregarded the law. [DE 1]. Luckett contends that JPMS has failed to satisfy the Sixth Circuit standard for vacating arbitration awards and moves to confirm. [DE 29].

### 1. Motion to Vacate Arbitration Award Standard

The Federal Arbitration Act ("FAA") expresses a federal policy in favor of enforcing arbitration awards. *See Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 600 (6th Cir. 2016) (citing *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003)). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Shelby Cnty. Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir. 1992). "When courts are called on to review an arbitrator's decision, the review is very narrow; it is one of the narrowest standards of judicial review in all of American jurisprudence." *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005) (citation omitted). "Courts must refrain from reversing an arbitrator simply because the court disagrees with the result

or believes the arbitrator made a serious legal or factual error." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Courts should proceed with particular caution when, as here, they are asked to reevaluate the factual basis of an award. *See Wachovia Sec., Inc. v. Gangale*, 125 F. App'x 671, 677 (6th Cir. 2005) ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers*, 484 U.S. at 36).

**\*3** The FAA sets out only four situations in which an arbitration award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a)(1)-(4). *See also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding § 10 lists the "exclusive grounds" under the FAA to vacate an arbitration award). The Sixth Circuit recognizes an additional ground for vacating an award where the arbitrators "manifestly disregarded the law." *Samaan*, 835 F.3d at 600 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995)).[2]

Moreover, where an arbitration panel declines "to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle." *Jaros*, 70 F.3d at 421. "If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed." *Id.* In other words, vacatur is proper only "where no judge or group of judges could conceivably come to the same determination." *Id.*

### 2. Manifest Disregard of the Law

JPMS argues that the Award should be vacated because it was issued in manifest disregard of the law. [DE 16 at 136-51]. JPMS asserts four reasons why vacatur is warranted on these grounds: (1) Luckett failed to prove the elements of a tortious interference claim. [*Id.* at 149-51]; (2) New York law, which JPMS argues should have applied to Luckett's claims, provides absolute privilege for statements on a Form U5 [*Id.* at 136-39]; (3) Luckett failed to "prove that JPMS published a false statement," which is a required element of a defamation claim [*Id.* at 139]; and (4) false light is not a recognized claim under New York law [*Id.* at 138].

 **\*4** "To constitute a manifest disregard for the law, '[a] mere error in interpretation or application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.' " *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 F. App'x 415, 418 (6th Cir. 2008) (alteration in original) (quoting *Jaros*, 70 F.3d at 421). "When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle." *Jaros*, 70 F.3d at 421.

This standard is particularly difficult to meet when arbitrators decline to explain the basis for their award. Generally, arbitrators are not required to explain their decisions. *See United Steelworkers v. Enter. Wheel & Car Co.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award"). When an award is unexplained,

> a party seeking to have the award set aside faces a tremendous obstacle. If a court can find any line of argument that is legally plausible and supports the award then it *must* be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrator must the award be set aside.

*Jaros*, 70 F.3d at 421 (emphasis added). Establishing manifest disregard based on an unexplained decision has been described as "all but impossible." *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000); *see also Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc.*, 894 F.2d 862, 871 (6th Cir. 1990) (Martin, J., concurring) (describing courts' review of unexplained arbitral decisions as "something of a judicial snipe hunt with counsel for the parties arguing about [legal] analysis that may or may not have been manifestly disregarded by the arbitrator"). If there is any conceivable basis on which the arbitrators could have based their award, the reviewing court should decline vacatur. *See Solvay Pharms., Inc. v. Duramed Pharms., Inc.*, 442 F.3d 471,

483–485 (6th Cir. 2006) (declining to vacate an arbitration panel's unexplained decision because plaintiff identified two plausible theories for the decision).

The Award lacks any explanation as to the factual or legal basis for the Panel's decision. Yet this is "precisely the outcome contracted for between the parties." *Questar Cap. Corp. v. Gorter*, 909 F.Supp.2d 789, 821–22 (W.D. Ky. 2012). The parties agreed FINRA rules would govern the arbitration. [DE 16-6 at 320]. FINRA rules provide that parties may request an explained decision. *See* FINRA Rule 13904 (g). Neither party did so in this case. [DE 9 at 46 n.4].

Thus, the Court has before it an unexplained award, four independent possible legal theories, the parties' briefings, and relevant portions of the arbitration record. JPMS asks the Court to review the merits of the Award based on the record, eliminating every possible line of reasoning that could support the Panel's award on each of the Luckett's four legal theories. Yet if any one of the theories could plausibly support the Award, the Court is bound to confirm it. *See Jaros*, 70 F.3d at 421 ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). If a movant presents multiple possible grounds for vacatur, a reviewing court need address only one legally plausible basis for the arbitrators' award. *See Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708, 714 (6th Cir. 2007).

 **\*5** The Court turns first to Luckett's tortious interference claim. Under New York law,[3] tortious interference requires a party to prove: "(1) the existence of a business relation with a third party; (2) that the defendant, having knowledge of such relationship, intentionally interfered with it; (3) that the defendant either acted with the sole purpose of harming the plaintiff or by means that were dishonest, unfair, or improper; and (4) a resulting injury to the plaintiff's business relationship." *Empire One Telecommunications, Inc. v. Verizon New York, Inc.*, 888 N.Y.S.2d 714, 728-29 (N.Y. Sup. Ct. 2009). The "tort of interference with business relations applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *WFB Telecommunications, Inc. v. NYNEX Corp.*, 590 N.Y.S.2d 460, 461 (N. Y App. Div. 1992). To establish the second prong a plaintiff must show some activities directed " 'towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff.' " *Zdenek Marek v. Old Navy (Apparel) Inc.*, 348 F. Supp. 2d 275, 280 (S.D.N.Y. 2004) (quoting *Fonar Corp. v. Magnetic*

*Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)). Further, establishing a defendant acted with dishonest, unfair, or improper means requires their conduct to have "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

As to the first element of a tortious interference claim, Luckett alleged that he had multiple business expectancies with other FINRA firms at the time of the publication of his Form U5 by JPMS. [DE 9-1 at 64-66]. Managers from Merrill Lynch and Raymond James testified during the arbitral proceedings about their firms' recruitment of Luckett. [DE 21-4 at 602-23]. Arthur Rozema ("Rozema"), a former Administration Manager at Merrill Lynch, testified that the firm was actively recruiting Luckett. [*Id.* at 608-18]. Tom Hirsch ("Hirsch"), a Complex Manager for Raymond James, similarly testified that Raymond James was in the process of interviewing Luckett and would have likely extended him an offer but for his firing. [*Id.* at 604-05]. This testimony establishes a plausible basis from which the Panel could conclude that Luckett had a business relationship with these potential employers.

As to the second element, Luckett did not show that JPMS had direct knowledge of his specific job prospects at Merrill Lynch and Raymond James. Yet it would be foreseeable and expected that future employers will review an applicant's FINRA profile. Rozema testified it was "protocol" to review the language on the Form U5 for "the firm to make a decision ... [about] mov[ing] forward." [ DE 21-4 at 617]. JPMS was likely to know of this practice as a member of the same industry and would have expected Luckett's potential employers to conduct this kind of review. This establishes a plausible basis from which the Panel could conclude that JPMS knew of the prospective employers and the effect which the Form U5 would have on Luckett's hiring prospects. The Court notes that this element may be less supported in the record than the others. However, it is not a situation "where no judge or group of judges could conceivably come to the same determination." *Jaros*, 70 F.3d at 421; *see also Wachovia Sec., Inc. v. Gangale*, 125 F. App'x at 677 ("neither the trial court nor this Court may reconsider the merits of an award, even when parties allege that the award rests on errors of fact") (quoting *United Paperworkers Int'l Union, AFL-CIO*, 484 U.S. at 36). There is thus a plausible basis from which the Panel could have found this element satisfied.

 **\*6** As to the third element of the tortious interference claim, JPMS alleges that Luckett failed to establish that JPMS

acted with either the sole purpose of harming him or by means that were dishonest, unfair, or improper. [DE 16 at 150]. This element may be satisfied by a showing that the defendant's actions amounted to an independent tort. *See Carvel Corp.*, 818 N.E.2d at 1103. In this case, Luckett simultaneously alleged defamation and false light, both of which are independent torts. In fact, the Award explicitly finds that the statements in the Form U5 were of a "defamatory nature." [DE 1-2 at 10]. Therefore, plausible grounds exist for the Panel to have found that Luckett satisfied each element of the tortious interference claim.

Even if the Panel did not properly find that JPMS's conduct was independently tortious, it would not constitute a manifest disregard for the law. *See Jaros*, 70 F.3d at 421 ("A mere error in interpretation or application of the law is insufficient ... Rather, the decision must fly in the face of clearly established legal precedent."). JPMS has failed to establish the Panel's decision necessarily "flies in the face" of New York law if it was based on Luckett's tortious interference claim. *Id.* After reviewing the record and transcripts, the Court concludes this case is not one "where no judge or group of judges could conceivably come to the same determination as the arbitrator." *Id.*

The fourth and final element of a tortious interference claim is an injury to the plaintiff's business relationship. Rozema testified that Merill Lynch had scheduled a start date for Luckett, but that the firm ultimately could not approve his hiring after the publication of his Form U5. [DE 21-4 at 608-18]. Hirsch similarly testified that but for Luckett's termination, Raymond James would have likely extended him an offer. [*Id.* at 604-05]. Luckett testified that JPMS's actions led him and his family to sell their home and cars and seek less expensive childcare. [*Id.* at 574]. He also testified that his current position pays substantially less than what he made while at Chase. [*Id.*; DE 21 at 459]. This is sufficient grounds on which the Panel could have found the final element of the tortious interference claim satisfied.

The tortious interference claim resolves this case because it could have properly formed the basis for the Panel's decision. The Court need not address other possible grounds for the Award. *See Visconsi*, 244 F. App'x at 714 ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award."). Nevertheless, the Court has reviewed the defamation and false light claims and has concluded that

one or both claims could have formed an additional valid basis for the award under New York or Kentucky law.

### 3. Exceeded Powers

JPMS argues the Award should be vacated because the Panel exceeded their powers if the Award was based, in whole or in part, on Luckett's claim for breach of the implied covenant of good faith and fair dealing. [DE 16 at 151]. JPMS asserts that the claim is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA") because it involves Luckett's right to rollover funds in his 401(k) account.

JPMS points to nothing in the Award that suggests it was based on Luckett's 401(k) claim. As established above in Part II.2, other valid grounds exist on which the Panel could have based their decision. As a result, the Court declines to further review the merits of an award on the claim for breach of the implied covenant of good faith and fair dealing. *See Visconsi, 244 F. App'x at 714* ("[The Court] need not address each of [movant's] individual arguments so long as we identify one legally plausible basis for the arbitrators' award.").

### 4. Motion to Confirm Arbitration Award Standard

 **\*7** Section 9 of the FAA states that when faced with a motion to confirm an arbitration award "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. The Sixth Circuit has held that "the plain language of the Federal Arbitration Act presumes that arbitration awards will be confirmed, and [the Court's] limited role in confirming an arbitration award under the Federal Arbitration Act is well settled." *Wachovia Sec., Inc. v. Gangale, 125 F. App'x at 676.* JPMS has failed to establish any grounds on which to vacate the Award, and therefore the plain language of the FAA compels the Court to grant Luckett's Motion to Confirm.

### III. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that:

1. Plaintiff's Motion to Vacate Arbitration Award [DE 1] is **DENIED**; and

2. Defendant's Motion to Confirm Arbitration Award [DE 29] is **GRANTED**.

3. The Court will enter separate judgment.

### All Citations

Slip Copy, 2023 WL 6050230

### Footnotes

1    The Court recognizes that the parties dispute one another's characterization of the facts that gave rise to Luckett's termination. Additionally, the Arbitration Panel ("Panel") did not issue any findings of fact with its award. Many of the contested characterizations are not relevant given the standard of review for arbitration awards. As a result, the Background includes only those facts agreed upon by the parties.

2    The Court assumes for this Order that "manifest disregard of the law" has survived *Hall Street* as a valid basis for vacatur. As Luckett points out in their Response [DE 9], this remains an "open question" among lower courts. *Samaan, 835 F.3d at 600; see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 n.3 (2010)* (declining to decide whether the manifest disregard standard of review survived *Hall Street* either "as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10"); *Humana Health Plan, Inc. v. Rite Aid Hdqtrs. Corp., 2023 WL 5002875, at \*6 (W.D. Ky. Aug. 4, 2023)* ("[T]he Sixth Circuit continues to recognize that an arbitration award may also be vacated where the arbitrator shows a 'manifest disregard of the law.' ") (citation omitted).

3    It is JPMS's position that the Panel should have applied New York law to all of Luckett's claims. [DE 16 at 11-13]. Luckett argues that the Panel was properly tasked with determining which state's law to apply, and that a decision to apply either state's law does not rise to the level of manifest disregard of the law. [DE 21 at 15-27]. The Court declines to speculate about which law was applied by the Panel. The Court applies New York law for the purposes of this analysis only. If,

under New York law, the tortious interference claim could plausibly support the Award, then the Court must confirm it. *Jaros*, 70 F.3d at 421.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---



**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

Claimant                                                    Case Number: 18-01879
Rose Mascarenhas

     vs.

Respondent                                                 Hearing Site: Chicago, Illinois
J.P. Morgan Securities, LLC

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Rose Mascarenhas ("Claimant"): Marc D. Schifanelli, Esq. and Gordana Schifanelli, Esq., Schifanelli Law, LLP, Annapolis, Maryland.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Alyson Terrell, Esq., Ulmer & Berne LLP, Cleveland, Ohio and Scott R. Koch, Esq., JPMorgan Chase Bank, NA, Chicago, Illinois.

## CASE INFORMATION

Statement of Claim filed on or about: May 16, 2018.
Claimant signed the Submission Agreement: May 16, 2018.

Statement of Answer filed on or about: August 6, 2018.
Respondent signed the Submission Agreement: July 30, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted the following cause of action: defamation. The cause of action relate to Claimant's allegation that the statements made by Respondent in Claimant's Form U4 and U5 caused Claimant to suffer great financial loss and to be unable to find comparable employment in the financial industry.

Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested $740,000.00 in compensatory and punitive damages, reimbursement of costs and attorneys' fees, and expungement and

modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD").

In the Statement of Answer, Respondent requested that the Panel deny Claimant's claims and request for expungement and damages, assess all costs and forum fees against Claimant, and award any other relief that the Panel deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The Arbitrators have provided an explanation of their decision in this award. The explanation is for the information of the parties only and is not precedential in nature.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  The Panel recommends expungement of the Termination Explanation in Section 3 of the Form U5 of Rose Mascarenhas (CRD# 5487635) filed by J.P. Morgan Securities, LLC on April 4, 2018, and maintained by the CRD. The Termination Explanation shall be changed to the following: "Terminated by Affiliate Bank – Not securities related. Reg. rep. as an affiliate bank employee opened two checking accounts for a long-time customer who had previously opened over 70 accounts. To accommodate the customer, and consistent with the branch practice prior to the recent arrival of a new manager, Reg. rep. opened the accounts without customer being present for the entire opening process, other than appearing to execute the account documents, which was contrary to policies of the Bank." The Reason for Termination shall remain the same.

    In addition, the Panel recommends the expungement of the "Yes" answer to question 7F(1) of the foregoing Form U5. The "Yes" answer shall be changed to "No" and the accompanying Termination Disclosure Reporting Page shall be deleted in its entirety.

    The above recommendations also apply to all subsequent disclosures concerning this event.

    The Panel recommends expungement based on the defamatory nature of the information. The Form U5 is not automatically amended to include the changes indicated above. Rose Mascarenhas must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

2.  Respondent is liable for and shall pay to Claimant the sum of $28,867.00 in attorneys' fees pursuant to the parties' submission agreements, in which they agreed to "submit the present matter in controversy, as set forth in the attached statement of claim [and] answer." Claimant requested an award of attorneys' fees in her Statement of Claim. Respondent's submission agreement therefore created a de facto arbitration agreement that included the authority for the arbitrators to award attorneys' fees if Claimant should prevail. The Panel further notes that Respondent did not oppose Claimant's request for attorneys' fees, other than to object to certain time entries, which the Panel has overruled.

3.  Respondent is liable for and shall pay to Claimant the sum of $974.72 in costs.

4.  Respondent shall reimburse Claimant for the non-refundable portion of Claimant's filing fee in the amount of $425.00.

5.  Respondent is liable for and shall pay to Claimant the sum of $1.00 in compensatory damages.

6.  Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

## ARBITRATORS' FINDINGS

Relevant Facts

Claimant was a long-time employee of Respondent and the principal banker for a family business which was a very large and active customer of the bank, having opened over 70 accounts over the years. The policies and procedures of the bank provide a 14-part computer process for opening business accounts, the first step of which is to verify at the beginning of the process that the customer is present in the bank in person. If the "in person" button is not pressed, the account opening process cannot proceed.

It is undisputed that under Claimant's prior bank manager (and perhaps more than one prior bank manager), it was generally allowed that for large, well-known customers such as these, the banker (including Claimant) was allowed to perform most of the process with the customer not present, including pressing the "in person" button. This allowed the account opening procedure, which can take as long as 40 minutes for each account, to be completed without the customer having to be present for the entire process, arriving only to sign the account opening documents. Respondent presented testimony that the branch manager who assumed her responsibilities on January 8, 2018 insisted that the account opening procedure no longer occur without the customer present for the entire process of opening the account.

The customers here contacted Claimant and requested that she prepare two new checking accounts on February 3, 2018 for two separate out-of-state branches of their business, and asked that they be required to appear only for so long as necessary to sign documents. Claimant agreed to do that, as she had on prior occasions, and prepared the

materials for their signature. It appeared undisputed that prior to the arrival of the customers, she performed each of the electronic tasks called for in the process with respect to the first account she opened that day, including pressing the "submit" button for that account. She then set aside the signature documents that had been created by the computer in the course of that process, and began the account opening process for the second account. It was not clear whether the "submit" button was pressed for the second account prior to the customers' arrival. It was further undisputed that the customers appeared that day, sometime after the "submit" button had been pressed for the first account, and signed the account opening documents for both accounts. There was no allegation that there was anything irregular about any aspect of the accounts or the opening procedure, other than the dispute about whether the customer needed to be present for the entire process.

Respondent terminated Claimant on March 16, 2018 as a consequence of her conduct on February 3. Claimant was a licensed banker, holding Series 6 and 63 licenses. As a consequence, the bank submitted a Form U5, which included an answer to Section 3, regarding "Termination Explanation" which Claimant alleged was false and defamatory.

In addition, Claimant alleged that the answer to question 7F(1) was false and defamatory.

NATURE OF THE CLAIM

Claimant contends that the Termination Explanation and the answer to question 7F(1) in the U5 were false and defamatory in that the first implied that the account was opened without customer approval and the second falsely asserts that Claimant was alleged to have violated an investment-related regulation when the offending conduct involved only opening a checking account. Beyond citing the language itself, Claimant presented documentary evidence from a prospective subsequent employer which showed that those bank officials had read the U5 as reporting that Claimant had been terminated for opening an account without customer authorization.

AWARD

a. Termination Explanation

The Panel finds that the explanation contained in the U5 Form is defamatory in that it incompletely and inaccurately describes the reason for termination.

Respondent argued that that the statement was accurate because Respondent considered the account to be "open" at the moment the "submit" button was pressed and it was pressed for the first account before the customer appeared. That is an unfairly literal reading of that language. It omits facts sufficient to give the reader an understanding of what actually occurred, and how it constituted inappropriate conduct. The statement is therefore incomplete and inaccurate and defamatory in allowing the impression that the account was opened without customer approval.

It is notable in this regard that the representative of the registration department testified that the only information in their possession regarding the basis for the termination was the report from the HR department that "Rose opened an account for a customer without them

being present." The representative and her team were therefore unaware of whether the customer knew about the account, was there for part of the time or was there for none of the time. In the context of the long history of the bank with that customer, the description of what occurred was therefore false and defamatory and the individual who prepared and submitted the U5 did so with an incomplete and therefore inaccurate understanding of the basis for the discharge.

(The expungement recommendation is stated above in the Award section.)

    b.   Answer to Question 7F(1)

The answer to question 7F(1) should be "no" because the opening of a checking account was not "investment-related." Respondent relies upon FINRA Regulatory Notice 10-39 as requiring that any allegation related to the products of a Bank are drawn within the definition of "investment-related" by the third bullet point of the second page of RN 10-39 where it states as follows:

> A firm should err on the side of interpreting the term "investment-related" in an expansive manner in line with the scope of the term when reporting information on Form U5. The scope of the term pertains to securities, commodities, banking, insurance or real estate (including, but not limited to, acting as or being associated with a broker-dealer, issuer, investment company, investment advisor, futures sponsor, bank or saving association." Accordingly, a firm may be required to provide an affirmative answer to a question even if the matter is not securities related.

The panel concludes that this language is intended to convey to the reporting entity that it should not focus on the nature of the institution at which the alleged misconduct occurs, but rather on the nature of the financial event being addressed. It was undisputed here that a checking account is not an investment. Respondent's witness testified that a checking account was not an investment. The fact that it was opened as part of "banking" cannot logically make it "investment-related."

Respondent was also unable to identify any particular statute, regulation, rule or industry standards of conduct that was violated. Respondent's position appeared to be that Claimant's conduct violated its Code of Conduct, which barred employees from falsifying company records which Respondent argued occurred when Claimant pressed the "in person" button when the customer was in fact not present in person. The panel was persuaded that, because the prior branch manager(s) had accommodated this very large and demanding customer to allow them not to be present for the entire account opening, that the customers were present to complete the process and none of the information submitted to create the accounts was inaccurate, there was no falsified record but rather a technical violation that had theretofore been allowed by management. Critically, the internal investigation performed by Respondent determined that there had been no violation of the Code of Conduct precisely because of the context in which the events occurred.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### Filing Fees
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

      Initial Claim Filing Fee                                  =$ 1,725.00

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

      Member Surcharge                              =$ 2,475.00
      Member Process Fee                          =$ 5,075.00

### Discovery-Related Motion Fee
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers
with one (1) arbitrator @ $200.00/decision                   =$ 200.00

Respondent submitted one discovery-related motion.

___

Total Discovery-Related Motion Fees                  =$ 200.00

The Panel has assessed $200.00 of the discovery-related motion fees to Respondent.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with the Panel @ $1,300.00/session    =$ 1,300.00
Pre-hearing conference:   August 24, 2018          1 session

Four (4) hearing sessions @ $1,300.00/session             =$ 5,200.00
Hearing Dates:          April 2, 2019         2 sessions
                      April 3, 2019         2 sessions

___

Total Hearing Session Fees                           =$ 6,500.00

The Panel has assessed $6,500.00 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____          5-10-19
James J. Stamos                                   Signature Date
Public Arbitrator, Presiding Chairperson


_____          _____
Victoria Wolf                                     Signature Date
Public Arbitrator


_____          _____
Nancy L. Hendrickson                              Signature Date
Non-Public Arbitrator


May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

Appx. 287

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

_____
James J. Stamos
Public Arbitrator, Presiding Chairperson

Signature Date

_____
Victoria Wolf
Public Arbitrator

5/10/19
Signature Date

_____
Nancy L. Hendrickson
Non-Public Arbitrator

Signature Date

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| James J. Stamos | - | Public Arbitrator, Presiding Chairperson |
| Victoria Wolf | - | Public Arbitrator |
| Nancy L. Hendrickson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures


_____          _____
James J. Stamos                                   Signature Date
Public Arbitrator, Presiding Chairperson


_____          _____
Victoria Wolf                                     Signature Date
Public Arbitrator

_____          _____
Nancy L. Hendrickson                              Signature Date
Non-Public Arbitrator

May 10, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

Appx. 289



EXHIBIT

I

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Mark Munizzi | Case Number: 18-02179 |
| vs. | |
| <u>Respondent</u><br>UBS Financial Services Inc. | <u>Hearing Site</u>: Chicago, Illinois |

Nature of the Dispute: Associated Person vs. Member

This case was decided by a majority-public panel.

## REPRESENTATION OF PARTIES

For Claimant Mark Munizzi ("Claimant"): Steven P. Gomberg, Esq. and Mindy Schwab, Esq., Lynch Thompson LLP, Chicago, Illinois.

For Respondent UBS Financial Services Inc. ("Respondent"): Andrew W. Sidman, Esq., Mark D. Knoll, Esq. and Susan George, Esq., Bressler, Amery & Ross, P.C., New York, New York.

## CASE INFORMATION

Statement of Claim filed on or about: June 12, 2018.
Amended Statement of Claim filed on or about: January 7, 2019.
Claimant signed the Submission Agreement: June 8, 2018.

Statement of Answer filed on or about: September 14, 2018.
Statement of Answer to Amended Statement of Claim filed on or about: April 4, 2019.
Respondent signed the Submission Agreement: August 20, 2018.

## CASE SUMMARY

In the Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of his registration records maintained by the Central Registration Depository ("CRD"), constituted defamation per se. In the Amended Statement of Claim, Claimant reasserted his claim for defamation per se, in addition to the following causes of action: violation of the Illinois Wage Payment and Collection Act and tortious interference with prospective economic advantage. The causes of action relate to Claimant's allegation that Claimant is owed severance from Respondent, and furthermore, that Respondent's inaccurate Form U5 filing will interfere with Claimant's ability to obtain commensurate future employment.

Appx. 290

Unless specifically admitted in the Statement of Answer and Statement of Answer to Amended Statement of Claim, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested expungement and modification of the Form U5 filed by Respondent, an award of compensatory damages and punitive damages in an amount to be determined at hearing, and all other appropriate relief. In the Amended Statement of Claim, Claimant requested the same relief as the Statement of Claim, in addition to interest and attorneys' fees.

In the Statement of Answer and Amended Statement of Answer, Respondent requested that Claimant's claims be denied and that Claimant take nothing from this action.

At the hearing, Claimant requested expungement and modification of the Form U5 filed by Respondent; compensatory damages of $3,149,656.00, including $112,500.00 for severance pay; $3,149.00 for interest on the severance pay, with interest accruing at $187.50 per month until paid; attorneys' fees in the amount of $496,753.50; costs in the amount of $23,419.13; punitive damages of ten times the compensatory damages; and that UBS be assessed all FINRA arbitration fees including adjournment fees, hearing session fees and assessments.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On or about January 7, 2019, Claimant filed a Motion to Amend the Statement of Claim ("Motion to Amend"). On or about January 10, 2019, Respondent filed a Response to Claimant's Motion to Amend, in which it stated it did not oppose the motion. After a pre-hearing conference on March 13, 2019, in a written order dated March 14, 2019, the Claimant's Motion to Amend was granted.

The parties present at the hearing have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $3,149,656.00 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant interest on $112,500.00 of the above-stated compensatory damages award, which represents severance pay, at the rate of 5% per annum from the date of this Award through and

including the date on which that portion of the compensatory damages award is paid in full.

3. Respondent is liable for and shall pay to Claimant the sum of $7,500,000.00 in punitive damages, pursuant to Republic Tobacco Co. v. N. Alt. Trading Co., 381 F.3d 717 (7th Cir. 2004) and Bavarati v. Josephthal, Lyon & Ross, 28 F.3d 704, 710, (7th Cir. 1994).

4. Respondent is liable for and shall pay to Claimant the sum of $496,753.36 in attorneys' fees, pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 1115/14.

5. Respondent is liable for and shall pay to Claimant the sum of $24,381.50 in costs.

6. Respondent is liable for and shall reimburse Claimant $375.00 for the non-refundable portion of Claimant's filing fee previously paid to FINRA Office of Dispute Resolution.

7. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of the Form U5 filed by UBS Financial Services Inc. and maintained by the CRD for Mark Munizzi (CRD Number 1692491) on May 18, 2018. The Reason for Termination shall be changed to "Other" and the Termination Explanation shall read "Terminated without cause."

In addition, the Panel recommends the expungement of the "Yes" answers to Question 7B and 7F(1) on the above Form U5. The Panel recommends that the answers be changed to "No" and the accompanying disclosure reporting pages be deleted in their entirety.

These recommendations shall apply to any subsequent disclosures concerning this event including, but not limited to the, the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018 and maintained by the CRD.

In addition, the Panel recommends the expungement of the "Yes" answer to Question 7F(3) on the Amended Form U5 filed by UBS Financial Services Inc. on May 22, 2018. The Panel recommends that the answer be changed to "No" and the accompanying disclosure reporting page be deleted in its entirety.

The Arbitrator recommends expungement based on the defamatory nature of the information. The registration records are not automatically amended to include the changes indicated above. Claimant Mark Munizzi must forward a copy of this Award to FINRA's Registration and Disclosure Department for review.

8. Any and all claims for relief not specifically addressed herein are denied.

## **FEES**

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

### **Filing Fees**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### **Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 1,900.00 |
| Member Process Fee | =$ 3,750.00 |

### **Postponement Fees**
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,125.00 |
| Total Postponement Fees | =$ 1,125.00 |

The Panel has assessed $1,125.00 of the postponement fees to Respondent.

### **Last Minute Cancellation Fees**
Fees apply when a hearing on the merits is postponed or settled within ten calendar days before the start of a scheduled hearing session:

| | |
|---|---|
| September 28, 2019, postponement requested jointly by parties | =$ 1,800.00 |
| Total Last Minute Cancellation Fees | =$ 1,800.00 |

The Panel has assessed $1,800.00 of the last minute cancellation fees to Respondent.

### **Discovery-Related Motion Fee**
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$ 200.00 |
| One (1) decision on a discovery-related motion on the papers with three (3) arbitrators @ $600.00 /decision | =$ 600.00 |

Claimant submitted (2) two discovery-related motions

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$ 800.00 |

The Panel has assessed $400.00 of the discovery-related motion fees to Claimant.

The Panel has assessed $400.00 of the discovery-related motion fees to Respondent.

## Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) pre-hearing session with a single arbitrator @ $450.00/session   =$ 450.00
Pre-hearing Conference:   March 13, 2019       1 session

One (1) pre-hearing session with the Panel @ $1,125.00/session   =$ 1,125.00
Pre-hearing Conference:   October 16, 2018       1 session

Twenty-six (26) hearing sessions @ $1,125.00/session   =$ 29,250.00

| Hearing Dates: | | |
|---|---|---|
| | June 11, 2019 | 2 sessions |
| | June 12, 2019 | 2 sessions |
| | June 13, 2019 | 2 sessions |
| | June 14, 2019 | 2 sessions |
| | June 17, 2019 | 2 sessions |
| | June 18, 2019 | 2 sessions |
| | September 24, 2019 | 2 sessions |
| | September 25, 2019 | 2 sessions |
| | September 26, 2019 | 2 sessions |
| | September 27, 2019 | 2 sessions |
| | November 19, 2019 | 2 sessions |
| | November 20, 2019 | 2 sessions |
| | November 21, 2019 | 2 sessions |

| | |
|---|---|
| Total Hearing Session Fees | =$ 30,825.00 |

The Panel has assessed $787.50 of the hearing session fees to Claimant.

The Panel has assessed $30,037.50 of the hearing session fees to Respondent.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa M. Krimen | - | Public Arbitrator, Presiding Chairperson |
| Donald M. Thompson | - | Public Arbitrator |
| Craig D. Cook | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Lisa M. Krimen*
_____

Lisa M. Krimen
Public Arbitrator, Presiding Chairperson

12/10/2019
_____
Signature Date


*Donald M. Thompson*
_____

Donald M. Thompson
Public Arbitrator

12/11/2019
_____
Signature Date


*Craig D. Cook*
_____

Craig D. Cook
Non-Public Arbitrator

12/11/2019
_____
Signature Date


December 11, 2019
_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

Appx. 295





All Quiet on the Stock Market Front (https://www.advisorhub.com/resources/all-quiet-on-the-stock-market-front/)

(https://www.advisorhub.com)

(https://www.advisorhub.com)

NEWS

# UBS Wires $14.1M to Ex-Compliance Officer Capping Off Battle over Defamation Award

by **Miriam Rozen**    April 19, 2022

- **News** ⌄

- **Deals & Comp**(/deals-and-comps/)

- **Breakaway Center**(/breakaway-center/)

(/#linkedin)    (/#twitter)    (https://www.advisorhub.com/#email)
**Asset Management**    **(https://www.facebook.com/asset-manager/)**

- **Events**(https://www.advisorhub.events/)

- **Rankings** ⌄

- **More** ⌄



Submit a Tip 💬(/submittip/)

*JHVEPhoto - stock.adobe.com*

A drawn-out legal dispute that has spanned four years and multiple appeals has concluded with a $14.1 million wire transfer from UBS Wealth Management USA to a former compliance officer in Chicago.

UBS Financial Services paid the total on April 12 to Mark Munizzi, its former regional compliance manager in Chicago, whom it had fired in 2018. Munizzi sued later that year for defamation and won $11.1 million in an arbitration award the following year.

UBS waged lengthy court battles (https://www.advisorhub.com/ubss-appeal-to-vacate-11-mln-finra-award-faces-uphill-battle-lawyers/) that were seen as a message to others who may consider taking on the firm in court, but ultimately failed to vacate the award. On March 31, the Supreme Court of Illinois denied UBS its final appeal without offering an explanation.

Because of the lengthy appeals process, UBS added about $3 million to the amount it ultimately paid Munizzi as interest continued to accrue, as well as attorney fees UBS was required to cover under the terms of the award, according to Munizzi's lawyer Stephen Gomberg of Lynch Thompson in Chicago.

A spokesperson for UBS declined to comment. The firm would have had to petition the U.S. Supreme Court for a hearing to continue with any appeal.

Appx. 297

In his arbitration complaint filed in June 2018, Munizzi alleged UBS defamed him on his U5 termination filing, which accused him of failing to supervise employees executing uncovered options strategy in accounts and of giving "varied responses" during the firm's review of his activities.

Munizzi, who had been earning roughly $200,000 a year, according to his lawyer, asserted that he was not properly informed by the firm's central supervision office of margin calls against brokers in UBS's Madison, Wisconsin branch. He had been one of several fired in the wake of a junior broker's naked options trades that were said to have cost $3.7 million in losses in employee-related accounts.

In the December 2019 award, which was the largest employee arbitration penalty that year, the Financial Industry Regulatory Authority arbitration panel had ordered UBS Financial Services to pay Munizzi $7.5 million in punitive damages, $3.1 million in compensatory damages for severance and almost $497,000 of attorneys' fees—a total of about $11.1 million.

In January 2020, a court upheld the award and entered a judgment for $12,177,360, which included an additional $908,965 of statutory interest and attorneys' fees and costs of $97,604, Gomberg said. The judge in that case also did not provide a written explanation, although courts are often deferential to arbitrators and have narrow grounds to overturn awards.

Munizzi was "very much relieved" with UBS's final payment and he "has enough money to retire," but he had been through an ordeal, Gomberg said. The U5 mark-up left him unemployable, according to the lawyer.

"He hasn't gotten a job, or even gotten an interview," Gomberg said.

The favorable outcome could embolden others to bring cases, according to Gomberg, who said he has seen signs of an "uptick" in employment disputes between brokerages and brokers relating to terminations as well as complaints filed with defamation claims.

Since the news of Munizzi's initial win before the Finra panel first surfaced, firms have also begun issuing more "carefully worded" U5s to avoid defamation claims, he added.

**Tags:** *Arbitration (https://www.advisorhub.com/tag/arbitration/)  Defamation (https://www.advisorhub.com/tag/defamation/)*

## Like this article? Let AdvisorHub come to you! SIGN UP

Appx. 298

# COMMENTS (4)

**on Apr 19 2022, Tired of Large Firm CYA-Hot Potato Game (https://www.advisorhub.com/author/) says:**

I'm very happy to hear the Compliance Officer won this battle. Its terrible how expensive it is in legal costs for the fired employee. I know far too many people who have lost their jobs so that senior executives at large firms could make it look like they took action for the regulators. I'm looking at you JPM.

Reply to Tired of Large Firm CYA-Hot Potato Game

**on Apr 19 2022, So tired of CYA Hot Potato Games! (https://www.advisorhub.com/author/) says:**

you are indeed a kindred spirit!

Reply to So tired of CYA Hot Potato Games!

**on Apr 20 2022, Not a Choosen one (https://www.advisorhub.com/author/) says:**

Happy for this guy. UBS is notorious for trashing employees and mid level mangers while they protect the inner circle choosen few. Sadly for every win like this there are many more who never get their justice due to cost and how like the big bank can fight for...

Reply to Not a Choosen one

**on Apr 20 2022, Arl (https://www.advisorhub.com/author/) says:**

Wow, makes me wonder if I have a case. My former broker dealer made mark on my U5 on my record from email and client said he was wrong and then a very large potential client saw
my U5 before it was removed and didn't hire me and recently had FINRA remove.

Reply to Arl

# LEAVE A REPLY

*We welcome your honest opinion, but keep it civil. Comments with personal attacks or vulgarities will be edited and/or removed.*

Your email address will not be published. Required fields are marked *

Appx. 299

**Name** *

**Email** *

**Website**

<div style="border:1px solid;display:inline-block;padding:10px 40px;"><strong>Post Comment</strong></div>

---

## Related News



# Broker on $1.1-Bln Merrill Team Leaves Brother Behind to Join UBS in CT (https://www.advisorhub.com/broker-on-1-1-bln-merrill-team-leaves-brother-behind-to-join-ubs-in-ct/)

Broker left a team he formed at Merrill shortly after starting his career in 2000.

May 29, 2024

Appx. 300

**Wall Street Returns to T+1 Stock Trading After a Century (https://www.advisorhub.com/wall-street-returns-to-t1-stock-trading-after-a-century/)**

May 28, 2024

**Merrill to Pay Nearly $20 Million to Settle Racial Discrimination Suit (https://www.advisorhub.com/merrill-to-pay-nearly-20-million-to-settle-racial-discrimination-suit/)**

May 28, 2024

**Morgan Stanley Claws Back $5 Million From Int'l Broker (https://www.advisorhub.com/morgan-stanley-claws-back-5-million-from-intl-broker/)**

May 28, 2024

**UBS Cuts 35 Employees at Latin American Wealth-Management Unit (https://www.advisorhub.com/ubs-cuts-35-employees-at-latin-american-wealth-management-unit/)**

May 27, 2024

## Creating More Scale and Efficiency in Your Practice

Appx. 301

Appx. 302

(https://www.advisorhub.com)

Search AdvisorHub

**Topics** ∨

**Deals & Comp(/deals-comps/)**

**Breakaway Center(/breakaway-center/)**

Careers(/careers/)

Advertise(/advertise-2nd-level/)

**AdvisorHub RIA(/resource_type/ria-resource-center/)**

**More** ∨

**About Us(/about-us/)**

Contact Us(/contact-us/)

Appx. 303

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Claimant</u><br>Joshua David Sappi Biering | <u>Case Number</u>: 24-01208 |
| vs. | |
| <u>Respondents</u><br>J.P. Morgan Securities, LLC<br>JPMorgan Chase & Co.<br>JPMorgan Chase Bank, N.A. | <u>Hearing Site</u>: Dallas, Texas |

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Non-Members

## <u>REPRESENTATION OF PARTIES</u>

For Claimant Joshua David Sappi Biering ("Claimant"): Joshua J. Iacuone, Esq. and Greg McAllister, Esq., Iacuone McAllister Potter PLLC, Dallas, Texas.

For Respondent J.P. Morgan Securities, LLC ("Respondent"): Jeffrey S. Dunlap, Esq. and Sarah Richardson, Esq., UB Greensfelder LLP, Cleveland, Ohio.

Respondent JPMorgan Chase & Co. did not enter an appearance in this matter.

Respondent JPMorgan Chase Bank, N.A. (collectively, with Respondent and JPMorgan Chase & Co., "Respondents") did not enter an appearance in this matter.

## <u>CASE INFORMATION</u>

Statement of Claim filed on or about: June 3, 2024.
Amended Statement of Claim filed on or about: August 12, 2024.
Second Amended Statement of Claim filed on or about: October 11, 2024.
Claimant signed the Submission Agreement: June 3, 2024.

Statement of Answer filed by Respondent on or about: September 5, 2024.
Statement of Answer to Second Amended Statement of Claim filed by Respondent on or about: October 31, 2024.
Respondent signed the Submission Agreement: September 10, 2024.

JPMorgan Chase & Co. did not file a Statement of Answer or sign the Submission Agreement.

JPMorgan Chase Bank, N.A. did not file a Statement of Answer or sign the Submission Agreement.

## CASE SUMMARY

In the Second Amended Statement of Claim, Claimant asserted the following causes of action: defamation/defamation per se and violation of FINRA rules; business disparagement; tortious interference; unfair competition; wrongful discharge; weaponization of U5; breach of contract; promissory estoppel; quantum merit and unjust enrichment; illegal forfeiture of earned compensation; forfeiture of deferred compensation (violation of ERISA); and violation of Texas and/or New York labor and wage laws.

Unless specifically admitted in the Statement of Answer to Second Amended Statement of Claim, Respondent denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Second Amended Statement of Claim, Claimant requested damages at least more than $10,000,000.00, including:

a) Damages Claimant suffered from loss of clients, including, without limitation, lost commissions and profits;
b) Expungement and modification of the Form U5 in Claimant's registration records maintained by the Central Registration Depository ("CRD");
c) Specific performance of Respondents' promise to pay Claimant's attorneys' fees in connection with expungement of a customer complaint referenced in the Second Amended Statement of Claim (or, alternatively, damages due to Respondents' failure to perform such promise);
d) Lost or forfeited deferred compensation;
e) Reasonable attorneys' fees incurred in the prosecution of Claimant's claims in this action;
f) Statutory penalties and damages;
g) Liquidated damages;
h) Punitive damages;
i) Damages to Claimant's reputation;
j) Past lost earnings;
k) Future lost earnings;
l) Consequential damages;
m) Mental anguish and emotional distress damages;
n) Future lost earning capacity;
o) The highest pre- and post-judgment interest permitted by law on all damages;
p) FINRA forum and other fees; and
q) Such other and furth relief, general or special, at law or in equity, to which the Panel determines Claimant is entitled.

In the Statement of Answer to the Second Amended Statement of Claim, Respondent requested that the Panel deny Claimant's claims; assess all costs and forum fees against Claimant; and award any other relief to Respondent that the Panel deems just and proper.

Appx. 305

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

The original Statement of Claim filed on June 3, 2024, and an Amended Statement of Claim filed on August 12, 2024, were not served on Respondent or considered by the Panel. The Statement of Claim filed on October 11, 2024, is deemed the only Statement of Claim filed in this matter.

JPMorgan Chase & Co. is not a member or associated person of FINRA and did not voluntarily submit to arbitration. Therefore, the Panel made no determination with respect to the claims against JPMorgan Chase & Co.

JPMorgan Chase Bank, N.A. is not a member or associated person of FINRA and did not voluntarily submit to arbitration. Therefore, the Panel made no determination with respect to the claims against JPMorgan Chase Bank, N.A.

The Panel has provided an explanation of the decision in this award. The explanation is for the parties' information only and is not precedential in nature.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims, except for expungement, are denied in their entirety.

2. The Panel recommends the expungement of the Reason for Termination and Termination Explanation in Section 3 of Joshua David Biering's (CRD Number 6883842) Form U5 filed by J.P. Morgan Securities, LLC (CRD Number 79) on December 22, 2023 and maintained by the CRD. The Reason for Termination shall be changed to "Voluntary" and the Termination Explanation should be deleted in its entirety and shall appear blank. This directive shall apply to all references to the Reason for Termination and Termination Explanation.

   The Panel further recommends the expungement of the Date Terminated field in Section 4 of the Form U5. The entry should be deleted in its entirety and shall be replaced with the following date: "10/28/2023".

   The above recommendations are made with the understanding that the registration records are not automatically amended. Joshua David Sappi Biering must obtain confirmation of this Award from a court of competent jurisdiction, before the CRD will execute the expungement directive, and must forward a copy of the Court Order to FINRA's Credentialing, Registration, Education and Disclosure Department for the amendments to be incorporated into the Registration Records.

3. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages, treble damages, and attorneys' fees, are denied.

## ARBITRATORS' EXPLANATION OF DECISION

The Panel believes that when Respondent learned that Claimant was contemplating resigning from Respondent and going to work for a competitor of Respondent, Respondent began investigating reasons to terminate Claimant so as to make it more difficult for Claimant to go to work with a competitor of Respondent. Based on the testimony and the citation to instances in which Respondent has been found to have done this in the past, the Panel is concerned that this may be a pattern of conduct.

Claimant was placed on administrative leave on October 27, 2023, without being informed of the claim being asserted against him. On October 28, 2023, Claimant resigned from Respondent. Respondent's policies required Claimant to remain an employee on a "Notice Period" or "garden leave" for 60 days after resignation, unless earlier terminated by Respondent. At no time following October 27, 2023, was Claimant permitted to engage in any conduct with Respondent for which registration would be required.

On December 1, 2023, Claimant was notified his employment was terminated for violation of Respondent's code of conduct. Both parties concede the violation did not involve regulatory concerns. On December 22, 2023, Respondent filed a Form U-5 annotating that Claimant was "Discharged" with an explanation of "After RR submitted resignation, but before expiration of Notice Period, RR was terminated for inappropriate behavior. Not related to the sale of securities or any customer complaints."

While the Panel believes Respondent was within its rights, based on the continuing employment status of Claimant and the results of its investigation, to terminate Claimant subsequent to his resignation, the Panel believes one of the primary reasons for the timing of the filing of the U-5 was to hinder Claimant's ability to transfer his book of business to a competitor of Respondent. The Panel does not find the reasons for termination given in the Form U-5 to be "defamatory." It does find, however, based on the facts in this case, the Form U-5 to be inaccurate. Accordingly, the Panel orders the Form U-5 to be expunged and amended to reflect that the termination was "Voluntary;" the explanation for termination be omitted, and; the date of termination be amended to October 28, 2023.

As to Claimant's claim that Respondent agreed to pay his attorneys' fees with respect to the expungement of a customer claim from his Form U-4, the Panel finds that while there may have been some discussions in that regard while Claimant was still employed by Respondent no such agreement was ever reduced to writing and any benefit/consideration that Respondent might derive from such an action vanished once Claimant was no longer employed by Respondent. The expungement was commenced after Claimant left Respondent and the correspondence between counsel for Claimant and Respondent shows Respondent did not acknowledge the

existence of any such agreement. There was, therefore, no detrimental reliance on any such promise by Claimant in proceeding with the expungement.

With respect to damages, although the Panel acknowledges the absence of a clean U-5 makes it very difficult to move to a Tier One competitor of Respondent, the Panel notes Claimant secured lucrative employment with a highly respected national brokerage firm less than two months after his termination from Respondent. The Panel further reiterates its finding that the reason for termination in the Form U-5 submitted by Respondent was not "defamatory." Accordingly, Claimant's claim for damages is denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

**Filing Fees**
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

Initial Claim Filing Fee                                                =$ 2,300.00

*The filing fee is made up of a non-refundable and a refundable portion.*

FINRA Dispute Resolution Services administratively waived Claimant's refundable portion of the filing fee of $ 1,500.00.

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute. Accordingly, as a party, Respondent is assessed the following:

Member Surcharge                                                      =$ 4,325.00
Member Process Fee                                                    =$ 7,300.00

**Discovery-Related Motion Fees**
Fees apply for each decision rendered on a discovery-related motion.

One (1) decision on a discovery-related motion on the papers          =$   200.00
with one (1) Arbitrator @ $200.00/decision

Claimant submitted one (1) discovery-related motion

_____

Total Discovery-Related Motion Fees                                   =$   200.00

The Panel has assessed the total discovery-related motion fees to Respondent.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrators, including a pre-hearing conference with the Arbitrators, which lasts four (4) hours or less. Fees associated with these proceedings are:

Two (2) pre-hearing sessions with a single Arbitrator @ $450.00/session     =$    900.00
Pre-Hearing Conferences: May 8, 2025                 1 session
                              August 27, 2025        1 session

One (1) pre-hearing session with the Panel @ $1,575.00/session     =$   1,575.00
Pre-Hearing Conference:   November 21, 2024       1 session

Eleven (11) hearing sessions @ $1,575.00/session           =$ 17,325.00
Hearings:              December 3, 2025      2 sessions
                      December 4, 2025      2 sessions
                      December 5, 2025      2 sessions
                      December 11, 2025    2 sessions
                      December 12, 2025    2 sessions
                      December 15, 2025    1 session

---

Total Hearing Session Fees                         =$ 19,800.00

The Panel has assessed the total hearing session fees to Respondent.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

Appx. 309

## ARBITRATION PANEL

| | | |
|---|---|---|
| Eric Ross Cromartie | - | Public Arbitrator, Presiding Chairperson |
| Christine Rister | - | Public Arbitrator |
| Alison Battiste Clement | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Eric Ross Cromartie*
_____
Eric Ross Cromartie
Public Arbitrator, Presiding Chairperson

12/24/2025
_____
Signature Date

*Christine Rister*
_____
Christine Rister
Public Arbitrator

12/29/2025
_____
Signature Date

*Alison Battiste Clement*
_____
Alison Battiste Clement
Non-Public Arbitrator

12/26/2025
_____
Signature Date

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

December 29, 2025
_____
Date of Service (For FINRA Dispute Resolution Services use only)